<u>FOR PUBLICATION</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**MODIFIED BENCH DECISION ON DEBTORS' APPLICATION PURSUANT TO
11 U.S.C. §§ 105(a) AND 363(b) TO (A) RETAIN ALVAREZ & MARSAL NORTH
AMERICA, LLC TO PROVIDE THE DEBTORS AN INTERIM CHIEF
EXECUTIVE OFFICER AND CERTAIN ADDITIONAL PERSONNEL AND
(B) DESIGNATE RALPH SCHIPANI AS INTERIM CHIEF EXECUTIVE
OFFICER FOR NINE WEST HOLDINGS, INC. AND ITS DEBTOR
AFFILIATES, *NUNC PRO TUNC* TO THE PETITION DATE**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway, New York, New York 10018.

A P P E A R A N C E S:

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
*Attorneys for Debtors and Debtors in Possession*
300 North LaSalle
Chicago, IL 60654
By:    James A. Stempel, Esq.
       Joseph M. Graham, Esq.

601 Lexington Avenue
New York, NY 10022
By:    Christopher J. Marcus, P.C.

609 Main Street
Houston, TX 77002
By:    Anna G. Rotman, P.C.

WILLIAM K. HARRINGTON
United States Trustee for Region 2
U.S. Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
By:    Andrea B. Schwartz, Esq.
       Susan Arbeit, Esq.
       Benjamin J. Higgins, Esq.

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
*Attorneys for Alvarez & Marsal North America, LLC*
28 Liberty Street
New York, NY 10005
By:    Dennis F. Dunne, Esq.
       Alexander B. Lees, Esq.

International Square Building
1850 K Street, NW
Washington, DC 20006
By:    Andrew M. Leblanc, Esq.

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
*Attorneys for Official Committee of Unsecured Creditors*
One Bryant Park
New York, NY 10036
By:    Daniel H. Golden, Esq.
          Arik Preis, Esq.

MORGAN LEWIS & BOCKIUS LLP
*Attorneys for Wells Fargo Bank, National Association*
One Federal Street
Boston, MA 02110
By:    Julia Frost-Davies, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for the Ad Hoc Secured Lender Group*
450 Lexington Avenue
New York, NY 10017
By:    Marshall S. Huebner, Esq.
          Darren S. Klein, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Brigade Capital Management, LP*
1177 Avenue of the Americas
New York, NY 10036
By:    Douglas H. Mannal, Esq.
          Rachael L. Ringer, Esq.

QUINN EMANUEL URQUHART &
SULLIVAN LLP
*Co-Counsel for GLAS Trust Company, LLC*
51 Madison Avenue, 22nd Floor
New York, NY 10010
By:    Benjamin I. Finestone, Esq.
          Kate Scherling, Esq.

SULLIVAN & WORCESTER LLP
*Co-Counsel for GLAS Trust Company, LLC*
One Post Office Square
Boston, MA 02109
By:    Jeanne P. Darcey, Esq.
          Amy A. Zuccarello, Esq.

KING & SPALDING LLP
*Attorneys for the Ad Hoc Group of Crossover Lenders*
1185 Avenue of the Americas
New York, NY 10036
By:    Michael C. Rupe, Esq.
        Jeffrey D. Pawlitz, Esq.

444 West Lake Street, Suite 1650
Chicago, IL 60606
By:    Bradley Thomas Giordano, Esq.

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the application (the "Application") of the Debtors to (a) retain

Alvarez & Marsal North America, LLC ("A&M") to provide the Debtors an interim

Chief Executive Officer and certain additional personnel and (b) designate Mr. Ralph

Schipani as interim Chief Executive Officer for Nine West Holdings, Inc. and its debtor

affiliates *nunc pro tunc* to April 6, 2018 (the "Petition Date").[2]  In support of the

Application, the Debtors filed the Declaration of Mr. Ralph Schipani [Dkt. No. 207] and

the Supplemental Declaration of Mr. Schipani [Dkt. No. 419] ("Schipani Suppl. Decl.").

The sole objection to the relief sought by the Application (the "Objection") was

filed by the Office of the United States Trustee (the "U.S. Trustee") on June 21, 2018,

together with the Declaration of Andrea Schwartz in support of the Objection [Dkt. Nos.

408 and 409].  Six statements in support of the Application were filed by creditors and/or

creditor groups representing virtually all levels of the Debtors' capital structure: (i) Wells

Fargo Bank, National Association, in its capacity as ABL/FILO DIP Agent and

Prepetition ABL/FILO Agent; (ii) an ad hoc group formed by certain lenders (the "Ad

Hoc Secured Lender Group") that collectively beneficially own or manage (or are

investment advisors or managers for funds that beneficially own or manage)

approximately (a) $227.5 million in aggregate principal amount of the loans under that

certain Term Loan Credit Agreement, dated as of April 8, 2014 (as amended, restated,

---

[2]    This decision was dictated on the record of the hearing held on June 28, 2018.  It has been
modified to include full citations and defined terms, and reflects minor additional non-substantive
modifications. The findings of fact and conclusions of law herein shall constitute the Court's findings of
fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant
to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of
law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding
of fact, it shall be so deemed.

supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Secured Term Loan Credit Agreement"), (b) $17.5 million in aggregate principal amount of the loans under that certain Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, dated as of April 11, 2018 (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Term Loan Credit Agreement"), and (c) $17.5 million in commitments for future fundings under the DIP Term Loan Credit Agreement; (iii) the so-called Ad Hoc Group of Crossover Lenders, a group of holders of loans under the Prepetition Secured Term Loan Credit Agreement and loans under that certain Unsecured Term Loan Credit Agreement, dated as of April 8, 2014 (the "Prepetition Unsecured Term Loan Credit Agreement"); (iv) GLAS Trust Company, LLC, in its capacity as Administrative Agent under the Prepetition Unsecured Term Loan Credit Agreement; (v) Brigade Capital Management, LP, one of the Debtors' largest economic stakeholders, serving as (a) a lender under the DIP Term Loan Credit Agreement, (b) a holder of loans under the Prepetition Secured Term Loan Credit Agreement, (c) a holder of loans under the Prepetition Unsecured Term Loan Credit Agreement, and (d) a holder of 8.25% Senior Notes Due 2019; and (vi) the Official Committee of Unsecured Creditors.  Replies to the Objection were filed by the Debtors [Dkt. No. 420] ("Debtors' Reply") and by A&M [Dkt. No. 426] ("A&M Reply").

The legal issue presented is a narrow, technical one: should the Debtors be permitted to retain A&M under section 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), as requested by the Application, or must the retention of A&M be considered solely under section 327(a) of the Code, as the U.S. Trustee asserts?  The U.S.

Trustee argues that A&M and Mr. Schipani are professional persons within the meaning

of section 327 of the Code and that employment of professional persons must be

accomplished solely and exclusively under section 327; the U.S. Trustee submits that a

debtor cannot use section 363(b) to employ a professional person.  Taking its argument a

step further, the U.S. Trustee posits that A&M cannot meet the disinterestedness

requirement of section 327(a) and that, therefore, the Application must be denied.

The Debtors and A&M vehemently disagree with the arguments of the U.S.

Trustee, pointing out that retention of distressed management consultants has been

authorized pursuant to section 363(b) in dozens of other bankruptcy cases where the

engagement satisfies the business judgment standard, and that the Objection directly

contradicts the U.S. Trustee's national policy over the last 14 years of explicitly assenting

to retention applications for management consultants pursuant to section 363(b) in similar

circumstances, some involving A&M and others involving other turnaround consulting

firms and personnel.  Moreover, the Debtors and A&M argue that, in the context of these

cases, A&M is not functioning as a "professional person" as such term is used in section

327(a), and that section 363(b) provides the appropriate basis for granting the

Application.

A hearing on the Application was held today, June 28, 2018 (the "Hearing").  At

the Hearing, the Court heard live testimony from Mr. Ralph Schipani.

The Court assumes familiarity with the general background facts of the Debtors'

cases; its findings in this Bench Decision pertain solely to the facts surrounding the role

of A&M and Mr. Schipani in these cases.  The facts described herein are contained in the

record and shall constitute the Court's findings of fact.

## Background

For over four years, A&M has been providing vital management services to the Debtors and their non-debtor affiliates.  Pursuant to A&M's prepetition engagement letter, which is attached to the Debtors' Reply as Exhibit A ("A&M 2014 Engagement Letter"), A&M was hired in April 2014 to assist two separate companies – Jones Holdings LLC and Nine West Holdings Inc. – in achieving strategic and operational goals, namely an internal restructuring of operational functions across the companies' business units following their acquisition by Sycamore Partners, L.P.  (Schipani Supp. Decl. ¶ 3; Ex. A to Debtors' Reply (A&M 2014 Engagement Letter)).  Following the acquisition, the new board of directors sought the assistance of A&M to implement the new business plan, which focused on organizing and developing the company's various brands and lines as separate business units.  (Schipani Suppl. Decl. ¶ 2).

### A&M's Role

Since April 2014, A&M has provided vital management services to the Debtors and their non-debtor affiliates and has overseen virtually all aspects of their day-to-day operations.  The duties of A&M personnel and Mr. Schipani have included, among other things, (a) supervising and assisting in operations, finance, accounting, and treasury functions; (b) assisting in the identification of cost reductions and other operational improvements; and (c) assisting in the evaluation and development of budgets and business plans.  (Ex. A to Debtors' Reply (A&M 2014 Engagement Letter) ¶ 1(b)).  A&M was engaged to manage the day-to-day operations of the business and supplement  traditional in-house functions.

8

As stated by Mr. Schipani in his Supplemental Declaration, A&M was not hired to restructure the obligations of the company, and nothing in A&M's prepetition engagement related to bankruptcy planning; rather, it was not until approximately three years after the engagement began, during the summer of 2017, that the company, in consultation with advisors and independent of A&M's activities and responsibilities, began considering the possibility of a bankruptcy filing.  (Schipani Suppl. Decl. ¶ 6).

Since the Petition Date, A&M has continued in its role of managing the daily operations of the Debtors' business; any services it has performed relating to the Debtors' chapter 11 process have been services that could have been performed by existing company personnel, rather than A&M personnel, had the necessary resources been available within the company.  (Schipani Suppl. Decl. ¶ 7).  For example, A&M personnel assisted in the company's preparation of bankruptcy schedules and disclosures, which bolstered the function of the finance department and was, as Mr. Schipani states, "a necessary extension and continuation of the A&M team's existing role in managing operations."  (*Id.*).  A&M has continued to provide the type of services it has provided to the company for years, and such work supports the professionals hired by the Debtors specifically for bankruptcy purposes, in Mr. Schipani's words, "in the same way that in-house employees and officers of any company going through a restructuring typically would in my experience."  (Schipani Suppl. Decl. ¶ 8).  Significantly, Mr. Schipani and his team played an instrumental role in achieving significant success in the recent sale of certain of the Debtors' assets for a winning bid well over 50% higher than the stalking horse bid, which secured over $140 million of additional value for the Debtors' estates.

**Mr. Schipani's Role as Officer**

At the outset of the A&M engagement in 2014, Mr. Schipani served initially as Interim Vice President of Operations; his principal focus then was assisting the company with an internal restructuring of operational functions across various business units. (Schipani Suppl. Decl. ¶ 3).  Subsequently, during A&M's prepetition engagement, Mr. Schipani also served in each of the following roles: (i) commencing after the acquisition, as Interim President of Shared Services, where he was tasked with determining which shared services would be distributed to each of the business units, assigning employees to the different units, and managing the team that ran the non-redistributed services functions; (ii) commencing in May 2015, as Interim President of Nine West Holdings, Inc., where Mr. Schipani was responsible for public financial reporting, conducting earnings calls, and overseeing cash flow management, overall capital management, and the creation of annual business plans; and (iii) commencing in June 2016, as Interim CEO of Nine West Holdings, Inc., where he "assumed responsibility for all aspects of the Company, including ensuring that the business plans of the individual business unit heads were coordinated and executed in a consistent manner" and where he became involved with the sale of the *Easy Spirit* brand and the acquisition of Kasper Topco Limited in January 2017.  (Schipani Suppl. Decl. ¶¶ 3-5, 11).

**Mr. Schipani's Role as Member of Subsidiary Boards**

At the time of A&M's engagement, Mr. Schipani served as an officer but not as a director of certain of the Debtors.  When the Interim Chief Operating Officer, Mr. Andrew Hede (another A&M Managing Director who had been appointed in connection with A&M's engagement) ceased working on the A&M engagement, Mr. Hede resigned

from his positions on the boards of certain of the Debtors' subsidiaries or affiliates. (Schipani Suppl. Decl. ¶¶ 10-11). At that time, in May 2015, Mr. Schipani was appointed to replace Mr. Hede on the boards of Dongguan Jones Commerce and Trading Co. Ltd. and Kasper Global Limited. In September 2015, when Mr. Christopher Cade, Chief Financial Officer, resigned from his positions on certain subsidiary boards, Mr. Schipani was appointed to replace Mr. Cade on the subsidiary boards from which he was departing. Around this time, Mr. Schipani was appointed to the boards of two other subsidiaries (Nine West Group International Limited and GRI Group Ltd.) to replace a company employee who had resigned from her positions. Mr. Schipani was also appointed to the board of Kasper Topco Limited when the company acquired the entity in January 2017.

All of Mr. Schipani's board appointments were made pursuant to the request of and under the supervision of the Debtors' parent level boards, on which he did not serve. (Schipani Suppl. Decl. ¶ 12).

The only legal entity that is a Debtor in these cases on whose board Mr. Schipani has served within the past two years is One Jeanswear Group Inc. Mr. Schipani and Mr. Joseph Donnalley (another officer of the company) served as the two members of this entity's board following Mr. Cade's resignation in September 2015. After Mr. Donnalley left the company in October 2016, Mr. Schipani served as the sole board member of One Jeanswear Group Inc. from October 2016 until August 2017, when Mr. Alan Miller and Mr. Harvey Tepner were appointed as additional board members. (Schipani Suppl. Decl. ¶ 13). Mr. Schipani resigned from each of his board positions on November 22, 2017. (Schipani Suppl. Decl. ¶ 14).

Mr. Schipani's role on each subsidiary board on which he served was "strictly administrative and did not entail substantive decision making as a director." (Schipani Suppl. Decl. ¶ 15). The boards on which he sat did not hold any meetings. His actions as a director were limited to signing written consents to enact decisions that were directed by the parent board, and he did so fewer than twenty times over the two-year period during which he served on the boards. (*Id.*). Prior to approving a transaction as a director, Mr. Schipani had already conducted a "substantive review and deliberation" in his capacity as an officer, and it was incidental that he would sign a written consent in his role as a director in order to formalize the approval. (Schipani Suppl. Decl. ¶¶ 15-16). At the Hearing, Mr. Schipani provided an example of this by referring to his vetting of the amendment of the ABL Credit Agreement in his role as an officer, after which he signed a written consent to the amendment in his role as a director. At no time did Mr. Schipani serve on the board of either (i) Debtor parent Jasper Parent LLC or (ii) lead Debtor Nine West Holdings Inc.; these two boards made all decisions with respect to the prepetition and postpetition retention and compensation of officers of the company and of professional firms such as A&M. (Schipani Suppl. Decl. ¶ 18).

As set forth in his Supplemental Declaration, of the approximately 9,857 hours Mr. Schipani billed between April 2014 and the Petition Date in connection with A&M's engagement by the company, he estimates that he spent less than one half of one hour, in total, on all matters relating to his service on the subsidiary boards. (Schipani Suppl. Decl. ¶ 17).

**Discussion**

I.      **Section 363(b) of the Bankruptcy Code**

Pursuant to section 363(b) of the Bankruptcy Code, after notice and hearing, a debtor has broad discretion to "use, sell, or lease, other than in the ordinary course of business, property of the estate," so long as such use is supported by a good business reason.  11 U.S.C. § 363(b)(1); *see*, *e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him [or her] at the hearing a good business reason to grant such an application.").

The Debtors and A&M submit that, pursuant to section 363(b), the Court may authorize the Debtors' retention of A&M and of Mr. Schipani as Interim CEO.  They cite to numerous decisions and orders from this District and other districts in which courts have relied on section 363(b) to authorize debtors to retain management consultancy firms, including where a firm's personnel were expected to fill key officer roles and manage the debtor's day-to-day business.  *See e.g., In re Enron Corp.*, No. 01-16034, 2006 WL 1030421, at *2 (Bankr. S.D.N.Y. Apr. 12, 2006) (noting that court authorized the debtors, under section 363(b), to retain a management consulting firm to provide a chief executive and chief restructuring officer and additional individuals to serve as additional personnel during the chapter 11 cases); *In re Ajubeo LLC*, No. 17-17924, 2017 WL 5466655, at *4 (Bankr. D. Col. Sept. 27, 2017) (approving retention of management consulting firm to provide a chief restructuring officer under section 363(b)); *In re Copenhaver, Inc.*, 506 B.R. 757, 764-65 (Bankr. C.D. Ill. 2014) (holding that the retention of a current director as consultant and chief restructuring officer under section

363(b) would be appropriate given the "unique and compelling circumstances" of the case, subject to modification of the court's oversight of the officers' fees); *In re Toisa Limited*, No. 17-10184 (Bankr. S.D.N.Y. Jan. 22, 2018) [Dkt. No. 458] (approving employment of a chief restructuring officer pursuant to section 363(b)); *see also* Debtors' Reply n.5 (citing orders entered by this Court authorizing retention pursuant to section 363(b) in sixteen cases); A&M Reply ¶ 22 (citing additional orders entered by this Court). In addition, with respect to A&M specifically, Exhibit A to the A&M Reply lists thirty-seven bankruptcy cases in which A&M itself has been retained as a management consultant pursuant to section 363 of the Bankruptcy Code. Notably, except in the case of *In re Toisa Limited*, the U.S. Trustee did not object in any of the cited cases to the debtor(s)' request to employ the advisors, consultants, and/or chief restructuring officers pursuant to section 363(b) of the Code nor press the position taken here today that such retentions could only proceed under section 327.

Seemingly ignoring this mountain of precedent, the U.S. Trustee argues that there is "a limited body of case law under which courts have approved the retention of restructuring professionals under section 363 and section 105(a)." (Objection, 22). With respect to cases referenced in which A&M was retained pursuant to section 363(b), the U.S. Trustee attempts to distinguish this case from those, asserting that "[n]one involved the retention of A&M to provide an interim CEO and certain additional personnel, and nearly all involved the retention of A&M to provide a Chief Restructuring Officer and other additional personnel or financial advisory services." (Objection, 5).

The Court is not persuaded by any of the U.S. Trustee's arguments with respect to section 363(b) and the Debtors' alleged inability to utilize this section of the Code to

provide the basis for retention of A&M and Mr. Schipani in this case. First, with respect to the plethora of cases cited in which section 363(b) has been relied on for the retention of A&M (without objection by the U.S. Trustee), the Court observes that the U.S. Trustee's narrow, factual distinction between the retention of Mr. Schipani as *CEO* here and the retention of an A&M professional as *CRO* in the previous engagements is nonsensical. Is the U.S. Trustee's position that retention of a CRO can be authorized under section 363 but retention of a CEO cannot? While it is true that the Debtors seek to retain Mr. Schipani as CEO and not as CRO, the U.S. Trustee's position here is that A&M and Mr. Schipani cannot be retained under section 363 and must be retained under section 327 because they are playing an intimate, significant, and central role in the Debtors' reorganization and are thus "professional persons" as such term is used in section 327(a) of the Code. (Objection, 18). Had the Debtors sought to retain Mr. Schipani as CRO, however, it appears likely that the U.S. Trustee's position with respect to section 327 would remain unchanged; he would argue that the principal duties of a CRO are to provide support in a bankruptcy case and thus retention under section 327 is required.

The distinction that that U.S. Trustee attempts to make in his Objection is simply illogical. Moreover, a close examination of the thirty-seven cases listed on Exhibit A to the A&M Reply reveals that A&M was not in fact retained to provide solely a CRO and other additional personnel to the debtors in each and every one of such cases. Instead, here, as in many of the cited cases, A&M employees were retained pursuant to section 363(b) to serve as additional officers of the debtors, including in roles such as Interim Chief Executive Officer, Interim Chief Financial Officer, Interim Chief Operating

15

Officer, and Interim Vice President of Finance, and to provide additional A&M personnel to assist such officers. *See*, *e.g.*, *In re Angelica Corp., et al.*, No. 17-10870 (Bankr. S.D.N.Y. May 4, 2017) [Dkt. No. 149]; *In re Ignite Restaurant Group, Inc., et al.*, No. 17-33550 (Bankr. S.D. Tex. Jun. 28, 2017) [Dkt. No. 255]; *In re Local Insight Media Holdings, Inc., et al.*, No. 10-13677 (Bankr. D. Del. Dec. 17, 2010; Feb. 11, 2011) [Dkt. Nos. 162, 333].

### a.  The Jay Alix Protocol

The U.S. Trustee's position that section 363(b) cannot provide the basis for retention of distressed management consultants such as A&M here lacks intellectual honesty and consistency, particularly when considered in light of the so-called Jay Alix Protocol adopted by the U.S. Trustee fourteen years ago.  The full text of the Jay Alix Protocol (the "Protocol") can be found on the website of the U.S. Trustee.[3]  The Protocol is not a provision of the Bankruptcy Code.  It is not law, and it is not binding on this Court or any other court.  As Joe Guzinski, then acting general counsel for the Executive Office for U.S. Trustee, stated on November 13, 2001,

> We have seen any number of situations where turnaround or other advisory services seek to be retained as professionals under Section 327 and also have a role in management . . . .  In our view, that renders them an insider and, therefore, not disinterested.  This protocol makes clear how advisory firms will work with the debtor in the future, at least in a way that's acceptable to the UST.  We have some cases pending against certain firms at this point - there are some agreements pending that we're trying to bring in under the protocol.  The protocol right now only applies to cases in Region 3. But we anticipate making it a policy nationwide after discussion with the USTs.

(*See* "EOUST SAYS JAY ALIX PROTOCOL WILL BE NATIONAL POLICY,"

---

[3]        *See* https://www.justice.gov/sites/default/files/ust/legacy/2014/08/11/J_Alix_Protocol_Engagement.pdf.

Bankruptcy Court Decisions Weekly News & Comments, 38 No. 14 Bankr. Ct. Dec. News 1 (November 13, 2001)).

The Protocol began as a settlement agreement executed in 2004 between the U.S. Trustee and Jay Alix & Associates, a management consultancy firm, in a bankruptcy case unrelated to this one; it has developed into a national policy adopted by the U.S. Trustee whereby the U.S. Trustee assents to – indeed, directs – the retention of distressed management consultants by a debtor pursuant to section 363 of the Code as long as the firm complies with certain requirements contained in the Protocol. (*See* Protocol §§ I.A-C (defining crisis management engagements to include any engagement where the firm "furnishes interim executive officers" either prepetition or postpetition and stating that crisis management firm "shall seek retention under section 363 of the Bankruptcy Code")).

As correctly summarized by the Debtors in their Reply, the core requirements of the Protocol include the following:

> (a) the firm sought to be retained must serve in only one capacity (*i.e.*, as either a financial advisor, crisis manager, claims agent, or investor);
> (b) the firm's retention application must be filed under section 363 of the Bankruptcy Code and the application must disclose the firm's relationships with interested parties and make other disclosures showing the firm is otherwise disinterested;
> (c) the firm must file monthly staffing reports, which must be subject to Court review; and
> (d) retention of persons furnished by the firm must be approved by and act under the direction of an independent board of directors.

Requiring parties to comply with the Protocol has served as a way to avoid conflicts of interest. More specifically, the Protocol's "one hat" rule (which requires that the firm sought to be retained serve the debtor in only one capacity) is designed to avoid the "inherent conflict" between an advisor's duty to a debtor and its own business

17

interests where the advisory firm serves both as a financial advisor retained pursuant to section 327 of the Bankruptcy Code and as a crisis manager with firm staff serving as officers of the debtor corporation. *See In re Saint Vincent's Catholic Med. Centers of New York*, No. 05-14945, 2007 WL 2492787, at *3 n.3 (Bankr. S.D.N.Y. Aug. 29, 2007). Put simply, the Protocol was designed to prevent a party from using its position in one capacity to benefit itself in another capacity. Footnote three to the Protocol states that a financial advisor "shall not seek to be retained in any capacity in a bankruptcy proceeding for an entity where any principal, employee or independent contractor of [the advisor] serves or has served as a director of the entity or an affiliate thereof within two years prior to the petition date." (Protocol, n.3). Compliance with the Protocol prevents a director of a debtor who is also an employee of the advisory firm sought to be retained from wielding undue influence over the hiring and compensation of such director's firm. The U.S. Trustee has not objected to the section 363 retention of distressed management consultants in scores, if not hundreds, of cases over the past fourteen years where such consultants have purportedly followed the Protocol.[4]

    Significantly, here, the U.S. Trustee's Objection fails to mention the Protocol at all, let alone A&M's compliance in all material respects with each of its requirements.

---

[4]    Notably, courts in this District and others have approved the retention of restructuring advisors pursuant to section 363(b) well before the U.S. Trustee first implemented the Protocol. *See, e.g., In re Adelphia Commc'ns. Corp.*, No. 02-41729 (Bankr. S.D.N.Y. July 31, 2002) [Dkt. 253] (authorizing the retention of a restructuring advisory firm to provide personnel, including a CRO, pursuant to section 363(b)); *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. Apr. 4, 2002) [Dkt. 2725] (authorizing the debtors to enter into an agreement with a consulting firm which then provided an individual as Acting CEO and CRO, and certain additional personnel pursuant to section 363(b)); *In re Iridium Operating, LLC*, No. 99-45005 (Bankr. S.D.N.Y. Oct. 12, 1999) [Dkt. 86] (authorizing and approving the terms of retention for restructuring officers pursuant to sections 105(a) and 363(b)); *In re Bill's Dollar Stores, Inc.*, No. 01-0435 (Bankr. D. Del. Mar. 14, 2001) [Dkt. 141] (authorizing the continued retention of an advisory firm to provide the debtors with interim management through their Interim CEO and CRO pursuant to section 363(b)).

Instead, the Objection on its face ignores the U.S. Trustee's prior position with respect to section 363 retentions and argues that retention of A&M can only be authorized pursuant to section 327(a) of the Code, implying that there was clear error in every case in which a bankruptcy court has in the past approved an A&M retention pursuant to section 363(b). Both the Debtors and A&M speculate in their respective Replies (and counsel for the U.S. Trustee confirmed at the Hearing) that the true origin of the Objection is A&M's alleged non-compliance with footnote three of the Protocol, given Mr. Schipani's service as a director of a lone Debtor entity within two years prior to the Petition Date.

Returning to first principles, the Court finds that the purpose of the Protocol – preventing a consultant from using its position in one capacity to benefit itself in another capacity – has not been violated by A&M here. As emphasized by the Debtors in their Reply, while Mr. Schipani did in fact serve as a director on a single subsidiary board within two years of the Petition Date, neither he nor any other A&M employee has ever served on the parent boards responsible for approving the prepetition or postpetition retention or compensation of A&M. (Debtors' Reply ¶ 20; Schipani Supp. Decl. ¶ 18). Nor did Mr. Schipani's service on certain subsidiary boards overlap with the timing of the consideration of either A&M's 2014 or 2018 engagement letters. Moreover, as the Court has found, Mr. Schipani's service on certain subsidiary boards was done at the discretion and under the direction of the parent boards and primarily involved what can fairly be characterized as ministerial duties and approvals of transactions he had previously vetted in his role as an officer. Accordingly, the circumstances surrounding the concerns which led to the development of the Protocol – avoiding undue influence by a director in the hiring of professionals – are simply not present here, and the Court finds

19

that A&M has complied with the core requirements of the Protocol in all material respects.

For fourteen years, the crisis and interim management industry has relied on the implicit consent of the U.S. Trustee that such firms can be retained in a bankruptcy case pursuant to section 363 rather than section 327 if they meet the requirements of the Protocol, and the industry has developed its business model based on the understanding that the U.S. Trustee would enforce this policy consistently and fairly. To permit the U.S. Trustee to now reverse course in this case would be, in the words of A&M, "starkly inequitable." (A&M Reply ¶ 29). The only explanation the U.S. Trustee has provided for this stunning reversal of policy is that "all bets are off" because of Mr. Schipani's *de minimis* board service; the economic disruption that his departure would cause is of no concern to the U.S. Trustee. The U.S. Trustee has chosen to take a position that would unquestionably visit damage on this case, this company, and its creditors; he chooses compliance with a footnote over the interests of every creditor in this case.

Courts are tasked with ensuring compliance with the Code and ensuring that the Code is applied with common sense and in a predictable manner. The U.S. Trustee cites to the Supreme Court's decision in *Jevic* for the proposition that deviating from strict interpretation of the Bankruptcy Code and creating a "rare case" exception to retain professionals pursuant to section 363 who might be ineligible under section 327 should not be permitted, as it may "threaten[ ] to turn a 'rare case' exception into a more general rule." (*See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017)). But the U.S. Trustee ignores the Supreme Court's additional statements regarding judicially-created exceptions not specifically found in the Code but which advance significant Code-related

20

objectives. *Jevic* strictly interpreted the absolute priority rule; however, with respect to

other instances "in which a court has approved interim distributions that violate ordinary

priority rules," including "'first-day' wage orders that allow payment of employees'

prepetition wages, 'critical vendor' orders that allow payment of essential suppliers'

prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor

to be paid first on their prepetition claims," the Supreme Court stated that "one can

generally find significant Code-related objectives that the priority-violating distributions

serve." *Id.* at 985. So too here.

At the Hearing, counsel for the U.S. Trustee characterized the Application's use

of section 363 as a "backdoor" way to avoid the limitations of section 327(a) of the Code,

including the disinterestedness requirement. When questioned by the Court, counsel for

the U.S. Trustee indicated that, if a turnaround consulting firm complies with the Jay Alix

Protocol, however, the U.S. Trustee would "exercise his prosecutorial discretion" and not

object to the debtor's seeking retention of the firm under section 363(b) instead of under

section 327(a). Counsel's explanation in this regard appears to indicate the U.S.

Trustee's belief that only the U.S. Trustee, and not the Court, has discretion to create an

"exception" to the Code's requirement that professional persons be retained pursuant to

section 327 rather than pursuant to section 363; *i.e.*, that it is only permissible for the

Court to approve a section 363 retention if the U.S. Trustee approves. This cannot be. If

the U.S. Trustee believes he can, through the Protocol, green-light an "exception" to

section 327(a) – which the Protocol clearly does – then he cannot arbitrarily revoke such

protocol without notice and inflict substantial harm on professionals and debtors who

have acted in reliance on over fourteen years of precedent with respect to A&M and other similar advisory firms.

As described by counsel to A&M at the Hearing, companies approaching financial distress have been able to meet their needs for operational resources by engaging management consultancy firms to run the day-to-day management of such companies and, at times, to serve as their interim officers.  Engagement of management consultancy firms prior to a bankruptcy filing and their continuing retention postpetition has enabled companies to achieve business continuity during their darkest hour.  As aptly pointed out by the Debtors, if, however, section 327 is the only path available for a chapter 11 debtor to retain a restructuring advisory firm and officers supplied by such firm, firms that previously provided firm personnel to fill necessary management roles at the company must be jettisoned when the company files for chapter 11 by virtue of the fact that, having served as officers of the debtor, the firm and its personnel are arguably not disinterested within the meaning of section 101(14) and thus cannot be retained under section 327(a).

This practice would disrupt company management at the precise time when management services are most needed – an absurd result, to say the least.  The U.S. Trustee's position in this regard appears to be that the more vital a role an advisory firm played at a company prepetition, the more likely it is that such firm and its personnel will be unable to serve as retained professionals in the company's bankruptcy case pursuant to section 327(a) of the Code.  And to what end?  Notably and inexplicably, the U.S. Trustee makes the unequivocable statement in its Objection that "[a] debtor cannot use section 363(b) to employ a professional person."  (Objection, 21 (citing *In re Bicoastal*

*Corp.*, 149 B.R. 216, 218 (Bankr. M.D. Fla. 1993)).  It is quite difficult for this Court to reconcile this statement with the statement in the Protocol that the professional "*shall seek retention under section 363 of the Bankruptcy Code.*"  (*See* Protocol § I.C. (emphasis added)).

The Court declines to elevate form over substance in the manner sought by the U.S. Trustee,  Instead, it concludes that rehabilitating a debtor and preserving the value of the debtor's business – significant Code-related objectives – can be best accomplished here by permitting the Debtors to utilize their estate assets under section 363 of the Code to hire the advisory services firm and its personnel who played key management roles at the company prepetition, thus ensuring the continuity of such services.  The Court agrees with the observation made by counsel to the Ad Hoc Secured Lender Group at the Hearing that section 363 is "not a backdoor but, rather, an equally appropriate door" on which the Court can consider the retention of A&M and Mr. Schipani.

Even assuming that the U.S. Trustee was not estopped from arguing that the retention cannot be considered under section 363, an argument on which the Court declines to rule at this time, after considering the extensive case law and precedent cited by the parties providing authority for the retention of A&M and Mr. Schipani pursuant to section 363(b) and the Code-related objectives of rehabilitating a debtor and preserving its economic value for stakeholders, the Court finds that the U.S. Trustee's section 363 argument is without merit.  For these reasons, the Court finds that nothing precludes the Debtors from relying on section 363(b) to seek authorization for the retention of A&M and Mr. Schipani.

### b. The Debtors' Business Decision to Retain A&M and Mr. Schipani is a Sound Exercise of Their Business Judgment

When considering whether to approve a debtor's use of estate property outside the ordinary course of business pursuant to section 363(b), courts review the business judgment of the debtor. The business judgment standard applied by courts presumes that the court will not second guess the business judgment of a debtor's board in making a business decision, provided that the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *See In re Lionel Corp.*, 722 F.2d at 1071; *Off. Comm. of Subordinated Bondholders v. Integrated Resources Inc. (In re Integrated Resources Inc.)*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Global Crossing Ltd.*, 295 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2003).

As is evident from the plethora of case law cited by the Debtors and A&M, courts in this District and elsewhere have entered orders permitting management consultant firms to be retained under section 363(b) based upon a finding that the engagement satisfies the business-judgment standard, without requiring applicants to meet a separate burden of proof under section 327(a).

Mr. Schipani's testimony at the Hearing demonstrated that retention of A&M and of Mr. Schipani as Interim CEO are necessary to preserve and maximize the value of the Debtors' businesses and are of critical importance in these cases. During the four years preceding the Petition Date and continuing postpetition, A&M personnel have occupied key management positions and supported existing in-house functions, helping to oversee day-to-day operations, find and pursue corporate opportunities, create and carry out business plans, and otherwise manage the Company at the direction of the board of

directors of parent Nine West Holdings, Inc.  Mr. Schipani and his team have overseen
all aspects of the company's affairs and have developed strong relationships with the
Debtors' customers, vendors, and employees, particularly since Mr. Schipani has served
as Interim CEO since June 2016.  At the Hearing, Mr. Schipani testified in a measured,
detailed, and passionate way concerning his responsibilities and role as CEO and
acknowledged that he is viewed as the "face of the stability" of the company by creditors,
vendors, and the company's 1350 employees, all of whom are counting on him.

As evidenced by the statements in support of the Application filed by six distinct
creditor groups representing virtually all major stakeholders across the Debtors' capital
structure, the Debtors' creditors believe that the retention of A&M and Mr. Schipani is
critical to the Debtors' success.  Mr. Schipani recently played a key role in obtaining
dramatically increased value for the Debtors in an auction of certain of their businesses
(*see* Dkt. No. 404), and he is expected to be a key participant in discussions regarding
chapter 11 resolutions and to play a crucial role in further refining the Debtors' go-
forward business plan.  (*See* Debtors' Reply ¶¶ 24-25).  In fact, were the Debtors *not* to
seek to retain the continuing services of Mr. Schipani and A&M, it would be a manifestly
*unreasonable* exercise of their business judgment.

Abruptly removing Mr. Schipani and A&M from their management roles at this
time, more than four years into A&M's engagement and just as the Debtors are entering
the most critical phase in their history as they seek to restructure their obligations in
bankruptcy, could, as the Debtors assert, put the success of the entire reorganization at
risk.  As counsel for the Debtor emphasized at the Hearing, were Mr. Schipani and A&M
to be ousted from the roles at this time, there would likely be insurmountable disruption

to the Debtors' business.  Their experience in managing the company would be impossible to replicate, and any new executive and supporting personnel would have a significant learning curve that the Debtors cannot afford at this time.  In addition, as pointed out in a footnote to the Debtors' Reply, the importance of the continued retention of Mr. Schipani and A&M was recently made even more stark due to the resignation of the Debtors' chief financial officer.  (*See* Debtors' Reply ¶ 24, n. 8).

The Debtors have demonstrated that retention of A&M and Mr. Schipani is clearly in the best interests of the Debtors, their estates, and their creditors, and, for all of these reasons, the Court declines to second-guess the business judgment of the parent board with respect to this decision.

## II.    Section 327 of the Bankruptcy Code

Section 327(a) of the Bankruptcy Code provides that a trustee or debtor in possession "with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a).

"[A] professional person is one who plays an intimate or central role in the administration of the debtor's bankruptcy proceeding."  (Objection, 19 (citing *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp., et al (In re Johns-Manville Corp.)*, 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1986) (stating that a professional within the meaning of section 327 is one intimately involved in the administration of the reorganization process, for example, one who played a part in negotiating a plan, who is involved with disposing of or acquiring assets, or who interacts with creditors))).  In this Circuit,

"professional persons" are defined to include firms or individuals who have been "hired for the purpose of reorganizing the corporation or otherwise assisting it through the Chapter 11 bankruptcy process."  *In re SageCrest II, LLC*, Nos. 3:10CV978, 3:10CV979, 2011 WL 134893, at *7 (D. Conn. Jan. 14, 2011).

In *SageCrest II*, the Court explained that "[o]fficers responsible for the day-to-day business of the debtor . . . stand in contrast to professionals hired for the *sole purpose* of reorganizing the debtor organization."  *Id.* (emphasis added); *see also In re Phoenix Steel Corp.*, 110 B.R. 141, 142 (Bankr. D. Del. 1989) (finding that workout managers hired as officers to evaluate company's financial condition and oversee day-to-day operations were not "professional persons" within the meaning of section 327(a)); *In re Dairy Dozen-Milnor, LLP*, 441 B.R. 918, 920 (Bankr. D.N.D. 2010) (stating that a "professional person" under section 327(a) is one who "takes a central role in the administration of the debtor's bankruptcy estate and bankruptcy proceedings as opposed to one who provides services to the debtor that are necessary regardless of whether a bankruptcy petition was filed"); *In re Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981) (concluding that maritime engineers hired by the debtor were not "professional persons" because they did not play a central role in the administration of the bankruptcy case and the need for their employment did not arise from the bankruptcy itself).

The U.S. Trustee argues that A&M and Mr. Schipani, are "professional persons" within the scope of section 327, as they "specialize in financial and operational restructuring" and, "[d]espite the label of Interim CEO, they are intimately involved in the restructuring of the Debtors' businesses and are central to the reorganization."

27

(Objection, 18).  In support of his assertion, the U.S. Trustee points to the fact that Mr.

Schipani and A&M personnel, among other things, have prepared each of the Debtors'

schedules and SOFAs; have assisted in claims work and in reviewing various contracts

for the Debtors to determine which contracts to assume or reject; are preparing the

Debtors' 13-week cash flow forecast; have been assisting with the debtor-in-possession

financing; and were intimately involved in the postpetition sale of a substantial portion of

the Debtors' business where they evaluated bids, qualified certain bids, and participated

in the auction which ultimately led to a very significant sale for the Debtors.  (*See*

Objection, 18-19).

After listing these tasks (and others) in the Objection, the U.S. Trustee concludes

that Mr. Schipani and A&M have been assisting the Debtors on "nearly every major

element" of a large chapter 11 case and, thus, unquestionably are professional persons

within the meaning of section 327(a) who must be retained under such Code section.

(Objection, 18-19).

In contrast, A&M contends that Mr. Schipani and A&M, who were engaged over

four years ago to manage the day-to-day operations of the company's businesses and not

for the express purpose of administering the then-nonexistent bankruptcy estates, are not

"professional persons" within the meaning of section 327(a).  The Court agrees.  Here,

there can be no doubt that the *SageCrest* "hired for the purpose of reorganizing"

formulation is inapplicable to A&M.

A&M was hired four years before the Petition Date, and, since that time, Mr.

Schipani and other A&M personnel have managed the company, providing services that

would be needed independent of any bankruptcy filing.  The evidence supports this

conclusion.  As stated by Mr. Schipani in his Supplemental Declaration and at the

Hearing, A&M was not hired to restructure the obligations of the company, and nothing

in A&M's 2014 engagement related to bankruptcy planning; rather, it was not until

approximately three years after the engagement began, during the summer of 2017, that

the company, in consultation with advisors and independent of A&M's activities and

responsibilities, began considering the possibility of a bankruptcy filing.  (Schipani

Suppl. Decl. ¶ 6).

Since the Petition Date, A&M has continued in its role of managing the daily

operations of the Debtors' businesses; any services it has performed relating to the

Debtors' chapter 11 processes have been services that could have been performed by

existing company personnel, rather than A&M personnel, had the necessary resources

been available within the company.  (*See* Schipani Suppl. Decl. ¶ 7).  During the chapter

11 cases, A&M has continued to provide the types of services it has provided to the

company for years, and such work supports the professionals hired by the Debtors

specifically for bankruptcy purposes, in Mr. Schipani's words, "in the same way that in-

house employees and officers of any company going through a restructuring typically

would in my experience."  (Schipani Suppl. Decl. ¶ 8).  As A&M correctly asserts,

"because the firm is not tasked with actually administering the bankruptcy estate," it does

not fall within the definition of a "professional person" under section 327(a).  (A&M

Reply ¶ 6).

At the Hearing, counsel for A&M elicited testimony from Mr. Schipani which

illustrated that the services he provides to the company postpetition have remained

largely unchanged, albeit augmented by certain bankruptcy-related responsibilities such

29

as attending section 341 meetings and preparing monthly operating reports. He

compared his prepetition and postpetition responsibilities as CEO, testifying that, during

both periods, he has been responsible for, among other things, monthly reporting;

managing cash flows; controlling inventory; sales of assets; and negotiating the

company's financing. For instance, Mr. Schipani testified that, in 2016, he coordinated

the sale of the *Easy Spirit* brand and, during the chapter 11 cases, he worked on the sale

of the *Nine West* brand; he was also responsible for negotiating amendments to the

prepetition credit agreement much as he did in connection with the DIP credit

agreement. Mr. Schipani's testimony was supported by a comparison of the scope of

services set forth in the A&M 2014 Engagement Letter and in A&M's 2018 postpetition

engagement letter. Mr. Schipani likened his role as Interim CEO to the role of other

CEOs at distressed companies such as that of the CEO of Chemtura, with whom he

worked closely.

The Court declines to find here that Mr. Schipani and A&M are "professional

persons" as such term is utilized in section 327(a) of the Code. Their roles – both

prepetition and postpetition – are focused on running the business. As Mr. Schipani's

testimony made clear, the services that they have provided to support the Debtors'

bankruptcy-specific professionals are largely work that the officers and managers of

any bankrupt entity would have to do in the ordinary course. It would be an absurd

result if their work in such roles was sufficient to render them "professional persons;"

if this were the case, virtually every senior executive of every chapter 11 debtor would

have to be retained under section 327(a). This simply cannot be.

As the Court has determined that section 327(a) does not apply to the retention of A&M and Mr. Schipani in these cases, it need not reach the U.S. Trustee's additional argument that they are not "disinterested" under section 101(14) of the Code and thus fail to meet the requirements of section 327(a).

For all of the foregoing reasons, the Objection is overruled, the Application is granted, and the Debtors are authorized to retain A&M to provide the Debtors with an interim CEO and certain additional personnel and to designate Mr. Schipani as Interim CEO pursuant to section 363(b) of the Bankruptcy Code.  The Debtors are directed to submit an order consistent with this Bench Decision.

Dated: July 2, 2018
New York, New York

/s/ Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE