AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
Arik Preis
David M. Zensky
Mitchell P. Hurley
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
dgolden@akingump.com
apreis@akingump.com
dzensky@akingump.com
mhurley@akingump.com

*Counsel to the Official Committee of
Unsecured Creditors of Nine West Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE,
STANDING, AND AUTHORITY TO COMMENCE AND
PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE NWHI
ESTATE AND EXCLUSIVE SETTLEMENT AUTHORITY IN
RESPECT OF SUCH CLAIMS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076). The location of the Debtors' service address is: 1411 Broadway, New York, New York 10018.

# Table of Contents

**Page**

PRELIMINARY STATEMENT ............................................................................... 2

BACKGROUND ................................................................................................ 10

    Jones Inc. Auction Process Implies $2.1 Billion Total Enterprise Value ................................. 10

    NWHI's LBO Debt Dwarfs Sycamore's Equity Investment ..................................................... 12

    Sycamore Causes NWHI to Sell Carve-Out Assets to Sycamore Affiliates for a Pittance ...... 13

    NWHI Was Rendered Deeply Insolvent by the LBO ............................................................... 14

    Sycamore Manipulates Estimates, Projections and Valuations Leading to LBO ..................... 16

    RemainCo Immediately and Disastrously Misses Sycamore Projections ................................ 21

    Sycamore's Self-Dealing Working Capital Waiver ................................................................. 22

    Sycamore Takes Worthless Stock Deduction, Depriving NWHI of NOLs ............................... 23

      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    The Debtors' Unjustifiable Refusal to Prosecute Claims Against Sycamore ............................ 26

ARGUMENT .................................................................................................... 28

    I.    Legal Standard for Derivative Standing ..................................................................... 28

    II.    The Committee Should Be Granted Derivative Standing ............................................... 30

      A.    The Proposed Claims Are Colorable ...................................................................... 30

        1.    NWHI's Constructive Fraud Claims Are Colorable ............................................. 30

          (a)    The LBO Rendered NWHI Insolvent ......................................................... 30

          (b)    NWHI Received Less than Reasonably Equivalent Value for the Property Transferred to Sycamore, and the Liens and Obligations Incurred for the LBO Debt    ........................................................................................................... 32

            1)    NWHI Transferred the Carve-Out Assets  to Sycamore for far Less than their Value .......................................................................................... 32

            2)    NWHI Incurred the Liens and Obligations to the LBO Lenders for far Less than the Value Received in Return ....................................................... 32

            3)    NWHI Received No Value for Waiving a $64 Million-Plus Payment Owed by Sycamore Affiliate Jones Apparel ................................................. 34

            4)    NWHI Received No Value in Exchange for its NOLs ................................ 34

          (c)    The Value of NWHI's Avoidance Claims Is Immense ................................. 35

        2.    NWHI Has Colorable Claims for Intentional Fraudulent Conveyance ............... 35

        3.    NWHI Has Colorable Claims for Breach of Fiduciary Duty Against the Sycamore and Jones Inc. Fiduciaries  Arising from their Pre-Petition Misconduct ..................... 36

4.    NWHI Has Colorable Claims for Aiding and Abetting Breach of Fiduciary Duty Against the Sycamore Principals, Sycamore, the Sycamore Employees, and the Jones Inc. Directors ................................................................................................ 40

5.    The Estate Has Colorable Claims for Unlawful Stock Redemption and Dividends Against the Jones Inc. Directors and the Sycamore Principals ..................................... 42

6.    The Estate Has Colorable Claims for Unjust Enrichment Against Sycamore and the Jones Inc. Directors ................................................................................................ 42

7.    NWHI Has Additional Claims for Breach of Contract and Tortious Interference with Contract Related to the Working Capital Waiver ................................................. 43

███████████████████████████████████████████████████████████████

B.    The Debtors Have Unjustifiably Refused to Prosecute the Proposed Claims .......... 47

C.    This Court Should Grant the Committee Exclusive Authority to Settle the Proposed Claims ................................................................................................................ 49

RESERVATION OF RIGHTS ..................................................................................... 49

NOTICE .................................................................................................................... 49

CONCLUSION .......................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
    241 F. Supp. 3d 461 (S.D.N.Y. 2017) ..................................................................45

*Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns
    Corp.*),
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ..............................................29, 30, 31, 48

*Alberts v. Tufts* (*In re Greater Se. Cmty. Hosp. Corp. I*),
    353 B.R. 324 (Bankr. D.D.C. 2006) .................................................................38

*Alert Holdings, Inc. v. Interstate Protective Servs., Inc.* (*In re Alert Holdings,
    Inc.*),
    148 B.R. 194 (Bankr. S.D.N.Y. 1992) ...............................................................47

*Antaramian Props., LLC v. Basil Street Partners, LLC* (*In re Basil Street
    Partners, LLC*),
    No. 9:12-ap-00863-FMD, 2012 WL 6101914 (Bankr. M.D. Fla. Dec. 7, 2012) ...................46

*Autobacs, Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs*),
    473 B.R. 525 (Bankr. D. Del. 2012) .................................................................38

*BAE Sys. Info. & Elec. Sys. Integration v. Lockheed Martin Corp.*,
    No. 3099-VCN, 2009 Del. Ch. LEXIS 17 (Del. Ch. Feb. 3, 2009) ..........................44

*Bartle v. Markson*,
    299 F. Supp. 958 (N.D.N.Y. 1969), *aff'd*, 423 F.2d 637 (2d Cir. 1970) ................41

*Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom
    Teachers Ass'n*,
    343 N.E.2d 278 (N.Y. 1975) ...........................................................................47

*BelCom, Inc. v. Robb*,
    No. CIV. A. 14663, 1998 WL 229527 (Del. Ch. Apr. 28, 1998) ............................46

*Bianco v. Erkins* (*In re Gaston & Snow*),
    243 F.3d 599 (2d Cir. 2001) ............................................................................40

*Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*),
    208 B.R. 288 (Bankr. D. Mass. 1997) ..............................................................38

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ...............................................................................39

*Burtch v. Seaport Capital, LLC* (*In re Direct Response Media, Inc.*),
    466 B.R. 626 (Bankr. D. Del. 2012) ...................................................39

*Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd.* (*In re Gibson Grp.*),
    66 F.3d 1436 (6th Cir. 1995) ...................................................48

*In re Colfor, Inc.*,
    No. 96-60306, 1998 Bankr. LEXIS 158 (Bankr. N.D. Ohio Jan. 5, 1998)...........................30

*Consove v. Cohen* (*In re Roco Corp.*),
    701 F.2d 978 (1st Cir. 1983)...................................................33

*Crescent/Mach I Partners, L.P. v. Turner*,
    846 A.2d 963 (Del. Ch. 2000)...................................................39

*Official Comm. of Unsecured Creditors of Cybergenics Corp ex rel. Cybergenics
    Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003)...................................................29

*Daley v. Chang* (*In re Joy Recovery Tech. Corp.*),
    286 B.R. 54 (Bankr. N.D. Ill. 2002) ...................................................33

*Giuliano v. Schnabel* (*In re DSI Renal Holdings, LLC*),
    574 B.R. 446 (Bankr. D. Del. 2017) ...................................................40

*Guzman v. Macy's Retail Holdings, Inc.*,
    No. 09 Civ. 4472 (PGG), 2010 WL 1222044 (S.D.N.Y. Mar. 29, 2010)...............................41

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995)...................................................33

*Hobby Ctr. v. Hudson United Bank* (*In re America's Hobby Ctr., Inc.*),
    223 B.R. 275 (Bankr. S.D.N.Y. 1998)...................................................30, 48

*Holber v. Dolchin Slotkin & Todd, P.C.* (*In re Am. Rehab & Physical Therapy,
    Inc.*),
    No. 04-014562, 2006 WL 1997431 (Bankr. E.D. Pa. May 18, 2006) ...................................36

*Interim Healthcare, Inc. v. Spherion Corp.*,
    884 A.2d 513 (Del. Sup. Ct. 2005) ...................................................44

*Jardel Co. v. Hughes*,
    523 A.2d 518 (Del. 1987) ...................................................38

*Joshua Slocum, Ltd. v. Boyle* (*In re Joshua Slocum, Ltd.*),
    103 B.R. 610 (Bankr. E.D. Pa. 1989) ...................................................33

*La. World Exposition v. Fed. Ins. Co.*,
858 F.2d 233 (5th Cir. 1988) ...............................................30

*Lampe v. Lampe* (*In re Lampe*),
665 F.3d 506 (3d Cir. 2011)...............................................39

*Lippe v. Bairnco Corp.*,
230 B.R 906 (S.D.N.Y. 1999)...............................................41

*In re Majestic Capital, LTD.*,
Case No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011) ...............................................50

*Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield* (*In re Mid-Island
Hosp., Inc.*),
276 F.3d 124 (2d Cir. 2002)...............................................43

*Mission Measurement Corp. v. Blackbaud, Inc.*,
287 F. Supp. 3d 691 (N.D. Ill. 2017) ...............................................45

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007*)* ...............................................37

*Neb. State Bank v. Jones*,
846 F.2d 477 (8th Cir. 1988) ...............................................30

*In re Novell, Inc. S'holder Litig.*,
C.A. No. 6032-VCN, 2013 WL 322560 (Del. Ch. Jan. 3, 2013)...............................................41, 42

*Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund,
L.P.* (*In re AppliedTheory Corp.*),
493 F.3d 82 (2d Cir. 2007)...............................................30

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin.
Grp.* (*In re Hechinger Inv. Co.*),
274 B.R. 71 (D. Del. 2002)...............................................40

*Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Technical Olympic,
S.A.* (*In re TOUSA, INC.*),
437 B.R. 447 (Bankr. S.D. Fla. 2010)...............................................38

*Official Comm. of Unsecured Creditors v. Baldwin (In re Lemington Home for the
Aged)*,
659 F.3d 282 (3d Cir. 2011)...............................................38

*Official Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines
Inc.*),
928 F.2d 565 (2d Cir. 1991)...............................................35, 47

*In re Old CarCo LLC (f/k/a/ Chrysler LLC)*,
  Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) .................................50

*Pereira v. Centel Corp.* (*In re Argo Commc'ns Corp.*),
  134 B.R. 776 (Bankr. S.D.N.Y. 1991) ....................................................................41

*In re Primedia, Inc. S'holders Litig.*,
  67 A.3d 455 (Del. Ch. 2013)...................................................................................41

*In re Sabine Oil & Gas Corp.*,
  547 B.R. 504 (Bankr. S.D.N.Y. 2016) ..............................................................48, 49

*Sadowy v. Sony Corp. of Am.*,
  496 F. Supp. 1071 (S.D.N.Y. 1980)........................................................................47

*Shubert v. Stranahan* (*In re Pa. Gear Corp.*),
  No. 02-36436DWS, 2008 WL 2370169 (Bankr. E.D. Pa. Apr. 22, 2008) .............36

*Stanziale v. Nachtomi* (*In re Tower Air, Inc.*),
  416 F.3d 229 (3d Cir. 2005)....................................................................................38

*Stuart v. Am. Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998)....................................................................................41

*SV Inv. Partners, LLC v. Thoughtworks, Inc.*,
  7 A.3d 973 (Del. Ch. 2010).....................................................................................43

*Triad Guar. Inc. v. Triad Guar. Ins. Corp.* (*In re Triad Guar. Inc.*),
  No. 14-1464 (GMS), 2016 WL 3523834 (D. Del. June 26, 2016) ........................35

*U.S. Bank N.A. v. DHL Global Forwarding* (*In re Evergreen Solar, Inc.*),
  Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) ..................................50

*U.S. v. Tabor Court Realty Corp.*,
  803 F.2d 1288 (3d Cir. 1986)..................................................................................33

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes* (*In re STN Enters.*),
  779 F.2d 901 (2d Cir. 1985)..............................................................................30, 48

*Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*),
  100 B.R. 127 (Bankr. D. Mass. 1989) ....................................................................33

*In re Walt Disney Co. Deriv. Litig.*,
  907 A.2d 693 (Del. Ch. 2005)..................................................................................38

*Wirum v. Wilson* (*In re SDR Capital Mgmt., Inc.*),
  No. 05-34008 TEC, 2007 WL 3450999 (Bankr. N.D. Cal. Nov. 14, 2007)...........33

## Statutes

11 U.S.C. § 101 ...........................................................................................................1

11 U.S.C. § 105(a) .......................................................................................................1

11 U.S.C. § 1103(c) .....................................................................................................1

11 U.S.C. § 1109(b) .....................................................................................................1

11 U.S.C. § 362(a)(3) .................................................................................................47

11 U.S.C. § 541(a)(1), (7) .........................................................................................47

11 U.S.C. § 541(a) (7) ...............................................................................................47

Del. Code Ann. tit. 6 § 1304 .....................................................................................36

Del. Code. Ann. tit. 6 § 1304(2) ...............................................................................31

Del. Code. Ann. tit. 6 § 1305 ....................................................................................31

Del. Code. Ann. tit. 6 § 1307 ....................................................................................31

12 Pa. C.S.A. § 5105 ..................................................................................................31

12 Pa. C.S.A. § 5107 ..................................................................................................31

12 Pa. Cons. Stat. § 5104(a)(1) .................................................................................36

15 Pa. Cons. Stat. § 1551 ..........................................................................................43

15 Pa. Cons. Stat. § 1551(b) ......................................................................................43

15 Pa. Cons. Stat. § 1553 ..........................................................................................43

N.Y. Debt. & Cred. Law § 273 ..................................................................................31

N.Y. Debt. & Cred. Law § 274 ..................................................................................31

N.Y. Debt. & Cred. Law § 275 ..................................................................................31

N.Y. Debt. & Cred. Law § 278 ..................................................................................31

N.Y. Debt. & Cred. Law § 279 ..................................................................................31

## Other Authorities

Bankruptcy Rule 9019 ...............................................................................................50

N.Y. C.P.L.R. § 202.................................................................................................................41

N.Y. C.P.L.R. § 213(7) ...........................................................................................................40

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "Debtors") hereby submits this motion (the "Motion"), by and through its undersigned counsel, for entry of an order, pursuant to §§ 105(a), 1103(c), and 1109(b) of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), in substantially the form attached hereto as Exhibit A[2] (the "Proposed Order") granting the Committee (A) leave, standing, and authority to commence and prosecute certain claims, as set forth in more detail in the draft complaint attached hereto as Exhibit B (the "Proposed Complaint"), on behalf of the estate of Debtor Nine West Holdings, Inc. ("NWHI")[3] against (i) Sycamore Management Partners L.P., Sycamore Partners, L.P., Sycamore Partners A., L.P., Sycamore Partners Management, L.L.C., Sycamore Fund I, and other Sycamore affiliates, the names of which are currently unknown to the Committee (collectively, the "Sycamore Fund Entities"); (ii) Jasper Apparel LLC ("Jasper Apparel"), Jasper Footwear Limited ("Jasper Footwear"), and Jasper SW LLC ("Jasper SW," and collectively with Jasper Apparel and Jasper Footwear the "Sycamore Affiliates"); (iii) Stefan Kaluzny and Peter Morrow, cofounders and principals of Sycamore, and directors of NWHI, in their individual capacities (the "Sycamore Principals"); (iv) Sycamore employees Ryan McClendon, Adam Weinberger, Dary Kopelioff, and other unknown Sycamore employees who participated in the conduct alleged in the Proposed Complaint (collectively, the "Sycamore Employees," and collectively with the Sycamore Fund Entities and the Sycamore Principals, "Sycamore"); (v)

---

[2] "Exhibits" refer to the exhibits attached to the accompanying Declaration of Daniel H. Golden in Support of the Motion ("Golden Decl."), filed concurrently herewith.

[3] The Committee continues to investigate the Proposed Claims (defined below), and may add other Debtors as plaintiffs in the final complaint as may be necessary or appropriate.

John T. McClain ("McClain"), the former Chief Financial Officer of Jones Group Inc. ("Jones Inc.") and former director of NWHI; (vi) the former directors of Jones Inc. (the "Jones Inc. Directors," and together with Sycamore, the Sycamore Affiliates and McClain, the "Third Party Defendants"); and (vii) Cortland Capital Market Services, LLC ("Cortland"), GLAS Trust Company, LLC ("GLAS"), Wells Fargo Bank, National Association ("Wells Fargo"), and John/Jane Roes 1-100, lenders under the Secured Term Loan, Unsecured Term Loan, and ABL Facility[4] ("Roes," and collectively with Cortland GLAS, and Wells Fargo, the "Lender Defendants") (the foregoing A(i)-(vii) are collectively referred to herein as the "Defendants"); and (B) sole authority to compromise and settle the Proposed Claims on behalf of the NWHI estate.[5]   In support of this Motion, the Committee respectfully represents as follows.

## PRELIMINARY STATEMENT

1.      The Committee seeks leave to prosecute fraudulent transfer and other claims for well over $1 billion (the "Proposed Claims") – excluding pre-judgment interest of about $350 million (and growing) – that Debtor Nine West Holdings, Inc. ("NWHI") has unjustifiably refused to assert against Sycamore and other potential defendants.

2.      For a few days, it appeared this Motion might be unnecessary.  As the Court is aware, two major unsecured creditor groups – the unsecured term lenders and the holders of unsecured notes due in 2019 and 2034 – believed they had resolved their internecine disputes in favor of a plan that could garner the support of all creditors and the Debtors.  Under the creditors' proposed plan, all of the Debtors' secured lenders would be paid in full, in cash, the unsecured term lenders would receive 92.5% of the equity of the reorganized debtors plus $40

---

[4] To the extent necessary, conflicts counsel appearing herein will file a separate complaint and prosecute claims with respect to recovery interest against individual lenders.

[5] NWHI also has valuable claims against other parties, such as NWHI's former shareholders prior to the LBO and Carve-Out Transactions (defined below).  The Committee reserves all rights in respect to such claims.

million in cash, and NWHI's valuable claims against Sycamore would be placed in a litigation

trust for prosecution post-emergence.  The litigation trust proceeds would supply the vast

majority of recoveries for NWHI's bondholders and trade creditors.  Creditor representatives put

the terms of the proposed plan on the record at a hearing before this Court on September 26,

2018.





7.    Worse, the Committee understands that the Debtors are likely to release the claims against Sycamore for a small fraction of their value, before even filing a complaint detailing those claims.  The Debtors have barred the Committee from participating in its settlement negotiations with Sycamore, so the Committee knows only the range of settlement consideration under discussion.  A settlement even at the top end of that range would represent but a small fraction of the value of the claims against Sycamore, would constitute a breach of the Debtors' fiduciary duties, and would be manifestly contrary to the interests of NWHI and its creditors.  Until those claims are firmly in the control of a determined and truly independent adversary – the Committee – Sycamore will continue to toy with the parties and the bankruptcy process itself in its desperate attempt to avoid answering for its myriad pre-petition wrongs and breaches of duty to NWHI.

8.    And there can be no doubt that the Proposed Claims are orders of magnitude more valuable than the range of settlement under discussion between the Debtors and Sycamore.  As

6

detailed in the accompanying Proposed Complaint (see Exhibit B), the majority of the Proposed

Claims arise out of a leveraged buyout of Jones Inc. (the "LBO") engineered by Sycamore, a

private equity fund with about $10 billion under management.[7]  Sycamore designed the

transaction to unfairly deflect the risk of the LBO from Sycamore to NWHI's creditors, who

shared none of Sycamore's potential upside.  In the end, despite NWHI's bankruptcy, Sycamore

reaped a massive financial windfall, while NWHI and its creditors lost upwards of $1 billion.

9.      To achieve its purpose, Sycamore concocted a scheme to fund the LBO by (i)

breaking Jones Inc. into five business segments, (ii) causing NWHI to sell three of those

segments (the "Carve-Out Assets") to Sycamore Affiliates at prices hundreds of millions of

dollars below their true value (the "Carve-Out Transactions"), (iii) adding more than $800

million (the "LBO Debt") to the balance sheet of the now hollowed-out survivor (NWHI), and

(iv) causing NWHI to turn the bulk of the loan and sale proceeds – more than $1.2 billion – over

to Jones Inc.'s former shareholders in exchange for no value.  When the dust settled, NWHI was

left with a crushing debt burden of $1.5 billion (with nothing to show for it), and had been

stripped of its most valuable assets.  NWHI as it existed following the Carve-Out Transactions is

sometimes referred to in this Motion and in Jones Inc.'s definitive proxy as "RemainCo."

10.     The lynchpin of Sycamore's scheme was to strip the Carve-Out Assets away from

NWHI and transfer them to the Sycamore Affiliates at vastly under-market prices set by

Sycamore itself.  A single Sycamore fund entity – Sycamore Fund I – was the ultimate beneficial

owner of all of Sycamore's interests in both RemainCo and the Carve-Out Assets, and

Sycamore's equity investment in RemainCo was just a sliver of the more than $1.5 billion in

debt RemainCo was left with after the LBO.  In contrast, Sycamore financed the Carve-Out

_____

[7] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the
Proposed Complaint.

Transactions with a much higher proportion of equity to debt. Hence, as long as Sycamore set the prices paid by the Sycamore Affiliates for the Carve-Out Assets far enough below their true value, Sycamore was virtually guaranteed to make a profit on the LBO even if RemainCo failed completely.

11.     And that is exactly what happened. In a series of transactions that began just months after the LBO and Carve-Out Transactions closed, Sycamore siphoned off tens of millions of dollars of dividends from the Carve-Out Assets, and then resold them *for almost double (about $1.1 billion) the amount paid by the Sycamore Affiliates in the LBO ($641 million).* As a result, even after RemainCo filed for bankruptcy – costing Sycamore its comparatively meager equity investment, but costing NWHI's creditors a fortune – *Sycamore still reaped a nearly $300 million net windfall on the LBO.*

12.     To justify selling the Carve-Out Assets to its affiliates for below market prices, Sycamore engaged in outright fraud. Among other things, beginning in October 2013, when it made its bid to buy Jones Inc., through April 8, 2014, when the LBO closed, Sycamore prepared increasingly aggressive "pro forma" estimates and projections to inflate the supposed value of RemainCo, while simultaneously driving down the implied value of and forecasts for the Carve-Out Assets. Sycamore's projections depended not only on highly speculative and subjective "sponsor addbacks" and other adjustments, they also were moving in the exact opposite direction of contemporaneous trends in the businesses at issue.

13.     Sycamore then tapped Duff & Phelps to prepare a RemainCo solvency opinion (the "RemainCo Solvency Opinion") using Sycamore's hyper-optimistic projections. Duff & Phelps, a firm Sycamore has engaged on about 60 other deals, gladly obliged. Incredibly, as soon as Sycamore obtained its solvency opinion and the LBO closed, Sycamore abandoned its

pie-in-the-sky RemainCo projections. When preparing internal valuations of RemainCo after the

LBO, Sycamore used much lower, unadjusted projections that would have shown insolvency had

they been used by Duff & Phelps in its discounted cash flow analysis in connection with the

LBO. Similarly, contemporaneous with the LBO itself NWHI issued projections – which were

shared with Sycamore but not disclosed publicly – that would have shown insolvency if used by

Duff & Phelps in its market multiple analysis.

14.    And there can be no serious doubt that NWHI was rendered insolvent by the

LBO. Sycamore's $15 per share bid, which followed a vigorous eight-month sale process, set

the ceiling for Jones Inc.'s total enterprise value at the time the LBO closed of about $2.103

billion. Market transactions demonstrate that the Carve-Out Assets were worth around a billion

dollars or more at the time of the LBO, which necessarily means that RemainCo – the only part

of Jones Inc. left after the Carve-Out Assets were stripped away – was worth no more than about

$1.1 billion, far less than its post-LBO debt of about $1.55 billion. [8]

15.    It was only Sycamore's manipulation of RemainCo's estimated and projected

performance in the run up to the LBO that prevented RemainCo's insolvency from being obvious

to all. For its part, the agent for the LBO term lenders knew (or should have known) that the

LBO would be financially disastrous for RemainCo despite Sycamore's manipulated financial

data and projections. The term loan agent prepared its own "base case" projections for

RemainCo that were much more realistic than Sycamore's. If weighted average cost of capital

and long term growth sensitivities were applied to the agent's projections in the range used by

Duff & Phelps, insolvency would have been shown in virtually all scenarios. The term lenders

---

[8] NWHI is entitled to recover the entire value of the Carve-Out Assets because (i) Sycamore acted in bad faith by knowingly underpaying NWHI for the Carve-Out Assets and fraudulently inflating the value of RemainCo, and (ii) the majority of the funds that Sycamore paid to acquire the Carve-Out Assets were used to redeem the Jones Inc. shareholders, and thus provided no value to RemainCo as a matter of law.

could afford to be cavalier about NWHI's solvency, however, because their debt was guaranteed

by RemainCo's operating subsidiaries, unlike NWHI's bond debt.  Hence, the new term loans

could be repaid in full even if the parent, NWHI, was deeply insolvent.  As discussed below, the

lenders of the LBO Debt all knew that most of the proceeds of their loans would immediately be

re-conveyed to former Jones Inc. shareholders for no value, and the obligations and liens NWHI

incurred in connection with the LBO Debt should therefore be avoided.

16.      No one was watching out for the interests of NWHI and its creditors in connection

with the LBO.  Happy to cash out their own substantial stock in the company, Jones Inc.'s legacy

directors stuck their heads in the sand, purporting to disclaim any opinion as to the fairness of

either the Carve-Out Transactions or the debt incurred to fund the LBO.  The post-LBO board of

NWHI was controlled by Sycamore's two founders – proposed defendants Stefan Kaluzny and

Peter Morrow – who would have been incapable of exercising independent judgment concerning

the LBO transactions even if they tried, and the record indicates they did not try.  In other words,

no fiduciary for NWHI and its creditors (or for the legacy Jones Inc. creditors) ever considered

whether the LBO would result in insolvency, or whether it would be fair to anyone other than

Sycamore and Jones Inc.'s former shareholders.  By themselves, these facts demonstrate clear

violations of each of the directors' fiduciary duties of care, loyalty and good faith and shift the

burden to the fiduciaries to demonstrate that the transactions were entirely fair to NWHI and its

stakeholders.  That is a burden the fiduciaries will never be able to carry.

17.      Sycamore's breaches of duty did not end with the LBO.  Just months after the

LBO closed, Sycamore caused NWHI to waive a nearly $65 million working capital true-up

payment owed to it by one of the Sycamore Affiliates without the slightest justification, in a

further effort to secrete assets from the reach of creditors of a manifestly insolvent NWHI.  More

recently, Sycamore took a worthless stock deduction that resulted in NWHI losing the benefit of

substantial tax credits in the form of Net Operating Losses ("NOLs"). ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  Sycamore could

hardly make its contempt for the rights of NWHI and its creditors, and its disregard of its own

fiduciary duties, more clear if it tried.

18.    NWHI is entitled to recover well over $1 billion from Sycamore, not including

prejudgment interest, based on Sycamore's fraudulent transfers and other misconduct described

in this Motion and in the Proposed Complaint.  In addition, the liens and obligations NWHI

incurred in connection with more than $800 million in LBO debt should be avoided, with all

payments of interest on the LBO Debt made by or on behalf of NWHI returned to the estate.

NWHI also is entitled to recover damages for breach of fiduciary duty from Sycamore and the

Jones Inc. directors, and to recover from the directors the full amount of transfers made to Jones

Inc.'s shareholders (about $1.2 billion).  Finally, an award of actual damages, punitive damages,

and attorneys' fees should be entered in favor of NWHI in connection with its claims for tortious

interference and actual fraudulent conveyance and other willful misconduct.

19.    Allowing the Debtors to release these extraordinarily valuable claims in exchange

for the relatively paltry sum the Debtors previously appeared poised to accept would constitute

yet another windfall for Sycamore.  For its part, Sycamore is acutely aware of the stakes

9 ████████████████████████████████████████

involved in avoiding plenary litigation against the Committee and its creditor constituents.

Indeed, Sycamore was so desperate to thwart post-emergence litigation of the claims against it

that Sycamore was willing to ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████    There can be no doubt that Sycamore believes

the Debtors' settlement range would be a steal compared to the actual value of the claims against

it, and Sycamore is right.  Standing to prosecute the Proposed Claims should be granted to the

Committee for the benefit of the estate, including stakeholders like NWHI's bondholders and

trade creditors whose recoveries are largely dependent on maximizing the value of those claims.

## BACKGROUND[10]

20.    Prior to the LBO, Jones Inc. was a publicly-traded company predominantly

focused on a wholesale footwear and apparel business selling such brands as Nine West, Anne

Klein, and Gloria Vanderbilt to retailers like Macy's, Lord & Taylor, and Walmart/Sam's Club.

Mid-tier footwear and apparel businesses like Jones Inc. faced a challenging economic

environment in 2013, driven in part by consumers' continuing recovery from the recession that

began in 2008.  Analysts predicted that these challenges would continue into 2014, and in fact,

the performance of mid-tier footwear and apparel retailers continued to trend downwards through

2015 and 2016.

### Jones Inc. Auction Process Implies $2.1 Billion Total Enterprise Value

21.    Jones Inc. performed poorly in 2013 and for years before, with flat sales, falling

stock prices and declining operating income, EBITDA, and EBITDA margins.  At the apparent

urging of at least one large shareholder that was looking for an exit from the company, Jones Inc.

---

[10] The Committee refers the Court to the Proposed Complaint for a full recitation of all relevant facts.
What follows below is a highly-truncated summary of the key facts at issue.

began exploring options for the sale of all or some of its businesses.[11]  The company embarked

on a robust, eight-month sale process, involving some seventeen sophisticated financial and

strategic buyers, who each reviewed confidential information concerning Jones Inc.'s

performance and prospects in an effort to determine the value of the enterprise.[12]

22.    On December 19, 2013, Jones Inc.'s Board of Directors unanimously approved

and executed an Agreement and Plan of Merger (the "Merger Agreement" or the "Merger") with

two entities controlled by Sycamore: Jasper Parent LLC ("Jasper Parent") and Jasper Merger

Sub, Inc. ("Merger Sub").[13]  At $15.00 per share, the deal with Sycamore indicated that Jones

Inc. – inclusive of all of its brands and businesses – had a total enterprise value of about $2.2

billion.[14]  Had Jones Inc. been worth materially more than $2.2 billion, another buyer would

have offered more, but none ever did.  By the time the LBO closed on April 8, 2014, the

enterprise value for Jones Inc.  implied by Sycamore's bid was approximately $2.103 billion, due

to a decrease in the number of outstanding Jones Inc. shares and an increase in the amount of

Jones Inc.'s excess cash.[15]

23.    Under the terms of the Merger Agreement, Jones Inc. merged with a Sycamore

subsidiary that was created for that purpose, survived the merger, and assumed the name Nine

West Holdings, Inc. (NWHI).[16]  At the same moment, Jones Inc.'s shares were converted to a

right to receive the merger consideration, totaling about $1.2 billion, from NWHI.[17]

Simultaneously with the closing of the LBO, Sycamore caused NWHI to (i) borrow the LBO

---

[11] Proposed Complaint ("Compl.") (Ex. B) ¶ 72.

[12] Compl. ¶¶ 73-81.

[13] Compl. ¶ 85.

[14] Compl. ¶¶ 80-81.

[15] Compl. ¶ 24 & n.6.

[16] Compl. ¶ 85.

[17] Compl. ¶ 91.

Debt, and (ii) sell the Carve-Out Assets to the Sycamore Affiliates, with much of the proceeds of the LBO Debt and Carve-Out Transactions immediately transferred to Jones Inc.'s former shareholders for no value.[18]

**NWHI's LBO Debt Dwarfs Sycamore's Equity Investment**

24.    As noted elsewhere, the LBO Debt Sycamore caused NWHI to incur amounted to more than $800 million, including (i) a $300 million unsecured term loan credit facility (the "Unsecured Term Loan"), (ii) a $445 million term loan credit facility (the "Secured Term Loan," and with the Unsecured Term Loan, the "Term Loans"), both arranged by Morgan Stanley, and (iii) a $129 million drawn on an asset-backed loan facility (the "ABL Facility") administered and arranged by Wells Fargo ($70 million of which was used to repay a prior ABL facility and $59 million of which was used to finance the LBO).[19]

25.    In addition, NWHI also owed another approximately $700 million to bondholders, including Jones Inc. legacy creditors.  Repayment of the Term Loans was guaranteed by virtually all of NWHI's operating subsidiaries (the "Guarantor Subsidiaries"), entities that were not obligors of any kind with respect to NWHI's bonds.[20]  As a result, the Term Loan lenders had structural priority over NWHI's unsecured bondholders, and could be repaid in full by the Guarantor Subsidiaries even if NWHI was deeply insolvent.  A total of $120 million in equity was contributed to RemainCo by Sycamore ($108 million) and its minority co-investor, Kohlberg Kravis Roberts & Co. L.P. ("KKR") ($12 million), a small fraction (less than 1/10) of the debt left on RemainCo's books after the LBO.[21]

---

[18] Compl. ¶¶ 86, 89, 91-96.
[19] Compl. ¶¶ 91-96.
[20] Compl. ¶ 210.
[21] Compl. ¶¶ 91, 96.

**Sycamore Causes NWHI to Sell Carve-Out Assets to Sycamore Affiliates for a Pittance**

26.    The Carve-Out Assets were stripped out of NWHI pursuant to three purchase

agreements entered into by Jasper Parent – controlled by Sycamore – and the applicable

Sycamore Affiliate – also controlled by Sycamore – as buyer.  Sycamore/Jasper Parent agreed to

cause NWHI to sell the Carve-Out Assets immediately after the merger at prices set unilaterally

by Sycamore.  Each purchase agreement – essentially between Sycamore and Sycamore – was

signed by Sycamore founder Stefan Kaluzny on behalf of Jasper Parent/NWHI, and by Sycamore

co-founder Peter Morrow on behalf of the Sycamore Affiliate buyer.  In its resolutions relating to

the merger and in the Merger Agreement itself, Jones Inc.'s board expressly disclaimed any

opinion concerning the prudence or fairness of the sale by NWHI of the Carve-Out Assets.  The

conflicted Sycamore Principals approved the Carve-Out Transactions before the LBO closed.

Apparently, however, no person acting in the capacity of a fiduciary of either Jones Inc. or

NWHI ever deliberated or voted on the incurrence of the LBO Debt, the prices set by Sycamore

for NWHI's sale of the Carve-Out Assets to the Sycamore Affiliates, or the impact of those

transactions on NWHI and its creditors.[22]

27.    Sycamore knew that the Carve-Out Assets were worth far more than what the

Sycamore Affiliates paid NWHI for such assets – indeed that was Sycamore's objective – and

immediately set about to capitalize on having separated the underperforming assets from the

crown jewels at artificially deflated prices.  Sycamore commenced a series of dividend and resale

transactions shortly after the LBO closed that demonstrate that the prices paid by the Sycamore

---

[22] Compl. ¶¶ 84-87.

Affiliates – set unilaterally by Sycamore itself – to obtain the Carve-Out Assets were a fraction of their actual values[23]:

| | Self-Dealing Sycamore Price (April 8, 2014) | Resale Price and Net Dividends (Date) | Difference Between Price Paid and Resale Price/Net Dividends |
|---|---|---|---|
| Stuart Weitzman | $395 million | $548 million sale (Jan. 2015) | $153 million |
| Kurt Geiger | $136 million | ███████████████ | ██████████ |
| Jones Apparel | $110 million | $40 million net dividend (Sept. 2014) $145 million sale (in two parts, Apr. 2015 and Jan. 2017) | $ 75 million |
| Totals | $641 million | ████████ | ████████ |

28.     As if this market evidence were not enough, Sycamore's own valuation firm – Duff & Phelps – also concluded that the Carve-Out Assets were worth far more than the amounts paid for them by the Sycamore Affiliates.  For example, Sycamore commissioned Duff & Phelps to prepare a valuation of each of Jones Apparel and Stuart Weitzman in August 2014 – just months after the LBO – to justify Sycamore taking a total of more than $160 million in dividends from the companies (substantially more than Sycamore's total equity investment in RemainCo). In those opinions, Duff & Phelps reckoned that Jones Apparel and Stuart Weitzman by themselves were worth about $1 billion or more.  Any contention that all three Carve-Out Assets were worth just the $641 million paid to NWHI in April 2014 is ludicrous.[24]

**NWHI Was Rendered Deeply Insolvent by the LBO**

29.     As discussed briefly below, and in detail in the Proposed Complaint, the estimates and projections for RemainCo and the Carve-Out Assets Sycamore created and presented to the market were a farce, and if realistic projections had been used, RemainCo's insolvency would

---

[23] Compl. ¶¶ 21-22, 154-164.
[24] Compl. ¶¶ 151-158.

have been obvious.  Indeed, Sycamore procured the RemainCo Solvency Opinion only by

supplying Duff & Phelps with its upside case for RemainCo.  But it is unnecessary to dig into the

projections to see that RemainCo was deeply insolvent at the time of the LBO.  All one need do

is look at the values set by the market for (i) Jones Inc. as a whole, and (ii) the Carve-Out Assets

that were peeled away from Jones Inc. in the LBO to create RemainCo.

      30.     A robust sale process led by Citigroup established the value of Jones Inc. at no

more than about $2.2 billion, and that implied value was reduced to $2.103 billion by the time

the LBO closed.[25]  Since Jones Inc. consisted only of RemainCo and the Carve-Out Assets,

subtracting the true value of the Carve-Out Assets from Jones Inc.'s overall value, each as set by

the market, yields the true value of RemainCo.  Even if the Carve-Out Assets were worth only

the $641 million purchase price set by Sycamore's self-dealing, RemainCo would have been in,

or teetering on the edge of, insolvency given the debt Sycamore heaped on it in the LBO.  As

market transactions and other objective evidence clearly demonstrates, however, the Carve-Out

Assets were collectively worth about $1 billion or more at the time of the LBO, even after

present valuing the sale prices back to April 8, 2014 using discount rates selected by Duff &

Phelps itself.  Hence, RemainCo necessarily was worth far less than the $1.551 billion in debt it

was left with after the LBO.  A chart illustrating this bridge to RemainCo insolvency follows:

---

[25] Compl. ¶ 24 & n.6.



Source: Company records; LBO Funds Flow; Purchase Agreements
(1) Reflects $1.18 billion purchased equity plus $1.01 billion of Pre-LBO debt less $91 million of excess cash (assuming $10 million minimum cash requirement)
(2) 2015 SW Sale Value of $548 million (includes $18 million earnout adjustment) discounted to April 8, 2014 at 13.5% WACC, based on SW WACC per D&P Stuart Weitzman Solvency Analysis (August 28, 2014)
(4) 2015 JNY IP Sale Value of $75 million discounted to April 8, 2014 at 12.75% WACC, based on mid range WACC per D&P Jones Apparel Solvency Analysis (August 28, 2014)
(5) 2014 ApparelCo Dividend of $40 million discounted to April 8, 2014 at 12.75% WACC, based on mid range WACC per D&P Jones Apparel Solvency Analysis (August 28, 2014)
(6) 2017 Kasper Sale and A/R Dividend of $71 million discounted to April 8, 2014 at 12.75% WACC, 12.75% WACC, based on mid range WACC per D&P Jones Apparel Solvency Analysis (August 28, 2014)

## Sycamore Manipulates Estimates, Projections and Valuations Leading to LBO

31.     Had Sycamore been honest about the true value of the Carve-Out Assets, it could not have sold those assets off to Sycamore Affiliates at the bargain-basement prices it did. Indeed, Sycamore's early, internal estimates of the valuation splits between RemainCo and the Carve-Out Assets showed that RemainCo could not support even close to $1.5 billion in debt, and that the Carve-Out Assets were substantially more valuable than the price Sycamore ultimately set for them in the LBO.  Over time, however, Sycamore moved its estimates farther

and farther away from reality, until finally Sycamore arrived at valuations that suited its purposes. Sycamore's valuation machinations are illustrated in the chart below[26]:

| Date of Sycamore Valuation | RemainCo Value | Carve-Out Asset Value | Total Enterprise Value |
|---|---|---|---|
| 10/29/13 | $1,330 | $840 | $2,170 |
| 11/01/13 | $1,410 | $760 | $2,170 |
| 11/04/13 | $1,505 | $665 | $2,170 |
| 11/29/13 | $1,560 | $640 | $2,200 |
| 12/16/13 | $1,570 | $670 | $2,240 |
| 1/31/14 | $1,570 | $660 | $2,230 |
| 3/5/14 | $1,580 | $640 | $2,220 |

32.    To justify RemainCo's ever-increasing share of enterprise value, Sycamore created and manipulated estimates and projections of performance that were contrary to the actual performance and trends of RemainCo's businesses. For example, Sycamore gradually increased its estimate for RemainCo's 2013 management pro forma EBITDA from $178 million in October 2013 to $198 million in February 2014 (including tens of millions of dollars in "management adjustments"), notwithstanding contemporaneous information that the actual performance of RemainCo's businesses was moving in the opposite direction.[27] Sycamore then piled on growing and highly speculative "Sponsor Addbacks," until Sycamore "estimated" 2013 adjusted EBITDA for RemainCo of $236 million, *or about $100 million more than estimated RemainCo 2013 EBITDA (i.e., RemainCo EBITDA without adjustments by Sycamore or anyone else)*. The chart below shows how Sycamore's 2013 estimates changed, and how those changes impacted RemainCo's estimated values[28]:

[26] Compl. ¶¶ 14-15, 98-99, 111.
[27] Compl. ¶¶ 101-104.
[28] Compl. ¶¶ 105-108.

| Date | RemainCo Pro Forma Unadjusted EBITDA ($ in millions) | RemainCo Sponsor Addbacks ($ in millions) | Total Sycamore RemainCo Pro Forma Adjusted 2013 EBITDA ($ in millions) | Sycamore RemainCo Valuation ($ in millions) |
|---|---|---|---|---|
| 10/23/13 | $178 | $28 | $206 | $1,300 |
| 10/29/13 | $187 | $28 | $215 | $1,330 |
| 11/01/13 | $187 | $28 | $215 | $1,410 |
| 11/04/13 | $188 | $28 | $216 | $1,505 |
| 11/29/13 | $188 | $17 | $205 | $1,560 |
| 12/16/13 | $189 | $29 | $218 | $1,570 |
| 1/31/14 | $195 | $36 | $231 | $1,570 |
| 3/5/14 | $198 | $38 | $236 | $1,580 |

33.     When Sycamore sought the RemainCo Solvency Opinion, it supplied Duff & Phelps with the highest RemainCo 2013 EBITDA figure that Sycamore ever estimated, at any time – $236 million. Sycamore also provided uber-aggressive five-year projections secretly premised on Sycamore's *upside* case, while representing to Duff & Phelps that it was the best, most accurate and most likely estimate for RemainCo's performance. The projections given by Sycamore to Duff & Phelps were also far higher than Jones Inc.'s contemporaneous projections. As just one example, whereas the projections that Sycamore gave Duff & Phelps assumed that RemainCo would generate $244 million of EBITDA in 2014, Jones Inc. management's own projections from April 2014 projected just $193 million for that year.[29]

34.     Meanwhile, over the same period of time, Sycamore's estimated pro forma 2013 EBITDA for the Carve-Out Assets collectively dropped from $101 million to $65 million, even though there were no developments in the underlying businesses that would have justified such dramatic changes[30]:

---

[29] Compl. ¶¶ 106, 123-128.
[30] Compl. ¶ 120.

| Date | Total Carve-Out Adjusted EBITDA (millions) | Total Sycamore Carve-Out Valuation (millions) |
|------|------|------|
| 10/23/13 | $101 | $790 |
| 10/29/13 | $92 | $840 |
| 11/01/13 | $68 | $760 |
| 11/04/13 | $66 | $665 |
| 11/29/13 | $65 | $640 |
| 12/16/13 | $74 | $670 |
| 1/31/14 | $66 | $660 |
| 3/5/14 | $65 | $640 |

35.     Tellingly, it appears that Sycamore never used its supercharged 2013 RemainCo

EBITDA and upside case projections other than in connection with the LBO.  For instance, when

Sycamore prepared an internal RemainCo valuation just months after the LBO, it did not include

any of the speculative Sponsor Addbacks, and instead premised its valuation on much lower

"unadjusted" EBITDA numbers.  The chart below compares the projections Sycamore gave to

Duff & Phelps to use for its RemainCo solvency analysis, with the projections Sycamore itself

used for RemainCo in an internal valuation in September 2014[31]:

| Projected EBITDA | | |
|------|------|------|
| Year | Duff & Phelps LBO Solvency Analysis, April 2014 (millions) | Sycamore Internal Valuation, September 2014 (millions) |
| 2014 | $244 | $191 |
| 2015 | $254 | $193 |
| 2016 | $263 | $196 |
| 2017 | $272 | $200 |
| 2018 | $282 | $204 |

36.     If Duff & Phelps had used Sycamore's more pessimistic RemainCo projections

from the third quarter of 2014 in its RemainCo Solvency Opinion, Duff & Phelps would have

determined that RemainCo was deeply insolvent at the time of the LBO.  Conversely, having

---

[31] Compl. ¶¶ 136-139.

stripped the Carve-Out Assets from NWHI, Sycamore became immediately more optimistic about the Carve-Out Assets' prospects. For example, when Sycamore wished to take an $80 million dividend from Stuart Weitzman in August 2014, it supplied Duff & Phelps with significantly *higher* projections than it used for the same business before the LBO. A comparison of the two sets of Stuart Weitzman projections is provided below[32]:

| Sycamore EBITDA Projections for Stuart Weitzman | | |
|---|---|---|
| ($ in millions) | Pre-LBO Lender Syndication Forecast | Post-LBO Solvency Analysis Forecast |
| 2013 (Actual) | $52.4 | $50.4 |
| 2014 | $58.8 | $56.9 |
| 2015 | $65.8 | $76.1 |
| 2016 | $69.7 | $101.0 |
| 2017 | $73.8 | $130.5 |
| 2018 | $78.0 | $164.6 |

37.    Using these higher estimates, Duff & Phelps concluded that Stuart Weitzman was worth between $705 million and $770 million, a far cry from the $395 million purchase price Sycamore set for its Affiliates in connection with the LBO just a few months before.[33] Likewise, in a series of post-LBO sale transactions, Sycamore resold Jones Apparel and Kurt Geiger at prices that collectively were about ▅▅▅▅▅▅ more than the prices Sycamore Affiliates paid in the LBO. Sycamore's clumsy manipulation of the pre-LBO estimates and projections, and sudden abandonment of those distorted models as soon as the LBO closed, are detailed in the Proposed Complaint.[34]

---

[32] Compl. ¶¶ 154-155.

[33] Compl. ¶ 158.

[34] *See* Compl. ¶¶ 159-163.

## RemainCo Immediately and Disastrously Misses Sycamore Projections

38.     RemainCo's performance after the LBO provides further corroboration that Sycamore's pre-LBO projections were worse than a fantasy.  RemainCo's actual EBITDA never came close – in any year – to Sycamore's claimed $236 million Adjusted EBITDA for 2013, the number Sycamore used to claim RemainCo was worth more than the $1.55 billion in post-LBO debt.[35]



39.     Sycamore's projections for 2014 and beyond were equally far-fetched.  Sycamore predicted that RemainCo would earn a total of about $1.03 billion in EBITDA between 2014 and 2017,[36] but RemainCo actually earned less than half of that amount, about $450 million.  In the years 2015, 2016 and 2017, RemainCo's actual EBITDA was just 37%, 24% and 32% of

---

[35] 2017 RemainCo EBITDA ($88 million) as presented in the chart includes financial results of Kasper, which was acquired in 2017.  *See* Compl. ¶ 131.

[36] Compl. ¶ 124.

Sycamore's pre-LBO forecast, respectively. These disastrous results almost certainly would have required a near-term bankruptcy filing, but RemainCo had no significant funded debt maturities until 2019. As it was, RemainCo limped along outside of bankruptcy for a few years, despite its manifest balance sheet insolvency, finally giving into the inevitable on April 6, 2018, when it filed for Chapter 11.

### Sycamore's Self-Dealing Working Capital Waiver

40.    In the months after the LBO, Sycamore also deprived RemainCo of approximately $64.5 million in excess working capital due from Jones Apparel and transferred the money to itself by means of a dividend.

41.    The purchase agreement for Jones Apparel included a standard working capital purchase price adjustment, or "true up," provision.[37] Under the true-up, Jasper Apparel (the buyer) agreed to pay an aggregate amount equal to any net working capital at closing in excess of the normalized working capital for the twelve months preceding the closing of the Carve-Out Transactions.[38]

42.    Jones Apparel had substantial excess net working capital on its balance sheet, approximately $74.2 million, at the time of the LBO.[39] Nevertheless, on July 8, 2014, Sycamore wrongly caused NWHI to waive the working capital adjustment in the amended Jones Apparel Purchase Agreement ("Working Capital Waiver"), causing a cash loss to NWHI of approximately $64.5 million, and a concurrent benefit to Jasper Apparel in the same amount.[40] Sycamore papered the waiver with a fraudulent and improper calculation worksheet. Thirty days later,

---

[37] Compl. ¶ 165.

[38] Compl. ¶ 165.

[39] Compl. ¶ 166. Internal Sycamore calculations from late June 2014 arrive at the slightly lower sum of $62 million. Compl. ¶ 168.

[40] Compl. ¶ 166.

Jones Apparel paid an $80 million dividend to Sycamore, funded in part by $40 million in cash, definitively demonstrating that Jones Apparel had significant excess capital that was wrongfully withheld from RemainCo.[41]

43.    The Working Capital Waiver occurred three months after the LBO closed, when it was plainly apparent that RemainCo was performing far worse than Sycamore's pie-in-the-sky projections forecasted.[42]  Sycamore nevertheless caused RemainCo to gift $64.5 million to Sycamore in exchange for nothing.

**Sycamore Takes Worthless Stock Deduction, Depriving NWHI of NOLs**

44.    Sycamore's self-dealing has continued into the present.  Just one week before the Debtors filed for bankruptcy, Sycamore informed RemainCo that it had claimed a tax deduction for Sycamore's basis in RemainCo's worthless stock (the "Worthless Stock Deduction").[43] Typically, the IRS views the taking of such a deduction as a "change of control" precluding the company from simultaneously claiming net operating losses ("NOLs") to offset its tax liabilities.[44]  Thus, Sycamore deprived the Debtors of the opportunity to claim the NOLs themselves.

45.    It appears, moreover, that Sycamore took the Worthless Stock Deduction in a bad faith effort to obtain leverage against the Debtors – for whom Sycamore and its principals remain fiduciaries – and to coerce a cheap settlement from the Debtors of their valuable claims against Sycamore.  Indeed, during the course of this pending litigation, Sycamore has suggested in several communications that it would consider unwinding the Worthless Stock Deduction in

---

[41] Compl. ¶ 166.
[42] Compl. ¶¶ 131-135.
[43] Compl. ¶ 171.
[44] Compl. ¶ 170.

exchange for a release of all estate claims against it. As discussed below, Sycamore's election to take the Worthless Stock Deduction is avoidable as a fraudulent conveyance, and entitles the Debtors to an award of damages for breach of fiduciary duty.[45]

**Sycamore's Bad Faith ███ Threats, and the Debtors' Inadequate Investigation**

46.     From the beginning of these cases, the Committee urged the Debtors to put the Proposed Claims in a trust to be prosecuted after confirmation of a plan, so the Debtors and their creditors can focus on reorganization without rushing into a settlement that would likely greatly undervalue those claims.

47.     This is exactly the outcome Sycamore most feared, and that Sycamore was desperate to avoid. ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████ █ ███████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████.[48]

48.     Sycamore's threats by themselves demonstrated its bad faith, and constituted a violation of the fiduciary and other duties owed by Sycamore and its principals to NWHI. The threats also were irrational, since they could only expose Sycamore to still more liability, and appeared calculated to try to intimidate the parties into releasing the claims against Sycamore for less than their value

---

[45] *See infra* Part II.A.1-3.
[46] Compl. ¶ 175; Depo. Tr. of Ralph Schipani (Ex. D) at 208-18:21 (July 17, 2018).
[47] Compl. ¶ 173.
[48] Compl. ¶ 173.

49.    ███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████. The Committee

worried openly that the longstanding and lucrative connections (i) between Sycamore and the

Debtors' primary bankruptcy counsel, Kirkland, and (ii) between Kirkland and Munger Tolles &

Olsen LLP ("MTO") would hamstring any serious inquiry into Sycamore's misconduct. In six

other recent bankruptcy cases MTO has assumed a similar role to that taken here, "represent[ing]

independent directors or managers for the debtors . . . where [Kirkland] has served as primary

bankruptcy counsel for the debtors."[49]

50.    The Committee's concerns were justified. For example, although the Debtors

insisted that MTO should work alongside professionals for the Committee in exploring the

Proposed Claims, MTO sought no documents from Sycamore beyond those that Sycamore

selected itself and provided voluntarily before Rule 2004 discovery began. MTO attended each

of the Rule 2004 depositions taken by the Committee, but asked just a handful of questions of a

single witness concerning the Working Capital Waiver. Remarkably, MTO chose not to demand

and review the Debtors' privileged documents relating to the LBO, though it undoubtedly had

the right to do so. Nor did MTO conduct interviews of many of the Debtors' key executives

(current and former) concerning the transaction at issue.

51.    On June 5, 2018, this Court granted the Committee's motion for expedited

discovery of the Debtors and various third parties pursuant to Rule 2004 of the Bankruptcy Code.

Since then, the Committee has diligently investigated the circumstances surrounding the LBO

and Carve-Out Transactions, including by reviewing approximately 110,000 documents and

---

[49] *See* Letter from T. Walper to D. Zensky dated May 28, 2018 (Ex. C), at 1-2.

taking eleven depositions.  The Rule 2004 examination has culminated in the Proposed

Complaint attached hereto, which describes in detail the wrongful behavior engaged in by the

Defendants that rendered NWHI insolvent and stripped away its best assets for far less than

equivalent value.

### The Debtors' Unjustifiable Refusal to Prosecute Claims Against Sycamore

52.    On August 20, 2018, the Committee formally demanded that the Debtors

prosecute the Proposed Claims to recover NWHI's assets for the benefit of the NWHI estate and

its creditors.  In the alternative, the Committee requested that the Debtors assign the Proposed

Claims to a Litigation Trust to pursue the claims after NWHI's emergence from bankruptcy for

the benefit of NWHI's unsecured creditors in accordance with a confirmed plan of

reorganization.[50]

53.    The Debtors refused, indicating instead that they planned to engage in settlement

negotiations with Sycamore.  The Committee repeatedly requested, orally and in writing, that its

counsel be permitted to attend and participate in any settlement meetings.  MTO rejected the

Committee's requests.[51]  MTO opted instead to provide only sporadic updates to the Committee

concerning the lopsided movement of MTO's "ask"—which dramatically undervalued the

Proposed Claims—towards Sycamore's relatively static, and woefully insufficient "bid."[52]

54.    Notwithstanding the Debtors' lack of transparency and Sycamore's bullying,

---

[50] *See generally* Letter from D. Zensky to T. Walper dated Aug. 20, 2018 (Ex. G).  The Committee updated its demand by letter dated September 21, 2018 (Ex. M).

[51] The Committee's 2004 motion did not encompass depositions of the independent directors, but the Committee will likely take such depositions prior to a hearing on this motion.  Such depositions will include, among other things, questions respecting the independent directors' rationale for excluding the Committee from negotiations with Sycamore.

[52] *See* Letter from D. Zensky to S. Goldman dated Aug. 10, 2018 (Ex. E); Email from D. Zensky to S. Goldman et al. dated Aug. 17, 2018 (Ex. F); Email from D. Zensky to T. Walper et al. dated Aug. 20, 2018 (Ex. H); Letter from H. Schub to T. Walper dated Aug. 21, 2018 (Ex. I); Email from S. Goldman to D. Zensky et al. dated Aug. 24, 2018 (Ex. J); Letter from T. Walper to D. Zensky and H. Schub dated Aug. 30, 2018 (Ex. K); Email from D. Zensky to T. Walper et al. dated Aug. 30, 2018 (Ex. L); Golden Decl. ¶ 14.

NWHI's unsecured creditors negotiated diligently with one another to resolve their intra-creditor disputes and preserve the valuable claims against Sycamore for a post-emergence trust.[53]  The creditors neared an agreement over the weekend ending Sunday, September 23, 2018.  On Monday, September 24, 2018, Kaluzny and Morrow abruptly announced their resignation from Sycamore's board of directors.[54]  The creditors reached a deal on Tuesday, September 25, 2018,[55] and put the terms of their agreement on the record at a hearing before this Court on Wednesday, September 26, 2018, including assignment of the claims against Sycamore to a litigation trust for prosecution after emergence.[56]

55.     Sycamore's maneuver unnerved the unsecured term lenders, and may have derailed the creditors' agreement.  It now seems the Debtors will again seek to settle the Sycamore claims for a small fraction of their value.  In so doing, the Debtors are playing directly into Sycamore's hands, and demonstrating – once again – that they simply are not the right parties to maximize the value of the Proposed Claims.

56.     The Committee already has unearthed sufficient facts through its Rule 2004 examination to demonstrate that the Proposed Claims are worth substantially more than is

---

[53] Compl. ¶ 176.

[54] *See* Letter from M. Thomas to D. Golden dated Sept. 25, 2018 (Ex. O).

[55] *See* Creditor Settlement Agreement dated Sept. 25, 2018 (Ex. N).

[56] *See* Hr'g Tr. at 19:6-29:4 (Sept. 26, 2018) (Ex. P).

reflected in the Debtors' proposed settlement range, and NWHI's claims – and the estate's bargaining position – only will become stronger as the investigation continues.  For example, the Committee has recently discovered that many of the key valuation spreadsheets maintained by Sycamore and others contained hidden worksheets with a wealth of important data and calculations.  Further analysis of these hidden calculations is certain to yield important evidence and insight into Sycamore's misconduct.

57.    In addition, in light of the compressed timeframe available for the Rule 2004 Examination, it would have been impractical for the Committee to seek document discovery from all of key advisors to the LBO, including advisers to Sycamore, or to take depositions of numerous witnesses whose testimony would be crucial in a plenary proceeding, including current and former officers and directors of RemainCo and the Carve-Out Assets and representatives from Sycamore's LBO advisers.  Nor has the Committee yet fully examined the numerous claims of privilege asserted by Sycamore and other producing parties.  Successful challenges to those assertions could result in the production of potentially significant additional materials.  Given the evidence that has been unearthed to date, the Committee is confident that further efforts in discovery will only strengthen its claims.

58.    Sycamore should not be permitted to cut short the investigation into its misconduct with a premature and inadequate settlement.  For the reasons described below, standing should be granted to the Committee to pursue the Proposed Claims.

## ARGUMENT

### I.    Legal Standard for Derivative Standing

59.    "The practice of authorizing the prosecution of actions on behalf of an estate by committees, and even by individual creditors, upon a showing that such is in the interests of the estate, is one of long standing, and nearly universally recognized."  *Adelphia Commc'ns Corp. v.*

*Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005);

*see also Official Comm. of Unsecured Creditors of Cybergenics Corp ex rel. Cybergenics Corp.*

*v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (recognizing that a "straightforward application" of

a bankruptcy court's equitable powers allows for a grant of derivative standing upon creditors'

committees to assert causes of action on behalf of, and for the benefit of, the debtor's estate); *La.*

*World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988) (similar); *Neb. State Bank*

*v. Jones*, 846 F.2d 477, 478 (8th Cir. 1988) (similar). In order to be granted derivative standing

in the Second Circuit, a creditors' committee must:

> (i)     "present[] a colorable claim or claims for relief that on appropriate proof would support a recovery," and
>
> (ii)    demonstrate that the debtor "unjustifiably failed to bring suit." *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes* (*In re STN Enters.*), 779 F.2d 901, 905 (2d Cir. 1985); *see also Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P.* (*In re AppliedTheory Corp.*), 493 F.3d 82 (2d Cir. 2007).

       60.      A colorable claim is one "that on appropriate proof would support a recovery."

*STN*, 779 F.2d at 905. The standard for presenting a "colorable" claim is a "relatively easy one

to meet," and is satisfied where the proposed litigation will not be a "hopeless fling." *Adelphia*,

330 B.R. at 376, 386; *see also Hobby Ctr. v. Hudson United Bank* (*In re America's Hobby Ctr.,*

*Inc.*), 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (standing should be denied only if claim is

"facially defective"); *In re Colfor, Inc.*, No. 96-60306, 1998 Bankr. LEXIS 158, at *7 (Bankr.

N.D. Ohio Jan. 5, 1998) (a "colorable" claim is one which is "plausible" or "not without some

merit"). A debtor's refusal to bring suit is unjustifiable when bringing suit would be likely to

benefit the reorganization estate, after taking account of any associated costs or delays. *STN*, 779

F.2d at 905. Both factors are readily met here, and the Committee's motion should be granted

accordingly.

## II.    The Committee Should Be Granted Derivative Standing

### A.    The Proposed Claims Are Colorable

61.    Sycamore and the Debtors themselves acknowledge at least tacitly that the claims against Sycamore are "colorable," they just massively understate the value of those claims.  As discussed above, the Debtors previously appeared poised to release all claims against Sycamore for far less than those claims are worth.  While any amount in the range under discussion would be woefully inadequate to compensate NWHI and its creditors for releasing their $1 billion-plus claims against Sycamore, it is more than any party would pay to escape claims the party believed to be a mere "hopeless fling."  *See, e.g., Adelphia*, 330 B.R. at 376, 386.  Sycamore's desperate efforts to preemptively settle the claims against it rather than face them outside of bankruptcy further demonstrate the colorability of those claims.  The basis for each of NWHI's claims – and their evident colorability – is discussed briefly below.

### 1.    NWHI's Constructive Fraud Claims Are Colorable

62.    NWHI is entitled to (i) avoid and recover from Sycamore the value of the Carve-Out Assets, the Working Capital Waiver and the Worthless Stock Deduction and (ii) avoid the liens and obligations it incurred in connection with the LBO Debt.  NWHI was insolvent at the time, or rendered insolvent by, each transfer and/or incurrence, and NWHI received less than reasonably equivalent (or fair) value for each, as discussed below.  *See, e.g.,* N.Y. Debt. & Cred. Law §§ 273, 274, 275, 278, 279; Del. Code. Ann. tit. 6 §§ 1304(2), 1305, 1307; 12 Pa. C.S.A. §§ 5105, 5105, 5107).

### (a)    The LBO Rendered NWHI Insolvent

63.    As described briefly above and in detail in the Proposed Complaint, the established market values of (i) the Jones Inc. enterprise and (ii) the Carve-Out Assets demonstrate conclusively that NWHI (RemainCo) was insolvent after the LBO.  The

overwhelming evidence regarding the true value of the Carve-Out Assets – as opposed to the self-dealing, deflated prices Sycamore arranged for its Affiliates to pay – is described in the Proposed Complaint.[59]   Once that true value – about $1 billion or more – is subtracted from Jones Inc.'s pre-transaction enterprise value of just about $2.1 billion, RemainCo's post-LBO insolvency is manifest.

64.    Sycamore sought to justify the Carve-Out Assets' bargain-basement LBO sale prices by manipulating estimates and projections for the business segments created by the LBO, which exaggerated the value of RemainCo (and consequently understated the value of the Carve-Out Assets).[60]   Notably, most actual performance trends of the relevant businesses pointed in exactly the opposite direction of Sycamore's projections at the time.[61]   Sycamore never used those projections again other than in connection with the LBO, relying instead on much less aggressive forecasts for RemainCo, and much more optimistic estimates of likely future performance of the Carve-Out Assets for its post-LBO internal valuations and dividend and sale transactions.[62]   The EBITDA contortions Sycamore went through to obtain the RemainCo Solvency Opinion and arrive at its desired value splits – and the manifest unreliability of Sycamore's approach and estimates – are alleged in detail in the Proposed Complaint.[63]

---

[59] *See* Compl. ¶¶ 13-23.
[60] *See* Compl. ¶¶ 82-90, 98-122.
[61] *See* Compl. ¶¶ 101-104, 116-122.
[62] *See* Compl. ¶¶ 123-130, 136-141, 150-158.
[63] *See* Compl. ¶¶ 98-130.

(b) **NWHI Received Less than Reasonably Equivalent Value for the Property Transferred to Sycamore, and the Liens and Obligations Incurred for the LBO Debt**

1) **NWHI Transferred the Carve-Out Assets to Sycamore for far Less than their Value**

65.     Regarding the sale of the Carve-Out Assets, lack of reasonably equivalent value is not a close call.  As discussed at length above and in the Proposed Complaint, the actual market transactions demonstrate that the Carve-Out Assets were worth *at least* $400 million more than NWHI received from the Sycamore Affiliates.  Similarly, Sycamore's internal valuations and forecasts and other contemporaneous evidence establish that the Carve-Out Assets were worth far more than $641 million.

2) **NWHI Incurred the Liens and Obligations to the LBO Lenders for far Less than the Value Received in Return**

66.     The LBO Lender Defendants (and/or their predecessors) had actual or constructive knowledge that the vast majority of the proceeds of the LBO Debt would be immediately transferred to Jones Inc.'s former shareholders for no value.[64]  It is well settled that multilateral lending transactions may be collapsed and treated as phases of a single transaction for purposes of evaluating whether a transferor or obligor received reasonably equivalent value.  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986).  The "paradigmatic scheme" justifying collapsing is where "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee."

---

[64] *See* Compl. ¶¶ 142-149, 206-213. A corporation receives no value when it re-conveys the proceeds of loans to shareholders in the form of stock redemptions or dividends.  *See, e.g., Wirum v. Wilson* (*In re SDR Capital Mgmt., Inc.*), No. 05-34008 TEC, 2007 WL 3450999, at *1 (Bankr. N.D. Cal. Nov. 14, 2007); *see also, e.g., Consove v. Cohen* (*In re Roco Corp.*), 701 F.2d 978, 982 (1st Cir. 1983); *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002); *Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 136 (Bankr. D. Mass. 1989); *Joshua Slocum, Ltd. v. Boyle* (*In re Joshua Slocum, Ltd.*), 103 B.R. 610, 618 (Bankr. E.D. Pa. 1989).

*HBE Leasing*, 48 F.3d at 635.  As a result, the "first transferee receives the debtor's [repayment obligation], and the second transferee receives the consideration, while the debtor retains nothing." *Id*.  "This approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent." *Id*.

67.     Further, although not required in order to satisfy the collapsing analysis, the Proposed Complaint also alleges that the original arranger and placement agent for the Term Debt – Morgan Stanley – knew or should have known that the LBO would result in NWHI's financial impairment, including by causing NWHI to be unable to repay the Unsecured and Secured Term Loans as they came due.[65]  For example, Morgan Stanley created its own base and downside projections for NWHI that were materially lower than those provided by Sycamore.[66]

68.     The Morgan Stanley model did not include a solvency analysis for NWHI.[67]  However, applying assumptions in the range used by Duff & Phelps to Morgan Stanley's projections results in a finding of NWHI insolvency in virtually all scenarios.[68]  Thus, the agent for the Unsecured Term Loans knew or should have known before the LBO closed that (i) Sycamore's projections for NWHI were overly aggressive, and that (ii) if projections reflecting Morgan Stanley's own view of NWHI's likely performance were used, the LBO Debt would render NWHI insolvent.[69]  Concerns regarding NWHI's insolvency were also evident to individual lenders under the Secured and Unsecured Term Loans.[70]

---

[65] *See* Compl. ¶¶ 147-149, 208-211.

[66] *See* Compl. ¶¶ 147-149.

[67] *See* Compl. ¶ 148.

[68] *See* Compl. ¶ 148.

[69] *See* Compl. ¶¶ 148-149.

[70] *See* Compl. ¶ 208. Indeed, one of the largest lenders under the Unsecured Term Loan stated in an internal email that it was "pretty likely" that NWHI would find itself in "real trouble" over the next three years.  Compl. ¶ 208.

69.    Morgan Stanley, however, like other Term Loan lenders, could afford to ignore, or willfully blind itself to, clear evidence of NWHI's post-LBO insolvency.[71]  Repayment of the LBO Debt was guaranteed by NWHI's key operating subsidiaries, which accounted for much of NWHI's value, but were encumbered by barely half of NWHI's debt.[72]  Those subsidiaries were not liable to repay, and did not guarantee, any of NWHI's $700 million of bond debt.  Hence, the Secured and Unsecured Term Loans could be repaid in full even if NWHI was insolvent, as long as the operating subsidiaries were solvent.  Morgan Stanley therefore was prepared to proceed with arranging and financing the Term Loans despite its actual or constructive knowledge of NWHI's financial impairment.[73]

3)    **NWHI Received No Value for Waiving a $64 Million-Plus Payment Owed by Sycamore Affiliate Jones Apparel**

70.    There is no question that RemainCo was contractually entitled to all of the net working capital at Jones Apparel at the time of the LBO – an amount which appears to have been approximately $64.5 million – and Sycamore simply waived that valuable right for no value.[74]

4)    **NWHI Received No Value in Exchange for its NOLs**

71.    Several decisions have held that NOLs are estate property subject to the automatic stay.  *See Official Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines Inc.*), 928 F.2d 565 (2d Cir. 1991) (upholding an order enjoining a parent corporation from taking a post-petition worthless stock deduction that would have prevented its subsidiary, the debtor, from using $74 million worth of NOLs); *Triad Guar. Inc. v. Triad Guar. Ins. Corp.* (*In re Triad Guar. Inc.*), No. 14-1464 (GMS), 2016 WL 3523834, at *10 (D. Del. June 26, 2016) (similar).  By

[71] *See* Compl. ¶¶ 210-211.
[72] *See* Compl. ¶¶ 210-211.
[73] *See* Compl. ¶¶ 210-211.
[74] *See* Compl. ¶¶ 165-169.

taking the Worthless Stock Deduction, Sycamore deprived RemainCo of the NOLs for no value.

### (c)    The Value of NWHI's Avoidance Claims Is Immense

72.    In light of the above, NWHI is entitled to recover over $1 billion in fraudulent

transfers to Sycamore.  This amount includes: the value of the Carve-Out Transactions as

evidenced by market transactions, i.e., re-sales and dividends (approximately $1 billion or more);

the working capital that Jasper Apparel should have but failed to turn over ($64.5 million); and

the value of the Worthless Stock Deduction.[75]  NWHI is also entitled to avoid liens and

obligations incurred to the benefit of the LBO Lenders in connection with the more than $800

million in LBO Debt.

### 2.    NWHI Has Colorable Claims for Intentional Fraudulent Conveyance

73.    NWHI's claims for intentional fraudulent conveyance for the same transfers and

incurrences also are colorable.  Indeed, evidence of intentional fraudulent conduct here is

overwhelming, and demonstrates Sycamore's willful and deliberate effort to repeatedly utilize its

control of NWHI to benefit itself at the expense of NWHI's creditors.

74.    A debtor can avoid any transfer or incurrence made "[w]ith actual intent to hinder,

delay or defraud any creditor of the debtor."  Del. Code Ann. tit. 6 § 1304; 12 Pa. Cons. Stat. §

5104(a)(1).  Since "individuals are rarely willing to admit intent, actual fraud is rarely proven by

direct evidence," *Shubert v. Stranahan* (*In re Pa. Gear Corp.*), No. 02-36436DWS, 2008 WL

2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008), and instead may be shown by "badges of fraud."

*See Holber v. Dolchin Slotkin & Todd, P.C.* (*In re Am. Rehab & Physical Therapy, Inc.*), No. 04-

014562, 2006 WL 1997431, at *15-16 (Bankr. E.D. Pa. May 18, 2006).

---

[75] *See* Compl. ¶ 197.

75.    This is the rare case where the Debtor already has actual evidence of Sycamore's fraud based solely on the limited Rule 2004 discovery taken to date.  As alleged in detail in the Proposed Complaint, Sycamore created projections that fraudulently inflated the value of RemainCo, and fraudulently deflated the value of the Carve-Out Assets, among other things.[76] In addition, the Proposed Complaint alleges a number of badges of fraud in connection with the Carve-Out Transactions, Working Capital Waiver, and Worthless Stock Deduction, and thus plainly states colorable claims that these transfers constitute intentional fraudulent conveyances.[77]  For instance, the Proposed Complaint alleges that (1) the Carve-Out Assets were transferred to Sycamore, an insider of the Debtors, (2) Sycamore paid NWHI significantly less for the Carve-Out Assets than those assets were worth, (3) the Carve-Out Transactions rendered NWHI insolvent, and (4) the Carve-Out Transactions occurred immediately after the Debtors incurred the enormous LBO Debt.[78]  Likewise, the Proposed Complaint alleges that both the Working Capital Waiver and the Worthless Stock Deduction were intended to hinder, delay, and or defraud RemainCo's creditors.[79]

### 3.    NWHI Has Colorable Claims for Breach of Fiduciary Duty Against the Sycamore and Jones Inc. Fiduciaries Arising from their Pre-Petition Misconduct

76.    The Sycamore Fund Entities, the Sycamore Principals, the Jones Inc. Directors, and McClain are all liable for breach of their fiduciary duties to NWHI and its creditors. Directors and controlling shareholders of a corporation owe the corporation and its shareholders fiduciary duties of care, loyalty, and good faith.  When a corporation becomes insolvent, the

---

[76] *See* Compl. ¶¶ 98-122, 136-141, 150-163.

[77] *See* Compl. ¶¶ 98-122, 136-141, 150-163, 165-171.

[78] *See* Compl. ¶¶ 80-122, 136-141, 150-163.

[79] *See* Compl. ¶¶ 165-171.

creditors replace shareholders as the residual stakeholders of the corporation and have standing

to sue for breach of fiduciary duty.  *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v.*

*Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007*); Official Comm. of Unsecured Creditors v. Baldwin*

*(In re Lemington Home for the Aged)*, 659 F.3d 282, 290 (3d Cir. 2011).

77.    The duty of care requires directors to "use that amount of care which ordinarily

careful and prudent men would use in similar circumstances." *In re Walt Disney Co. Deriv.*

*Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) ("*Disney I*"); *Stanziale v. Nachtomi* (*In re Tower Air,*

*Inc.*), 416 F.3d 229, 241-42 (3d Cir. 2005) (due care violation is "synonymous with engaging in

an irrational decision-making process" by failing to obtain information necessary to make an

informed decision, or reaching irrational conclusions in light of available information).  The

standard for a duty of care violation—"gross negligence"—is somewhat "nebulous." *See Jardel*

*Co. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).  While the term "signifies more than ordinary

inadvertence or inattention," it "is nevertheless a degree of negligence," as distinct from

recklessness, which "connotes a different type of conduct akin to the intentional infliction of

harm." *Alberts v. Tufts* (*In re Greater Se. Cmty. Hosp. Corp. I*), 353 B.R. 324, 339 (Bankr.

D.D.C. 2006) (citing *Jardel*, 523 A.2d at 530).  Notably, a director's burden to act with care is

heightened where a major corporate transaction such as an LBO is being considered. *Brandt v.*

*Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 305 (Bankr. D. Mass. 1997).

Board action with respect to such a transaction "will fail to meet the standard of due care" if it

suggests "indifference to a potential risk of harm" to the corporation. *Official Comm. of*

*Unsecured Creditors of TOUSA, Inc. v. Technical Olympic, S.A.* (*In re TOUSA, INC.*), 437 B.R.

447, 462 (Bankr. S.D. Fla. 2010) (citation omitted).

78.     The duty of loyalty "is an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Autobacs, Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs*), 473 B.R. 525, 562 (Bankr. D. Del. 2012); *see also Lampe v. Lampe* (*In re Lampe*), 665 F.3d 506, 515 (3d Cir. 2011) (fiduciary is required "in dealing with the affairs of the corporation to promote the interests of the corporation rather than its own interest").  A breach of the duty of good faith (which is a subset of the duty of loyalty) occurs where a fiduciary intentionally acts with a purpose other than advancing the best interests of the corporation, acts with the intent to violate positive law, or intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his or her duties.  *See, e.g., Burch v. Seaport Capital, LLC* (*In re Direct Response Media, Inc.*), 466 B.R. 626, 652 (Bankr. D. Del. 2012).  A complaint sufficiently pleads breach of the duty of loyalty if it alleges that the fiduciaries (1) were interested in the transaction at issue, (2) acted without good faith, or (3) lacked independence.  *See Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000) (declining to dismiss duty of loyalty claim where only single basis was pled); *see also Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000).

79.     All of the fiduciary defendants breached their duties to NWHI shamelessly in connection with the LBO, as well as certain other pre-petition misconduct.  In approving the LBO, the Jones Inc. Directors disavowed concern for any constituency other than Jones Inc. shareholders – a constituency of which each director was a part.  In so doing, the Jones Inc. Directors considered only their own interests, and failed to evaluate whether the interrelated LBO transactions would result in the insolvency of the surviving corporation, or the impact the LBO transactions would have on the surviving corporation's creditors.  All elements of the LBO

– the Merger, the Carve-Out Transactions and the LBO Debt – were part of a single, unified

transaction, and the Jones Inc.'s Directors' malfeasance and/or nonfeasance constituted a clear

violation of their fiduciary duties.  *See Giuliano v. Schnabel* (*In re DSI Renal Holdings, LLC*),

574 B.R. 446, 470-71 (Bankr. D. Del. 2017)

80.    Sycamore[80] and the Sycamore Principals had become fiduciaries of NWHI by the

time the LBO Debt was incurred and Carve-Out Assets were transferred to the Sycamore

Affiliates, but considered only their own parochial interests in those transactions, despite their

obvious and devastating impact on NWHI and its creditors, as detailed above and in the

Proposed Complaint.  Likewise, Sycamore, its principals and John McClain (who served as a

director of NWHI from April 15, 2014 to October 9, 2015) violated their fiduciary duties when

they caused NWHI to execute the Working Capital Waiver, which inured solely to Sycamore's

benefit and provided no benefit whatsoever to RemainCo.  Finally, Sycamore and the Sycamore

Principals violated their duties of care and loyalty to NWHI by taking the Worthless Stock

Deduction shortly before the petition was filed.

81.    Sycamore has informed the Committee that it intends to argue that NWHI's

breach of fiduciary duty claims are time-barred.  In fact, NWHI's claims accrued well within the

six-year statute of limitations provided under applicable New York law.  *See* N.Y. C.P.L.R.

§ 213(7) (providing that "an action by or on behalf of a corporation against a present or former

director, officer or stockholder . . . to recover damages for waste or for an injury to property"

must be brought within six years of the alleged breach.).  Federal courts apply the choice of law

principles of the state in which the court is located.  *See, e.g., Bianco v. Erkins* (*In re Gaston &*

---

[80] A sole or majority stockholder such as Sycamore owes the same fiduciary duties of care, loyalty, and good faith as corporate officers and directors.  *See Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co.*), 274 B.R. 71, 93 (D. Del. 2002).

*Snow*), 243 F.3d 599, 601-02 (2d Cir. 2001). The rule in New York is that if a claim accrues (i)

in the state or (ii) in favor of a resident of the state, New York's statute of limitations governs.

*See* N.Y. C.P.L.R. § 202; *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998).

82.    Since NWHI, and Jones Inc. before it, both had their headquarters in New York,

they are deemed New York residents, and the derivative claims against NWHI's and Jones Inc.'s

fiduciaries are subject to New York's six-year limitations period. *See, e.g., Guzman v. Macy's

Retail Holdings, Inc.,* No. 09 Civ. 4472 (PGG), 2010 WL 1222044, at *10 (S.D.N.Y. Mar. 29,

2010) ("A corporation's principal place of business . . . determines its residence."); *Pereira v.

Centel Corp. (In re Argo Commc'ns Corp.*), 134 B.R. 776, 783-84 (Bankr. S.D.N.Y. 1991)

(applying New York's six-year period to bankruptcy trustee's claims against controlling

shareholder in connection with failed merger brought "in the name of the debtor and for the

benefit of creditors"); *see also Lippe v. Bairnco Corp.*, 230 B.R 906, 913 (S.D.N.Y. 1999)

(similar); *Bartle v. Markson*, 299 F. Supp. 958, 965 (N.D.N.Y. 1969) (similar), *aff'd*, 423 F.2d

637 (2d Cir. 1970).

### 4.    NWHI Has Colorable Claims for Aiding and Abetting Breach of Fiduciary Duty Against the Sycamore Principals, Sycamore, the Sycamore Employees, and the Jones Inc. Directors

83.    The Complaint also states colorable claims for aiding and abetting the breaches of

fiduciary duty described above. Under Delaware law, a claim for aiding and abetting breach of

fiduciary duty has four elements: (1) the existence of a fiduciary relationship, (2) a breach of the

fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages

proximately caused by the breach. *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 496 (Del.

Ch. 2013). The third element, knowing participation, requires that the third party act with the

knowledge that the conduct advocated or assisted constitutes a breach fiduciary duty. *See In re

Novell, Inc. S'holder Litig.*, C.A. No. 6032-VCN, 2013 WL 322560, at *17 (Del. Ch. Jan. 3,

2013).  Knowing participation may be inferred where a fiduciary breaches its duty in an "inherently wrongful manner," and the plaintiff alleges specific facts from which the Court could reasonably infer knowledge of the breach by the non-fiduciary.  *See id.*

84.    Various parties knowingly participated in the breaches of fiduciary duty described above.  The Sycamore Employees aided and abetted the Sycamore Principals, Sycamore, and the Jones Inc. Directors, because they knew that the projections on which the LBO Debt and Carve-Out Transactions were premised were fraudulent, but nevertheless assisted the Sycamore Principals, Sycamore, and the Jones Inc. Directors in consummating those transactions, by, *inter alia*, (i) devising the LBO structure, including the carve out and quick resale of Jones Inc.'s crown jewel assets; (ii) creating artificially low "historical" financial information and going-forward projections for the Carve-Out Assets to justify their low-ball purchase price; (iii) creating "historical" financial information and going-forward projections for RemainCo, including the Sponsor Addbacks, that were used to artificially inflate the value of RemainCo; (iv) providing misleading "historical" financial information and going-forward projections for RemainCo to Duff & Phelps, for the purpose of fraudulently obtaining a solvency opinion; (v) disseminating false and misleading projections to the public, including to the Lender Defendants, prospective investors, and rating agencies; (vi) assisting in securing debt financing for the LBO; and (vii) assisting in managing the overall LBO process.[81]  The Sycamore Employees knew that by doing so, they were helping the Sycamore Principals, Sycamore, and the Jones Inc. Directors earn huge profits at RemainCo's expense.

85.    Additionally, for all the reasons described herein, both the Sycamore Principals and Sycamore itself are liable for aiding and abetting the breaches of fiduciary duty by the Jones

---

[81] *See* Compl. ¶¶ 82-141, 150-163, 165-171.

Inc. Directors.[82]  Likewise, the Jones Inc. Directors are liable for aiding and abetting the

breaches of fiduciary duty by the Sycamore Principals and Sycamore, by knowingly facilitating

the LBO, LBO Debt, and Carve-Out Transactions by approving the Merger (which contemplated

the Carve-Out Transactions and LBO Debt), and then abdicating the fiduciary duties they owed

to NWHI to ensure that the Merger did not result in harm to the corporation.[83]

> **5.    The Estate Has Colorable Claims for Unlawful Stock Redemption and
> Dividends Against the Jones Inc. Directors and the Sycamore
> Principals**

86.     Stock redemptions and dividends are illegal when the capital of the corporation

either already is or would be impaired as a result of the distributions.  *See, e.g.,* DGCL §

160(a)(1)*;* 15 Pa. Cons. Stat. § 1551.  Directors who authorize such payments are liable to the

corporation and its creditors for the amount of the illegal dividends or redemptions, with interest.

DGCL § 174; 15 Pa. Cons. Stat. § 1553.  A corporation's capital is impaired if a redemption or

dividend renders a corporation "balance sheet" insolvent within the meaning of the Bankruptcy

Code.  *See SV Inv. Partners, LLC v. Thoughtworks, Inc.*, 7 A.3d 973, 982 (Del. Ch. 2010); *see

also* 15 Pa. Cons. Stat. § 1551(b) (prohibiting redemptions and dividends where "the total assets

of the corporation would be less than the sum of its total liabilities").  Here, the LBO rendered

NWHI insolvent, and the Sycamore and Jones Inc. fiduciaries are liable to NWHI for the more

than $1.2 billion in stock redemption payments made in connection with the LBO.

> **6.    The Estate Has Colorable Claims for Unjust Enrichment Against
> Sycamore and the Jones Inc. Directors**

87.     To establish unjust enrichment a plaintiff must show (1) a benefit to the defendant

(2) at the plaintiff's expense, and (3) that equity and good conscience require restitution.  *Mid-*

---

[82] *See* Compl. ¶¶ 82-141, 150-163, 165-171.
[83] *See* Compl. ¶¶ 80-96.

*Island Hosp., Inc. v. Empire Blue Cross & Blue Shield* (*In re Mid-Island Hosp., Inc.*), 276 F.3d

124, 129 (2d Cir. 2002); *see also BAE Sys. Info. & Elec. Sys. Integration v. Lockheed Martin

Corp.*, No. 3099-VCN, 2009 Del. Ch. LEXIS 17, at *25-26 (Del. Ch. Feb. 3, 2009) (internal

quotations omitted) (similar).  Here, Sycamore was unjustly enriched when, among other things,

it (i) caused NWHI to (a) sell the Carve-Out Assets to Sycamore for significantly less than they

were worth and (b) execute the Working Capital Waiver for nothing in exchange, and (ii) took

the Worthless Stock Deduction, which deprived NWHI of its ability to utilize its NOLs to offset

its tax obligations.[84]  The Jones Inc. Directors were unjustly enriched when they approved the

Merger, which provided them with $14.3 million in the aggregate in exchange for their shares.[85]

Equity and good conscience demand that Sycamore and the Jones Inc. Directors provide

restitution to NWHI of the amounts they received from these unjust transactions.

### 7.    NWHI Has Additional Claims for Breach of Contract and Tortious Interference with Contract Related to the Working Capital Waiver

88.    The Working Capital Waiver also gives rise to claims by NWHI for breach of

contract and tortious interference with contract.  The elements of a breach of contract claim are:

(1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.  *See

Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Sup. Ct. 2005).  NWHI was

an express third-party beneficiary of the purchase agreement between Jasper Apparel and Jasper

Parent that included the working capital purchase price adjustment provision.[86]  Sycamore

induced Jasper Apparel to breach that agreement by failing to pay to NWHI the amount by which

---

[84] *See* Compl. ¶¶ 82-89, 150-171.
[85] *See* Compl. ¶¶ 59, 337.
[86] *See* Compl. ¶ 165.

the Closing Working Capital exceeded the Target Working Capital, which was approximately

$64.5 million.[87]



[88] The elements of a claim for tortious interference with

business relations are: (1) business relations with a third party; (2) the defendant's interference

with those business relations; (3) that the defendant acted with the sole purpose of harming the

plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship.

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 486 (S.D.N.Y. 2017).

90.

---

[87] *See* Compl. ¶¶ 166-169.
[88]
[89] *See* Compl. ¶¶ 172-179.

91.    ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

████████████████████    This Court will not find a more clear-cut violation of

the duty of loyalty.

92.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████

Moreover, the Sycamore Fund Entities were and remain the sole equity owners of the Debtors,

and owe continuing fiduciary duties to NWHI irrespective of the composition of NWHI's board

of directors.

93.     The Estates also have colorable claims for prima facie tort, which requires a

plaintiff to allege (1) an intentional infliction of harm; (2) resulting in special damages; (3)

without excuse or justification; (4) by an act that would otherwise be lawful.  *Sadowy v. Sony*

*Corp. of Am.*, 496 F. Supp. 1071, 1074-76 (S.D.N.Y. 1980).  A claim for prima facie tort may be

alleged in the alternative to claims for specific, recognized torts.  *Bd. of Educ. of Farmingdale*

*Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n*, 343 N.E.2d 278, 284 (N.Y.

1975). ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

94.     ██████████████████████████████████████

██████████████████████████████████████████████

███████████████████████     Under the Bankruptcy Code, estate property encompasses,

among other things, "all legal or equitable interests of the debtor in property as of the

commencement of the case," and "[a]ny interest in property that the estate acquires after the

commencement of the case."  11 U.S.C. § 541(a)(1), (7); *see In re Prudential Lines Inc.*, 928

F.2d at 572-73 (property of the estate is "anything of value that the debtors have in the

estate"). ███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

### B.     The Debtors Have Unjustifiably Refused to Prosecute the Proposed Claims[90]

95.     In order to decide whether a debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action, the court should examine "whether an action asserting such claim(s) is likely to benefit the reorganization estate."  *STN*, 779 F.2d at 905 (citation omitted).  The debtor need not have an "improper motive" for failing to bring the suit, *Adelphia*, 330 B.R. at 379 & n.19 (*citing STN*, 779 F.2d at 905), and the creditor is not required to plead facts alleging the debtor's reason or motive for inaction, *see Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd.* (*In re Gibson Grp.*), 66 F.3d 1436, 1439 (6th Cir. 1995).  "Rather, the burden may be met through notice pleading by alleging the existence of an unpursued colorable claim that would benefit the estate.  Thereafter, the burden shifts to the debtor, who is then obligated to show that its failure to act is justified."  *In re Sabine Oil & Gas Corp.*, 547 B.R. 504, 516 (Bankr. S.D.N.Y. 2016) (citing *Canadian Pac. Forest Prods.*, 66 F.3d at 1446).

96.     "While the Court "need [not] undertake a mini-trial" to determine whether the suit is likely to benefit the estate, it should assure itself that there is a "sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce," *STN*, 779 F.2d at 905-06, and that there is a "fair chance that the benefits to be obtained from the litigation will outweigh its costs," *Hobby Ctr.*, 223 B.R. at 284.  Courts also consider other "common sense factors" such as "(i) whether the deputization of the committee would permit the debtor to concentrate its resources on

---

[90] The Debtors have not disclosed to the Committee their position with respect to McClain and the Jones Inc. Directors.  Those claims arise out of the same transactions and occurrences as the claims against the Sycamore Defendants and are therefore included in the Proposed Complaint.

rehabilitating its business, (ii) whether the committee's interests do not conflict with those of the estate, and (iii) whether the assignment would prejudice the equity of distribution amongst the debtor's creditors." *Sabine*, 547 B.R. at 517 (citing *Adelphia*, 330 B.R. at 375).

97.    There is no question here that pursuit of the Proposed Claims would benefit the estate, or that the Debtors have unjustifiably refused to pursue them.  As described above, the Proposed Claims have a significant likelihood of success, and could lead to a judgment of more than a billion dollars.  Indeed, avoidance of the Carve-Out Transactions ***alone*** could result in a judgment of more than a billion dollars.  Successful prosecution of the claims of breach of fiduciary duty (and aiding and abetting breach of fiduciary duty), unjust enrichment, and illegal share redemptions and dividends could result in similar judgments, and the claims related to the Working Capital Waiver, Worthless Stock Deduction, and ███████████████████ could lead to additional damages.  Avoidance of the LBO Debt would yield a decrease of up to $800 million or more in claims against the estate (before interest).

98.    Further, there is little doubt that NWHI would be able to realize value on such judgments.  Avoidance of the Lender Defendants' claims at NWHI is self-effectuating.  Sycamore is a prominent private equity fund with $10 billion of assets under management, and defendants Kaluzny and Morrow – who, like the other Sycamore personnel, presumably have rights of indemnification from Sycamore – are very wealthy on their own.  Sycamore and the various Director Defendants also have substantial insurance coverage that should be available to fund part of a judgment or settlement.  We believe the face amounts of these policies alone collectively equal or exceed the amount at which the Debtors are considering settling the claims against Sycamore.

### C.    This Court Should Grant the Committee Exclusive Authority to Settle the Proposed Claims

99.    This Court should also grant the Committee exclusive authority to settle the

Proposed Claims, subject to Court approval in accordance with Bankruptcy Rule 9019.  Similar

relief has been granted by this and other courts in similar circumstances.  *See, e.g., In re Old*

*CarCo LLC (f/k/a/ Chrysler LLC)*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009)

[Docket No. 5151 at ¶ 2] (granting unsecured creditors' committee the exclusive right to

prosecute and settle claims on behalf of the debtors' estate); *In re Majestic Capital, LTD*., Case

No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011) [Docket No. 211 at ¶ 3] (same); *U.S.*

*Bank N.A. v. DHL Global Forwarding* (*In re Evergreen Solar, Inc.*), Case No. 11-12590 (MFW)

(Bankr. D. Del. Oct. 28, 2011) [Docket No. 382 at ¶ 3] (same).  Granting exclusive settlement

authority to the Committee would ensure that the Debtors are not able to settle the Proposed

Claims at a discounted value, and is particularly appropriate given that the Debtors have already

demonstrated a willingness to do so.

### RESERVATION OF RIGHTS

100.    The Committee reserves its right to seek authority to commence and prosecute

other claims and/or causes of action against the Defendants on behalf of the Debtors' estate.

### NOTICE

101.    This Motion was served on: (i) the Office of the United States Trustee for the

Southern District of New York; (ii) the Debtors and their counsel; (iii) counsel to Sycamore; and

(iv) counsel to the named Lender Defendants.

### CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) enter the

proposed order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the Committee

standing to commence and prosecute the Proposed Claims on behalf of the Debtors' estate; and

(ii) grant such additional relief as the Court may deem just, proper and equitable.


New York, New York                    AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  October 5, 2018


                                By: /s/ *Daniel H. Golden*                         

                                Daniel H. Golden
                                Arik Preis
                                David M. Zensky
                                Mitchell P. Hurley
                                Deborah Newman
                                One Bryant Park
                                New York, New York 10036
                                Telephone: (212) 872-1000
                                Facsimile: (212) 872-1002
                                dgolden@akingump.com
                                apreis@akingump.com
                                jrubin@akingump.com
                                djnewman@akingump.com

                                *Counsel to the Official Committee of Unsecured*
                                *Creditors of Nine West Holdings, Inc.*