James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | Case No. 18-10947 (SCC) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF THE DEBTORS' REVISED DISCLOSURE
STATEMENT FOR THE DEBTORS FIRST AMENDED JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

    **PLEASE TAKE NOTICE** that on November 9, 2018, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 837] (the "Disclosure Statement").

    **PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a further revised version of the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Revised Disclosure Statement"), attached hereto as **Exhibit 1**.

    **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit 2** is a "changed pages only" redline of the Revised Disclosure Statement reflecting cumulative changes from the Disclosure Statement.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076). The location of the Debtors' service address is: 1411 Broadway, New York, New York 10018.

**PLEASE TAKE FURTHER NOTICE** that copies of the Revised Disclosure Statement and all other documents in these chapter 11 cases are available free of charge by visiting https://cases.primeclerk.com/ninewest or by calling (855) 628-7533 within the United States or Canada or, outside of the United States or Canada, by calling +1 (917) 651-0324.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.nysb.uscourts.gov.

New York, New York
Dated:  November 12, 2018

/s/ Joseph M. Graham
James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit 1**

**Revised Disclosure Statement**

James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated:  November 12, 2018

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**This is not a solicitation of votes to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code and within the meaning of section 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126. This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court. The information in this Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway New York, New York 10018.

THE DEBTORS[2] ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREOF.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE LIKELIHOOD THAT THE DEBTORS WILL ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

---

[2]    The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their business, including, without limitation, Anne Klein®, Gloria Vanderbilt®, Jessica Simpson®, Vintage America Blues®, Kasper®, Le Suit®, and Albert Nipon®. This Disclosure Statement may omit the registered trademark (®), trademark (™), and other similar symbols for such trademarks named herein.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.    THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW.    THE DEBTORS WILL INSTEAD RELY UPON (A) THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND (B) TO THE EXTENT THAT THE EXEMPTION PROVIDED BY SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER.    NO LEGAL OR TAX ADVICE IS PROVIDED BY THIS DISCLOSURE STATEMENT.    THE DEBTORS ARE NOT CURRENTLY A REPORTING CORPORATION UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT") AND THE REORGANIZED DEBTORS MAY NOT BE A REPORTING CORPORATION AS OF THE EFFECTIVE DATE UNDER THE EXCHANGE ACT AND THE NEW COMMON STOCK WILL NOT BE LISTED ON ANY NATIONAL SECURITIES EXCHANGE.    THE DEBTORS DO NOT ANTICIPATE THAT THERE WILL BE A PUBLIC MARKET FOR THE SECURITIES ISSUED HEREUNDER.    THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE OWNERSHIP AND TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT.    SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTORS' EXPECTATIONS WITH RESPECT TO FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN AND ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.    MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS, THEREFORE, SPECULATIVE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR EXPECTED FUTURE RESULTS AND OPERATIONS.    ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR MANAGEMENT'S ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.    THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.    THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE

ii

OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE VIII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

*     *     *     *     *     *

KE 52165855

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION**.....................................................................................................1
   A.   *Introduction*.......................................................................................................1
   B.   *Plan Overview*...................................................................................................1
   C.   *Development of the Plan*...................................................................................3
   D.   *Recommendation*..............................................................................................6
**ARTICLE II. TREATMENT OF CLAIMS AND INTERESTS** ..............................................6
**ARTICLE III. SOLICITATION AND VOTING PROCEDURES**...........................................9
   A.   *Solicitation Packages*........................................................................................9
   B.   *Voting Deadline*..............................................................................................10
   C.   *Voting Procedures*..........................................................................................10
   D.   *Plan Objection Deadline*................................................................................11
   E.   *Confirmation Hearing*....................................................................................11
**ARTICLE IV. THE DEBTORS' BACKGROUND** .................................................................11
   A.   *The Debtors' Business*....................................................................................11
   B.   *The Debtors' Non-Debtor Affiliates*...............................................................15
   C.   *Summary of Prepetition Capital Structure*....................................................15
   D.   *The Debtors' Management*.............................................................................18
   E.   *Events Leading to these Chapter 11 Cases*....................................................20
   F.   *Appointment of Independent Directors*..........................................................22
   G.   *Prepetition Restructuring Efforts*..................................................................23
   H.   *Canadian Insolvency Proceedings*.................................................................24
**ARTICLE V. EVENTS OF THESE CHAPTER 11 CASES** ..................................................25
   A.   *First Day Pleadings and Other Case Matters*................................................25
   B.   *Other Procedural and Administrative Motions*..............................................25
   C.   *Appointment of the UCC*................................................................................26
   D.   *Final Approval of DIP Financing Facilities*..................................................26
   E.   *The 363 Sale*..................................................................................................27
   F.   *Standstill Agreement*......................................................................................28
   G.   *Investigation of Estate Causes of Action by the Debtors and UCC*..............29
   H.   *UCC Standing Motion*....................................................................................30
   I.   *Plan Exclusivity*.............................................................................................31
   J.   *Rejection and Assumption of Executory Contracts and Unexpired Leases*....31
   K.   *Key Employee Retention Program*..................................................................32
   L.   *Schedules and Statements, Claims Process, Litigation Matters*....................32
   M.   *Marketing Process*.........................................................................................32
   N.   *Plan Negotiations*...........................................................................................33
   O.   *Independent Directors' Evaluation and Pursuit of Potential Claims*............35
   P.   *Evaluation of Proposed Plan Settlements*......................................................46
   Q.   *Case Party Positions*......................................................................................61
   R.   *Mediation*.......................................................................................................71
**ARTICLE VI. SUMMARY OF THE PLAN**...........................................................................71
   A.   *Treatment of Unclassified Claims*..................................................................72
   B.   *Classification and Treatment of Claims and Interests*...................................75
   C.   *Means for Implementation of the Plan*...........................................................84
   D.   *Settlement, Release, Injunction, and Related Provisions*...............................92
   E.   *Conditions Precedent to Effective Date*.........................................................97
   F.   *Payment of Restructuring Fees*......................................................................98
**ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** .....99
   A.   *Confirmation Hearing*....................................................................................99
   B.   *Confirmation Standards*................................................................................100
   C.   *Acceptance by Impaired Classes*..................................................................103
   D.   *Confirmation without Acceptance by All Impaired Classes*..........................104
**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**...........105

(i)

A.     *Risks Related to the Confirmation and Consummation of the Plan.* ...........................................105
B.     *Risks Related to Recoveries Under the Plan.* ...................................................................109
C.     *Risks Related to the Debtors' Business.* ..........................................................................110
D.     *Risks Related to the New Common Stock and the New Warrants.* ..................................116
E.     *Disclosure Statement Disclaimer.* .................................................................................117

**ARTICLE IX. SECURITIES LAW MATTERS** ............................................................................**119**

**ARTICLE X. CERTAIN UNITED STATED FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN** ...........................................................................................................................**120**
A.     *Introduction.* ................................................................................................................120
B.     *Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized
Debtors.* ........................................................................................................................121
C.     *Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Claims
Entitled to Vote.* ...........................................................................................................124
D.     *Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain
Allowed Claims.* ..........................................................................................................127
E.     *Information Reporting and Backup Withholding.* .......................................................129

**ARTICLE XI. RECOMMENDATION OF THE DEBTORS** .......................................................**130**

KE 52165855

## EXHIBITS

EXHIBIT A          First Amended Joint Plan of Reorganization

EXHIBIT B          Corporate Structure Chart

EXHIBIT C          Amended and Restated Restructuring Support Agreement

EXHIBIT D          Financial Projections

EXHIBIT E          Valuation Analysis

EXHIBIT F          Liquidation Analysis

KE 52165855

# ARTICLE I.
# INTRODUCTION

A.    *Introduction.*

Nine West Holdings, Inc. ("<u>NWHI</u>") and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), submit this disclosure statement (this "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 836] (as amended, supplemented, or modified from time to time, the "<u>Plan</u>").[3]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

B.    *Plan Overview.*

The proposed Plan achieves a balance sheet restructuring that maximizes the value of the Debtors' businesses and potential litigation assets stemming from their 2014 going-private transaction (the "<u>2014 Transaction</u>") and related carve-out transactions (the "<u>Carve-Out Transactions</u>").  The proposed Plan is the culmination of more than a year of negotiations and related diligence and investigations into the Debtors' assets by, among others, the Debtors' independent directors and their advisors, the Debtors' secured term loan lenders (the "<u>Secured Term Loan Lenders</u>"), the Debtors' unsecured term loan lenders (the "<u>Unsecured Term Loan Lenders</u>"), and certain holders of the Debtors' unsecured notes.  Importantly, the proposed Plan contemplates a settlement of claims and causes of action among the Debtors, the Debtors' secured lenders, the Debtors' unsecured term lenders, and the Debtors' private equity owners.  Through these settlements, the Plan provides significant recoveries to the Debtors' unsecured noteholders and other unsecured creditors at NWHI, who likely otherwise would receive minimal, if any, recovery.  In addition, the proposed Plan maximizes the value of the Debtors' business assets to ensure significant recoveries for all creditor stakeholders at each of the Debtors.  Certain of the Debtors' unsecured creditors, including the UCC, the 2019 Indenture Trustee, the 2034 Indenture Trustee, the Combined Ad Hoc Noteholder Group (each as defined herein),[4] and the New Ad Hoc Noteholder Group,[5] disagree and believe that alternative plan constructs could offer a chance of enhanced recovery for unsecured claim holders.

The Plan provides this value by settling estate claims and causes of action against Sycamore Partners Management, L.P. (together, with its affiliates, "<u>Sycamore</u>" or the "<u>Sponsor</u>") and certain affiliates of KKR Credit Advisors (US) LLC (collectively, "<u>KKR</u>" or the "<u>Minority Equity Holders</u>"), the Debtors' indirect minority equity owners, on account of the 2014 Transaction and Carve-Out Transactions, and any other potential claims arising on or before the effective date of the Plan (the "<u>Effective Date</u>").  This settlement (the "<u>Equity Holders Settlement</u>") requires the Debtors' indirect equity owners to make a cash contribution to NWHI on the Effective Date of $105,000,000, direct the Debtors' indirect parent company, Nine West Topco LLC, to unwind a worthless stock deduction taken on its 2017 U.S. Partnership tax return (to the extent not already unwound), and also requires Sycamore to cause its portfolio company, Belk, Inc., to enter into a 3-year commitment agreement with the Reorganized Debtors,

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

[4]    As of their Bankruptcy Rule 2019 disclosure on September 21, 2018 [Docket No. 685], the Combined Ad Hoc Noteholder Group members beneficially owned $438,582,000 in aggregate principal amount of NWHI's unsecured notes (including the 2034 Notes, the 2019 Notes, and Stub 2019 Notes).  This number may have increased or decreased since that time.

[5]    As of their Bankruptcy Rule 2019 disclosure on November 2, 2018 [Docket No. 807], the New Ad Hoc Noteholder Group members beneficially owned $76,488,000 in aggregate principal amount of NWHI's unsecured notes (including the 2034 Notes, the 2019 Notes, and Stub 2019 Notes).  This number may have increased or decreased since that time.

KE 52165855

strengthening the Debtors' business value and ability to raise third-party financing to fund distributions to the Secured Term Loan Lenders, DIP Lenders (as defined herein), and administrative and statutory priority creditors. Rather than exposing the Debtors' business assets to potentially value-destructive litigation against Sycamore—the owner of one of the Debtors' most significant customers, Belk, Inc.—the Plan provides for substantial near-term cash contributions from Sycamore and KKR to be provided directly to the Debtors' creditors, and provides protection for the equity value in the Debtors' business assets. Through the Equity Holders Settlement, the Debtors have stabilized their business value while at the same time bringing in a significant cash payment to provide their creditors with near-term recoveries without the risk of lengthy and speculative litigation that could ultimately result in lesser recoveries.

The Plan delivers additional value to NWHI's creditors through the resolution of intercreditor and intercompany disputes in a manner that weighs the merits of the parties' various positions against the costs of the burdensome, lengthy, and value-destructive litigation that would ensue absent the resolution of such disputes embodied in the Plan. Such litigation, as more fully described herein, which primarily would be among the Debtors' structurally senior Unsecured Term Loan Lenders and NWHI's unsecured noteholders (the "Noteholders"), could delay the Debtors' path to emergence or, at the very least, delay the timing of distributions to the Debtors' creditors. Indeed, taken to its extreme, the costs of this litigation could result in the liquidation of the Debtors' business assets. The Debtors therefore engaged in extensive, hard-fought negotiations with their creditor groups, obtaining significant concessions from the Unsecured Term Loan Lenders on account of potential claims and rights that their subsidiary guarantors may have against NWHI as a result of transactions that have transpired both before and during these chapter 11 cases, which would leave little, if any, value for creditors of NWHI.

As a result of the Equity Holders Settlement and the intercreditor and intercompany settlements, the Plan provides the following recoveries, all as more fully set forth in the Plan:

- Unsecured Term Loan Lenders will receive their pro rata share of:

  - 92.5% of the Reorganized Debtors' equity, subject to dilution for equity reserved for a management equity incentive plan and the New Warrants, and subject to adjustment downward if the Debtors raise cash in excess of the Debtors' minimum cash requirements to fund the cash recoveries and other sources and uses under the Plan,

  - one-third of the net proceeds of the Equity Holders Settlement, and

  - the aggregate cash proceeds resulting from the "New Secured Facility Upsize Amount" (i.e., the cash the Company is able to raise above the necessary Plan sources and uses), if any.

- 2034 Noteholders and 2019 Noteholders, and holders of unsecured claims against NWHI (other than the Unsecured Term Loan Lenders) will receive their pro rata share of:

  - 6.981% of the Reorganized Debtors' equity, subject to dilution for equity reserved for a management equity incentive plan and the New Warrants, and subject to adjustment upward if the Debtors raise cash in excess of the Debtors' minimum cash requirements to fund the cash recoveries and other sources and uses under the Plan,

  - warrants for 20% of the Reorganized Debtors' equity, subject to dilution for the management incentive plan, exercisable at a total enterprise value of $650 million for the Reorganized Debtors, subject to the terms and conditions set forth in the Plan and the warrant agreement, and

  - two-thirds of the cash proceeds of the Equity Holders Settlement.

- Holders of unsecured claims against the Debtors' operating subsidiaries will receive their pro rata share of 0.519% of the Reorganized Debtors' equity (depending on the applicable Debtor subsidiary), which amount is in compliance with section 1129 of the Bankruptcy Code.

2

- The Secured Term Loan Lenders will receive payment in full in cash but will waive payment of postpetition interest at the default rate as consideration in exchange for the Estate Action STL Settlement, and the Debtors' DIP Lenders will receive payment in full in cash.

The Plan is subject to the Debtors' fiduciary duties to maximize the value of their estates. The Debtors will therefore continue to review all options for their primary business and litigation assets, and remain willing and able to talk to all parties regarding alternative viable and feasible chapter 11 plans. As part of the continued efforts to develop consensus around a viable chapter 11 plan, the Debtors have entered into Bankruptcy Court-ordered mediation with all parties in interest, including, among others, the UCC and certain Noteholders, Secured Term Loan Lenders, and Unsecured Term Loan Lenders. The strong fiduciary out in the Debtors' agreement supporting this proposed Plan allows the Debtors to consider all options should an improved deal construct emerge as a result of mediation or otherwise, and the mediation order [Docket No. 831] (the "Mediation Order") allows parties to participate in mediation without violating or breaching the terms of the A&R RSA (as defined herein).

The Plan is supported by more than 85 percent of the Secured Term Loan Lenders and more than 80 percent of the Unsecured Term Loan Lenders. The parties supporting the proposed Plan include the Debtors' DIP Lenders, the Secured and Unsecured Term Loan Agents, the Secured Lender Group, the Crossover Group, and Brigade (each as defined herein). The proposed Plan maximizes creditor recoveries, meaningfully reduces the Debtors' aggregate funded debt (by more than $900 million over their funded debt obligations as of the commencement of these chapter 11 cases), and best positions the Debtors for future success. The Debtors encourage you to vote to accept the Plan.

C.    *Development of the Plan*.

1.    The Debtors' Businesses, Prepetition Negotiations, and Chapter 11 Filing.

The Debtors are a leading apparel, jeanswear, and jewelry wholesaler using its owned trademarks including Anne Klein®, Kasper®, Napier®, and Gloria Vanderbilt®, as well as licensed brands, such as Nine West®, Bandolino®, Jessica Simpson®, and DKNY®. The Debtors products are sold through well-known retailers including Macy's, Belk, Lord & Taylor, JCPenney, Amazon, T.J. Maxx, Ross Stores, Steinmart, Kohl's, Walmart / Sam's Club, and Costco. Historically, the Debtors were also significant players in the shoe and handbag design and distribution business, and they have traditionally had retail operations.

As of April 6, 2018 (the "Petition Date"), the Debtors had approximately $1.6 billion in aggregate funded debt obligations. This capital structure is the result of the 2014 Transaction. Although the Debtors generate positive EBITDA, the Debtors knew it would be difficult to refinance their debt obligations when such obligations came due starting in 2019 without re-focusing their operations and paying down some of their debt obligations. The Debtors therefore realized by the fall of 2016 that they would need to develop and execute on a turnaround strategy for their business operations that would receive their support of their creditor groups.

The Debtors historically have been both a direct retailer through their shoe and handbag business and a wholesaler through their apparel, jeanswear, jewelry, and shoe and handbag businesses. The Debtors' retail and shoe and handbag businesses started struggling starting in late 2014, and the Debtors' retail business suffered a significant underperformance. Due to, among other things, design missteps and changing consumer habits, the Debtors' shoe and handbag business also failed to generate significant positive earnings. Given these struggles, the Debtors determined to refocus their operations on their apparel, jeanswear, and jewelry wholesale businesses. To that end, the Debtors sold their Easy Spirit® shoe brand and certain associated working capital assets in the fall of 2016, and used the proceeds to pay down their Prepetition ABL/FILO Facility (as defined herein) and purchase the Kasper Group, a wholesaler of women's suits separates, dresses, and sportswear. The terms of this sale and purchase are described more fully herein. The Debtors also commenced efforts to license out their Anne Klein shoe and handbag business, ultimately reaching agreement to do so in the spring of 2018, and to sell their Nine West® and Bandolino® shoe and handbag businesses, eventually reaching agreement on a process to sell those brands during these chapter 11 cases through a competitive auction process. Prior to the chapter 11 filing it became clear that no party was interested in purchasing the Debtors' retail operations, and in late 2016 the Debtors also began

KE 52165855

their efforts to exit their retail store footprint in the ordinary course of business by letting their store leases expire and entering into shorter-term leases where necessary during the wind-down period.

As the Debtors worked on this business turnaround, in mid-2017 the Debtors also commenced negotiations with their creditors regarding a comprehensive restructuring of their debt obligations. In connection therewith, the Debtors engaged two independent directors in August 2017, who, in turn, directed the Debtors to hire an independent counsel and financial advisor to act at the direction of the independent directors. These directors took an active role in overseeing restructuring negotiations and in reviewing potential claims and causes of action related to the 2014 Transaction, the Carve-Out Transactions, and other potential conflict matters between the Debtors and their private equity owners.

Despite hopes that the Debtors would be able to restructure their debt obligations out of court, it became clear that any restructuring would require the Debtors to seek bankruptcy protection to effectuate both the sale of the Nine West Group's assets and a significant reduction of the Debtors' debt obligations. The Debtors engaged in initial diligence discussions with advisors to their creditors starting in the summer of 2017 and engaged in principal level discussions with their creditors starting in the fall of 2017. After significant and hard-fought negotiations, the Debtors, certain of the Secured Term Loan Lenders (the "Consenting Secured Lenders"), and certain of the Unsecured Term Loan Lenders (the "Consenting Unsecured Lenders") reached agreement on the principal terms of a comprehensive restructuring, the terms of which were memorialized in a restructuring support agreement dated April 6, 2018 (the "Prepetition RSA"). Among other things, the Prepetition RSA called for the sale of the Debtors' Nine West Groups' assets (the proceeds of which would be used to pay down amounts outstanding under the Debtors' secured term loan and asset-based lending facility), the restructuring of the Debtors' debt through the repayment of the Debtors' secured debt (with the waiver by the Secured Term Loan Lenders of default interest), and the conversion of the Debtors' unsecured term loan facility into equity in the reorganized Debtors and $150 million of second-lien take back debt. The Prepetition RSA did not outline treatment of the Debtors' other unsecured debt claims but instead left such treatment to be determined. The Prepetition RSA was instrumental to the Debtors smoothly landing in chapter 11 following the commencement of these chapter 11 cases and giving the Debtors' employees, customers, and trade vendors confidence that the Debtors would successfully reorganize at a time that certain large retailers—such as Toys 'R' Us and Bon Ton—were announcing plans to liquidate. The Debtors also negotiated a fiduciary out in the Prepetition RSA that permits the Debtors to consider any alternative proposals that provide higher or better recoveries for their estates or in the event the Debtors determine that they cannot prosecute the Plan.

       2.     The Nine West Asset Sale.

Following the commencement of these cases, the Debtors have continued their efforts to refocus their business operations and maximize the value of their main estate assets. As noted above and discussed more fully herein, the Debtors' extensively marketed their Nine West®, Bandolino®, and associated footwear and handbag brands prior to the Petition Date, which efforts culminated in an asset purchase agreement (the "Stalking Horse APA") providing a baseline $200 million purchase price for the assets. Following a competitive auction process, ABG purchased the Debtors' footwear and handbag business assets for approximately $348.3 million in total value (the "363 Sale"), which sale price is discussed more fully herein. The Debtors used the 363 Sale proceeds to pay down significant amounts of the Debtors' secured debt, paving the way for the Debtors and certain of their key constituencies to negotiate and reach agreement on the proposed Plan. A more detailed discussion of the 363 Sale and its impact on these chapter 11 cases (including the intercompany and intercreditor settlements embodied therein) is below.

       3.     Postpetition Negotiations.

The Debtors have sought to create consensus regarding the path forward for the Debtors' two remaining main assets—their potential litigation claims and their remaining business assets. The Debtors have funded an extensive investigation by the Official Committee of Unsecured Creditors (the "UCC") into the 2014 Transaction and Carve-Out Transactions and related potential estate claims. The Debtors also provided multiple stakeholders with business overview presentations and management meetings with the business heads of the Debtors' Kasper Group, One Jeanswear Group, The Jewelry Group, and Anne Klein licensing businesses. These efforts have ensured that all key stakeholders are aware of the potential value of the Debtors' primary assets. To further ensure that

4

parties had sufficient time to engage in constructive negotiations, the Debtors also agreed to a "Standstill Agreement" with the UCC, whereby the Debtors and the UCC agreed to refrain from taking certain actions (including prosecuting a chapter 11 plan) until and including September 13, 2018 (the "Standstill Period").

During the Standstill Period, the Debtors engaged in simultaneous negotiations and discussions with both the Unsecured Term Loan Lenders and Noteholders (as well as the UCC), seeking to push each to a plan construct that would maximize value and minimize the ongoing administrative burden on the Debtors and their businesses.

Despite these efforts, the Debtors were unable to reach a global resolution among the Estates and their key creditor constituents. Two primary alternative paths to exit from chapter 11 emerged regarding the treatment of unsecured creditor claims during these multi-party negotiations. First, the Debtors could pursue a chapter 11 plan under which unsecured creditors would receive a beneficiary interests in a litigation trust created to pursue potential Estate Causes of Action, including against the Sponsor, the Minority Equity Holders, and others arising out of, among other things, the 2014 Transaction and Carve-Out Transactions. Second, the Debtors could pursue a chapter 11 plan premised on a settlement of the potential causes of action against Sycamore, KKR, and their affiliates, officers, and directors arising out of the 2014 Transaction and Carve-Out Transactions, the proceeds of which would be used to fund plan recoveries. The chapter 11 settlement plan would deliver immediate recoveries to creditors. In either path, the Unsecured Term Loan Lenders would receive substantially all of the reorganized equity in the Debtors' go-forward businesses (subject to dilution for equity reserved for a management incentive plan and the New Warrants). Also in either scenario the Debtors would have to resolve a myriad of intercreditor and intercompany issues, primarily between the Unsecured Term Loan Lenders and the Noteholders, and determine the best way to allocate business and litigation value between the two creditor constituents.

During these negotiations, certain of the Debtors' unsecured creditors at NWHI preferred the litigation trust path, because such creditors likely would receive limited business value given the structural seniority of the Unsecured Term Loan Lenders and therefore were willing to engage in speculative litigation in pursuit of increased recoveries. Although certain unsecured creditors of NWHI argued that successful litigation on account of the estate causes of action arising out of the 2014 Transaction and Carve-Out Transactions offers a chance to improve recoveries for creditors of NWHI, the Debtors believe that such litigation is not a guaranteed success, is inherently risk-laden, and creates concrete, value-destructive pressure within the Debtors' operations. In particular, a litigation trust path focused on suing the Sponsor and Minority Equity Holders present certain operational risks because Sycamore owns Belk, Inc., the Debtors' fourth largest customer. Historically, the Debtors and Belk have engaged in business on a purchase order basis, meaning Belk is under no obligation to continue to do business with the Debtors. Any material deterioration in the Belk-Debtor relationship likely would severely reduce the value of the Debtors' go-forward business. Moreover, the prospect of any potential disruption to the business relationship resulted in further complications among the parties regarding allocation of assets and value under a chapter 11 plan. The Debtors sought to balance these competing concerns throughout the negotiation process.

While those discussions remained ongoing, on September 25, 2018, certain Unsecured Term Loan Lenders, and the Combined Ad Hoc Noteholder Group (as defined herein) announced an intercreditor agreement in principle, the terms of which included contributing certain Estate Causes of Action to a litigation trust. Such Estate Causes of Action included Causes of Action against, among others, Sycamore and KKR. Certain Unsecured Term Loan Lenders and the Combined Ad Hoc Noteholder Group announced the terms of this agreement on the record at a hearing on September 26, 2018. Following that hearing, one of the significant risks of a litigation trust plan materialized: the Debtors received a letter from Belk terminating Belk's business relationship with the Debtors. Upon receipt of the letter, the Debtors forcefully responded to Belk and engaged with Belk on the Debtor-Belk business relationship, each as more fully described herein. The Debtors and their creditors also explored the prospect of moving forward under a scenario where the Reorganized Debtors would not have the benefit of continuing the Belk relationship. But the potential loss of Belk's business had changed the value proposition for various creditor recoveries and endangered the Debtors' ability to raise necessary exit financing. Moreover, other critical aspects underlying the proposed intercreditor agreement, such as commitments from the Combined Ad Hoc Noteholder Group to fund a $40 million cash payment to the Unsecured Term Loan Lenders proved unworkable due to structural issues with how the $40 million would be funded notwithstanding the parties' good faith efforts to document the agreement in principle. The intercreditor settlement was subject to, among other things, a 7-day documentation period, which was subject to extension by agreement of the parties. Despite good-faith efforts by the

KE 52165855

Debtors, the UCC, the Noteholders, and the Unsecured Term Loan Lenders, the parties were unable to document and finalize the intercreditor deal within the requisite timeframe.

The Debtors continued to engage all parties in good-faith negotiations on potential plans, including both a new intercreditor settlement plan that would contribute causes of action against the Sponsor and the Minority Equity Holders to a litigation trust and a settlement plan. Finally, after extensive, good-faith negotiations, the Debtors, the Unsecured Term Loan Lenders, the Secured Term Loan Lenders, Sycamore, and KKR agreed on the terms of the Plan, which the Debtors believe embodies (a) a reasonable settlement of estate claims and causes of action against Sycamore, KKR, and directors and officers that are also Sycamore principals, and (b) an appropriate compromises of the various disputes between and among the Unsecured Term Loan Lenders, the Noteholders, and other general unsecured creditors related to value allocation between the Unsecured Term Loan Lenders and the Noteholders. The proposed Plan also is the only viable, feasible plan of reorganization that has support from any of the Debtors' constituents after months of intense negotiations. The Debtors therefore believe that the proposed Plan represents the best path forward for these chapter 11 cases.

On October 17, 2018, the Debtors, the requisite Consenting Secured Lenders, the requisite Consenting Unsecured Lenders, Sycamore, and KKR reached agreement on the Amended and Restated Restructuring Support Agreement (the "A&R RSA"). The A&R RSA sets forth the principal terms of the restructuring transactions and requires the parties to the A&R RSA to support the Plan.

While the Debtors continue to pursue an expeditious emergence from chapter 11 through confirmation of the proposed Plan, the Debtors and other stakeholders are also currently engaged in Bankruptcy Court-ordered mediation.

D.      *Recommendation.*

The Debtors believe that the Plan maximizes stakeholder recoveries in these chapter 11 cases. As such, the Debtors seek the Bankruptcy Court's approval of the Plan and strongly urge all holders of Claims entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Prime Clerk LLC, the Debtors' solicitation agent (the "Solicitation Agent"), no later than **[__], 2018, at 5:00 p.m., prevailing Eastern Time** (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing (as defined herein).

## ARTICLE II.
## TREATMENT OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, DIP ABL/FILO Claims, DIP Term Loan Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan. The treatment and the projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only. Risk factors addressing the effects of the actual amount of Allowed unclassified Claims exceeding the Debtors' estimates, and the effect of such variation on creditor recoveries, and other risks related to Confirmation and the Effective Date of the Plan are addressed in Article VIII hereof. To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|
| Administrative Claims | Unimpaired | $33,371 | 100% | 0.0%-100% |
| Priority Tax Claims | Unimpaired | $1,089,051 | 100% | 64.2% |
| DIP ABL/FILO Claims | Unimpaired | $92,947,791[6] | 100% | 100% |
| DIP Term Loan Claims | Unimpaired | $50,000,000[7] | 100% | 100% |

The table below summarizes the classification and treatment of all classified Claims and Interests against each Debtor (as applicable) under the Plan. **The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. In particular, recoveries available to the holders of General Unsecured Claims against various Debtors entities are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided below. In such an instance, the recoveries available to the holders of General Unsecured Claims could be materially lower when compared to the estimates provided below.** To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan. For all purposes under the Plan, each Class will contain sub Classes for each of the Debtors, except that (1) Class 5B, Class 5C, and Class 5D shall be vacant at each Debtor other than NWHI, (2) Class 5E shall be vacant at each Debtor other than Nine West Development LLC, (3) Class 5F shall be vacant at each Debtor other than Nine West Management Service LLC, (4) Class 5G shall be vacant at each Debtor other than Nine West Distribution LLC, (5) Class 5H shall be vacant at each Debtor other than One Jeanswear Group Inc., (6) Class 5I shall be vacant at each Debtor other than Kasper Group LLC, (7) Class 5J shall be vacant at each Debtor other than Jasper Parent LLC ("Jasper Parent"), Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, and (8) Class 7 shall be vacant at each Debtor other than Holdings.

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests | Estimated Range of % Recovery Under Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | $189,698 | 100% | 64.2% |
| Class 2 | Other Secured Claims | Unimpaired | $812,852 | 100% | 99.2% |

---

[6]    Amount reflects the estimated balance outstanding as of January 31, 2019.

[7]    Amount reflects principal amount outstanding and not accrued interest at any given time or other Claims arising pursuant to the DIP Order.

KE 52165855

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests | Estimated Range of % Recovery Under Plan | Estimated Range of % Recovery Under Chapter 7 |
|-------|---------------------------|----------------|---------------------------------------|------------------------------------------|-----------------------------------------------|
| Class 3 | Secured Tax Claims | Unimpaired | N/A | 100% | N/A |
| Class 4 | Secured Term Loan Claims | Impaired | $432,798,741[8] | 100% | 100% |
| Class 5A | Unsecured Term Loan Claims | Impaired | $305,099,461 | 84.2% | 17.6%–29.0% |
| Class 5B | 2034 Notes Claims | Impaired | $255,997,396 | 10.8%–12.0%[9] | 2.1%–5.6% |
| Class 5C | 2019 Notes Claims | Impaired | $476,002,016 | 10.8%–12.0% | 2.1%–5.6% |
| Class 5D | General Unsecured Claims against NWHI | Impaired | $157,897,543 | 10.8%–12.0% | 2.1%–5.6% |
| Class 5E | General Unsecured Claims against Nine West Development LLC | Impaired | $92,843 | 100% | 14.8%–28.2% |
| Class 5F | General Unsecured Claims against Nine West Management Service LLC | Impaired | $2,705,054 | 13.1% | 0% |
| Class 5G | General Unsecured Claims against Nine West Distribution LLC | Impaired | $76,133 | 6.7% | 0.4% |
| Class 5H | General Unsecured Claims against One Jeanswear Group Inc. | Impaired | $2,386,675 | 22.2% | 0% |

[8]    Amount does not include interest at non-default rate and other Claims arising under Secured Term Loan Documents and does not reflect the Secured Term Loan 363 Sale Payment and the Secured Term DIP Order Payments.

[9]    The recovery range shown for Classes 5B, 5C, and 5D is based on the valuation range for the New Warrants, as more fully described in the Valuation Analysis (as defined herein). As discussed in the Valuation Analysis, the value of the New Warrants was estimated by the Debtors using a Black-Scholes valuation model. For the avoidance of doubt, and as more fully described in Article VI.C.1(b)(2) hereof, the New Warrants contemplated by the Plan do not have any "Black-Scholes" protections.

KE 52165855

| Class | Type of Claim or Interest | Plan Treatment | Estimated Allowed Claims or Interests | Estimated Range of % Recovery Under Plan | Estimated Range of % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| Class 5I | General Unsecured Claims against Kasper Group LLC | Impaired | $1,994,648 | 13.2% | 0% |
| Class 5J | General Unsecured Claims against Non-Operating Debtors | Impaired | $76,352 | 0% | 0%[10] |
| Class 6 | Intercompany Claims | Impaired or Unimpaired | N/A | 0–100% | N/A |
| Class 7 | Interests in Holdings | Impaired | N/A | 0% | N/A |
| Class 8 | Intercompany Interests | Impaired or Unimpaired | N/A | 0–100% | N/A |
| Class 9 | Section 510(b) Claims | Impaired | N/A | 0% | N/A |

Based on the foregoing, (i) holders of Claims in Class 4, Class 5A, Class 5B, Class 5C, Class 5D, Class 5E, Class 5F, Class 5G, Class 5H, Class 5I, and Class 5J, are impaired under the Plan, and, therefore, are entitled to vote, (ii) holders of Claims in Class 1, Class 2, and Class 3 are not impaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan, (iii) holders of Claims and Interests in Class 5J, Class 7, and Class 9 are receiving no distribution under the Plan and, therefore, are deemed to reject the Plan, and (iv) holders of Claims and Interests in Class 6 and Class 8 are either impaired or unimpaired and will be presumed to accept or deemed to reject the Plan.

## ARTICLE III.
## SOLICITATION AND VOTING PROCEDURES

A.   *Solicitation Packages*.

On [●], 2018, the Bankruptcy Court entered the order approving the Disclosure Statement (the "Disclosure Statement Order").  For purposes of this Article III, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  Pursuant to the Disclosure Statement Order, holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (in paper or electronic form) including (the "Solicitation Package"):

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan and any exhibits to the Plan);

- the Disclosure Statement Order (without exhibits thereto);

---

[10]   The Liquidation Analysis (as defined herein) provides that general unsecured creditors against Nine West Jeanswear Holding LLC would receive an estimated 0.4% recovery under chapter 7, though the Debtors estimate that there will be no Allowed General Unsecured Claims at that entity.

9

- the Solicitation Procedures;

- the Confirmation Hearing Notice;

- an appropriate ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

- a cover letter from the Debtors (1) describing the contents of the Solicitation Package and (2) urging the holders of Claims in each of the Voting Classes to vote to accept the Plan; and

- any supplemental documents the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

The Solicitation Package may also be obtained: (a) from the Solicitation Agent by (i) calling the Debtors' restructuring hotline at (855) 628-7533 within the United States or Canada or, outside of the United States or Canada, by calling +1 (917) 651-0324; (ii) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ninewest; (iii) writing to Prime Clerk, LLC, Attn: Nine West Holdings, Inc. Ballot Processing, c/o Prime Clerk, LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022; and/or (b) for a fee via PACER (except for ballots) at http://www.nysb.uscourts.gov.

B.    *Voting Deadline.*

The deadline to vote on the Plan is [●], 2018, at 5:00 p.m., prevailing Eastern Time. All votes to accept or reject the Plan must be received by the Solicitation Agent by the Voting Deadline.

C.    *Voting Procedures.*

The Debtors are distributing this Disclosure Statement, accompanied by a ballot to be used for voting to accept or reject the Plan, to the holders of Claims entitled to vote to accept or reject the Plan. If you are a holder of a Claim in Class 4 (Secured Term Loan Claims), Class 5A (Unsecured Term Loan Claims), Class 5B (2034 Notes Claims), Class 5C (2019 Notes Claims), Class 5D (General Unsecured Claims against NWHI), Class 5E (General Unsecured Claims against Nine West Development LLC), Class 5F (General Unsecured Claims against Nine West Management Service LLC), Class 5G (General Unsecured Claims against Nine West Distribution LLC), Class 5H (General Unsecured Claims against One Jeanswear Group Inc.), or Class 5I (General Unsecured Claims against Kasper Group LLC), you may vote to accept or reject the Plan by completing the applicable ballot and returning it according to the instructions received.

The Debtors have retained Prime Clerk, LLC to serve as the Solicitation Agent [Docket No. 79]. The Solicitation Agent is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

| **VOTING INQUIRIES** |
|---|
| If you have any questions on the procedure for voting on the Plan, please call the Solicitation Agent at:<br><br>(855) 628-7533 (within the United States or Canada) or,<br>+1 (917) 651-0324 (international) |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by following the instructions set forth in the applicable ballot. All ballots must be properly executed, completed, and delivered according to their respective voting instructions, so that the votes are **actually received** by the Solicitation Agent no later than the Voting Deadline. Any ballot that is properly executed by the holder of a

Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic means will not be counted, unless specifically authorized in the applicable ballot. For the avoidance of doubt, a bank, broker, or other financial institution serving as a nominee for one or more noteholders will be permitted to return its "master" ballot to the Solicitation Agent by e-mail.

Each holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such holder. By signing and returning a ballot or otherwise voting pursuant to the instructions set forth on the ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other votes with respect to such Claim has been cast or, if any other votes have been cast with respect to such Claim, such earlier votes are superseded and revoked.

All ballots will be accompanied by return envelopes or alternate instructions for submitting your vote. The holder must follow the specific instructions provided therein, as failing to do so may result in the holder's vote not being counted.

D.    *Plan Objection Deadline*.

The Bankruptcy Court has established [●], 2018, at 5:00 p.m., prevailing Eastern Time, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be filed with the Bankruptcy Court and served in accordance with the *Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief* [Docket No. 107] (the "Case Management Order") and Disclosure Statement Order so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

E.    *Confirmation Hearing*.

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek confirmation of the Plan at a hearing scheduled on [●], 2018, [●]:00 [●].m., prevailing Eastern Time, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom No. 623 of the United States Court for the Southern District of New York, 1 Bowling Green, New York, NY 10004 (such hearing, the "Confirmation Hearing"). The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

**ARTICLE IV.**
**THE DEBTORS' BACKGROUND**

A.    *The Debtors' Business*.

1.    The Debtors' Corporate History.

The Debtors were founded in 1970 as the Jones Apparel Division of W.R. Grace & Co. The Jones Apparel Division was spun out of W. R. Grace & Co. in 1975 and incorporated as Jones Apparel Group. Over the next several decades, Jones Apparel Group experienced significant growth, both organically and through the acquisition of licenses and trademarks for several well-known brands, including the Nine West® brand in 1999, after which the name of the corporate parent of was changed to The Jones Group Inc.

The Debtors' existing business operations and capital structure are the product of the 2014 and Carve-Out Transactions led by investment funds managed by the Sponsor. The Sponsor purchased The Jones Group Inc. and

all affiliated brands in the 2014 Transaction for approximately $2.2 billion (including the assumption of existing debt), or approximately $15 per share for The Jones Group Inc.'s shareholders. At the closing of the transaction, The Jones Group Inc.'s name was changed to Nine West Holdings, Inc.[11]

Also at the closing of the transaction on April 8, 2014 (and after the Merger), certain Sponsor-affiliated entities purchased certain businesses from NWHI, including the Stuart Weitzman®, Kurt Geiger®, and the Jones Apparel Group (which included both the Jones New York® and Kasper® brands), in exchange for over $600 million in cash, which transactions are known as the Carve-Out Transactions. The cash proceeds from the Carve-Out Transactions (and certain portions the funded debt described below, together with a $120 million equity contribution from the Sponsor and the Minority Equity Holders) were used to fund the 2014 Transaction.

The Debtors entered into the Prepetition ABL/FILO Facility,[12] the Secured Term Loan Facility, and the Unsecured Term Loan Facility in connection with the 2014 Transaction, and subsequent to the closing of the 2014 Transaction and Carve-Out Transactions, issued the 8.25% senior unsecured notes (the "2019 Notes"). Separately, the Sponsor paid $120 million in cash to purchase the equity interests in NWHI. This equity investment was approximately $280 million less than the Sponsor's original binding equity commitment made in December 2013 in connection with the commitment to purchase The Jones Group Inc. This reduction in the Sponsor's binding equity commitment for the 2014 Transaction was the result of strong credit market demand for the NWHI debt to be issued to consummate the 2014 Transaction, which resulted in a significant oversubscription for the debt offered in the 2014 Transaction. Specifically, the Secured Term Loan Facility originally was offered at $400 million, which was oversubscribed by approximately 4 times, ultimately resulting in a Secured Term Loan Facility in the amount of $445 million. Moreover, the Unsecured Term Loan Facility was initially not offered at all, but after the oversubscription for the Secured Term Loan Facility, a new $300 million tranche of unsecured debt was offered (referred to herein as the Unsecured Term Loan Facility), which was itself oversubscribed by approximately 2.5 times due to further market demand. In addition, as part of the 2014 Transaction, holders of the approximately $400 million aggregate principal amount of 6.875% senior unsecured notes due 2019 (the "Stub 2019 Notes") were given the option to either (a) cash out their notes at a put price of 101% of their face amount (the "Put Option") or (b) exchange their notes for the newly issued 2019 Notes (the "Exchange Option"). In the end, the holders of approximately $366.8 million of Stub 2019 Notes opted for the Exchange Option. Only approximately $4.7 million (or 1%) of the holders of the Stub 2019 Notes opted for the Put Option. Separately, on April 16, 2014, NWHI issued an additional $60 million in aggregate principal amount of 2019 Notes, the proceeds of which were used to repay draws on the Prepetition ABL/FILO Facility in connection with the 2014 Transaction. In total, approximately $925 million of new debt and equity were raised in connection with the 2014 Transaction in addition to the funds raised as part of the Carve-Out Transactions. The new debt and equity raised in connection with the 2014 Transaction (including from the Carve-Out Transactions) were used to pay the merger consideration to shareholders, retire unsecured notes due 2014, repay amounts outstanding under the existing Prepetition ABL/FILO Facility, and fund the Put Option, among other things. This amount does not include the amounts available under the Prepetition ABL/FILO Facility to fund ongoing operations.

At the closing of the 2014 Transaction (and after the Merger), NWHI owned (a) the Debtors' shoe and handbag working capital assets (including inventory and accounts receivable) and (b) The Jewelry Group's working capital assets. NWHI also employed the Nine West Group's and The Jewelry Group's employees, including the CEO's of the relevant divisions, the design staffs, and the sales teams. At that same time, Debtor One Jeanswear Group, Inc. owned the Debtors' jeanswear working capital assets and employed the jeanswear-specific employees,

---

[11]    NWHI is the result of a series of mergers that occurred on April 8, 2014 (collectively, the "Merger") in connection with the 2014 Transaction. At 10:15 a.m., prevailing Eastern Time, The Jones Group Inc. merged with and into Jones Apparel Group Holdings, Inc. At 10:16 a.m., prevailing Eastern Time, Jones Apparel Group Holdings, Inc. merged with and into Jones Apparel Group USA, Inc. At 10:17 a.m., prevailing Eastern Time, JAG Footwear, Accessories and Retail Corporation merged with and into Jones Apparel Group USA, Inc. Finally, at 10:17 a.m., prevailing Eastern Time, Jones Apparel Group USA, Inc. changed its name to NWHI.

[12]    The FILO Loan (as defined herein) was borrowed in August 2016.

KE 52165855

including the jeanswear CEO, design staff, and sales team.[13]  At the closing of the 2014 Transaction, Nine West Development Inc. n/k/a Nine West Development LLC ("NWD") owned the Nine West®, Bandolino®, and Easy Spirit® trademarks.  Also at that time, Jones Investment Co. ("JICO") owned certain licenses and trademarks, including Napier®, Anne Klein®, Judith Jack®, l.e.i.®, Gloria Vanderbilt®, Energie®, Code Blue®, and Erika®.  At the closing of the 2014 Transaction, JICO was a guarantor under the Prepetition ABL/FILO Facility, the Secured Term Loan Facility, and the Unsecured Term Loan Facility.  At the end of 2014, JICO directly transferred to NWD (also a guarantor under the prepetition ABL/FIL Facility, the Secured Term Loan Facility, and the Unsecured Term Loan Facility) the Napier®, Anne Klein®, and Judith Jack® trademarks, and directly transferred to One Jeanswear Group, Inc. the l.e.i.®, Gloria Vanderbilt®, Energie®, Code Blue®, and Erika® trademarks.  JICO then merged with and into NWHI and ceased to be a separate guarantor under the Debtors' funded debt facilities.

As described further below, in December 2016, the Debtors sold their Easy Spirit® wholesale shoe business to Marc Fisher Footwear.  In January 2017, the Debtors used the proceeds from that sale to repurchase the remaining portion of the Jones Apparel business, which by that time had been significantly restructured and renamed "Kasper Group."  Each of the Debtors' primary business segments and the Debtors' operations are discussed more fully below.

       2.       The Carve-Out Businesses.

Following the consummation of the Carve-Out Transactions, the Sponsor-affiliated entities subsequently entered into a number of transactions relating to the businesses subject to the Carve-Out Transactions (the "Carve-Out Businesses"): (a) in January 2015, the Stuart Weitzman® business was sold to Coach for approximately $530 million; (b) in April 2015, Jones New York® (as part of the Jones Apparel business) was sold to Authentic Brands Group for approximately $75 million; (c) in December 2015, the Kurt Geiger® business was sold to Cinven Limited for approximately £250 million (equivalent to approximately $363 million); and (d) in January 2017, the Kasper® brands (also part of Jones Apparel) were sold back to NWHI for approximately $40 million (excluding certain receivables retained by the Sponsor affiliates).  In addition, (a) on September 9, 2014, a dividend was taken by the Sponsor affiliates and the other equity holders of Jones Holdings LLC (the owner of the Jones Apparel business) in the amount of approximately $79.8 million, and (b) on September 10, 2014, a dividend was taken by the Sponsor affiliates and the other equity holders of Stuart Weitzman Topco LLC (the owner of the Stuart Weitzman business) in the amount of approximately $85.1 million.  In total, together with other transactions and dividends relating to the Carve-Out Businesses, the Sponsor affiliates received in excess of $500 million of value from the Carve-Out Businesses in the years following the consummation of the Carve-Out Transactions, net of any equity contributions or other debt at such entities.

       3.       The Debtors' Business Segments.

The Debtors operate four major business units:  One Jeanswear Group, Kasper Group, Anne Klein, and The Jewelry Group.  Prior to the consummation of the 363 Sale during these chapter 11 cases, the Debtors also operated a fifth business unit—Nine West Group.  The Debtors utilize various trademarks, including Anne Klein® and Gloria Vanderbilt®, across these business segments.  In the aggregate, over 80 percent of the Debtors' historical sales come from wholesale distribution and sales to department stores, off price retailers, and mass merchants, a number which increased to 100 percent following the consummation of the 363 Sale.  The Debtors' customers are comprised of a diverse array of big box retailers, off-price retailers, well-known department stores, and, increasingly, e-commerce companies.  The Debtors' four major business units currently employ approximately 950 people across the United States.  Each of the Debtors' major business segments are discussed in turn below.

---

[13]    At the time of the 2014 Transaction certain warehouse employees serving The Jewelry Group, the Debtors' shoe and handbag business lines, and jeanswear were employed at Nine West Distribution LLC.  In 2016, jeanswear warehouse employees were moved from Nine West Distribution LLC to One Jeanswear Group, Inc.

13

(a)    One Jeanswear Group.[14]

The Debtors' jeanswear business operates as a leading wholesaler of women's denim under recognized, mass-appeal brands, such as Gloria Vanderbilt®, Jessica Simpson®, Nine West®, Bandolino®, and Vintage America Blues®.  The Debtors' products are designed and marketed as individual items of jeans, skirts, pants, shorts, jackets, casual tops, dresses, sweaters, activewear, and related accessories, which, while sold as separates, can be combined with each other into groups termed "lifestyle collections" that are designed to be worn together. One Jeanswear Group currently has a portfolio of company-owned and licensed brands and a private label division that designs product for over 30 retailers.  In 2017, the One Jeanswear Group business segment accounted for net revenue of approximately $656 million, which was approximately 41 percent of the Debtors' total revenue and approximately 13 percent of the United States market share in women's denim.

(b)    Kasper Group.[15]

The Debtors purchased Kasper Group in January 2017 from affiliates of Sycamore, which had purchased the Jones Apparel Group (which included the Kasper Group) as part of the Carve-Out Transactions described above. Kasper Group offers women's suits, dresses, and sportswear under the brands Kasper®, Anne Klein®, Le Suit®, and Albert Nipon®, as well as the licensed brand Jones Studio®.  Kasper Group has successfully reinvented itself to keep up with market changes, moving from primarily a dress and suit business—in which suit tops and bottoms are sold together—to selling suit separates and sportswear.  Their products are sold on a wholesale basis and can be purchased in department stores and off-price retailers.  In 2017, Kasper Group accounted for net revenue of approximately $242 million, which was approximately 15 percent of the Debtors' total revenue.

(c)    Anne Klein.[16]

The Debtors' Anne Klein business encompasses timeless American classics in womenswear, accessories, footwear, watches, eyewear, jewelry, legwear, and more.  The brand has become synonymous with American sportswear, and a number of iconic designers, such as Donna Karan, have created clothing under the Anne Klein® name.  The Debtors license the Anne Klein® brand internally and externally, which accounted for 61 percent of the label's operating earnings for 2017 and will be 100 percent of its operating earnings going forward.  Licensed products include watches, outerwear, sunglasses, and luggage.  While the Debtors historically operated the Anne Klein footwear and handbags business within this segment, as part of their restructuring plan and desire to exit the footwear and handbag categories, in early 2018 the Debtors and Steven Madden, Ltd. entered into a licensing agreement granting Steve Madden, Ltd. the exclusive right to use the Anne Klein® trademark in connection with the manufacture or sale of its footwear and handbags segments worldwide.  In 2017, the Anne Klein business accounted for net revenue of approximately $142 million, which was approximately nine percent of the Debtors' total revenue.

(d)    The Jewelry Group.[17]

The Jewelry Group designs and distributes fashion jewelry through wholesale channels to stores around the globe, and its products are available in a variety of department stores, specialty retailers, and mass-market stores. The Jewelry Group is the successor to Victoria & Co. (established in 1950) and was acquired by the Jones Apparel

---

[14]    One Jeanswear Group is owned and operated by Debtor One Jeanswear Group, Inc.  One Jeanswear Group, Inc. owns the Gloria Vanderbilt® intellectual property, among others.

[15]    Kasper Group is owned and operated by Debtor Kasper Group LLC.  Kasper Group LLC owns the Kasper® intellectual property, among others.

[16]    The Anne Klein® brand intellectual property is owned by Debtor NWD, and that entity is the party to the license agreement with Steve Madden, Ltd. described herein.

[17]    The Jewelry Group's operations (including working capital assets) are located at Debtor NWHI.  Many of the trademarks owned by the Debtors and used in The Jewelry Group's operations are owned by Debtor NWD.

14

Group in 2000.  The Jewelry Group has become a leading fashion jewelry producer in the United States, selling under internal and licensed brands including Nine West®, Anne Klein®, and Napier®.  In 2017, The Jewelry Group business segment accounted for net revenue of approximately $73 million, which was approximately five percent of the Debtors' total revenue.

> (e)    The Nine West Group.

Prior to the consummation of the 363 Sale, Debtor NWD owned the e-commerce site, www.NineWest.com, and The Nine West® and Bandolino® brands.  Certain of the Nine West Group's operations (including store leases and working capital assets) were located at Debtor NWHI.  The Nine West Group formerly designed, contract manufactured, and distributed women's footwear and handbags in over 65 countries around the world under the Nine West® and Bandolino® trademarks.  As discussed more fully herein, the Debtors sold the Nine West® and Bandolino® trademarks during these chapter 11 cases.  Through ongoing license agreements entered into as part of the 363 Sale, the Debtors still use the Nine West® and Bandolino® brands in other product categories, including apparel, jewelry, and jeanswear.

> 4.    <u>Retail Operations</u>.

As of March 31, 2018, the Debtors operated approximately 70 retail stores in the United States under the Easy Spirit® and Nine West® brand names.  For many years and consistent with national economic trends disfavoring retail operations, the Debtors' retail store performance continued to decline and dragged down the Debtors' earnings.  As part of the Easy Spirit sale in December 2016, the Debtors agreed to exit the Easy Spirit retail stores in an orderly fashion within three years.  With respect to Nine West®, notwithstanding extensive efforts by the Debtors' management team and advisors prior to the Petition Date, no party that completed diligence expressed an interest in purchasing the Debtors' retail store operations.  The Debtors' discontinued their brick-and-mortar retail operations prior to the Petition Date and vacated each of their store locations by the Petition Date.  In 2017, the Debtors' retail operations generated approximately eight percent of the Debtors' total revenue but created losses of approximately $30.6 million of the Debtors' 2017 EBITDA.

Prior to the 363 Sale, the Debtors also operated an e-commerce website, www.NineWest.com, where consumers could directly purchase Nine West® brand products.

B.    *The Debtors' Non-Debtor Affiliates.*

The Debtors have certain affiliates that are not part of these chapter 11 cases.  The majority of these non-debtor affiliates are entities providing or supporting quality control, product sourcing, and production operations for the Debtors' brands.  Certain non-debtor affiliates are holding companies, non-operating entities created for other legal purposes, or residual entities remaining from mergers and acquisitions.  The non-debtor affiliates are not liable for any of the Debtors' outstanding funded debt obligations.

C.    *Summary of Prepetition Capital Structure.*

A diagram presenting the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit B**.  As set forth on **Exhibit B**, Debtor NWHI is a wholly owned subsidiary of Debtor Jasper Parent.  Each of the other Debtors is a direct or indirectly wholly-owned subsidiary of NWHI.  Jasper Parent is wholly owned by non-debtor Jasper Investment Holdings LLC, which is wholly owned by non-debtor Nine West Topco LLC.  Investment funds managed by Sycamore directly or indirectly hold more than 90 percent of the outstanding equity interests in non-debtor Nine West Topco LLC, with the remaining equity interests held by funds affiliated with KKR.

As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $1.6 billion, comprised of the Prepetition ABL/FILO Facility, the Secured Term Loan Facility, the Unsecured Term Loan Facility, the 2019 Notes, the Stub 2019 Notes, and the 2034 Notes (each as defined herein).  Each Debtor is an obligor (either as a borrower or guarantor) under the Prepetition ABL/FILO Facility, the Secured Term Loan Facility, and the Unsecured Term Loan Facility.  NWHI is

the only obligor under each of the Unsecured Notes.  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date, and the obligations are described in more detail below.

| Funded Debt | Maturity | Approximate Principal Amount Outstanding (m) |
|---|---|---|
| $250 million Revolving Loan[18] | Apr. 2019 | $          108.0 |
| $25 million FILO Loan | Apr. 2019 | $           22.1 |
| Secured Term Loan Facility | Oct. 2019 | $          427.1 |
| Unsecured Term Loan Facility | Jan. 2020 | $          300.0 |
| 2019 Notes | Mar. 2019 | $          426.7 |
| Stub 2019 Notes | Mar. 2019 | $           28.5 |
| 2034 Notes | Nov. 2034 | $          250.0 |
|  | **Total:** | $        1,562.4 |

1.    Prepetition ABL/FILO Facility.

Each Debtor is party to that certain Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "ABL/FILO Credit Agreement"), by and among NWHI, One Jeanswear Group, Inc., and Kasper Group LLC, as borrowers, the lenders party thereto (the "ABL Lenders," and with the lenders under the FILO Loan, the "ABL/FILO Lenders"), and Wells Fargo Bank, National Association, as agent (the "ABL/FILO Agent").  The ABL Credit Agreement provides for a $250 million senior secured revolving credit facility (the "Revolving Loan") and a $25 million first in, last out loan (the "FILO Loan," and together with the Revolving Loan, the "Prepetition ABL/FILO Facility").  The FILO Loan was borrowed in August 2016.  The Debtors who are not borrowers under the ABL/FILO Credit Agreement have guaranteed all obligations under the Prepetition ABL/FILO Facility.

The relative contractual rights and priorities of the ABL/FILO Agent and the Secured Term Loan Agent with respect to shared collateral are governed by that certain Intercreditor Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Intercreditor Agreement"), between the ABL/FILO Agent and the Term Loan Agent.  Pursuant to the Intercreditor Agreement, obligations under the Prepetition ABL/FILO Facility are secured by a first priority lien on, among other things, the Debtors' accounts (other than certain accounts which are identifiable proceeds of collateral of the Secured Term Loan Facility described below), credit card receivables, cash, money and cash equivalents (other than that which is identifiable proceeds of collateral of the Secured Term Loan Facility described below), deposit accounts, and inventory (collectively, the "ABL Priority Collateral"), and a second priority lien on all other property of the borrowers and the guarantors (collectively, the "Term Loan Priority Collateral").

The Prepetition ABL/FILO Facility provides for cash dominion when the excess availability under the Prepetition ABL/FILO Facility is less than 2.5 percent of the maximum credit available under the Prepetition ABL/FILO Facility, at which point the ABL/FILO Agent can exercise certain controls over the Debtors' bank accounts.  Although the Debtors were not required under the Prepetition ABL/FILO Facility, prior to the Petition Date the Debtors agreed to be under cash dominion pursuant to a letter agreement.  Additionally, pursuant to various control agreements executed between certain Debtors and the ABL/FILO Lenders, the ABL/FILO Agent could take available funds from the Debtors' master operating account and other material accounts and use those funds to pay down the Prepetition ABL/FILO Facility.  As of the Petition Date, substantially all of the Debtors' cash was subject to a control agreement in favor of the ABL/FILO Agent.  The amount outstanding under the Prepetition ABL/FILO Facility was subject to fluctuations based on daily cash sweeps.  Approximately $108.0 million in principal under the Revolving Loan was outstanding as of the Petition Date (excluding letters of credit as described above).  As of the Petition Date, approximately $22.1 million in principal amount remained outstanding under the FILO Loan.  Immediately upon entry of the Interim DIP Order, all amounts outstanding under the Prepetition ABL/FILO Facility were refinanced by the DIP ABL/FILO Facility.  Notwithstanding the refinancing of the Prepetition ABL/FILO Facility, the Debtors remain obligated to the ABL/FILO Agent and the ABL/FILO Lenders for certain amounts

---

[18]    Balance excludes approximately $28.1 million of letters of credit issued thereunder as of the Petition Date.

16

arising under, or in connection with, the Prepetition ABL/FILO Facility, including contingent indemnification obligations and professional fees, which remain secured by valid, continuing, enforceable, and perfected liens, and replacement liens, on the ABL Priority Collateral and the Term Loan Priority Collateral. Although there are not currently any liquidated claims outstanding under the Prepetition ABL/FILO Facility, so long as the risk remains that claims may be brought against the ABL/FILO Agent and/or the ABL/FILO Lenders, the Debtors and/or the Reorganized Debtors will remain obligated to indemnify the ABL/FILO Agent as a result of such claims and the ABL/FILO Agent will retain its lien (and replacement lien) on the ABL Priority Collateral and the Term Loan Priority Collateral.

       2.       Secured Term Loan Facility.

Each Debtor is party to that certain Term Loan Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Secured Term Loan Credit Agreement"), by and among NWHI, as borrower, Jasper Parent as Holdings, Cortland Capital Market Services LLC, as successor administrative agent (in such capacity, the "Secured Term Loan Agent"), and the lenders thereto. The Secured Term Loan Credit Agreement initially provided a $445 million secured term loan facility (the "Secured Term Loan Facility"). Holdings and the other Debtors who are not borrowers under the Secured Term Loan Credit Agreement have jointly and severally guaranteed all obligations under the Secured Term Loan Facility. As of the Petition Date, approximately $427.1 million in aggregate principal amount remained outstanding under the Secured Term Loan Facility. As discussed more fully herein, upon consummation of the 363 Sale, the Debtors transferred approximately $263 million into an escrow account to be released to the holders of debt under the Secured Term Loan Facility in accordance with the terms of the DIP Order. From the 2014 Transaction to the Petition Date, the Debtors made approximately $80 million in ordinary course interest payments under the Secured Term Loan Facility in accordance with the terms thereof.

Pursuant to the Intercreditor Agreement, obligations under the Secured Term Loan Credit Agreement are secured by a first priority lien on Term Loan Priority Collateral (i.e., all property of the borrowers and guarantors other than the ABL Priority Collateral) and a second priority lien on the ABL Priority Collateral.

       3.       Unsecured Term Loan.

Each Debtor is party to that certain Term Loan Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "Unsecured Term Loan Credit Agreement"), by and among NWHI, as borrower, Jasper Parent, as Holdings, GLAS Trust Company LLC, as administrative agent (in such capacity, the "Unsecured Term Loan Agent"), and the lenders party thereto. The Unsecured Term Loan Credit Agreement provides for a $300 million unsecured term loan (the "Unsecured Term Loan Facility"). Holdings and the other Debtors who are not borrowers under the Unsecured Term Loan Credit Agreement have jointly and severally guaranteed all obligations under the Unsecured Term Loan Facility. As of the Petition Date, approximately $300 million in aggregate principal amount remained outstanding under the Unsecured Term Loan Credit Agreement. From the 2014 Transaction to the Petition Date, the Debtors made approximately $72 million in ordinary course interest payments under the Unsecured Term Loan Facility in accordance with the terms thereof.

       4.       Unsecured Notes.

       (a)       2019 Notes.

NWHI issued approximately $427 million in aggregate principal amount of 8.25% senior unsecured notes under that certain indenture, dated as of April 23, 2014 (as amended, supplemented, or otherwise modified from time to time), with U.S. Bank National Association, as trustee (the "2019 Trustee"), in exchange for approximately $366.8 million of Stub 2019 Notes in connection with the Exchange Option and the incurrence of $60 million of new money to fund the Put Option or repay draws incurred under the Prepetition ABL/FILO Facility to fund the 2014 Transaction. Only approximately $4.27 million was used to fund the Put Option, as 99% of holders elected to the Exchange Option or to continue to hold the Stub 2019 Notes. Thus, approximately $55.73 million was used to fund repayment of the Prepetition ABL/FILO Facility. The 2019 Notes mature in March 2019 and, prior to the Petition Date, required semiannual coupon payments on March 15 and September 15. As of the Petition Date,

KE 52165855

approximately $426.7 million in aggregate principal amount of 2019 Notes remained outstanding. From the 2014 Transaction to the Petition Date, the Debtors made approximately $128.3 million in ordinary course interest payments under the 2019 Notes in accordance with the terms thereof.

(b)     Stub 2019 Notes.

NWHI (as successor in interest)[19] issued $300 million in aggregate principal amount of 6.875% senior unsecured notes, under that certain indenture, dated March 7, 2011 (as amended, supplemented, or otherwise modified from time to time), with the 2019 Trustee. The Stub 2019 Notes mature in March 2019 and, prior to the Petition Date, required semiannual coupon payments on March 15 and September 15. As noted above, holders of Stub 2019 Notes were given the option to (a) put their notes to NWHI under the Put Option or (b) exchange their notes for 2019 Notes under the Exchange Option, and in connection with such option, holders of approximately $366.8 million in principal amount in the Stub 2019 Notes elected to exchange for the 2019 Notes. As of the Petition Date, approximately $28.5 million in aggregate principal amount of Stub 2019 Notes remained outstanding. From the 2014 Transaction to the Petition Date, the Debtors made approximately $6.9 million in ordinary course interest payments under the 2019 Stub Notes in accordance with the terms thereof.

(c)     2034 Notes.

In 2004, NWHI (as successor in interest)[20] issued $250 million in aggregate principal amount of 6.125% senior unsecured notes (collectively, the "2034 Notes" and, collectively with the 2019 Notes and the Stub 2019 Notes, the "Unsecured Notes"), issued under that certain indenture, dated November 22, 2004 (as amended, supplemented, or otherwise modified from time to time), with Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to SunTrust Bank) (the "2034 Trustee"). The 2034 Notes do not have a change of control provision. The 2034 Notes mature in November 2034 and, prior to the Petition Date, required semiannual coupon payments on May 15 and November 15. As of the Petition Date, approximately $250 million in aggregate principal amount of 2034 Notes remained outstanding. From the 2014 Transaction to the Petition Date, the Debtors made approximately $61.3 million in ordinary course interest payments under the 2034 Notes in accordance with the terms thereof.

D.     *The Debtors' Management.*

1.     The Debtors' Board Members and Executives.

As of the date hereof, set forth below are the names, position(s), and biographical information of the current Board of Directors of NWHI as well as current key executive officers for the Debtors various businesses. The Boards oversee the business and affairs of the Debtors and its various subsidiaries.

| Name | Position |
|---|---|
| Ralph Schipani | Chief Executive Officer |
| Patricia Lind | Senior Vice President and General Counsel |
| Karen Curione | Treasurer |
| Harvey L. Tepner | Director |

---

[19]    NWHI is party to the Stub 2019 Notes Indenture as the Issuer of the Stub 2019 Notes after Jones Apparel Group USA, Inc. survived the Merger and was renamed NWHI.

[20]    NWHI is party to the 2034 Notes Indenture as the Issuer of the 2034 Notes after Jones Apparel Group USA, Inc. survived the Merger and was renamed NWHI.

| Name | Position |
|------|----------|
| Alan B. Miller | Director |

*Ralph Schipani*. Mr. Schipani has served as interim President of NWHI since May 2015 and as interim CEO of NWHI since June 2016. Mr. Schipani is also a Managing Director with Alvarez & Marsal North America LLC ("A&M"). His primary areas of focus include interim management, the development and evaluation of strategic business plans, assessment of bankruptcy planning and strategy, and the development and negotiation of recapitalization strategies and refinancing plans, as well as plans of reorganization. Mr. Schipani has worked with companies across a variety of industries, including retail, consumer products, manufacturing, chemicals, and media services. Other notable engagements include Vertis Communications, a $1 billion leading provider of marketing communication services, on out-of-court and ultimately Chapter 11 proceedings and Chemtura, a $3 billion global specialty chemical company, which successfully emerged from bankruptcy after paying all creditors in full, along with providing a return to the prepetition equity.

Before joining A&M in 2007, Mr. Schipani spent three years in various management positions with Interstate Brands Corp. Previously, he was in the strategy practice at Accenture. Mr. Schipani received a bachelor's degree in business and economics from Lafayette College. He is a member of the Association of Insolvency and Restructuring Advisors.

*Patricia Lind*. Ms. Lind has served as Senior Vice President and General Counsel for NWHI since August 2016. From July 2015 to August 2016, she served as Senior Vice President and Co-General Counsel at NWHI's corporate predecessor, the Jones Group. From October 2000 to July 2015, Ms. Lind was Vice President and Associate General Counsel for The Jones Group, Inc. During her time with Nine West Holdings, Inc. and The Jones Group, Inc., Ms. Lind has developed an expertise in employment law, real estate transactions, and litigation. Before joining The Jones Group, Inc. in 2000, Ms. Lind spent 17 years with Vedder Price, P.C., where she advised a diverse complement of companies with domestic and international operations, on general corporate, employment, real estate, civil litigation and mergers, acquisitions, contracts and other transactional matters. Ms. Lind received a bachelor's degree from Smith College, and received her Juris Doctorate from St. John's University College of Law.

*Karen Curione*. Ms. Curione has served as Treasurer since January 2018. As Treasurer, Ms. Curione is the head of treasury functions and shared services financial operations. Prior to Treasurer, Ms. Curione was Vice President of Payment Services for Nine West from 2010 to 2017. Ms. Curione led the global treasury, cash management operations, accounts payable, accounts receivable, credit, collections, purchasing and payroll functions.

Prior to her role at Nine West, Ms. Curione worked at Jones Apparel Group (the predecessor company to NWHI), first as a Retail Marketing Manager from 1998 to 2001, then as Retail Inventory Control Manager from 2001 to 2003, and then as Director in Accounts Payable from 2003 until 2010. Ms. Curione received her bachelor's degree from Temple University and her MBA from Holy Family University.

*Harvey L. Tepner*. Mr. Tepner has served as an independent member of the Board of Directors since August 2017. Mr. Tepner is an independent corporate director and private investor. From 2008 to 2015, Mr. Tepner was a senior executive of WL Ross & Co. LLC, a private equity and alternative investment fund manager (and a subsidiary of Invesco Ltd., a public mutual fund and asset management company). From 2002 to 2008, Mr. Tepner was a Partner at Compass Advisers, LLP in charge of its investment banking restructuring practice. Prior to that time, Mr. Tepner was a Managing Director of Loeb Partners Corporation from 1995 to 2002, and before Loeb, served as an officer in the corporate finance departments of Dillon, Read & Co. Inc. and Rothschild Inc. Mr. Tepner began his career with Price Waterhouse in Canada and is a Chartered Accountant and Chartered Professional Accountant (Canada). Mr. Tepner serves as a director of Core-Mark Holding Company, Inc., Alpha Natural Resources Holdings, Inc., Clear Channel Outdoor Holdings, Inc., and Village Roadshow Entertainment Group (BVI) Limited. In February 2016, Mr. Tepner was appointed a director of Zochem Inc., the Canadian subsidiary of Horsehead Holding Corp., a publicly traded company operating in chapter 11, and served until the consummation of reorganization proceedings in September 2016. Mr. Tepner previously served on the boards of several public and private companies including portfolio companies controlled by WL Ross & Co. Mr. Tepner holds a B.A. from Carleton University and an M.B.A. from Cornell University. Mr. Tepner was selected to serve as a member of the

KE 52165855

Debtors' Board based upon his extensive experience with distressed companies as both a private equity investor and investment banker, and his knowledge of regulatory and accounting issues.

*Alan B. Miller*. Mr. Miller has served as an independent member of the Board of Directors since August 2017. Mr. Miller was a senior partner and counsel at Weil Gotshal & Manges LLP, a large international law firm, in the Business Finance & Restructuring Department between 1972 and 2005. As part of his practice, Mr. Miller regularly counseled debtors, trustees, secured creditors' committees, investors and purchasers and sellers of distressed entities and assets. From 2007 to 2012, Mr. Miller has served as Special Counsel and Litigation Trustee to Collins & Aikman Corporation, and its debtor subsidiaries. In addition, Mr. Miller currently serves on the board of directors/managers of Toys 'R' Us, Inc. Mr. Miller recently served on the board of directors/managers of Ceva Holdings LLC and Ceva Group PLC, as well as TNEH (UK) and Westinghouse Electric Company, subsidiaries of Toshiba Corporation. Mr. Miller holds a B.A. from Trinity College and a J.D. from Boston College Law School. Mr. Miller was selected to serve as a member of the Debtors' Board for his extensive experience counseling distressed companies through in and out-of-court restructurings and his service on the board of more than twenty-five entities since 2006.

2.    Board Member Resignations.

Stefan Kaluzny and Peter Morrow also served as members of the Board of Directors from April 8, 2014, to September 24, 2018. Mr. Kaluzny and Mr. Morrow are the co-founders of Sycamore Partners and are both Managing Directors there. On September 24, 2018, Mr. Kaluzny and Mr. Morrow resigned from all offices (including as members of the Board of Directors) or other positions with Jasper Parent, NWHI, and each of their respective subsidiaries.

E.    *Events Leading to these Chapter 11 Cases.*

1.    Factors Causing the Debtors' Performance Decline.

Despite owning and licensing well known and respected brand names, the Debtors' Nine West® footwear and handbag business performance significantly declined starting in late 2014, while their One Jeanswear Group, Kasper Group, and The Jewelry Group, and Anne Klein have shown relative stability notwithstanding macroeconomic issues. Three main factors contributed to the Debtors' recent struggles.

*First*, the Debtors have faced the same macro retail market trends in the United States, Canada, Asia, the Middle East, and South America that have recently impacted other apparel and retail companies, including a general shift away from brick-and-mortar shopping, a shift in consumer preferences away from branded apparel, and changing fashion and style trends. Because a substantial portion of the Debtors' profits derive from wholesale distribution, the Debtors have been hurt by the decline of many large retailers, such as Sears, Bon Ton, and Macy's, which have closed stores across the country and purchased less product for their stores due to decreased consumer traffic. In 2015 and 2016, the Debtors experienced a steep and unanticipated cut back on orders from two of the Debtors' most significant footwear customers, which led to year over year decreases in revenue of $16 million and $46 million in 2015 and 2016, respectively. These troubles have been somewhat offset by e-commerce platforms such as Amazon and Zappos, but such platforms have not made up for the sales volume lost as a result of brick-and-mortar retail declines.

*Second*, the Debtors' l.e.i.® brand, which was historically successful and an important part of the One Jeanswear Group business, suffered significant losses beginning in mid-to-late 2014. For example, from 2014 to 2015 the Debtors' revenue from the l.e.i® brand decreased by $36 million. Additionally, from 2014 to 2016, the jeanswear market was more generally affected by increasing sales of "athleisurewear" and consumer tastes trending away from jeans. The Debtors have partly offset these declines through the introduction of new brands since 2014 to maintain One Jeanswear Group's revenues.

*Third*, the Nine West Group business experienced a precipitous decline in operating performance, beginning with a decrease in sales in the fall of 2014. Ultimately, the Nine West Group's performance continued to decline and was a negative earnings contributor to the Debtors' operations in 2017. A number of factors led to this

KE 52165855

decline. First, the Nine West Group business suffered significant declines in orders from a large shoe chain retailer and various department store customers beginning in late 2014. Second, due to the challenging global retail environment and certain geopolitical issues affecting certain key partners, the Debtors' international business also experienced declines. This exaggerated the negative performance impact compared to many competitors that were only recently expanding internationally. Relatedly, a key partner in Asia, GRI Group, had its own specific challenges which resulted in significantly-reduced Nine West Group sales and profit in a key territory. Third, industry factors, including a consumer shift from dress shoes and pumps (one of Nine West Group's strengths in footwear) to comfort and casual footwear, caused a decline in revenue. Fourth, as moderate department stores closed locations and began to emphasize private label products, the Nine West Group's footwear and handbag presence in these stores dwindled. The Debtors, for their part, acknowledge their own missteps in adjusting to these industry challenges, which included both quality and design issues, as well as a slowness to react to changes in consumer trends. Although the Debtors addressed these missteps through senior management and design team changes, as well as a new sourcing strategy, these changes created a significant downward revenue trend for a key part of the Debtors' business.

The Debtors similarly "missed the mark" in predicting consumer preferences with respect to their Easy Spirit® brand, which resulted in decreased demand and substantial losses. Specifically, the Debtors' efforts to pursue a younger, more fashionable consumer for the Easy Spirit® brand failed, which led to a significant decrease in sales in the fall of 2015 and spring of 2016. The losses were further exacerbated by a substantial inventory purchase that ultimately did not meet sales expectations with retail partners or in the Debtors' own stores. As a result, Easy Spirit turned from a business with profits of $10–15 million in 2014 to a business with losses of $20 million in 2016. Due to continuing losses, the Debtors chose to sell their Easy Spirit® wholesale business in December 2016 and invested the proceeds of that transaction in the acquisition of Kasper Group business.

The continued challenges described above, the difficult global retail environment, product and design missteps, and quality problems all led to certain of the Debtors' customers, and the Debtors' end-consumers, losing confidence in the Debtors—particularly the Nine West® and Bandolino® brands. Nine West Group net sales declined 36.9 percent since fiscal year 2015—from approximately $647.1 million to approximately $408 million in the most recent fiscal year.

In response to these struggles, the Debtors sold the Easy Spirit® brand in December 2016, moved away from brick-and-mortar retail stores, and made senior management and design team changes within Nine West Group. Substantial capital and operational investments as well as concentrated attention on the shoe business, however, would have been required for the Debtors to turn around the Nine West Group business. The Debtors did not have the capital to sustain such efforts, which did not have a guarantee of success in light of the Debtors' missteps on footwear and handbags in the past several years. Accordingly, the Debtors decided that such time, attention, and money would be better spent on their historically stable jeanswear, apparel, and jewelry businesses.

In light of the Debtors' operational challenges, the Debtors struggled to sustain the costs associated with their funded debt obligations. The Debtors' annual interest expense is equal to approximately $113.9 million, compared with approximately $88.1 million of adjusted EBITDA in fiscal year 2017. Although the Debtors expect improved performance without the overhang of their store footprint and after re-positioning their business without the losses associated with their footwear and handbag businesses, the Debtors' post-emergence projected adjusted EBITDA of $95.5 million for fiscal year 2019 would still be insufficient to sustain the Debtors' prepetition capital structure. The Debtors were therefore proactive in seeking to address their balance sheet in advance of the 2019 maturities under their Prepetition ABL/FILO Facility, Secured Term Loan Facility, 2019 Notes, and Stub 2019 Notes.

2.    Prepetition Strategic Transactions.

Given the decline in the Debtors' footwear and handbag business, the Debtors were at a crossroads by late 2016: they could either make a substantial investment in the Nine West Group business in an effort to turn around declining sales or they could divest from the footwear and handbag business and focus on their historically strong, stable, and profitable business lines.

KE 52165855

The Debtors took the first step toward executing their strategy of focusing on their historically strong business lines by selling the Easy Spirit® brand and certain working capital assets in December 2016 to Marc Fisher Footwear.  Prior to this sale, Debtor NWHI owned the Easy Spirit-related working capital assets (primarily accounts receivable and inventory), which constituted ABL Priority Collateral, and Debtor NWD owned the Easy Spirit® trademark, which constituted Term Loan Priority Collateral.  The purchase price for the intellectual property was $52 million, and the purchase price for the working capital assets was $3.2 million.  In compliance with the Debtors' cash management system, the $55.2 million in gross sale proceeds were received by NWHI, which, net of fees and costs, resulted in net sale proceeds of $52.0 million in cash.  In January 2017, the Debtors used approximately $15 million to pay down the Revolving Loan and approximately $40 million to purchase the Kasper® branded business from an affiliate of the Sponsor and the Minority Equity Holders (Kasper SuperCo Ltd.), which by that time had been renamed Kasper Group (the Kasper® branded businesses had previously been sold to affiliates of the Sponsor and Minority Equity Holders as part of the Carve-Out Transactions).  The Debtors also collected the proceeds from working capital assets related to the Kasper Group (totaling approximately $30 million) and sent those proceeds to Kasper SuperCo Ltd. pursuant to the terms of the relevant purchase agreement.

Kasper Group provided the Debtors with a cash-flow positive business that they already had operating experience with—it was already a licensee of many of the Debtors' brands including Nine West® and Anne Klein® and it fit with the Debtors' strategic shift to concentrate on apparel.  The Debtors continued on this path by April 2017 were actively marketing the Nine West® brand to strategically monetize this asset and allow the company to focus on its core businesses.  These marketing efforts proved successful, allowing the Debtors to commence these chapter 11 cases with the Stalking Horse APA to sell assets related to the Nine West® brand, a process that created significant value following the competitive postpetition bidding process, as more fully described below.

3.      Real Estate Right-Sizing Initiatives.

The Debtors' management team also determined that the Debtors' strengths are in wholesale distribution and not in brick-and-mortar retail.  The Debtors' footwear and handbag businesses were saddled with expensive commercial lease obligations not supported by customer demand at the retail store level.  Prior to the Petition Date, the Debtors determined to exit brick-and-mortar retail altogether to reduce the drag of that business on overall earnings.  To that end, the Debtors began a strategy of largely entering short-term leases and began to allow their store leases to naturally expire.

As of the Petition Date, the Debtors leased approximately 70 Nine West® and Easy Sprit® store locations and three corporate offices.  In addition, the Debtors subleased one former store location and one office location.  As of the Petition Date, the Debtors ceased operations, vacated their store lease premises, and abandoned possession to their respective landlords.  The Debtors also vacated one of their three offices and abandoned the premises to its landlord.  The Debtors determined that such stores and offices were not profitable and did not have a place in the Debtors' ongoing business operations or the Debtors' strategic plan for the future.

F.      Appointment of Independent Directors.

In August 2017, to ensure a fair and thorough review of the Debtors' strategic alternatives, the Board of Directors or Managers, as applicable, of NWHI, Jasper Parent, and One Jeanswear Group, Inc. appointed Alan Miller and Harvey Tepner to the boards as disinterested directors (the "Independent Directors").  The Independent Directors were added to the boards due, in part, to the fact that the Debtors' board members at that time were the co-founders of the Sponsor.  Each of the Independent Directors has extensive experience serving on boards of managers and boards of directors in distressed situations.  The Debtors, at the Independent Directors' direction, subsequently retained Munger, Tolles & Olson LLP ("MTO") and Berkeley Research Group LLC ("BRG") as independent counsel and independent financial advisor, respectively, to assist the Independent Directors' review of matters regarding transactions or negotiations that may result in conflicts of interest, including related to the 2014 Transaction and related Carve-Out Transactions.

As part of this mandate, beginning in October 2017 and continuing through the pendency of these chapter 11 cases, the Independent Directors have conducted an investigation into any claims related to the 2014 Transaction and Carve-Out Transactions, or other transactions involving their direct or indirect equity owners or

22

other persons and entities involved in those transactions, including but not limited to their ABL/FILO Lenders, Secured Term Loan Lenders, and Unsecured Term Loan Lenders, and the directors involved in those transactions. The Independent Directors' prepetition and postpetition evaluation and pursuit of potential claims is discussed more fully below.

G.      *Prepetition Restructuring Efforts.*

Recognizing the Debtors' 2019 funded debt maturities and ongoing operational challenges, the Debtors retained Lazard Frères & Co. LLC ("Lazard") on April 5, 2017, as investment banker, to aid in a review of all strategic alternatives. Moreover, Consensus Advisory Services LLC ("Consensus"), the investment banker that assisted the Debtors in selling the Easy Spirit® brand, was approached by a third-party (who had also been involved in that Easy Spirit® process) in April 2017 who expressed interest in purchasing the Nine West® brand. This party had expressed similar interest previously during the Easy Spirit® process. Given this interest, the Debtors retained Consensus to assist the Debtors in marketing the Nine West® brand. The Debtors, with the assistance of their advisors, then commenced a two-prong process, as discussed more fully below.

1.      Sale of Nine West®, Bandolino®, and Associated Brands.

In April 2017, Consensus had a discussion with a third party that it had previously communicated with during the Debtors' marketing process for the Easy Spirit® brand. That party inquired into the possibility of purchasing the Nine West® brand from the Debtors and expressed strong interest in doing so. After engaging in initial discussions regarding the viability of this proposed sale, the Debtors retained Consensus to consider this proposal and eventually to actively market the Nine West® brand, the Bandolino® brand, and associated brands. The Debtors also agreed to provide this strategic buyer with an exclusive right to negotiate an asset purchase agreement for the sale of the Nine West® brand, which exclusivity period eventually was extended through July 15, 2017.

When this exclusivity period expired without the entry into an asset purchase agreement, it was unclear to the Debtors whether the initial potential purchaser would be able to close the deal. As such, the Debtors and Consensus began actively marketing the Nine West® and Bandolino® brands and ultimately contacted a total of 56 parties regarding a potential sale, with a primary focus on strategic buyers. Of those 56 parties, 20 entered into nondisclosure agreements, or were otherwise already party to nondisclosure agreements with the Debtors, and began conducting due diligence. Throughout this period, the Debtors also worked with the initial potential purchaser and its potential lenders on due diligence related to a potential sale in an effort to help effectuate a transaction with that potential buyer.

Over the course of approximately nine months, the Debtors engaged interested parties on a potential sale, including the initial potential purchaser, before reaching agreement on a letter of intent with Authentic Brands Group LLC ("ABG") on January 17, 2018, which provided ABG with the exclusive right to negotiate an asset purchase agreement that would allow ABG to act as a stalking horse bidder in the sale of the Nine West®, Bandolino®, and associated brands. The Debtors compared the terms and conditions of the offer from the initial potential purchaser (including the status of those negotiations) with the terms and conditions being offered by ABG and determined in their business judgment that the letter of intent with ABG would maximize the value of their estates and provide certainty to their stakeholders.

The Debtors and ABG reached a final agreement on the Stalking Horse APA on April 5, 2018. The Stalking Horse APA provided the commitment by the Stalking Horse Bidder to pay $200 million for the intellectual property associated with the Nine West®, Bandolino®, and associated brands and related to certain working capital assets, subject to adjustments as set forth in the Stalking Horse APA (collectively, the "Shoe & Handbag Assets"). Importantly, the majority of the Debtors' creditor constituencies supported this sale process. The cash proceeds of the assets sold were to be used to partially repay the DIP ABL/FILO Claims and Secured Term Loan Claims following the consummation of the sale during these chapter 11 cases, as more fully discussed herein.

    2.    <u>Creditor Negotiations & Prepetition RSA</u>.

With the assistance of Lazard, the Debtors began, in the summer of 2017, to organize their funded debt creditors in an effort to gauge support regarding various restructuring proposals. The Debtors focused their initial organization efforts on their larger known creditors at the top portion of their capital structure, which creditors the Debtors knew through their lender registers (versus their publicly traded notes). The Debtors also were aware that certain Noteholders held credit default swap ("CDS") positions related to the 2019 Notes, making it difficult to organize such holders. After engaging in initial diligence with their Secured and Unsecured Term Loan Lenders in the summer and early fall, in October 2017, the Debtors entered into confidentiality agreements with (a) the Ad Hoc Group of Secured Term Loan Lenders (the "<u>Secured Lender Group</u>"), represented by Davis Polk & Wardwell LLP and Ducera Partners LLC, (b) the Ad Hoc Crossover Group of Secured and Unsecured Term Loan Lenders (the "<u>Crossover Group</u>"), represented by King & Spalding LLP and Guggenheim Securities, LLC, and (c) Brigade Capital Management, LP ("<u>Brigade</u>"), represented by Kramer Levin Naftalis & Frankel LLP, Moelis & Company LLC, and Morris Tbeile. The Debtors proposed a general deal construct based in part on the sale of the Nine West® or another brand to pay down debt, with various cash, debt, and equity recoveries for the Debtors' creditors. The parties provided preliminary feedback on the deal construct but expressed differing views on value and how the Debtors' debt should be restructured in the context of an asset sale. Ultimately, with no such asset sale in hand, negotiations halted on November 27, 2017, when the creditors' confidentiality agreements terminated.

In late 2017 and early 2018, the Debtors concentrated on the ongoing efforts to sell the Nine West® brand. As these efforts gained traction, in early February 2018, the Debtors again entered into confidentiality agreements with the Secured Lender Group, Crossover Group, and Brigade. These groups remained divergent on their views of enterprise value, leading each to propose a different path for the Debtors' restructuring. The Debtors engaged with these groups on potential deal constructs and exchanged term sheets in furtherance thereof. The Debtors also engaged with principals for an Ad Hoc Group of 2034 Noteholders (the "<u>2034 Noteholder Group</u>"), represented by Jones Day and Houlihan Lokey, starting in March 2018. The 2034 Noteholder Group made proposals to the Debtors, Brigade, and the Crossover Group on potential plan recoveries in the context of the restructuring being negotiated by those groups. The 2034 Noteholder Group also engaged in negotiations with the Sponsor with respect to potential claims related to the 2014 Transaction and the Carve-Out Transactions. Soon after the Petition Date, the 2034 Noteholder Group disbanded.

While these discussions were ongoing, on March 15, 2018, approximately $18.6 million in aggregate interest payments came due under the indentures governing the 2019 Notes and Stub 2019 Notes. The indentures governing these Unsecured Notes each permitted the Debtors a 30-day "grace period" to make the interest payment before the failure to make such payment would mature into an "Event of Default" under such indentures. To preserve liquidity while restructuring negotiations were underway, the Debtors determined to enter into the grace period with respect to each of these interest payments. The Debtors had not made these payments as of the Petition Date. The Debtors used this time to continue to focus parties on reaching a settlement on the terms of a global restructuring transaction.

On April 6, 2018, these efforts culminated in the execution of the Prepetition RSA by the Debtors, the Secured Lender Group, the Crossover Group, and Brigade. This support—coming from holders of over 78 percent by principal amount of loans under the Secured Term Loan Facility and holders of over 89 percent by principal amount of loans under the Unsecured Term Loan Facility—enabled the Debtors to experience a smooth landing in chapter 11 and created important momentum leading to a successful 363 Sale.

H.    *Canadian Insolvency Proceedings*.

In addition to these chapter 11 cases, Jones Canada, Inc. and Nine West Canada LP (the "<u>Canadian Debtors</u>") have commenced foreign insolvency proceedings so that the Debtors and the Canadian Debtors may effectuate an enterprise-wide restructuring and otherwise protect their foreign assets. Specifically, contemporaneously with the Debtors' commencement of these chapter 11 cases, the Canadian Debtors commenced proceedings (the "<u>Canadian Proceedings</u>") under the *Bankruptcy and Insolvency Act* (the "<u>BIA</u>") in Canada. Shortly after the First Day Motions (as defined herein) were approved by the Bankruptcy Court, the Canadian Court entered orders granting certain relief requested in the Canadian Proceedings, including approval of a liquidation process with respect to Nine West Canada LP's inventory. On April 11, 2018, the Canadian Court entered an order

outlining the proposed liquidation of the Canadian Debtors' inventory and FF&E at their stores. The liquidation sale of the Canadian Debtors' commenced on April 14, 2018, and was completed by June 30, 2018. The Canadian Debtors filed a "Proposal" for approval by their creditors on September 14, 2018. Creditors voted unanimously to approve the Proposal at a meeting of the creditors held on October 4, 2018. The Canadian Court will consider approval of the Proposal on November 23, 2018. If approved by the Canadian Court, NWHI stands to receive approximately CAD $4 million on account of pre-April 6, 2018, secured intercompany claims. Also if approved by the Canadian Court, NWHI stands to receive approximately CAD $4 million, Nine West Distribution, LLC stands to receive approximately CAD $850, and Nine West Management Service LLC stands to receive approximately CAD $413,000, each on account of pre-April 6, 2018, unsecured intercompany claims.

## ARTICLE V.
## EVENTS OF THESE CHAPTER 11 CASES

A.    *First Day Pleadings and Other Case Matters.*

To minimize disruption to the Debtors' operations, on or shortly after the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed motions seeking, among other relief, to the authority to:  (1) obtain postpetition financing, use cash collateral, and declare certain prepetition secured parties adequately protected [Docket No. 33]; (2) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions [Docket No. 7]; (3) honor customer obligations in the ordinary course of business [Docket No. 10]; (4) pay vendors critical to the Debtors' go-forward business and lien claimants in the ordinary course of business [Docket Nos. 11, 12]; (5) pay prepetition wages and certain administrative costs related to those wages [Docket No. 9]; and (6) pay certain taxes and fees [Docket No. 13], surety bond obligations [Docket No. 15], or insurance obligations [Docket No. 14] that accrued or arose in the ordinary course of business before the Petition Date  (the "First Day Motions").  A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the *Declaration of Ralph Schipani Interim Chief Executive Officer of Nine West Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 6], filed on the Petition Date.  At a hearing on May 7, 2018, the Bankruptcy Court granted all of the relief requested the First Day Motions on a final basis [Docket Nos. 213, 214, 215, 216, 217, 218, 219]—with the exception of the cash management motion and DIP Financing motion, which were granted on a final basis at a hearing on June 25, 2018 [Docket Nos. 428, 450] ([Docket No. 428, the "Cash Management Order").

B.    *Other Procedural and Administrative Motions.*

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of these chapter 11 cases and reduce the administrative burdens associated therewith. On April 16, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (B) Granting Related Relief* [Docket No. 112] (the "OCP Motion").  On May 7, 2018, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 221], which order established procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of business.

Finally, the Debtors filed a number of applications in the beginning of these chapter 11 cases seeking to retain certain professionals postpetition.  On the Petition Date, the Debtors filed an application to retain Prime Clerk LLC, as notice and claims agent to the Debtors [Docket No. 19], which application was approved by the Bankruptcy Court on April 9, 2018 [Docket No. 79].  On April 16, 2018, the Debtors filed an application to retain Consensus as sales process investment banker [Docket No. 115], which application was approved by the Court on May 7, 2018 [Docket No. 222].  In May 2018, the Debtors filed additional applications to obtain authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these chapter 11 cases, including: (a) Kirkland & Ellis LLP, as counsel to the Debtors [Docket No. 212]; (b) Lazard, as investment banker to the Debtors [Docket No. 206]; (c) BDO USA, LLP, as accountant and auditor [Docket No. 300]; (d) Deloitte Tax LLP, as tax services provider [Docket No. 255]; (e) Prime Clerk LLC, as solicitation agent to the Debtors [Docket No. 205]; (f) MTO, as counsel to the Debtors to serve at the direction of the Independent Directors [Docket No. 210]; and (g) BRG, as financial advisor to Debtors to serve at the direction of the Independent Directors [Docket No. 209] (collectively, the "Retention Applications").  The Bankruptcy Court approved the Retention

KE 52165855

Applications for Prime Clerk LLC and Deloitte Tax LLP on June 5, 2018 [Docket Nos. 354, 357], Lazard on June 14, 2018 [Docket No. 382], and the remaining Retention Applications on June 29, 2018 [Docket Nos. 454, 455, 457, 458]. Also in May 2018, the Debtors filed an application to retain Alvarez & Marsal North America LLC to provide the Debtors with an Interim CEO and certain additional personnel [Docket No. 207]. The Office of the United States Trustee for Region 2 filed an objection to this retention [Docket No. 408]. On July 2, 2018, the Bankruptcy Court issued an opinion and entered an order approving A&M's retention under section 363 of the Bankruptcy Code over the U.S. Trustee's objections [Docket Nos. 465, 466]. The foregoing professionals are, in part, responsible for the administration of these chapter 11 cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

C.    *Appointment of the UCC.*

On April 19, 2018, the U.S. Trustee filed the Notice of Appointment of Official Committee of Unsecured Creditors, which was subsequently amended [Docket Nos. 126, 130, 232], notifying parties in interest that the U.S. Trustee had appointed the UCC in these chapter 11 cases. The UCC is currently composed of the following members: (a) Aurelius Capital Management, LP, a holder of the Debtors' 2034 Notes, 2019 Notes, and Stub 2019 Notes; (b) GLAS Trust Company LLC, as administrative agent for the Unsecured Term Loan Facility; (c) the Pension Benefit Guaranty Corporation; (d) Simon Property Group, one of the Debtors' former landlords; (e) Stella International Trading (Macao Commercial Offshore) Limited, a trade vendor for the Debtors' former shoe and handbag business; (f) Surefield Limited, a trade vendor for the Debtors' former shoe and handbag business; and (g) U.S. Bank National Association, as indenture trustee for the 2019 Notes and Stub 2019 Notes. The UCC has retained Akin Gump Strauss Hauer & Feld LLP as its legal counsel [Docket Nos. 266, 459], Kasowitz Benson Torres LLP as its conflicts counsel [Docket Nos. 515, 547], Houlihan Lokey Capital, Inc. as its investment banker [Docket Nos. 267, 398], and Protiviti Inc. [Docket Nos. 268, 460] and Province Inc. [Docket Nos. 407, 456] as its financial advisors and forensic accountants.

D.    *Final Approval of DIP Financing Facilities.*

Recognizing the need for additional postpetition financing to sustain operations through these chapter 11 cases, the Debtors and their advisors focused their efforts on raising a debtor in possession ("DIP") term loan facility (either on an unsecured, junior, or priming basis) from either new third party sources or their existing lenders in the months leading up to the Petition Date. To ensure that the Debtors obtained the best available terms for postpetition financing, ideally coupled with a value-maximizing path to emergence, the Debtors pursued intense multi-track negotiations with multiple stakeholders up until the eve of these chapter 11 cases. During this prepetition process, the Debtors spent considerable time seeking out third party lenders who could potentially replace their existing Secured Term Loan Facility or a DIP facility from their Unsecured Term Loan Lenders that would be junior in priority to the Secured Term Loan and ABL Facilities. Ultimately, the Debtors efforts were successful in obtaining two DIP financing facilities provided by both tranches of the Debtors' secured prepetition debt and the consensual use of cash collateral during these chapter 11 cases.

The Debtors' DIP financing includes a $247.5 million asset-based lending facility (the "DIP ABL/FILO Facility") whereby the Debtors' obligations under the Prepetition ABL/FILO Facility were refinanced by the DIP ABL/FILO Facility, which has substantially the same borrowing and cash sweep procedures to which the Debtors had become accustomed to under the Prepetition ABL/FILO Facility. The DIP financing also includes the $50 million new money, dual-draw DIP term loan facility (the "DIP Term Loan Facility," and together with the DIP ABL/FILO Facility, the "DIP Facilities") funded by parties to the prepetition RSA. On April 6, 2018, the Debtors filed a motion seeking approval of the DIP Facilities [Docket No. 33]. On April 9, 2018, the Bankruptcy Court entered an order approving the DIP Facilities on an interim basis [Docket No. 80]. The Debtors entered into the DIP ABL/FILO Facility and the DIP Term Loan Facility on April 11, 2018, at which time the Debtors refinanced the obligations under the Prepetition ABL/FILO Facility and drew $25 million from the DIP Term Loan Facility.

Shortly after its formation, the UCC expressed views with respect to the economic and non-economic terms of the DIP Facilities, and in particular the DIP Term Loan Facility. The UCC's advisors approached various creditor groups, ultimately obtaining an offer to provide a $50 million junior, third lien term loan from an ad hoc group of holders of the 2019 Notes (the "Alternative DIP Lenders"). The Debtors engaged in extensive negotiations

26

with the Alternative DIP Lenders and the UCC on this alternative competing term DIP facility. Because of this process, the Debtors and the UCC—at many times working together—were able to improve certain economic and non-economic terms of the Final DIP Order and Term DIP Facility provided by the existing DIP term loan lenders. Coupled with the Standstill Agreement between the Debtors and the UCC, which is discussed more fully below, the existing DIP term loan lenders provided several concessions regarding the Term DIP Facility thereby allowing the Debtors to resolve all objections to the DIP Facilities. On June 28, 2018, the Bankruptcy Court entered an order approving the Debtors' proposed DIP Facilities on a final basis [Docket No. 450] (the "DIP Order"). Shortly thereafter, the Debtors drew the remaining $25 million from the DIP Term Loan Facility.

Among other things, the DIP Order maintains (1) for both the Debtors and the UCC, a challenge period to, among other things, avoid the claims under the Secured Term Loan Facility, and (2) for the UCC, a challenge period to, among other things, avoid the claims under the Prepetition ABL/FILO Facility. The DIP Order also provides that certain adequate protection and other payments made under the DIP Order (including amounts from asset sales (such as the 363 Sale) used to pay down debt under the prepetition Secured Term Loan Facility and the refinancing of the Prepetition ABL/FILO Facility) remain subject to disgorgement in accordance with paragraph 17 of the DIP Order.

For their role in the DIP negotiation process, the Alternative DIP Lenders filed a substantial contribution motion seeking an administrative expense claim for their legal costs on account of their efforts [Docket No. 523]. The Debtors and the UCC supported this request, and no party formally objected to the Alternative DIP Lenders' request. The Bankruptcy Court entered an order approving this motion on August 10, 2018 [Docket No. 575], approving $386,203.81 in fees and expenses as administrative expenses of the Debtors' estates, to be paid pursuant to a chapter 11 plan.

On October 9, 2018, the Debtors and the DIP Lenders agreed to extend the maturity on both DIP Facilities from November 7, 2018, to January 15, 2018. Given the timing of confirmation, the Debtors and the DIP Lenders are discussing the terms of a further maturity extension for the Debtors' DIP Facilities. In addition, the Debtors are reviewing their options to ensure that the Debtors have the necessary liquidity to fund their chapter 11 cases as the cases extend further into 2019 and the Debtors' working capital buildup period for the spring ordering season.

E.      *The 363 Sale.*

On the Petition Date, the Debtors filed a motion seeking approval of bidding procedures related to the sale of the Shoe & Handbag Assets and certain bid protections related to the Stalking Horse APA, and depending on the outcome of the bidding process and any potential auction, approval of the Stalking Horse APA (the "Sale Procedures Motion") [Docket No. 20]. On May 7, 2018, the Bankruptcy Court entered an order approving the proposed bidding procedures and approving an affiliate of ABG as the stalking horse bidder [Docket No. 223]. The stalking horse bid set forth a $200 million purchase price for the Shoe & Handbag Assets, subject to certain working capital adjustments. Of this $200 million, the Debtors' allocated $77 million to working capital assets (ABL Priority Collateral) and $123 million to the Nine West®, Bandolino®, and associated brand intellectual property (Term Loan Priority Collateral). The Debtors' books and records showed that the working capital assets (the "Working Capital Assets") were owned by NWHI and the intellectual property assets (the "IP Assets") were owned by NWD both prior to and after the 2014 Transaction.

Both before and following the Bankruptcy Court's approval of the bidding procedures, the Debtors and their advisors conducted a vigorous marketing process, reaching out to dozens of strategic and financial buyers, and keeping their stakeholders updated on their marketing process. As the result of these efforts, on June 4, 2018, the Debtors received a bid from DSW Inc. ("DSW") for the Shoe & Handbag Assets, in accordance with the bidding procedures. An auction for the Shoe & Handbag Assets commenced on June 8, 2018, with ABG and DSW participating. At the conclusion of the auction on the evening of June 10, 2018, ABG was selected as the successful bidder for the Shoe & Handbag Assets with a final bid of approximately $348.3 million—$148 million in value accretion over the original stalking horse bid. The final bid composed of $340 million in cash, subject to certain working capital adjustments, $6 million in royalty-related credits, and relieving the Debtors of up to $2.3 million in severance obligations. The next-highest bid was offered by DSW on essentially the same terms, but would have required an additional payment of $6.75 million in bid protections to ABG under the Stalking Horse APA, resulting in less value received by the Debtors' estates. Accordingly, the Debtors selected ABG's bid. ABG's final bid resulted in an additional $140 million in cash being allocated to the IP Assets owned by NWD, for a total of

$263 million in asset sale proceeds (the "IP Sale Proceeds") allocated to the IP Assets (which constituted Term Loan Priority Collateral).

Pursuant to the 363 Sale, the Debtors assumed and assigned 39 executory contracts to ABG, including 16 contracts where NWD was the only Debtor counterparty, 10 contracts where NWHI was the only Debtor counterparty, and 13 contracts where both NWHI and NWD were Debtor counterparties. The Debtors assigned no sale proceeds to the assignment of these contracts (other than ABG's obligation to cure all defaults under such contracts). The NWHI and NWD estates, as applicable, benefited from these assumptions and assignments through the reduction of unsecured damages claims.

The Court approved the 363 Sale to ABG on June 18, 2018 [Docket No. 397] (the "Sale Order"), at a fully consensual hearing. The Sale Order preserved the rights of all parties regarding the allocation of the sale proceeds among the Debtors, including whether such allocation should cause such proceeds to be deemed to be received or paid by any Debtor, or will result in or should be deemed to give rise to any intercompany claim, or rise to any rights or claims of subrogation, contribution, or reimbursement that any Debtor may have against another Debtor.

The 363 Sale closed on July 3, 2018 [Docket No. 469]. ABG paid all amounts owed to purchase the Shoe & Handbag Assets to NWHI in accordance with the Debtors' cash management system (because NWHI is the location of the Debtors' main operating account). No amounts were paid directly to NWD, and NWHI did not transfer proceeds to NWD. NWHI's inventory and NWD's trademarks were then transferred to ABG. Upon consummation of the 363 Sale, NWHI used the IP Sale Proceeds to repay in part outstanding obligations under the Secured Term Loan Facility and used the proceeds from the Working Capital Assets to repay outstanding obligations under the DIP ABL/FILO Facility, each as authorized by the Sale Order. These payments were reflected in the Debtors' July 2018 Monthly Operating Report [Docket No. 576] in accordance with the Debtors' books and records, which also shows that the IP Sale Proceeds were accounted for as receivables for NWD and the proceeds from the Working Capital Assets were accounted for as receivables for NWHI in the Debtors' books and records. The amounts used to repay the amounts outstanding under the Secured Term Loan Facility are subject to the terms and conditions of the DIP Order. As set forth more fully herein, the Unsecured Term Loan Lenders have asserted these payments have created intercompany administrative claims and/or subrogation claims in favor of NWD, and/or related rights between NWHI and NWD, and any disputes regarding these payments are settled pursuant to the terms of the proposed Plan.

F.      *Standstill Agreement.*

In connection with the Debtors' and UCC's discussions to reach a consensual resolution to the UCC's potential objections to the Debtors' proposed DIP Facilities, the Debtors and the UCC reached a broader agreement on the path forward for these chapter 11 cases. Specifically, as announced in open court during a hearing on June 18, 2018, the Debtors and the UCC entered into a "Standstill Agreement" on certain actions during the case. Pursuant to the Standstill Agreement, the Debtors agreed not to (1) seek to settle any Estate Causes of Action against third parties relating to the 2014 Transaction, the Carve-Out Transactions, or other transactions relating to the Sponsor or (2) file a chapter 11 plan unless that plan was supported by the UCC, until the expiration of the standstill period, originally set to expire on August 14, 2018. The UCC, in turn, agreed not to (1) file a motion seeking derivative standing to pursue Estate Causes of Action, (2) seek to terminate the Debtors' exclusivity in filing a chapter 11 plan, or (3) object to any motion of the Debtors seeking to extend such exclusivity to September 14, 2018, during the course of the standstill period. Importantly, the Standstill Agreement allowed the UCC time to further its ongoing investigation into potential estate claims and causes of action into claims related to, among other things, the 2014 Transaction and the Carve-Out Transactions. Moreover, the Standstill Agreement provided the parties necessary time to engage in further good-faith negotiations on the terms of a chapter 11 plan that could potentially avoid costly and unnecessary litigation. The parties subsequently extended the expiration of the Standstill Agreement to September 13, 2018.

KE 52165855

G.    *Investigation of Estate Causes of Action by the Debtors and UCC*.

1.    The Independent Directors' Evaluation of Potential Claims and Causes of Action.

In August 2017, to ensure a fair and thorough review of the Debtors' strategic alternatives, the Board of Directors or Managers, as applicable, of NWHI, Jasper Parent, and One Jeanswear Group, Inc. appointed Alan Miller and Harvey Tepner as the Independent Directors. Each of the Independent Directors has extensive experience serving on boards of managers and boards of directors in distressed situations. The Debtors, at the Independent Directors' direction, subsequently retained MTO and BRG as independent counsel and independent financial advisor, respectively, to assist the Independent Directors' review of matters regarding transactions or negotiations that may result in conflicts of interest, including related to the 2014 Transaction and related Carve-Out Transactions.

Beginning in October 2017 and continuing through the pendency of these chapter 11 cases, the Independent Directors investigated whether the Estates may have any claims related to the 2014 Transaction and Carve-Out Transactions, or other transactions involving their direct or indirect equity owners or other persons and entities involved in those transactions, including but not limited to their ABL/FILO Lenders, Secured Term Loan Lenders, and Unsecured Term Loan Lenders, and the directors (the "Investigation"). MTO and BRG regularly met with and advised the Independent Directors on the information gathered during the Investigation.

Prior to the bankruptcy filing, at the direction of the Independent Directors, MTO initiated diligence requests to the Debtors, to the Debtors' indirect equity owners, and to third parties such as Duff & Phelps. This process included a review of documents in September 2017, requests for information and documents from the Debtors on October 5, 2017, with a first supplement on October 13, 2018, and several additional supplemental requests, as well as requests to the equity owners on October 15, 2017, and several additional supplemental requests including a request for all emails on February 13, 2018. As advisors to the Debtors, MTO and BRG, and the Independent Directors, had access to and reviewed thousands of documents relevant to the Investigation. Through both their prepetition and postpetition efforts (including as part of the Rule 2004 discovery discussed below), MTO and BRG ultimately reviewed over 100,000 documents, comprising over 1.3 million pages.

As part of the Investigation, MTO and BRG also interviewed eleven witnesses, from the Debtors, the controlling equity holder (Sycamore), Morgan Stanley, and Duff & Phelps, which were conducted in over 15 separate sessions. BRG personnel interviewed the Debtors' finance and accounting personnel on issues relating to the Debtors' books and records, as well as financials both prior to and following the 2014 Transaction and Carve-Out Transactions. Following the Petition Date, MTO and BRG participated in the Rule 2004 discovery filed by the UCC with the support of the Debtors, including the review of all additional documents produced, and the eleven depositions of personnel from the Debtors, Sycamore, KKR, Duff & Phelps, Peter J. Solomon, Citigroup, Morgan Stanley, and Wells Fargo (many of which were subjects of the Independent Directors' prepetition interviews).

2.    The UCC's Rule 2004 Investigation.

On May 30, 2018, the UCC filed a motion seeking authority to conduct an examination of the Debtors and certain third parties, including Sycamore, financial advisors to The Jones Group Inc., and parties that provided debt financing and/or equity investments in connection with the 2014 Transaction, under Bankruptcy Rule 2004 [Docket Nos. 320, 346], so that it could investigate potential estate claims arising out of, among other things, the 2014 Transaction and related Carve-Out Transactions. Even prior to this motion, the Debtors proactively provided documents and diligence to the UCC and other stakeholders related to these transactions. The Debtors supported and the Bankruptcy Court granted this motion on June 5, 2018 [Docket No. 355] (the "2004 Order"). On August 7, 2018, the UCC filed a supplemental motion under Bankruptcy Rule 2004 seeking to expand the scope of discovery under the 2004 Order to certain initial unsecured term loan lenders in the 2014 Transaction [Docket No. 559] (the "Supplemental 2004 Motion"), citing "[o]ne potential estate claim includes the avoidance of Nine West Holdings, Inc.'s obligations under the Unsecured Term Loan" but that the "[UCC] has not yet formed a view as to the viability of this potential estate claim." The Bankruptcy Court entered an order approving this supplemental motion on August 15, 2018 [Docket No. 587] (together with the 2004 Order, the "2004 Orders").

KE 52165855

As part of discovery taken pursuant to the 2004 Orders, the UCC has conducted 11 depositions and reviewed at least 108,000 documents, totaling over 1,355,343 pages. The Debtors participated in this investigation. They cooperatively produced documents and witnesses for depositions and their Independent Directors supervised the active engagement of Debtors' counsel (MTO) and financial advisor (BRG).

On August 20, 2018, and August 21, 2018, counsel to the UCC wrote to the Independent Directors identifying a number of potential claims and causes of action against Sycamore, KKR, the former directors, shareholders, and advisors to The Jones Group Inc. at the time of the 2014 Transaction, and the Prepetition ABL/FILO Facility, Secured Term Loan Facility, and Unsecured Term Loan Facility. The Independent Directors responded to those letters on August 30, 2018, asserting that commencing litigation while all parties were negotiating (when there is no expiring statute) would be polarizing, disruptive, and an additional significant estate expense, in particular when creditor constituents were actively exchanging term sheets and engaged in negotiation.

H.    *UCC Standing Motion.*

On October 4, 2018, the UCC filed a motion seeking standing to commence, prosecute, and settle certain causes of action on behalf of the NWHI's Estates [Docket No. 718] (the "Standing Motion"). It also filed a draft twenty-two count adversary complaint [Docket No. 719, Ex. B] (the "Standing Complaint"). The UCC is seeking standing on behalf of NWHI's Estate to commence, prosecute, and/or settle certain causes of action on behalf of NWHI's Estate against: (a) certain Sycamore funds and affiliates, (b) certain Sycamore principals and employees, (c) certain former directors and officers of NWHI and its predecessor (including the directors and officers and Jones Inc.), and (d) the lenders and agents under the Secured Term Loan, Unsecured Term Loan, and Revolving Loan. On October 11, 2018, the UCC filed a second motion seeking standing on behalf of NWHI's Estate to commence, prosecute, and settle certain causes of action against KKR [Docket No. 731]. As of today, most originally redacted portions of the Standing Motion and Standing Complaint have been unredacted. In all, the UCC seeks to bring claims on behalf of NWHI's Estate asserting:

- constructive and intentional fraudulent transfers with respect to the Carve-Out Transactions, Sycamore's alleged waiver of a working capital true up (the "Working Capital Waiver"), and Sycamore's asserted direction to NWHI's parent company that it take a worthless stuck deduction before the Petition Date (the "Worthless Stock Deduction"), and the avoidance of lender claims (for the Revolving Loan, the Secured Term Loan Facility, and the Unsecured Term Loan Facility) and associated obligations at NWHI (including the return of any payments made on account of such debt, inclusive of interest payments);

- breach of fiduciary duties with respect to the 2014 Transaction, the Carve-Out Transactions, the Working Capital Waiver, the Worthless Stock Deductions, and certain of the defendants allegedly causing Belk, Inc., a key customer of NWHI, to cease doing business with NWHI;

- aiding and abetting the breach of fiduciary duties;

- violations of Delaware corporate law with respect to a stock redemption taken in connection with the 2014 Transaction as an unlawful dividend;

- unjust enrichment;

- breach of contract and tortious interference with respect to the Working Capital Waiver; and

- with respect to Belk, tortious interference with business relations, breach of fiduciary duty, prima facie tort, and violation of the automatic stay.

The Standing Motion will be heard in connection with the Confirmation Hearing. Before the hearing, the parties will complete discovery and briefing addressing the Standing Motion. The Debtors strongly believe that they are properly and fully prosecuting the claims asserted in the Standing Complaint through the settlements encompassed in the proposed Plan, including the agreements incorporated in the intercreditor settlement and the Equity Holders Settlement.

I.       *Plan Exclusivity.*

The initial period pursuant to section 1121 of the Bankruptcy Code during which the Debtors had the exclusive right to file a chapter 11 plan was set to expire on August 4, 2018 (the "Plan Filing Exclusivity Deadline"). On July 25, 2018, the Debtors move to extend the Plan Filing Exclusivity Deadline by 41 days through and including September 14, 2018, as well as a corresponding extension of the time in which the Debtors had the exclusive authority to solicit votes thereon through and including November 13, 2018 (the "First Exclusivity Motion") [Docket No. 533]. This requested extension was in line with the agreements set forth in the Standstill Agreement. The Court granted the First Exclusivity Motion on August 10, 2018 [Docket No. 573].

On August 31, 2018, the Debtors moved to extend the Plan Filing Exclusivity Deadline by another 45 days through and including October 29, 2018, as well as a corresponding extension of the time in which the Debtors have the exclusive authority to solicit votes thereon through and including December 28, 2018 (the "Second Exclusivity Motion") [Docket No. 615]. The Court granted the Second Exclusivity Motion on September 14, 2018 [Docket No. 653].

On October 29, the Debtors moved to extend the Plan Filing Exclusivity Deadline by an additional 78 days through and including January 15, 2019, as well as a corresponding extension of the time in which the Debtors have the exclusive authority to solicit votes thereon through and including March 16, 2019 [Docket No. 780] (the "Third Exclusivity Motion"). The Third Exclusivity Motion is pending as of the date hereof.

J.       *Rejection and Assumption of Executory Contracts and Unexpired Leases.*

Prior to the Petition Date, the Debtors determined to exit brick-and-mortar retail altogether to reduce the drag of that business on overall earnings. In an effort to stem growing losses from their retail operations, but also in light of the Debtors' overall turnaround strategy to focus on the competitive and successful wholesale segments of their businesses, on the Petition Date, the Debtors filed motions seeking to reject all of their retail leases and executory contracts related to the retail operations *nunc pro tunc* to the Petition Date [Docket Nos. 21, 22]. On May 7, 2018, Bankruptcy Court entered orders approving the motions [Docket Nos. 220, 224]. Rejecting the retail leases and executory contracts related to the retail operations has saved the Debtors more than approximately $3 million in rental and operating expenses per month.

The Debtors have continued to review their real estate portfolio to right size their lease obligations. To that end, on May 2, 2018, the Debtors filed an additional motion to reject an unexpired lease of nonresidential property [Docket No. 178], which motion was approved by the Bankruptcy Court on May 16, 2018 [Docket No. 256]. Further, on August 10, 2018, the Debtors filed a notice of presentment of an additional motion requesting authorization to enter into a joint amendment for office space held at 200 Rittenhouse Circle, Bristol, Pennsylvania 19007, and reject a separate lease for certain units on such premises [Docket No. 579]. On September 26, 2018, the Debtors filed a motion to reject their headquarters lease and enter into a new lease for The Jewelry Group at 1411 Broadway in New York, New York [Docket No. 695]. The Court entered an order approving that motion on October 11, 2018 [Docket No. 729]. On October 24, 2018, the Debtors filed a motion seeking to reject certain warehouses and contracts that were either historically associated with the shoe and handbag business or were unnecessary to the Debtors' go-forward business [Docket No. 769]. Also on October 24, 2018, the Debtors filed a motion to assume the lease for the warehouse that provides distribution capabilities for their jeanswear business and certain leases for corporate offices where the Debtors intend to continue operations [Docket No. 770]. The Court entered order approving both motions on November 7, 2018 [Docket Nos. 822, 823].

The Debtors, with their advisors, have reviewed and will continue to review Executory Contracts to identify contracts to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts.

31

K.    *Key Employee Retention Program.*

On August 24, 2018, the Debtors filed a motion seeking approval of the Debtors' key employee retention program (the "KERP") [Docket No. 594]. The Debtors designated 51 shared services employees to participate in the KERP (collectively, the "KERP Participants"). The KERP Participants perform a variety of important business functions for the Debtors—including treasury and accounting, facilities management, legal, human resources, information technology, and other crucial operational services—that are vital to the Debtors' ability to preserve and enhance stakeholder value. Under the proposed program, KERP Participants have the opportunity to earn two cash retention payments: (i) the first payment would be made in the pay cycle following the entry of an order approving the motion and the KERP Participant's execution of a retention bonus agreement; and (ii) the second payment would be made in the pay cycle following the Debtors' emergence. The total payments proposed to be made under the KERP will not exceed $655,000. The Court entered an order approving the KERP on September 14, 2018 [Docket No. 656].

L.    *Schedules and Statements, Claims Process, Litigation Matters.*

On May 21–22, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules and Statements") [Docket Nos. 277–298].

On May 2, 2018, the Debtors filed a motion to set bar dates and establish procedures for filing proofs of claim in these chapter 11 cases. On May 15, 2018, the Bankruptcy Court entered an order establishing June 29, 2018, at 5:00 p.m., prevailing Eastern Time, as the general bar date for filing proofs of claim (including claims under section 503(b)(9) of the Bankruptcy Code), and October 3, 2018, at 5:00 p.m., prevailing Eastern Time, as the bar date for Governmental Units to file proofs of claim [Docket No. 248].

On August 31, 2018, the Debtors filed a motion seeking an order authorizing the Debtors to implement claims objection procedures [Docket No. 616]. The Bankruptcy Court entered an order approving the motion on September 14, 2018 [Docket No. 658]. On October 1, 2018, the Debtors filed their first omnibus objection to claims, which is scheduled to be heard on November 7, 2018.

The Debtors cannot predict with certainty the outcome of the resolution of claims (including litigation claims) arising out of their business operations.

M.    *Marketing Process.*

Following the success of the 363 Sale, the Debtors received multiple inquiries from potential interested parties regarding the ability to purchase some or all of the Debtors' remaining assets. The Debtors, in consultation with the advisors to the DIP Lenders, the UCC, the Secured Lender Group, the Crossover Group, and Brigade, commenced a targeted market test to determine whether there was interest to purchase some or all of the Debtors' remaining assets. Through this process, the Debtors reached out to approximately 23 parties, with 11 parties either entering into non-disclosure agreements or participating in diligence under previously signed confidentiality agreements. The Debtors kept the advisors to their major creditor constituents (including the UCC, the DIP Lenders, the Secured Lender Group, the Crossover Group, Brigade, and the Ad Hoc Group of 2019 Noteholders) apprised of this process, including the indications of interest received in early August 2018. The Debtors did not provide those indications of interest to the advisors to the Ad Hoc Group of 2019 Noteholders at that time because that group was considering proposing a rights offering, and were akin to a competitor in the marketing process. Pursuant to this process, the Debtors received two bids for substantially all of their assets, one bid for their Anne Klein® trademark and the Kasper Group, and four other bids for the Anne Klein® trademark. After reviewing these bids and consulting with their creditor constituents, the Debtors provided the potential third party purchasers with further guidance on how to improve their bids. Ultimately, none of these potential third party purchasers improved its bid to a point where the Debtors believed a sale process was actionable as compared to a standalone chapter 11 plan.

N.    *Plan Negotiations.*

The Debtors' commenced these chapter 11 cases with the support of more than 78 percent of the Secured Term Loan Lenders and 89 percent of the Unsecured Term Loan Lenders, who were party to the Prepetition RSA with the Debtors.  By the Prepetition RSA, the Secured Term Loan Lenders agreed to waive any right to default interest but would otherwise be paid in full in cash, and the Unsecured Term Loan Lenders would receive 100 percent of the Reorganized Debtors' equity, subject to reduction for encumbered value to be shared pro rata with other unsecured creditors at NWHI and at the Debtors' operating subsidiaries, and $150 million of second lien take-back debt with dividends paid at 10 percent per annum, paid in kind.  The Prepetition RSA was structured to allow the Debtors to reorganize around their jeanswear, women's apparel, jewelry, and Anne Klein® licensing businesses.  The Debtors and their Prepetition RSA counterparties understood that the Prepetition RSA would eventually need to be amended to accommodate recoveries for the Debtors' other unsecured creditors at NWHI and the other Debtors.

The Debtors believe that their prepetition negotiations had been complicated by CDS positions related to the 2019 Notes.  In part due to certain CDS positions, the Debtors were unable to organize large groups of 2019 noteholders.  Moreover, despite efforts to do so, the Debtors were unable to strike a deal between the Ad Hoc Group of 2034 Noteholders and the Unsecured Term Loan Lenders on the allocation of value among the Debtors' term lender and noteholder unsecured creditor constituencies prior to the commencement of these chapter 11 cases.

In April 2018, after the filing of these chapter 11 cases, there was a CDS auction for the 2019 Notes, allowing certain creditors to purchase these 2019 Notes.  In addition, the members of the prepetition Ad Hoc Group of 2034 Noteholders generally sold their positions, leading to a significant changeover in the holders of the 2034 Notes.  These stakeholders spent the first months of these chapter 11 cases following along with the Debtors' 363 Sale process and the potential litigation regarding the Debtors' DIP Facilities and the UCC's investigation.  Certain of the holders of the 2019 Notes also became the Alternative DIP Lenders.

The Debtors' negotiations with their Unsecured Term Loan Lenders and Noteholders became more intense as the Debtors' marketing process wound to a close in late July and early August.  The Debtors kept the advisors to the UCC, the Secured Lender Group, and the DIP ABL/FILO Lenders apprised of these ongoing plan discussions with the unsecured noteholders and the Unsecured Term Loan Lenders.  The UCC advisors, in turn, provided the Debtors with feedback on the Debtors' ongoing discussions, which the Debtors took into account as they continued to engage their creditor constituents.

The Debtors' noteholders began to coalesce into organized and active creditor groups in and around July 2018.  Four noteholders that owned 2019 Notes (three of whom who had been Alternative DIP Lenders)— Paloma Partners Management Company, Taconic Capital Advisors LP, Centerbridge Partners, L.P., and Tennenbaum Capital Partners, LLC—formed the Ad Hoc Group of 2019 Noteholders.  Two other noteholders owning a mixture of the Stub 2019 Notes, 2019 Notes, 2034 Notes, and Unsecured Term Loan Claims—Aurelius Capital Management, LP and Contrarian Capital Management, L.L.C.—formed the Ad Hoc Group of Unsecured Debtholders.

The members of the Ad Hoc Group of 2019 Noteholders, along with another large holder of 2019 Notes, Alden Global Capital LLC, signed confidentiality agreements and became restricted on August 10, 2018, allowing for confidential plan negotiations to occur with the Debtors.  The members of the Ad Hoc Group of Unsecured Debtholders separately entered into confidentiality agreements with the Debtors and became restricted on August 13, 2018.  Shortly after the Debtors commenced these discussions with the various unsecured noteholders, these ad hoc groups merged (the "<u>Combined Ad Hoc Noteholder Group</u>").  The Combined Ad Hoc Noteholder Group made proposals for a rights offering to the Debtors related to potential ownership or control of the Reorganized Debtors.  The Debtors provided feedback on these proposals to aid in the development of a comprehensive deal with the Debtors' other stakeholders, and in particular the Unsecured Term Loan Lenders.  Ultimately, the Debtors and the unsecured noteholders were unable to reach agreement on a chapter 11 plan, and the non-disclosure agreements expired by their terms on September 8, 2018.  The Debtors' and the Combined Ad Hoc Noteholder Group's advisors continued to discuss potential plan constructs following the expiration of these non-disclosure agreements.  The members of the Combined Ad Hoc Noteholder Group would later sign new

non-disclosure agreements on or around September 27, 2018, after reaching an agreement on the potential intercreditor settlement described below.

On August 21, 2018, the Debtors entered into confidentiality agreements with Brigade and the members of the Crossover Group. The Debtors and the Unsecured Term Loan Lenders exchanged multiple term sheets on potential equity splits and the allocation of estate proceeds from the Estate Causes of Action related to the 2014 Transaction and the Carve-Out Transactions. These were contentious negotiations, as the Debtors sought to ensure the highest recoveries for their non-term loan lender creditors. By September 24, 2018, the Debtors and the Unsecured Term Loan Lenders were discussing whether an executable plan of reorganization that would include a settlement with the Debtors' equity owners was achievable, though the Debtors had not reached a final settlement agreement with respect to such a plan.

During this time, the Debtors were aware that intercreditor discussions, between the Unsecured Term Loan Lenders, the Combined Ad Hoc Noteholder Group, and UCC, were occurring simultaneously. On September 25, 2018, a substantial majority of the Unsecured Term Loan Lenders and the Combined Ad Hoc Noteholder Group announced an intercreditor agreement in principle for a plan of reorganization. Those parties, with the support of the UCC, announced the terms of this agreement in principle on the record at a hearing on September 26, 2018. Among other things, the agreement in principle provided the Unsecured Term Loan Lenders with 92.5% of the equity in the Reorganized Debtors and $40 million in cash, to be backstopped by the Combined Ad Hoc Noteholder Group, purportedly in exchange for the Unsecured Term Lenders' interests in the litigation trust. The Noteholders and other unsecured creditors at NWHI and the other Debtors would receive 7.5% of the equity in the Reorganized Debtors and the Noteholders and the other unsecured creditors at NWHI (other than the Unsecured Term Loan Lenders) would receive warrants for 20% of the Reorganized Debtors' equity and 100% of the interests in a litigation trust vested with claims against, among others, Sycamore and KKR. Significantly, there remained open points on who would be released under the proposed plan, what claims would be put into the proposed trust, and the backstop of the $40 million to be paid to the Unsecured Term Loan Lenders, purportedly in exchange for the Unsecured Term Lenders' interests in the litigation trust. Following the public announcement of this intercreditor deal, the Debtors received a letter from Belk (signed by Belk's chairman, Mr. Kaluzny) on September 26, 2018, terminating the Belk business relationship. The Debtors engaged with the creditors on moving forward on the intercreditor agreement, including the preparation of a draft plan, disclosure statement, and restructuring support agreement that the Debtors shared with the parties. Concurrently, the Debtors engaged with Belk over the termination. Mr. Schipani, the Debtors' interim CEO, spent the days following the termination in negotiations with Belk's management team to secure Belk's commitment to complete existing orders subject to open purchase orders. But the potential loss of future and uncommitted business with Belk impacted the Debtors' going forward business plan, lowering future business projections, and lowering total enterprise value. Based on previous discussions with potential exit financing lenders in May 2018 and later in July and August 2018, the Debtors believed that the loss of the Belk business would adversely impact the Debtors' ability to raise necessary exit financing to pay all cash needs under the proposed intercreditor deal to allow the Debtors to emerge from bankruptcy protection. Other aspects of the intercreditor agreement, such as commitments from the Combined Ad Hoc Noteholder Group to fund the $40 million cash payment to the Unsecured Term Loan Lenders, remained open and undocumented. As noted above, a key component of the intercreditor agreement in principle was the 7-day documentation period (subject to extension by agreement of the parties). The Debtors, the UCC, the Combined Ad Hoc Noteholder Group, and the Unsecured Term Loan Lenders were, despite their good faith efforts, unable to finalize and document the intercreditor deal in the prescribed time period (including an extension of the deadline for an additional, eighth day).

The Combined Ad Hoc Noteholder Group believes that the intercreditor agreement in principle could have been documented but for the Belk letter, and also that: (i) the terms of the contemplated settlement assumed that general unsecured claimants at debtors other than NWHI would be paid in cash and would not share in the 7.5% equity for non-Unsecured Term Loan Lender creditors, (ii) the only open points about which claims would be included in a litigation trust involved "low-value" avoidance actions, and (iii) the only open item regarding releases was with respect to releases of management, which the parties had agreed they would negotiate to resolution. The Combined Ad Hoc Noteholder Group otherwise believes that the deal would have been completed. First, the Debtors disagree with the Combined Ad Hoc Noteholder Group's assertion on the equity splits, given the language

of the intercreditor term sheet and the statements about the agreement in principle made on the record.[21]    The Debtors also believe that there were other issues with the intercreditor agreement, including potential structural issues with respect to the $40 million cash payment to the Unsecured Term Loan Lenders, which was a critical component of the intercreditor deal for which parties had not yet agreed on structure (including, among other things, what the $40 million was for and who could participate in making the payment).  The inability to agree on such a critical component of the intercreditor agreement made timely completion of such a deal highly unlikely.

The Debtors continued to engage all parties in good-faith negotiations on multiple plan paths, including both a new intercreditor settlement plan with a litigation trust and a settlement plan with their Equity Holders and the Unsecured Term Loan Lenders and Secured Term Loan Lenders.  Finally, after extensive, good-faith negotiations, the Debtors, the Unsecured Term Loan Lenders, the Secured Term Loan Lenders, Sycamore, and KKR agreed on the terms of the Plan, more fully described below, which embodies (1) a reasonable settlement of estate claims and causes of action against Sycamore, KKR, and directors and officers, (2) a reasonable settlement of estate causes of action against the Secured Term Loan Lenders and Unsecured Term Loan Lenders (on terms similar to those reached between the Unsecured Term Loan Lenders and the Combined Ad Hoc Noteholder Group (and affirmatively supported by the UCC) prior to the termination of the intercreditor deal), and (3) an appropriate compromises of the various disputes between the Debtors' estates related to value allocation.  In addition to being in the interests of the Debtors' estates, the Debtors believe that the settlements embodied in the Plan provide significant value to otherwise potentially out of the money general unsecured creditors at NWHI, while maximizing the value of their two primary assets.  The Debtors believe that the proposed Plan represents the best path forward for these chapter 11 cases.  As noted below, the Debtors and other parties in interest will engage in Bankruptcy Court-ordered mediation on a parallel path with the confirmation process.[22]

O.    *Independent Directors' Evaluation and Pursuit of Potential Claims.*

As discussed above, the Investigation was commenced in October 2017, just after the Independent Directors were appointed.  Based on information and advice provided as part of the Investigation, the Independent Directors evaluated the strengths and weakness of various potential estate causes of action, the value of any such potential claims to the Debtors' estates, the costs of litigating such causes of action to judgment, and whether pursuing such claims, through any litigation or settlement, and to what extent, would be in the best interests of the Debtors' estates, as described below.

    1.    <u>Potential Claims Arising Out of 2014 Transaction and Carve-Out Transactions, Including Dividends, Working Capital Adjustment, Worthless Tax Deduction, Sponsor Fees, and Belk</u>.

The potential claims and defenses thereto investigated by the Independent Directors, and resolved by the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement are summarized below.  The following does not include all evidence reviewed and legal analysis considered by the Independent Directors, nor is it intended to include all evidence or legal analysis that may be presented at the Confirmation Hearing.  The Debtors reserve all rights with respect thereto.

---

[21]    For instance, on the record at the hearing on September 26, 2018, the creditor parties announced that "the first part of the intercreditor settlement is a split of the reorganized equity.  92.5 percent of the reorganized equity would go to the unsecured term loan lenders and seven and a half percent of the reorganized equity would go to all other unsecured creditors, including the 2019 and 2034 noteholders."  Hr'g Tr. 19:6–11 (Sept. 26, 2018).  The intercreditor deal term sheet similarly provides for the 92.5% and 7.5% split between the Unsecured Term Loan Lenders and all other creditors.  <u>See</u> [Docket No. 757], Ex. N ("Creditor Settlement Final Agreement term sheet").

[22]    The Debtors have been asked to consider whether a feasible alternative plan structure exists that may enable the operating subsidiaries to emerge from bankruptcy without having to suffer the delay, cost, and expense of pursuing litigation-related issues that only benefit creditors of NWHI.  Additional diligence is needed with respect to such a potential path.

(a)        Background Regarding Potential Claims.

On December 19, 2013, the Sponsor, the Minority Equity Holders, and affiliates entered into an Agreement and Plan of Merger providing for the purchase of all the outstanding shares of The Jones Group Inc. and its merger into what is now Nine West.  Also on December 19, 2013, the Sponsor Directors, in their capacity as directors of Jasper Parent as seller, and as directors of other Sponsor affiliates as buyers, entered into three purchase agreements providing for the sale of three of Nine West's businesses to Sponsor affiliates.  These transactions, as amended, closed on April 8, 2014.

The Carve-Out Transactions transferred to the Sponsor affiliates (1) Stuart Weitzman Holdings, LLC and its subsidiaries ("Stuart Weitzman"), (2) KG Group Holdings Limited and its subsidiaries ("Kurt Geiger"), and Jones Apparel businesses and assets, other than jeanswear and footwear ("ApparelCo").  The Carve-Out Businesses were sold to the Sponsor affiliates for a cumulative gross purchase price of approximately $641 million (before netting transactions costs paid by the seller under the agreements and other potential offsets and reductions)—$395 million for Stuart Weitzman, $136 million for Kurt Geiger, and $110 million for ApparelCo.

Over the next two years, the Sponsor affiliates received dividends from the Carve-Out Businesses, and then sold them at a substantial profit.  In August/September 2014, less than five months after the Carve-Out Transactions, Sponsor affiliates received dividends from Stuart Weitzman and ApparelCo of $84 million and $80 million, respectively.  The Sponsor affiliates sold Stuart Weitzman and Kurt Geiger, and portions of ApparelCo, in less than two years, for $530 million, $372 million, and $75 million, respectively.  In January 2017, the Sponsor affiliates sold what remained of ApparelCo back to Nine West for $70 million ($40 million in cash, plus a transfer of accounts receivable).  In aggregate, the Sponsor affiliates received over $1.2 billion in gross proceeds from the Carve-Out Businesses.  All told, the Sponsor affiliates made a profit of roughly $436 million dollars on the purchase and resale of the Carve-Out Businesses.

In July 2014, the Sponsor and Minority Equity Holders caused the Sponsor Directors to waive the working capital adjustment called for under the Carve-Out Transactions purchase agreements without consideration.  For ApparelCo, this adjustment, if implemented, could have resulted in payment to Nine West of approximately $26 million without accounting for cash balances, and approximately $41 million if cash balances are included.

More recently, in or about March 2018, Nine West Topco LLC, which is directly owned by the Sponsor and the Minority Equity Holders, informed the Debtors that it allegedly filed tax returns claiming a worthless stock deduction ("WSD") on account of its equity investment in the Debtors.  The Sponsor Directors did not give the Debtors advance notice of this action, but on March 29, 2018, just before the bankruptcy filings, the Debtors received an email from Sycamore's counsel, advising the Debtors that the deduction had been taken.  That same email offered to rescind the WSD in exchange for a full release (and on April 16, 2018, offering to settle all claims and reverse the WSD for $33 million), noting that "unwinding the WSD could save the [Debtors'] estates a multi-million dollar administrative priority tax claim . . . , could shelter gain from other transactions . . . and could shelter gain realized by the post-emergence entity."

Finally, the Independent Directors assessed claims that may exist regarding certain actions taken by the Sponsor relating to Belk, Inc., a major customer of the Debtors that is owned by an affiliate of the Sponsor, based on the developments described in the Plan Negotiations section above.  Within days of the board resignations of the Sponsor directors, one of the former directors acting on behalf of Belk sent a letter to Nine West, terminating all aspects of the Belk relationship.

In addition to these claims, the Independent Directors were also aware that the Debtors maintained director and officer liability insurance in the amount of $35 million and Sycamore maintained liability insurance in the amount of $100 million, which, subject to the terms of the policies regarding covered claims and other matters, could be available to cover defense costs and liability related to certain claims against the Debtors' directors and officers.  The Debtors and the UCC sent a joint demand letter to the Sycamore-affiliated directors to ensure the insurance carriers would be put on notice of the Debtors' potential claims and causes of action if they were not already.  The Independent Directors were also aware that The Jones Group, Inc. maintained $55 million of liability insurance for its directors and officers (who are Non-Released Parties for certain potential claims related to the 2014 Transaction under the proposed Plan).

2.      Consideration of Potential Claims.

(a)      Fraudulent Conveyance and Fiduciary Duty.

The 2014 Transaction and Carve-Out Transactions, and the waiver of the working capital adjustment each give rise to what the Independent Directors believe are colorable claims by Debtors against the Sponsor, the Minority Equity Holders, and affiliates for actual and constructive fraudulent conveyance, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, and against the Sycamore Directors for breach of fiduciary duties of loyalty and reasonable care owed to Debtors (and related claims for unlawful dividend and unjust enrichment).

(i)      *Solvency Opinion and Other Reports.*

A predicate issue in the success of the fraudulent conveyance claims is whether NWHI was insolvent upon the closing of the 2014 Transaction and Carve-Out Transactions on April 8, 2014. The acquisition of NWHI in 2014 was highly leveraged, resulting in a capitalization of 92.5% debt, and 7.5% equity. In light of the evidence gathered through the Investigation, the Independent Directors believe that NWHI's solvency following the 2014 Transaction and Carve-Out Transactions would be hotly contested in any litigation of these claims, with substantial evidence on both sides of the issue.

In particular, in connection with the 2014 Transaction and Carve-Out Transactions, Duff & Phelps prepared a solvency analysis report dated April 4, 2014, effective as of April 8, 2014, that opined that NWHI was solvent after closing of the 2014 Transaction and Carve-Out Transactions, with positive equity of $288 million, which would support a solvency conclusion.

While this analysis was performed contemporaneously with the closing of the Transactions, however, it may be challenged in any litigation on several grounds. For example, a litigant could challenge the discount rate, the indebtedness and cash balance figures, and EBITDA projections that Duff & Phelps used. The Duff & Phelps analysis would likely be subject to vigorous dispute in any litigation.

The Independent Directors considered the arguments set forth in the UCC's Standing Complaint, which seeks to discredit the Duff & Phelps opinions as unreasonable and even fabricated. For example, the UCC asserts that the $198 million and $236 million EBITDA figures used as part of the analysis were improperly engineered by the Sponsor, pointing in part to substantial upward movements in those numbers in various internal models from October 2013 to January 2014, the time between the negotiation of the 2014 Transaction and Carve-Out Transactions and the closings. But two thirds of the $30 million increase in EBITDA (a 14.5% increase) for the Debtors during that period is accounted for by fourth quarter actual results exceeding the amounts initially projected for the same time period. It is also the case that over that same period, the projections for Weitzman and Geiger also increased, by $6 million for Weitzman (a 12% increase) and by $3 million for Geiger (a 15% increase), while ApparelCo declined by $47 million (a 72% decline). The baseline $198 million of adjusted EBITDA appeared in The Jones Group, Inc.'s SEC filings reviewed by an external accounting firm and it is reflected in The Jones Group, Inc.'s books and records.

The referenced $38 million in Sponsor-projected cost savings may also be subject to challenge. The projected cost savings are based on the elimination of the entire executive suite overhead, the stabilization of the retail stores following the closures projected for 2013 and 2014, and the ability to maintain international revenue and sourcing. A litigant could seek to challenge the reasonableness of these addbacks and the foreseeability of certain risks that materialized, particularly in retrospect, but the Sponsor supported many of their assumptions with a Bain Consulting and PricewaterhouseCoopers quality of earnings diligence analyses, both prepared at the request of the Sponsor in 2013. These projections were also diligenced by Duff & Phelps, Morgan Stanley, and Wells Fargo, among others, as well as various market participants that subscribed for debt issued as part of the 2014 Transaction.

The UCC's Standing Complaint also references various internal valuations and models prepared by Sycamore, KKR, and other financial institutions involved in the 2014 Transaction and Carve-Out Transactions that used a lower pro forma EBITDA than employed in the Duff & Phelps analysis, which the Standing Complaint contends reflects a lack of credibility. A detailed review, however, indicates conservatism in certain calculations,

less in others, but in all cases the Sponsor's and Minority Equity Holders' internal valuations also projected that NWHI is solvent after the 2014 Transaction and Carve-Out Transactions. The Standing Complaint also points to Sycamore documents from March 2014 that reflect a lower pro forma EBITDA and alleges that Sycamore and KKR did not provide Duff & Phelps with their best expectations. But these allegations appear to be anomalous when considered in conjunction with the full picture painted by the vast amounts of other contemporaneous documents and are more likely explained as outdated portions of larger spreadsheets in which the portion cited by the UCC was not updated from a prior or earlier version.

With respect to the projected growth rate used in the Duff & Phelps solvency analysis, the UCC asserts it was unrealistic and belied by the significantly lower results that the Debtors experienced as early as the second quarter of 2014. Whether the second quarter downturn was foreseeable as of the April 8, 2014, closing will certainly be contested. At the time of the closing, no significant decline was apparent. The first quarter of 2014 results achieved 11% EBITDA margins despite a decline in revenue and a tough sales environment. The issues giving rise to the decline in financial performance began in late 2014 and/or in 2015, including, loss of business from certain major customers, shifting consumer preferences, and the cyclical decline in retail businesses generally. Certain issues relating to the Debtors' Canadian and Asian international distribution network and the Company's Asian joint venture partner also arose after the closing of the Transactions.

(ii)     *Contemporaneous Market Evidence.*

Contemporaneous market evidence can support solvency and does not rely on a retrospective review or litigation expert analysis. Numerous sophisticated institutions and institutional investors conducted or had the opportunity to conduct their own extensive diligence into the 2014 Transaction and Carve-Out Transactions before deciding to invest debt and equity into the Debtors. These institutions and investors included Morgan Stanley and Wells Fargo, and numerous institutional debt investors, and after diligence they invested $445 million in the Secured Term Loan Facility, $300 million in the Unsecured Term Loan Facility, approximately $366 million of exchanged 2019 Notes, and an additional $60 million in new 2019 Notes, as well as the equity investments of the Sponsor and the Minority Equity Holders. As noted above, the $445 million Secured Term Loan Facility was oversubscribed by approximately 4 times, and the $300 million Unsecured Term Loan Facility, which was originally not offered at all, was itself oversubscribed by approximately 2.5 times due to further market demand. Notably and significantly, $60 million in new 2019 Notes was invested at NWHI, which is structurally junior to the subsidiary operating entities.

The Independent Directors considered the UCC's assertions that this market evidence should be discounted because the disclosures to these investors did not include the true pro forma financials, undisclosed by the Sponsor. As noted above, however, there is substantial evidence that the true pro forma financials were in fact disclosed and tie out to the contemporaneous records of the Debtors as well as the SEC filings made by The Jones Group, Inc. Therefore, while the reasonableness of projections is almost always subject to debate and would be debated here, the Independent Directors did not find credible evidence of fraud.

It is indisputable that the Debtors operated in the ordinary course of business for nearly four years after the Transactions, notwithstanding new retail challenges emerging every year. It is also the case that as of the bankruptcy filing, no creditor sought to avoid or set aside the Transactions, the Debtors paid over $350 million on account of their funded debt obligations, and they remained current on their trade obligations and other obligations up until the eve of the commencement of these cases.

It is also the case that certain transfers related to ApparelCo—three parcels of real estate, trademarks, domain names, and license agreements—were transferred by four subsidiaries of NWHI. There is no dispute that these entities were solvent as of April 8, 2014.

The Independent Directors concluded, based on a wealth of information only described herein, that the solvency issue is complex and the outcome of a solvency dispute is not easy to predict. To try the issues would require several experts and involve great expense, considerations which are discussed further below.

(b)    Reasonably Equivalent Value.

With respect to whether NWHI received reasonably equivalent value in the Transactions, Debtors could cite to the "collapsing" doctrine to assert that the 2014 Transaction and the Carve-Out Transactions should be treated as a single transaction, and that under that view a substantial portion of the amount paid went to the Jones Group, Inc. shareholders and did not constitute value to NWHI. Under this approach, it could be argued that the Sponsor and the Minority Equity Holders did not pay reasonably equivalent value in the Carve-Out Transactions.

The Debtors could point to other evidence to support the lack of reasonably equivalent value as well. The ApparelCo business, sold to the equity holders' affiliates for a gross purchase price of $110 million, was determined by Duff & Phelps, in the purchase price allocation of August 2014 (done for purchase price accounting requirements under GAAP), to have a fair value of $310 million as of April 8, 2014. Based in substantial part on this ApparelCo differential, Debtors booked a loss of $238 million ($219 million after tax adjustment) on the sale of the Carve-Out Businesses in 2014. Similarly, with respect to Stuart Weitzman, Duff & Phelps performed a solvency analysis dated August 28, 2014, on behalf of Sycamore, in connection with the anticipated dividend from that entity. That analysis found Stuart Weitzman to have an enterprise value of $759 million, i.e., roughly double the price that the Sycamore Directors had NWHI sell Stuart Weitzman for less than five months earlier. Finally, the Sponsor affiliates made substantial profits on the Carve-Out Businesses, largely within two years of the 2014 Transaction. This is also strong evidence that NWHI was not paid reasonably equivalent value for those businesses.

There is also evidence to the contrary, however. The private equity arm of KKR estimated that Weitzman and Geiger would only yield $490 million after taxes upon resale, the Duff & Phelps purchase price accounting valued Weitzman and Geiger at around the prices paid in the Carve-Out Transactions, nothing was paid on the earnout for Weitzman because it never hit the targets following the sale to Coach in 2015, and the business performance of Geiger improved substantially over the period between April 8, 2014, and the resale of Geiger. It is of course also the case that buyers believe the asset or business being purchased is worth more than the purchase price. Otherwise, no buyer would go through with a purchase if he or she believed there would not be any profit. In a related vein, the UCC's Standing Complaint alleges that the $15 per share price paid to the old Jones Group shareholders imposes a cap of $2.2 billion on the value of Nine West and the Carve-Out Businesses. That is belied by the Duff & Phelps purchase price accounting, which valued the four businesses at over $2.4 billion, and is inconsistent with the facts of the process conducted by the old Jones Group board. That board did not explore the sale of each business or line. It only pursued bids for the entire company or for the apparel and footwear businesses as a combined bid. As a result, The Jones Group did not run a process to value each of its pieces, nor did the $15 per share bear a fixed relationship to the value of each of them, separately or together after being marketed and sold individually. In fact, the Sponsor noted that it believed that all four businesses, including the Debtors, were valued at a discount to market as standalone businesses. Additionally, the Jones Group shareholders sued The Jones Group's board on the basis that the $15 per share merger price was inadequate, and one institutional debt investor noted internally that $15 per share was cheap.

(c)    Actual Intent to Hinder, Delay, and Defraud.

The Transaction and Carve-Out Transactions would be intentional fraudulent conveyances, if the Sponsor and affiliates acted with "actual intent" to "hinder, delay or defraud" creditors. The Independent Directors have not found credible evidence of intent to defraud. For this reason, the Independent Directors have not provided credit to the intentional fraudulent conveyance claim for settlement purposes.

(d)    Damages.

The calculation of potential damages under the various causes of action for the 2014 Transaction and Carve-Out Transactions would be substantially similar and overlapping. The Independent Directors considered that there would be substantial dispute over the proper measure of damages in any successful litigation. The following

39

tables show the amounts transferred by the Debtors and the amounts received by the Sponsor in connection with the Transactions.[23]

| Value Transferred by Debtors | | | | |
|---|---|---|---|---|
| | ($ millions) | | | |
| | **Weitzman** | **Geiger** | **Apparelco** | **Total** |
| Estimated Sale Proceeds[24] | $530 | $372 | $201 | $1,103 |
| Interim Distributions to Sponsor | $84 | $21 | $80 | $185 |
| **Gross Sale Proceeds/Distributions** | $614 | $393 | $281 | $1,288 |
| **Reduction of Debt Financing Dividends** | | | | **(124)** |
| **Value transfer net of related debt incurred** | | | | **$1,164** |
| **Less 2014 Note Repayment** | | | | **(263)** |
| **Less old 2019 Notes Tendered** | | | | **(5)** |
| **Value transfer net of related debt incurred and LBO Debt repayments** | | | | **$896** |

| Net Sponsor Returns from Carve-Outs | | | | |
|---|---|---|---|---|
| | ($ millions) | | | |
| | **Weitzman** | **Geiger** | **Apparelco** | **Total** |
| Amounts Sponsor Received on Re-Sales | $530 | $372 | $201 | $1,103 |
| Interim Distributions to Sponsor | $84 | $21 | $80 | $185 |
| Gross Sale Proceeds/Distributions | $614 | $393 | $281 | $1,288 |
| Estimated Debt Repaid | $(339) | $(131) | $(130) | $(600) |
| Gross Proceeds | $275 | $262 | $151 | $688 |
| Less Management Distributions | $(16) | $(60) | $(1) | $(77) |
| **Net Carve-Out Proceeds to Sponsor** | $259 | $202 | $150 | **$611** |
| Initial Sponsor Investment | $(135) | $(20) | $(20) | $(175) |
| **Net Carve-Out Sponsor Returns** | $124 | $182 | $130 | **$436** |
| **Net LBO Returns Including Nine West $120 million equity investment** | | | | **$316** |

There is a wide range of potential damage measures. For a top line damages claim, the Debtors could point to the $1.28 billion the Sponsor and Minority Equity Holders received from dividends and re-sales of the Carve-Out Businesses. The Debtors also could point to $896 million, which accounts for a deduction for the debt incurred to

---

[23]    There is a dispute whether the repayment of the old 2014 notes and the Stub 2019 Notes were repaid with funds from newly-incurred funded debt at NWHI, from the equity contributions to NWHI made by the Sponsor and the Minority Equity Holders, or from the proceeds of the Carve-Out Transactions. There are also disputed issues as to whether the repayments qualify as a defense or offset to liability, if any. The Independent Directors considered these issues in their analysis.

[24]    Actual Sale proceeds from Apparelco of $201 million comprised of (i) Liquidation proceeds of $130 million ($75 million for Brand sale to ABG and net $55 million from wind-down of Jones business), and (ii) $71 million on sale of Kasper back to Nine West ($40 million sale proceds and $31 million dividend of accounts receivable).

KE 52165855

fund the dividends, repayment of the retired 2014 notes, and the Stub 2019 Notes tendered as part of the 2014 Transaction.  On the other hand, if one deducts the full debt incurred in the Carve-Out Transactions and repaid by the Sponsor affiliates, the net proceeds to the Sponsor and the Minority Equity Holders was $611 million.  The Sponsor and the Minority Equity Holders assert that damages should be limited to the roughly $278.5 million, arguing that amount represents the amount of notes that did not voluntarily participate in the 2014 Transactions.  Alternatively, they assert that damages should be measured at most by the Sycamore's and KKR's profits on the 2014 Transaction and Carve-Out Transactions, which total approximately $316 million after accounting for their full equity contribution of $295 million.  Another possibility is $436 million, Sycamore's and KKR's profit net of equity contributions of $175 million in the Carve-Out Businesses.  In considering the value of any potential causes of action to the Debtors' estates, the Independent Directors adjusted these potential claim amounts to reflect the cost of litigating such claims, the likelihood of success on the merits in a litigated scenario, and the impact of litigation on the business, among other factors, as discussed below.

(e)    Prejudgment Interest.

The Independent Directors also examined whether the Debtors could seek prejudgment interest on any damages awarded.  The award of prejudgment interest is subject to the court's discretion.  New York allows for 9% simple interest (and Pennsylvania or Delaware law allows for 6% simple interest, if the laws of those states are applicable).  Relevant considerations for the court include that no creditor made a demand until August 2017, no creditor filed suit prior to bankruptcy, and most current holders of the 2034 and 2019 Notes purchased them at deep discount on the secondary market long after the 2014 Transaction and Carve-Out Transactions, and in many cases after the Debtors commenced these chapter 11 cases.  In addition, the damages calculations described above are based on the subsequent appreciated values of the Carve-Out Businesses.  The award of prejudgment interest on those damages may be duplicative and/or inequitable.

(f)    Section 546(e) of the Bankruptcy Code.

The Independent Directors also evaluated the Sponsor's and Minority Equity Holders' assertions that intentional and constructive fraudulent conveyance claims arising out of the 2014 and Carve-Out Transactions fall within the safe harbor of section 546(e) of the Bankruptcy Code, which if applicable would bar such claims.  There are also potential arguments that to the extent the remedy sought for breach of fiduciary duty or unjust enrichment is the return of transferred assets, the safe harbor may also bar those claims.  The Sponsor and Minority Equity Holders have asserted that section 546(e) covers the 2014 and Carve-Out Transactions because Jasper Parent (the Sponsor-affiliated entity that owns NWHI) is a "financial participant" within the meaning of section 546(e), and that the transfers of the Carve-Out Businesses were made by, to, or for the benefit of Jasper Parent.  This interpretation of section 546(e) has not been addressed by any case law that the Debtors have located to date, and accordingly presents legal issues of first impression, the outcome of which cannot be predicted with certainty.

(g)    Statute of Limitations.

The Sponsor and the Minority Equity Holders further assert that any breach of fiduciary duty claims are barred by the Delaware three year statute of limitation, or that if choice of law analysis leads to application of New York law, then by the New York three year statute of limitation for breach of fiduciary duty claims.  The Independent Directors believe that the choice of law analysis most likely would lead to application of New York statute of limitations, and believe that New York courts most likely would apply the six year statute of limitation for breach of fiduciary duty claims by a corporation against its directors.  But the outcome of these statute of limitation issues cannot be predicted with absolute certainty.

The Sponsor and the Minority Equity Holders also would assert the defense of value given in good faith, in particular with respect to the payoff of NWHI's old 2014 unsecured notes and the tendered 2019 Notes, collectively a total of $268 million.  For the reasons discussed above, whether the Sponsor and the Minority Equity Holders acted in good faith would be a contested issue.

(h)      Working Capital Adjustment.

With respect to the July 2014 waiver of the working capital adjustment called for by the ApparelCo carve out sale agreement, the Independent Directors concluded that there are colorable claims for constructive and actual fraudulent transfer against the Sponsor affiliates, breach of fiduciary duty against the Sycamore Directors, and aiding and abetting breach of fiduciary duty against Sycamore.  NWHI was contractually entitled to payment under the working capital adjustment provision, and the payment was waived without providing reasonable value.  The Sponsor and the Minority Equity Holders assert, however, that the contract provides for payment to Jasper Parent of the working capital adjustment, or an entity designated in writing by Jasper Parent, and that NWHI is a third-party beneficiary (not a contracting party) who is entitled to enforce the obligations of the parties but not necessarily require Jasper Parent to direct the payment.  The Sponsor and the Minority Equity Holders also assert offsets to the obligation for other items paid or incurred by Jasper Parent and its subsidiaries in connection with the 2014 Transaction and the Carve-Out Transactions, that NWHI had adequate working capital, was solvent, and so no payment was necessary.  Finally, the Sponsor and the Minority Equity Holders asserted that section 546(e) applies to bar any avoidance claim or other claim asserting disgorgement related to the working capital adjustment.  Fraudulent conveyance and breach of fiduciary duty causes of action are also colorable with respect to the roughly $33 million of cash swept to the Carve-Out Businesses in connection with the closing on April 8, 2014.  This cash should have remained with NWHI under the terms of the Transactions.

As with certain other claims discussed above, these claims would depend upon proof of NWHI insolvency at the pertinent dates.  It is the case that the damages from these claims likely would be duplicative of the various damages measures discussed above.

The terms of the license agreements and transitional services agreements entered into at closing may also give rise to claims.  The damages calculations would be approximately $2 million or less for the licenses collectively or around $16 million under an aggressive theoretical alternative transition services agreement.  These damages may also be duplicative.

(i)      Worthless Stock Deduction.

Shortly before the Petition Date, Sycamore elected to take the WSD for the value of the Debtors' common stock.  The Sycamore Directors' failure to take action to warn of, and/or to prevent, the owners from taking the WSD (and instead sought to leverage it expressly against the interests of the Debtors) and may be actionable.  Sycamore has maintained that it was entitled to take the WSD and that the Debtors had no right to it.  Under the majority view, however, such tax attributes can be property of the estate, and the Sycamore Directors had separate duties not to take this action to the detriment of the Debtors even if Sycamore is otherwise entitled to do so.

The potential damages, if any, from the WSD, are highly uncertain.  While the deduction may impinge on the Debtors' ability to use NOLs in the future, it currently appears unlikely that Debtors will have income that these NOLs could shield from tax.  The settlement, however, eliminates this risk by providing for a reversal of the election by Nine West Topco LLC.

(j)      Belk Relationship and Termination.

The Independent Directors believe that the Debtors may be able to assert that the steps taken by Sycamore and the Sycamore directors with respect to the termination of the Belk relationship in September 2018 constitute breaches of fiduciary duty because they allegedly were a continuation of a scheme initiated while the Sycamore Directors were still on the Debtors' boards.  The Debtors may also be able to claim that by causing Belk to terminate its relationship with the Debtors, Sycamore tortiously interfered with their prospective business relationship with Belk.  The Debtors could argue that loss of the Belk relationship could affect roughly $23 million per year of EBITDA, which translates into a reduction in the Debtors' enterprise value of approximately $110 million.

Sycamore could respond by asserting that the action was taken by Belk, rather than Sycamore or the Sycamore Directors in their roles with respect to the Debtors, and thus was not a breach of fiduciary duty.  The defendants also would likely maintain that the Belk business relationship was at will, with no long-term contractual

42

obligations, and there would not be any liability for loss of that business. In addition, the defendants could assert that the conduct is not actionable because it was taken by the parent of Belk, at least in part to benefit the economic interests of parent. Finally, Sycamore could argue that the Debtors have suffered no damage since Belk agreed to comply with all existing contractual obligations (i.e., open purchase orders).

These issues would be contested and the outcome is difficult to predict. Any damages claim would be uncertain because it would be unclear how much future business would be lost and to what extent the Debtors had a reasonable expectation of that future business that was being conducted only at will. Under the proposed Plan, Belk's relationship with the Debtors has not been terminated. The proposed Equity Holders Settlement locks in minimum purchase amounts by Belk from the Debtors for three years, conveying value to the Debtors through a new contractual commitment unlike the previous at will relationship.

     (k)    Other Claims.

Finally, the Independent Directors reviewed various potential claims that do not appear to be colorable. First, Sycamore received only relatively small expense reimbursements under their services agreement with the Debtors, and the expenses appear to have been actually incurred and for the benefit of the Debtors. Sycamore did not receive any management fees, beyond a *de minimis* payment for the initial year with respect to ApparelCo, and the amount does not appear unreasonable. Second, the January 2017 re-sale of the Kasper business from ApparelCo back to NWHI, for $40 million plus ApparelCo's retention of $30 million of receivables and about $1 million of cash, seems to have been fair to the Debtors. The Kasper business provides positive EBITDA to the Debtors, and it was purchased for only about three times EBITDA, a relatively low multiple.

    3.    Cost and Delay of Litigation.

The Independent Directors' Investigation also evaluated the costs of litigating the Debtors' causes of action to judgment, the potential delays associated with monetizing such litigation, the impact of litigation on the Debtors' operations, management, and employees, the impact of the litigation on the company's restructuring, as well as the defendants' financial wherewithal to fund and engage in protracted litigation. As discussed above, any such litigation would have arguments on both sides of the issues, and the Independent Directors expected that any such litigation would be lengthy, potentially extending multiple years, with multiple appeals.

    4.    Meetings with the UCC and Other Case Constituents.

Shortly after the formation of the UCC, its counsel announced that the UCC believed that all the foregoing potential claims should be placed in a litigation trust (i.e., settlement should not be considered until after a plan of reorganization was confirmed). Since then, the UCC has told the Independent Directors repeatedly that it opposed any effort to settle the potential claims before they were placed into a litigation trust. The Independent Directors carefully considered this position, but determined that, just as they should ensure the Debtors were prepared to prosecute the claims, they should neither ignore nor reject out of hand opportunities for settlement negotiations, particularly in light of the potential effects on business operations and potential reorganization alternatives. The Independent Directors always considered the views of their disparately positioned creditor constituencies and took note of the fact that there never was a point when all of the creditors (secured and unsecured) adopted the UCC's position.

From the outset, the Independent Directors and advisors acting at their direction sought to educate the case constituents about potential third-party claims and even agreed to standstill to facilitate that process. Even before the bankruptcy filings, MTO presented the factual background of the Independent Director investigation in February and March of 2018 to the then organized ad hoc groups of creditors including the Secured Term Loan Lenders, the Unsecured Term Loan Lenders, and the 2034 Notes. MTO presented the same information to the UCC on April 25, 2018, and to the advisors to the Combined Ad Hoc Noteholder Group on August 8, 2018, after they became organized.

To aid the education and diligence process of the case constituents, in May 2018, BRG presented detailed tutorial regarding potential claims to the UCC advisors, and advisors to various creditors groups, including the facts

KE 52165855

relating to the 2014 Transaction and Carve-Out Transactions, the solvency issues, and the subsequent transactions relating to the Carve-Out Businesses. BRG has continued to field questions from creditor advisors and act as a resource for pertinent documents as inquiries are made. MTO has engaged in ongoing communications with the UCC's advisors, and with advisors to various creditors groups, regarding potential claims and potential treatment or settlement thereof under a chapter 11 plan, including providing them with Debtors documents related to the so-called "five prong" financials from the Debtors records that tied to the SEC filings showing $198 million in EBITDA for 2013.

While the UCC declined to engage in settlement discussions with respect to the claims against the Sponsor and the Minority Equity Holders, MTO sought to include UCC and its advisors in both discussion of process for plan and exploration of settlement discussion with the Sponsor, the Minority Equity Holders, and the Debtors' lenders for the 2014 Transaction. MTO also arranged on June 19, 2018, for all parties to receive a presentation from Zolfo Cooper, financial advisor to Sycamore, regarding the Sycamore's views on solvency. MTO and BRG met again with Zolfo Cooper on June 25, 2018.

The following is a summary of certain of the calls, meetings, discussions, and interactions that have occurred on these subjects during these cases. The following is not intended to include all evidence that may be presented at the Confirmation Hearing. The Debtors reserve all rights with respect thereto.

On July 24, 2018, MTO and BRG met with the UCC professionals in person to discuss claims against the Sponsor, the Minority Equity Holders, and others. The UCC reiterated its view that the only course of action was to agree on a plan with a litigation trust for non-lender claims, and that no settlement discussions whatsoever should occur with the Debtors' equity holders until that plan was filed. At that meeting, the UCC also asserted that the Unsecured Term Loan Lenders and the holders of the 2019 Notes and 2034 Notes were close to a reorganization plan that would place potential claims against the Debtors' indirect equity holders, The Jones Group's shareholders, and The Jones Group's director and officer into a litigation trust.

On August 1, 2018, the UCC and Debtors discussed claims against Secured Term Loan Lenders, Unsecured Term Loan Lenders, and Prepetition ABL/FILO Lenders, intercompany claims, and other issues affecting the recovery of creditors of NWHI and creditors of the subsidiaries. On August 8, 2018, the Debtors met again with the UCC regarding the Debtors' views on the issues discussed on August 1 regarding the intercompany claims and issues affecting the recovery of creditors of NWHI and creditors of the subsidiaries.

On August 14, 2018, the Independent Directors and their professionals met with the UCC members and their professionals. MTO asked the UCC to join with MTO to present the strengths of the claims against the Sponsor and the Minority Equity Holders, but at that meeting, the UCC again insisted that no settlement discussions should occur with Sycamore or KKR until a plan was on file that included a litigation trust and the UCC had veto power over any settlement with the Debtors' indirect equity owners. The Independent Directors maintained that all reorganization options should proceed in parallel, and clearly expressed their view that they could not make an informed decision about the best value-maximizing plan without engaging in settlement discussions to make a comparison. On that same day, MTO arranged an in person meeting among counsel to Sycamore, counsel to the UCC, and MTO. Counsel to the UCC refused to engage in any substantive discussions on the claims against the Sponsor. Notwithstanding the unwavering refusal of the UCC to participate in settlement discussions with the Sponsor, the Independent Directors and MTO agreed to keep the UCC advised on the status of negotiations.

On August 15, 2018, the UCC's legal counsel presented its views to the Unsecured Term Loan Lenders about claims against them and on the intercompany claims and issues.

Both before and after the Petition Date, the Independent Directors have been briefed extensively by MTO and BRG regarding the investigation and analysis of all of the potential claims, and the Independent Directors have participated in numerous discussions of the issues surrounding the potential claims, including on November 14, 2017, and various supplemental and additional presentations in April, May, July, August, September, and October 2018. The Independent Directors have also met with the UCC's advisors, and with UCC members, as well as other creditor groups, the Debtors' indirect equity owners, and other constituents regarding their views of the claims and related considerations. These have included presentations from the legal and financial advisors to the Sponsor and the Minority Equity Holders in June and August 2018, and from the UCC's advisors in September 2018. The

Independent Directors also received and responded to letters from the UCC in August 2018 relating to the potential claims against the Sponsor, Minority Equity Holders, the ABL/FILO Lenders, the Secured Term Loan Lenders, and the Unsecured Term Loan Lenders, and sent a joint demand letter with the UCC to the Sponsor affiliated directors of the Debtors in September 2018.

The Independent Directors evaluated the information from these sources and also consulted with MTO and BRG as well as management of the Debtors regarding such information. The Independent Directors likewise received extensive briefing and reports and information related to their service as directors of the Debtors, their responsibilities for overseeing the management of the Debtors, and the business performance of the Debtors.

The Independent Directors have made a number of substantial monetary (and other) demands on the equity holders in pursuit of recoveries on the claims through potential settlements. Negotiations have extended over several months. Various creditors groups have also been involved in, and/or consulted regarding, those negotiations at various times. On October 17, 2018, the Independent Directors, the equity holders and their affiliates, and groups of secured and unsecured term loans holders, reached agreement on a proposed settlement of the claims against the Sponsor, the Minority Equity Holders, and their affiliates (i.e., the Equity Holders Settlement), and claims against the Secured Term Loan Lenders, Unsecured Term Loan Lenders, and ABL/FILO Lenders, and related intercompany claims and issues (i.e., the Intercreditor Plan Settlement). The Equity Holders Settlement, which will be more fully briefed in connection with seeking approval of the Equity Holders Settlement as part of confirmation of the Plan, requires the Sponsor and Minority Equity Holders to pay $105,000,000 to the NWHI, to unwind the WSD (and provide ancillary protections), and to lock in a valuable multi-year business relationship between the Debtors and Belk, one of the Debtors' substantial customers that is owned by a Sycamore affiliate. The Debtors' agreement with Belk provides the Debtors with additional protections even if the proposed Plan is not confirmed, as Belk must comply with the agreement through September 2019 even if the proposed Plan is not consummated.

5.    Plan and Settlement Negotiations—Contemporaneous Discussions with Creditors, the Sponsor, and the Minority Equity Holders.

The negotiation of a potential settlement with Sycamore, KKR, the Secured Term Loan Lenders, and the Unsecured Term Loan Lenders is the culmination of many multi-party negotiations, which overlapped with the negotiation with other possible reorganization structures and occurred over several months. The elements of the Equity Holders Settlement were negotiated in the context of the overlapping claims against the Debtors' lenders, as well as the need to maximize enterprise value for all constituents. A potential sale of the current business was explored but the indications of interest were inadequate. Also significant was the impact of the Belk business on the Debtors' enterprise value, the ability of the Debtors to obtain adequate exit financing or alternative sources of capital to fund an exit under a plan of reorganization, and the value and consequences of suing Belk (one of its largest customers) and certain Belk affiliates (including Belk's owner and certain directors). During this time, MTO along with Kirkland was in regular contact with the UCC regarding plan negotiations, and MTO was clear that it was involved in ongoing discussions with Sycamore and KKR, including more than two dozen calls and meetings after July 24, 2018.

Negotiations on a plan with a litigation trust were pursued in August and September, were pursued in connection with the Unsecured Term Loan Lender and Combined Ad Hoc Noteholder Group intercreditor term sheet deal, and were pursued after that failed to be finalized from October 5 through October 17. The creditors could not reach agreement on how much to pay for the interests in a litigation trust or the amount of such interests to otherwise be distributed to the Unsecured Term Loan Lenders. The Unsecured Term Loan Lenders insisted on a large percentage of litigation trust interests if the Belk business terminated to partially make up for the reduction in equity value that the Unsecured Term Loan Lenders would receive under a plan as a result of the significantly lower enterprise value that would result from the loss of the Belk business. In addition, neither the Unsecured Term Loan Lenders nor the Noteholders were willing to provide committed exit financing to pay off the Secured Term Loan Facility and other emergence costs, and also own the equity interests without ongoing Belk business. This means that suing Belk was not the same as having the Belk business (i.e., the value of litigation was less than the value of the business anticipated to be provided in future purchase orders). As such, the only plan that can be pursued now is the one that was negotiated (i.e., the proposed Plan)—there was and is no alternative plan. The Debtors retain a fiduciary out to explore and pursue a better alternative plan if such plan is viable and feasible.

P.      *Evaluation of Proposed Plan Settlements.*

Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Settlements are appropriate in a chapter 11 plan when they constitute a "valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate." *In re DBSD N. Am.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009). In making a determination, the Bankruptcy Court may look to the standards set forth in Bankruptcy Rule 9019. Under Bankruptcy Rule 9019, the Bankruptcy Court may approve a settlement so long as it does not fall below the lowest point in the range of reasonableness. This determination is to be made based on:

> [T]he probabilities of ultimate success should the claim be litigated and an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other facts relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*In re AppliedTheory Corp.*, Case No. 02-11868, 2008 WL 1869770, at *3 (Bankr. S.D.N.Y. April 24, 2008) (internal citations omitted).

1.      *Equity Holders Settlement*.

An integral part of the Plan and the A&R RSA, which contains a fiduciary out so that all alternatives can be considered and as appropriate pursued, is the Equity Holders Settlement whereby all Estate Causes of Action against Sycamore, KKR, and their related Released Parties are compromised, settled, and released. The consideration for the compromise, settlement, and release is the agreement of the Sponsor and KKR to make a cash contribution to NWHI on the Effective Date of $105,000,000 and direct the Debtors' indirect parent company, Nine West Topco LLC, to unwind a worthless stock deduction taken on its 2017 U.S. Partnership tax return (to the extent not already unwound), and also the requirement that Sycamore cause its portfolio company, Belk, Inc., to enter into a three-year commitment agreement with the Reorganized Debtors, strengthening the Debtors' business value and ability to raise third-party financing to fund distributions to the Secured Term Loan Lenders, the DIP Lenders, and administrative and statutory priority creditors. The Equity Holders Settlement covers claims both against the Sponsor and the Minority Equity Holders as well as affiliates of each and, among others, principals, directors, officers, managers, or employees of the Sponsor or the Minority Equity Holders who may have in the past been directors or officers of the Debtors. NWHI's Estate is the exclusive beneficiary of the cash consideration delivered by the Sponsor and the Minority Equity Holder in connection with the Equity Holders Settlement. Each unsecured creditor at NWHI benefits from the cash proceeds of the Equity Holders Settlement; however, the Unsecured Term Loan Lenders receive additional value from these cash proceeds primarily on account of intercompany claims held by NWD against NWHI, at which Debtor the Unsecured Term Loan Lenders also hold claims.

The Debtors believe that the Equity Holders Settlement is fair, reasonable, and exceeds the standards for settlement approval under the Code. The Equity Holders Settlement is supported by creditors holding supermajorities of the Secured Term Loan Claims and the Unsecured Term Loan Claims. The Debtors provide below a summary, which will be further supported by a detailed memorandum and related evidence regarding the Equity Holders Settlement (including any related information or evidence regarding these cases, the Plan, or the Intercreditor Plan Settlement) to be filed in accordance with the Court's confirmation scheduling order and heard in connection with the hearing on confirmation of the Plan, of the Independent Directors evaluation of the proposed Equity Holders Settlement in light of, among other things, the facts and applicable law as well as the time, delay, cost, and risk associated with litigating the matters to a final, non-appealable order. The following is not intended to include all evidence or legal analysis which may be presented at the Confirmation Hearing. The Debtors reserve all rights with respect thereto.

The Independent Directors considered the analysis and views of MTO and BRG, as well as the analysis and views of the UCC and the other constituents in these cases in assessing the merits of the claims settled in the Equity Holders Settlement and the comparative value of settling with Sycamore and KKR and litigating with them.

The Independent Directors worked with MTO and BRG to weight the chances of success on the various claims investigated, the amount that could be obtained at trial, and the time and cost of obtaining such a judgment. The single largest claim against the Sponsor and the Minority Equity Holders arises from the 2014 Transaction and the Carve-Out Transactions. The Independent Directors evaluated the ability to seek damages ranging from zero to $278.5 million, to $316 million, to $436 million, to $896 million, to $1.164 billion, and to $1.255 billion. They assigned a percentage to each of these damage figures to derive a composite, estimated damage amount of $420 million (assuming 100% success in aspects of a litigation). The Independent Directors also evaluated various defenses and arguments related to the damage numbers, including post transfer appreciation or depreciation, section 550(e) of the Bankruptcy Code, offsets for value given, good faith, equitable limitations on damages, claims under section 502(h) of the Bankruptcy Code, and indemnity claims of potential defendants.

The Independent Directors then evaluated the issues to be litigated as to claims related to the 2014 Transaction and the Carve-Out Transactions, including claims for actual and constructive fraudulent transfer for the Carve-Out Businesses, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, unlawful dividend, and unjust enrichment. The risk of recovery under each of these claims, in the view of the Independent Directors, would be driven largely by the risks of prevailing on four critical issues: insolvency, the applicability of section 546(e) of the Bankruptcy Code to the fraudulent transfer or other claims seeking disgorgement, reasonably equivalent value for the Carve-Out Transactions if viewed as stand-alone transfers outside the reach of section 546(e), and statute of limitations.

The Independent Directors spent extensive time with MTO and BRG in assessing the financial condition of the Debtors as of closing of the 2014 Transaction and the Carve-Out Transactions and subsequent to that time. This included consideration of the Duff & Phelps solvency opinion as of April 4, 2014, and purchase price accounting report completed in August 2014, the voluminous documents produced in the investigation and Rule 2004 examination, the contemporaneous market evidence and documents produced by lenders at the time, and analysis by BRG of the projections prepared at the time and other inputs for valuation, as well as an assessment of the capital adequacy of the Debtors and the arguments on both sides of the foreseeability of the Debtors financial and business decline since April of 2014. The Independent Directors did not find compelling evidence that the projections were falsified or that there were two sets of books as alleged by the UCC. All the numbers that build to the EBITDA projections were reviewed by numerous professionals and outsiders, and were disclosed in public filings. Whether some market participants (or the Sponsor or the Minority Equity Holders) used some or all of the adjustments in their evaluations does not convincingly indicate "cooked books," particularly when those evaluations did not indicate insolvency. These differences could credibly be shown to reflect reasonable differences of opinion on the reasonableness of the projections. The facts create important litigation risk for both the plaintiff and the defendant which the Independent Directors factored into their analysis of the merits as well as the costs and delay associated with litigation versus settlement.

The Independent Directors concluded that it was very unlikely that the Debtors subsidiaries and their estates could demonstrate at trial that the subsidiary guarantor Debtors were insolvent as of closing of the 2014 Transaction and Carve-Out Transactions. Nor do the Independent Directors understand any party in these cases, including the UCC, to be alleging that the subsidiary guarantor Debtors were insolvent at that time.

The Independent Directors also spent extensive time with MTO and BRG in assessing the applicability of section 546(e) of the Bankruptcy Code, what value was given to the Debtors in the Carve-Out Transactions, whether it was reasonably equivalent, and whether any claims were barred by the statute of limitations. The Independent Directors understood that section 546(e), if applicable, would be a complete bar to any claim for fraudulent transfer, whether actual or constructive, because the only viable claims arise under state law pursuant to section 544 of the Bankruptcy Code. The Independent Directors consulted with MTO on the merits and unresolved legal questions around whether Jasper Parent qualifies as a financial participant and whether the transfer of the Carve-Out Businesses was a transfer by or for the benefit of Jasper Parent as a financial participant.

The Independent Directors also evaluated the value given to the Debtors by the Sponsor and the Minority Equity Holders with and without collapsing of the 2014 Transaction and the Carve-Out Transactions. If the 2014 Transaction and Carve-Out Transactions are collapsed, then the purchase prices paid in the Carve-Out Transactions would be reduced for purposes of testing reasonably equivalent value, by any proceeds used to buy out the old Jones Group shareholders. That would reduce the value given to no more than $268 million (the debt of the old Jones

Group paid with Carve-Out Transaction proceeds), which was not reasonably equivalent.  Collapsing the two transactions, however, increased the likelihood that section 546(e) would apply to the claims.  If the Carve-Out Transactions are not collapsed with the 2014 Transaction, then the amounts paid range between $340 million and $395 million for Stuart Weitzman, $12 million and $136 million for Kurt Geiger, and $42 million and $110 million Jones Apparel.  The Independent Directors assessed various documents dating from the time of the transfers, documents subsequent to the transfers, including the Duff & Phelps purchase price accounting report and August 2014 solvency opinions for Weitzman and ApparelCo, and the subsequent transactions for the Carve-Out Businesses, as well as analyses prepared by BRG.

As discussed above, the Independent Directors also considered whether any claims were barred by the statute of limitations, in particular for breach of fiduciary duty under Delaware or Pennsylvania law, and the impact on the overall claims and damages given multiple claims related to the same conduct.  While the Independent Directors believed that the substantial majority of cases would result in applying the six-year statute of limitations to beach of fiduciary duty and related claims arising under Delaware or Pennsylvania law, there was contrary authority that applied the internal affairs doctrine to the statute of limitations and a shorter 3-year statute under New York law.  There was some risk, therefore, that certain claims could be time barred.

The Independent Directors also assessed the probability of success on additional claims arising from the investigation and whether those claims were additive or overlapping with the claims related to the 2014 Transaction and Carve-Out Transactions.  For example, the cash swept at closing on April 8, 2014, occurred at the same time as closing of the 2014 Transaction and Carve-Out Transactions, and is subsumed in the calculation of damages for fraudulent transfer and other causes of action for the same transactions.  Therefore, no additional amount was added for that item.  On the other hand, although the damages also overlap, the Independent Directors nevertheless included the waiver of working capital adjustments and stranded costs in 2015 related to the elimination of shared services personnel and office space following the wind-down of Jones New York by Jones Apparel, as additive to the fraudulent transfer and breach of duty claims because those transactions occurred after the April 8, 2014, closing and therefore solvency was relatively more likely.  Because the damages overlap, however, the Independent Directors reduced the probability of success for those claims.  The Independent Directors did not add any damages for the Kasper acquisition in 2017 because they concluded there were no viable claims.  The Independent Directors also did not include any additional damages related to the taking of the WSD because the Debtors retained sufficient use of the NOLs to offset the tax gain under the Plan, notwithstanding the WSD.

Applying the ranges discussed above to $420 million of damages for the 2014 Transaction and Carve-Out Transactions, plus additional damages of $8.8 million to $23.0 million for the working capital adjustment waiver and the stranded costs, and deducting $40 million to $60 million in anticipated litigation costs (or contingency fees), yielded a midpoint range of $83.7 million to $167.8 million in expected net value of claims against the Equity Holders.  This range is exclusive of pre-judgment interest, which is entirely discretionary, and likewise is not discounted to present value for the time of litigating the claims to judgment and through any appeals.  The Independent Directors relied on their prior experience in estimating the cost of litigation of claims that involved myriad factual and legal issues, extensive expert needs, and substantial numbers of parties and witnesses.  They were also aware that the UCC alone has incurred approximately $9 million in professional fees from April through August on the investigation of claims, and that the UCC insists that substantial additional discovery and analysis is necessary.

The Equity Holders Settlement is well within, or even above, this range.  The cash component of $105 million alone is a substantial amount to obtain in settlement and is solidly within this range.  The reversal of the WSD is protective of the Debtors estates and significant even if it does not contribute economic value in the form of cash savings on tax liability under current expectations.  The three-year agreement with Belk also ensures specified cash flow through 2021.  If valued based on the contribution to enterprise value under the Plan, the inclusion of Belk in the business plan equates to approximately $110 million of value.  That values the Equity Holders Settlement between $150 million and at least $215 million, not counting any incremental value from the reversal of the WSD or the inclusion of minimum purchase requirements in the Belk agreement that did not exist in the historical relationship with Belk (or any other customer of the Debtors).

The Independent Directors spent substantial time evaluating the Belk agreement, the litigation over the termination of the Belk business, and the impact on the Debtors of settling with the Equity Holders and obtaining an

agreement on Belk versus suing the Equity Holders and litigating over the termination of the Belk business. The EBITDA represented by the business with Belk could not be obtained from another distribution channel because the Debtors are already doing business in every available channel. As explained elsewhere, this EBITDA was essential to obtaining adequate exit financing to pay administrative expenses and the Secured Term Loan Lenders in full in cash at emergence. Absent that level of EBITDA, no plan was viable as demonstrated by the failed efforts to achieve commitments for such a plan despite three separate efforts to date. The Independent Directors examined very closely the merits of claims for the Belk termination and consulted extensively with Ralph Schipani and the Debtors advisors, including MTO and BRG about those claims and about the consequences to the Debtors of such a suit. MTO and UCC counsel also collaborated on evaluating such claims and drafting papers to sue over the Belk termination. Ultimately, the Independent Directors concluded that, provided Belk fulfilled its existing contractual obligations, commencing a lawsuit related to the termination of future business with Belk was imprudent in the absence of a committed, documented, and confirmable plan of reorganization for the Debtors that did not rely upon the Belk business as part of the business plan and go forward projections. As noted, despite three separate efforts to date, no such plan could be agreed upon and no constituent committed to provide financing for that plan.

The Independent Directors also concluded that settling and obtaining the three-year agreement with Belk with minimum purchase commitments was more valuable to the Debtors, their estates, and their stakeholders, than litigation. Litigation of the claims was not a substitute for the ongoing business because all the potential claims were subject to some discount for the risk of losing as each claim faced important legal and/or factual hurdles and the amount of recoverable damages was uncertain. In addition, victory on those claims could result only in restoration of an essentially at-will business relationship based on periodic purchase orders, and litigation against a customer—whether successful or not—is not likely to help maintain an ongoing commercial relationship. Under that arrangement, Belk can stop purchasing from the Debtors at any time and for any reason. As such, suing over the Belk termination and even winning retraction of the termination notice would not provide sufficient certainty for the Debtors to include Belk in the business plan and go-forward projections, use it for exit financing, or use it to resolve the distribution of equity and other value to and among the creditor constituents. The only way to obtain those benefits was to settle and have Belk agree to continue for at least three years with minimum purchase commitments.

The Debtor entities that do business with Belk (and therefore that were affected by the Belk termination letter) are primarily subsidiary Debtors. By 2017 net sales, One Jeanswear Group, Inc. does 59.6% of the Debtors' Belk business, Kasper Group LLC does 33.9% of the Debtors' Belk business, and NWHI (through its ownership of The Jewelry Group) does 6.5% of the Debtors' Belk business. NWD indirectly benefits from this business through its ownership of the Anne Klein® trademark as well as trademarks primarily used in The Jewelry Group's business. The Debtor subsidiaries are not obligated on the 2019 Notes or the 2034 Notes. As such, the value of the business with Belk (and potential claims and causes of action related to the loss of that business) would largely be assets of the Debtor subsidiaries, not NWHI. The Belk commitment agreement recognizes this fact, and the commitment directly benefits each of NWHI (through its ownership of The Jewelry Group's jewelry business and working capital assets), One Jeanswear Group Inc. (through its ownership of the Debtors' jeanswear business), and Kasper Group (through its ownership of the Debtors' apparel business), and indirectly benefits NWD through its ownership of the Anne Klein brand and certain jewelry trademarks, which have licensing agreements with each of the Debtors doing business with Belk.

It should also be noted that various claims are not released under the Plan. These include claims against the old Jones Group shareholders and the old Jones Group board of director and officers.

The Debtors believe that the Equity Holders Settlement is fair, reasonable, and exceeds the standards for settlement approval under the Code. The Equity Holders Settlement is supported by creditors holding supermajorities of the Secured Term Loan Claims and the Unsecured Term Loan Claims. A detailed memorandum regarding the Equity Holders Settlement will be filed and heard in connection with the hearing on confirmation of the Plan. The analysis contained herein is not intended to include all evidence or legal analysis which may be presented at the Confirmation Hearing. The Debtors reserve all rights with respect thereto.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits afforded under the terms of the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Equity Holders Settlement.

2.    *Intercreditor Plan Settlement*.

Another integral part of the proposed Plan is the settlement of intercreditor and intercompany claims and litigation (the "Intercreditor Plan Settlement"). The issues addressed by the Intercreditor Plan Settlement are issues raised by various stakeholders in these chapter 11 cases, including the Noteholders, the Unsecured Term Loan Lenders, and the UCC. The Debtors' advisors met with and discussed many of these issues with advisors to the UCC on August 1, 2018 (at a meeting attended by Akin Gump, Houlihan, Kirkland, Lazard, MTO, and BRG), August 8, 2018 (at a meeting attended by Akin Gump, Houlihan, Kirkland, Lazard, MTO, BRG, and A&M), and August 15, 2018 (at a meeting attended by Akin Gump, Wilmer Cutler Pickering and Dorr LLP (counsel to the Combined Ad Hoc Noteholder Group at that time), Kramer Levin Naftalis & Frankel LLP (as counsel to Brigade), King & Spalding LLP (as counsel to the Crossover Group), Quinn Emanuel Urquhart & Sullivan, LLP (as counsel to the Unsecured Term Loan Agent), Kirkland, and MTO). The Debtors' advisors had numerous other conversations with the advisors to the UCC about these issues.

A key aspect of the Debtors' negotiations with their unsecured creditors were the potential estate claims and causes of action against the Prepetition ABL/FILO Facility, Secured Term Loan Facility, and Unsecured Term Loan Facility. In particular, certain creditors holding claims at NWHI allege that the Prepetition ABL/FILO Facility,[25] Secured Term Loan Facility, and Unsecured Term Loan Facility can be avoided at NWHI, the Debtor where the 2014 Transaction debt was incurred, as constructive fraudulent conveyances. Other creditors, holding claims at NWHI, have also asserted that this debt could be avoided at the Debtor subsidiaries as well. Under the DIP Order, the right to seek to avoid the Secured Term Loan Facility was reserved for both the Debtors and other parties in interest, and the right to seek to avoid the Prepetition ABL/FILO Facility was preserved for the UCC and other creditors.

Another key issue raised by NWHI creditors is how to allocate the value of the Debtors' assets, in particular its intellectual property assets. This issue became more acute given that the IP Sale Proceeds from the 363 Sale were used by NWHI to pay down a portion of the Secured Term Loan Facility, and rights with respect to this allocation were reserved in the Sale Order. Following the pay down of a portion of the Secured Term Loan Facility with assets of NWD, a subsidiary guarantor of the Secured Term Loan Facility and Unsecured Term Loan Facility, the Unsecured Term Loan Lenders argued that this pay down gave rise to a right of subrogation and/or a postpetition intercompany claim entitled to administrative expense priority in favor of NWD against NWHI—the result of which would have been to shift substantially all of the value of NWHI to NWD. In addition, while creditors of NWHI have argued that the assets of the subsidiary Debtors should be used to satisfy the Secured Term Loan Claims first, the Unsecured Term Loan Lenders have argued that the assets of NWHI should be first used to satisfy the Secured Term Loan Claims, and even if the subsidiary Debtors' assets were used to satisfy the Secured Term Loan Claims, doing so would only increase the subrogation rights of the subsidiaries against NWHI.

An additional potential dispute surrounded the amount and validity of the intercompany claims between the Debtor entities. The Debtors believe that their books and records are the best indicators of outstanding intercompany claims. Based on the Debtors' books and records, NWHI is a net payor to the subsidiaries under the Debtors' prepetition and postpetition intercompany claims due to the fact that NWHI holds the Debtors' main bank accounts for transacting business. Given the facts and circumstances, the Debtors believe any full-scale forensic accounting investigation of the intercompany claims is unnecessary and would be unduly burdensome for the Debtors' estates.

The Debtors, through their Independent Directors, analyzed these avoidance, allocation, and intercompany issues. The Independent Directors obtained advice from Kirkland, Lazard, MTO, and BRG as they analyzed each of the legal theories raised by creditor groups. The Debtors' advisors also informed the Independent Directors of the views espoused by the UCC's advisors during multiple meetings on intercompany and intercreditor matters. The Debtors' advisors prepared multiple waterfall scenarios and sensitivity analyses for the Independent Directors to review and analyze recoveries to the Unsecured Term Loan Lenders and the Debtors' other creditors. The Debtors

---

[25]    The FILO Loan was issued in August 2016, and therefore was not incurred in connection with the 2014 Transaction.

and their advisors discussed various waterfall scenarios with the advisors to the Unsecured Term Loan Lenders and to the Combined Ad Hoc Noteholders Group as part of plan negotiations.

The Independent Directors considered multiple waterfalls at various total enterprise valuations.  The Debtors and the Unsecured Term Loan Lenders settled on a plan total enterprise value of $600 million as discussed more fully below.  Among other waterfalls, the Independent Directors considered other scenarios, including, but not limited to, the following:[26]

- Alternative 1:  A waterfall that provides an administrative intercompany claim held by NWD against NWHI on account of the IP Sale Proceeds in the amount of $263 million (or a secured subrogation claim by NWD on account of the use of the IP Sale Proceeds to repay NWHI's secured obligations).  This scenario would not reallocate value of the Debtors' intellectual property but instead would recognize the ownership of that intellectual property based on book ownership.  Under this waterfall, creditors at NWHI would receive no reorganized equity.  Unsecured Term Loan Lenders would receive more than 99% of the reorganized equity.

- Alternative 2:  A waterfall that would be based on the allocated value to each Debtor (see below), without any avoidance of claims, reallocation of IP Sale Proceeds, or intercompany administrative or subrogation claims based on the IP Sale Proceeds.  In this waterfall, the Unsecured Term Loan Lenders would receive more than 90% of the reorganized equity, though less than the 92.5% of common equity the Unsecured Term Loan Lenders receive under the Plan.

- Alternative 3:  A waterfall that assumes the avoidance of the Secured Term Loan Facility and the Unsecured Term Loan Facility at NWHI, and thus eliminates any intercompany administrative or subrogation claim on account of the IP Sale Proceeds.  This scenario did not reallocate value of the Debtors' intellectual property among Debtor entities.  Under this waterfall, the Unsecured Term Loan Lenders would receive more than 78% of the reorganized equity.

- Alternative 4:  A waterfall that assumes the avoidance of the Secured Term Loan Facility and the Unsecured Term Loan Facility at NWHI as well as the reallocation of the IP Sale Proceeds based on claims asserted against NWHI and NWD (after accounting for the avoidance of claims).  Under this waterfall, the Unsecured Term Loan Lenders would receive more than 56% of the reorganized equity.

As discussed above, the Debtors engaged both certain of the Noteholders and the Unsecured Term Loan Lenders on the equity splits for the Reorganized Debtors as part of their plan negotiations.  Those Noteholders and the Unsecured Term Loan Lenders engaged in their own negotiations as well, ultimately announcing an intercreditor deal based on equity splits consistent with the proposed Plan.  The Debtors also spent significant time discussing these intercreditor and inter-Debtor issues with the advisors to the UCC as the Debtors sought a path to emergence for their business assets.  The Debtors and their Independent Directors recognized that any resolution of these issues without the agreement of both the Noteholders and the Unsecured Term Loan Lenders would be contested.  Despite good-faith efforts, the Debtors were unable to reach consensus among these two creditor groups.

The Plan resolves these disputes by negotiating a settlement with respect to the allowance of the Unsecured Term Loan Claims and the recoveries to the Unsecured Term Loan Lenders and other general unsecured creditors of NWHI.  Through a negotiated settlement of these avoidance, allocation, and intercompany claim issues, the

---

[26]    Each of the waterfalls described herein are based on those waterfalls at a total enterprise value for the Reorganized Debtors of $600 million, which is the Plan Settlement TEV as more fully described below.  In each scenario, unsecured creditors at the subsidiary Debtors (other than the Unsecured Term Loan Lenders) receive less than 1% of the reorganized equity due to the relatively limited aggregate unsecured claims at such entities.

For the avoidance of doubt the Debtors and the Independent Directors examined numerous other waterfalls in addition to those set forth herein.

Unsecured Term Loan Lenders have agreed to receive consideration that, at Plan value, equates to an 84.2% recovery. As noted above, under certain theories—including either subrogation or claims based on intercompany administrative claims related to the 363 Sale Proceeds—the Unsecured Term Loan Lenders would take more than 99% of the equity value (with the remainder going to other unsecured creditors at the subsidiary Debtors) and payment of a substantial majority of litigation or settlement proceeds until paid in full. Under the settlement embodied in the proposed Plan, the Unsecured Term Loan Lenders have agreed to not seek such a recovery.

Further, for purposes of determining what non-NWHI general unsecured creditors (i.e., other than Unsecured Term Loan Lenders) would be entitled to under the Plan Settlement TEV, the Debtors allocated the Plan Settlement TEV among the subsidiary Debtors based on each entity's pro rata contribution to the Debtors' projected 2019 EBITDA. Based on this, the Debtors allocated approximately $62 million of Plan Settlement TEV to NWHI (on account of The Jewelry Group), approximately $94 million of Plan Settlement TEV to NWD (on account of Anne Klein® and other trademarks), approximately $303 million of Plan Settlement TEV to One Jeanswear Group Inc. (on account of the jeanswear business), and approximately $142 million of Plan Settlement TEV to Kasper Group LLC (on account of the apparel business). The Debtors then ran the waterfall scenario described in Alternative 2 above, which, among other things, gave effect to applicable prepetition and postpetition intercompany claims among Debtor entities to determine value at other Debtors, including Debtors Nine West Management LLC and Nine West Distribution LLC. The Debtors used the estimated general unsecured claims (including the Unsecured Term Loan Lender Claims and general unsecured intercompany claims) at each Debtor to determine recoveries for each unsecured creditor at each Debtor (including the subsidiary Debtors), and the Unsecured Term Loan Lenders get the same recovery percentage at each Debtor as other unsecured creditors other than at NWD, where their recovery percentage is less. In particular, for purposes of the Debtors' estimated allowed unsecured claims at NWD (i.e., the Unsecured Term Loan Claims and an estimated $92,843 of general unsecured claims), the Debtors agreed as part of the Intercreditor Plan Settlement that an intercompany administrative claim existed from NWHI to NWD on account of the IP Sale Proceeds. As noted above, however, as part of the Intercreditor Plan Settlement, the Unsecured Term Loan Lenders have agreed to a series of settlements that ultimately results in a compromise of a portion of their recovery that they would otherwise be entitled to on account of NWD's administrative claim against NWHI (as a settlement of any potential risks related to this claim), allowing additional value to stay at NWHI for non-Unsecured Term Loan Lender unsecured creditors at that entity. For the avoidance of doubt, the determination by the Debtors that an intercompany administrative claim exists from NWHI owing to NWD as part of the Intercreditor Plan Settlement shall not apply to, and shall have no effect on, any asserted claims at NWD other than (a) the Unsecured Term Loan Claims and (b) the current amount of estimated general unsecured claims at NWD in an amount of $92,843. The estimated general unsecured claims of $92,843 at NWD are receiving a par recovery under the proposed Plan.

In addition, the Plan resolves all estate claims and causes of actions against the Secured Term Loan Lenders in exchange for the Secured Term Loan Lenders' waiver of their right to receive postpetition interest at the default rate.

The Debtors believe that the Intercreditor Plan Settlement reflects a reasonable and fair resolution of these issues in light of, among other things, the facts and applicable law as well as the time, delay, cost, and risk associated with litigating the matters to a final, non-appealable order. On October 16 and October 17, at duly called board meetings, the Debtors' Independent Directors approved the Intercreditor Plan Settlement after months of diligence and meetings with the Debtors' advisors (including Kirkland, Lazard, A&M, MTO, and BRG) into the various legal and factual issues addressed below, at the same time that the Independent Directors authorized the Debtors to enter into the A&R RSA and file the October 17 version of the Plan.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Intercreditor Plan Settlement, as more fully set forth herein.

(a)    Avoidance Causes of Action

In connection with Plan negotiations, the Debtors and the Consenting Unsecured Lenders agreed to settle potential claims and Causes of Action that may have been asserted to avoid claims underlying the Secured Term

52

Loan Facility, the Prepetition ABL/FILO Facility, and the Unsecured Term Loan Facility, as well as any payments previously made on account of such claims. Various arguments and defenses are discussed more fully herein.

As an initial matter, the Debtors acknowledge the varying views held by their stakeholders on the solvency of the Debtors' businesses following the 2014 Transaction. With respect to the Debtor subsidiaries, the Debtors believe that the Secured Term Loan Lenders, ABL Lenders,[27] and the Unsecured Term Loan Lenders (collectively, the "Prepetition Lenders") would be able to establish that the Debtor subsidiaries were neither insolvent nor rendered insolvent as a result of the 2014 and Carve-Out Transactions because of, among other things, the value of the Debtors' subsidiary businesses, the smaller debt load at these subsidiaries (which was more than $700 million less than the debt at NWHI), and the intercompany claims owed by NWHI to the subsidiaries at the closing of the 2014 Transaction. The inability to establish insolvency of these entities at the time of the 2014 and Carve-Out Transactions renders an avoidance action targeting these guarantee claims highly unlikely to succeed. Consistent with the foregoing, the UCC Standing Motion does not seek to avoid these guarantee claims.

With respect to the solvency of NWHI, the Debtors believe that potential defendants (including the Prepetition Lenders) will point to a plurality of contemporaneous market evidence to establish NWHI's solvency. The Debtors believe, given the locus of the 2014 and Carve-Out Transactions, that New York law is likely to govern application of section 544 of the Bankruptcy Code. As such, the Debtors believe that the Prepetition Lenders will assert that a plaintiff would be required to prove actual insolvency and not merely insufficient capital. *See In re Best Products Co., Inc.*, 168 B.R. 35, 56 (Bankr. S.D.N.Y. 1994) (noting that applicable New York law requires a showing of insolvency for the avoidance of an "obligation incurred," as opposed to a "conveyance," which can be avoided by meeting the lesser standard of insufficient capital).

Even if a plaintiff were able to prove that NWHI was insolvent or rendered insolvent as a result of the 2014 and Carve-Out Transactions, disallowance of creditor claims in a legitimate leveraged buyout is difficult to establish given that the creditors actually parted with value. *See Best Products*, 168 B.R. at 59 (citing "respectable commentary" to this effect). Any action to avoid the claims of any of the Prepetition Lenders against NWHI would require the plaintiffs to make additional, challenging showings to establish that NWHI did not receive fair consideration in connection with each of these loans. First, in view of the fact that the Prepetition Lenders advanced actual funds to NWHI on a dollar-for-dollar basis relative to the claims sought to be avoided, the Prepetition Lenders could argue that, under Second Circuit law, a plaintiff pursuing fraudulent transfer claims must establish that the Prepetition Lenders had actual or constructive knowledge of the "fraudulent scheme" that rendered the conveyances fraudulent. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) (noting that "contrary to the approach taken by the District Court, the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent" and that, at a minimum, plaintiffs must show a failure to make appropriate inquiries (citations omitted)). In other words, under this standard, the plaintiff will have to show that the underwriters and/or lenders lent hundreds of millions of dollars in connection with transactions that they knew or should have known would render NWHI insolvent. Based on information learned during the ongoing investigations, both the underwriters for the loans and the lenders themselves lent in good faith without actual or constructive knowledge that the 2014 and Carve-Out Transactions would render NWHI insolvent, because, among other things, the underwriter and the lenders (a) requested and received solvency certificates from the company and a solvency representation in the governing credit agreements, (b) understood that a solvency opinion was issued by Duff & Phelps, (c) observed the market's demand for the debt to be issued under the 2014 Transaction (including that the demand for the Unsecured Term Loan Facility was oversubscribed by approximately 2.5 times), (d) conducted their own due diligence of the transaction and their own tests to ensure NWHI would be able to service the debt, and (e) reasonably relied on management's and the Sponsor's projections. In addition, contemporaneous market evidence, of various sorts, provided strong indications that NWHI would be a viable business after the transaction, and would not be rendered insolvent.

---

[27]    The FILO Loan component of the Prepetition ABL/FILO Facility was not borrowed until 2016, and the Debtors do not believe the lenders under the FILO Loan would be subject to any potential claims and Causes of Action that may exist with respect to the 2014 Transaction.

Second, the ABL Lenders could rely on the defense that the proceeds of the Prepetition ABL/FILO Facility provided new value to the Debtors because those proceeds were used to fund the Debtors' daily operations, and could be seen as providing a new loan on a rolling basis. The ABL Lenders also have asserted they could rely on an additional defense that all of the transactions involving the Prepetition ABL/FILO Facility are safe-harbored under section 546(e) of the Bankruptcy Code because they are each a "financial institution," as that term is defined by section 101(22) of the Bankruptcy Code. Certain other Prepetition Lenders have asserted that this section 546(e) argument may also apply to them.

Third, the Debtors expect that the Secured Term Loan Lenders and the ABL Lenders will assert that the proceeds of the Secured Term Loan Facility and Revolving Loan (or at least some portion of the proceeds of those loans) were used to repay pre-transaction debt and not used to fund distributions to Jones Group shareholders at the closing of the 2014 Transaction, thus providing new value to the Debtors at the closing of the 2014 Transaction. The Debtors note that transaction documents indicate that cash used to fund transaction payments was commingled into one account used for distributions to creditors and shareholders alike, meaning that all lending parties (including the Unsecured Term Loan Lenders) could argue that a portion of their debt was used for the repayment of antecedent debt, thereby providing reasonably equivalent value to the Debtors.

Fourth, even assuming that NWHI was rendered insolvent as a result of the 2014 and Carve-Out Transactions, the Secured Term Loan Lenders would argue that they are entitled to payment in full on their Claims because the assets of Debtor subsidiaries are sufficient to repay the obligations under the Secured Term Loan Facility. The ABL Lenders could rely on that same argument as well as the additional argument that they held claims against an additional borrower, One Jeanswear Group Inc., and could therefore be satisfied in full from that entity's assets directly.

In addition, the Prepetition Lenders may argue that, assuming for the sake of argument that the Prepetition Lenders' claims were avoidable, many of the holders of the Stub 2019 Notes and 2034 Notes possessed (by virtue of publically available market information and prospectuses circulated in connection with the Put Option and Exchange Option and SEC-filings related to 2014 Transaction) the very same understanding of the 2014 and Carve-Out Transactions, and, as such, ratified or acquiesced therein and therefore cannot share in any recoveries resulting from the successful avoidance of any of the Secured Term Loan Facility, the Prepetition ABL/FILO Facility, or the Unsecured Term Loan Facility, thus eliminating any overall potential benefit to the Debtors' estates. Moreover, the Unsecured Term Loan Lenders have indicated in their proof of claim that they may assert a tort claim against the Debtors to the extent the Unsecured Term Loan Lenders' claim is avoided if it were found to be the case that the Debtors were insolvent after all.

On balance, the Debtors believe it would be difficult to succeed in any action to avoid the Secured Term Loan Facility, the Prepetition ABL/FILO Facility, and the Unsecured Term Loan Facility at NWHI or any of the Debtor subsidiaries. Given the facts, the Plan does not seek any discounts with respect to the Prepetition ABL/FILO Facility. In exchange for a settlement of all estate claims and causes of action against the Secured Term Loan Lenders, the Secured Term Loan Lenders' legal entitlement to postpetition interest at the default rate will be waived, resulting in the impairment of the Class of Secured Term Loan Claims. While the Unsecured Term Loan Claims are allowed in full against each of the Debtor entities (including NWHI and the Debtor subsidiaries), the Consenting Unsecured Lenders have agreed, and the Plan reflects, to limit the recovery on their total claim amount outstanding as of the Petition Date (including accrued and unpaid interest) to the treatment provided for in the Plan. As a result of these concessions, the Plan is able to provide immediate tangible value to potentially out of the money general unsecured creditors of NWHI whose recoveries otherwise would hinge on the uncertain success of litigation of estate claims.

(b)      Allocation of Value.

As noted above, certain creditors have argued that, notwithstanding the fact that the IP Sale Proceeds were proceeds of assets held and legally owned by NWD in the Debtors' books and records, these sale proceeds should be reallocated among Debtor entities (i.e., that a portion of the IP Sale Proceeds should instead be allocated to NWHI). Some of these arguments are based on which Debtor entities employed the employees that developed and serviced the Nine West®, Bandolino®, and associated brands, while others are based on which entities derived EBITDA from the brands. The Debtors also are aware of other arguments raised in *In re Nortel Networks, Inc.*, 532 B.R. 494

(Bankr. D. Del. 2015), a decision by the Bankruptcy Court for the District of Delaware in a joint opinion with a Canadian bankruptcy court on a multinational allocation dispute. In *Nortel*, the court determined that the proper allocation should be based on a modified pro rata allocation based, in large part, at which debtor entities claims were asserted. *Id.* at 500. The Debtors believe that application of the Nortel decision is appropriately limited to the facts of that case, which included more than 130 subsidiaries located in more than 100 countries, and included numerous cross border issues that are not present or relevant to these chapter 11 cases. Unlike *Nortel*, the Debtors are primarily a U.S.-based company that has historically accounted for intercompany claims and observed corporate separateness of the various Debtor entities. In this situation, because the Debtors' books and records have historically shown, and showed at the time of the 363 Sale, that NWD owned the Nine West® and Bandolino® intellectual property (as well as the Anne Klein® intellectual property). The Debtors observe standard corporate formalities in their business operations and in the ownership of assets by each Debtor entity. Because the Nine West® and Bandolino® brand recognition is dependent on the trademarks themselves, the Debtors believe that the allocation for the 363 Sale proceeds for that intellectual property or the value of the Anne Klein brand are properly allocated to NWD and not to NWHI—just like each Debtor agrees that NWHI owns The Jewerly Group's working capital assets and owned the Debtors' working capital assets related to the Debtors' former shoe and handbag business, One Jeanswear Group, Inc. owns the jeanswear working capital assets and certain intellectual property used in the jeanswear business, and Kasper Group LLC owns the apparel working capital assets and certain intellectual property used in the apparel business. The Debtors' books and records regarding the 363 Sale proceeds allocation were reflected in the fourth monthly operating report filed with the Bankruptcy Court on August 10, 2018 [Docket No. 576]. The Debtors consider *Nortel* inapposite to the facts in these cases, and while the Debtors acknowledge that the decision results in the small risk to the re-allocation of the IP Sale Proceeds to NWHI, the Debtors believe that it would be very difficult for general unsecured creditors of NWHI to prove that any of the IP Sale Proceeds should be allocated to NWHI. As part of the comprehensive series of intercreditor settlements embodied in the Plan, however, the Unsecured Term Loan Lenders have agreed to provide additional value to other NWHI unsecured creditors.

    (c)  The Jewelry Group.

    Certain parties have argued that because the Debtors' Jewelry Group business resides at NWHI, creditors of NWHI are entitled to their pro rata share of distributable value equal to The Jewelry Group's portion of the Debtors' total enterprise value. Other parties have argued that because NWD owns the vast majority of the intellectual property used in The Jewelry Group's business, certain portions of The Jewelry Group's value should be allocated to NWD. Thus, there is an intercreditor dispute as to how much, if any, value should be attributed to NWHI on account of The Jewelry Group business.

    The Debtors believe that because The Jewelry Group's inventory, employees, and certain of the intellectual property reside at NWHI, a significant portion of The Jewelry Group's business value should be allocated to NWHI. While a litigable issue, the Debtors do not believe that any other value exists at NWHI (separate from the proceeds of any litigation or settlement on account of Estate Causes of Action). The Jewelry Group's business amounts to approximately $10.5 million or 11% of the forecasted FY2019 EBITDA. In formulating the terms of the settlement embodied in the Plan, the Debtors have considered the arguments in favor of allocating The Jewelry Group business's value to NWHI and the implications of other, senior claims that may be asserted against NWHI by other Debtors on the availability of this value for unsecured creditors. Such claims could include subrogation claims arising from the postpetition pay down of outstanding obligations under the Secured Term Loan Facility and/or postpetition administrative intercompany claims arising from the postpetition transfer of the IP Sale Proceeds from NWD to NWHI, each as discussed in detail below.

    (d)  Subrogation.

    The Plan further resolves the Debtor subsidiaries' rights to subrogation (or potentially assert intercompany claims, as discussed below) against NWHI related to the repayment of the debt borrowed by NWHI. More specifically, the repayment of NWHI's obligations under the Secured Term Loan Facility with the IP Sale Proceeds related to intellectual property of NWD, a guarantor under the Secured Term Loan Facility, allows NWD to step into the shoes of secured creditors at NWHI and receive value until it is repaid for the amounts it paid on NWHI's behalf. *See, e.g.*, *In re Chateaugay Corp.*, 89 F.3d 942 (2d Cir. 1996) ("Under its rule, one compelled to pay a debt which ought to have been paid by another entitled to exercise all remedies which the creditor possessed against that

other.") (*quoting American Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. 314, 317 (1941)); *In re Chateaugay Corp.*, 155 B.R. 625, 634 (Bankr. S.D.N.Y. 1993) ("The guarantor who satisfied the debt owed to the lessor was entitled to assert the same administrative priority expense under §507(a)(2) as the lessor would have asserted if the guarantor had not paid its claim."); *In re Wingspread*, 145 B.R. 784, 791 (Bankr. S.D.N.Y. 1992) ("Under the doctrine of subrogation, a subrogee is entitled to assert any priority or special right of the subrogor."). Because NWD would step into the shoes of a secured claim, its right of subrogation would come before the recoveries to any administrative or general unsecured creditor at NWHI, and would drive a substantial amount of the Debtors' value to the subsidiaries for the benefit of the Unsecured Term Loan Lenders. The 2019 Trustee has asserted that the potential subrogation right may not be available to the extent that the Secured Term Loan Facility was under-secured at NWHI (with respect to the repayment in full of the Secured Term Loan Facility from NWHI's assets without recourse to the subsidiary Debtors and their assets).

After analyzing applicable legal authority and established facts, the Debtors believe that a right of subrogation for the repayment of the Secured Term Loan Facility exists. Yet, the Debtors acknowledge that the argument is subject to attack, notably on the basis that the right of subrogation would cease to exist if the entirety of the claims and liens of the Secured Term Loan Facility were successfully avoided as a fraudulent transfer at NWHI, which itself is subject to significant defenses as discussed above. Consequently, the Plan discounts the value of the Debtor subsidiaries' subrogation rights by providing additional value to the NWHI unsecured creditors rather than allocating almost all value to the Debtors' subsidiaries until the subsidiaries are paid in full.

Additionally, the Debtors are aware that unsecured creditors of NWHI have asserted that the assets of the subsidiary Debtors should be used to repay the Secured Term Loan Claims, while the Unsecured Term Loan Lenders have argued that the Secured Term Loan Lenders should look first to the assets of NWHI for repayment before looking to the assets of the subsidiary Debtors. Even if it was determined that the assets of the subsidiary Debtors were used to repay the Secured Term Loan Claims, the Debtors believe that this would only increase the subrogation claims of those subsidiary Debtors as against NWHI. Creditors of NWHI have also suggested that the Secured Term Loan Lenders should agree to waive their claims against NWHI, which the Unsecured Term Loan Lenders believe is an effort to undermine or limit any subrogation claims arising from the repayment of the Secured Term Loan Claims. The Debtors believe that any such waiver could not be unilaterally granted by the Secured Term Loan Lenders under the terms of the Secured Term Loan Credit Agreement, and are aware that the Unsecured Term Loan Lenders have asserted that the subsidiary Debtors agreeing to such a waiver would expose those Debtors to potential claims and causes of action, including possible breach of fiduciary duties. For the purposes of the intercreditor settlement described herein, the Debtors agree that any claim held by the Secured Term Loan Lenders against NWHI has not been waived, and that the settlements appropriately resolve inter-debtor disputes regarding the repayment of the Secured Term Loan Claims, avoiding expensive and complex litigation over the appropriate use of the various Debtors' assets.

       (e)       Intercompany Claims.

       (i)       *Prepetition Intercompany Claims.*

Certain of the Debtors' creditors have sought diligence with respect to the Debtors' prepetition intercompany claims, and the Debtors have undertaken their own efforts to review such claims. Before the commencement of these chapter 11 cases, the Debtors and their advisors provided overviews of the intercompany claims to their organized creditors, including the 2034 Noteholder Group, the Crossover Group, Brigade, and the Secured Lender Group. After its formation, the Debtors met with the UCC's advisors on May 2, 2018, to review their prepetition intercompany claims and the Debtors' cash management system, and the Debtors' advisors and the UCC's advisors have had numerous conversations around the intercompany claims since that time. Pursuant to the Cash Management Order, the Debtors also provided the UCC's advisors with "any and all information reasonably requested with regard to the Debtors' and their non-debtor subsidiaries' intercompany ledgers since April 9, 2014." The Debtors believe the intercompany claims reflected on the Debtors' books and records and the intercompany claims model maintained by the Debtors' professionals—as shared with the financial advisors to the UCC, the Secured Term Loan Lenders, and the Unsecured Term Loan Lenders—accurately reflect the Debtors' internal accounting system and is the best evidence of the Debtors' intercompany claims accounting. The Debtors observe standard corporate formalities in their business operations and in tracking intercompany claims, and each Debtor understands that it owes or is owed amounts by another Debtor on the basis of each intercompany transaction. The

56

Debtors are not aware of any allegation of improper record-keeping or accounting practices or even a suggestion that the disclosure of the intercompany claims is in any way inaccurate by those parties that have engaged in extensive review and analysis of the intercompany claims.  Prior to October 30, 2018, no party in interest had raised any argument that the intercompany claims should not be respected.  Since that time, the UCC, the Combined Ad Hoc Noteholder Group, and the 2019 Trustee have raised concerns about these intercompany claims, including whether each Debtor entity would have an expectation of payment on account of such intercompany claims.  Almost all of the intercompany claims arose from the Debtors' daily operations and each such Debtor has an expectation that such intercompany claim due or payable will be respected given that almost all arise from NWHI receiving cash on account of other Debtors and paying amounts owed by other Debtors.  Each Debtor therefore believes that the intercompany claims should be treated as valid and accurate.

Based on the Debtors' own intercompany accounting system, there are substantial intercompany claims between NWHI and its subsidiaries, the net effect of which will cause value to flow from NWHI to NWHI's subsidiaries that are guarantors of the Secured Term Loan Facility and Unsecured Term Loan Facility.  The Debtors believe that it would be difficult and expensive to pursue litigation to recharacterize the intercompany claims, and that any such litigation is speculative at best and unlikely to succeed.  The Plan respects the intercompany claims reflected in the Debtors' books and records and intercompany claims model, but nevertheless, the Plan provides additional value to the NWHI unsecured creditors as part of the intercreditor settlements.

For purposes of providing parties in interest with additional disclosure regarding the Debtors' intercompany claims, the Debtors and their advisors have prepared the following prepetition intercompany matrix.  The intercompany matrix reflects all intercompany activity from inception through both the 2014 Transaction and the Petition Date.  The Debtors and their advisors specifically reviewed all intercompany details from April 9, 2014, through December 31, 2017.  The Debtors leveraged the existing matrix, which included balances up to April 9, 2014, and rolled balances forward using transaction level detail.

There are five sets of general ledger accounts utilized to record intercompany activity.  Intercompany entries are automatically generated on a daily basis between the Debtor entities.  Examples of daily activity include the collection of cash or payment of invoices.  Because intercompany balances reflect thousands of individual transactions between NWHI and its subsidiaries, providing detailed descriptions of each transaction would be impracticable.  As more fully disclosed in the Debtors' cash management motion [Docket No. 7], NWHI holds most of the Debtors' bank accounts that comprise the Debtors' cash management system.  The Debtors' cash management system therefore routes most ordinary course payments through NWHI, which remits payments on behalf of the Debtors' Debtor and non-debtor subsidiaries on account of invoices due and payable by such affiliates.  NWHI also receives payments on behalf of such subsidiaries.  When receipts come into an NWHI bank account for another Debtor entity (such as Kasper Group LLC or One Jeanswear Group, Inc.), an intercompany transaction is recorded between the two entities, namely a payable from NWHI to the other Debtor.  Similarly, when NWHI pays an expense on behalf of another entity, a receivable from the other entity to NWHI is recorded.  The Debtors believe that the intercompany entries reflect standard business practices for businesses similar to the Debtors.  The Debtors were authorized by the Cash Management Order to continue to engage in intercompany transactions on a postpetition basis in the same ordinary course manner they had done so prior to the Petition Date.  At the end of the month, certain intercompany entries are manually created to record certain recurring activities (e.g., allocation of shared service costs), one-time events, or to correct previously entered intercompany entries.  For certain transactions, the trading partner was not immediately identifiable, which required the Debtors to further review supporting documentation.  The Debtors and their advisors went through an extensive process to analyze thousands of individual transactions entity by entity to determine trading partners.[28]

---

[28]   The tables do not include intercompany claims to or from Nine West Apparel Holdings LLC, US KIC Top Hat LLC, or US KIC Top Hat LLC, as none of those entities have any intercompany claims to any other entity. Balances are as of April 7, 2018, as the Debtors' accounting closed their books and records on that date.

Prepetition Intercompany Matrix— Inception to 2014 Transaction

| | NWHI | NWD | Nine West Management Service LLC | Nine West Distribution LLC | One Jeanswear Group Inc. | Kasper Group LLC | Nine West Jeanswear Holding LLC | Jasper Parent | Canada Entities[29] | Non-Debtor Entities[30] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NWHI** | - | (86,566,934) | 206,426,857 | 28,540,901 | (612,043,636) | - | (57,649,712) | - | - | 2,852,640 | (518,439,883) |
| **NWD** | 86,566,934 | - | (6,195,869) | - | 15,410,285 | - | - | - | - | - | 95,781,350 |
| **Nine West Management Service LLC** | (206,427,806) | 6,195,869 | - | 8,288,105 | 172,753,989 | - | - | - | - | 555,321 | (18,634,521) |
| **Nine West Distribution LLC** | (28,540,901) | - | (8,288,105) | - | 37,092,414 | - | - | - | - | - | 263,408 |
| **One Jeanswear Group Inc.** | 612,043,636 | (15,410,285) | (172,753,989) | (37,092,414) | - | - | 1,547,662 | - | - | 2,139,709 | 390,474,318 |
| **Kasper Group LLC** | - | - | - | - | - | - | - | - | - | - | - |
| **Nine West Jeanswear Holding LLC** | 57,649,712 | - | - | - | (1,547,662) | - | - | - | - | (363,001) | 55,739,049 |
| **Jasper Parent** | - | - | - | - | - | - | - | - | - | - | - |
| **Canada Entities** | | | | | | | | | | | |
| **Non-Debtor Entities** | (2,851,691) | - | (555,321) | - | (2,139,709) | - | 363,001 | - | - | - | - |
| **Total** | 518,439,884 | (95,781,350) | 18,633,573 | (263,408) | (390,474,318) | - | (55,739,049) | - | 49,900 | 5,134,769 | (0) |

Prepetition Intercompany Matrix— Inception to April 7, 2018[31]

| | NWHI | NWD | Nine West Management Service LLC | Nine West Distribution LLC | One Jeanswear Group Inc. | Kasper Group LLC | Nine West Jeanswear Holding LLC | Jasper Parent | Canada Entities | Non-Debtor Entities | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NWHI** | - | (33,000,341) | 207,539,479 | 39,238,665 | (882,266,757) | 7,135,542 | (57,602,871) | 25,363 | - | 20,334,053 | **(698,596,868)** |
| **NWD** | 33,604,306 | - | (10,712,697) | - | 42,877,658 | 675 | - | - | - | (680,369) | **65,089,573** |
| **Nine West Management Service LLC** | (207,540,427) | 10,712,697 | - | 22,766,252 | 287,893,585 | 3,920,898 | - | - | - | 667,704 | **118,420,708** |

---

[29]   "Canada Entities" includes Jones Canada Inc. and Nine West Canada LP.

[30]   "Non-Debtor Entities" includes Nine West Group International Limited, Jones Apparel Group Canada ULC, Dongguan Nine West Commerce and Trading Co., Jones Holdings (Canada) ULC, Jasper Apparel Group Canada LP, One Jeanswear Group - Egypt, LLC, Kasper Topco Limited, Jones Foreign Blocker S.a.r.l., JH Foreign Blocker LLC, JH Apparel Holdings LLC, JH Apparel (US) LLC, JHA Services, The Jones Group Spain S.L., Kasper Global Limited, Dongguan Jones Commerce and Trading Co.

[31]   Although the Debtors maintain their intercompany accounts on a transaction by transaction basis, the accounts are reconciled at each month end close. For purposes of the Schedules and Statements, the Debtors utilized an intraperiod date of April 7, 2018, to create the intercompany balances at filing. The result was an intercompany matrix with a small net imbalance of approximately $583,117, or less than 0.1% of the total. Due to timing and resource constraints, the Debtors did not complete a full intercompany reconciliation of the month-end close process for the intraperiod matrix to eliminate the imbalance.

KE 52165855

| | NWHI | NWD | Nine West Management Service LLC | Nine West Distribution LLC | One Jeanswear Group Inc. | Kasper Group LLC | Nine West Jeanswear Holding LLC | Jasper Parent | Canada Entities | Non-Debtor Entities | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nine West Distribution LLC** | (39,238,665) | - | (22,766,252) | - | 109,352,732 | 6,734 | - | - | - | 508,429 | **47,862,978** |
| **One Jeanswear Group Inc.** | 882,266,758 | (42,865,472) | (287,893,585) | (109,352,732) | - | 2,119,126 | 1,547,662 | - | - | (14,098,730) | **431,723,026** |
| **Kasper Group LLC** | (7,161,730) | (675) | (3,920,898) | (6,734) | (2,119,126) | - | - | - | - | (22,810,107) | **(36,019,270)** |
| **Nine West Jeanswear Holding LLC** | 57,602,871 | - | - | - | (1,547,662) | - | - | - | - | (363,002) | **55,692,207** |
| **Jasper Parent** | (25,363) | - | - | - | - | - | - | - | - | - | **(25,363)** |
| **Canada Entities** | - | - | - | - | - | - | - | - | - | (6,460,673) | **(6,460,673)** |
| **Non-Debtor Entities** | (20,259,028) | 680,369 | (667,704) | (508,429) | 14,017,411 | 22,810,107 | 363,002 | - | 6,460,673 | 396 | **22,896,796** |
| **Total** | **699,248,721** | **(64,473,422)** | **(118,421,657)** | **(47,862,978)** | **(431,792,159)** | **35,993,082** | **(55,692,207)** | **25,363** | **6,460,673** | **(22,902,298)** | **583,117** |

(ii)       *Postpetition Intercompany Claims.*

As discussed above, in accordance with the Debtors' cash management system, while the IP Sale Proceeds were an asset of NWD, it was NWHI who paid down a portion of the Secured Term Loan Claims with the use of the IP Sale Proceeds. As a result, NWD either transferred or was deemed to have transferred the $263 million in IP Sale Proceeds to NWHI, arguably providing NWD with a right to a $263 million, postpetition administrative intercompany claim against NWHI that would also be entitled to priority over any unsecured claims at NWHI, thereby reducing any value available to unsecured creditors of NWHI (including any value from estate claims and causes of action). Although creditors of NWHI may dispute whether or not such a postpetition intercompany claim is entitled to administrative expense priority, the Debtors believe, after analyzing applicable legal authority and established facts, that the repayment of the Secured Term Loan Facility by NWHI gave rise to an administrative, postpetition, intercompany claim in favor of NWD under the Debtors' cash management system. Because certain parties dispute whether this claim should be entitled to priority, however, the Plan discounts the value of the Debtors' subsidiaries' postpetition intercompany claims by providing additional value to the NWHI unsecured creditors rather than allocating almost all value to the Debtors' subsidiaries until the creditors of the subsidiaries are paid in full.

As noted above, the Debtors were authorized to continue engaging in intercompany transactions in accordance with their normal cash management system. Pursuant to the Cash Management Order, the intercompany claims incurred as part of these intercompany transactions are treated as administrative expenses of each Debtor estate.

(iii)      *Intercompany Claims and Proceeds of Estate Causes of Action.*

In addition, partially as a result of the subsidiaries' claims against NWHI (including intercompany, subrogation, reimbursement, and/or contribution claims) coupled with the claims of the Unsecured Term Loan Lenders against those subsidiaries in addition to NWHI, the Debtors believe that the Unsecured Term Loan Lenders likely would be entitled to receive a substantial portion of the proceeds of any Estate Causes of Action (obtained either through litigation or through a settlement) up until payment in full of their claims. To resolve disputes relating to the participation of the Unsecured Term Loan Lenders in the settlement proceeds, however, the Unsecured Term Loan Lenders have agreed to limit their distribution to only one-third of any consideration from the Equity Holders Settlement—an amount that is less than what the Unsecured Term Loan Lenders would otherwise be entitled.

59

(f)        Allocation of Administrative Expenses.

As a result of the mounting professional fees incurred by estate-retained or estate-paid professionals, the Debtors have, collectively, been shouldering substantial administrative costs since the Petition Date.  The Debtors believe that the subsidiary Debtors have borne a disproportionate amount of the administrative expenses incurred during these chapter 11 cases given the costs of, among other things, the investigations into NWHI's causes of action.  In fact, as of the date hereof, although NWHI pays all professional fees from its main operating account, an administrative intercompany claim is booked from Nine West Management LLC (a subsidiary Debtor) to NWHI. The amounts incurred by Nine West Management LLC have not, as of the date hereof, been allocated among Debtor entities.  In the context of the intercreditor settlement, creditors of the subsidiary Debtors are agreeing to forego any reallocation of previously incurred administrative expenses prior to the signing of the A&R RSA, but found it imperative that NWHI be responsible for a more appropriate share of the administrative expenses going forward. Indeed, the substantial majority of creditors that are not party to the A&R RSA will be creditors primarily or solely at NWHI.  As the Debtors believe that the concessions made by the Unsecured Term Loan Lenders in the Plan are in the best interests of all Debtor estates in these chapter 11 cases, the Debtors and the Unsecured Term Loan Lenders have agreed that, to the extent additional administrative expenses are incurred in connection with the pursuit or defense of any challenge to the intercreditor settlements and the Plan, or the pursuit or defense of any motion seeking standing to pursue Estate Causes of Action, those administrative expenses should be borne exclusively by general unsecured creditors of NWHI (other than the Unsecured Term Loan Lenders, whose recoveries are based in large part on recoveries at the subsidiary Debtors).  Thus, as described in more detail in the Plan, the intercreditor settlement allocates the administrative expenses of estate professionals from and after the effective date of the A&R RSA that are incurred in connection with the pursuit of, or defense against, any objections to any Plan-related documents (including motions for further extensions of exclusivity) or with the pursuit of any estate claims or the pursuit or defense of any motion seeking standing to pursue Estate Causes of Action (including against the Sponsor, the Minority Equity Holders, or the Prepetition Lenders) to NWHI exclusively.[32]  This allocation to NWHI will result in a dollar-for-dollar reduction in Cash distributions that would otherwise be made to general unsecured creditors of NWHI (other than the Unsecured Term Loan Lenders).  **Such allocation of administrative expenses may significantly dilute the recoveries of general unsecured creditors of NWHI.**  The Debtors believe such an allocation is reasonable and appropriate under the circumstances, and in the context of the intercreditor settlements described herein and in the Plan.  The 2034 Trustee, the 2019 Trustee, the Combined Ad Hoc Noteholder Group, and the UCC have asserted that such an allocation is unreasonable, coercive, and inappropriate under the circumstances.

*        *        *        *        *

The Debtors believe that the intercreditor settlement encompassed in the Plan is a reasonable exercise of their business judgment and in the best interests of all of the Debtors' estates.  Indeed, with respect to business allocation and cash to the Unsecured Term Loan Lenders, the proposed Plan is not materially dissimilar to the terms reflected in the agreement in principle between certain Unsecured Term Loan Lenders and the Combined Ad Hoc Noteholder Group.  The Plan, which is supported by their Secured Term Loan Lenders and Unsecured Term Loan Lenders, enables the Debtors to provide stakeholders with material recoveries and to preserve enterprise value by consensually resolving material disputes that could have otherwise required substantial litigation.  The Debtors believe that the settlements of these issues clearly are above the lowest point in the range of reasonableness.

3.        Plan Settlement TEV.

The recoveries provided for under the Plan are based upon a settled enterprise valuation for the Reorganized Debtors of $600 million (the "Plan Settlement TEV").  The Debtors' investment banker, Lazard, has prepared an independent valuation analysis, which is attached hereto as **Exhibit E** (the "Valuation Analysis"), which reflects an enterprise valuation range of $575 million to $675 million with a midpoint of $625 million.  The Valuation Analysis is based on the value of the Reorganized Debtors' business enterprise.  For purposes of the

---

[32]    Notably, however, administrative expenses of estate professionals incurred in connection with the Bankruptcy Court-ordered mediation will not be allocated to NWHI exclusively, in accordance with the Mediation Order.

Valuation Analysis, no value has been ascribed to any retained claims or causes of action related to the 2014 Transaction or Carve-Out Transactions, including, but not limited to, claims against Non-Released Parties under the Plan. No value has been ascribed to such claims as any such value would be speculative in nature. Certain of the Debtors' Unsecured Term Loan Lenders have asserted that the Valuation Analysis overstates the value of the Reorganized Debtors. In support of their position, these Unsecured Term Loan Lenders pointed to, among other things, (a) the Debtors' targeted marketing process, which did not attract offers for the Debtors' businesses in the Valuation Analysis valuation range, (b) feedback received from potential exit lenders regarding the Debtors' ability to raise exit financing, and (c) the inability of any third-parties, including the Noteholders, to come forward with a viable rights offering or other new money investment. In addition, these Unsecured Term Loan Lenders pointed to the publicly announced intercreditor deal, whereby parties agreed to a $600 million settlement total enterprise value. The Debtors considered the issues raised by these Unsecured Term Loan Lenders regarding the Valuation Analysis and determined that it is well within reason to settle valuation at the Plan Settlement TEV. Importantly, the Plan Settlement TEV falls within the Debtors' valuation range set forth in the Valuation Analysis. Moreover, the Debtors negotiated for the inclusion of the New Warrants for 20% of the New Common Stock (subject to dilution for the management incentive plan) with a strike price at a $650 million total enterprise valuation as additional protection for the Debtors' unsecured noteholders and other non-Unsecured Term Loan Lender unsecured creditors at NWHI. The Plan Settlement TEV is an integral component of the settlements incorporated in the proposed Plan.

Q.    *Case Party Positions.*

In an effort to provide additional information to creditors, the Debtors requested comments or inserts to the Disclosure Statement from key creditors and other parties in interest, including with respect to the 2014 Transaction, the Carve-Out Transactions, the Intercreditor Plan Settlement, and the Equity Holders Settlement. The Sponsor and the Minority Equity Holders submitted the following insert. As set forth in more detail above, the Debtors disagree with some or all of the positions set forth in the insert below, but have included the response verbatim, with the exception of conforming certain defined terms, in the interests of full disclosure and transparency.

1.    *Position of the Sponsor and Minority Equity Holders Regarding the Equity Holders Settlement*.[33]

(a)    Introduction.

The Plan: (i) preserves and maintains enterprise value; (ii) materially improves the Debtors' business relationship with a critical customer through a written contract obligating that customer to purchase product from the Debtors and the reorganized Debtors; (iii) allows the Debtors to emerge from Chapter 11, thereby benefitting employees, vendors, customers, creditors and other stakeholders; and (iv) provides the Debtors with a $105 million cash payment to settle what would be very expensive, lengthy, hotly-contested, complicated and risky litigation.

The Equity Holders Settlement constitutes a critical and integral part of the Plan. All Estate Causes of Action against Sycamore, KKR and their related Released Parties are compromised, settled and released. The consideration for the compromise, settlement and release includes the agreement of the Debtors' indirect equity owners to: (i) make a cash contribution to the Debtors on the Effective Date of $105 million; (ii) cause non-debtor Nine West Topco LLC ("Topco") to unwind the Worthless Stock Deduction that was taken on Topco's 2017 U.S. Partnership tax return prior to the Petition Date (Topco now has unwound the Worthless Stock Deduction by filing an amended 2017 U.S. Partnership tax return); and (iii) cause Sycamore's portfolio company, Belk, Inc.,[34] to enter

---

[33]    This insert provided by the Sponsor does not address all of the legal and factual allegations contained in the Standing Motion and the Standing Complaint and does not set forth all of Sponsor's legal and factual disputes, defenses, claims and offsets regarding those pleadings. All legal and factual disputes, defenses, claims and offsets are hereby reserved.

[34]    Belk is a key customer of the Debtors (*See, Declaration of Ralph Schipani, Interim Chief Executive Officer of Nine West Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [DI #6], p. 2, and *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [DI #129], pp. 12-13).

into a written agreement with the Debtors, which, unlike any of the Debtors' other customers, obligates Belk to purchase product from the Debtors and the reorganized Debtors (Belk now has entered into the written agreement with the Debtors).

Beginning shortly after it was appointed, the UCC and its co-chair Aurelius Capital Management, LP, began demanding that claims against the Sponsor and the Minority Equity Holders must be transferred to a "litigation trust" for prosecution and that no settlement discussions should occur prior to the transfer of claims to the "litigation trust". During the first four months following the Petition Date, the UCC's professionals have incurred in excess of $15 million in professional fees. The UCC elected to pursue an all or nothing litigation trust strategy and refused to engage in settlement discussions with the Sponsor.[35]

Sycamore conducted extensive diligence (both internally and through retained professionals) prior to committing $395 million of equity to NWHI in December 2013, which equity was subordinated to over $1.4 billion of committed and then outstanding debt financing for NWHI. Sycamore committed $395 million of equity to NWHI in December 2013, and funded $120 million of equity to NWHI in April 2014, with the expectation and belief that the equity investment into NWHI would turn a profit. Sycamore would not have committed $395 million of equity behind over $1.4 billion of debt if Sycamore "knew" that NWHI only was worth $1.1 billion. Similarly, in December 2013, after conducting their own diligence, sophisticated underwriters would not have committed over $1.1 billion of new money debt financing to an entity that they believed was insolvent. All current and prospective creditors of NWHI were provided with extensive operational and financial disclosure materials so that they could conduct their own diligence before deciding to provide new debt financing (i.e., the Secured Term Loan Lenders and the Unsecured Term Loan Lenders), deciding to reject an offer for payment in cash at 101% of par in favor of exchanging old notes for new notes (i.e., the 2019 Notes) or deciding to continue to hold their investment in NWHI's existing indebtedness (i.e., the 2034 Notes).

The current and prospective creditors all were sophisticated institutional debt investors. The extensive disclosures made clear that the 2014 Transaction and the Carve-Out Transactions (defined below) would occur at the exact same time and that the substance of the single, integrated transaction was that: (i) The Jones Group, Inc. ("TJG") would sell four different business units to four different Sycamore entities; (ii) NWHI and each of the Carve-Out Businesses (defined below) would be separate legal entities, with their own separate and distinct management teams, corporate structures and capital structures; (iii) NWHI creditors would have recourse against NWHI only, not against any of the Carve-Out Businesses; (iv) the debt and equity raised for NWHI and for the Carve-Out Businesses principally would fund the $2.2 billion purchase price paid to TJG, including payments on account of pre-existing funded debt of TJG; and (v) the new creditors of NWHI would be making loans to an entity that did not own, control, operate or receive any credit support from any of the Carve-Out Businesses. With full and complete disclosure of this and more, the market reacted enthusiastically to the NWHI debt offerings. No NWHI creditor ever sought to unwind or avoid the 2014 Transaction or the Carve-Out Transactions until now. Ultimately, NWHI sought Chapter 11 relief due to unforeseen operational and industry wide challenges that have materially and adversely affected the entire retail sector.

As will be discussed below, the theory of the UCC's case defies logic and common sense. There are no valid claims: (i) for actual fraud, constructive fraud or breach of fiduciary duty in connection with the 2014 Transaction or the Carve-Out Transactions; (ii) based upon the Worthless Stock Deduction; or (iii) based upon the announced intention to cease doing future business with the Debtors. The Sponsor and Minority Equity Holders, however, agreed to enter into the demonstrably fair and reasonable Equity Holders Settlement in order to avoid the expense, distraction, delay, and uncertainty inherent in complex, complicated litigation regarding a $2.2 billion transaction that was entered into almost five years ago.

---

[35]    Notwithstanding the professional fees incurred while the Committee conducted extensive discovery, collected hundreds of thousands of documents and took numerous depositions, the Committee contends that "far more fulsome discovery from Sycamore and other parties will be necessary to prosecute and ultimately resolve such claims [and that] … there is a substantial amount of additional work to do in terms of document discovery … and an additional 10 to 12 depositions of critical witnesses." (*See, Supplemental 2004 Motion* [DI #559], ¶ 14).

(b)       Transaction Background.

In 2013, TJG, a publicly-traded company, embarked upon a public sale process. TJG was advised by Citibank and TJG's independent directors were advised by Peter J. Solomon Company. On June 20, 2013, Sycamore executed a confidentiality agreement so that it could conduct diligence regarding the operations, assets and businesses operated by TJG. Numerous other potential financial and strategic buyers also entered into confidentiality agreements and conducted their own diligence. Throughout the sale process, TJG and its financial advisors encouraged parties to make offers for all or parts of TJG and put potential bidders in touch with other bidders so that, if it made sense, "consortiums" of bidders could be formed to maximize value for TJG. Sycamore conducted extensive internal due diligence for several months, including reviewing materials posted to a TJG data room, following up with diligence questions for TJG, and attending management presentations and meetings. Sycamore also employed external experts to conduct due diligence, including Bain & Company ("Bain") and PricewaterhouseCoopers ("PwC"). Like in any large, complex transaction, as Sycamore's diligence evolved, its offers to TJG, its financing plans for any transaction, and its potential structure for any transaction likewise evolved.

On or about November 28, 2013, PwC delivered to Sycamore quality of earnings ("QOE") reports for the TJG businesses and operations that now are known as NWHI and also for the Carve-Out Businesses. The PwC QOE reports regarding NWHI totaled more than 220 pages and were the result of an extensive analysis of TJG's financials. The PwC QOE reports were critical parts of Sycamore's diligence and analysis of TJG. Sycamore also provided the prospective underwriters (discussed below) with the PwC QOE reports. The PwC QOE report for the NWHI businesses concluded that the trailing twelve months (from October 1, 2012 to September 30, 2013) management adjusted EBITDA for NWHI was $198.8 million and that diligence adjusted EBITDA for the same period was $242.1 million.

On December 19, 2013, less than thirty days after receipt of the PwC QOE reports, Jasper Parent, a newly-formed entity controlled by investment funds managed by Sycamore, and TJG entered into an Agreement and Plan of Merger (the "Merger Agreement"), whereby Jasper Parent agreed to buy TJG for $15 per share, resulting in a total purchase price of about $2.2 billion (at closing of the Merger Agreement, the total sources and uses were about $2.290 billion).

Also on December 19, 2013, Jasper Parent entered into three Purchase Agreements (collectively, the "Purchase Agreements") with three other newly-formed entities (the "Carve-Out Entities") controlled by investment funds managed by Sycamore. The Purchase Agreements provided that, concurrently with the closing of the Merger Agreement, Jasper Parent would sell the Stuart Weitzman, Kurt Geiger and Jones Apparel Group businesses operated by TJG to the Carve-Out Entities for a total of $641 million). Accordingly, the total $2.290 billion purchase price for TJG was allocated $1.649 billion to NWHI and $641 million to the Carve-Out Businesses.

Also on December 19, 2013, Sycamore and third-party underwriters (including, without limitation, Morgan Stanley, Jefferies, affiliates of KKR Financial, Wells Fargo and Bank of America) executed binding agreements whereby the underwriters committed to provide $1.175 billion of debt financing to NWHI, and Sycamore committed to fund a cash equity contribution of "not less than" $395 million to NWHI, and the underwriters and Sycamore committed to provide additional debt and equity for the $641 million combined purchase price for the Carve-Out Businesses. Sycamore's $395 million equity commitment was made by its inaugural, and at the time only, fund under management. The commitment letters expressly contemplated that the $250 million of 2034 Notes would remain outstanding obligations of NWHI. The commitment letters were issued in reliance on the fact that the total purchase price for TJG was allocated $1.649 billion to NWHI and $641 million to the Carve-Out Businesses. The underwriters conducted their own extensive diligence, including reviewing the PwC QOE reports and other information, before committing to provide debt financing to NWHI and to the Carve-Out Businesses.

As of December 19, 2013, the underwriters had not committed to provide, seek or raise any additional or further debt financing for NWHI that might have been used to reduce Sycamore's $395 million equity commitment for NWHI. Accordingly, on December 19, 2013, Sycamore was contractually committed to provide a cash equity contribution of "not less than" $395 million to NWHI that would have been junior and subordinate to $1.425 billion of indebtedness for borrowed money, consisting of: (a) the $1.175 billion of debt financing committed by the underwriters; and (b) the $250 million of 2034 Notes.

After the Merger Agreement, the Purchase Agreements and the commitment letters were executed on December 19, 2013, the underwriters and their advisors began preparing extensive materials and populating a data room so that the underwriters could take their committed debt financing to market. The debt marketing materials included, without limitation: (i) each dated February 14, 2014: (a) an over-sixty-page Confidential Information Memorandum for the Senior Secured Term Loan Facility, (b) an over-forty-page Public Lenders' Presentation and an accompanying public lenders' financial model that disclosed estimated 2013 operating results, which included both "preliminary and unaudited" pro forma adjusted 2013 EBITDA of $236 million as well as "preliminary and unaudited" adjusted 2013 EBITDA of $198 million and (c) a fifteen-page Private Lenders' Supplement and an accompanying private lenders' financial model that disclosed estimated 2013 operating results, which included both pro forma adjusted 2013 EBITDA of $236 million as well as adjusted 2013 EBITDA of $198 million; (ii) dated February 2014, an over-fifty-page Executive Summary Memorandum for Senior Secured Asset-Based Revolving Credit Facilities; (iii) dated February 2014, an over-twenty-page Confidential Summary for Public Investors on a $455 million Senior Unsecured Bridge Facility; (iv) dated March 6, 2014, a thirty-five-page Notice of Change of Control and Offer to Purchase all outstanding 2019 Notes for a cash payment in full plus a 1% premium; and (v) dated March 24, 2014, an over-140-page Offering Memorandum regarding an Offer to Exchange any and all old 2019 Notes for new higher interest rate 2019 Notes (the foregoing (i) through (v), collectively, the "<u>Lender Marketing Materials</u>").

On February 16, 2014, based on initial loan market feedback and the high level of interest in the offered Secured Term Loan Facility, Morgan Stanley asked Sycamore if it was interested in Morgan Stanley "doing some thinking" about possibly increasing NWHI's debt and reducing the amount of Sycamore's equity commitment. Sycamore indicated that this would be of interest. As a result of the overwhelming loan market demand for the offered NWHI loans, on March 4, 2014, Jasper Parent and the underwriters amended the debt financing commitment to provide for the marketing, on a best efforts basis, of a $300 million Unsecured Term Loan Facility which, if successfully syndicated, the first $25 million of proceeds of which would be used to reduce the size of the Secured Term Loan Facility from $470 million to $455 million, and the remaining $275 million of which would reduce the size of the Sponsor's equity commitment from $395 million to $120 million. The entire $300 million Unsecured Term Loan Facility was successfully syndicated prior to the April 8, 2014 closing of the Merger, and the Secured Term Loan Facility and the Sponsor's equity commitment were reduced as described above.

In addition to the Lender Marketing Materials, TJG also made extensive public filings regarding the Merger Agreement, the Carve-Out Transactions and the related debt and equity financings thereof to its existing and prospective public company investors, including to the holders of each of the 2019 Notes and the 2034 Notes. These public company investor materials included, without limitation:

(i) the Form 8-K filed on December 23, 2013, attaching the Merger Agreement. The recitals and Section 6.17 disclosed Sycamore's intent to "sell, assign and transfer each of the Jones Apparel Business, the Kurt Geiger Business and the Stuart Weitzman Business, in each case, to certain controlled Affiliates of [Sycamore]");

(ii) the Preliminary Proxy Statement filed on January 17, 2014, which disclosed: (a) that Jasper Parent intended to consummate the Carve-Out Transactions substantially concurrently with the consummation of the Merger and that immediately thereafter, NWHI's remaining businesses would be comprised of the Nine West footwear and accessories business and the Nine West jeanswear business (see Preliminary Proxy Statement pp. 3, 4, 16 and 106); (b) the $1.175 billion in debt financing committed by the underwriters for the NWHI business (see Preliminary Proxy Statement pp. 7, 8 and 73) and (c) that the $250 million of TJG's existing 2034 Notes would remain outstanding following the consummation of the Merger and the Carve-Out Transactions (see Preliminary Proxy Statement pp. 8, 75 and 105);

(iii) the Form 8-K filed on February 13, 2014, which disclosed that the debt financing commitment letter for NWHI had been amended to increase the amount of the Secured Term Loan Facility from $400 million to $470 million and to decrease the Unsecured Bridge Facility from $525 million to $455 million, and also providing, in the form of a chart, the pro forma capitalization of NWHI, adjusted for the completion of the Merger and the Carve-Out Transactions, including pro forma credit statistics indicating that the NWHI would have substantially higher leverage than that of the predecessor TJG business;

(iv) the Form 8-K filed on February 24, 2014, providing stand-alone audited financial statements for 2011 through 2013 for each of the NWHI business and the Stuart Weitzman business, together with other financial information disclosed to prospective lenders for each of the NWHI business and the Stuart Weitzman business;

(v) the Form 8-K filed on March 4, 2014, disclosing that, due to the overwhelming market demand for the Secured Term Loan Facility, the underwriters were taking to market, on a best efforts basis, an Unsecured Term Loan Facility in the amount of $300 million, which would be used to reduce the size of the Secured Term Loan Facility and reduce the size of the Sponsor's equity commitment from $395 million to $120 million;

(vi) the Definitive Proxy Statement filed on March 6, 2014, which disclosed: (a) that Jasper Parent intended to consummate the Carve-Out Transactions substantially concurrently with the consummation of the Merger and that immediately thereafter, NWHI's remaining businesses would be comprised of the Nine West footwear and accessories business and the Nine West jeanswear business (see Definitive Proxy Statement pp. 3, 4, 17 and 112); (b) that the Sponsor equity commitment would be reduced from $395 million to $120 million in the event of the successful syndication of the Unsecured Term Loan Facility (see Definitive Proxy Statement pp. 7 and 77); (c) the $1.150 billion in debt financing committed by the underwriters for the NWHI business and a description of the Unsecured Term Loan Facility to be marketed by the underwriters on a best efforts basis (see Definitive Proxy Statement pp. 7, 8, 9, 77, 78); (d) that the $250 million of TJG's existing 2034 Notes would remain outstanding following the consummation of the Merger and the Carve-Out Transactions (see Definitive Proxy Statement pp. 9, 80 and 110), and (e) that Jasper Parent intended to consummate at the effective time of the Merger the required change of control offer for the 2019 Notes, at the required offer price of 101% under the indenture for the 2019 Notes (see Definitive Proxy Statement pp. 9, 80 and 110);

(vii) the Form 8-K filed on March 7, 2014, announcing the upcoming change of control of TJG to the holders of the 2019 Notes and commencement of the offer to purchase such Notes at the required price of 101% (which offer was accepted by holders of approximately $4.7 million of the 2019 Notes, or approximately 1% of the aggregate then outstanding $400 million of 2019 Notes); and

(viii) the Form 8-K filed on March 24, 2014, announcing the offer to holders of the 6.875% 2019 Notes to exchange those outstanding notes for new 8.250% Notes due 2019, disclosing that the new exchanged 2019 Notes would be structurally subordinated to the new Secured Term Loan Facility and the new Unsecured Term Loan Facility, and also providing, in the form of a chart, the pro forma capitalization of the NWHI, adjusted for the completion of the Merger, the Carve-Out Transactions and the above exchange offer for the 2019 Notes, including disclosure of unaudited adjusted 2013 EBITDA of $198 million and unaudited pro forma adjusted 2013 EBITDA of $236 million, together with pro forma credit statistics indicating that the NWHI would have substantially higher pro forma leverage than that of the predecessor TJG business (the foregoing (i) through (viii), collectively, the "Public Investor Materials").

Explicitly through the Lender Marketing Materials and the Public Investor Materials, all existing and potential TJG and NWHI creditors (including, without limitation, the Secured Term Loan Lenders, the Unsecured Term Loan Lenders, the holders of the 2019 Notes and the holders of the 2034 Notes) were fully informed about: (i) the Carve-Out Transactions; (ii) the fact that independently-owned Sycamore affiliates would be the purchasers and owners of each of the Carve-Out Businesses; and (iii) the fact that NWHI's existing and newly-created debt obligations would not be guaranteed by, or be obligations of, the Carve-Out Businesses. Such information included open and transparent disclosures that: (i) concurrently with the closing of the Merger, Jasper Parent would transfer the Carve-Out Businesses to independently-owned and operated Sycamore affiliates for cash proceeds of $620 million that would be used to finance the Merger; (ii) following the closing of the Merger and the Carve-Out Transactions, NWHI would be the sole issuer and obligor under the 2019 Notes indenture and the 2034 Notes indenture; (iii) following the closing of the Carve-Out Transactions, the Carve-Out Businesses would not have any obligations with respect to any existing or newly-created indebtedness of NWHI; (iv) set forth the preliminary and unaudited adjusted 2013 EBITDA of $198 million and the preliminary and unaudited pro forma adjusted 2013 EBITDA of $236 million, with detail on the nature of the pro forma cost savings included in the pro forma adjusted EBITDA amount; and (v) set forth detail on the pro forma debt and equity capitalization of NWHI, including the fact that the Total Debt/Pro Forma Adjusted EBITDA figure of 6.2x was significantly higher than that of the predecessor TJG entity.

KE 52165855

(c)        The Market Spoke on Solvency.

The enthusiasm of the market provides compelling evidence of solvency. Specifically, the underwriters committed to fund $1.175 billion to NWHI, that commitment was fully syndicated to sophisticated institutional debt investors, and the underwriters marketed and syndicated an additional $300 million Unsecured Term Loan Facility to sophisticated institutional debt investors. Market enthusiasm for the Secured Term Loan Facility was so great that it was oversubscribed by a factor of four times (4.0x). All existing and prospective TJG and NWHI creditors were informed that the sale of the Unsecured Term Loan Facility would reduce the committed Secured Term Loan Facility and would reduce the Sponsor's committed equity. Nonetheless, the Unsecured Term Loan Facility was oversubscribed by a factor of two and one-half times (2.5x). Sophisticated bondholders with extensive diligence materials available to them (i) elected to put back to TJG, at the required change of control offer price of 101% of par, only $4.7 million of the $400 million of 2019 Notes, (ii) exchanged their existing 6.875% 2019 Notes (except for Stub 2019 Notes) for new, 8.250% 2019 Notes of NWHI, rather than accept the offer to put them to NWHI at 101% of par and (iii) elected to maintain their investment in the 2034 Notes (which traded up from $80.75 as of November 23, 2013 (the date of the first press reports indicating that Sycamore was in talks with TJG) to $85 as of April 30, 2014 (shortly following the consummation of the 2014 Transaction)), despite having had ample opportunity to sell them in the open market with full knowledge that NWHI would have substantially more leverage than the predecessor TJG entity and that their Notes would be structurally subordinated to approximately $1 billion in new revolving credit and term debt. All of these NWHI creditors affirmatively elected to make a new investment in NWHI's indebtedness, or elected to continue their existing investment in TJG/NWHI, with full disclosure of the fact that none of NWHI's existing or new indebtedness for borrowed money would be obligations of, or guaranteed by, any of the Carve-Out Businesses. Lastly, sophisticated private equity investors at Sycamore and KKR funded a total equity check of $120 million into NWHI behind approximately $1.5 billion of funded debt.

(d)        Post Transaction Matters.

On April 23, 2014 (following the April 8, 2014 closing of the Merger and the Carve-Out Transactions), sophisticated institutional debt investors purchased an additional $60 million of structurally subordinated 8.250% 2019 Notes of NWHI (the proceeds of which were used to reduce revolving credit borrowings incurred as of the closing of the Merger).

Operating performance, not leverage, caused NWHI to seek Chapter 11 relief. Sales declined over 35% since 2015, due to macro retail trends, brand deterioration, customer shifts, and missteps in responding to industry and customer shifts, which missteps included quality problems, lack of fashion-forward products, design misses and production mistakes. The unprecedented systemic economic headwinds affecting many brick-and-mortar retailers (including certain of the Debtors' largest customers) significantly and adversely impacted the operating performance of NWHI's footwear and handbag businesses. NWHI's global businesses faced strong headwinds as the macro retail environment in Asia, the Middle East, and South America became challenged. This was compounded by a difficult department store environment in the United States and NWHI's operation of its own unprofitable retail network. Notably, at the time of the 2014 Transaction, the market was not predicting such a significant downturn in retail business. On the contrary, the market was projecting growth, and in a number of cases significant growth, for many businesses comparable to NWHI.

Notwithstanding the challenges to operating performance, during the period from the 2014 Transaction through the Petition Date (nearly four years), the Debtors operated in the ordinary course of business, were current on payments to their employees, trade creditors, taxing authorities and landlords, were not in default (taking account all applicable grace periods) in payments on account of their funded debt obligations, and did not receive a "going concern qualification" in any of their audited financial statements. Specifically, during that four year period, the Debtors paid: (i) $98 million to the Secured Term Loan Lenders; (ii) $72 million to the Unsecured Term Loan Lenders; (iii) $128 million to the holders of the 2019 Notes; and (iv) $61 million to the holders of the 2034 Notes. Furthermore, at no time prior to the Petition Date did any creditor bring any action seeking to avoid or set aside the 2014 Transaction, the Carve-Out Transactions or any of the debt or equity financings related thereto.

(e)   Some Legal Principles.

Bankruptcy Courts are courts of equity. Fraudulent conveyance law is remedial, not punitive. Fraudulent conveyance law is intended, in accordance with its remedial purpose, to restore parties to the positions they would have been in if the challenged transactions had not occurred. Creditors should not receive an inequitable windfall based upon the mere happenstance of bankruptcy. Fraudulent conveyance law should not be used to transform a non-recourse loan into a recourse loan or to provide creditors an after-the-fact insurance policy or guaranty. This is especially true with respect to creditors who had knowledge of and approved the challenged transactions and who did not seek to set aside the transactions prior to bankruptcy.

Compromises are favored in bankruptcy and courts may approve fair and equitable settlements. The court need not decide all the underlying questions of fact and law in approving a settlement; rather, it is enough for the court to canvass the issues. The court is not required to conduct a "mini-trial" in order to approve a settlement. When reviewing a settlement, the court should give weight to the debtor's business judgment.

(f)   The UCC's Theory of the Case Defies Logic and Common Sense.

The UCC's case defies logic, common sense, substantial contemporaneous direct evidence, and reasonable inferences that can be drawn from that evidence. The Standing Motion and Standing Complaint leave out key facts and metrics that rebut the UCC's theories. The UCC's case hinges upon the argument that Sycamore intentionally overvalued NWHI by hundreds of millions of dollars and undervalued the Carve-Out Businesses by the same amount. The UCC's contends that Sycamore paid NWHI $641 million for the Carve-Out Businesses, but "knew" those businesses were worth at least $953 million. The UCC contends that Sycamore "knew" that NWHI was worth "no more than" $1.1 billion. On December 19, 2013, however, Sycamore committed to fund $395 million of equity that was subordinated to the underwriters' $1.175 billion of committed debt financing and to the $250 million of existing 2034 Notes.

When the $395 million equity check was committed by Sycamore in December 2013, there was no obligation or commitment to raise additional debt to reduce that amount. Furthermore, in December 2013, Sycamore and the underwriters had already allocated the Merger Agreement purchase price to NWHI, for $1.649 billion, and to the Carve-Out Entities, for $641 million. What the UCC calls "valuations" were, instead, ongoing, internal Sycamore "what if" diligence modeling exercises testing different assumptions and inputs. Finally, the UCC ignores evidence proving that Sycamore had logical and specific reasons for assigning serious risks to each of the Carve-Out Businesses, which identified risks supported Sycamore's purchase price allocations.

To credit the UCC's theories on actual fraud, constructive fraud and breach of fiduciary duty, a finder of fact would have to conclude that: (i) in December 2013, although Sycamore "knew" that NWHI was worth only $1.1 billion, Sycamore committed to invest $395 million of equity from its inaugural fund, which equity was instantly out of the money and worth nothing because it was subordinated to $1.425 billion of committed and funded debt; (ii) in December 2013, Sycamore knowingly risked $395 million from its inaugural fund to potentially earn a return on the $175 million of equity that Sycamore committed to invest in the Carve-Out Businesses; (iii) in December 2013, the underwriters committed $1.175 billion of debt financing to an insolvent entity; and (iv) in April 2014, although Sycamore "knew" that NWHI was worth only $1.1 billion, Sycamore (with KKR) invested $120 million of equity that was instantly out of the money and worth nothing because it was subordinated to $1.425 billion of committed and funded debt. No such findings could be made given the undisputed factual chronology, common sense and logic. To the contrary, Sycamore believed that the $120 million equity investment into NWHI was going to be a highly profitable investment.

(g)   There Are no Valid Claims for Constructive Fraudulent Conveyance.

The 2014 Transaction and the Carve-Out Transactions cannot be avoided because substantial evidence establishes that NWHI was solvent when the transactions occurred. First, market evidence clearly points to solvency. In 2013 and 2014, all new and existing creditors of TJG and NWHI had full and fair disclosure of all relevant facts surrounding the 2014 Transaction before deciding to make new or continuing their existing debt investments in NWHI. The Standing Complaint contends that NWHI only was worth $1.1 billion, yet NWHI incurred about $1.5 billion of debt through an open and transparent market process and Sycamore and KKR made an

67

equity investment of $120 million. Sophisticated institutions and investors would not have invested hundreds of millions of dollars of debt and equity into an enterprise that they knew or suspected would be insolvent upon inception.

Second, the UCC's theory that Sycamore manipulated financial information to dupe or defraud sophisticated investors ignores contrary facts and evidence. The UCC alleges that Sycamore increased its "valuation" of NWHI without basis, yet the PwC QOE report for the businesses that comprised NWHI fully supported Sycamore's purchase price allocation metrics and contemporaneous evidence from the market, including a survey of comparable companies, showed a cautious, but still optimistic, view of revenue projections. Further, while the UCC contends, without elaborating further, that information provided to investors was "misleading," the Lender Marketing Materials and the Public Investor Materials set forth extensive information regarding: (i) TJG and NWHI; (ii) historical business operations; (iii) future plans for the business; (iv) the Carve-Out Transactions; and (v) potential future operational and financial risks.

In addition, the Standing Complaint devotes much time to various criticisms of the Duff & Phelps' solvency opinion, specifically its discounted cash flow analysis. To begin with, the solvency opinion, which was issued just before the 2014 Transaction closed, was not relied upon by any creditor in making its decision to invest in NWHI's debt. Moreover, the UCC's criticisms consist largely of attempts to poke holes in the Duff & Phelps analysis by changing one input without changing anything else. The Duff & Phelps opinion used financial growth models that were in line with or conservative as compared to available market data at that time. The UCC's hindsight analysis does nothing to weaken the Duff & Phelps discounted cash flow analysis done at the time of the transaction. Put simply, using accepted practices, Duff & Phelps concluded that NWHI was solvent based a discounted cash flow analysis, a Selected Public Company Analysis, and a Selected M&A Transaction Analysis. The UCC ignores that independent, contemporaneous analyses done by other experts also concluded that NWHI was solvent and that even if, for the sake of argument, the Duff & Phelps opinion was flawed, no market participants relied on it in coming to their own conclusions. These independent market participants used their own inputs and valuation methodologies to determine whether to invest in NWHI's indebtedness.

In sum, the UCC fraudulent conveyance claims must fail because insolvency cannot be established.

Additionally, the Carve-Out Transactions cannot be avoided due to the safe harbor set forth in section 546(e) of the Bankruptcy Code. Here, the Carve-Out Transactions were set forth in Purchase Agreements between Jasper Parent and the Carve-Out Entities. The UCC seeks to avoid the transfers of the Carve-Out Businesses from Jasper Parent (or from NWHI) to the Carve-Out Entities. Section 546(e) of the Bankruptcy Code provides, in pertinent part, that: "the trustee may not avoid a transfer . . . that is a transfer made by or to (or for the benefit of) a . . . financial participant . . . in connection with a securities contract." Jasper Parent falls within the plain meaning of the defined term "financial participant". The Merger Agreement and the Purchase Agreements fall within the plain meaning of the defined term "securities contracts". When evaluating the safe harbor of section 546(e) of the Bankruptcy Code, courts should apply the plain meaning of defined terms used in the statute. The transfer of the Carve-Out Businesses was made by or for the benefit of a financial participant in connection with securities contracts. Accordingly, all fraudulent conveyance claims are barred by the safe harbor of section 546(e) of the Bankruptcy Code.

      (h)    Breach of Fiduciary Duty Claims Are Barred by the Statute of Limitations and Otherwise Lack Merit.

A three-year statute of limitations bars each of the UCC's breach of fiduciary duty claims relating to the 2014 Transaction and the Carve-Out Transactions. Delaware has a three-year statute of limitations and New York applies a three-year statute of limitations to claims seeking a legal remedy, which is the remedy sought here. Therefore, the claims are barred because the alleged breach of fiduciary duty occurred in December 2013, when Jasper Parent (a Delaware corporation) signed the Purchase Agreements for the sales of the Carve-Out Businesses, or, at the latest, when the 2014 Transaction closed.

But even if the UCC could somehow get around the applicable statute of limitations, no duty was owed or breached. In December 2013, Jasper Parent, a party to the Merger Agreement and Purchase Agreements, had no creditors or other obligations. It owed no duties to its subsidiaries, which were newly-formed entities with no assets

or liabilities. It had no operations and conducted no business. In any event, the 2014 Transaction and the Carve-Out Transactions were fully disclosed and known to all existing and prospective creditors of each of TJG and NWHI. Full disclosure defeats any claim for breach of fiduciary duty even if such claim could survive the statute of limitations bar.

        (i)       There Are no Valid Claims for Actual Fraud.

Any claims based upon actual intent to hinder delay or defraud creditors cannot be squared with the voluminous, contemporaneous, public disclosures regarding all aspects and risks of the 2014 Transaction and the Carve-Out Transactions set forth in the Lender Marketing Materials and the Public Investor Materials. Here, numerous, sophisticated and independent market participants were involved in the transactions and conducted or could have conducted their own diligence. Unlike cases where an actual fraudulent conveyance is found, the transactions here were consummated after thorough public disclosure, not under cover of darkness. The transfers were not secret or hasty, they were conducted in the ordinary course of business, and all parties were represented by competent and knowledgeable legal and financial advisors. Moreover, the entire fraud theory is premised on the supposed intentional overvaluing of NWHI and undervaluing of the Carve-Out Businesses. As discussed above, those "values" were completed and fixed on December 19, 2013 in the Merger Agreement, the Purchase Agreements and the debt and equity commitment letters. It defies logic and common sense to contend that Sycamore would attempt to hinder, delay and defraud creditors, while at the exact same time committing nearly $400 million of equity from its inaugural fund that it supposedly "knew" was instantly out of the money and worthless.

        (j)       If There Is Liability, and There Is Not, Damages Would Be Far Less than $1 Billion.

Although the UCC contends that Sycamore paid $641 million for the Carve-Out Businesses that had an April 8, 2014 value of $953 million, it then argues that Sycamore should pay the estates "over $1 billion". The UCC's $1 billion claim is punitive, not remedial. Such a claim would bestow an inequitable windfall, resulting from the mere happenstance of bankruptcy, on funded debt holders that: (i) had full knowledge of the now-challenged transactions; (ii) approved of and participated in those transactions; (iii) never challenged those transactions; and (iv) were paid hundreds of millions of dollars in connection with those transactions. Sycamore should not be subjected to punitive damages for the benefit of sophisticated institutional investors (or their successors who purchased claims at pennies on the dollar), thereby converting fraudulent conveyance law into an insurance policy for creditors.

With respect to damages, if all complete defenses (including, without limitation, solvency, section 546(e) of the Bankruptcy Code and statute of limitations) are resolved against the Sponsor and Minority Equity Holders (and they should not be), any damage award: (i) in the first instance, should not exceed $250 million, representing the amount of 2034 Notes, as the holders of the 2034 Notes were the only holders of NWHI indebtedness that did not provide new money financing for the 2014 Transaction (the Secured Term Loan Lenders and the Unsecured Term Loan Lenders provided new money financing and the holders of the 2019 Notes elected to exchange their notes instead of accepting payment in full in cash at 101% of par); (ii) alternatively, should not exceed $312 million (the "value" that NWHI "lost" from the Carve-Out Transactions based upon the UCC's allegation that the present value of the Carve-Out Businesses was $953 million and the purchase price at closing was $641 million); or (iii) alternatively, should not exceed $316 million, which represents the "net" amount of proceeds that the Equity Holders obtained as a result of the 2014 Transaction ($611 million minus $295 million equity invested – See, Revised Disclosure Statement [DI # 783], page 37). Finally, the Sponsor is entitled to an indemnification claim in an amount equal to any damage award, which would reduce any amount that might have to be paid. Accordingly, even if the Sponsor's and Minority Equity Holders' complete defenses are substantially discounted (and they should not be), the proposed Equity Holders Settlement, providing well in excess of $105 million of value to the Debtors' estates, manifestly is fair and reasonable.

        (k)       The Waiver of the Jones Apparel Working Capital Adjustment Is Not Actionable.

The UCC argues that the decision to waive the working capital adjustment in the Purchase Agreement for Jones Apparel was a breach of contract and a breach of fiduciary duty on the part of NWHI's directors. It was neither. There was no breach of contract because the Purchase Agreement was amended to waive the working

KE 52165855

capital adjustment.  Moreover, putting aside the bar of the statute of limitations and even assuming, arguendo, that an amount was due and owing on account of any working capital adjustment (which Sycamore does not concede due to, among other things, GAAP required adjustments), there was no breach of fiduciary duty for at least two reasons. First, there is no evidence that NWHI was insolvent in July 2014, when the decision to waive the working capital adjustment was made.  If NWHI was solvent, then there was no breach of the duty of loyalty.  Second, if NWHI was insolvent in July 2014, the UCC would have to prove that the decision to waive the working capital adjustment was unfair to NWHI.  Apart from pointing to the terms of the Purchase Agreement that were waived, there is no such evidence.  It was perfectly reasonable, and not a breach of loyalty, for Sycamore to reassess the pre-closing contract terms between NWHI and Jones Apparel after the 2014 Transaction had closed and determine that they should be amended based on circumstances as they existed at the time, provided they made a good faith determination that doing so would not be unfair to NWHI.  That good faith determination was made with respect to the decision to waive the working capital adjustment, including by confirming that the amount of NWHI's working capital post-closing did not materially vary from its historical average.

        (l)       The Worthless Stock Deduction Does Not Result in Either Liability or Damages Against Sycamore.

The right to take the Worthless Stock Deduction was a statutory right and asset of taxpayer Topco.  Under Delaware law, Topco does not owe fiduciary duties to its subsidiaries or their creditors; therefore, it could not have breached such a duty by taking the Worthless Stock Deduction.  In any event, the Worthless Stock Deduction now has been reversed and unwound.  Accordingly, the Debtors have not suffered and are not entitled to any damages related to that claim.

        (m)      The Belk Letter Does Not Result in Either Liability or Damages.

The possibility that Belk could cease doing future business with the Debtors was entirely foreseeable.  Belk had no contract with the Debtors obligating Belk to purchase future products from the Debtors.  The Debtors' disclosed in their first day pleadings that Belk was a key customer of the Debtors, that the Debtors and Belk had common board members, and that Belk was a Sycamore portfolio company.  The Debtors' creditors announced in open court that they would be the new owners of reorganized NWHI and that they would create a litigation trust to sue Belk's owner and other Sycamore defendants.  If Belk conducted future business with reorganized NWHI, Belk would in essence fund litigation against its owner and other Sycamore defendants.  It was in Belk's owner's and the other Sycamore defendants' economic interests to notify the Debtors that Belk would cease doing future business with the Debtors in the event that the creditors pursued a plan whose central feature contemplated a litigation trust. In addition, even if the mere writing of the Belk letter gave rise to liability, and it did not, any damages resulting from the writing of the letter would be speculative and extremely difficult to prove.  Here, Belk fulfilled all of its contractual obligations to the Debtors.

Moreover, no fiduciary duty could have been breached, because the common board members, Messrs. Kaluzny and Morrow, attended no NWHI board meetings after the Petition Date and resigned their positions on the NWHI board before the decision was made that Belk would cease doing future business with the Debtors.  The decision that Belk should not do future business with the Debtors was not based on any information Messrs. Kaluzny and Morrow gained as members of the NWHI board, but rather on the very public facts that Belk was a customer of the Debtors, that Belk was owned by Sycamore, and that the Debtors' creditors announced in Court a plan, the lynchpin of which was litigation against Sycamore, Belk's owner.

Finally, the Belk letter has now been retracted and Belk has entered into a written contract obligating Belk to purchase product from the Debtors, an arrangement that the Debtors do not have with any of their other customers (all of whom conduct business with the Debtors, at their discretion, on a purchase order basis).  The Belk business has not been "restored", it has been materially improved.  Put simply, the Debtors are better off now with the written Belk agreement than they were at any time in the past, because they now have an agreement obligating Belk to purchase product from the Debtors whereas before Belk had no such obligation.  Accordingly, the Debtors have not suffered and are not entitled to any damages relating to the Belk letter.

(n)    The Equity Holders Settlement Is Demonstrably Fair, Reasonable and Should Be Approved.

The Sponsor contends that: (i) the claims set forth in the Standing Complaint lack merit and are subject to multiple complete defenses; (ii) the UCC's theory of the case defies logic and common sense; and (iii) the Standing Complaint completely ignores, among other things, the December 2013 debt and equity commitments, the extensive information supplied to existing and prospective creditors of TJG and NWHI, and key metrics that supported Sycamore's internal purchase price allocations.  A $2.2 billion transaction involves months of internal and external diligence, which iterative process informs the parties in their negotiations on price, financing and structure.

The Sponsor further contends that the entirety of the consideration realized by the Debtors in the Equity Holders Settlement (comprised of a $105 million cash payment, reversal of the Worthless Stock Deduction and a three year supply agreement with Belk) is fair, reasonable and significantly exceeds the lowest point in the range of reasonable settlements.  There are strong complete defenses that could result in the alleged claims against the Sponsor and Minority Equity Holders being worth nothing.  Damages would never approach $1 billion.  Litigation of claims against the Sponsor and Minority Equity Holders by the Debtors could cost well in excess of an additional $50 million.  Additionally, any litigation of those claims would be lengthy (likely lasting at least two years), complex, challenging and risky.

Under section 1123(b)(3)(A), a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  Settlements are appropriate in a chapter 11 plan when they constitute a "valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate."  *In re DBSD N. Am.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009).  Here, the Equity Holders Settlement was entered into after extensive, hard fought, arms-length negotiations among the Sponsor, on the one hand, and the Independent Directors, the Ad Hoc Crossover Term Lender Group, and Brigade, on the other hand.

R.    *Mediation.*

At a status conference held on October 30, the Bankruptcy Court expressed concern at the increasingly contentious tenor of these chapter 11 cases (in particular around the proposed Plan) and ordered the Debtors and other significant stakeholders to seek mediation before the Honorable Judge James M. Peck (ret.) regarding all aspects of the Plan.  All parties in interest are to participate in the mediation, and the Debtors and other case parties are working to schedule dates for mediation before Judge Peck.  The Mediation Order was entered on November 9, 2018.  The Debtors have entered into mediation in full hopes of developing greater consensus surrounding a chapter 11 plan.  At the same time, because the Debtors firmly believe that the proposed Plan offers the only viable path forward that maximizes the value of the Debtors' assets and provides the greatest opportunity for the Debtors' successful emergence from chapter 11, the Debtors will continue to seek confirmation of the proposed Plan while engaging in parallel mediation.

## ARTICLE VI.
## SUMMARY OF THE PLAN

This section provides a summary of the structure and means for implementation of the Plan, the settlements contemplated therein, and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other

71

parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.     *Treatment of Unclassified Claims.*

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.     DIP Claims.

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, and expenses.

Except to the extent that a holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Loan Claim, each such holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash of such holder's Allowed DIP Term Loan Claim on the Effective Date.

Except to the extent that a holder of an Allowed DIP ABL/FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL/FILO Claim, each such holder of an Allowed DIP ABL/FILO Claim shall receive indefeasible payment in full in Cash of such holder's Allowed DIP ABL/FILO Claim on the Effective Date. As used in this paragraph "payment in full in Cash" shall mean the indefeasible payment in full in Cash of all DIP ABL/FILO Claims (including all fees and expenses of the DIP ABL/FILO Agent through the Effective Date), the cancellation, backing, or cash collateralization of letters of credit under the DIP ABL/FILO Facility in accordance with the terms of the DIP ABL/FILO Documents, the termination of the DIP ABL/FILO Agent's and DIP ABL/FILO Lenders' obligation to extend credit under the DIP ABL/FILO Facility, and the receipt by the DIP ABL/FILO Agent of a countersigned payoff letter in form and substance satisfactory to the DIP ABL/FILO Agent. The ABL/FILO DIP Liens (as defined in the DIP Order) shall not be released until the satisfaction of the DIP ABL/FILO Claims in accordance with Article II.A of the Plan.

Immediately upon receipt of the payments required in Article II.A of the Plan, and except with respect to the Contingent DIP Term Loan Obligations and Contingent DIP ABL Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Term Loan Documents or the DIP ABL/FILO Documents, as applicable, as provided below), the DIP Documents shall be deemed cancelled, all Liens on property of the Debtors or the Reorganized Debtors, as applicable, arising out of such DIP Documents shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agents or the DIP Lenders and all guarantees of the Debtors or Reorganized Debtors, as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. The DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Contingent DIP Term Loan Obligations and the Contingent DIP ABL Obligations shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order, and (ii) the DIP Facilities and the DIP Documents shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (1) the Contingent DIP Term Loan Obligations and the Contingent DIP ABL Obligations and (2) the relationships among the DIP Agents and the DIP Lenders, as applicable, including those provisions relating to the rights of the DIP Agents and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof. After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agents and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facilities in accordance with the terms thereof and/or the DIP Order. The

Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agents or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

2.    Administrative Claims.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (after consultation with the Requisite Term Loan Lenders) or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims, must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, the Debtors' or Reorganized Debtors' property, or the Estates, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    Statutory Fees.

Each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors) shall pay all U.S. Trustee quarterly fees pursuant to section 1930(a)(6) of the Judicial Code, together with any interest thereon pursuant to 31 U.S.C. § 3717, on or before the Effective Date in Cash, based on disbursements in and outside the ordinary course of the Debtors' business and Plan payments.  Thereafter, U.S. Trustee quarterly fees and any applicable interest shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) until the earlier of entry of a final decree closing such Chapter 11 Case or an order of dismissal or conversion, whichever occurs first.

4.    Payment of Fees and Expenses under DIP Order.

On the later of (1) the Effective Date and (2) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses, and disbursements of the DIP Agents and DIP Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the applicable DIP Order.

KE 52165855

All payments of fees, expenses, or disbursements pursuant to Article II.C of the Plan shall be subject in all respects to the terms of the DIP Order.

     5.      <u>Professional Fee Claims</u>.

     (a)      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

     (b)      Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

     (c)      Professional Fee Escrow Amount.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided, however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, provided that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

     (d)      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses

related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors and Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

6.    <u>Priority Tax Claims</u>.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. Solely to the extent required by the Bankruptcy Code, Allowed Priority Tax Claims will be paid with interest at the applicable non-default rate under non-bankruptcy law.

B.    *Classification and Treatment of Claims and Interests*.

1.    <u>Classification of Claims and Interests</u>.

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F of the Plan. For all purposes under the Plan, each Class will contain sub Classes for each of the Debtors, except that (1) Class 5B, Class 5C, and Class 5D shall be vacant at each Debtor other than NWHI, (2) Class 5E shall be vacant at each Debtor other than Nine West Development LLC, (3) Class 5F shall be vacant at each Debtor other than Nine West Management Service LLC, (4) Class 5G shall be vacant at each Debtor other than Nine West Distribution LLC, (5) Class 5H shall be vacant at each Debtor other than One Jeanswear Group Inc., (6) Class 5I shall be vacant at each Debtor other than Kasper Group LLC, (7) Class 5J shall be vacant at each Debtor other than Jasper Parent, Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, and (8) Class 7 shall be vacant at each Debtor other than Holdings.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 5A | Unsecured Term Loan Claims | Impaired | Entitled to Vote |
| 5B | 2034 Notes Claims | Impaired | Entitled to Vote |
| 5C | 2019 Notes Claims | Impaired | Entitled to Vote |
| 5D | General Unsecured Claims against NWHI | Impaired | Entitled to Vote |
| 5E | General Unsecured Claims against Nine West Development LLC | Impaired | Entitled to Vote |
| 5F | General Unsecured Claims against Nine West Management Service LLC | Impaired | Entitled to Vote |
| 5G | General Unsecured Claims against Nine West Distribution LLC | Impaired | Entitled to Vote |
| 5H | General Unsecured Claims against One Jeanswear Group Inc. | Impaired | Entitled to Vote |
| 5I | General Unsecured Claims against Kasper Group LLC | Impaired | Entitled to Vote |
| 5J | General Unsecured Claims against Non-Operating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Interests in Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

2.      Treatment of Claims and Interests.

Subject in all respects to the Plan, and to the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification and treatment of Allowed Claims and Allowed Interests is set forth below.

1.      Class 1 - Other Priority Claims

(a)      *Classification:*  Class 1 consists of all Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim and the applicable Debtor (after consultation with the Requisite Term Loan Lenders) or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Priority Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

76

> > (i) payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or
> >
> > (ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.
>
> (c) *Voting*: Class 1 is Unimpaired under the Plan. Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan.

2. Class 2 - Other Secured Claims

> (a) *Classification*: Class 2 consists of all Other Secured Claims.
>
> (b) *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim and the applicable Debtor (after consultation with the Requisite Term Loan Lenders) or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Secured Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:
>
> > (i) payment in full in Cash of the unpaid portion of such holder's Allowed Other Secured Claim on the later of the Effective Date and such date such Other Secured Claim becomes an Allowed Other Secured Claim;
> >
> > (ii) Reinstatement of such holder's Allowed Other Secured Claim;
> >
> > (iii) the applicable Debtor's interest in the collateral securing such holder's Other Secured Claim; or
> >
> > (iv) such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired.
>
> (c) *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan.

3. Class 3 - Secured Tax Claims

> (a) *Classification*: Class 3 consists of all Secured Tax Claims.
>
> (b) *Treatment*: Except to the extent that a holder of an Allowed Secured Tax Claim and the applicable Debtor or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Secured Tax Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:
>
> > (i) payment in full in Cash of the unpaid portion of such holder's Allowed Secured Tax Claim on the later of the Effective Date and such date such Secured Tax Claim becomes an Allowed Secured Tax Claim; or

77

(ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Reorganized Debtors to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c) *Voting:*  Class 3 is Unimpaired under the Plan.  Each holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of a Secured Tax Claim is not entitled to vote to accept or reject the Plan.

4. Class 4 - Secured Term Loan Claims

(a) *Classification*:  Class 4 consists of all Secured Term Loan Claims.

(b) *Allowance*:  On the Effective Date, the Secured Term Loan Claims shall be Allowed in an aggregate amount equal to $432,798,741, plus interest at the non-default rate, fees, costs, charges, and other Secured Term Loan Claims arising under the Secured Term Loan Documents (with any interest accruing at the non-default rate) accruing after the Petition Date up to and including the Effective Date, which Allowed amount does not reflect (i) the Secured Term Loan 363 Sale Payment and (ii) the Secured Term Loan DIP Order Payments.

(c) *Treatment:*  On the Effective Date, except to the extent that a holder of an Allowed Secured Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Term Loan Claim, each holder of an Allowed Secured Term Loan Claim shall receive payment in full in Cash of the unpaid portion of its Allowed Secured Term Loan Claim.

(d) *Voting:*  Class 4 is Impaired under the Plan.  Holders of Secured Term Loan Claims are entitled to vote to accept or reject the Plan.

5. Class 5A - Unsecured Term Loan Claims

(a) *Classification*:  Class 5A consists of all Unsecured Term Loan Claims.

(b) *Allowance*:  On the Effective Date, the Unsecured Term Loan Claims shall be Allowed in an aggregate amount equal to $305,099,461.

(c) *Treatment:*  Except to the extent that a holder of an Allowed Unsecured Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Term Loan Claim, each such holder of an Allowed Unsecured Term Loan Claim shall receive its Pro Rata share of:

(i) 92.5% of the New Common Stock, (x) subject to decrease for the Financing Distribution Decrease, (y) subject to dilution by the Management Incentive Plan and the New Warrants;

(ii) 33.33% of the Cash from the Equity Holders Settlement Proceeds; and

(iii) the UTL Financing Cash Pool, if applicable.

(d)      *Voting:* Class 5A is Impaired under the Plan.  Holders of Unsecured Term Loan Claims are entitled to vote to accept or reject the Plan.

6.      Class 5B - 2034 Notes Claims

(a)      *Classification*:  Class 5B consists of all 2034 Notes Claims.

(b)      *Allowance*:  On the Effective Date, the 2034 Notes Claims shall be Allowed in an aggregate amount equal to $255,997,396.

(c)      *Treatment:* Except to the extent that a holder of an Allowed 2034 Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 2034 Notes Claim, each such holder of an Allowed 2034 Notes Claim shall receive its Pro Rata share (based on the aggregate amount of (A) Allowed Claims in Classes 5B and 5C, and (B) the estimated Allowed Claims in Class 5D) of:

(i)      6.981%% of the New Common Stock, (A) subject to increase for the Financing Distribution Increase, and (B) subject to dilution by the Management Incentive Plan and the New Warrants;

(ii)      66.67% of the Cash from the Equity Holders Settlement Proceeds, which amount is subject to Pro Rata reduction on account of the NWHI Administrative Expense Allocation; and

(iii)      the New Warrants.

(d)      *Voting:* Class 5B is Impaired under the Plan.  Holders of 2034 Notes Claims are entitled to vote to accept or reject the Plan.

7.      Class 5C - 2019 Notes Claims

(a)      *Classification*:  Class 5C consists of all 2019 Notes Claims.

(b)      *Allowance*:  On the Effective Date, the 2019 Notes Claims shall be Allowed in an aggregate amount equal to $476,002,016.

(c)      *Treatment:*  Except to the extent that a holder of an Allowed 2019 Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 2019 Notes Claim, each such holder of an Allowed 2019 Notes Claim shall receive its Pro Rata share (based on the aggregate amount of (A) Allowed Claims in Classes 5B and 5C, and (B) the estimated Allowed Claims in Class 5D) of:

(i)      6.981% of the New Common Stock, (A) subject to increase for the Financing Distribution Increase, and (B) subject to dilution by the Management Incentive Plan and the New Warrants;

(ii)      66.67% of the Cash from the Equity Holders Settlement Proceeds, which amount is subject to Pro Rata reduction on account of the NWHI Administrative Expense Allocation; and

(iii)      the New Warrants.

KE 52165855

(d)     *Voting:* Class 5C is Impaired under the Plan.  Holders of 2019 Notes Claims are entitled to vote to accept or reject the Plan.

8.     <u>Class 5D - General Unsecured Claims against NWHI</u>

(a)     *Classification:*  Class 5D consists of all General Unsecured Claims against NWHI.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5D agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5D, each such holder of an Allowed General Unsecured Claim in Class 5D shall receive its Pro Rata share (based on the aggregate amount of (A) Allowed Claims in Classes 5B and 5C, and (B) the estimated Allowed Claims in Class 5D) of:

(i)     6.981% of the New Common Stock, (A) subject to increase for the Financing Distribution Increase, and (B) subject to dilution by the Management Incentive Plan and the New Warrants;

(ii)     66.67% of the Cash from the Equity Holders Settlement Proceeds, which amount is subject to Pro Rata reduction on account of the NWHI Administrative Expense Allocation; and

(iii)     the New Warrants.

(c)     *Voting*:  Class 5D is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5D are entitled to vote to accept or reject the Plan.

9.     <u>Class 5E - General Unsecured Claims against Nine West Development LLC</u>

(a)     *Classification:*  Class 5E consists of all General Unsecured Claims against Nine West Development LLC.

(b)     *Treatment:*  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5E agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5E, each such holder of an Allowed General Unsecured Claim in Class 5E shall receive its Pro Rata share of 0.039% of the New Common Stock from the GUC Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

(c)     *Voting:*  Class 5E is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5E are entitled to vote to accept or reject the Plan.

10.     <u>Class 5F - General Unsecured Claims against Nine West Management Service LLC</u>

(a)     *Classification*:  Class 5F consists of all General Unsecured Claims against Nine West Management Service LLC.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5F agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5F, each such holder of an Allowed General Unsecured Claim in Class 5F shall receive its Pro Rata share of 0.147% of the New Common Stock from the GUC Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

KE 52165855

(c)     *Voting*:  Class 5F is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5F are entitled to vote to accept or reject the Plan.

11.     <u>Class 5G - General Unsecured Claims against Nine West Distribution LLC</u>

(a)     *Classification:*  Class 5G consists of all General Unsecured Claims against Nine West Distribution LLC.

(b)     *Treatment:*  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5G agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5G, each such holder of an Allowed General Unsecured Claim in Class 5G shall receive its Pro Rata share of 0.002% of the New Common Stock from the GUC Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

(c)     *Voting:*  Class 5G is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5G are entitled to vote to accept or reject the Plan.

12.     <u>Class 5H - General Unsecured Claims against One Jeanswear Group Inc.</u>

(a)     *Classification:*  Class 5H consists of all General Unsecured Claims against One Jeanswear Group Inc.

(b)     *Treatment:*  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5H agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5H, each such holder of an Allowed General Unsecured Claim in Class 5H shall receive its Pro Rata share of 0.221% of the New Common Stock from the GUC Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

(c)     *Voting:*  Class 5H is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5H are entitled to vote to accept or reject the Plan.

13.     <u>Class 5I - General Unsecured Claims against Kasper Group LLC</u>

(a)     *Classification*:  Class 5I consists of all General Unsecured Claims against Kasper Group LLC.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5I agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5I, each such holder of an Allowed General Unsecured Claim in Class 5I shall receive its Pro Rata share of 0.110% of the New Common Stock from the GUC Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

(c)     *Voting*:  Class 5I is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5I are entitled to vote to accept or reject the Plan.

14.     <u>Class 5J - General Unsecured Claims against Non-Operating Debtors</u>

(a)     *Classification*:  Class 5J consists of all General Unsecured Claims against Jasper Parent, Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, if any.

(b)     *Treatment*:  Allowed General Unsecured Claims in Class 5J, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of General Unsecured Claims in Class 5J will not receive any distribution on account of such Allowed General Unsecured Claims.

(c)     *Voting*:  Class 5J is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5J are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

15.     <u>Class 6 - Intercompany Claims</u>

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  On the Effective Date, all Intercompany Claims shall be, as determined by the Debtors with the reasonable consent of the Requisite Unsecured Lenders, either: (i) Reinstated, (ii) converted to equity, or (iii) cancelled and shall receive no distribution on account of such Claims and may be compromised, extinguished, or settled after the Effective Date.

(c)     *Voting*:  Class 6 is either Impaired or Unimpaired under the Plan.  Holders of Intercompany Claims are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

16.     <u>Class 7 - Interests in Holdings</u>

(a)     *Classification*:  Class 7 consists of all Interests in Holdings.

(b)     *Treatment*:  On the Effective Date, all Interests in Holdings will be discharged, cancelled, released, and extinguished, and will be of no further force or effect, and holders of Interests in Holdings will not receive any distribution on account of such Interests in Holdings.

(c)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Interests in Holdings are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

17.     <u>Class 8 - Intercompany Interests</u>

(a)     *Classification*:  Class 8 consists of all Intercompany Interests.

(b)     *Treatment*:  On the Effective Date, Intercompany Interests shall be, as determined by the Debtors with the reasonable consent of the Requisite Unsecured Lenders, either: (i) Reinstated, or (ii) discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

(c)     *Voting*:  Class 8 is Impaired or Unimpaired under the Plan.  Holders of Intercompany Interests are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

KE 52165855

18.    <u>Class 9 - Section 510(b) Claims</u>

(a)    *Classification*:  Class 9 consists of all Section 510(b) Claims.

(b)    *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

(c)    *Treatment*:  Allowed Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)    *Voting*:  Class 9 is Impaired under the Plan.  Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such holders (if any) are not entitled to vote to accept or reject the Plan.

3.    <u>Special Provision Governing Unimpaired Claims.</u>

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired of the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

4.    <u>Confirmation Pursuant to 1129(a)(10) and 1129(b) of the Bankruptcy Code.</u>

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules; provided that Article III.D of the Plan shall not limit the respective rights of each party to the Restructuring Support Agreement.

5.    <u>Subordinated Claims.</u>

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

KE 52165855

6.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

7.      Intercompany Interests.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

8.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

C.      *Means for Implementation of the Plan*.

1.      Sources of Consideration for Plan Distributions.

The Reorganized Debtors will fund distributions and other sources and uses contemplated by the Plan with (a) Cash on hand, (b) the issuance and distribution of New Common Stock and New Warrants, (c) proceeds from the New Debt, and (d) the Equity Holders Settlement Proceeds.

(a)      New Common Stock.

On the Effective Date, Reorganized Holdings shall issue the New Common Stock to the Entities entitled to receive the New Common Stock pursuant to the Plan.  The issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests.  All of the shares of New Common Stock issued (including any New Common Stock to be issued upon the exercise of the New Warrants) pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

For the avoidance of doubt, any claimant's acceptance of New Common Stock, shall be deemed as its agreement to the Reorganized Holdings Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

The New Common Stock to be distributed pursuant to the Plan is subject to dilution by the New Warrants and the Management Incentive Plan.  Any further dilution will be on terms contemplated by the Reorganized Holdings Organizational Documents (including the Shareholders Agreement).  The Reorganized Holdings

Organizational Documents will be filed as soon as reasonably practicable, and in no event less than 7 days before the Voting Deadline.

        (b)        New Debt.

The Debtors shall use commercially reasonable best efforts to syndicate the New Secured Facility and the New Secured Facility Upsize Amount. Any such New Secured Facility Upsize Amount in excess of the Minimum Exit Cash Requirement shall be used to fund a Cash distribution to holders of Unsecured Term Loan Claims from the UTL Financing Cash Pool, pursuant to Article III.B.5 of the Plan and shall result in the Financing Distribution Increase and the Financing Distribution Decrease, reallocating New Common Stock from holders of Unsecured Term Loan Claims to holders of Claims in Classes 5B, 5C, and 5D.

The New Secured Facility Upsize Amount is designed in a way to provide additional value to the holders of unsecured claims. As the structurally senior Unsecured Term Loan Lenders receive an increase in their Cash recoveries, other unsecured creditors will receive additional equity in the Reorganized Debtors at an equivalent value to the additional Cash received by the Unsecured Term Loan Lenders. The ability to provide additional New Common Stock to non-Unsecured Term Loan Lender unsecured creditors was a critical part of negotiations surrounding the Plan.

On the Effective Date, contemporaneously with the satisfaction of the DIP Claims in accordance with Article II.A of the Plan, Reorganized Holdings and one or more Reorganized Debtors shall enter into the New Debt on the terms and conditions set forth in the New Debt Documents. On and after the Effective Date, the New Debt Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Debt, including the New Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Debt.

On the Effective Date, immediately upon receipt of the payments required in Article II.A of the Plan, all of the liens and security interests to be granted in accordance with the terms of the New Debt Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Debt Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New Debt Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

        (c)        New Warrants; New Warrant Agreement.

As described herein, the holders of Claims in Classes 5B, 5C, and 5D, shall receive their Pro Rata share of New Warrants under the Plan. The New Warrants shall only be exercisable as follows: (a) during the 5-year term of the warrants, upon a change of control event consummated through a sale or a merger at a strike price based on a $650 million total enterprise value; and (b) during the first 42 months of the term of the New Warrants, for Cash only at the option of the holder of the New Warrants at a strike price based on a $650 million total enterprise value. No adjustments will be made to the New Warrants' strike price, except solely in the event of dividends to shareholders or share repurchases, and other customary anti-dilution protections, to be set forth in the New Warrant Agreement. In addition, the New Warrant Agreement shall provide that the New Warrants shall not (x) have any Black-Scholes or similar "cash out" protections in the event of a change of control transaction for less than the strike price, (y) have any covenants, or (z) entitle the New Warrant holders to any corporate governance rights.

As condition to the issuance of the New Warrants, each party entitled to a New Warrant under this Plan shall take any and all actions necessary to be bound by the New Warrant Agreement. The New Warrant Agreement shall provide that the holders of New Warrants shall be subject to confidentiality obligations, restrictions against transfer to competitors, and restrictions against transfer that would result in Reorganized Holdings becoming subject to reporting requirements of section 12 or 15 of the Securities Exchange Act of 1934, as amended.

On the Effective Date, Reorganized Holdings shall issue the New Warrants to the Entities entitled to receive the New Warrants pursuant to the Plan. The issuance of the New Warrants shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests other than as set forth herein. Each distribution and issuance of the New Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

For the avoidance of doubt, any claimant's acceptance of the New Warrants (including any New Common Stock to be issued upon the exercise of the New Warrants) shall be deemed as its agreement to the Reorganized Holdings Organizational Documents (including the Shareholders Agreement), as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

The New Warrants are subject to dilution for the Management Incentive Plan. The Warrant Agreement will disclose further terms with respect to the New Warrants, including whether they are subject to dilution for anything other than the Management Incentive Plan. The New Warrant Agreement will be filed as soon as reasonably practicable, and in no event less than 7 days before the Voting Deadline.

2.    <u>Equity Holders Settlement</u>.

Effective as of October 17, 2018, Nine West Topco (a) shall, to the extent it has not yet previously done so, amend its previously filed 2017 U.S. partnership tax return to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its equity investment in Holdings; (b) shall not take any action that results in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the Interests in Holdings as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code or by subsequently amending Topco's 2017 U.S. partnership tax return to claim a worthless stock deduction on account of its equity investment in Holdings) until after the Effective Date (it being expressly acknowledged and agreed that Nine West Topco LLC shall be permitted to claim a worthless stock deduction on account of its Interest in Holdings in the taxable year in which the Effective Date occurs); (c) shall not knowingly permit any Person (other than Nine West Topco LLC) to own or take any action that would result in any person owning directly, indirectly, or constructively (by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the Interests in Holdings until on or after the Effective Date; (d) shall not change its taxable year to be other than the calendar year until after the Effective Date; and (e) take or refrain from taking any other action requested by the Company in its reasonable discretion in order to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its direct or indirect equity investment in Holdings; provided, however, that the Debtors understand, acknowledge, and agree that none of the Sponsor, the Minority Equity Holders, or any of their respective Affiliates make any representations or warranties with respect to the existence, realization, or value of any tax attributes of any of the Debtors.

On the Effective Date and subject to the satisfaction (but not waiver) of the condition set forth in Article IX.A.7 of the Plan, Nine West Topco LLC shall contribute, or cause to be contributed, to the Estates the Equity Holders Settlement Proceeds.

Effective as of October 17, 2018, an Affiliate of the Sponsor has caused its Affiliate, Belk, Inc., to enter into a covenant agreement whereby Belk, Inc. has agreed to make certain required minimum purchases of product from NWHI for the periods specified therein.

3.    General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan, including the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors.

4.    NWHI Administrative Expense Allocation.

As soon as reasonably practicable following the Confirmation Date and prior to the Effective Date, the Debtors, with the consent of the Requisite Unsecured Lenders (such consent not to be unreasonably withheld, conditioned, or delayed), shall determine in good faith the NWHI Administrative Expense Estimate, which amount shall be filed with the Bankruptcy Court and reserved from any Cash distributions that would otherwise be made to holders of Claims in Classes 5B, 5C, and 5D on the Effective Date.  The NWHI Administrative Expense Estimate shall be allocated exclusively to NWHI and shall reduce the Cash distributions from the Equity Holders Settlement Proceeds that would otherwise be distributed to holders of Claims in Classes 5B, 5C, and 5D on a dollar-for-dollar basis.  The Cash in an amount equal to the NWHI Administrative Expense Estimate shall vest in the Reorganized Debtors.  For the avoidance of doubt, Cash vested in the Reorganized Debtors by operation of the NWHI Administrative Expense Allocation shall not result in a New Secured Facility Upsize Amount or a corresponding Financing Distribution Decrease or Financing Distribution Increase.

For the avoidance of doubt, any reduction in distributions to holders of Claims in Classes 5B, 5C, and 5D as a result of the NWHI Administrative Expense Allocation shall in no way reduce any Equity Holders Settlement Proceeds or any obligation to pay such Equity Holders Settlement Proceeds.  As soon as reasonably practicable following the Effective Date, the Debtors shall notice a hearing on the NWHI Administrative Expense Estimate and provide parties in interest with an opportunity to object to the NWHI Administrative Expense Estimate.  Any objections will be resolved by mutual agreement or by further order of the Bankruptcy Court.  If, following the Effective Date, the Reorganized Debtors, with the consent of the Requisite Unsecured Lenders, determine that the NWHI Administrative Expense Estimate exceeded the actual NWHI Administrative Expenses, the difference between the NWHI Administrative Expense Estimate and the actual NWHI Administrative Expenses shall be distributed, Pro Rata, to holders of Allowed Claims in Classes 5B, 5C, and 5D in accordance with Article III of this Plan.

5.    Shareholders Agreement.

On the Effective Date, Reorganized Holdings shall enter into and deliver the Shareholders Agreement, in substantially the form included in the Plan Supplement, to each holder of New Common Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

6.      Management Incentive Plan.

On the Effective Date, all grants under the Management Incentive Plan shall be reserved for directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized Holdings Board and in accordance with the Management Incentive Plan to be included in the Plan Supplement.  To the extent New Common Stock is set aside for the Management Incentive Plan, the New Common Stock will be dilutive of the New Common Stock distributed to the holders of Claims pursuant to the Plan.

The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but not limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized Holdings Board.  At this time, it is not clear what aspects of the Management Incentive Plan will be subject to Bankruptcy Court approval at the time of confirmation other than that New Common Stock may be set aside as part of the Plan. The Debtors will disclose the amount of New Common Stock (if any) and any other information related to the Management Incentive Plan as soon as reasonably practicable, and in no event less than 7 days before the Voting Deadline.  The U.S. Trustee has raised questions about the Management Incentive Plan, including that it may be an insider retention plan that must comply with section 503(c) of the Bankruptcy Code.  *See* 11 U.S.C. § 503(c) ("Notwithstanding subsection (b), there shall neither **be allowed**, nor paid . . .") (emphasis added).  The Debtors disagree that section 503(c) is applicable to the Management Incentive Plan or that the Management Incentive Plan is a retention program covered by section 503(c).  To the extent that after further disclosures regarding the Management Incentive Plan, parties in interest (including the U.S. Trustee) object to the Management Incentive Plan, the Debtors will brief the issues and meet their burden on these matters in connection with Confirmation.

7.      Reorganized Holdings Board.

The Reorganized Holdings Board shall initially consist of seven members, and shall include the Chief Executive Officer and one independent director, each of which shall be selected by the Requisite Unsecured Lenders and shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.

Notwithstanding the foregoing, each holder of Unsecured Term Loan Claims that is a Consenting Unsecured Lender prior to the Petition Date and who holds as of the Petition Date and continues to hold as of the Effective Date: (1) at least 10% but less than 30% of the aggregate principal amount of Unsecured Term Loan Claims, shall have the right to appoint one director to the Reorganized Holdings Board; and (2) more than 30% of the aggregate principal amount of Unsecured Term Loan Claims, shall have the right to appoint two directors to the Reorganized Holdings Board, provided that notwithstanding the rights of the Consenting Unsecured Lenders set forth in the foregoing clauses (1) and (2), nothing herein shall limit in any way the Consenting Unsecured Lenders' rights to select directors based on their respective holdings of New Common Stock as provided in the Reorganized Holdings Organizational Documents.

8.      Restructuring Transactions.

On and after the Confirmation Date, the Debtors or Reorganized Debtors, may take all actions, subject to the Restructuring Support Agreement, as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Holdings, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (5) the execution and delivery of the New Debt Documents, and any filings related thereto; (6) this issuance of the New Common Stock; and (7) all other actions

88

that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

9.    Corporate Existence.

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtors Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

10.    Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

11.    Cancellation of Existing Securities and Agreements.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, and in the case of the DIP Claims, subject to satisfaction of such Claims in accordance with Article II.A of the Plan: all notes, instruments, certificates, shares, bonds, indentures, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and other documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors giving rise to any rights or obligations relating to Claims or Interests, including the Secured Term Loan Claims, the Unsecured Term Loan Claims, the 2019 Notes Claims, the 2034 Notes Claims, the DIP Claims, and Interests in Holdings, shall be deemed cancelled and surrendered without any need for a holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, and any non-Debtor parties, thereunder or in any way related thereto shall be deemed satisfied in full and released and discharged, provided that notwithstanding Confirmation, Consummation, or the releases contained in Article VIII of the Plan any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions as specified under the Plan, (b) allowing the Indenture Trustees, the DIP Agents, the Unsecured Term Loan Agent, and the Secured Term Loan Agent to make distributions pursuant to the Plan, (c) preserving the Secured Term Loan Agent's, the Unsecured Term Loan Agent's and the Indenture Trustees' rights to compensation and indemnification as against any money or property distributable to holders of Secured Term Loan Claims, Unsecured Term Loan Claims, 2034 Notes Claims, or 2019 Notes Claims, as applicable, including permitting the Secured Term Loan Agent, Unsecured Term Loan Agent, and each of the Indenture Trustees to maintain, enforce, and exercise their respective Secured Term Loan Agent Charging Lien, Unsecured Term Loan Agent Charging Lien, or Indenture Trustee Charging Liens, as applicable, against such distributions, (d) preserving all rights, including rights of enforcement, of the Indenture Trustees, the DIP Agents, the Unsecured Term Loan Agent, and the Secured Term Loan Agent against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the holders of the 2034 Notes Claims, 2019 Notes Claims, DIP Claims, the Unsecured Term Loan Claims, or Secured Term Loan Claims, as applicable, pursuant and subject to the terms of the

89

applicable Indenture as in effect on the Effective Date, (e) permitting the Indenture Trustees, the DIP Agents, and the Secured Term Loan Agent to enforce any obligation (if any) owed to such Indenture Trustees, DIP Agent, the Unsecured Term Loan Agent, or the Secured Term Loan Agent under the Plan, (f) permitting the Indenture Trustees, DIP Agent, the Unsecured Term Loan Agent, or Secured Term Loan Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other Court, and (g) permitting the DIP Agents, the DIP Lenders, the Secured Term Loan Agent, and the Secured Term Loan Lenders to assert any right with respect to the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, or the Contingent Secured Term Loan Obligations, as applicable; *provided, however*, that (i) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (ii) except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. Each of the Indenture Trustees shall be discharged and shall have no further obligation or liability except as provided in the Plan and the Confirmation Order, and after the performance by the Indenture Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, each of the Indenture Trustees shall be relieved of and released from any obligations and duties arising under the Plan, Confirmation Order, and the applicable indentures, (i) unless otherwise specifically set forth in or provided for under the Plan or Confirmation Order and (ii) except with respect to such other rights of the Indenture Trustees, that pursuant to the applicable indentures, survive the termination of such indentures. For the avoidance of doubt, nothing in this provision shall effectuate a cancellation of any New Equity or New Warrants.

Except as provided in the Plan, on the Effective Date, the DIP Agents, the Secured Term Loan Agent, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Documents and the Secured Term Loan Documents, as applicable. The commitments and obligations (if any) of the Secured Term Loan Lenders and/or the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents or the Secured Term Loan Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Documents or DIP Order are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.

If the record holder of either of the 2019 Notes or the 2034 Notes is DTC or its nominee or another securities depository or custodian thereof, and such 2019 Notes or 2034 Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of such 2019 Notes or 2034 Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

12.    Corporate Action.

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the issuance of the New Common Stock and the New Warrants; (2) the selection of the directors, officers, managers, and members for Reorganized Holdings and the other Reorganized Debtors; (3) implementation of the Restructuring Transactions; and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Holdings and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Holdings, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, or members of the Debtors, Reorganized Holdings, or the other Reorganized Debtors. On or before the Effective Date, as applicable, the appropriate officers or other authorized persons of the Debtors, Reorganized Holdings, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Holdings and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.L of the Plan shall be effective notwithstanding any requirements under non bankruptcy law.

13.    Reorganized Debtors Organizational Documents.

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtors will file such Reorganized Debtors Organizational Documents as are required to be filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors Organizational Documents will prohibit the issuance of non voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective Reorganized Debtors Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized Debtors Organizational Documents.

14.    Exemption from Certain Taxes and Fees.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

15.    Exemption from Securities Act Registration.

Pursuant to section 1145 of the Bankruptcy Code, except as noted below, the offering, issuance, and distribution of the New Common Stock and the New Warrants in respect of Claims as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Common Stock and the New Warrants to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) are not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) have not been such an "affiliate" within 90 days of such transfer, and (iii) are not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock or the New Warrants to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock and the New Warrants to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock and the New Warrants to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock and the New Warrants to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

16.    Retention of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Retained Causes of Action Schedule, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue and/or settle the Causes of Action, as appropriate, in their discretion and in accordance with the best interests of the Reorganized Debtors.

KE 52165855

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors, in each case through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

The Retained Causes of Action include any claims or Causes of Action against the Non-Released Parties. This includes former shareholders of The Jones Group Inc. for potential claims for fraudulent conveyance or fraudulent transfer in connection with the $1.183 billion distributed to them in the 2014 Transaction (a claim that, with prejudgment interest, could exceed $1.6 billion), and against the former directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates for the potential claims for breach of fiduciary duty in connection with the 2014 Transaction or Carve-Out Transactions.

Any value attributed to the Retained Causes of Action is speculative in nature. Many of the Retained Causes of Action relate to the Debtors' business operations, including the right to bring or settle potential claims against trade creditors, customers, and current or former employees. With respect to litigation against the Non-Released Parties, the Reorganized Debtors would need assess whether such claims are colorable or whether litigation would produce a benefit in light of potential legal costs. At this time, no party has proposed sources of funding for a litigation trust to pursue these claims or otherwise proposed a structure for such a trust that has the support of, among others, the Debtors' unsecured creditors at NWHI and the Unsecured Term Loan Lenders. Further, litigating the Retained Causes of Action at this time would likely take significant time and impose additional costs on the Estates.

D.     *Settlement, Release, Injunction, and Related Provisions*.

1.     <u>Discharge of Claims and Termination of Interests</u>.

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (for the avoidance of doubt, the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, and the Contingent Secured Term Loan Obligations, in each case, are not discharged hereunder) or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective

Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

2.    Debtor Release.

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing entities, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Debt Documents, the Prepetition Credit Facilities, the 2014 Transaction, the Carve-Out Businesses, the ownership and/or operation of the Debtors and/or the Carve-Out Businesses by the Sponsor and the Minority Equity Holders, the Restructuring Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the 363 Sale, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release (a) any post-Effective Date obligations of any Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claims or Causes of Action against any Non-Released Party, and (c) any Retained Causes of Action.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized**

93

Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

3.    Third-Party Release.

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Debt Documents, the Prepetition Credit Facilities, the 2014 Transaction, the Carve-Out Businesses, the ownership and/or operation of the Debtors and/or the Carve-Out Businesses by the Sponsor and the Minority Equity Holders, the Restructuring Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the 363 Sale, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release (a) any post-Effective Date obligations of any Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Claims or Causes of Action against any Non-Released Party, and (c) any Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of claims released by the Third Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Third Party Release.

4.    Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for (a) any prepetition action taken or omitted to be taken in connection with, or

94

related to, formulating, negotiating, or preparing the Plan or the Restructuring Support Agreement, or (b) any postpetition action taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Restructuring Support Agreement), the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the 363 Sale transactions and documents, the New Debt Documents, the DIP Facilities, the DIP Documents, and/or the Restructuring Transactions, or selling or issuing the New Debt, the New Common Stock, and/or any other Security to be offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Restructuring Support Agreement and the Plan. Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt, the Non-Released Parties shall not be Exculpated Parties and shall not receive any exculpation under the Plan.

5.      Release of Liens.

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim or Secured Tax Claim, satisfaction in full of the portion of the Other Secured Claim or Secured Tax Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. The ABL/FILO DIP Liens and Term DIP Liens (in each case, as defined in the DIP Order) shall not be released until the payment in full in Cash of the DIP ABL/FILO Claims or DIP Term Loan Claims, as applicable, in accordance with Article II.A of the Plan.

6.      Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for

obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to the Debtor Release, the Third Party Release, or another provision of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims, claims, or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, claim, or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, claims, or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims, claims, and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan; provided, however, that the foregoing shall not enjoin any Consenting Term Loan Lender from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

7.      Challenge Period; No Disgorgement; Release of Escrowed Sale Proceeds Payment.

Notwithstanding anything to the contrary in the DIP Order (including paragraphs 17 and 26 thereof) or any other order of the Bankruptcy Court, (1) upon entry of the Confirmation Order (i) the Challenge Period (as defined in the DIP Order) shall have expired and all provisions of the DIP Order that are contingent or become effective upon the expiration of the Challenge Period be in full force and effect, including clauses (a) through (e) of paragraph 26(b), and (ii) the Non-Stipulated Claims (as defined in the DIP Order) shall be stipulated to and released by the Debtors, which stipulation and release shall be binding upon all parties in interests, including the Committee, and (2) upon the Effective Date (i) any Adequate Protection Payment, Adequate Protection Fees and Expenses, Sale Proceeds Payment (as each term is defined in the DIP Order), payments received by the Prepetition ABL/FILO Secured Parties (as defined in the DIP Order) in connection with the ABL/FILO Refinanced Loans (as defined in the DIP Order), or any payment realized by the Prepetition Secured Parties (as defined in the DIP Order), including upon the exercise of remedies pursuant to paragraph 10 of the DIP Order shall be deemed to be indefeasible and shall not be subject to disgorgement, recharacterization, or reallocation pursuant to section 506(b) of the Bankruptcy Code or any other remedy, and (ii) the Prepetition Secured Term Loan Agent is authorized to disburse any portion of the Sale Proceeds Payment held by the Prepetition Secured Term Loan Agent pursuant to the Escrow Agreement (as defined in the DIP Order) to any Prepetition Term Loan Lender in accordance with the DIP Order, regardless of whether such Prepetition Term Loan Lender submitted a Certification (as defined in the DIP Order).

8.      Protections Against Discriminatory Treatment.

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor

under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.      Document Retention.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

10.     Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

11.     Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect following the Effective Date in accordance with their terms.

12.     Subordination Rights.

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, the Reorganized Debtors, their respective property, and holders of Claims and Interests and is fair, equitable, and reasonable.

E.      *Conditions Precedent to Effective Date.*

1.      Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

(a)     the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been stayed, modified, or vacated on appeal;

(b)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(c)     the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

(d)     the New ABL Facility Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements, and the Debtors shall have issued the indebtedness contemplated thereby;

(e)     the New Secured Facility Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements, and the Debtors shall have issued the indebtedness contemplated thereby;

(f)     the Reorganized Holdings Organizational Documents and the Reorganized Debtors Organizational Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect, and the New Common Stock and the New Warrants shall have been issued;

(g)     the Equity Holders Settlement shall have been approved by the Bankruptcy Court and the payments contemplated thereby shall have been made, and the Debtors or Reorganized Debtors shall have entered into all documents contemplated thereby; and

(h)     all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all attorneys, advisors, and other professionals payable under the Restructuring Support Agreement and the DIP Order shall have been paid in Cash.

2.      <u>Waiver of Conditions</u>.

Subject to and without limiting the rights to each party to the Restructuring Support Agreement, the conditions to Consummation set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of (x) the Requisite Unsecured Lenders, (y) the Requisite Secured Lenders (solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.5, and Article IX.A.8), and (z) the Sponsor and the Minority Equity Holders (solely with respect to the condition set forth in Article IX.A.7), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

3.      <u>Effect of Failure of Conditions</u>.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, or claims by any holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders, or any other Entity in any respect.

F.      *Payment of Restructuring Fees.*

The Plan provides that all Restructuring Expenses, incurred up to (and including) the Effective Date shall be treated as Allowed Administrative Claims and shall be paid in full in Cash on the Effective Date; *provided that*

KE 52165855

each party and its counsel shall provide the Debtors or Reorganized Debtors with summary invoices (redacted for any potentially privileged material) for which it seeks payment. Restructuring Expenses include the reasonable fees and expenses (including reasonable attorneys' fees) incurred by the DIP Lenders, the Secured and Unsecured Term Loan Agents, the Secured Lender Group, the Crossover Group, and Brigade. Certain of these fees, such as the reasonable fees and expenses incurred by the DIP Lenders, the Secured Term Loan Agent, and the Secured Lender Group, are covered by the DIP Order, subject to the terms and conditions set forth therein. The Debtors do not have an estimate for the fees and expenses that will be accrued and unpaid as of the Effective Date, and such amounts will depend on the costs incurred by parties in connection with Confirmation.

On November 7, 2018, the U.S. Trustee filed an objection to the adequacy of the Disclosure Statement and the confirmability of the Plan based on, among other the things, the payment of Restructuring Expenses. The Debtors understand that the U.S. Trustee asserts that (1) payments to creditors (outside those approved under the DIP Order) may only be made if such creditors (or the Debtors) can demonstrate that such creditors provided a "substantial contribution" as required by section 503(b) of the Bankruptcy Code, and (2) payments to the Unsecured Term Loan Agent for fees and expenses incurred in its role as a member of the UCC are impermissible. The U.S. Trustee relies on the United States District Court for the Southern District of New York's decision in *Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings, Inc.)*, 508 B.R. 283, 289 (S.D.N.Y. 2014), for the argument that section 503 of the Bankruptcy Code provides the exclusive and sole source of payment for administrative expenses, and that individual committee members cannot have their professional fee expenses paid as administrative expenses solely on the basis of their committee membership. The Debtors acknowledge the *Lehman* decision, but believe that the payment of the Restructuring Expenses are permissible pursuant to section 363(b) of the Bankruptcy Code. *See e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO LLC)*, 650 F. 3d 593, 603 (5th Cir. 2011); *United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, Case No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *10–13 (S.D.N.Y. July 28, 2003) (affirming bankruptcy court's approval of reimbursement of professional fees and expenses of largest unsecured creditor constituency pursuant to section 363(b)(1) in connection with the professionals undertaking due diligence required for the creditors to participate in discussions regarding the restructuring of the debtor); *In re Adelphia Commc'ns Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010); *In re AMR Corp.*, 497 B.R. 690, 694–96 (Bankr. S.D.N.Y. 2013); *In re Penn Virginia Corp.* No. 16-32395 (KLP) (Bankr. E.D. Va. Aug. 11, 2016); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. Aug. 10, 2016). The Debtors intend to meet this burden at the Confirmation Hearing.

## ARTICLE VII.
### STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for [__], at __:00 _.m., prevailing Eastern Time.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties as required by the Case Management Order no later than the Plan Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

KE 52165855

B.      *Confirmation Standards.*

1.      <u>Requirements for Confirmation of the Plan.</u>

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.      <u>The Debtors' Releases, Third-Party Release, Exculpation, and Injunction Provisions.</u>

Article VIII of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties (the "<u>Debtor Release</u>"). The Released Parties are each of the following in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Secured Term Loan Lenders; (d) the Secured Term Loan Agent; (e) the Unsecured Term Loan Lenders; (f) the Unsecured Term Loan Agent; (g) the Prepetition ABL/FILO Secured Parties; (h) the DIP Lenders; (i) the DIP Agents; (j) the Debtors' current and former officers, directors, and managers; (k) the Sponsor; (l) the Minority Equity Holders; and (m) with respect to each of the foregoing entities in clauses (a) through (l), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such, *provided, however*, notwithstanding the foregoing or anything in the Plan to the contrary, and for the avoidance of doubt, the Non-Released Parties shall not be deemed Released Parties regardless of whether they would otherwise meet the definition of Released Party.

Article VIII of the Plan provides for releases of certain claims and Causes of Action that holders of Claims or Interests may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "<u>Third-Party Release</u>"). The holders of Claims and Interests who are releasing certain claims and Causes of Action against non-Debtors under the Third-Party Release include each of the following in their capacity as such: (a) the Consenting Secured Lenders; (b) the Secured Term Loan Agent; (c) the Consenting Unsecured Lenders; (d) the Unsecured Term Loan Agent; (e) the Prepetition ABL/FILO Secured Parties; (f) the DIP Lenders; (g) the DIP Agents; (h) the Sponsor; (i) the Minority Equity Holders; (j) all holders of Claims that vote to accept the Plan; (k) all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third Party Release; (l) all holders of Claims entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third Party Release; (m) all other holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; and (n) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. The Debtors updated the Third-Party Release on November 9, 2018, to reflect these Releasing Parties to be consistent with the opt-out provisions in the Ballots.

KE 52165855

Article VIII of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with these chapter 11 cases. The released and exculpated claims are limited in those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or these chapter 11 cases. The Exculpated Parties are in each case solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors, (c) the Debtors' current and former officers, directors, and managers; (d) the Secured Term Loan Lenders; (e) the Secured Term Loan Agent; (f) the Unsecured Term Loan Lenders; (g) the Unsecured Term Loan Agent; (h) the Prepetition ABL/FILO Secured Parties; (i) the DIP Lenders; (j) the DIP Agents; (k) DTC; (l) the Sponsor; (m) the Minority Equity Holders; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, and Affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, *provided, however*, notwithstanding the foregoing or anything in the Plan to the contrary, and for the avoidance of doubt, the Non-Released Parties shall not be deemed Exculpated Parties regardless of whether they would otherwise meet the definition of Exculpated Parties.

The Plan does not provide exculpation, a Debtor Release, or a Third-Party Release to certain non-released parties (the "Non-Released Parties"). The Non-Released Parties are: (a) each solely in their capacity as such, shareholders of The Jones Group Inc. who held common stock immediately prior to the consummation of the 2014 Transaction and any of their Affiliates or assignees, and (b) each solely in their capacity as such, the former directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, who were in such positions immediately prior to the consummation of the 2014 Transaction, but only in connection with any claims or Causes of Action pursuant to the 2014 Transaction or Carve-Out transactions occurring on April 8, 2014, to create the Carve-Out Businesses; provided, for the avoidance of doubt, the Sponsor and the Minority Equity Holders (and their respective related parties described in clause (m) of the definition of Released Party) shall not be deemed Non-Released Parties regardless of whether they would otherwise meet the definition of Non-Released Parties.

Article VIII of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

The Plan provides that all holders of Claims or Interests who are entitled to vote on the Plan who vote to accept the Plan will be granting a release of any claims or rights they have or may have as against many individuals and Entities. In addition, certain other holders of Claims or Interests identified in the definition of "Releasing Parties" will be granting a release of any claims or rights they have or may have as against many individuals and Entities, unless such holders "opt out" of such release on their Ballot or Election Form, as applicable.

The Third-Party Release includes any and all claims that such holders may have against the Released Parties, which in any way relate to the Debtors, their operations either before or after these chapter 11 cases began, any securities of the Debtors, whether purchased or sold, including sales or purchases which have been rescinded, and any transaction that these Released Parties had with the Debtors.

Debtors are authorized to settle or release their claims in a chapter 11 plan. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible). Debtor releases are granted by courts in the Second Circuit where the debtors establish that such releases are in the "best interests of the estate." *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate."). Courts often find that releases pursuant to a settlement are appropriate. *See, e.g.*, *In re Spiegel, Inc.*, 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); *see also In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *accord In re Adelphia*

KE 52165855

*Commc'ns Corp.*, 368 B.R. at 263 n.289 ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

Additionally, in the Second Circuit, third party releases are permissible where "unusual circumstances" render the release terms integral to the success of the plan. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142–43 (2d Cir. 2005). The determination is not a matter of "factors and prongs" but courts have provided some guidance for allowing third party releases. "Unusual circumstances" include (but are not limited to) instances in which: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent. *Id.* at 141. Courts typically allow releases of third party claims against non-debtors where there is the express consent of the party giving the release or where other circumstances in the case justify giving the release. *Id.*

Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved. *See, e.g., Oneida*, 351 B.R. at 94, n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity). In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan. *See In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd, In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

The U.S. Trustee filed an objection on November 7, 2018, to the adequacy of the Disclosure Statement and the confirmability of the Plan based on, among other things, the Third-Party Release [Docket No. 820]. In the objection, the U.S. Trustee asserts that certain of the Third-Party Releases are non-consensual. In support of this position, the U.S. Trustee cites, among other cases, to *In re SunEdison Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) and *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015), for the proposition that the Plan's "opt-out" provisions—pursuant to which rejecting classes, or classes that are deemed to reject the plan, can elect not to grant a release—are impermissible non-consensual releases. Further, the U.S. Trustee argues that the Plan's opt-out procedure is not sufficient to demonstrate consent to the Third-Party Releases contained in the Plan. The Debtors disagree. A number of courts have found that an opt-out procedure substantially similar to the procedure contemplated by the Plan is sufficient to demonstrate the consent of parties that do not opt out. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 305–06 (Bankr. D. Del. 2013); *In re Tops Holding II Corporation*, No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018) [Docket No. 765]; *In re Cumulus Media, Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769].

The U.S. Trustee also argues that Classes 1, 2, and 3 are Impaired under the Plan because the Classes are designated as Releasing Parties granting the Third-Party Releases to the Released Parties. The Debtors disagree that a release renders a claim "impaired" within the meaning of section 1124 of the Bankruptcy Code. A party's ability to release claims is not a legal attribute of a claim that can be altered by statute. In any event, the releases granted by Classes 1, 2, and 3 are consensual releases permitted under the Bankruptcy Code that do not render the Plan unconfirmable. *See In re Indianapolis Downs, LLC*, 486 B.R. at 305–06.

The Debtors disagree with the positions adopted by the U.S. Trustee. The Debtors believe that the releases, exculpation, and the injunction set forth in the Plan are customary for chapter 11 plan in this and other districts. The Debtors believe that applicable case law and the Bankruptcy Code permit the Plan's releases and that they are

justified under the facts and circumstances of these chapter 11 cases. The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because the releases are related to, among other things, the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan, participated in good faith in negotiations surrounding the A&R RSA, the Prepetition RSA, the Plan, and the Restructuring Transactions, and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

3.    Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

4.    Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared Financial Projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit D**. Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. The Debtors are obligated under the Restructuring Support Agreement to secure a commitment for the New Debt prior to the hearing on the adequacy of this Disclosure Statement and believe that they will have sufficient availability under the New Debt to provide for the distributions under the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Article III.F of the Plan provides in full: "If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan." Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code. *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 259–63.

Courts have held that only one impaired accepting class at one debtor is required for a multi-debtor joint chapter 11 plan under sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. *See In re Charter Commc'ns*, 419 B.R. 221, 266 (stating that "it is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not, as the CCI Noteholders argue, on a per-debtor basis"); *see also JPMCC 2007-C1 Grasslawn Lodging LLC v. Transwest Resort Props. Inc.*, 881 F.3d 724, 730 (9th Cir. 2018). The Debtors would expect parties to object to confirmation of the Plan if the Debtors proceeded to confirmation without a consenting class at each debtor.

D.    *Confirmation without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, subject to the rights set forth in the Restructuring Support Agreement.

1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    Fair and Equitable Test.

The fair and equitable test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery.

104

(a)    Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

(c)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under (i) no class of interests junior to the non-accepting class may receive a distribution under the plan.

3.    Valuation of the Debtors.

The Debtors' investment banker, Lazard, has prepared an independent valuation analysis, which is attached hereto as **Exhibit E** and incorporated into this Disclosure Statement by reference (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Article VII of this Disclosure Statement, and the Financial Projections. The Valuation Analysis is dated as of October 26, 2018, and is based on information as of that date. The holders of Claims and Interests should carefully review the information in **Exhibit E** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes.

**ARTICLE VIII.**
**CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.    *Risks Related to the Confirmation and Consummation of the Plan*.

1.    The A&R RSA May be Terminated.

As more fully set forth in Section 7 of the A&R RSA, the A&R RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones related to the filing, confirmation, and consummation of the Plan, and the breaches by the Debtors, the Consenting Secured Lenders, and/or the Consenting Unsecured Lenders of their respective obligations under the A&R RSA. In the event

that the A&R RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

2.    The Debtors May Not Be Able to Obtain Exit Financing Commitments.

The Debtors are required under the A&R RSA to obtain commitments for exit financing no later than November 30, 2018. Exit financing remains contingent on market interest and any conditions required by potential lenders. There is a risk that the Debtors may not be able to secure exit financing commitments within the proscribed time period set forth in the A&R RSA, and parties to the A&R RSA may terminate their obligations thereunder.

3.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

4.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

5.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7.      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.      Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of these chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

9.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests and the Debtors' Liquidation Analysis is set forth in Article 1 of this Disclosure Statement, "*Statutory Requirements for Confirmation of the Plan*," and the Liquidation Analysis attached hereto as **Exhibit G**.

10.      The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied

107

upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.     Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

12.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

13.     Recoveries to General Unsecured Creditors of NWHI May Be Lower Than Anticipated Due to the Expense Allocation Provision.

Article IV.C of the Plan provides for the allocation of certain administrative expenses incurred following the execution of the A&R RSA solely to NWHI. Under the Plan, any fees or expenses incurred by any estate-paid professional in connection with (i) any objection to or defense of the Plan or any Plan-related documents, and (ii) the pursuit of or defense against any Estate Causes of Action or any motion seeking standing to pursue such estate claims or causes of action, will be allocated to NWHI and reduce distributions to general unsecured creditors of NWHI on a dollar-for-dollar basis. As a result, to the extent any estate-paid professionals determine to challenge the Plan or Plan-related documents, or seek standing to pursue estate claims or causes of action, recoveries to general unsecured creditors of NWHI may be materially lower than the amounts described herein.

14.     The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

15.     The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors.

With respect to holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

KE 52165855

16.     The Total Amount of Allowed Administrative and Priority Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors.

The amount of Cash the Debtors' ultimately receive on account of the working capital assets the Debtors' are collecting in connection with the 363 Sale and from other sources prior to and following the Effective Date may be lower than anticipated. Additionally Allowed Administrative Claims and Allowed Priority Claims maybe higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

17.     The Actual Amount Collected by the Debtors on Account of Their Accounts Receivable and the Actual Timing of Such Collections May Materially Differ Than that Anticipated By the Debtors.

The Debtors will require proceeds on account of their accounts receivable to satisfy administrative and priority claims in accordance with the Plan. The actual amount the Debtors realize on their accounts receivable and the actual timing for the receipt of such proceeds may materially differ than that anticipated by the Debtors. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

B.     *Risks Related to Recoveries Under the Plan.*

1.     The Debtors May Not Be Able to Achieve Their Projected Financial Results.

The Financial Projections represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate. The Financial Projections also depend on other factors such as the state of the jeanswear and apparel market, the financial health of the Debtors' suppliers and wholesale customers, the Debtors' ability to retain and attract key personnel, and the continued business of major customers. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control. If the Debtors do not achieve these projected financial results, (a) the value of the New Common Stock may be negatively affected; (b) the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date; and (c) the Reorganized Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.     The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes.

As a multinational corporation, the Debtors are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgment is required in determining the Debtors' global provision for income taxes and other tax liabilities. In the ordinary course of a global business, there are many intercompany transactions and calculations where the ultimate tax determination is uncertain. The Debtors' income tax returns are routinely subject to audits by tax authorities. Although the Debtors regularly assess the likelihood of adverse outcomes resulting from these examinations to determine their tax estimates, a final determination of tax audits or tax disputes could have an adverse effect on their results of operations and financial condition. The Debtors are also subject to non-income taxes, such as payroll, sales, use, value-added, net worth, property and goods and services taxes in the U.S. and various foreign jurisdictions. They are regularly under audit by tax authorities with respect to these non-income taxes and may have exposure to additional non-income tax liabilities which could have an adverse effect on the Debtors' results of operations and financial condition.

In addition, the Debtors' future effective tax rates could be favorably or unfavorably affected by changes in tax rates, changes in the valuation of their deferred tax assets or liabilities, or changes in tax laws or their interpretation. Such changes could have a material adverse impact on their financial results.

KE 52165855

For a detailed description of the effect Consummation of the Plan may have on the Debtors' tax attributes, or how the tax implications of the Plan and these chapter 11 cases may adversely affect holders of Claims and Interests, *see* Article IX of this Disclosure Statement, titled "Certain United States Federal Income Tax Consequences of the Plan."

      3.      <u>The New Warrants May Never Be Exercisable</u>.

The Plan and New Warrant Agreement place a number of conditions to the issuance and exercise of the New Warrants. If the required conditions do not occur, holders of the New Warrants may never be able to exercise the New Warrants to receive New Common Stock.

C.      *Risks Related to the Debtors' Business*.

      1.      <u>The Debtors Will Be Subject to the Risks and Uncertainties Associated with These Chapter 11 Cases</u>.

For the duration of these chapter 11 cases, the Debtors' operations and their ability to execute their business strategy will be subject to the risks and uncertainties associated with the bankruptcy proceedings. These risks include:

- the Debtors' ability to continue as a going concern;
- the Debtors' ability to develop, confirm, and consummate a chapter 11 plan, an alternative restructuring transaction, or a sale;
- the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in these chapter 11 cases from time to time;
- the Debtors' ability to comply with and operate under the terms of any cash management orders entered by the Bankruptcy Court from time to time, which subject the Debtors to restrictions on transferring cash and other assets;
- the Debtors' ability to maintain adequate cash on hand and to generate cash from operations throughout these chapter 11 cases;
- the Debtors' ability to fund their emergence and to fund their operations after emergence from the bankruptcy process on reasonable terms;
- the Debtors' ability to comply with the covenants and conditions of the DIP Facilities;
- the Debtors' ability to maintain contracts that are critical to their operations;
- the Debtors' ability to execute their business plan;
- the ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors;
- the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert these chapter 11 cases to a Chapter 7 proceeding; and
- the actions and decisions of the Debtors' creditors and other third parties who have interests in these chapter 11 cases that may be inconsistent with the Debtors' plans.

Because of the risks and uncertainties associated with these chapter 11 cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the chapter 11 reorganization process may have on the Debtors' business, financial condition and results of operations, and there is no guarantee as to their ability to continue as a going concern.

Difficulties of providing services while attempting to reorganize the Debtors' businesses in bankruptcy may make it more difficult to maintain and promote their services and attract customers to their services and to keep their suppliers. As a result of these chapter 11 cases, the Debtors may experience collection issues with otherwise valid receivables of certain customers. Adverse resolution of these disagreements may impact the Debtors' revenues and other costs of services, both prospectively and retroactively. It is too soon for the Debtors to predict with any certainty the ultimate impact of these disagreements. The Debtors suppliers, vendors, and services providers may require stricter terms and conditions, and the Debtors may not find these terms and conditions acceptable. In

KE 52165855

addition, the Debtors may experience a loss of confidence by current and prospective suppliers, customers, landlords, employees, or other stakeholders, which could make it more difficult for the Debtors to operate and have an adverse effect on the Debtors' businesses, financial condition, and results of operations. Any failure to timely obtain suitable supplies at competitive prices could materially adversely affect the Debtors' businesses, financial condition, and results of operations.

2.        Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to these chapter 11 cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses. In addition, the longer the proceedings related to these chapter 11 cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to these chapter 11 cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of these chapter 11 cases. These chapter 11 cases also require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to fully draw on the availability under the DIP Facilities, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

3.        The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base. The Debtors' recent liquidity issues and these chapter 11 cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

4.        Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition.

5.        Adverse Publicity in Connection with These Chapter 11 Cases or Otherwise Could Negatively Affect the Debtors' Businesses.

Adverse publicity or news coverage relating to us, including, but not limited to, publicity or news coverage in connection with these chapter 11 cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after emergence from these chapter 11 cases.

111

6.    The Success of the Debtors' Business Depends on Their Ability to Revitalize Their Brand, to Retain the Heritage of and Evolve Their Brands, and to Develop Product Offerings That Resonate with Their Existing Customers and Attract New Customers.

The Debtors' success depends, in large part, on their ability to consistently anticipate, gauge, and respond to customers' demands and tastes and fashion trends in the design, pricing, style, and production of their products. Any failure on their part to anticipate, identify, and respond effectively to those demands, tastes, and trends could adversely affect acceptance of their products. If that occurs, the Debtors may need to employ increased levels of markdowns or promotional sales to dispose of excess or slow-moving inventory, or they may miss opportunities to increase sales, either of which would harm their business and profitability. The Debtors' success depends on their ability to effectively define, protect, evolve, and promote their brands to expand their customer base while continuing to appeal to their existing customers. Merchandise missteps could negatively impact the image of their brands with their customers and result in diminished loyalty to their brands, which would adversely impact their business.

7.    The Denim, Accessories, and Apparel Industries Are Heavily Influenced by General Economic Cycles That Affect Consumer Spending. A Prolonged Period of Depressed Consumer Spending Would Have A Material Adverse Effect on the Debtors.

The denim, accessories, and apparel industries have historically been subject to cyclical variations, recessions in the general economy, and uncertainties regarding future economic prospects that affect consumer spending habits, which could negatively impact the Debtors' business. The success of the Debtors' operations depends on a number of factors impacting discretionary consumer spending, including general economic conditions, consumer confidence, wages and unemployment, housing prices, consumer debt, interest rates, fuel and energy costs, taxation, and political conditions. To the extent there is a downturn in the economy, it may affect consumer purchases of the Debtors' products and adversely impact their growth and profitability.

Recent global economic conditions have included significant recessionary pressures and declines in employment levels, disposable income, and actual or perceived wealth and further declines in consumer confidence and economic growth. These conditions have led and could lead to continued declines in consumer spending over the foreseeable future and may have resulted in a shift in consumer spending habits that makes it unlikely that spending will return to prior levels for the foreseeable future. The current depressed economic environment has been characterized by a decline in consumer discretionary spending and has disproportionately affected sellers of consumer goods, particularly those whose goods are viewed as discretionary purchases, including apparel and jeanswear such as ours. And although recent economic trends have demonstrated growth, including for certain retailers, there is no guaranty that such conditions will continue.

Economic conditions have also led to a highly promotional environment and strong discounting pressure from the Debtors' wholesale partners, which have had a negative impact on the revenues and profitability of some of their brands. This promotional environment may continue even after economic growth returns. The domestic and international political situation also affects consumer confidence. The threat, outbreak, or escalation of terrorism, military conflicts, or other hostilities around the world could lead to further decreases in consumer spending.

8.    The Debtors Business and Results of Operations Could Be Negatively Impacted by A Change in Consumer Demand for Denim in the Marketplace.

Consumer demands and fashion trends are subject to cyclical variations. In addition, consumer spending habits are often affected by the general economy and future economic prospects. A change in consumer demand, consumer purchases of discretionary items, general economic conditions, or fashion trends, may result in lower sales, excess inventories, or lower profit margins for their jeanswear products, any of which could have a material adverse effect on the Debtors' results of operations and financial condition.

9.        The Loss of or A Significant Reduction of Business with Any of the Debtors' Largest Customers
Could Have A Material Adverse Effect on the Debtors' Business.

The Debtors rely on certain significant customers in their wholesale jeanswear, wholesale jewelry, and wholesale apparel operating segments, which customers drive a significant percentage of the Debtors' revenues and EBITDA.

The Debtors believe that purchasing decisions are generally made independently by department store units within a customer group.  There has been a trend, however, toward more centralized purchasing decisions.  As such decisions become more centralized, the risk to the Debtors of such concentration increases.  A decision by the controlling owner of a customer group of department stores to modify those customers' relationships with the Debtors (for example, decreasing the amount of product purchased from us, modifying floor space allocated to apparel and denim in general or the Debtors' products specifically, or focusing on promotion of private label products rather than their products) could have a material adverse effect on them.  Furthermore, the Debtors believe a trend exists among their major customers to concentrate purchasing among a narrowing group of vendors.  To the extent any of the Debtors' key customers reduce the number of vendors and consequently do not purchase from them, including as a result of these chapter 11 cases, the Debtors' results of operations could be materially adversely affected.

In the future, wholesalers may have financial problems or consolidate, undergo restructurings or reorganizations, or realign their affiliations, any of which could further increase the concentration of the Debtors' customers.  The loss of any of their larger customers, or the bankruptcy or material financial difficulty of any large customer, would have a material adverse effect on the Debtors.  The Debtors do not have long-term contracts with any of their customers, and sales to customers generally occur on an order-by-order basis.  As a result, customers can terminate their relationships with the Debtors at any time or under certain circumstances cancel or delay orders.

10.        The Denim, Accessories, and Apparel Industries Are Highly Competitive.  Any Increased
Competition Could Result in Reduced Sales or Prices, or Both, Which Could Have A Material
Adverse Effect on the Debtors.

Denim, accessories, and apparel companies face competition on many fronts, including effectively managing costs, establishing and maintaining favorable brand recognition, developing products that appeal to consumers, pricing products appropriately, and obtaining affordable access to retail outlets and sufficient floor space.

There is intense competition in the sectors of the denim, accessories, and apparel industries in which the Debtors participate.  The Debtors compete with many other manufacturers and retailers, some of which are larger and have greater financial, creative, and technical resources than they do.  The Debtors compete primarily on the basis of fashion, price, and quality.  Any increased competition could result in reduced sales or prices, or both, which could have a material adverse effect on us.

The Debtors also provide design and manufacturing resources to several of their wholesale customers to develop product lines to be sold under their own private labels.  These and other private label lines compete directly with their product lines and may receive more prominent positioning on the retail floor by department stores.  While private label brands create more competition, the Debtors believe that national brands are often preferred by the consumer.

11.        The Debtors Reliance on Independent Manufacturers Could Cause Delay and Damage
the Debtors' Reputation and Customer Relationships.

The Debtors rely upon independent third parties for the manufacture of their products.  A manufacturer's failure to ship products to the Debtors in a timely manner or to meet the required quality standards could cause them to miss the delivery date requirements of their customers for those items.  The failure to make timely deliveries may drive customers to cancel orders, refuse to accept deliveries, demand reduced prices, or return products, any of which could have a material adverse effect on the Debtors.  This could damage their reputation.  The Debtors do not

have long-term written agreements with any of their third party manufacturers. As a result, any of these manufacturers may unilaterally terminate their relationships with the Debtors at any time. There are a limited number of manufacturers available to manufacture the Debtors' products and they may not be able to find alternative manufacturers on commercially reasonable terms or at all.

Although the Debtors have an active program to train their independent manufacturers in, and monitor their compliance with, their labor and other factory standards, any failure by those manufacturers to comply with their standards or any other divergence in their labor or other practices from those generally considered ethical in the United States and any negative publicity relating to any of these events could materially harm the Debtors and their reputation.

12.    The Extent of the Debtors' Foreign Sourcing and Contract Manufacturing May Adversely Affect Their Business.

Nearly all of the Debtors' products are manufactured outside of North America. The following may adversely affect their foreign sources and contract manufacturers:

- political instability in countries where suppliers and contractors are located;
- imposition of regulations and quotas relating to imports;
- imposition of duties, taxes, and other charges on imports;
- significant fluctuation of the value of the U.S. dollar, euro, and pound against other foreign currencies;
- labor shortages in countries where suppliers and contractors are located; and
- restrictions on the transfer of funds to or from foreign countries.

As a result of their foreign sourcing and contract manufacturing, the Debtors are subject to the following risks:

- a reduction in available manufacturing capacity, resulting from the closing of foreign factories that have experienced substantial declines in orders;
- uncertainties of sourcing associated with an environment in which general quota has been eliminated on apparel and denim products pursuant to the World Trade Organization Agreement;
- reduced manufacturing flexibility because of geographic distance between the Debtors and their foreign manufacturers, increasing the risk that they may have to mark down unsold inventory as a result of misjudging the market for a foreign-made product;
- increases in manufacturing costs in the event of a decline in the value of the U.S. dollar or euro against major world currencies, particularly the Chinese yuan, and higher labor and commodity costs being experienced by their foreign manufacturers in China;
- potential shipping constraints from labor actions at U.S. ports; and
- violations by foreign contractors of labor and wage standards and any resulting adverse publicity.

13.    Fluctuations in the Price, Availability, and Quality of Raw Materials Could Cause Delays and Increase Costs.

Fluctuations in the price, availability, and quality of the fabrics or other raw materials used by the Debtors in their manufactured apparel and denim and in the price of materials used to manufacture their footwear and accessories could have a material adverse effect on their cost of sales or their ability to meet their customers' demands. The prices for such fabrics and materials depend largely on the market prices for the raw materials used to produce them, particularly cotton, leather, and synthetics. The price and availability of such raw materials may fluctuate significantly, depending on many factors, including crop yields and weather patterns. In the future, the Debtors may not be able to pass all or a portion of such higher raw materials prices on to their customers.

114

14.     The Loss or Infringement of the Debtors' Trademarks and Other Proprietary Rights Could Have A Material Adverse Effect on the Debtors.

The Debtors believe that their trademarks and other proprietary rights are important to their success and competitive position.  Accordingly, the Debtors devote substantial resources to the establishment and protection of their trademarks on a worldwide basis.  There can be no assurances that such actions taken to establish and protect their trademarks and other proprietary rights will be adequate to prevent imitation of their products by others or to prevent others from seeking to block sales of their products as violative of their trademarks and proprietary rights.  Moreover, there can be no assurances that others will not assert rights in, or ownership of, their trademarks and other proprietary rights or that the Debtors will be able to successfully resolve such conflicts.  In addition, the laws of certain foreign countries may not protect proprietary rights to the same extent as do the laws of the United States.  The loss of such trademarks and other proprietary rights, or the loss of the exclusive use of such trademarks and other proprietary rights, could have a material adverse effect on us.  Any litigation regarding their trademarks could be time-consuming and costly.

15.     The Debtors Rely on Their Licensing Partners to Preserve the Value of Their Brands.

Although the Debtors generally have significant control over their licensees' products and advertising, they rely on their licensees for, among other things, operational and financial controls over their businesses.  Failure of their licensees to successfully market licensed products or the Debtors' inability to replace existing licensees, if necessary, including as a result of these chapter 11 cases, could adversely affect their revenues, both directly from reduced royalties received and indirectly from reduced sales of their other products.  Risks are also associated with a licensee's ability to:

- obtain capital;
- manage its labor relations;
- maintain relationships with its suppliers;
- manage its credit risk effectively; and
- maintain relationships with its customers.

In addition, the Debtors rely on their licensees to help preserve the value of their brands.  Although the Debtors make every attempt to protect their brands through, among other things, approval rights over design, production processes, and quality, packaging, merchandising, distribution, advertising, and promotion of their licensed products, the Debtors cannot completely control the use of their brands by their licensees.  The misuse of a brand by a licensee could have a material adverse effect on that brand and on the Debtors.

16.     The Debtors Have Entered into License Agreements to Use the Trademarks of Others.  Loss of A License Could Have an Adverse Effect on Them.

The Debtors' business strategy is based on offering their products in a variety of brands, channels, and price points.  This strategy is designed to provide stability should market trends shift.  In entering into license agreements, the Debtors target their products towards certain market segments based on consumer demographics, design, suggested pricing, and channel of distribution to minimize competition with their own brands and maximize profitability.  To this end, the Debtors have entered into licensing agreements with independent third parties to license certain brands the Debtors do not own.  If any of the Debtors licensors determine to introduce similar products under similar brand names or otherwise change the parameters of design, pricing, distribution, or target market, they could experience a significant downturn in that brand's business, adversely affecting their sales and profitability.  In addition, as products may be personally associated with these designers and celebrities, the Debtors sales of those products could be materially and adversely affected if any of those individuals' images, reputations, or popularity were to be negatively impacted.  If any of the Debtors' licensing agreements are not renewed, including as a result of these chapter 11 cases, this may result in material adverse effect on their business.

17.    A Security or Privacy Breach Could Adversely Affect the Debtors.

The Debtors are dependent on information technology networks and systems, including the internet, to process, transmit, and store electronic information. In the normal course of the Debtors' business, they collect, process, and retain sensitive and confidential information pertaining to their customers, their employees, and other third parties. The Debtors, and their third-party service providers, have systems and processes in place that are designed to protect information and protect against security and data breaches. Despite these safeguards, their systems and processes may be vulnerable to security breaches, acts of vandalism, computer viruses, lost data, inadvertent data disclosure, or other similar events. Any failure to protect the confidential data of the Debtors' customers, employees, or third parties could damage their reputation and customer relationships, expose them to the costs and risks of litigation and possible liability, disrupt their operations, and adversely impact their business.

18.    Extreme or Unseasonable Weather Conditions Could Adversely Affect the Debtors' Business.

Extreme weather events and changes in weather patterns can influence customer trends and shopping habits. Extended periods of unseasonably warm temperatures during the winter season or cool weather during the summer season may diminish demand for their seasonal merchandise. If severe weather events were to force closure of or disrupt operations at the distribution centers the Debtors use for their merchandise, they could incur higher costs and experience longer lead times to distribute their products to their wholesale customers. If prolonged, such extreme or unseasonable weather conditions could adversely affect their business, financial condition, and results of operations.

19.    The Debtors' Failure to Comply with Trade and Other Regulations Could Lead to Investigations or Actions by Government Regulators and Negative Publicity.

The labeling, distribution, importation, marketing, and sale of their products are subject to extensive regulation by various federal agencies, including the Federal Trade Commission, Consumer Product Safety Commission, and state attorneys general in the United States, as well as by various other federal, state, provincial, local, and international regulatory authorities in the countries in which their products are distributed, licensed, or sold. If the Debtors fail to comply with any of these regulations, they could become subject to enforcement actions or the imposition of significant penalties or claims, which could harm their results of operations or their ability to conduct their business. In addition, the adoption of new regulations or changes in the interpretation of existing regulations may result in significant compliance costs or discontinuation of product sales and could impair the marketing of their products, resulting in significant loss of net sales.

The Debtors' international operations are also subject to compliance with the U.S. Foreign Corrupt Practices Act ("FCPA") and other anti-bribery laws applicable to their operations. In many foreign countries, particularly in those with developing economies, it may be a local custom that businesses operating in such countries engage in business practices that are prohibited by the FCPA or other U.S. and foreign laws and regulations applicable to us. Although the Debtors have implemented procedures designed to ensure compliance with the FCPA and similar laws, there can be no assurance that all of their employees, agents, and other channel partners, as well as those companies to which they outsource certain of their business operations, will not take actions in violation of their policies. Any such violation could have a material and adverse effect on the Debtors' business.

D.    *Risks Related to the New Common Stock and the New Warrants.*

1.    An Active Trading Market May Not Develop for the New Common Stock and the New Warrants.

The New Common Stock and New Warrants are a new issue of securities and, accordingly, there is currently no established public trading market for the New Common Stock or New Warrants. It is not currently contemplated to apply to list the New Common Stock or New Warrants on any national securities exchange and, as such, there can be no assurance that an active trading market for the New Common Stock or the New Warrants will develop. If there is no active trading market in the New Common Stock, the market price and liquidity of the New Common Stock and the New Warrants may be adversely affected. If a trading market does not develop or is not maintained, holders of New Common Stock and New Warrants may experience difficulty in reselling such securities

at an acceptable price or may be unable to sell them at all. Even if a trading market were to exist, such market could have limited liquidity and the New Common Stock and New Warrants could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, or prospects and investor expectations thereof. As a result, there may be limited liquidity in any trading market that does develop for the New Common Stock and New Warrants. In addition, the Reorganized Holdings Organizational Documents (including the Shareholders Agreement) may also contain restrictions on the transferability of the New Common Stock and New Warrants (such as rights of first refusal/offer, tag-along rights, and/or drag-along rights, among others), which may adversely affect the liquidity in the trading market for the New Common Stock and New Warrants.

       2.      <u>A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors</u>.

Consummation of the Plan may result in a small number of holders owning a significant percentage of the shares of the outstanding the New Common Stock in Reorganized Holdings. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.

       3.      <u>The Issuance of New Common Stock under the Management Equity Incentive Plan will Dilute the New Common Stock</u>.

On the Effective Date, a percentage of the New Common Stock will be reserved for issuance as grants of options in connection with the Management Equity Incentive Plan. If the Reorganized Debtors distribute such equity-based awards to management pursuant to the Management Equity Incentive Plan, it is contemplated that such distributions will dilute the New Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the New Common Stock distributed under the Plan.

       4.      <u>The New Common Stock and New Warrants are Equity Interests and Therefore Subordinated to the Indebtedness of the Reorganized Debtors</u>.

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock and New Warrants would rank below all debt claims against the Reorganized Debtors. As a result, holders of New Common Stock and New Warrants will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of its obligations to its debt holders have been satisfied.

       5.      <u>Certain Holders of New Common Stock and/or New Warrants May Be Restricted in Their Ability to Transfer or Sell Their Securities</u>.

To the extent that the New Common Stock and/or New Warrants issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock and/or New Warrants pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act of 1933 or other applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act or another applicable exemption.

E.      *Disclosure Statement Disclaimer*.

       1.      <u>Information Contained in this Disclosure Statement is for Soliciting Votes</u>.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

KE 52165855

2.          This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.    Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

3.          No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

**This Disclosure Statement is not legal advice to you.**    The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.    Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.    This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.          No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, holders of Allowed Claims or Allowed Interests, or any other parties in interest.

5.          Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.    The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.          No Waiver of Right to Object or Right to Recover Transfers and Assets.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

7.          Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.    Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

8.          Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.    While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this

Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

       9.        <u>No Representations Outside this Disclosure Statement Are Authorized</u>.

No representations concerning or relating to the Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

<div align="center">

**ARTICLE IX.**
**SECURITIES LAW MATTERS**
</div>

Under the Plan, shares of New Common Stock will be distributed to holders of Claims in Classes 5A, 5B, and 5C, and may be distributed to holders of Claims in Classes 5D, 5E, 5F, 5G, 5H, and 5I, and New Warrants will be distributed to holders of Claims in Classes 5B, 5C, and 5D.  The Reorganized Debtors will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer, issuance, and distribution of the New Common Stock and New Warrants, including New Common Stock issued upon the exercise of the New Warrants.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (A) with a view to distributing those securities, and (B) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that Entities who receive the New Common Stock and New Warrants are deemed to be "underwriters," resales by those Entities would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those Entities would, however, be permitted to sell New Common Stock, New Warrants, or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

Under certain circumstances, holders of New Common Stock and New Warrants deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met.  These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may

<div align="center">119</div>

be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that notice of the resale be filed with the Securities Exchange Commission.

## ARTICLE X.
## CERTAIN UNITED STATED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A.    *Introduction.*

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims, New Warrants, and New Common Stock. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, Persons who hold Claims or who will hold New Warrants or New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Code). For purposes of this discussion, a "Non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend

upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.    *Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.*

    1.    <u>Effects of Restructuring on Tax Attributes of Debtors.</u>

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor (a "<u>Taxable Transaction</u>") or as a recapitalization of the Debtors (a "<u>Recapitalization Transaction</u>"). The Debtors have not yet determined how the Restructuring Transactions will be structured, whether in whole or in part. Such decision will depend on, among other things, whether assets being sold pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (i.e., a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (i.e., a "built-in loss"), the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income "<u>COD Income</u>") and whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up in the tax basis of the Debtors' assets as a result of a Taxable Transaction, and the amount and character of any losses with respect to the stock of the Debtors, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would realize gain or loss upon the transfer in an amount equal to the difference between the aggregate fair market value of the assets transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Gain, if any, would be reduced by the amount of the Debtors' available NOLs, NOL carryforwards and any other available tax attributes, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, (subject to reduction due to COD Income, as described below), unless the Debtors make an election pursuant to Code sections 338(h)(10) or 336(e) with respect to the purchase to treat the purchase as the purchase of assets.

As of December 31, 2017, the Debtors estimate that they have approximately $609 million of federal NOLs. The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes. Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. NOLs arising before 2018 may offset 100% of future taxable income and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year. As discussed below, however, the Debtors' NOLs are expected to be eliminated upon implementation of the Plan.

    (a)    Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, the Debtors will realize and recognize COD Income upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new debt issued, and (iii) the fair market value of the New Common Stock, New Warrants, or other consideration, in each case, given in satisfaction of such satisfied indebtedness at the time of the exchange.

KE 52165855

Under section 108 of the Code, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the Debtors with respect to the sale of all or a portion of their assets in a Taxable Transaction).  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Code.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced pursuant to section 108 of the Code will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction or Recapitalization Transaction.  Further, the exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.  Regardless of the implemented structure, however, the Debtors expect that the amount of such COD Income will be sufficient to eliminate most, if not all, of their NOLs and tax credits allocable to taxable periods prior to the Effective Date pursuant to section 108 of the Code.  Some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

(b)      Limitation on NOLs and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes (i.e., if the Restructuring Transactions are not structured as a Taxable Transaction pursuant to which the Debtors' assets, and not stock of corporate entities, are being transferred to the Reorganized Debtors for U.S. federal income tax purposes), the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Code.

Under sections 382 and 383 of the Code, if the Debtors undergo an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies.

(i)      General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period

ending with the calendar month in which the ownership change occurs, or 2.29 percent for October 2018). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

<div align="center">(ii)        Special Bankruptcy Exceptions.</div>

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The availability to the Reorganized Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan. As discussed above, however, the Debtors expect that all of the Debtors' NOLs allocable to periods prior to the Effective Date will be eliminated and hence will not be available following the year in which the Effective Date occurs regardless of the implemented structuring.

<div align="center">(c)        Excess Loss Accounts.</div>

Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary. In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)-(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes. The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock

<div align="center">123</div>

of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account.

C.     *Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Allowed Claims Entitled to Vote.*

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.     Consequences to the Holders of Allowed Class 4 Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 4 Secured Term Loan Claims, each holder thereof will receive Cash. The receipt of Cash by a U.S. Holder of an Allowed Class 4 Secured Term Loan Claim should be treated as a taxable exchange pursuant to Section 1001 of the Code. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the Cash received, and (b) the holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Claim were held for more than one year. To the extent that a portion of the Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. *See* "Accrued Interest" below.

2.     Consequences to the Holders of Allowed Class 5 Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 5A, Class 5B, Class 5C, Class 5D, Class 5E, Class 5F, Class 5G, Class 5H, and Class 5I Claims (collectively, the "Class 5 Claims"), each holder thereof will receive on account of its Cass 5 Claims, New Common Stock, New Warrants, and/or Cash, if anything.

The Debtors expect to take the position that, even in a Recapitalization Transaction, the New Common Stock and the New Warrants that will be received by the holders of Unsecured Term Loan Claims will first be issued and contributed by Reorganized Holdings to NWHI and then distributed (in addition to the other consideration, if applicable) to such holders pursuant to the Plan, and to treat such transactions as occurring in the same order (issuance, contribution, and distribution) for U.S. federal income tax purposes. The Debtors believe, and intend to take the position that, this treatment applies for U.S. federal income tax purposes, and the remainder of the discussion assumes this. The tax consequences to the Debtors, the Reorganized Debtors, and holders of Unsecured Term Loan Claims described herein could be materially different in the event this characterization was not respected for U.S. federal income tax purposes.

The exchange of obligations underlying the Class 5 Claims for New Common Stock, New Warrants, and/or Cash will constitute a fully taxable exchange under section 1001 of the Code. A U.S. Holder of a Class 5 Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the sum of Cash, if any, and the total fair market value of any New Common Stock or New Warrants received in exchange for its Allowed Class 5 Claim, in each case, to the extent such consideration is not allocable to accrued but untaxed interest on the obligations underlying the Allowed Class 5 Claim (as discussed below under "Accrued Interest"), and (b) the U.S. Holder's adjusted tax basis in its Allowed Class 5 Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Class 5 Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the consideration received in exchange for its Allowed Unsecured Term Loan Claim is allocable to accrued but untaxed interest (or OID), the U.S. Holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" below. A U.S. Holder's tax basis in any New Common Stock, other than with respect to any amounts received that are attributable to accrued but untaxed interest or OID, should be equal to its fair market value. A U.S. Holder's tax basis in any New Warrants, other than with respect to any amounts received that are attributable to accrued but untaxed interest or OID, should be equal to their issue

KE 52165855

price.  A U.S. Holder's holding period for any New Common Stock and New Warrants received on the Effective Date should begin on the day following the Effective Date.

3.      Accrued Interest.

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest in such event.

4.      Market Discount.

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.  Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

5.      Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

KE 52165855

6.      Dividends on New Common Stock.

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

7.      Sale, Redemption or Repurchase of New Common Stock.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.

8.      New Warrants.

The exercise of a New Warrant by the U.S. Holder thereof should not give rise to taxable gain or loss.  The holding period of the New Common Stock acquired upon exercise of the New Warrants should begin on the date of such exercise, and should not include the period during which such New Warrants were held.  The U.S. Holder's tax basis in the New Common Stock acquired upon exercise should include the U.S. Holder's tax basis in the New Warrants increased by the amount paid upon exercise.  In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants.  Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise.  If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held his or her New Warrants.

If New Warrants held by a U.S. Holder expire unexercised, such New Warrants should be deemed to have been sold or exchanged on the day of expiration.  Such expiration should therefore in most cases give rise to a capital loss, unless such U.S. Holder previously claimed a deduction for the worthlessness of such New Warrants in a previous taxable period.

The rules applicable to the treatment of warrants are complex, particularly in the context of warrants acquired in a complex transaction such as this one.  U.S. Holders of New Warrants are urged to consult their tax advisors to review and determine the tax consequences associated with the receipt, ownership and disposition of such New Warrants.

9.      Limitation on Use of Capital Losses.

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital

gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

D.     *Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims*.

     1.     <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims</u>.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

     (a)     Gain Recognition.

Any gain realized by a Non-U.S. Holder on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

     (b)     Accrued but Untaxed Interest.

Payments made to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of Reorganized Holdings and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

2.    <u>U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock</u>.

(a)    Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Holdings' current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)    Sale, Redemption, or Repurchase of New Common Stock.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless:

i.    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

ii.    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

iii.    Reorganized Holdings is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an

128

applicable income tax treaty). The Debtors consider it unlikely, based on Reorganized Holdings' current business plans and operations, that Reorganized Holdings will become a "U.S. real property holding corporation" in the future.

3.    FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source dividends (which would include New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source income or dividends that occurs after December 31, 2018.

**Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such holders' exchange of any of its Claims pursuant to the Plan and on its ownership of loans provided under the New Common Stock.**

E.    *Information Reporting and Backup Withholding*.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

---

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

---

KE 52165855

## ARTICLE XI.
## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims and Allowed Interests than proposed under the Plan. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated:  November 12, 2018

NINE WEST HOLDINGS, INC.
on behalf of itself and its debtor affiliates

*/s/ Ralph Schipani*

Ralph Schipani
Interim Chief Executive Officer
Nine West Holdings, Inc.

COUNSEL:

James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

130

## Exhibit A

**Plan**

**[FILED AT DOCKET NO. 836]**

**<u>Exhibit B</u>**

**Corporate Structure Chart**

KE 52165855

# NINE WEST

(1) Jones Canada, Inc. is the general partner of Jones Apparel Group Canada, LP and Nine West Canada LP.



**<u>Exhibit C</u>**

**Restructuring Support Agreement**

# FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT

This FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of October 17, 2018, amends, restates, and replaces the Restructuring Support Agreement dated as of April 6, 2018 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof), by and among the following parties (each a "Party" and, collectively, the "Parties"):

  i.   Jasper Parent LLC and Nine West Holdings, Inc., together with certain of their direct and indirect subsidiaries, including: Kasper Group LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, Nine West Development LLC, Nine West Distribution LLC, Nine West Jeanswear Holding LLC, Nine West Management Service LLC, One Jeanswear Group, Inc., and US KIC Top Hat LLC (collectively, the "Company");

  ii.  the undersigned holders of claims (and together with their respective successors and permitted assigns, the "Consenting Secured TL Lenders") under the Prepetition Secured TL Credit Agreement (as defined herein);

  iii. the undersigned holders of claims (and together with their respective successors and permitted assigns, the "Consenting Unsecured TL Lenders") under the Prepetition Unsecured TL Credit Agreement (as defined herein);

  iv.  investment funds managed or advised by, or Affiliates of, Sycamore Partners Management, L.P. ("Sponsor"); and

  v.   investment funds managed or advised by, or Affiliates of, KKR Credit Advisors (US) LLC and/or Kohlberg Kravis Roberts & Co., L.P. (the "Minority Equity Holders" and, together with Sponsor, the "Equity Holder Parties").

## RECITALS

**WHEREAS**, the Company, the Consenting Secured TL Lenders, and the Consenting Unsecured TL Lenders entered into the Original RSA to implement a restructuring pursuant to the Original Plan (each as defined herein);

**WHEREAS**, following new developments in the Chapter 11 Cases (as defined herein) and feedback from other creditor constituencies, the Parties have engaged in arm's-length, good-faith discussions regarding a restructuring of the Company's capital structure based on certain amendments to the Original Plan;

**WHEREAS**, each Party desires that such restructuring be implemented through an amended joint chapter 11 plan of reorganization for the Company on the terms and conditions set forth in this Agreement, the chapter 11 plan attached hereto as **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time consistent with the terms of this Agreement, the "Plan"), and definitive documents necessary or appropriate to implement the Plan (the transactions contemplated by the Plan shall hereinafter be referred to as the "Restructuring");

**WHEREAS**, the Company commenced the Chapter 11 Cases in the Bankruptcy Court (as defined herein) on April 6, 2018;

**WHEREAS**, following the commencement of the Chapter 11 Cases by the Company, on July 3, 2018, the Company consummated the 363 Sale (as defined in the Plan);

**WHEREAS**, in connection with the 363 Sale and pursuant to the 363 Sale Order (as defined in the Plan), the Company sold (i) the Nine West® and Bandalino® footwear and handbag trademarks held by Nine West Development LLC, and (ii) certain receivables and working capital held by Nine West Holdings, Inc.;

**WHEREAS**, in connection with the 363 Sale and pursuant to the 363 Sale Order, Nine West Development LLC received $263 million in cash as a result of the sale of its assets (the "IP Sale Proceeds"), and Nine West Holdings, Inc. received additional consideration as a result of the sale of its inventory and the winding down of accounts receivables (the "NWHI Sale Proceeds");

**WHEREAS**, pursuant to the 363 Sale Order and DIP Financing Order, on or around July 3, 2018, Nine West Holdings, Inc. used approximately $24 million of the NWHI Sale Proceeds to pay down the ABL Facility, and used the IP Sale Proceeds to make the $263 million Sale Proceeds Payment on the Secured TL Claims;

**WHEREAS**, the pay down of the Prepetition Secured TL Claims by Nine West Holdings, Inc. with the IP Sale Proceeds gave rise to certain rights of subrogation and/or postpetition intercompany claims by Nine West Development LLC against Nine West Holdings, Inc.;

**WHEREAS**, to effectuate the Restructuring, the Company shall file in the Bankruptcy Court and prosecute the Plan and a related disclosure statement (as may be amended, supplemented, or otherwise modified from time to time consistent in all material respects with the terms of this Agreement, the "Disclosure Statement");

**WHEREAS**, certain members of the Ad Hoc Secured TL Lender Group, the Ad Hoc Crossover TL Lender Group, and Brigade have funded, and the Company has borrowed, approximately $50 million pursuant to the terms of the Term DIP Credit Agreement and the DIP Financing Order;

**WHEREAS**, the Company has requested, and the members of the Ad Hoc Secured TL Lender Group, the Ad Hoc Crossover TL Lender Group, and Brigade have agreed to amend, the Term DIP Credit Agreement to amend certain of the Milestones (as such term is defined in the Term DIP Credit Agreement) such that they are consistent with the Chapter 11 Milestones set forth herein; and

**WHEREAS**, each Party has reviewed the Disclosure Statement and Plan, has agreed to the terms of the Restructuring on the terms set forth therein, and agrees that the following sets forth the agreement among the Parties concerning their respective rights and obligations in respect of the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.     Definitions.**

The following terms shall have the following definitions:

"ABL DIP Facility" has the meaning set forth in the DIP Financing Order.

"Accredited Investor" has the meaning set forth in Rule 501 of the Securities Act.

"Ad Hoc Crossover TL Lender Group" means the holders of Prepetition Secured TL Claims and Prepetition Unsecured TL Claims represented by King & Spalding LLP.

"Ad Hoc Crossover TL Lender Group Advisors" means King & Spalding, LLP, Guggenheim Securities, LLC, and, with the reasonable consent of the Company, such other or additional counsel, financial advisors, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring.

"Ad Hoc Secured TL Lender Group" means the holders of Prepetition Secured TL Claims represented by Davis Polk & Wardwell LLP and Ducera Partners LLC.

"Ad Hoc Secured TL Lender Group Advisors" means Davis Polk & Wardwell LLP and Ducera Partners LLC, and, with the reasonable consent of the Company, such other or additional counsel, financial advisors, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring.

"Agreement" has the meaning set forth in the preamble hereof, and, for the avoidance doubt, includes all of the exhibits attached to the Agreement.

"Agreement Effective Date" means the date upon which this Agreement shall become effective and binding upon each of the Parties pursuant to the terms of Section 2 hereof.

"Alternative Transaction" means any chapter 11 plan or restructuring transaction involving the Company other than the Restructuring.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"<u>Belk Commitment Agreement</u>" means the covenant agreement between Belk, Inc. and Nine West Holdings, Inc., by and on behalf of itself and each of its subsidiaries.

"<u>Belk Retraction Letter</u>" means a letter from Belk, Inc. to Nine West Holdings, Inc. retracting its letter dated September 26, 2018, in favor of the Belk Commitment Agreement.

"<u>Brigade</u>" means Brigade Capital Management, LP., and its accounts and managed funds that are holders of Claims under any Debt Instruments.

"<u>Brigade Advisors</u>" means Kramer Levin Naftalis & Frankel LLP, Moelis & Company, LLC, and Morris Tbeile, and, with the reasonable consent of the Company, such other or additional counsel, financial advisors, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring.

"<u>Business Day</u>" means a day other than a Saturday, Sunday, or other day on which the Federal Reserve Bank of New York is closed.

"<u>Chapter 11 Cases</u>" means the procedurally consolidated and jointly administered chapter 11 cases commenced by the Company in the Bankruptcy Court and captioned *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC).

"<u>Chapter 11 Milestones</u>" means those certain milestones set forth in Section 5.04(c) hereof.

"<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"<u>Company</u>" has the meaning set forth in the preamble hereof.

"<u>Company Advisors</u>" means, solely for purposes of Section 5.04(f), Kirkland & Ellis LLP, Lazard, Freres & Co. LLC, and Alvarez & Marsal North America, LLC.

"<u>Company Termination Event</u>" has the meaning set forth in Section 7.04 hereof.

"<u>Company Trigger Event</u>" has the meaning set forth in Section 7.04 hereof.

"<u>Confidentiality Agreement</u>" has the meaning set forth in Section 5.05 hereof.

"<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"<u>Consenting Secured TL Lenders</u>" has the meaning set forth in the preamble hereof, <u>provided</u> that if any Consenting Secured TL Lender terminates its obligations under this Agreement in accordance with the terms of this Agreement, such Party shall no longer be a Consenting Secured TL Lender.

4

"Consenting Unsecured TL Lenders" has the meaning set forth in the preamble hereof provided that if any Consenting Unsecured TL Lender terminates its obligations under this Agreement in accordance with the terms of this Agreement, such Party no longer be a Consenting Unsecured TL Lender.

"Debt Instruments" means, collectively, the (i) Prepetition Secured TL Credit Agreement, (ii) Prepetition Unsecured TL Credit Agreement, (iii) Indentures, and (iv) Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), between and among Nine West Holdings, Inc., One Jeanswear Group Inc., and Kasper Group LLC, as borrowers, Jasper Parent LLC, the lenders party thereto, and Wells Fargo Bank, National Association, as both administrative agent and FILO agent.

"DIP Financing" means, collectively, the ABL DIP Facility and the Term DIP Facility.

"DIP Financing Order" means the final order of the Bankruptcy Court [Docket No. 450] approving the DIP Financing.

"Disclosure Statement" has the meaning set forth in the recitals hereof.

"Disclosure Statement Motion" means the motion seeking approval of the Disclosure Statement.

"Disclosure Statement Order" means an order of the Bankruptcy Court approving the Disclosure Statement, the Plan Solicitation Materials, and the Solicitation (as defined below) for the Plan.

"Equity Holder Parties" has the meaning set forth in the preamble hereof.

"Equity Holder Parties Termination Event" has the meaning set forth in Section 7.05 hereof.

"Equity Holder Parties Trigger Event" has the meaning set forth in Section 7.05 hereof.

"Equity Holders Settlement" shall have the meaning ascribed to such term in the Plan.

"Exit Financing Commitment" means an irrevocable and legally binding commitment, in form and substance reasonably satisfactory (or satisfactory solely with respect to any condition, contingency, or other provision in such commitment that poses a material risk to the parties being able to close or fund the New Secured Facility pursuant to such commitment, and consistent with terms of this Agreement and the Plan) to the Requisite Consenting TL Lenders to enter into the New Secured Facility.

5

"Exit Financing Commitment Milestone" means the Company's milestone obligation set forth in Section 5.04(c)(ii) hereof, the date by which the Company shall have entered into an Exit Financing Commitment.

"Indentures" means, collectively, the (i) 8.250% Unsecured Notes due 2019 under the Indenture, dated April 23, 2014 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), with Nine West Holdings, Inc., as issuer, and U.S. Bank National Association, as indenture trustee, (ii) 6.875% Unsecured Notes 2019 under the Indenture, dated March 7, 2013 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), with Nine West Holdings, Inc., as issuer, and U.S. Bank National Association, as indenture trustee, and (iii) 6.125% Unsecured Notes due 2034 under the Indenture, dated November 22, 2004 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), with Nine West Holdings, Inc., as issuer, and U.S. Bank National Association as indenture trustee.

"Material Asset(s)" means one or more assets of the Company with a fair market value of $2,500,000 as determined by the Company in its reasonable discretion.

"Minority Equity Holders" has the meaning set forth in the preamble hereof, provided that in determining whether any consent or approval required by this Agreement has been given by the Minority Equity Holders, the Company shall be entitled to rely on an instrument executed or written by KKR Credit Advisors (US) LLC.

"New Secured Facility" has the meaning set forth in the Plan.

"Original Plan" means the Debtors Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 128].

"Original RSA" means that certain Restructuring Support Agreement, dated as of April 6, 2018, by and among the Company, the Consenting Secured TL Lenders, and the Consenting Unsecured TL Lenders, as amended, restated, supplemented, or otherwise modified from time to time prior to the Agreement Effective Date.

"Party" and "Parties" have the meanings set forth in the preamble hereof.

"Permitted Transfer" has the meaning set forth in Section 5.05 hereof.

"Permitted Transferee" has the meaning set forth in Section 5.05 hereof.

"Petition Date" means April 6, 2018, the date on which the Company commenced the Chapter 11 Cases.

"Plan" has the meaning set forth in the recitals hereof.

"Plan Effective Date" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and on which the Restructuring and the other transactions to occur on the Plan Effective Date pursuant to the Plan become effective or are consummated.

"Plan Solicitation Materials" means the ballots and other related materials drafted in connection with the solicitation of acceptances of the Plan and to be approved by the Bankruptcy Court pursuant to the Disclosure Statement Order.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company with the Bankruptcy Court.

"Plan Support Period" means the period commencing on the Agreement Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 7 hereof.

"Prepetition Secured TL Claims" means any claim for principal, interest, fees, expenses, and any other amounts, including contingent obligations, arising under or in connection with the Prepetition Secured TL Credit Agreement.

"Prepetition Secured TL Credit Agreement" means that certain Term Loan Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), by and among Nine West Holdings, Inc., as borrower, Jasper Parent LLC, as holdings, Morgan Stanley Senior Funding, Inc., as administrative agent, and the other lenders party thereto.

"Prepetition Unsecured TL Claims" means all obligations arising under or in connection with the Prepetition Unsecured TL Credit Agreement, including any claim for principal, interest, fees, expenses, and any other amounts arising under or in connection with the Prepetition Unsecured TL Credit Agreement.

"Prepetition Unsecured TL Credit Agreement" means that certain Unsecured Term Loan Credit Agreement, dated as of April 8, 2014 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date), by and among Nine West Holdings, Inc., as borrower, Jasper Parent LLC, as holdings, Morgan Stanley Senior Funding, Inc. as administrative agent, and the other lenders party thereto.

"Qualified Institutional Buyer" has the meaning set forth in Rule 144A of the Securities Act.

"Qualified Marketmaker" means an entity that holds itself out to the public or applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company, in its capacity as a dealer or market maker in claims against the Company.

"Requisite Consenting Secured TL Lenders" means, as of the relevant date, Consenting Secured TL Lenders holding more than 50% in aggregate principal amount of Prepetition Secured TL Claims held by all of the Consenting Secured TL Lenders as of such date.

"Requisite Consenting TL Lenders" means, collectively, the Requisite Consenting Secured TL Lenders and Requisite Consenting Unsecured TL Lenders.

"Requisite Consenting Unsecured TL Lenders" means, as of the relevant date, Consenting Unsecured TL Lenders holding no less than 66.67% in aggregate principal amount of Prepetition Unsecured TL Claims held by all of the Consenting Unsecured TL Lenders as of such date.

"Restructuring" has the meaning set forth in the recitals hereof.

"Restructuring Documents" means, collectively, (i) the Plan, (ii) the Disclosure Statement, (iii) the Disclosure Statement Motion, related Plan Solicitation Materials, and the Disclosure Statement Order, (iv) the Confirmation Order, (v) the Plan Supplement and the documents contained therein, (vi) the DIP Financing Credit Agreement, DIP Financing Order, and any credit agreements or motions to approve any exit financing and any related orders, (vii) any asset purchase agreements and related motions for any sale pursuant to section 363 of the Bankruptcy Code and any related orders, (viii) any other material (with materiality determined in the reasonable discretion of the Company's advisors) agreements, motions (excluding any motions seeking to retain or compensate the Company's professional advisors), pleadings, briefs, applications (other than applications to retain or compensate the Company's advisors), orders, and other filings with the Bankruptcy Court, and (ix) all exhibits, schedules, supplements, annexes, and attachments with respect to each of the foregoing (but excluding any declarations).

"Restructuring Expenses" means all reasonable and documented fees and expenses owed by the Company and incurred by the Ad Hoc Secured TL Lender Group Advisors, the Brigade Advisors, and the Ad Hoc Crossover TL Lender Group Advisors, and the Unsecured TL Agent Fees, in each case, in accordance with their respective fee letters or engagement letters, any applicable Bankruptcy Court order, or as otherwise agreed by the Company in connection with the execution of this Agreement.

"Sale Proceeds Payment" means the payments to holders under the ABL Facility and holders of Prepetition Secured TL Facility Claims pursuant to the 363 Sale Order (as defined in the Plan).

"Secured TL Lender" means a lender under the Prepetition Secured TL Credit Agreement.

"Secured TL Lender Termination Event" has the meaning set forth in Section 7.02 hereof.

"Secured TL Lender Trigger Event" has the meaning set forth in Section 7.02 hereof.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

"Sponsor" has the meaning set forth in the preamble hereof, provided that in determining whether any consent or approval in this Agreement has been given by the Sponsor, the Company shall be entitled to rely on an instrument executed or written by Sycamore Partners Management, L.P.

"Term DIP Credit Agreement" has the meaning set forth in the DIP Financing Order.

"Term DIP Facility" has the meaning set forth in the DIP Financing Order.

"Transfer" means any direct or indirect sale, use, pledge, assignment, transfer, or the disposal of Claims.

"Transfer Agreement" means a transfer agreement in the form of **Exhibit B** attached hereto.

"TL Challenge Proceeding" has the meaning set forth in Section 5.04(k) hereof.

"Transferee" means a recipient of the Transfer of a Claim as described in Section 5.05 hereof.

"UCC Standing Motions" means the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respective Such Claims* [Docket No. 718] and the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing, and Authority to Commence and Prosecute Certain Additional Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respect of Such Claims* [Docket No. 731].

"Unsecured TL Agent" means GLAS Trust Company LLC as successor agent under the Prepetition Unsecured TL Credit Agreement.

9

"Unsecured TL Agent Fees" means any fees of the Unsecured TL Agent, including fees for professionals retained by the Unsecured TL Agent in connection with these Chapter 11 Cases, including Quinn Emanuel Urquhart & Sullivan LLP, Sullivan & Worcester LLP, and such other or additional counsel, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring.

"Unsecured TL Lender" means a lender under the Prepetition Unsecured TL Credit Agreement.

"Unsecured TL Lender Termination Event" has the meaning set forth in Section 7.03 hereof.

"Unsecured TL Lender Trigger Event" has the meaning set forth in Section 7.03 hereof.

Unless otherwise specified, references in this Agreement to any Section or clause refer to such Section or clause as contained in this Agreement. The words "herein," "hereof," and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes," and "include" shall each be deemed to be followed by the words "without limitation".  Wherever the consent or the written consent of a Party is required, the Company may rely on email correspondence from the Ad Hoc Crossover TL Lender Group Advisors and the Brigade Advisors, or Ad Hoc Secured TL Lender Group Advisors, and the advisors to the Equity Holder Parties, as applicable.

**Section 2.    Agreement Effective Date; Conditions to Effectiveness.**

The Agreement Effective Date shall occur immediately upon delivery (a) to the Parties of executed and released signature pages for (i) this Agreement from (A) the Requisite Consenting Secured TL Lenders, (B) the Requisite Consenting Unsecured TL Lenders, (C) the Equity Holder Parties, and (D) the Company and (ii) the Belk Commitment Agreement from (Y) Belk, Inc. and (Z) the Company, and (b) to the Company of the executed Belk Retraction Letter from Belk, Inc. Upon the Agreement Effective Date, this Agreement shall be deemed effective and thereafter the terms and conditions herein may only be amended, modified, waived, or otherwise supplemented as set forth in Section 10 hereof.

**Section 3.    Restructuring Documents**

Each of the Restructuring Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Plan, and otherwise be acceptable to the Company, and the Requisite Consenting TL Lenders (such acceptance not to be unreasonably withheld, conditioned, or delayed), including in each case with respect to any material modifications, amendments, deletions, or supplements to such Restructuring Documents at any time during the

10

Plan Support Period.[1]    Notwithstanding the foregoing, the Plan (and any modifications or amendments thereto) and the form of the Confirmation Order must be acceptable to the Requisite Consenting TL Lenders and the Equity Holder Parties (solely with respect to the Equity Holder Parties, such acceptance not to be unreasonably withheld, conditioned, or delayed).

**Section 4.    Plan.**

The Plan is expressly incorporated herein and made part of this Agreement.  The general terms and conditions of the Restructuring are set forth in the Plan.  Prior to the Plan Effective Date, in the event of any inconsistencies between the terms of this Agreement and the Plan, this Agreement shall control and govern.  After the Plan Effective Date, the confirmed Plan shall control and govern and this Agreement shall terminate in accordance with Section 7.08 hereof.

**Section 5.    Commitments Regarding the Restructuring.**

5.01.    <u>Commitments of Consenting Secured TL Lenders</u>.    Subject to the terms and conditions of this Agreement, and so long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Secured TL Lender hereby covenants and agrees to:

(a)    (i) use its commercially reasonable efforts to support the Restructuring and the transactions contemplated by the Plan (including the settlements encompassed therein, including, for the avoidance of doubt, the Equity Holders Settlement), (ii) negotiate in good faith and execute (to the extent such Party is a party thereto) and otherwise support (and not oppose or seek to cause any other entity to oppose) each of the Restructuring Documents, and (iii) act in good faith, support, and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the implementation and consummation of the Restructuring;

(b)    (i) to the extent so requested, timely vote or cause to be voted (subject to receipt of a Disclosure Statement approved by the Bankruptcy Court soliciting votes on the Plan) all of its Claims, including the Claims under the Debt Instruments, that it holds, controls, or has the ability to control to accept the Plan by delivering a duly executed and timely completed ballot or ballots accepting the Plan following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code, (ii) not withdraw, amend, or revoke such vote (or cause or direct such vote to be withdrawn, amended, or revoked), if no Secured Lender Termination Event or Company Termination Event has occurred, (iii) to the extent such election is available, not elect on its ballot to preserve claims, if any, that such Consenting Secured TL Lender may own or control that may be affected by any releases contemplated under the Plan (and, to the extent required by such ballot, to affirmatively "opt in" to any such releases and exculpation), and (iv) support confirmation and consummation of the Plan, including the release and exculpation provisions to be provided in the Plan and contemplated by the Disclosure Statement and Plan Solicitation Materials, and take all reasonably necessary actions in support thereof;

---

[1]  For the avoidance of doubt, the failure to accept the terms of any Restructuring Document or the failure to consent by the Requisite Consenting TL Lenders to any other term or issue addressed in this Agreement or in the Plan shall not be deemed unreasonable merely due to the acceptance or consent by any individual Consenting Unsecured TL Lender or Consenting Secured TL Lender.

(c)    not directly or indirectly (i) object to, vote, or cause to be voted any of its Claims under its control to reject the Plan, (ii) seek, solicit, support, encourage, or vote its Claims for, consent to, or encourage any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring of Company other than the Plan, (iii) seek, solicit, support, or encourage postpetition financing other than as, and to the extent, provided for in this Agreement, (iv) take any other action that is inconsistent with, or that would, or would reasonably be expected to, impede, delay, appeal, or obstruct the proposal, solicitation, confirmation, or consummation of the Plan or the Restructuring that is materially consistent with this Agreement, or (v) instruct the applicable administrative and/or collateral agents under the Debt Instruments or related credit documents to take any action, or refrain from taking any action, that would be inconsistent with this Agreement;

(d)    support (and not object to or otherwise delay) any Restructuring Documents filed by the Company in furtherance of the Restructuring that are materially consistent with this Agreement;

(e)    oppose, and use reasonable efforts to prosecute such opposition to, the UCC Standing Motions;

(f)    notify the Company and the Consenting Unsecured TL Lenders of any material breach by the Consenting Secured TL Lenders of which the Ad Hoc Secured TL Lender Group Advisors have actual knowledge in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the Company in accordance with Section 15.09 hereof within three (3) Business Days of actual knowledge of such breach;

(g)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, the Consenting Secured TL Lenders agree to negotiate in good faith with the Company, the Consenting Unsecured TL Lenders, and other relevant third parties appropriate additional or alternative provisions to address any such impediment;

(h)    not challenge or support any other party that challenges the validity, enforceability, or priority of the Prepetition Unsecured TL Credit Agreement, or any claims or interests arising thereunder; and

(i)    not commence, or join as a plaintiff in, any legal proceeding against any Party hereto by reason of any claim or cause of action contemplated to be released under the Plan.

5.02.    Commitments of Consenting Unsecured TL Lenders.  Subject to the terms and conditions of this Agreement, and so long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Unsecured TL Lender hereby covenants and agrees to:

(a)    (i) use its commercially reasonable efforts to support the Restructuring and the transactions contemplated by the Plan (including the settlements encompassed therein, including, for the avoidance of doubt, the Equity Holders Settlement), (ii) negotiate in good faith and execute (to the extent such Party is a party thereto) and otherwise support (and not oppose or

12

seek to cause any other entity to oppose) each of the Restructuring Documents, and (iii) act in good faith, support, and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the implementation and consummation of the Restructuring;

(b)     (i) timely vote or cause to be voted (subject to receipt of a Disclosure Statement approved by the Bankruptcy Court soliciting votes on the Plan) all of its Claims, including the Claims under the Debt Instruments, that it holds, controls, or has the ability to control to accept the Plan) by delivering a duly executed and timely completed ballot or ballots accepting the Plan following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code, (ii) not withdraw, amend, or revoke such vote (or cause or direct such vote to be withdrawn, amended, or revoked), if no Unsecured Lender Termination Event or Company Termination Event has occurred, (iii) to the extent such election is available, not elect on its ballot to preserve claims, if any, that such Consenting Unsecured TL Lender may own or control that may be affected by any releases contemplated under the Plan (and, to the extent required by such ballot, to affirmatively "opt in" to any such releases and exculpation), and (iv) support confirmation and consummation of the Plan, including the release and exculpation provisions to be provided in the Plan and contemplated by the Disclosure Statement and Plan Solicitation Materials, and take all reasonably necessary actions in support thereof;

(c)     not directly or indirectly (i) object to, vote, or cause to be voted any of its Claims under its control to reject the Plan, (ii) seek, solicit, support, encourage, or vote its Claims for, consent to, or encourage any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring of Company other than the Plan, (iii) seek, solicit, support, or encourage postpetition financing other than as, and to the extent, provided for in this Agreement, (iv) take any other action that is inconsistent with, or that would, or would reasonably be expected to, impede, delay, appeal, or obstruct the proposal, solicitation, confirmation, or consummation of the Plan or the Restructuring that is materially consistent with this Agreement, or (v) instruct the applicable administrative and/or collateral agents under the Debt Instruments or related credit documents to take any action, or refrain from taking any action, that would be inconsistent with this Agreement;

(d)     support (and not object to or otherwise delay) any Restructuring Document filed by the Company in furtherance of the Restructuring that are materially consistent with this Agreement;

(e)     oppose, and use reasonable efforts to prosecute such opposition to, the UCC Standing Motions;

(f)     notify the Company and the Consenting Secured TL Lenders of any material breach by the Consenting Unsecured TL Lenders of which the Ad Hoc Crossover TL Lender Group Advisors or Brigade Advisors have actual knowledge in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the Company in accordance with Section 15.09 hereof within three (3) Business Days of actual knowledge of such breach;

(g)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, the Consenting Unsecured TL Lenders agree to negotiate in good faith with the Company, the Consenting Secured TL Lenders, and other relevant third parties appropriate additional or alternative provisions to address any such impediment;

(h)    not challenge or support any other party that challenges the validity, enforceability, or priority of the Prepetition Secured TL Credit Agreement, any lien or security interest granted in respect thereof, or any claims or interests arising thereunder;

(i)    not object to or commence any legal proceeding challenging the adequate protection granted or proposed to be granted to the holders of Prepetition Secured TL Claims under the DIP Financing Order; and

(j)    not commence, or join as a plaintiff in, any legal proceeding against any Party hereto by reason of any claim or cause of action contemplated to be released under the Plan.

5.03.    <u>Rights of Consenting Unsecured TL Lenders and Consenting Secured TL Lenders Unaffected</u>.  Nothing contained herein, or in any of the confidentiality agreements in place between the Company, the Consenting Unsecured TL Lenders, the Consenting Secured TL Lenders, or their respective advisors, shall limit (a) the rights of the Consenting Secured TL Lenders to take or not take, or direct the administrative agent and/or the collateral agent under the Prepetition Secured TL Credit Agreement to take or not take, any action relating to the maintenance, protection, or preservation of their security interests in and liens on collateral under the Prepetition Secured TL Credit Agreement and related security documents, to the extent not inconsistent with this Agreement; (b) any right of a Consenting Unsecured TL Lender or Consenting Secured TL Lender under any applicable Debt Instrument or any other applicable agreement, instrument, or document that gives rise to such Consenting Unsecured TL Lender's or Consenting Secured TL Lender's Claims, to the extent not inconsistent with this Agreement; (c) the rights of a Consenting Unsecured TL Lender or a Consenting Secured TL Lender under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Unsecured TL Lender's or Consenting Secured TL Lender's obligations hereunder; (d) the ability of a Consenting Unsecured TL Lender or Consenting Secured TL Lender and their advisors to consult with other Parties to this Agreement, the Company, or other parties in interest and their respective advisors; (e) the ability of a Consenting Unsecured TL Lender or a Consenting Secured TL Lender to purchase, sell, or enter into any transactions regarding the Claims, subject to the terms hereof; or (f) the ability of a Consenting Unsecured TL Lender or Consenting Secured TL Lender to enforce any right, remedy, condition, consent, or approval requirement under this Agreement or any of the Restructuring Documents.  Nothing contained in this Agreement shall amend, waive, or modify any of the Debt Instruments or any other agreement, instrument, or document that gives rise to a Consenting Unsecured TL Lenders' or Consenting Unsecured TL Lenders', as applicable, Claims, or constitute the amendment or waiver of any Party's rights and remedies thereunder.

5.04.   <u>Commitments of the Company to the Consenting TL Lenders</u>.  Subject to the terms and conditions of this Agreement, and so long as this Agreement has not been terminated by the Company or the Consenting TL Lenders in accordance with the terms hereof, the Company hereby covenants and agrees to, as to the Consenting TL Lenders:

(a)   (i) support and take all reasonable actions necessary to facilitate the implementation, solicitation, confirmation, and consummation of the Restructuring, (ii) negotiate in good faith and execute (to the extent such Party is a party thereto) and otherwise support (and not oppose or seek to cause any other entity to oppose) each of the Restructuring Documents, (iii) not take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay, or impede the approval of the Disclosure Statement, the solicitation of votes on the Plan, or the confirmation and consummation of the Plan, and (iv) use commercially reasonable efforts to obtain any required regulatory and/or third-party approvals for the Restructuring, if any;

(b)   not take any action inconsistent with, or omit to take any action required by, this Agreement;

(c)   comply with the following deadlines:

(i)   the Company shall obtain entry of an order approving the Disclosure Statement by no later than November 15, 2018;

(ii)   the Company shall obtain the Exit Financing Commitment by no later than November 30, 2018;

(iii)   the Company shall obtain entry of the Confirmation Order confirming the Plan by no later than December 28, 2018; and

(iv)   the Plan Effective Date shall occur no later than January 15, 2019;

(d)   provide the Ad Hoc Secured TL Lender Group Advisors, the Brigade Advisors, and the Ad Hoc Crossover TL Lender Group Advisors, and direct their employees, officers, advisors, and other representatives to provide the Ad Hoc Secured TL Lender Group Advisors, the Brigade Advisors, and the Ad Hoc Crossover TL Lender Group Advisors, with (i) reasonable access (without any material disruption to the conduct of the Company's businesses) during normal business hours to the Company's books and records, (ii) reasonable access to the management and advisors of the Company for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs, and (iii) timely and reasonable responses to all reasonable diligence requests;

(e)   as soon as reasonably practicable, notify the Consenting Secured TL Lenders and Consenting Unsecured TL Lenders of any newly commenced or threatened (x) TL Challenge Proceeding or (y) material governmental, regulatory, or third party litigations, investigations, or hearings, in each case of which the Company Advisors have actual knowledge;

(f)   as soon as reasonably practicable, notify the Consenting Secured TL Lenders and Consenting Unsecured TL Lenders of any material breach by the Company of which

15

the Company Advisors have actual knowledge in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the Consenting Secured TL Lenders and Consenting Unsecured TL Lenders in accordance with Section 15.09 hereof within three (3) Business Days of actual knowledge of such breach;

(g)     distribute drafts of all Restructuring Documents to be filed with the Bankruptcy Court to the Ad Hoc Secured TL Lender Group Advisors, the Brigade Advisors, and the Ad Hoc Crossover TL Lender Group Advisors three (3) calendar days or as soon as reasonably practicable in advance of any filing thereof;

(h)     to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, the Company agrees to negotiate in good faith with the Consenting Secured TL Lenders, the Consenting Unsecured TL Lenders, and other relevant third parties regarding appropriate additional or alternative provisions to address any such impediment;

(i)     not seek, solicit, propose, or support an Alternative Transaction;

(j)     subject to Section 8 of this Agreement, not (i) publicly announce its intention not to pursue the Restructuring, (ii) suspend or revoke the Restructuring, or (iii) execute, file, or agree to file any Restructuring Documents (including any modifications or amendments thereof) that are inconsistent in any material respect with this Agreement;

(k)     oppose and not commence an avoidance action or other legal proceeding (or consent to any other Person obtaining standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability, or priority of the Prepetition Secured TL Credit Agreement, the Prepetition Unsecured TL Credit Agreement, or any Claim under any Debt Instrument held by any Consenting Secured TL Lender or Consenting Unsecured TL Lender (such action or proceeding, a "TL Challenge Proceeding");

(l)     oppose, and support and take all reasonable actions necessary to support opposition of, the UCC Standing Motions;

(m)     not enter into any commitment or agreement with respect to debtor-in-possession financing, use of cash collateral, adequate protection, exit financing, and/or any other financing arrangements other than the facilities contemplated by the Plan unless otherwise agreed to by and among the Company, the Requisite Consenting Unsecured TL Lenders, and the Requisite Consenting Secured TL Lenders, other than such financing arrangements that arise in the ordinary course of the Company's business operations;

(n)     consult with Ducera Partners LLC, in its capacity as financial advisor to the Ad Hoc Secured TL Lender Group, Guggenheim Securities, LLC, in its capacity as financial advisor to the Ad Hoc Unsecured TL Lender Group, and Moelis & Company, LLC, in its capacity as financial advisor to Brigade, on its process for soliciting and obtaining commitments to fund the New Secured Facility and provide such advisors with all information reasonably requested with respect to such process promptly upon request, in each case, so long as such advisor's client remains a party to this Agreement;

(o)    use commercially reasonable best efforts to syndicate the New Secured Facility Upsize Amount (as defined in the Plan);

(p)    not sell any Material Asset outside of the ordinary course of business without the prior written consent of the Requisite Consenting TL Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed); and

(q)    conduct their business in the ordinary course in a manner that is consistent with past practices, and use commercially reasonable efforts to preserve intact their business organization and (subject to such modifications and changes as may be made by the Company in its reasonable business judgment that do not have an adverse effect on the Company) relationships with third parties (including lessors, licensors, suppliers, distributors, and customers) and employees.

5.05.    <u>Commitments of the Company to the Equity Holder Parties</u>.  Subject to the terms and conditions of this Agreement, and so long as this Agreement has not been terminated by the Company or the Equity Holder Parties in accordance with the terms hereof, the Company hereby covenants and agrees to, as to the Equity Holder Parties:

(a)    (i) use its commercially reasonable efforts to support the Restructuring and the transactions contemplated by the Plan (including the settlements encompassed therein, including, for the avoidance of doubt, the Equity Holders Settlement), (ii) negotiate in good faith and execute (to the extent such Party is a party thereto) and otherwise support (and not oppose or seek to cause any other entity to oppose) each of the Restructuring Documents, including the definitive documentation necessary to effectuate the Equity Holders Settlement, and (iii) act in good faith, support, and take all commercially reasonable actions necessary or reasonably requested by the Equity Holder Parties to facilitate the implementation and consummation of the Restructuring;

(b)    not take any action inconsistent with, or omit to take any action required by, this Agreement;

(c)    diligently prosecute confirmation and consummation of the Plan, including the release and exculpation provisions to be provided in the Plan and contemplated by the Disclosure Statement and Plan Solicitation Materials, and take all reasonably necessary actions in support thereof.

(d)    as soon as reasonably practicable, notify the Equity Holder Parties of any newly commenced or threatened (x) TL Challenge Proceeding or (y) material governmental, regulatory, or third party litigations, investigations, or hearings, in each case of which the Company Advisors have actual knowledge;

(e)    as soon as reasonably practicable, notify the Equity Holder Parties of any material breach by the Company of which the Company Advisors have actual knowledge in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the Equity Holder Parties in accordance with Section 15.09 hereof within three (3) Business Days of actual knowledge of such breach;

(f)    negotiate in good faith and execute (to the extent such Party is a party thereto) and otherwise support (and not oppose or seek to cause any other entity to oppose) the definitive documentation necessary to effectuate the Equity Holders Settlement;

(g)    distribute the draft of the form Confirmation Order to be filed with the Bankruptcy Court to the advisors to the Equity Holder Parties three (3) calendar days or as soon as reasonably practicable in advance of any filing thereof;

(h)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, the Company agrees to negotiate in good faith with the Consenting Secured TL Lenders, the Consenting Unsecured TL Lenders, the Equity Holder Parties, and other relevant third parties regarding appropriate additional or alternative provisions to address any such impediment; and

(i)    oppose, and support and take all reasonable actions necessary to support opposition of, the UCC Standing Motions.

5.06.    <u>Commitments of the Equity Holder Parties</u>: Subject to the terms and conditions of this Agreement, and so long as this Agreement has not been terminated by the Equity Holder Parties in accordance with the terms hereof, the Equity Holder Parties hereby covenant and agree to:

(a)    (i) use their commercially reasonable efforts to support the Restructuring and the transactions contemplated by the Plan (including the settlements encompassed therein, including, for the avoidance of doubt, the Equity Holders Settlement), (ii) negotiate in good faith and execute (to the extent such Party is a party thereto) and otherwise support (and not oppose or seek to cause any other entity to oppose) each of the Restructuring Documents, including the definitive documentation necessary to effectuate the Equity Holders Settlement, and (iii) act in good faith, support, and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the implementation and consummation of the Restructuring;

(b)    support confirmation and consummation of the Plan, including the release and exculpation provisions to be provided in the Plan and contemplated by the Disclosure Statement and Plan Solicitation Materials, and take all reasonably necessary actions in support thereof;

(c)    not directly or indirectly (i) object to the Plan, (ii) seek, solicit, support, encourage, consent to, or encourage any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring of Company other than the Plan, (iii) seek, solicit, support, or encourage postpetition financing other than as, and to the extent, provided for in this Agreement, or (iv) take any other action that is inconsistent with, or that would, or would reasonably be expected to, impede, delay, appeal, or obstruct the proposal, solicitation, confirmation, or consummation of the Plan or the Restructuring that is materially consistent with this Agreement;

18

(d)    support (and not object to or otherwise delay) any Restructuring Documents filed by the Company in furtherance of the Restructuring that are materially consistent with this Agreement;

(e)    notify the Company of any material breach by any of the Equity Holder Parties of which the Equity Holder Parties' advisors have actual knowledge in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the Company in accordance with Section 15.09 hereof within three (3) Business Days of actual knowledge of such breach;

(f)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, the Equity Holder Parties agree to negotiate in good faith with all other Parties and other relevant third parties appropriate additional or alternative provisions to address any such impediment;

(g)    not commence or participate in any legal proceeding against any Party hereto by reason of any claim or cause of action contemplated to be released under the Plan so long as this Agreement has not been terminated in accordance with the terms hereof;

(h)    not interfere with any business relationship between the Company and their Affiliates and any of their respective customers, vendors, or suppliers, or cause or threaten to cause any customer, vendor, or supplier of the Company or their Affiliates to cease doing business with the Company or any of their Affiliates, it being agreed that the terms and conditions of Belk Inc.'s overall future business relationship will be as set forth in the Belk Commitment Agreement;

(i)    cause Nine West Topco LLC to (i) on the Agreement Effective Date, to the extent it has not yet previously done so, amend its previously filed 2017 U.S. partnership tax return to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its direct or indirect equity investment in Jasper Parent LLC, (ii) not take any action that results in an ownership change of Jasper Parent LLC within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the direct or indirect equity interests in Jasper Parent LLC as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby potentially resulting in an ownership change of Jasper Parent LLC within the meaning of Section 382(g) of the Internal Revenue Code or by subsequently amending Topco's 2017 U.S. partnership tax return to claim a worthless stock deduction on account of its equity investment in Jasper Parent LLC) until after the Plan Effective Date (it being expressly acknowledged and agreed that Nine West Topco LLC shall be permitted to claim a worthless stock deduction on account of its direct or indirect equity interests in Jasper Parent LLC in the taxable year in which the Plan Effective Date occurs), (iii) not knowingly permit any person (other than Nine West Topco LLC) to own or take any action that would result in any person owning directly, indirectly, or constructively (by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the direct or indirect equity interests in Jasper Parent LLC until on or after the Plan Effective Date, (iv) not change its taxable year to be other than the calendar year until after the Plan Effective Date and (v) take, or refrain from taking, any other action requested by the Company in its reasonable discretion to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its direct or indirect equity investment in Jasper Parent LLC; provided, however, that the Company understands, acknowledges, and agrees that

19

none of the Sponsor, the Minority Equity Holders, or any of their respective Affiliates make any representations or warranties with respect to the existence, realization, or value of any tax attributes of any of the Company;

(j)    on the Plan Effective Date, contribute, or cause to be contributed, to the Company $105,000,000 in Cash; and

(k)    on and after the Agreement Effective Date, the Sponsor shall not directly or indirectly cause its Affiliate, Belk, Inc., to take any action that would breach or otherwise violate the Belk Commitment Agreement.

5.07.    _Transfer of Claims_.  For the period commencing as of the date such Consenting Secured TL Lender and Consenting Unsecured TL Lender executes this Agreement and through the earlier to occur of (a) termination of this Agreement and (b) the Plan Effective Date, and subject to the terms and conditions hereof, each Consenting Secured TL Lender and Consenting Unsecured TL Lender agrees, solely with respect to itself and all affiliates controlled (directly or indirectly) by each such Consenting Secured TL Lender and Consenting Unsecured TL Lender (as applicable), that it shall not Transfer any ownership (including any beneficial ownership) in any of its Claims or any option thereon or any right or interest therein (including by granting any proxies or depositing any interests in the Claims into a voting trust or by entering into a voting agreement (other than this Agreement) with respect to the Claims), unless the intended transferee (x) is a Consenting Secured TL Lender (in the case of Transfer of a Prepetition Secured TL Claim), (y) is a Consenting Unsecured TL Lender (in the case of a Transfer of a Prepetition Unsecured TL Claim), or (z) executes and delivers to counsel to the Company on the terms set forth below an executed form of the Transfer Agreement in the form attached hereto as **Exhibit B** before such Transfer is effective (it being understood that any Transfer shall not be effective until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to the Company, in each case, on the terms set forth herein) (such transfer, a "Permitted Transfer" and such party to such Permitted Transfer, a "Permitted Transferee").

(a)    Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Consenting Secured TL Lender or Consenting Unsecured TL Lender from settling or delivering any Claims to settle any confirmed transaction pending as of the date of such Consenting Secured TL Lender or Consenting Unsecured TL Lender's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Claims so acquired and held (_i.e._, not as a part of a short transaction) shall be subject to the terms of this Agreement), (ii) a Qualified Marketmaker that acquires any Claims with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a Consenting Secured TL Lender, Consenting Unsecured TL Lender, or Permitted Transferee and the transfer otherwise is a Permitted Transfer, and (iii) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of Claims that is not a Consenting Secured TL Lender or Consenting Unsecured TL Lender to a transferee that is not a Consenting Secured TL Lender

20

or Consenting Unsecured TL Lender at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Transfer Agreement.

(b)    This Agreement shall in no way be construed to preclude either of the Consenting Secured TL Lenders or the Consenting Unsecured TL Lenders from acquiring additional Claims; provided, however, that any such acquired Claims shall automatically and immediately upon acquisition by such Consenting Secured TL Lender or Consenting Unsecured TL Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Company as set forth above), other than with respect to any Claims acquired by such Consenting Secured TL Lender or Consenting Unsecured TL Lender in its capacity as a Qualified Marketmaker.

(c)    This Section 5.05 shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Secured TL Lender or Consenting Unsecured TL Lender to Transfer any Claims. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information (each such executed agreement as may be amended from time to time, a "Confidentiality Agreement"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

(d)    Any Transfer made in violation of this Section 5.05 shall be void ab initio.

(e)    For the avoidance of doubt, (i) following a Permitted Transfer by a Consenting Secured TL Lender or Consenting Unsecured TL Lender of all of its interests in the Claims, such Consenting Secured TL Lender or Consenting Unsecured TL Lender shall have no additional or continuing obligations under this Agreement or any related direction letters to any agent or trustee, and (ii) prior to the effective date of a Permitted Transfer, the Permitted Transferee shall not have obligations or liabilities under this Agreement or any related direction letters to any agent or trustee to any party to the Agreement.

## Section 6.    Representations and Warranties.

6.01.    Mutual Representations and Warranties.    Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows:

(a)    It is existing and in good standing under the laws of the legal jurisdiction of its organization, and this Agreement is a legal and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws or equitable principles;

(b)    Except as expressly provided in this Agreement, it has all requisite direct or indirect power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part and no consent,

approval of, action of, filing with, or notice to any governmental or regulatory authority is required in connection with the execution, delivery, and performance of this Agreement; and

(d)    It (or an ad hoc group of which it is a member) has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel (or legal counsel to an ad hoc group of which it is a member) and has not relied on any statements made by any other Party or its legal counsel (or legal counsel to an ad hoc group of which it is a member) as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof.

6.02.    <u>Representations of Consenting Secured TL Lenders</u>. Each of the Consenting Secured TL Lenders, severally and not jointly, represents and warrants that, as of the date such Consenting Secured TL Lender executes and delivers this Agreement (or, if such Party is a Transferee, as of the date such Transferee executes and delivers the applicable Joinder):

(a)    it (i) is either (A) the sole legal and beneficial owner of the principal amount of the Claims set forth below its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of the Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (iii) holds no Claims that are not identified below its signature hereto;

(b)    other than pursuant to this Agreement, such Claims that are subject to Section 6.02(a) hereof are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would materially and adversely affect such Consenting Secured TL Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

(c)    it has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement; and

(d)    it is either (i) a Qualified Institutional Buyer, (ii) an Accredited Investor, (iii) a non-U.S. person under Regulation S under the Securities Act, or (iv) the foreign equivalent of the foregoing clauses (i) or (ii).

6.03.    <u>Representations of Consenting Unsecured TL Lenders</u>. Each of the Consenting Unsecured TL Lenders, severally and not jointly, represents and warrants that, as of the date such Consenting Unsecured TL Lenders executes and delivers this Agreement (or, if such Party is a Transferee, as of the date such Transferee executes and delivers the applicable Joinder):

(a)    it (i) is either (A) the sole legal and beneficial owner of the principal amount of the Claims set forth below its signature hereto, or (B) has sole investment or voting discretion

with respect to the principal amount of the Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote, and consent to matters concerning such Claims and dispose of, exchange, assign, and transfer such Claims, and (iii) holds no Claims that are not identified below its signature hereto;

(b)    other than pursuant to this Agreement, such Claims that are subject to Section 6.02(a) hereof are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would materially and adversely affect such Consenting Unsecured TL Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

(c)    it has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement; and

(d)    it is either (i) a Qualified Institutional Buyer, (ii) an Accredited Investor, (iii) a non-U.S. person under Regulation S under the Securities Act, or (iv) the foreign equivalent of the foregoing clauses (i) or (ii).

6.04.    <u>Representations of Equity Holder Parties</u>. Each Equity Holder Party, severally and not jointly, represents and warrants that, as of the date such Equity Holder Party executes and delivers this Agreement:

(a)    it has, or will have on the Plan Effective Date, immediately available funds equal to such Equity Holder Party's share of the Equity Holders Settlement consideration;

(b)    it is unaware of any impediment that would prevent Nine West Topco LLC (to the extent it has not yet previously done so) from amending its previously filed 2017 U.S. partnership tax return to reverse the worthless stock deduction taken by Nine West Topco LLC on account of its direct or indirect equity investment in Jasper Parent LLC; and

(c)    to the best of its knowledge after reasonable inquiry, the Equity Holder Party has, and its employees, officers, advisors, and other representatives have, complied truthfully and in good faith with the information requests of the Company, the UCC, and their respective advisors, with respect to their respective investigations of the Estate Causes of Action (as defined in the Plan).

## Section 7.    Termination Events.

7.01.    Notwithstanding any provision in this Agreement to the contrary, no Party shall terminate this Agreement as to such Party if such Party is in material breach of any provision hereof; <u>provided</u>, <u>however</u>, that (x) the Company may terminate this Agreement under Section 7.04(c) hereof notwithstanding any existing breach by the Company and (y) this Agreement may

be terminated by mutual agreement among all Parties under Section 7.05 hereof notwithstanding any existing breach by any Party.

7.02.    <u>Secured TL Lender Termination</u>.  Requisite Consenting Secured TL Lenders may terminate this Agreement (such termination, a "<u>Secured TL Lender Termination Event</u>") only as to the Consenting Secured TL Lenders if, upon the occurrence and continuation of any of the following events (each, a "<u>Secured TL Lender Trigger Event</u>"), such Requisite Consenting Secured TL Lenders provides the Company, the Equity Holder Parties, and the Consenting Unsecured TL Lenders written notice of such Secured TL Lender Trigger Event delivered in accordance with Section 15.09 hereof, and (x) such Secured TL Lender Trigger Event remains uncured for a period of five (5) Business Days following such Requisite Consenting Secured TL Lenders' service of such notice (other than as set forth in Section 7.02(c)), and (y) such Requisite Consenting Secured TL Lenders have not waived such Secured TL Lender Trigger Event on or before the expiration of such cure period:

(a)    a breach by the Company, any Equity Holder Party, or the Consenting Unsecured TL Lenders of any of their respective obligations, representations, warranties, or covenants set forth in this Agreement in any respect that adversely affects, in any material respect, the Consenting Secured TL Lenders' interests in connection with the Restructuring, the Plan, or this Agreement;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any (i) ruling or order enjoining the consummation of the Restructuring in a way that cannot be reasonably remedied by the Company in a manner that is reasonably satisfactory to the Requisite Consenting Secured TL Lenders, or (ii) final, non-appealable ruling or order preventing the consummation of a material portion of the Restructuring;

(c)    the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of:  (i) three (3) Business Days after the Company receives written notice from the Requisite Consenting Secured TL Lenders that such motion or pleading is inconsistent, in any material respect, with this Agreement or the Plan, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(d)    the Company (i) withdraws the Plan or publicly announces its intention to withdraw the Plan or to pursue an Alternative Transaction, (ii) moves voluntarily to dismiss any of the Chapter 11 Cases, (iii) moves for conversion of any of the Chapter 11 Cases to chapter 7 under the Bankruptcy Code, or (iv) moves for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Chapter 11 Cases, or supports any other Person seeking any of the foregoing relief;

(e)    the occurrence of an Unsecured TL Lender Termination Event or an Equity Holder Parties Termination Event;

(f)    the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in

any of the Chapter 11 Cases to operate the Company's businesses pursuant to section 1104 of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases, in each case if such order has not been stayed, reversed, or vacated within fourteen (14) calendar days;

(g)    the Company's filing of any Restructuring Document, or the waiver, amendment, or modification of any of the Restructuring Documents in a manner materially inconsistent with this Agreement, without the consent of the Requisite Consenting Secured TL Lenders;

(h)    the Company's use of cash collateral has been terminated in accordance with the terms of the DIP Financing Order;

(i)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any Material Asset of the Company in a manner that materially impacts the Consenting Secured TL Lenders without the prior written consent of the Requisite Consenting Secured TL Lenders (such consent not to be unreasonably withheld, conditioned, or delayed);

(j)    the Company files or supports (or fails to timely object to) another party in filing a motion or pleading challenging the amount or validity of any Prepetition Secured TL Claim inconsistent with this Agreement;

(k)    the termination of any Exit Financing Commitment obtained by the Company in satisfaction of the Exit Financing Commitment Milestone, without the Company obtaining a replacement Exit Financing Commitment within ten (10) calendar days of such termination;

(l)    the Company fails to meet any of the Chapter 11 Milestones;

(m)    the failure by the Company to make adequate protection payments to the Consenting Prepetition Secured TL Lenders in accordance with the DIP Financing Order; or

(n)    the Bankruptcy Court enters a final order (i) disallowing, invalidating, subordinating, recharacterizing, or declaring unenforceable the claims, liens, or interests, in whole or in part, held by any Secured TL Lender arising under the Prepetition Secured TL Credit Agreement or any related document, (ii) granting the UCC Standing Motion in whole or in part, or granting standing to any Person to pursue any estate claim or causes of action, or commence any avoidance action (including a TL Challenge Proceeding) or any other legal proceeding, but only if the party granted standing has the exclusive right to settle such estate claim or cause of action, or (iii) ordering the Prepetition Secured TL Lenders to disgorge, in whole or in part, the Sale Proceeds Payment.

7.03.    Unsecured TL Lender Termination.    The Requisite Consenting Unsecured TL Lenders may terminate this Agreement (such termination, an "Unsecured TL Lender Termination Event") only as to the Consenting Unsecured TL Lenders if, upon the occurrence and continuation of any of the following events (each, an "Unsecured TL Lender Trigger Event"), such Requisite Consenting Unsecured TL Lenders provide the Company, the Equity Holder Parties, and the

25

Consenting Secured TL Lenders written notice of such Unsecured TL Lender Trigger Event delivered in accordance with Section 15.09 hereof, and (x) such Unsecured TL Lender Trigger Event remains uncured for a period of five (5) Business Days following such Requisite Consenting Unsecured TL Lenders' service of such notice (other than as set forth in Section 7.03(f)), and (y) such Requisite Consenting Unsecured TL Lenders have not waived such Unsecured TL Lender Trigger Event on or before the expiration of such cure period:

(a)    a breach by the Company or the Consenting Secured TL Lenders of any of their respective obligations, representations, warranties, or covenants set forth in this Agreement in any respect that adversely affects, in any material respect, the Consenting Unsecured TL Lenders' interests in connection with the Restructuring, the Plan, or this Agreement;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any (i) ruling or order enjoining the consummation of the Restructuring in a way that cannot be reasonably remedied by the Company in a manner that is reasonably satisfactory to the Requisite Consenting Unsecured TL Lenders or (ii) final, non-appealable ruling or order preventing the consummation of a material portion of the Restructuring;

(c)    the occurrence of a Secured TL Lender Termination Event or an Equity Holder Parties Termination Event;

(d)    the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases to operate the Company's businesses pursuant to section 1104 of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases, in each case if such order has not been stayed, reversed, or vacated within fourteen (14) calendar days;

(e)    the Company's use of cash collateral has been terminated in accordance with the terms of the DIP Financing Order;

(f)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any Material Asset of the Company in a manner that materially impacts the Consenting Unsecured TL Lenders without the prior written consent of the Requisite Consenting Unsecured TL Lenders (such consent not to be unreasonably withheld, conditioned, or delayed);

(g)    the Company files or supports (or fails to timely object to) another party in filing a motion or pleading challenging the amount or validity of any Prepetition Unsecured TL Claim;

(h)    the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of:  (i) three (3) Business Days after the Company receives written notice from the Requisite Consenting Unsecured TL Lenders that such motion or pleading is inconsistent, in any material respect, with this Agreement or the Plan, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(i)    the Company (i) withdraws the Plan or publicly announces its intention to withdraw the Plan or to pursue an Alternative Transaction, (ii) moves voluntarily to dismiss any of the Chapter 11 Cases, (iii) moves for conversion of any of the Chapter 11 Cases to chapter 7 under the Bankruptcy Code, or (iv) moves for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Chapter 11 Cases, or supports any other Person seeking any of the foregoing relief;

(j)    the Company's filing of any Restructuring Document, or the waiver, amendment, or modification of any of the Restructuring Documents in a manner materially inconsistent with this Agreement, without the consent of the Requisite Consenting Unsecured TL Lenders;

(k)    the Company fails to meet any of the Chapter 11 Milestones; or

(l)    the Bankruptcy Court enters a final order (i) disallowing, invalidating, subordinating, recharacterizing, or declaring unenforceable the claims, or interests, in whole or in part, held by any Unsecured TL Lender arising under the Prepetition Unsecured TL Credit Agreement or any related document, (ii) granting the UCC Standing Motion in whole or in part, or granting standing to any Person to pursue any estate claim or causes of action, or commence any avoidance action (including a TL Challenge Proceeding) or any other legal proceeding, but only if the party granted standing has the exclusive right to settle such estate claim or cause of action, or (iii) ordering the Prepetition Secured TL Lenders to disgorge, in whole or in part, the Sale Proceeds Payment.

7.04.    Company Termination.    Except as otherwise set forth in this Section 7.04, the Company may terminate this Agreement (such termination, a "Company Termination Event") if, upon the occurrence of any of the following events (each, a "Company Trigger Event"), the Company provides the Consenting Secured TL Lenders, the Consenting Unsecured TL Lenders, and the Equity Holder Parties written notice of such Company Trigger Event delivered in accordance with Section 15.09 hereof, and (x) such Company Trigger Event remains uncured for a period of five (5) Business Days following the Company's service of such notice and (y) the Company has not waived such Company Trigger Event on or before the expiration of such cure period:

(a)    a breach by any Equity Holder Party, any Consenting Secured TL Lenders or any Consenting Unsecured TL Lenders of any of their respective obligations, representations, warranties, or covenants set forth in this Agreement in any respect that adversely affects, in any material respect, the Company's ability to consummate the Restructuring or the Plan;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any (i) ruling or order enjoining the consummation of the Restructuring in a way that cannot be reasonably remedied by the Company in a manner that is reasonably satisfactory to the Company, the Requisite Consenting Secured TL Lenders, and the Requisite Consenting Unsecured TL Lenders, or (ii) final, non-appealable ruling or order preventing the consummation of a material portion of the Restructuring;

(c)    following the Company determining, after consultation with outside counsel, that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties as described in Section 8 hereof; provided, that, notwithstanding any provision in this Agreement to the contrary, upon such determination, the Company shall be entitled, but not required, to terminate this Agreement immediately upon written notice to each of the Consenting Secured TL Lenders, the Consenting Unsecured TL Lenders, and the Equity Holder Parties, delivered in accordance with Section 15.09 hereof; or

(d)    the occurrence of an Equity Holder Parties Termination Event, an Unsecured TL Lender Termination Event or a Secured TL Lender Termination Event (only if less than 66.7% of the Prepetition Unsecured TL Claims are subject to this Agreement).

7.05.    Equity Holder Parties Termination.  Except as otherwise set forth in this Section 7.05, the Equity Holder Parties may terminate this Agreement (such termination, a "Equity Holder Parties Termination Event") only as to the Sponsor or the Minority Equity Holders, as applicable, if, upon the occurrence of any of the following events (each, a "Equity Holder Parties Trigger Event"), the Sponsor and/or the Minority Equity Holders provide the Consenting Secured TL Lenders, the Consenting Unsecured TL Lenders, and the Company written notice of such Equity Holder Parties Trigger Event delivered in accordance with Section 15.09 hereof, and (x) such Equity Holder Parties Trigger Event remains uncured for a period of five (5) Business Days following the Equity Holder Parties' service of such notice and (y) the applicable Equity Holder Parties have not waived such Equity Holder Parties Trigger Event on or before the expiration of such cure period:

(a)    a breach by the Company, the Consenting Secured TL Lenders, or the Consenting Unsecured TL Lenders of any of their respective obligations, representations, warranties, or covenants set forth in this Agreement in any respect that adversely affects, in any material respect, the Equity Holder Parties' interests in connection with the Restructuring, the Plan, or this Agreement;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any (i) ruling or order enjoining the consummation of the Restructuring in a way that cannot be reasonably remedied by the Company, or (ii) final, non-appealable ruling or order preventing the consummation of a material portion of the Restructuring that adversely affects, in any material respect, the Equity Holder Parties' interests in connection with the Restructuring, the Plan, or this Agreement; or

(c)    the Company's filing of any Restructuring Document, or the waiver, amendment, or modification of any of the Restructuring Documents in a manner materially inconsistent with this Agreement that adversely affects the Equity Holder Parties' rights, without the consent of the Sponsor or the Minority Equity Holders, as applicable.

7.06.    Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the Company, the Requisite Consenting Secured TL Lenders, the  Requisite Consenting Unsecured TL Lenders, and the Equity Holder Parties.

7.07.  Individual Termination Right. Any individual Consenting Secured TL Lender or Consenting Unsecured TL Lender shall have the right to terminate this Agreement, as to itself only, if (i) such Consenting Secured TL Lender or Consenting Unsecured TL Lender is not otherwise in breach of any of its obligations, representations, warranties, or covenants set forth in this Agreement and (ii) the Plan Effective Date has not occurred by January 15, 2019. Notwithstanding anything contained herein, Brigade shall have the right to terminate this Agreement, as to itself only, if the Company enters into, or files, any Restructuring Document that includes terms (by amendment or otherwise) that Brigade determines are inconsistent with this Agreement or the Plan and such terms materially and adversely affect the rights or economic recovery relating to Brigade's Claims under any Debt Instruments (which determination may be contested by the Company), *provided* that this termination right shall only apply if Brigade provides a written notice in accordance with Section 15.09 hereof detailing any such inconsistent terms within ten (10) calendar days of the Company providing Brigade with written notice of its entry into or filing of such Restructuring Document and such event remains uncured for five (5) Business Days after Brigade provides such notice.  In the event a Party terminates pursuant to this Section 7.07 such termination shall be effective as to such Party only, shall not affect any of the rights or obligations of any other Party to this Agreement.

7.08.  Automatic Termination.  This Agreement, and the obligations of all Parties, shall be terminated automatically and immediately without any further required action or notice required by or to any Party on the Plan Effective Date.

7.09.  Automatic Stay. The Company acknowledges and agrees and shall not dispute that the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided).

7.10.  Effect of Termination.

(a)  Upon the termination of this Agreement as to the Equity Holder Parties, Consenting Secured TL Lenders, or the Consenting Unsecured TL Lenders pursuant to either an Equity Holder Parties Termination Event, a Secured TL Lender Termination Event, or an Unsecured TL Lender Termination Event, respectively, this Agreement shall remain binding as to the other Parties hereto unless such Parties also terminate this Agreement pursuant to the terms hereof. Notwithstanding the foregoing, (i) a Consenting Secured TL Lender that is also a Consenting Unsecured TL Lender may terminate this Agreement as to all of its Claims under any Debt Instrument upon an Unsecured TL Lender Termination Event, and (ii) a Consenting Unsecured TL Lender that is also a Consenting Secured TL Lender may terminate this Agreement as to all of its Claims under any Debt Instrument upon a Secured TL Lender Termination Event. Upon the occurrence of either a Secured TL Lender Termination Event or an Unsecured TL Lender Termination Event, (i) this Agreement shall be of no further force and effect as to the Consenting Secured TL Lenders or the Consenting Unsecured TL Lenders, as applicable, and such Consenting Secured TL Lenders or Consenting Unsecured TL Lenders, as applicable, shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would

29

have been entitled to take had it not entered into this Agreement, and (ii) any and all consents tendered by such Consenting Secured TL Lenders, such Consenting Unsecured TL Lenders, and the Equity Holder Parties, as applicable, prior to such termination shall be deemed, for all purposes, to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, the Plan, and this Agreement or otherwise and such consents may be changed or resubmitted; provided, however, that if the approval of the Bankruptcy Court shall be required under applicable law for such Consenting Secured TL Lenders, Consenting Unsecured TL Lenders, or Equity Holder Party to change or resubmit such consents, then the Company shall not oppose any attempt by such Consenting Secured TL Lenders, Consenting Unsecured TL Lenders, or Equity Holder Party, to terminate, change, or resubmit the consent under this Section 7.10(a).

(b)     Upon the termination of this Agreement by a Consenting Secured TL Lender or Consenting Unsecured TL Lender (or, in each case, Brigade), pursuant to Section 7.07, solely with respect to such Consenting Secured TL Lender or Consenting Unsecured TL Lender (i) this Agreement shall be of no further force and effect as to such Consenting Secured TL Lender or Consenting Unsecured TL Lender, and such Consenting Secured TL Lender or Consenting Unsecured TL Lender, as applicable, shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, and (ii) any and all consents tendered by such Consenting Secured TL Lender or such Consenting Unsecured TL Lender, as applicable, prior to such termination shall be deemed, for all purposes, to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, the Plan, and this Agreement or otherwise and such consents may be changed or resubmitted.  Notwithstanding anything herein to the contrary, to the extent a Consenting Unsecured TL Lender or Consenting Secured TL Lender terminates its obligations under this Agreement in accordance with Section 7.07, such termination shall not automatically terminate this Agreement or, in itself, provide any other Party with the right to terminate its obligations hereunder.

(c)     Upon termination of this Agreement pursuant to a Company Termination Event or a mutual termination pursuant to Section 7.05 hereof, (i) this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, and (ii) any and all consents tendered by the Consenting Secured TL Lenders and the Consenting Unsecured TL Lenders prior to such termination shall be deemed, for all purposes, to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, the Plan, and this Agreement or otherwise and such consents may be changed or resubmitted; provided, however, that if the approval of the Bankruptcy Court shall be required under applicable law in order for such Consenting Secured TL Lenders or Consenting Unsecured TL Lenders to change or resubmit such consents, then the Company shall not oppose any attempt by such Consenting Secured TL Lenders or Consenting Unsecured TL Lenders to terminate, change, or resubmit the consent under this Section 7.10(c).

**Section 8.        Fiduciary Duties.**

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company, or any directors, officers, or employees of the Company (in such person's capacity as a director, officer, or employee) to take any action, or to refrain from taking any action, to the extent that the Company or its board of directors or officers determines in good faith, after consultation with outside counsel, that taking such action or refraining from taking such action may be inconsistent with its or their fiduciary obligations under applicable law, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided, however, that the effect of any such action or inaction (and to the extent the Company does not terminate this Agreement in accordance with this Section 8 and Section 7.04(c) hereof), shall provide the Consenting Secured TL Lenders, the Consenting Unsecured TL Lenders and the Equity Holder Parties, with the ability to terminate this Agreement in accordance with Sections 7.02, 7.03, and 7.05, respectively.  The Company, in its sole discretion, may (but shall not be required to) terminate this Agreement in accordance with Section 7.04(c) hereof, and specific performance shall not be available as a remedy if this Agreement is terminated in accordance with this Section 8 and Section 7.04(c) hereof.  All Equity Holder Parties, Consenting Secured TL Lenders and Consenting Unsecured TL Lenders reserve all rights they may have, including the right (if any) to challenge any exercise by the Company of its ability to terminate this Agreement under Section 7.04(c) pursuant to this Section 8.

Notwithstanding the foregoing, if, prior to the Confirmation Hearing, any Entity provides the Company with a proposal for what that Entity believes to be a higher or otherwise better transaction than what is contemplated by the Plan, including a proposal that provides higher and better consideration for the Estate Causes of Action than what is contemplated under the Equity Holders Settlement, the Company shall promptly inform the Parties hereto and the Committee, and shall consult in good faith with the Parties.

For the avoidance of doubt, as of the date of this Agreement, the Company acknowledges it has decided to enter into this Agreement on the terms and conditions set forth herein and in the Plan in the exercise of its fiduciary duties.

**Section 9.        Remedies.**

The Parties agree that any breach of this Agreement would give rise to irreparable damage for which monetary damages would not be an adequate remedy.  Each of the Equity Holder Parties, Consenting Secured TL Lenders, Consenting Unsecured TL Lenders, and the Company, accordingly agree that any of the Consenting Secured TL Lenders, Consenting Unsecured TL Lenders, Equity Holder Parties, or the Company, as the case may be, will be entitled to enforce the terms of this Agreement by decree of specific performance without the necessity of proving the inadequacy of monetary damages as a remedy and to obtain injunctive relief against any breach or threatened breach; provided, however, that specific performance shall not be an available remedy against the Company if the Company terminates this Agreement in accordance with, and subject to, Section 7.04(c) and Section 8 hereof.  The Parties agree that such relief will be their only remedy against the applicable breaching Party or Parties with respect to any such breach, and that in no event will any Party be liable for monetary damages under or in connection with this Agreement.

31

**Section 10.     Amendments and Waiver.**

(a)     This Agreement may only be modified, amended, or supplemented in a writing signed by the Company and the Requisite Consenting TL Lenders; provided that if any such Party is no longer a Party to this Agreement, such Party's consent will not be required for such modification, amendment, or supplement to this Agreement; provided, however, that any modification, amendment, or change to (i) the definition of Requisite Consenting Secured TL Lenders or the threshold of Consenting Secured TL Lenders set forth in Section 7.02 to exercise a Secured Creditor Termination Event shall also require the written consent of each Consenting Secured TL Lender, (ii) the definition of Requisite Consenting Unsecured TL Lenders or the threshold of Consenting Unsecured TL Lenders set forth in Section 7.02 to exercise an Unsecured Creditor Termination Event shall also require the written consent of each Consenting Unsecured TL Lender, (iii) this Section 10 shall require the written consent of the Company, each Consenting Secured TL Lender, and each Consenting Unsecured TL Lender, (iv) Section 7.07 shall also require the written consent of each Consenting Secured TL Lender, and each Consenting Unsecured TL Lender, (v) this Agreement that treats or affects any Consenting Secured TL Lender or Consenting Unsecured TL Lender in a manner that is disproportionately adverse, on an economic or non-economic basis, to the treatment of their Prepetition Secured TL Claims or Prepetition Unsecured TL Claims, as applicable, shall also require the written consent of such Consenting Secured TL Lender or Consenting Unsecured TL Lender, as applicable.

(b)     In determining whether any consent or approval has been given or obtained by the Requisite Consenting Secured TL Lenders or Requisite Consenting Unsecured TL Lenders, any Prepetition Secured TL Lender Claims or Prepetition Unsecured TL Lender Claims, as applicable, held by any then-existing Consenting Secured TL Lender or Consenting Unsecured TL Lender that is in material breach of its covenants, obligations, or representations under this Agreement shall be excluded from such determination, and the Prepetition Secured TL Lender Claims or Prepetition Unsecured TL Lender Claims, as applicable, held by such Consenting Secured TL Lender or Consenting Unsecured TL Lender shall be treated as if they were not outstanding

(c)     Any waiver shall not be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.

(d)     The failure of any Party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party with its obligations hereunder shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

**Section 11.     Equity Holder Parties Amendments and Waivers**

Notwithstanding in Section 10, (a) this Agreement may not be amended or modified in a way that materially and adversely affects the Equity Holder Parties without their express written consent, (b) any amendment or modification of the definition of the Sponsor or the Minority Equity

Holders shall require the written consent of the applicable Equity Holder Parties, (c) any modification or amendment to the Equity Holder Settlement embodied herein or in the Plan requires the consent of the Equity Holder Parties, and (d) the modification, amendment, or supplement to this Section 11 shall require the written consent of each Equity Holder Party,

**Section 12.    Restructuring Expenses.**

Unless otherwise paid during the Chapter 11 Cases pursuant to the DIP Financing Order, the Company hereby agrees to pay in full, in cash, all accrued and unpaid Restructuring Expenses incurred in accordance with an advisor's respective fee letter or engagement letter incurred up to (and including) the Plan Effective Date (including all accrued and unpaid fees and expenses incurred through the Agreement Effective Date) by Parties still subject to this Agreement, without any requirement for Bankruptcy Court review or further Bankruptcy Court order. Notwithstanding the foregoing, nothing herein shall affect or limit any obligations of the Company to pay the Restructuring Expenses as provided in the DIP Financing Order. Notwithstanding the foregoing, nothing in this section shall require the Company to pay any Restructuring Expenses incurred in connection with any action by a Party in furtherance of a Secured TL Lender Trigger Event, an Unsecured TL Lender Trigger Event, or a Company Trigger Event, in each case other than as a result of a breach by the Company, or to any Party that exercises its individual termination right pursuant to Section 7.07 hereof.

**Section 13.    No Solicitation.**

Notwithstanding anything to the contrary herein, this Agreement is not and shall not be deemed to be (a) a solicitation of consent to the Plan or any chapter 11 plan or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act and the Securities Exchange Act of 1934, as amended. The acceptance of any party will not be solicited until such party has received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

**Section 14.    Disclosure.**

The Company shall (a) submit drafts to the Ad Hoc Secured TL Lender Group Advisors, the Brigade Advisors, the Ad Hoc Crossover TL Lender Group Advisors, and the advisors to the Equity Holder Parties of any press releases and public documents that constitute the disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) calendar days or as soon as reasonably practicable prior to making any such disclosure, (b) afford such advisors a reasonable opportunity under the circumstances to comment on such documents and disclosures, and (c) incorporate comments received from such advisors in good faith. Except as required by law or otherwise permitted under the terms of any other agreement between the Company, on the one hand, and the Ad Hoc Secured TL Lender Group, the Ad Hoc Crossover TL Lender Group, the Equity Holder Parties, or Brigade, on the other hand, no Party or its advisors (including counsel to any Party) shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Prepetition Secured TL Claim or Prepetition Unsecured TL Claim or any other securities of the Company held by any Party, in each case, without such Party's prior written

consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant disclosing Party) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Prepetition Secured TL Claim or Prepetition Unsecured TL Claim held by all Parties to this Agreement.  Notwithstanding the provisions in this Section 14, any Party may disclose, to the extent consented to in writing by a duly authorized officer or representative of the affected Party, such Party's individual holdings.

**Section 15.    Miscellaneous.**

15.01.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Restructuring in a manner materially consistent with the terms set forth in this Agreement.

15.02.  Complete Agreement.  This Agreement and the exhibits hereto represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between the Parties with respect thereto.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of the applicable Parties (which Parties, for the avoidance of doubt, must include the Company).

15.03.  Parties.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 5.05 hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

15.04.  Headings.  The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

15.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court, and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court, and (c) waives any objection that the Bankruptcy Court are an inconvenient forum or do not have jurisdiction over any Party hereto.  Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

15.06. <u>Execution of Agreement</u>.    This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

15.07. <u>Interpretation</u>.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

15.08. <u>Successors and Assigns</u>.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

15.09. <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

   (a)  if to the Company, to:

    Nine West Holdings, Inc.
    1411 Broadway
    New York, New York 10018
    Attn:   Patricia Anne Lind (plind@ninewestholdings.com)

    with copies (which shall not constitute notice) to:

    Kirkland & Ellis LLP
    300 North LaSalle
    Chicago, Illinois 60654
    Attn:   James A. Stempel (james.stempel@kirkland.com)
      Christopher J. Marcus, P.C. (christopher.marcus@kirkland.com)
      Joseph M. Graham (joe.graham@kirkland.com)
      Angela M. Snell (angela.snell@kirkland.com)
      Justin Alphonse Mercurio (justin.mercurio@kirkland.com)

   (b)  if to a Consenting Secured TL Lenders or a Transferee thereof, to the physical or e-mail address set forth on such Consenting Secured TL Lender's signature page (or as directed by any Transferee thereof), as the case may be, with copies (which shall not constitute notice) to each of:

    Davis Polk & Wardwell LLP
    450 Lexington Avenue
    New York, NY 10017
    Attn:   Marshall S. Huebner (marshall.huebner@davispolk.com)
      Darren S. Klein (darren.klein@davispolk.com)
      Adam L. Shpeen (adam.shpeen@davispolk.com)

(c)    if to a Consenting Unsecured TL Lender or a Transferee thereof, to the physical or e-mail address set forth on such Consenting Unsecured TL Lender's signature page (or as directed by any Transferee thereof), as the case may be, with copies (which shall not constitute notice) to each of:

> King & Spalding LLP
> 1185 Avenue of the Americas
> New York, NY 10036
> Attn:   Jeffrey D. Pawlitz (jpawlitz@kslaw.com)
>             Michael R. Handler (mhandler@kslaw.com)
>             David S. Zubricki (dzubricki@kslaw.com)
>
> and
>
> Kramer Levin Naftalis & Frankel LLP
> 1177 Avenue of the Americas
> New York, NY 10036
> Attn:   Douglas Mannal (dmannal@kramerlevin.com)
>             Rachael Ringer (rringer@kramerlevin.com)

(d)    if to the Sponsor, to the physical or e-mail address set forth on the Sponsor's signature page, as the case may be, with copies (which shall not constitute notice) to each of:

> Proskauer Rose LLP
> 11 Times Square
> New York, New York 10036-8299
> Attn: Michael T. Mervis (mmervis@proskauer.com)
>
> and
>
> Proskauer Rose LLP
> 70 West Madison Street
> Suite 3800
> Chicago, Illinois 60602
> Attn: Mark K. Thomas (mthomas@proskauer.com)
>
> and
>
> Proskauer Rose LLP
> 2049 Century Park East
> 32nd Floor
> Los Angeles, California 90067-3206
> Attn: Peter J. Young (pyoung@proskauer.com)

(e)    if to the Minority Equity Holders, to the physical or e-mail address set forth on the Minority Equity Holders' signature page, as the case may be, with copies (which shall not constitute notice) to each of:

Milbank, Tweed, Hadley & McCloy LLP
1850 K Street NW, Suite 1100
Washington, DC 20006
Attn: Andrew M. Leblanc (aleblanc@milbank.com)

15.10.  Several, Not Joint, Obligations.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.11.  Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated hereunder.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

15.12.  No Third-Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

15.13.  Reservation of Rights; Settlement Discussions.  Subject to and except as expressly provided in this Agreement or in any amendment thereof agreed upon by the Parties pursuant to the terms hereof, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases.  Without limiting the foregoing sentence in any way, if the Restructuring is not consummated, or if this Agreement is terminated for any reason, nothing in this Agreement shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses (including, for the avoidance of doubt, with respect to any claims or causes of action proposed to be commenced pursuant to the UCC Standing Motions).  This Agreement shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

15.14.  Relationship Among the Parties. It is understood and agreed that no Consenting Unsecured TL Lender, Consenting Secured TL Lender, or Equity Holder Party has any duty of trust or confidence in any kind or form with any other Consenting Unsecured TL Lender, Consenting Secured TL Lender, or Equity Holder Party, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Party may trade in the Prepetition Secured TL Claim and/or Prepetition Unsecured TL Claim, or other equity securities of the Company without the consent of the Company or any other Party, subject to applicable securities laws, the terms of this Agreement (including Section 5.05), and any confidentiality agreement and/or non-disclosure agreement

entered into with the Company; provided, however, that no Consenting Unsecured TL Lender or Consenting Secured TL Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

15.15.  <u>Consideration</u>.  The  Parties hereby acknowledge that no consideration, other than that specifically described herein, shall be due or paid to any Party for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement.

15.16.  <u>Original RSA Superseded</u>.  This agreement shall supersede and replace in its entirety the Original RSA with respect to the Parties hereto.  Upon the Agreement Effective Date, all obligations of the Parties hereto arising under the Original RSA shall be of no further effect.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the date first set forth above.

**NINE WEST HOLDINGS, INC.**

By: _____
Name: Ralph Schipani
Title:   Interim CEO

*Signature Page to Restructuring Support Agreement*

**[OTHER PARTIES' SIGNATURE PAGES REDACTED]**

## Exhibit D

## Financial Projections

## FINANCIAL PROJECTIONS

In connection with developing the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Plan"),[1] the Debtors' management ("Management") prepared the following financial projections for the Reorganized Debtors (collectively, the "Financial Projections"). The Financial Projections reflect Management's estimate of the expected consolidated financial position, results of operations, and cash flows for the Reorganized Debtors (collectively, the "Reorganized Debtors") after the transactions contemplated by the Plan for 2018, 2019, 2020, 2021, and 2022 (the "Projection Period"). For the purposes of the Financial Projections, the Effective Date is assumed to be January 31, 2019 (the "Assumed Effective Date"). The Financial Projections were prepared to establish the feasibility of the Plan and therefore take into account the estimated effects on the deleveraging and capitalization of the Debtors as set forth in the Plan.

The Financial Projections reflect Management's judgment of expected future operating and business conditions, which are subject to change. Although the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. The Debtors' advisor Alvarez & Marsal North America, LLC has assisted in preparing the Financial Projections and has relied upon the accuracy and completeness of financial and other information furnished by Management and did not attempt to independently audit or verify such information. All estimates and assumptions shown within the Financial Projections were developed by Management. The Financial Projections have not been audited or reviewed by independent accountants. The assumptions disclosed herein are those that Management believes to be significant to the Financial Projections. Although Management is of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, such as change in customer demand and collection rates, successful implementation of growth plans and capital expenditures, laws and regulations, interest rates, inflation, and other economic factors affecting the Reorganized Debtors' businesses. Despite efforts to foresee and plan for the effects of changes in these circumstances, the impact cannot be predicted with certainty. Consequently, actual financial results could vary significantly from projected results.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. ALTHOUGH MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS ARE STATED BELOW. THE FINANCIAL PROJECTIONS ASSUME THAT THE DEBTORS WILL EMERGE FROM CHAPTER 11 ON THE ASSUMED EFFECTIVE DATE. THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH (1) THE DISCLOSURE STATEMENT, INCLUDING ANY OF THE EXHIBITS THERETO OR INCORPORATED REFERENCES THEREIN, AS WELL AS THE RISK FACTORS SET FORTH THEREIN, AND (2) THE SIGNIFICANT ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC

---

[1] Capitalized terms used but not otherwise defined herein have the meanings set forth in (a) the Plan or (b) *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Disclosure Statement"), to which the Financial Projections are attached as **Exhibit E**, as applicable.

1

ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS.   WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF MANAGEMENT.   THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN OF REORGANIZATION AND THE TIMING OF THE CONFIRMATION OF SUCH PLAN.  CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.   ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

Included below are the Debtors' and/or Reorganized Debtors' projected financial results in 2018, 2019, 2020, 2021 and 2022.

2

**Notes to Financial Projections**

The Financial Projections were prepared in good faith based on assumptions believed to be reasonable and applied in a manner consistent with past practices. Certain assumptions that may or may not prove to be correct include customer demand and collection rates, successful implementation of growth plans and capital expenditures, laws and regulations, interest rates, inflation, and other economic factors affecting the Debtors' businesses.

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE THEIR FINANCIAL PROJECTIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR FINANCIAL PROJECTIONS PUBLICLY AVAILABLE. THE SUMMARY FINANCIAL PROJECTIONS AND RELATED INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT AND THE EXHIBITS THERETO HAVE BEEN PREPARED EXCLUSIVELY BY MANAGEMENT. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS AND RELATED INFORMATION OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.**

Assumptions for Financial Projections

1.  Restructuring Assumptions

    (a)  *Assumed Effective Date*: The Restructuring Transactions contemplated by the Plan will be consummated on January 31, 2019, and the Debtors will emerge from chapter 11 at that time.

    (b)  *General Unsecured Claims*: General Unsecured Claims of $165 million.

    (c)  *Post-Emergence New Debt*: The post-emergence New Debt credit facilities contemplated by the Plan will have terms as follows:

        •  Libor + 175 bps, New ABL Facility; interest payable in cash;
        •  Libor + 500 bps, 0% LIBOR floor, New Secured Facility.

    (d)  *DIP Term Facility*: A $50 million DIP Term Facility and a $247.5 million DIP ABL/FILO Facility are available to fund the liquidity needs of the Debtors from the Petition Date through the Debtors' emergence from the Chapter 11 Cases.

    (e)  *Miscellaneous*: Approximately $83 million of projected payments will be due at emergence on account of (a) settlement payments to certain unsecured creditors that are not paid in the ordinary course of business, (b) unpaid professional fees, (d) the Reorganized Debtors' KERP, and (e) fees related to the New Debt (excluding OID on the New Secured Facility).

3

2. Operational Assumptions

(a) *One Jeanswear Group ("Jeanswear")*: The Jeanswear business operates as a wholesaler of women's denim under recognized, mass-appeal brands, such as Gloria Vanderbilt®, Jessica Simpson®, Nine West®, Bandolino®, and Vintage America Blues®. The Debtors' products are designed and marketed as individual items of jeans, skirts, pants, shorts, jackets, casual tops, dresses, sweaters, activewear, and related accessories, which, while sold as separates, can be combined with each other into groups termed "lifestyle collections" that are designed to be worn together. Jeanswear currently has a portfolio of company owned and licensed brands and a private label division that designs products for over 30 retailers. In 2017, Jeanswear business segment accounted for net revenue of approximately $656 million, which was approximately 41 percent of the Debtors' total revenue.

(b) *Kasper Group*: Kasper Group offers women's suits, dresses, and sportswear under the brands Kasper®, Anne Klein®, Le Suit®, and Albert Nipon®, as well as licensed brands such as Jones Studio® and Nine West®. Kasper Group has successfully reinvented itself to keep up with market changes, moving from primarily a dress and suit business—in which suit tops and bottoms are sold together—to selling suit separates and sportswear. Kasper Group's products are sold on a wholesale basis and can be purchased in department stores and off-price retailers. In 2017, the Kasper Group business segment accounted for net revenue of approximately $242 million, which was approximately 15 percent of the Debtors' total revenue.

(c) *The Jewelry Group*: The Jewelry Group designs and distributes fashion jewelry through wholesale channels to stores around the globe, and its products are available in a variety of department stores, specialty retailers, and mass-market stores. The Jewelry Group has become a leading fashion jewelry producer in the United States, selling under internal and licensed brands including Nine West®, Anne Klein®, and Napier®. In 2017, The Jewelry Group business segment accounted for net revenue of approximately $73 million, which was approximately 5 percent of the Debtors' total revenue.

(d) *Anne Klein*: The Anne Klein business includes womenswear, accessories, footwear, watches, eyewear, jewelry, legwear, and more. The Debtors license the Anne Klein® brand internally and externally, which accounted for 61% of the label's operating earnings for 2017 and which has been 100% of its operating earnings going forward. Licensed products include apparel, jewelry, watches, outerwear, sunglasses, and luggage. While the Debtors historically operated the Anne Klein footwear and handbags business within this segment, as part of their restructuring plan, in early 2018, the Debtors and Steven Madden, Ltd. entered into a licensing agreement, which granted Steve Madden, Ltd. the exclusive right to use the Anne Klein® trademark in connection with the manufacture or sale of its footwear and handbags categories worldwide. In 2017, the Anne Klein business accounted for net revenue of approximately $143 million, which was approximately 9 percent of the Debtors' total revenue.

Note A – Cash and cash equivalents

The Reorganized Debtors consider cash to consist of cash on deposits in banks. The Company maintains minimal cash balances when borrowings exist on the DIP ABL/FILO Facility.

Note B – Working Capital Accounts

The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivable, inventory, prepaid expenses, accounts payable, and accrued expenses continue to perform according to the historical relationships with respect to revenue and expense activity. Accounts receivable, inventory and accounts payable balances are projected based on days outstanding calculations and forecasted to be generally in-line with historical ratios. Working capital balances fluctuate significantly during the year depending on seasonality.

Note C – Property, Plant & Equipment, net and Intangibles, net

Opening balances are based on the company's existing Balance Sheet and may be materially impacted due to fresh-start accounting.  Depreciation, Amortization and the corresponding change in the Company's projected balances are based on the Company's preliminary tax analysis.

Note D – Short-term Borrowings

Short-term Borrowings is comprised of the Reorganized Debtors' New ABL Facility.

Note E – Long-term Debt

The Financial Projections illustrate the New Secured Facility of $325 million to be entered into by the Reorganized Debtors as of and subject to the occurrence of the Effective Date.  The New Secured Facility assumes a 1% Original Issue Discount, $3.25 million of which is amortized and reflected in the term loan balance, and proceeds on the balance sheet and statement of cash flows.  The New Secured Facility is assumed to have a 5-year maturity.

Note F – Net revenue

The Financial Projections are based on Management's view of the Reorganized Debtors' market position, product strategies, and overall economic outlook.  Revenue is expected to be approximately $977 million and increase by approximately 13.8% to $1,113 million by FY 2022.

Note G – Selling, general, and administrative expenses

Management has performed a comprehensive operating expense review and intends to continue cost reduction initiatives throughout the bankruptcy and post-emergence.  Identified savings opportunities include costs related to employee related programs, purchase and service contracts, travel and entertainment, and executory contract rejections and re-negotiations.  Despite these cost savings, expenses are expected to increase from $191 million in 2018 to $207 million in 2022, largely driven by inflation.  Expenses are expected to improve from 19.5% of revenue in fiscal year 2018 to 18.6% of revenue in fiscal year 2022.

Note H – Interest expense

Interest expense for the Reorganized Debtors' New Secured Facility is assumed to be LIBOR plus 500 basis points cash interest.  Interest expense for the Reorganized Debtors' New ABL Facility is assumed to be LIBOR plus 175 basis points cash interest based on availability.  LIBOR rates for both the New Secured Facility and the New ABL Facility are projected based on the 3-month forward LIBOR curve.

Note I – Income taxes

The Reorganized Debtors are projected to be Federal and State cash taxpayers based on the Reorganized Debtors' anticipated capital structure.  Additionally, an incremental $10 million of cash taxes is assumed to be paid in fiscal year 2019 as a result of the Company's reorganization.

## UNAUDITED PROJECTED BALANCE SHEET

| ($ in millions) | Notes | Plan FY 2018 | Plan FY 2019 | Plan FY 2020 | Plan FY 2021 | Plan FY 2022 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | Note A | $ 3.0 | $ 3.0 | $ 37.4 | $ 85.2 | $ 136.6 |
| Restricted cash | | 0.1 | - | - | - | - |
| Accounts receivable, net | Note B | 136.2 | 149.3 | 156.6 | 164.5 | 172.6 |
| Inventories, net | Note B | 166.7 | 155.9 | 161.8 | 167.0 | 174.8 |
| Prepaid taxes | | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Prepaid expenses & other | Note B | 34.2 | 34.4 | 34.7 | 35.0 | 35.2 |
| **Total current assets** | | **340.4** | **342.8** | **390.7** | **451.9** | **519.5** |
| | | | | | | |
| Net PPE | Note C | 34.6 | 24.2 | 26.6 | 29.1 | 31.6 |
| Intangibles, net | Note C | 248.9 | 228.5 | 208.1 | 187.7 | 167.3 |
| Other assets | | 28.4 | 28.4 | 28.4 | 28.4 | 28.4 |
| Deferred financing costs | | 0.4 | 7.5 | 5.7 | 3.8 | 1.9 |
| **Other assets** | | **312.3** | **288.6** | **268.8** | **249.0** | **229.1** |
| | | | | | | |
| **Total assets** | | **$ 652.7** | **$ 631.4** | **$ 659.5** | **$ 700.9** | **$ 748.7** |
| | | | | | | |
| **Liabilities and Equity** | | | | | | |
| Short-term borrowings | Note D | $ 83.8 | $ 8.7 | $ - | $ - | $ - |
| DIP Loan | | 49.6 | - | - | - | - |
| Current portion of long-term debt | | 2.3 | 5.5 | 5.5 | 5.4 | 5.4 |
| Accounts payable | Note B | 117.0 | 120.6 | 123.6 | 127.2 | 131.1 |
| Income taxes payable | | 0.4 | 2.1 | 3.5 | 4.0 | 4.4 |
| Accrued expenses & other | Note B | 59.1 | 63.4 | 64.6 | 65.3 | 66.5 |
| **Total current liabilities** | | **312.2** | **200.4** | **197.2** | **202.0** | **207.3** |
| | | | | | | |
| Long-term debt | Note E | 184.8 | 315.8 | 313.3 | 310.7 | 308.1 |
| Liabilities subject to compromise | | 1,080.5 | - | - | - | - |
| Obligations under capital leases | | 7.7 | 5.4 | 3.0 | 0.6 | 0.1 |
| Income taxes payable | | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Deferred taxes | | 44.2 | 44.2 | 44.2 | 44.2 | 44.2 |
| Other liabilities | | 19.0 | 19.0 | 19.0 | 19.0 | 19.0 |
| **Other liabilities** | | **1,336.8** | **385.1** | **380.1** | **375.1** | **372.0** |
| | | | | | | |
| **Total liabilities** | | **1,649.0** | **585.4** | **577.3** | **577.1** | **579.3** |
| | | | | | | |
| **Total equity** | | **(996.3)** | **46.0** | **82.2** | **123.8** | **169.4** |
| | | | | | | |
| **Total liabilities and equity** | | **$ 652.7** | **$ 631.4** | **$ 659.5** | **$ 700.9** | **$ 748.7** |

## UNAUDITED PROJECTED INCOME STATEMENT

| ($ in millions) | Notes | Pro Forma FY 2018 | Plan FY 2019 | Plan FY 2020 | Plan FY 2021 | Plan FY 2022 |
|---|---|---|---|---|---|---|
| Gross revenue | | $ 1,167.4 | $ 1,189.0 | $ 1,237.3 | $ 1,276.4 | $ 1,316.8 |
| Sales returns & allowances (SR&A) | | 190.1 | 186.5 | 194.5 | 198.3 | 204.1 |
| **Net revenue** | Note F | **977.3** | **1,002.4** | **1,042.7** | **1,078.1** | **1,112.6** |
| Cost of goods sold | | 694.7 | 711.0 | 740.6 | 765.4 | 790.7 |
| **Gross profit** | | **282.6** | **291.5** | **302.1** | **312.7** | **321.9** |
| *Margin %* | | *28.9%* | *29.1%* | *29.0%* | *29.0%* | *28.9%* |
| Selling, general, and administrative | Note G | 190.7 | 196.0 | 199.5 | 203.3 | 207.1 |
| **Management EBITDA** | | $ **91.9** | $ **95.5** | $ **102.6** | $ **109.5** | $ **114.8** |
| *Margin %* | | *9.4%* | *9.5%* | *9.8%* | *10.2%* | *10.3%* |
| *Other Expense / (Income):* | | | | | | |
| Depreciation & amortization | | 143.3 | 35.8 | 22.9 | 22.9 | 22.9 |
| Pension expense | | 0.5 | - | - | - | - |
| Interest expense | Note H | 68.7 | 31.8 | 29.4 | 28.9 | 28.8 |
| Other non-cash or non-recurring items | | 4.0 | - | - | - | - |
| Reorganization items, net | | (67.0) | (1,032.8) | - | - | - |
| Total | | 149.6 | (965.2) | 52.3 | 51.9 | 51.7 |
| **Net income before taxes** | | $ **(57.7)** | $ **1,060.6** | $ **50.2** | $ **57.6** | $ **63.0** |
| Income tax expense / (gain) | Note I | (10.2) | 18.4 | 14.0 | 16.0 | 17.5 |
| **Net income from continuing operations** | | $ **(47.5)** | $ **1,042.2** | $ **36.2** | $ **41.6** | $ **45.6** |
| (Gain) / loss from discontinued operations | | 0.8 | - | - | - | - |
| **Net income / (loss)** | | $ **(48.3)** | $ **1,042.2** | $ **36.2** | $ **41.6** | $ **45.6** |

**UNAUDITED PROJECTED STATEMENT OF CASH FLOWS**

| ($ in millions) | Plan FY 2019 | Plan FY 2020 | Plan FY 2021 | Plan FY 2022 |
|---|---|---|---|---|
| **Net income** | $ 1,042.2 | $ 36.2 | $ 41.6 | $ 45.6 |
| **Non-cash items** | | | | |
| Depreciation & amortization | 35.8 | 22.9 | 22.9 | 22.9 |
| Non-cash interest | 0.9 | 0.7 | 0.7 | 0.7 |
| Amortization of deferred financing costs | 4.1 | 1.9 | 1.9 | 1.9 |
| Gain on settlement of pre-petition liabilities | (1,080.5) | - | - | - |
| Total non-cash items | (1,039.7) | 25.5 | 25.5 | 25.5 |
| **Changes in working capital** | | | | |
| (Inc) / Dec in accounts receivable, net | (13.1) | (7.3) | (8.0) | (8.1) |
| (Inc) / Dec in inventories | 10.9 | (5.9) | (5.2) | (7.8) |
| (Inc) / Dec in prepaid expenses & other | (0.3) | (0.3) | (0.3) | (0.3) |
| (Dec) / Inc in accounts payable | 3.6 | 2.9 | 3.7 | 3.8 |
| (Dec) / Inc in accrued expenses & other | 1.2 | 0.7 | 0.8 | 0.8 |
| (Dec) / Inc in accrued interest | 3.1 | 0.5 | (0.2) | 0.3 |
| (Dec) / Inc in income taxes payable | 1.7 | 1.4 | 0.5 | 0.4 |
| Net change in working capital | 7.1 | (8.0) | (8.6) | (10.8) |
| **Cash from operating activities** | $ 9.7 | $ 53.8 | $ 58.5 | $ 60.2 |
| **Investing activities** | | | | |
| Capital expenditures | $ (5.0) | $ (5.0) | $ (5.0) | $ (5.0) |
| **Cash from investing activities** | $ (5.0) | $ (5.0) | $ (5.0) | $ (5.0) |
| **Financing activities** | | | | |
| Proceeds from issuance of debt | $ 321.8 | $ - | $ - | $ - |
| Repayment of Unsecured term loan | (164.1) | - | - | - |
| Repayment of FILO loan | (22.5) | - | - | - |
| Repayment of DIP term loan | (49.9) | - | - | - |
| Debt issuance costs and other financing fees | (9.3) | - | - | - |
| New Secured debt paydown | (3.3) | (3.3) | (3.3) | (3.3) |
| Repayment of capital leases | (2.4) | (2.4) | (2.4) | (0.6) |
| **Cash from financing activities** | $ 70.4 | $ (5.7) | $ (5.7) | $ (3.8) |
| Net change in cash & cash equivalents (before revolver draw) | $ 75.1 | $ 43.1 | $ 47.8 | $ 51.4 |
| Increase in short-term borrowings | (75.1) | (8.7) | - | - |
| **Net change in cash & cash equivalents (after revolver draw)** | 0.0 | 34.4 | 47.8 | 51.4 |
| Beginning cash balance | 3.0 | 3.0 | 37.4 | 85.2 |
| **Ending cash balance** | $ 3.0 | $ 37.4 | $ 85.2 | $ 136.6 |

8

## **Exhibit E**

## **Valuation Analysis**

VALUATION ANALYSIS[1]

THE VALUATION INFORMATION SET FORTH HEREIN REPRESENTS A HYPOTHETICAL VALUATION OF THE DEBTORS, ON A REORGANIZED BASIS, WHICH ASSUMES THAT, AMONG OTHER THINGS, SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS.  THE ESTIMATED VALUE SET FORTH IN THIS SECTION DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATE SET FORTH IN THIS SECTION.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THIS VALUATION.

THE ESTIMATE OF THE HYPOTHETICAL ENTERPRISE VALUE CONSISTS OF THE AGGREGATE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS ON A GOING-CONCERN BASIS AS OF THE ASSUMED EFFECTIVE DATE.  THE PLAN DOES NOT CONSOLIDATE THE DEBTOR ENTITIES FOR PURPOSES OF MEASURING CLAIMS OR DISTRIBUTIONS.  AS SUCH, THE VALUES OF THE INDIVIDUAL DEBTORS AND THE ALLOWED CLAIMS AGAINST SUCH DEBTORS MAY AFFECT AMOUNTS AVAILABLE FOR DISTRIBUTION TO THE CREDITORS OF EACH INDIVIDUAL DEBTOR.

The Debtors have been advised by their financial advisor, Lazard Frères & Co. LLC ("Lazard"), with respect to the estimated going concern value of the Reorganized Debtors.  Lazard undertook this analysis to determine the value potentially available for distribution to holders of Allowed Claims pursuant to the Plan.  The estimated total value available for distribution to holders of Allowed Claims (the "Enterprise Value") consists of the estimated value of the Reorganized Debtors' operations on a going-concern basis. The valuation analysis described herein is based on information as of the date of the Disclosure Statement. The valuation analysis assumes that the reorganization takes place on January 31, 2019 (the "Assumed Effective Date"), and is based on projections provided by the Debtors' management ("Financial Projections") for the second half of 2018 and for the full calendar years 2019 to 2022 (the "Forecast Period").  For purposes of the valuation analysis, no value has been ascribed to any retained claims or causes of action related to the 2014 Transaction or Carve-Out Transactions, including, but not limited to, claims against Non-Released Parties under the Plan.  No value has been ascribed to such claims as any such value would be speculative in nature.

The Debtors' long term business plan contemplates the Reorganized Debtors' post-emergence businesses continue trading on a going-concern basis, including retention of all key customers.  Lazard developed valuation estimates based on the Debtors' aforementioned long term business plan.

Based on the Financial Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range of approximately $575 million to approximately

---

[1]    Terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Disclosure Statement.

$675 million, with a midpoint estimate of approximately $625 million, which reflects the value of the Reorganized Debtors' operations on a going-concern basis. For purposes of this valuation, Lazard assumes that no material changes affecting the underlying Enterprise Value occur between the date of the Disclosure Statement and the Assumed Effective Date. Based on approximately $360 million of net debt at emergence as contemplated by the Plan, the implied range of value for the equity of the Reorganized Debtors is approximately $215 million to approximately $315 million, with a midpoint estimate of approximately $265 million.[2] These values do not give effect to the potentially dilutive impact of any equity issued upon exercise of any warrants or any equity under any management equity incentive program.

The value of the New Warrants has been estimated using a Black-Scholes valuation model and assumes the estimated range of the Reorganized Debtors' equity value above. Based on that analysis, the value of the New Warrants is estimated at approximately $7 million to $31 million, with an average of approximately $19 million.

Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF OCTOBER 26, 2018. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THE ESTIMATE.

When performing its analyses, Lazard assumed that the Financial Projections had been reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Financial Projections in all material respects, including revenue growth, EBITDA margins, and cash flows as projected. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value.

In estimating the Enterprise Value, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries, and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Reorganized Debtors' businesses, operating assets and liabilities, and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

---

[2]    Assumes a normalized ABL balance drawn.

Lazard did not independently verify the Financial Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith.  The Company developed the Financial Projections solely for purposes of the formulation and negotiation of the Plan, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

Lazard's estimated Enterprise Value does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan.  Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any time.

The estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities, which may be significantly different than the amounts set forth herein.  The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.  As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  Neither the Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of any securities will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received, developments in the Reorganized Debtors' industry and economic conditions generally and other factors which generally influence the prices of securities.

### A.  VALUATION METHODOLOGIES

The following is a brief summary of certain financial analyses performed by Lazard, including a discounted cash flow analysis, a comparable publicly traded companies analysis, and a precedent transactions analysis to arrive at its range of estimated Enterprise Values for the Reorganized Debtors.

Lazard considered all three generally accepted valuation methodologies; however, the estimate of the Enterprise Value of the Reorganized Debtors is based on the results of a discounted cash flow ("DCF") analysis and the results of a comparable company analysis; a precedent transaction analysis was considered but not included due to a lack of applicable precedents.

An estimate of Enterprise Value is not entirely mathematical, but rather involves complex considerations and judgments concerning various factors that could affect the value of an operating business.  Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions on which such analyses were based, and other factors, with management of the Debtors, including the projected financial results of the Reorganized Debtors.  The estimated Enterprise Value is highly dependent on the Debtors' ability to meet their Financial Projections.  The valuation analysis must be considered as a whole.

i.    Discounted Cash Flow Analysis

The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business. The enterprise value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Financial Projections plus an estimate for the value of the firm beyond the Forecast Period, known as the terminal value. The terminal value can be derived through two generally accepted approaches, (i) applying perpetuity growth rates to the terminal year normalized cash flow, and (ii) applying projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") multiples (for example, relating to the final projected year of the Forecast Period). The terminal value is then discounted back to the Assumed Effective Date using the Discount Rate.

To estimate the Discount Rate, Lazard calculated the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted total debt-to-total capitalization ratio based on an assumed range of the Reorganized Debtors' long term target capitalization. Lazard calculated the cost of equity using the Capital Asset Pricing Model, which assumes a required equity return is a function of the risk-free cost of capital and the covariance of a publicly traded stock's performance relative to the return on the broader market, as well as taking into consideration size and other factors affecting the company being valued.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect their cost of capital and terminal values.

ii.    Comparable Publicly Traded Companies Analysis

The comparable publicly traded companies valuation analysis utilizes the trading multiples of publicly traded companies that have operating and financial characteristics that are relatively similar to the Reorganized Debtors. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices of the equity securities of such company in the public markets and adding the value of outstanding net debt for such company and minority interest, and adjusting for the value of any unconsolidated investments. Once the enterprise value of the selected comparable companies is calculated, it is commonly expressed as a multiple of various measures of financial performance (for example, EBITDA). In addition, each of the selected public companies' operational performance, operating margins, profitability, and leverage were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Debtors' actual and projected results. Lazard focused primarily on EBITDA multiples to estimate the value of the Reorganized Debtors.

A key factor in this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other things, business model, revenue composition, retail channel exposure, intellectual property rights, growth prospects, margin profile, and capital intensity. The selection of appropriate comparable companies is often difficult, a matter of judgment and subject to limitations due to

sample size, the availability of meaningful market-based information and updated financial projections from financial research.

Although there is not a public company that is truly comparable to the Reorganized Debtors, publicly traded companies were selected on the basis of general comparability to the Debtors in one or more of the factors described above (the "Peer Group").

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS, AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

**<u>Exhibit F</u>**

**Liquidation Analysis**

**Nine West Holdings, Inc., et al.**
**Liquidation Analysis**

## INTRODUCTION[1]

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the Debtors' Plan satisfies the "best interest" of creditors test, the Debtors have prepared this liquidation analysis (this "Liquidation Analysis") presenting recoveries that may be obtained by holders of Claims and Interests upon a disposition of assets in a chapter 7 liquidation as an alternative to recoveries provided under the Plan.

The Liquidation Analysis presents information based on, among other things, the Debtors' books and records, good-faith estimates regarding asset recoveries, and Claims arising in connection with liquidation under chapter 7 of the Bankruptcy Code. Unless stated otherwise, the asset values referenced in the Liquidation Analysis are sourced from the Debtors' five-year business plan dated as of February 2, 2019. The determination of the proceeds from the liquidation of assets involves the use of estimates and assumptions. Although the Debtors consider the estimates and assumptions underlying the Liquidation Analysis to be reasonable under the circumstances, such estimates and assumptions are subject to business, economic, competitive, and other uncertainties and contingencies beyond the Debtors' control. Accordingly, the forecasted results set forth in the Liquidation Analysis may not be realized if the Debtors were liquidated. Actual results in such a case could vary materially from those presented herein, which could result in distributions to members of applicable Classes of Claims to differ from those set forth in the Liquidation Analysis.

**The Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of presenting a reasonable, good-faith estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. The Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a holistic reorganization, and there may be a difference between the Liquidation Analysis and the values that may be realized or Claims generated in an actual liquidation. All assumptions made herein, including those made for purposes of the "high recovery" scenario, are for purposes of this Liquidation Analysis only.**

**Nothing contained in the Liquidation Analysis is intended to be, or constitutes, a concession, admission, or allowance of any claim by the Debtors. The actual amount or priority of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts**

---

[1] Capitalized terms used but not otherwise defined herein have the meanings set forth in (a) the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Disclosure Statement"), to which the Liquidation Analysis is attached as **Exhibit F**, or (b) the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. ●] (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Plan"), as applicable.

**set forth and used in the Liquidation Analysis. The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.**

## GENERAL ASSUMPTIONS

The Debtors prepared the Liquidation Analysis assuming that each of the Debtors' current chapter 11 cases convert to chapter 7 cases on February 2, 2019 (the "Conversion Date"), at which time the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to conduct an orderly wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to holders of Allowed Claims during the period after the Conversion Date. There can be no assurance that the liquidation would be completed in a limited timeframe, nor is there any assurance that the recoveries assigned herein to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest. 11 U.S.C. § 704.

### A.   Assumptions Related to Forecasted Assets and Liabilities

The Debtors have relied on forecasted results consistent with the Debtors' five-year business plan. Such forecasted results contain numerous estimates and assumptions that remain subject to change.

### B.   Chapter 7 Liquidation Costs and Length of the Liquidation Process

The Debtors have assumed that the liquidation and wind down of the Debtors' estates would occur over approximately four months, including a three-month sale period, to provide for orderly sales of substantially all the Debtors' assets as well as to arrange distributions. In an actual liquidation, the wind down process and time period could significantly vary, thereby affecting recoveries. For example, the potential for priority, contingent, and other claims, litigation, rejection costs, and the final determination of Allowed Claims could substantially affect both the timing and amount of the distribution of asset proceeds to creditors. Litigation of Estate Causes of Action would likely extend beyond four months and generate significant costs that could further dilute recoveries in a chapter 7 liquidation. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such liquidation.

### C.   Claims Estimates

The Liquidation Analysis contains an estimate of the amount of Claims that will ultimately become Allowed Claims. The Debtors developed this estimate for each Class of Claims based on the Debtors' continuing review of Claims filed in the Chapter 11 Cases, the Debtors' books and records, and the Debtors' Schedules and Statements. The Debtors also developed an estimate of additional Claims that would arise in a chapter 7 liquidation. Accordingly, this analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. Moreover, the Claims filed against the Debtors' Estates have not been fully evaluated by the Debtors and no order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of any Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. Thus, the actual amount of Allowed Claims could differ materially from the amount of Allowed Claims estimated herein.

KE 56684029

**D.    Allocation of Administrative, Chapter 7 Trustee, and Carve-Out Claims**

The Liquidation Analysis assumes that Claims related to Administrative expenses (including professional fees), chapter 7 trustee expenses, and the Carve-Out (as defined in the DIP Order) are allocated across the Debtors according to the percentage of asset recovery by each entity. Parties in interest may dispute that allocation. Any successful challenge to the allocation of the Claims described in this paragraph could materially alter recoveries shown in the Liquidation Analysis.

**E.    Non-Debtor Entities**

The Liquidation Analysis assumes that as of the Conversion Date the Debtors will no longer fund any non-debtor operations. The Liquidation Analysis does not contemplate potential claims that may arise from non-debtor operations.

**F.    Tax Consequences**

The Liquidation Analysis does not include estimates for the tax consequences, both foreign and domestic, that may be triggered upon the liquidation of the Debtors in the manner described above.

**G.    Values Not Discounted Over Time**

The Liquidation Analysis assumes that all asset proceeds and creditor recoveries are at nominal amounts and does not consider the discounting of values over time. The discounting of values would result in lower recoveries to stakeholders than those presented.

**H.    High Recovery Scenario Assumptions**

The Liquidation Analysis makes certain assumptions in the "high" recovery scenario that are more favorable to the unsecured creditors at Nine West Holdings, Inc., which assumptions are based on issues raised by creditors at that Debtor. In contrast, those assumptions are less favorable to the unsecured creditors at the Debtor subsidiaries. These assumptions are made for the purposes of this Liquidation Analysis only. By the Liquidation Analysis, the Debtors do not concede the validity of the creditors' arguments and do not make a guaranty that any such arguments would be successful or even meritorious.

KE 56684029

**Specific Notes to the Liquidation Analysis**

A.    *Gross Liquidation Proceeds*

(1)    Cash and Cash Equivalents:  The Debtors assume that the DIP ABL Administrative Agent and DIP Term Loan Administrative Agent would immediately sweep any available cash and pay down the DIP ABL/FILO and DIP Term Loan, respectively.

(2)    Accounts Receivable:  The Debtors' estimated net accounts receivable balance as of the Conversion Date is assumed to be $142.8 million per the Debtors' forecast.  Accounts receivable are assumed to realize a recovery range of 85.0% to 95.0% of the estimated net accounts receivable balance based on the applicable business division, which accounts for estimated incremental customer markdowns netted against accounts receivable.

(3)    Inventory:  The Debtors' estimated inventory balance as of the Conversion Date is assumed to be $191.6 million per the Debtors' forecast.  Recovery assumptions are based on an adjusted third-party inventory appraisal that reflects the net orderly liquidation value ("NOLV").  The NOLV rate determined by the third-party appraiser is as of the most recent inventory appraisal for each of the applicable business division's recovery as a percentage of the forecast balance.  Jeanswear ranges from 81.3% to 90.8%, Jewelry ranges from 90.0% to 98.5%, and Kasper ranges from 68.6% to 77.6%.

(4)    Property, Plant, and Equipment ("PPE"):  PP&E includes machinery, computer systems, telecommunications, furniture and fixtures, and other equipment of the Debtors in the remaining corporate offices and distribution centers.  The Liquidation Analysis assumes estimated proceeds from the sale of PP&E results in a total estimated recovery range from 0.7% to 1.4% of the forecasted balance.

(5)    Intangibles:  Intellectual property owned by the Debtors is comprised of a portfolio of trademarks and tradenames, domain name assets, customer relationships, licensing assets, and favorable leases (collectively, the "Debtors' IP").  The Debtors and their advisors used average forecasted royalty income by trademark with multiples ranging from 4 to 7 times licensing income.

(6)    Other Assets:  The Debtors' Other Assets primarily consist of real estate related letters of credit, rent deposits, corporate credit card deposits, and other prepaid assets, which collectively are estimated at $59.9 million.  The Liquidation Analysis assumes no recovery and that third parties that hold any deposits/prepaid assets will offset those assets against their claim.

(7)    Intercompany Claims:  Other proceeds include prepetition and postpetition intercompany recoveries based on intercompany receivables and claims as of April 6, 2018, and September 1, 2018, respectively.  The Liquidation Analysis assumes that all prepetition Intercompany Claims are treated *pari passu* to General Unsecured Claims and postpetition Intercompany Claims between Debtors are treated as postpetition Administrative Claims in accordance with paragraph 12 of the Debtors' cash management order [Docket No. 428].  Amounts are presented on a net basis.  Receivable recoveries reflect the estimated mid-point recovery of the respective Debtor's claim.

4

As discussed in Article V.E of the Disclosure Statement, pursuant to paragraph 8 of the 363 Sale Order, the rights of parties are reserved as to the allocation of the sale proceeds from the sale of the Nine West®, Bandolino®, and associated brands between Debtors, including whether such allocation should cash such proceeds to be deemed to be received or paid by any Debtor, or will result in or should be deemed to give rise to any intercompany claims, or rights or claims of subrogation, contribution, or reimbursement that any Debtor may have against another Debtor. Any intercompany transaction arising from the sale has therefore been excluded from the postpetition Intercompany Claim amounts for both Nine West Holdings Inc. and Nine West Development LLC. The inclusion of such an Administrative Intercompany Claim would materially change the recoveries at Nine West Holdings Inc. and Nine West Development LLC in a chapter 7 liquidation.

(8)   Estate Actions Proceeds: To the extent that the DIP ABL/FILO Claims, DIP Term Loan Claims, and Secured Term Loan Claims are otherwise paid in full, proceeds from Estate Causes of Action available to the Debtors' Estates (including pursuant to chapter 5 of the Bankruptcy Code) are available for distribution to the Debtors administrative and prepetition creditors pursuant to the priorities otherwise established by the Bankruptcy Code. The Debtors believe that recoveries from such actions, if any, are speculative in nature. Notwithstanding the foregoing, the Liquidation Analysis assumes $105.0 million in recoveries on account of all potential Estate Causes of Action (including those both settled and those not released pursuant to the Plan). The Liquidation Analysis assumes the $105.0 million in cash proceeds because that is the amount of cash proceeds from the Equity Holders Settlement as set forth in the Plan. By the Liquidation Analysis, the Debtors make no guarantee that such a settlement or recovery would be available outside the context of the Plan, nor is it intended to be, or constitute, a concession, admission, or waiver of any claims by the Debtors with respect to any Estate Causes of Action against the Sponsor, the Minority Equity Holders, or any other entity (including Non-Released Parties). The proceeds of the Estate Causes of Action could be higher or lower than $105.0 million.

(9)   Non-Debtors: To estimate the Debtors' recovery with respect to certain intercompany balances and equity holdings in a chapter 7 liquidation, the Liquidation Analysis assumes substantially all of the Debtors' non-Debtor subsidiaries will undertake parallel liquidations, whereby the proceeds of such liquidations are, in turn, distributed in accordance with priority of Claims and ownership on an entity-by-entity basis. The material assumptions (e.g., liquidation costs and asset recovery percentages) made in connection with the foregoing analysis are substantially consistent with those made in connection with the Debtors' hypothetical chapter 7 liquidation.

(10)  Nine West Canada Secured and Unsecured Notes: On April 6, 2018, Nine West Canada LP and Jones Canada, Inc. (collectively, the "Canadian Entities") filed a Notice of Intention to Make a Proposal pursuant to Section 50.4(1) of the Bankruptcy and Insolvency Act in Canada. As of the filing date, certain of the Debtors have secured and unsecured intercompany claims against the Canadian Entities in the approximate amounts of CAD $4.0 million and CAD $15.6 million, respectively. On September 14, 2018, the Canadian Entities filed a "Proposal" in the Canadian court. On October 4, 2018, creditors voted

5

unanimously to approve the Proposal at a meeting of the creditors. The Proposal remains subject to court approval. The Canadian court will consider approval of the Proposal on November 23, 2018. Accordingly, the Liquidation Analysis assumes that the secured and unsecured recovery of CAD $8.4 million is collected prior to the Conversion Date.

**B.** *Liquidation Costs*

(11) <u>Wind-down Expenses</u>: Wind-down expenses reflect a four-month budget, including a three-month liquidation sale period. Expenses are mainly comprised of corporate salaries and benefits, occupancy, inventory sell off, and royalty costs. Corporate salaries included at full cost for the wind-down period to account for the WARN notice period. Occupancy and utilities costs were adjusted to reflect the assumed three-month sale term and turnover of existing leased properties. With the exception of material and factory liabilities, on-order inventory during the wind-down period is assumed to recover 85.0% to 110.0% of cost. The Liquidation Analysis assumes wind-down expenses of $34.4 million to $42.1 million.

(12) <u>Chapter 7 Trustee Fees and Other Professional Fees</u>: Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1,000,000 upon all moneys disbursed or turned over in the case by the trustee to parties in interests. 11 U.S.C. § 326. For purposes of the Liquidation Analysis, these Trustee fees are estimated based on 3.0% of gross asset recovery proceeds. The Liquidation Analysis estimates the Chapter 7 Trustee fees range from $18.5 million to $21.8 million.

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors assets, will be entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The Liquidation Analysis estimates Chapter 7 professional fees of $5.4 million, which is based on expected fees and expenses of legal, financial, and other professionals as well as the complexity of the Debtors' liquidation and wind-down. Professional fees were fixed at the fees projected to be incurred during the four-month wind-down period. Litigation of Estate Causes of Action (on account of the 2014 Transaction, the Carve-Out Transactions, and/or other potential claims and causes of action) likely would extend significantly beyond four months, which would result in higher administrative and professional fee costs then those reflected in the Liquidation Analysis.

**C.** *Claims*

(13) <u>Carve-Out</u>: Paragraph 6 of the DIP Order provides that certain unpaid and accrued professional fees and expenses shall be entitled to priority above the DIP Claims as well as Claims and fees to which the DIP Claims are senior. The Liquidation Analysis estimates this amount to be $27.9 million. This total includes approximately $24.3 million in accrued but unpaid fees and expenses incurred by Professionals retained by the Debtors and the Committee, unpaid fees of $1.0 million required to be paid to the Clerk of the Court and to

6

the Office of the United States Trustee under section 1930(a) of the Judicial Code, fees and expenses up to $100,000 incurred by a Chapter 7 trustee under section 726(b) of the Bankruptcy Code, plus $2.5 million payable under the Post Carve Out Trigger Notice Cap (as defined in the DIP Order). For the purposes of the Liquidation Analysis only, these Claims are allocated among the Debtor entities based on a percentage of total asset recoveries.

(14)    <u>DIP ABL/FILO Claim</u>: The Liquidation Analysis assumes that the balance of the DIP ABL/FILO Claim is $109.4 million as of the Conversion Date per the Debtors' projections, including letters of credit, estimated interest accrual, and reasonable fees and expenses incurred pursuant to the DIP Order. The Liquidation Analysis assumes $18.3 million of letters of credit is drawn by various parties. The DIP ABL/FILO Claim is allocated based on a percentage of total ABL asset recoveries for Nine West Holdings, Inc., One Jeanswear Group Inc., and Kasper Group Inc., the three borrowers under the DIP ABL/FILO Facility. The Liquidation Analysis assumes any shortfall in recoveries to the DIP ABL/FILO Claims is re-allocated to the three borrowers that have available asset proceeds.

(15)    <u>DIP Term Loan Claim</u>: The Liquidation Analysis assumes that the balance of the DIP Term Loan Claim is $54.7 million as of the Conversion Date per the Debtors' projections, including accrued and unpaid interest and reasonable fees and expenses incurred pursuant to the DIP Order. As stated above, this amount reflects net of $0.1 million that was utilized to pay down the DIP Term Loan Claim shortly after the conversion of the Chapter 11 Cases to Chapter 7. The DIP Term Loan Claim is allocated based on a percentage of total asset recoveries for all Debtors. The Liquidation Analysis assumes any shortfall in recoveries to DIP Term Loan Claims is re-allocated to Debtor entities that have available asset proceeds.

(16)    <u>Secured Claims</u>: Secured Claims include the Secured Term Loan Claim in the aggregate amount of $165.1 million, and Other Secured Claims of $0.8 million. For Nine West Holdings, Inc., the Liquidation Analysis reflects three scenarios; low-marshalling, low, and high. In the low marshalling scenario, the full Secured Term Loan claim of $165.1 million is asserted at Nine West Holdings, Inc., which results in a recovery of 64.1% at Nine West Holdings, Inc. to holders of Secured Term Loan Claims before and Nine West Holdings Inc. becomes administratively insolvent. In the low scenario, the Liquidation Analysis allocates the Secured Term Loan Claim based on a percentage of total asset recoveries for all Debtor entities. In the high recovery scenario, the Liquidation Analysis allocates the Secured Term Loan Claim based on a percentage of total asset recoveries for all Debtors excluding Nine West Holdings Inc. In both low and high scenarios, recovery for the Secured Term Loan Claim is 100% and for the Other Secured Claims recovery is between 99.2% and 100%.

(17)    <u>Administrative Claims</u>: Administrative Claims includes employee claims, postpetition Intercompany Claims, Claims arising under section 503(b)(9) of the Bankruptcy Code, unpaid postpetition taxes, unpaid postpetition professional fees (not covered by the Carve-Out), unpaid postpetition royalties for the Nine West®, Bandolino®, and associated brands, unpaid on-order inventory, damages related to terminated assumed and new postpetition leases, and unpaid postpetition accounts payable and accrued operating expenses.

7

a.  Employee Claims include unpaid wages, pension, workers compensation, accrued vacation, and medical claims that have been incurred postpetition prior to the Conversion Date.  Employee claims are estimated at $5.7 million.

b.  Postpetition Intercompany Claims are estimated at $79.6 million, which reflects balances as of September 1, 2018.  Accordingly, postpetition Intercompany Claims are likely to be higher.

c.  Section 503(b)(9) Claims are estimated at $1.9 million.  Section 503(b)(9) Claims primarily reside with One Jeanswear Group, Inc. and Kasper Group LLC.

d.  Unpaid postpetition taxes are estimated at $13.2 million.

e.  Unpaid postpetition professional fees (not covered by the Carve-Out) are estimated at $0.4 million.

f.  Unpaid post-petition royalties are estimated at $9.0 million, which includes guaranteed minimum royalty and ad contribution that would have been earned for the term of the contract.

g.  Unpaid on-order inventory is estimated at $24.8 million.  The Liquidation Analysis assumes that the Debtors' can only cancel 50% of on-order inventory across all business units.

h.  Damages on terminated assumed leases and new postpetition leases are estimated at $13.5 million.  The Liquidation Analysis assumes that damages are capped at one year.

i.  Unpaid post-petition accounts payable and accrued operating expenses are estimated at $167.7 million.

(18)  Priority Claims:  Priority Claims include Priority Tax Claims and Other Priority Claims. Total Priority Claims are estimated at $1.3 million.  The estimated recovery is 64.2%.

(19)  Unsecured Term Loan Facility: Outstanding prepetition obligations under the Unsecured Term Loan Facility are estimated at $305.1 million, including accrued and unpaid interest and fees up through the Petition Date.  Under the low recovery scenario, the full claim amount is asserted at all Debtor entities.  Under the high recovery scenario, the full claim is asserted to all Debtor entities excluding Nine West Holdings Inc.  The treatment of the Unsecured Term Loan Facility at Nine West Holdings Inc. reflects a "high recovery" scenario for the holders of other unsecured claims at Nine West Holdings, Inc., and the assumptions in the "high recovery" scenario are less favorable to the Unsecured Term Loan Facility.  The recovery range is between 17.6% and 29.0%.

(20)  2019 Notes and 2034 Notes: The 2019 Notes and 2034 Notes are estimated at $476.0 million and $256.0 million, respectively.  The 2019 Notes Claims and 2034 Notes Claims include accrued and unpaid interest and fees up through the Petition Date.  The 2019 Notes Claims and 2034 Notes Claims reside solely at Nine West Holdings, Inc.  The estimated recovery range is between 2.1% and 5.7%.

8

(21) <u>General Unsecured Claims</u>:  General Unsecured Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (a) prepetition trade Claims; (b) rejection damages Claims; (c) Claims related to the Debtors' pension and retirement obligations; (d) prepetition Intercompany Claims (e) Claims related to prepetition litigation; and (f) prepetition employee Claims.  The Debtors estimate that General Unsecured Claims total $219.2 million.  The estimated recovery range is between 0.0% and 5.7% for Nine West Holdings, Inc., which reflects the exclusion of any asserted claims related to the Unsecured Term Loan and Prepetition Intercompany Claims.  The estimated recovery range is between 14.8% and 28.2% for Nine West Development.  The estimated recovery percentage is 0.4% for Nine West Distribution and Nine West Jeanswear Holdings, Inc.  The estimated recovery percentage is 0.0% for Nine West Management Services, One Jeanswear Group Inc., The Kasper Group, and the non-operating Debtor entities.

    a. *Unexpired Lease and Contract Rejection Claims*:  Of the total amount of General Unsecured Claims, unexpired and lease and contract rejection Claims include Claims related to the rejection of the Debtors' corporate offices and distribution centers, prepetition license agreements, and select IT-related contracts.  Total contract rejection Claims are estimated at $45.8 million, calculated as of May 1, 2019.

    b. *Pension and Post Retirement Claims*:  The Liquidation Analysis assumes that the Debtors will be subject to withdrawal liability associated with their participation in a "multiemployer pension plan" (as such term is defined in Section 4001(a)(3) of ERISA), as well as (i) PBGC termination premiums and annual premiums, (ii) missed minimum funding contributions, (iii) unfunded benefit liabilities, and (iv) other costs on account of their sponsoring and participation in a single employer defined benefit pension plan subject to Title IV of ERISA and various non-pension retirement programs.  Of the total amount of General Unsecured Claims, the Debtors estimate that the Claim amounts related to their pensions will total approximately $27.3 million, which is based on the filed claims.  For the single employer plan, the Claim amount is estimated at $17.5 million on account of unfunded benefit liabilities, pension insurance premiums, and minimum funding contributions.  For the multiemployer plan, the Claim is estimated at $4.7 million on account of asserted withdrawal liability.  For non-pension retirement programs, the Claim amount is estimated at $5.0 million.  The Debtors assumed that the Claims related to the multiemployer pension plan and the single employer defined benefit pension plan would be asserted at each of the Debtor entities, based on a joint and several "controlled group" (as determined under Title IV of ERISA) theory of liability.  The Debtors take no position as to whether any non-Debtor affiliates may be part of the Debtors' "controlled group," and the Liquidation Analysis does not account for any such affiliates being liable for the single employer or multiemployer pension claims. The Debtors' non-Debtor affiliates are assumed to have insufficient assets to materially impact this Liquidation Analysis with respect to satisfaction of the Debtors' pension obligations.

    c. *Prepetition Intercompany Claims*: Prepetition Intercompany Claims include Claims assumed to be asserted by and among Debtors and by and among Debtors

and non-Debtors related to prepetition intercompany transactions. Total Prepetition Intercompany Claims are estimated at $1.8 billion. The recovery percentage ranges from 0.0% to 28.2% depending on Debtor entity. In the high recovery scenario, at Debtor Nine West Holdings, Inc., the Liquidation Analysis reflects a scenario in which prepetition Intercompany Claims are not asserted against Nine West Holdings, Inc., a treatment more favorable to the holders of general unsecured claims (excluding holders of Unsecured Term Loan Claims) at Nine West Holdings, Inc.  In the event such prepetition intercompany claims are successfully asserted against Nine West Holdings, Inc., distributable value available for distribution to creditors of Nine West Holdings, Inc. would decrease.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 56684029

**<u>Exhibit 2</u>**

**Changed Pages Redline**

James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated:  November 912, 2018

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED JOINT PLAN OF**
**REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**This is not a solicitation of votes to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code and within the meaning of section 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126. This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court. The information in this Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway New York, New York 10018.

4.      Unsecured Notes.

(a)      2019 Notes.

NWHI issued approximately $427 million in aggregate principal amount of 8.25% senior unsecured notes under that certain indenture, dated as of April 23, 2014 (as amended, supplemented, or otherwise modified from time to time), with U.S. Bank National Association, as trustee (the "2019 Trustee"), in exchange for approximately $366.8 million of Stub 2019 Notes in connection with the Exchange Option and the incurrence of $60 million of new money to fund the Put Option or repay draws incurred under the Prepetition ABL/FILO Facility to fund the 2014 Transaction. Only approximately $4.27 million was used to fund the Put Option, as 99% of holders elected to the Exchange Option or to continue to hold the Stub 2019 Notes. Thus, approximately $55.73 million was used to fund repayment of the Prepetition ABL/FILO Facility. The 2019 Notes mature in March 2019 and, prior to the Petition Date, required semiannual coupon payments on March 15 and September 15. As of the Petition Date, approximately $426.7 million in aggregate principal amount of 2019 Notes remained outstanding. From the 2014 Transaction to the Petition Date, the Debtors made approximately $128.3 million in ordinary course interest payments under the 2019 Notes in accordance with the terms thereof.

(b)      Stub 2019 Notes.

NWHI (as successor in interest)[19] issued $300 million in aggregate principal amount of 6.875% senior unsecured notes, under that certain indenture, dated March 7, 2011 (as amended, supplemented, or otherwise modified from time to time), with the 2019 Trustee. The Stub 2019 Notes mature in March 2019 and, prior to the Petition Date, required semiannual coupon payments on March 15 and September 15. As noted above, holders of Stub 2019 Notes were given the option to (a) put their notes to NWHI under the Put Option or (b) exchange their notes for 2019 Notes under the Exchange Option, and in connection with such option, holders of approximately $366.8 million in principal amount in the Stub 2019 Notes elected to exchange for the 2019 Notes. As of the Petition Date, approximately $28.5 million in aggregate principal amount of Stub 2019 Notes remained outstanding. From the 2014 Transaction to the Petition Date, the Debtors made approximately $6.9 million in ordinary course interest payments under the 2019 Stub Notes in accordance with the terms thereof.

(c)      2034 Notes.

In 2004, NWHI (as successor in interest)[20] issued $250 million in aggregate principal amount of 6.125% senior unsecured notes (collectively, the "2034 Notes" and, collectively with the 2019 Notes and the Stub 2019 Notes, the "Unsecured Notes"), issued under that certain indenture, dated November 22, 2004 (as amended, supplemented, or otherwise modified from time to time), with Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to SunTrust Bank) (the "2034 Trustee"). The 2034 Notes do not have a change of control provision. The 2034 Notes mature in November 2034 and, prior to the Petition Date, required semiannual coupon payments on May 15 and November 15. As of the Petition Date, approximately $250 million in aggregate principal amount of 2034 Notes remained outstanding. From the 2014 Transaction to the Petition Date, the Debtors made approximately $61.3 million in ordinary course interest payments under the 2034 Notes in accordance with the terms thereof.

---

[19]    NWHI is party to the Stub 2019 Notes Indenture as the Issuer of the Stub 2019 Notes after Jones Apparel Group USA, Inc. survived the Merger and was renamed NWHI.

[20]    NWHI is party to the 2034 Notes Indenture as the Issuer of the 2034 Notes after Jones Apparel Group USA, Inc. survived the Merger and was renamed NWHI.

KE 52165855

amount of loans under the Unsecured Term Loan Facility—enabled the Debtors to experience a smooth landing in chapter 11 and created important momentum leading to a successful 363 Sale.

H.    *Canadian Insolvency Proceedings*.

In addition to these chapter 11 cases, Jones Canada, Inc. and Nine West Canada LP (the "Canadian Debtors") have commenced foreign insolvency proceedings so that the Debtors and the Canadian Debtors may effectuate an enterprise-wide restructuring and otherwise protect their foreign assets.    Specifically, contemporaneously with the Debtors' commencement of these chapter 11 cases, the Canadian Debtors commenced proceedings (the "Canadian Proceedings") under the *Bankruptcy and Insolvency Act* (the "BIA") in Canada.    Shortly after the First Day Motions (as defined herein) were approved by the Bankruptcy Court, the Canadian Court entered orders granting certain relief requested in the Canadian Proceedings, including approval of a liquidation process with respect to Nine West Canada LP's inventory.    On April 11, 2018, the Canadian Court entered an order outlining the proposed liquidation of the Canadian Debtors' inventory and FF&E at their stores.    The liquidation sale of the Canadian Debtors' commenced on April 14, 2018, and was completed by June 30, 2018.    The Canadian Debtors filed a "Proposal" for approval by their creditors on September 14, 2018.    Creditors voted unanimously to approve the Proposal at a meeting of the creditors held on October 4, 2018.    The Canadian Court will consider approval of the Proposal on November 23, 2018.    If approved by the Canadian Court, NWHI stands to receive approximately CAD $4 million on account of pre-April 6, 2018, secured intercompany claims.    Also if approved by the Canadian Court, NWHI stands to receive approximately CAD $4 million, Nine West Distribution, LLC stands to receive approximately CAD $850, and Nine West Management Service LLC stands to receive approximately CAD $413,000, each on account of pre-April 6, 2018, unsecured intercompany claims.

## ARTICLE V.
## EVENTS OF THESE CHAPTER 11 CASES

A.    *First Day Pleadings and Other Case Matters*.

To minimize disruption to the Debtors' operations, on or shortly after the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed motions seeking, among other relief, to the authority to:  (1) obtain postpetition financing, use cash collateral, and declare certain prepetition secured parties adequately protected [Docket No. 33]; (2) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions [Docket No. 7]; (3) honor customer obligations in the ordinary course of business [Docket No. 10]; (4) pay vendors critical to the Debtors' go-forward business and lien claimants in the ordinary course of business [Docket Nos. 11, 12]; (5) pay prepetition wages and certain administrative costs related to those wages [Docket No. 9]; and (6) pay certain taxes and fees [Docket No. 13], surety bond obligations [Docket No. 15], or insurance obligations [Docket No. 14] that accrued or arose in the ordinary course of business before the Petition Date (the "First Day Motions").    A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the *Declaration of Ralph Schipani Interim Chief Executive Officer of Nine West Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 6], filed on the Petition Date.    At a hearing on May 7, 2018, the Bankruptcy Court granted all of the relief requested the First Day Motions on a final basis [Docket Nos. 213, 214, 215, 216, 217, 218, 219]—with the exception of the cash management motion and DIP Financing motion, which were granted on a final basis at a hearing on June 25, 2018 [Docket Nos. 428, 450].—] ([Docket No. 428], the "Cash Management Order").

B.    *Other Procedural and Administrative Motions*.

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of these chapter 11 cases and reduce the administrative burdens associated therewith. On April 16, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (B) Granting Related Relief* [Docket No. 112] (the "OCP Motion").    On May 7, 2018, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 221], which order established procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of business.

2.      *Intercreditor Plan Settlement*.

Another integral part of the proposed Plan is the settlement of intercreditor and intercompany claims and litigation (the "Intercreditor Plan Settlement"). The issues addressed by the Intercreditor Plan Settlement are issues raised by various stakeholders in these chapter 11 cases, including the Noteholders, the Unsecured Term Loan Lenders, and the UCC. The Debtors' advisors met with and discussed many of these issues with advisors to the UCC on August 1, 2018 (at a meeting attended by Akin Gump, Houlihan, Kirkland, Lazard, MTO, and BRG), August 8, 2018 (at a meeting attended by Akin Gump, Houlihan, Kirkland, Lazard, MTO, BRG, and A&M), and August 15, 2018 (at a meeting attended by Akin Gump, Wilmer Cutler Pickering and Dorr LLP (counsel to the Combined Ad Hoc Noteholder Group at that time), Kramer Levin Naftalis & Frankel LLP (as counsel to Brigade), King & Spalding LLP (as counsel to the Crossover Group), Quinn Emanuel Urquhart & Sullivan, LLP (as counsel to the Unsecured Term Loan Agent), Kirkland, and MTO). The Debtors' advisors had numerous other conversations with the advisors to the UCC about these issues.

A key aspect of the Debtors' negotiations with their unsecured creditors were the potential estate claims and causes of action against the Prepetition ABL/FILO Facility, Secured Term Loan Facility, and Unsecured Term Loan Facility. In particular, certain creditors holding claims at NWHI allege that the Prepetition ABL/FILO Facility,[25] Secured Term Loan Facility, and Unsecured Term Loan Facility can be avoided at NWHI, the Debtor where the 2014 Transaction debt was incurred, as constructive fraudulent conveyances. Other creditors, holding claims at NWHI, have also asserted that this debt could be avoided at the Debtor subsidiaries as well. Under the DIP Order, the right to seek to avoid the Secured Term Loan Facility was reserved for both the Debtors and other parties in interest, and the right to seek to avoid the Prepetition ABL/FILO Facility was preserved for the UCC and other creditors.

Another key issue raised by NWHI creditors is how to allocate the value of the Debtors' assets, in particular its intellectual property assets. This issue became more acute given that the IP Sale Proceeds from the 363 Sale were used by NWHI to pay down a portion of the Secured Term Loan Facility, and rights with respect to this allocation were reserved in the Sale Order. Following the pay down of a portion of the Secured Term Loan Facility with assets of NWD, a subsidiary guarantor of the Secured Term Loan Facility and Unsecured Term Loan Facility, the Unsecured Term Loan Lenders argued that this pay down gave rise to a right of subrogation and/or a postpetition intercompany claim entitled to administrative expense priority in favor of NWD against NWHI—the result of which would have been to shift substantially all of the value of NWHI to NWD. In addition, while creditors of NWHI have argued that the assets of the subsidiary Debtors should be used to satisfy the Secured Term Loan Claims first, the Unsecured Term Loan Lenders have argued that the assets of NWHI should be first used to satisfy the Secured Term Loan Claims, and even if the subsidiary Debtors' assets were used to satisfy the Secured Term Loan Claims, doing so would only increase the subrogation rights of the subsidiaries against NWHI.

An additional potential dispute surrounded the amount and validity of the intercompany claims between the Debtor entities. The Debtors believe that their books and records are the best indicators of outstanding intercompany claims. Based on the Debtors' books and records, NWHI is a net payor to the subsidiaries under the Debtors' prepetition and postpetition intercompany claims due to the fact that NWHI holds the Debtors' main bank accounts for transacting business. Given the facts and circumstances, the Debtors believe any full-scale forensic accounting investigation of the intercompany claims is unnecessary and would be unduly burdensome for the Debtors' estates.

The Debtors, through their Independent Directors, analyzed these avoidance, allocation, and intercompany issues. The Independent Directors obtained advice from Kirkland, Lazard, MTO, and BRG as they analyzed each of the legal theories raised by creditor groups. The Debtors' advisors also informed the Independent Directors of the views espoused by the UCC's advisors during multiple meetings on intercompany and intercreditor matters. The Debtors' advisors prepared multiple waterfall scenarios and sensitivity analyses for the Independent Directors to

---

[25]   The FILO Loan was issued in August 2016, and therefore was not incurred in connection with the 2014 Transaction.

The Plan resolves these disputes by negotiating a settlement with respect to the allowance of the Unsecured Term Loan Claims and the recoveries to the Unsecured Term Loan Lenders and other general unsecured creditors of NWHI.  Through a negotiated settlement of these avoidance, allocation, and intercompany claim issues, the Unsecured Term Loan Lenders have agreed to receive consideration that, at Plan value, equates to an 84.2% recovery.  As noted above, under certain theories—including either subrogation or claims based on intercompany administrative claims related to the 363 Sale Proceeds—the Unsecured Term Loan Lenders would take more than 99% of the equity value (with the remainder going to other unsecured creditors at the subsidiary Debtors) and payment of a substantial majority of litigation or settlement proceeds until paid in full.  Under the settlement embodied in the proposed Plan, the Unsecured Term Loan Lenders have agreed to not seek such a recovery.

Further, for purposes of determining what non-NWHI general unsecured creditors (i.e., other than Unsecured Term Loan Lenders) would be entitled to under the Plan Settlement TEV, the Debtors allocated the Plan Settlement TEV among the subsidiary Debtors based on each entity's pro rata contribution to the Debtors' projected 2019 EBITDA.  Based on this, the Debtors allocated approximately $62 million of Plan Settlement TEV to NWHI (on account of The Jewelry Group), approximately $94 million of Plan Settlement TEV to NWD (on account of Anne Klein® and other trademarks), approximately $303 million of Plan Settlement TEV to One Jeanswear Group Inc. (on account of the jeanswear business), and approximately $142 million of Plan Settlement TEV to Kasper Group LLC (on account of the apparel business).  The Debtors then ran the waterfall scenario described in Alternative 2 above, which, among other things, gave effect to applicable prepetition and postpetition intercompany claims among Debtor entities to determine value at other Debtors, including Debtors Nine West Management LLC and Nine West Distribution LLC.  The Debtors used the estimated general unsecured claims (including the Unsecured Term Loan Lender Claims and general unsecured intercompany claims) at each Debtor to determine recoveries for each unsecured creditor at each Debtor (including the subsidiary Debtors), and the Unsecured Term Loan Lenders get the same recovery percentage at each Debtor as other unsecured creditors other than at NWD, where their recovery percentage is less.  In particular, for purposes of the Debtors' estimated allowed unsecured claims at NWD (i.e., the Unsecured Term Loan Claims and an estimated $92,843 of general unsecured claims), the Debtors agreed as part of the Intercreditor Plan Settlement that an intercompany administrative claim existed from NWHI to NWD on account of the IP Sale Proceeds.  As noted above, however, as part of the Intercreditor Plan Settlement, the Unsecured Term Loan Lenders have agreed to a series of settlements that ultimately results in a compromise of a portion of their recovery that they would otherwise be entitled to on account of NWD's administrative claim against NWHI (as a settlement of any potential risks related to this claim), allowing additional value to stay at NWHI for non-Unsecured Term Loan Lender unsecured creditors at that entity.  For the avoidance of doubt, the determination by the Debtors that an intercompany administrative claim exists from NWHI owing to NWD as part of the Intercreditor Plan Settlement shall not apply to, and shall have no effect on, any asserted claims at NWD other than (a) the Unsecured Term Loan Claims and (b) the current amount of estimated general unsecured claims at NWD in an amount of $92,843.  The estimated general unsecured claims of $92,843 at NWD are receiving a par recovery under the proposed Plan.

In addition, the Plan resolves all estate claims and causes of actions against the Secured Term Loan Lenders in exchange for the Secured Term Loan Lenders' waiver of their right to receive postpetition interest at the default rate.

The Debtors believe that the Intercreditor Plan Settlement reflects a reasonable and fair resolution of these issues in light of, among other things, the facts and applicable law as well as the time, delay, cost, and risk associated with litigating the matters to a final, non-appealable order.  On October 16 and October 17, at duly called board meetings, the Debtors' Independent Directors approved the Intercreditor Plan Settlement after months of diligence and meetings with the Debtors' advisors (including Kirkland, Lazard, A&M, MTO, and BRG) into the various legal and factual issues addressed below, at the same time that the Independent Directors authorized the Debtors to enter into the A&R RSA and file the October 17 version of the Plan.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Intercreditor Plan Settlement, as more fully set forth herein.

reallocated among Debtor entities (i.e., that a portion of the IP Sale Proceeds should instead be allocated to NWHI). Some of these arguments are based on which Debtor entities employed the employees that developed and serviced the Nine West®, Bandolino®, and associated brands, while others are based on which entities derived EBITDA from the brands.  The Debtors also are aware of other arguments raised in *In re Nortel Networks, Inc.*, 532 B.R. 494 (Bankr. D. Del. 2015), a decision by the Bankruptcy Court for the District of Delaware in a joint opinion with a Canadian bankruptcy court on a multinational allocation dispute.  In *Nortel*, the court determined that the proper allocation should be based on a modified pro rata allocation based, in large part, at which debtor entities claims were asserted. *Id.* at 500.  The Debtors believe that application of the Nortel decision is appropriately limited to the facts of that case, which included more than 130 subsidiaries located in more than 100 countries, and included numerous cross border issues that are not present or relevant to these chapter 11 cases.  Unlike *Nortel*, the Debtors are primarily a U.S.-based company that has historically accounted for intercompany claims and observed corporate separateness of the various Debtor entities.  In this situation, because the Debtors' books and records have historically shown, and showed at the time of the 363 Sale, that NWD owned the Nine West® and Bandolino® intellectual property (as well as the Anne Klein® intellectual property~~).~~).  The Debtors observe that corporate formalities in their business operations and ~~because~~in the ownership of assets by each Debtor entity.  Because the Nine West® and Bandolino® brand recognition is dependent on the trademarks themselves, the Debtors believe that the allocation for the 363 Sale proceeds for that intellectual property or the value of the Anne Klein brand are properly allocated to NWD and not to NWHI.~~.~~—just like each Debtor agrees that NWD owns The Jewerly Group's working capital assets and owned the Debtors' working capital assets related to the Debtors' former shoe and handbag business, One Jeanswear Group, Inc. owns the jeanswear working capital assets and certain intellectual property used in the jeanswear business, and Kasper Group LLC owns the apparel working capital assets and certain intellectual property used in the apparel business.  The Debtors' books and records regarding ~~such~~the 363 Sale proceeds allocation were ~~also~~ reflected in the fourth monthly operating report filed with the Bankruptcy Court on August~~ ~~10,~~ ~~2018 [Docket No. 576].  The Debtors consider *Nortel* inapposite to the facts in these cases, and while the Debtors acknowledge that the decision results in the small risk to the re-allocation of the IP Sale Proceeds to NWHI, the Debtors believe that it would be very difficult for general unsecured creditors of NWHI to prove that any of the IP Sale Proceeds should be allocated to NWHI.  As part of the comprehensive series of intercreditor settlements embodied in the Plan, however, the Unsecured Term Loan Lenders have agreed to provide additional value to other NWHI unsecured creditors.

        (c)        The Jewelry Group.

Certain parties have argued that because the Debtors' Jewelry Group business resides at NWHI, creditors of NWHI are entitled to their pro rata share of distributable value equal to The Jewelry Group's portion of the Debtors' total enterprise value.  Other parties have argued that because NWD owns the vast majority of the intellectual property used in The Jewelry Group's business, certain portions of The Jewelry Group's value should be allocated to NWD.  Thus, there is an intercreditor dispute as to how much, if any, value should be attributed to NWHI on account of The Jewelry Group business.

The Debtors believe that because The Jewelry Group's inventory, employees, and certain of the intellectual property reside at NWHI, a significant portion of The Jewelry Group's business value should be allocated to NWHI. While a litigable issue, the Debtors do not believe that any other value exists at NWHI (separate from the proceeds of any litigation or settlement on account of Estate Causes of Action).  The Jewelry Group's business amounts to approximately $10.5 million or 11% of the forecasted FY2019 EBITDA.  In formulating the terms of the settlement embodied in the Plan, the Debtors have considered the arguments in favor of allocating The Jewelry Group business's value to NWHI and the implications of other, senior claims that may be asserted against NWHI by other Debtors on the availability of this value for unsecured creditors.  Such claims could include subrogation claims arising from the postpetition pay down of outstanding obligations under the Secured Term Loan Facility and/or postpetition administrative intercompany claims arising from the postpetition transfer of the IP Sale Proceeds from NWD to NWHI, each as discussed in detail below.

        (d)        Subrogation.

The Plan further resolves the Debtor subsidiaries' rights to subrogation (or potentially assert intercompany claims, as discussed below) against NWHI related to the repayment of the debt borrowed by NWHI.  More specifically, the repayment of NWHI's obligations under the Secured Term Loan Facility with the IP Sale Proceeds

KE 52165855

related to intellectual property of NWD, a guarantor under the Secured Term Loan Facility, allows NWD to step into the shoes of secured creditors at NWHI and receive value until it is repaid for the amounts it paid on NWHI's behalf.  *See, e.g.*, *In re Chateaugay Corp.*, 89 F.3d 942 (2d Cir. 1996) ("Under its rule, one compelled to pay a debt which ought to have been paid by another entitled to exercise all remedies which the creditor possessed against that other.") (*quoting American Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. 314, 317 (1941)); *In re Chateaugay Corp.*, 155 B.R. 625, 634 (Bankr. S.D.N.Y. 1993) ("The guarantor who satisfied the debt owed to the lessor was entitled to assert the same administrative priority expense under §507(a)(2) as the lessor would have asserted if the guarantor had not paid its claim."); *In re Wingspread*, 145 B.R. 784, 791 (Bankr. S.D.N.Y. 1992) ("Under the doctrine of subrogation, a subrogee is entitled to assert any priority or special right of the subrogor.").  Because NWD would step into the shoes of a secured claim, its right of subrogation would come before the recoveries to any administrative or general unsecured creditor at NWHI, and would drive a substantial amount of the Debtors' value to the subsidiaries for the benefit of the Unsecured Term Loan Lenders.  The 2019 Trustee has asserted that the potential subrogation right may not be available to the extent that the Secured Term Loan Facility was under-secured at NWHI (with respect to the repayment in full of the Secured Term Loan Facility from NWHI's assets without recourse to the subsidiary Debtors and their assets).

After analyzing applicable legal authority and established facts, the Debtors believe that a right of subrogation for the repayment of the Secured Term Loan Facility exists.  Yet, the Debtors acknowledge that the argument is subject to attack, notably on the basis that the right of subrogation would cease to exist if the entirety of the claims and liens of the Secured Term Loan Facility were successfully avoided as a fraudulent transfer at NWHI, which itself is subject to significant defenses as discussed above.  Consequently, the Plan discounts the value of the Debtor subsidiaries' subrogation rights by providing additional value to the NWHI unsecured creditors rather than allocating almost all value to the Debtors' subsidiaries until the subsidiaries are paid in full.

Additionally, the Debtors are aware that unsecured creditors of NWHI have asserted that the assets of the subsidiary Debtors should be used to repay the Secured Term Loan Claims, while the Unsecured Term Loan Lenders have argued that the Secured Term Loan Lenders should look first to the assets of NWHI for repayment before looking to the assets of the subsidiary Debtors.  Even if it was determined that the assets of the subsidiary Debtors were used to repay the Secured Term Loan Claims, the Debtors believe that this would only increase the subrogation claims of those subsidiary Debtors as against NWHI.  Creditors of NWHI have also suggested that the Secured Term Loan Lenders should agree to waive their claims against NWHI, which the Unsecured Term Loan Lenders believe is an effort to undermine or limit any subrogation claims arising from the repayment of the Secured Term Loan Claims.  The Debtors believe that any such waiver could not be unilaterally granted by the Secured Term Loan Lenders under the terms of the Secured Term Loan Credit Agreement, and are aware that the Unsecured Term Loan Lenders have asserted that the subsidiary Debtors agreeing to such a waiver would expose those Debtors to potential claims and causes of action, including possible breach of fiduciary duties.  For the purposes of the intercreditor settlement described herein, the Debtors agree that any claim held by the Secured Term Loan Lenders against NWHI has not been waived, and that the settlements appropriately resolve inter-debtor disputes regarding the repayment of the Secured Term Loan Claims, avoiding expensive and complex litigation over the appropriate use of the various Debtors' assets.

(e)    Intercompany Claims.

(i)    *Prepetition Intercompany Claims*.

Certain of the Debtors' creditors have sought diligence with respect to the Debtors' prepetition intercompany claims, and the Debtors have undertaken their own efforts to review such claims.  ~~The~~Before the commencement of these chapter 11 cases, the Debtors and their advisors provided overviews of the intercompany claims to their organized creditors, including the 2034 Noteholder Group, the Crossover Group, Brigade, and the Secured Lender Group.  After its formation, the Debtors met with the UCC's advisors on May 2, 2018, to review their prepetition intercompany claims and the Debtors' cash management system, and the Debtors' advisors and the UCC's advisors have had numerous conversations around the intercompany claims since that time.  ~~At this time, no party has asserted that the intercompany claims are avoidable.~~Pursuant to the Cash Management Order, the Debtors also provided the UCC's advisors with "any and all information reasonably requested with regard to the Debtors' and their non-debtor subsidiaries' intercompany ledgers since April 9, 2014."  The Debtors believe the intercompany claims reflected on the Debtors' books and records and the intercompany claims model maintained by the Debtors'

professionals—as shared with the financial advisors to the UCC, the Secured Term Loan Lenders, and the Unsecured Term Loan Lenders—accurately reflect the Debtors' internal accounting system and is the best evidence of the Debtors' intercompany claims accounting. The Debtors observe standard corporate formalities in their business operations and in tracking intercompany claims, and each Debtor understands that it owes or is owed amounts by another Debtor on the basis of each intercompany transaction. The Debtors are not aware of any allegation of improper record-keeping or accounting practices or even a suggestion that the disclosure of the intercompany claims is in any way inaccurate by those parties that have engaged in extensive review and analysis of the intercompany claims. Prior to October 30, 2018, no party in interest had raised any argument that the intercompany claims should not be respected. Since that time, the UCC, the Combined Ad Hoc Noteholder Group, and the 2019 Trustee have raised concerns about these intercompany claims, including whether each Debtor entity would have an expectation of payment on account of such intercompany claims. Almost all of the intercompany claims arose from the Debtors' daily operations and each such Debtor has an expectation that such intercompany claim due or payable will be respected given that almost all arise from NWHI receiving cash on account of other Debtors and paying amounts owed by other Debtors. Each Debtor therefore believes that the intercompany claims should be treated as valid and accurate.

Based on the Debtors' own intercompany accounting system, there are substantial intercompany claims between NWHI and its subsidiaries, the net effect of which will cause value to flow from NWHI to NWHI's subsidiaries that are guarantors of the Secured Term Loan Facility and Unsecured Term Loan Facility. The Debtors believe that it would be difficult and expensive to pursue litigation to recharacterize the intercompany claims, and that any such litigation is speculative at best and unlikely to succeed. The Plan respects the intercompany claims reflected in the Debtors' books and records and intercompany claims model, but nevertheless, the Plan provides additional value to the NWHI unsecured creditors as part of the intercreditor settlements.

For purposes of providing parties in interest with additional disclosure regarding the Debtors' intercompany claims, the Debtors and their advisors have prepared the following prepetition intercompany matrix. The intercompany matrix reflects all intercompany activity from inception through both the 2014 Transaction and the Petition Date. The Debtors and their advisors specifically reviewed all intercompany details from April 9, 2014, through December 31, 2017. The Debtors leveraged the existing matrix, which included balances up to April 9, 2014, and rolled balances forward using transaction level detail.

There are five sets of general ledger accounts utilized to record intercompany activity. Intercompany entries are automatically generated on a daily basis between the Debtor entities. Examples of daily activity include the collection of cash or payment of invoices. The Debtors' intercompany claims activity are more fully disclosed in the Debtors' cash management motion [Docket No. 7].Because intercompany balances reflect thousands of individual transactions between NWHI and its subsidiaries, providing detailed descriptions of each transaction would be impracticable. As more fully disclosed in the Debtors' cash management motion [Docket No. 7], NWHI holds most of the Debtors' bank accounts that comprise the Debtors' cash management system. The Debtors' cash management system therefore routes most ordinary course payments through NWHI, which remits payments on behalf of the Debtors' Debtor and non-debtor subsidiaries on account of invoices due and payable by such affiliates. NWHI also receives payments on behalf of such subsidiaries. When receipts come into an NWHI bank account for another Debtor entity (such as Kasper Group LLC or One Jeanswear Group, Inc.), an intercompany transaction is recorded between the two entities, namely a payable from NWHI to the other Debtor. Similarly, when NWHI pays an expense on behalf of another entity, a receivable from the other entity to NWHI is recorded. The Debtors believe that the intercompany entries reflect standard business practices for businesses similar to the Debtors. The Debtors were authorized by the Cash Management Order to continue to engage in intercompany transactions on a postpetition basis in the same ordinary course manner they had done so prior to the Petition Date. At the end of the month, certain intercompany entries are manually created to record certain recurring activities (e.g., allocation of shared service costs), one-time events, or to correct previously entered intercompany entries. For certain transactions, the trading partner was not immediately identifiable, which required the Debtors to further review

Prepetition Intercompany Matrix— Inception to April 7, 2018[31]

| | NWHI | NWD | Nine West Management Service LLC | Nine West Distribution LLC | One Jeanswear Group Inc. | Kasper Group LLC | Nine West Jeanswear Holding LLC | Jasper Parent | Canada Entities | Non-Debtor Entities | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NWHI | - | (33,000,341) | 207,539,479 | 39,238,665 | (882,266,757) | 7,135,542 | (57,602,871) | 25,363 | - | 20,334,053 | (698,596,868) |
| NWD | 33,604,306 | - | (10,712,697) | - | 42,877,658 | 675 | - | - | - | (680,369) | 65,089,573 |
| Nine West Management Service LLC | (207,540,427) | 10,712,697 | - | 22,766,252 | 287,893,585 | 3,920,898 | - | - | - | 667,704 | 118,420,708 |
| Nine West Distribution LLC | (39,238,665) | - | (22,766,252) | - | 109,352,732 | 6,734 | - | - | - | 508,429 | 47,862,978 |
| One Jeanswear Group Inc. | 882,266,758 | (42,865,472) | (287,893,585) | (109,352,732) | - | 2,119,126 | 1,547,662 | - | - | (14,098,730) | 431,723,026 |
| Kasper Group LLC | (7,161,730) | (675) | (3,920,898) | (6,734) | (2,119,126) | - | - | - | - | (22,810,107) | (36,019,270) |
| Nine West Jeanswear Holding LLC | 57,602,871 | - | - | - | (1,547,662) | - | - | - | - | (363,002) | 55,692,207 |
| Jasper Parent | (25,363) | - | - | - | - | - | - | - | - | - | (25,363) |
| Canada Entities | - | - | - | - | - | - | - | - | - | (6,460,673) | (6,460,673) |
| Non-Debtor Entities | (20,259,028) | 680,369 | (667,704) | (508,429) | 14,017,411 | 22,810,107 | 363,002 | - | 6,460,673 | 396 | 22,896,796 |
| Total | 699,248,721 | (64,473,422) | (118,421,657) | (47,862,978) | (431,792,159) | 35,993,082 | (55,692,207) | 25,363 | 6,460,673 | (22,902,298) | 583,117 |

    (ii)    *Postpetition Intercompany Claims.*

————As discussed above, in accordance with the Debtors' cash management system, while the IP Sale Proceeds were an asset of NWD, it was NWHI who paid down a portion of the Secured Term Loan Claims with the use of the IP Sale Proceeds. As a result, NWD either transferred or was deemed to have transferred the $263 million in IP Sale Proceeds to NWHI, arguably providing NWD with a right to a $263 million, postpetition administrative intercompany claim against NWHI that would also be entitled to priority over any unsecured claims at NWHI, thereby reducing any value available to unsecured creditors of NWHI (including any value from estate claims and causes of action). Although creditors of NWHI may dispute whether or not such a postpetition intercompany claim is entitled to administrative expense priority, the Debtors believe, after analyzing applicable legal authority and established facts, that the repayment of the Secured Term Loan Facility by NWHI gave rise to an administrative, postpetition, intercompany claim in favor of NWD under the Debtors' cash management system. Because certain parties dispute whether this claim should be entitled to priority, however, the Plan discounts the value of the Debtors' subsidiaries' postpetition intercompany claims by providing additional value to the NWHI unsecured creditors rather than allocating almost all value to the Debtors' subsidiaries until the creditors of the subsidiaries are paid in full.

As noted above, the Debtors were authorized to continue engaging in intercompany transactions in accordance with their normal cash management system. Pursuant to the Cash Management Order, the intercompany

---

[31] Although the Debtors maintain their intercompany accounts on a transaction by transaction basis, the accounts are reconciled at each month end close. For purposes of the Schedules and Statements, the Debtors utilized an intraperiod date of April 7, 2018, to create the intercompany balances at filing. The result was an intercompany matrix with a small net imbalance of approximately $583,117, or less than 0.1% of the total. Due to timing and resource constraints, the Debtors did not complete a full intercompany reconciliation of the month-end close process for the intraperiod matrix to eliminate the imbalance.

KE 52165855

claims incurred as part of these intercompany transactions are treated as administrative expenses of each Debtor estate.

    (iii)    *Intercompany Claims and Proceeds of Estate Causes of Action*.

In addition, partially as a result of the subsidiaries' claims against NWHI (including intercompany, subrogation, reimbursement, and/or contribution claims) coupled with the claims of the Unsecured Term Loan Lenders against those subsidiaries in addition to NWHI, the Debtors believe that the Unsecured Term Loan Lenders ~~would~~ likely would be entitled to receive a substantial portion of the proceeds of any Estate Causes of Action (obtained either through litigation or through a settlement) up until payment in full of their claims. To resolve disputes relating to the participation of the Unsecured Term Loan Lenders in the settlement proceeds, however, the Unsecured Term Loan Lenders have agreed to limit their distribution to only one-third of any consideration from the Equity Holders Settlement—an amount that is less than what the Unsecured Term Loan Lenders would otherwise be entitled.

    (f)    Allocation of Administrative Expenses.

As a result of the mounting professional fees incurred by estate-retained or estate-paid professionals, the Debtors have, collectively, been shouldering substantial administrative costs since the Petition Date. The Debtors believe that the subsidiary Debtors have borne a disproportionate amount of the administrative expenses incurred during these chapter 11 cases given the costs of, among other things, the investigations into NWHI's causes of action. In fact, as of the date hereof, although NWHI pays all professional fees from its main operating account, an administrative intercompany claim is booked from Nine West Management LLC (a subsidiary Debtor) to NWHI. The amounts incurred by Nine West Management LLC have not, as of the date hereof, been allocated among Debtor entities. In the context of the intercreditor settlement, creditors of the subsidiary Debtors are agreeing to forego any reallocation of previously incurred administrative expenses prior to the signing of the A&R RSA, but found it imperative that NWHI be responsible for a more appropriate share of the administrative expenses going forward. Indeed, the substantial majority of creditors that are not party to the A&R RSA will be creditors primarily or solely at NWHI. As the Debtors believe that the concessions made by the Unsecured Term Loan Lenders in the Plan are in the best interests of all Debtor estates in these chapter 11 cases, the Debtors and the Unsecured Term Loan Lenders have agreed that, to the extent additional administrative expenses are incurred in connection with the pursuit or defense of any challenge to the intercreditor settlements and the Plan, or the pursuit or defense of any motion seeking standing to pursue Estate Causes of Action, those administrative expenses should be borne exclusively by general unsecured creditors of NWHI (other than the Unsecured Term Loan Lenders, whose recoveries are based in large part on recoveries at the subsidiary Debtors). Thus, as described in more detail in the Plan, the intercreditor settlement allocates the administrative expenses of estate professionals from and after the effective date of the A&R RSA that are incurred in connection with the pursuit of, or defense against, any objections to any Plan-related documents (including motions for further extensions of exclusivity) or with the pursuit of any estate claims or the pursuit or defense of any motion seeking standing to pursue Estate Causes of Action (including against the Sponsor, the Minority Equity Holders, or the Prepetition Lenders) to NWHI exclusively.[32] This allocation to NWHI will result in a dollar-for-dollar reduction in Cash distributions that would otherwise be made to general unsecured creditors of NWHI (other than the Unsecured Term Loan Lenders). **Such allocation of administrative expenses may significantly dilute the recoveries of general unsecured creditors of NWHI.** The Debtors believe such an allocation is reasonable and appropriate under the circumstances, and in the context of the intercreditor settlements described herein and in the Plan. The 2034 Trustee, the 2019 Trustee, the Combined Ad Hoc Noteholder Group, and the UCC have asserted that such an allocation is unreasonable, coercive, and inappropriate under the circumstances.

*      *      *      *      *

---

[32]    Notably, however, administrative expenses of estate professionals incurred in connection with the Bankruptcy Court-ordered mediation will not be allocated to NWHI exclusively, in accordance with the Mediation Order.

KE 52165855

(a)    New Common Stock.

On the Effective Date, Reorganized Holdings shall issue the New Common Stock to the Entities entitled to receive the New Common Stock pursuant to the Plan. The issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests. All of the shares of New Common Stock issued (including any New Common Stock to be issued upon the exercise of the New Warrants) pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

For the avoidance of doubt, any claimant's acceptance of New Common Stock, shall be deemed as its agreement to the Reorganized Holdings Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

The New Common Stock to be distributed pursuant to the Plan is subject to dilution by the New Warrants and the Management Incentive Plan. Any further dilution will be on terms contemplated by the Reorganized Holdings Organizational Documents (including the Shareholders Agreement). The Reorganized Holdings Organizational Documents will be filed as soon as reasonably practicable, and in no event less than 7 days before the Voting Deadline.

(b)    New Debt.

The Debtors shall use commercially reasonable best efforts to syndicate the New Secured Facility and the New Secured Facility Upsize Amount. Any such New Secured Facility Upsize Amount in excess of the Minimum Exit Cash Requirement shall be used to fund a Cash distribution to holders of Unsecured Term Loan Claims from the UTL Financing Cash Pool, pursuant to Article III.B.5 of the Plan and shall result in the Financing Distribution Increase and the Financing Distribution Decrease, reallocating New Common Stock from holders of Unsecured Term Loan Claims to holders of Claims in Classes 5B, 5C, and 5D.

The New Secured Facility Upsize Amount is designed in a way to provide additional value to the holders of unsecured claims. As the structurally senior Unsecured Term Loan Lenders receive an increase in their Cash recoveries, other unsecured creditors will receive additional equity in the Reorganized Debtors at an equivalent value to the additional Cash received by the Unsecured Term Loan Lenders. The ability to provide additional New Common Stock to non-Unsecured Term Loan Lender unsecured creditors was a critical part of negotiations surrounding the Plan.

On the Effective Date, contemporaneously with the satisfaction of the DIP Claims in accordance with Article II.A of the Plan, Reorganized Holdings and one or more Reorganized Debtors shall enter into the New Debt on the terms and conditions set forth in the New Debt Documents. On and after the Effective Date, the New Debt Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Debt, including the New Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Debt.

On the Effective Date, immediately upon receipt of the payments required in Article II.A of the Plan, all of the liens and security interests to be granted in accordance with the terms of the New Debt Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance

85

with the terms of the New Debt Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New Debt Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

(c)       New Warrants; New Warrant Agreement.

As described herein, the holders of Claims in Classes 5B, 5C, and 5D, shall receive their Pro Rata share of New Warrants under the Plan. The New Warrants shall only be exercisable as follows: (a) during the 5-year term of the warrants, upon a change of control event consummated through a sale or a merger at a strike price based on a $650 million total enterprise value; and (b) during the first 42 months of the term of the New Warrants, for Cash only at the option of the holder of the New Warrants at a strike price based on a $650 million total enterprise value. No adjustments will be made to the New Warrants' strike price, except solely in the event of dividends to shareholders or share repurchases, and other customary anti-dilution protections, to be set forth in the New Warrant Agreement. In addition, the New Warrant Agreement shall provide that the New Warrants shall not (x) have any Black-Scholes or similar "cash out" protections in the event of a change of control transaction for less than the strike price, (y) have any covenants, or (z) entitle the New Warrant holders to any corporate governance rights.

As condition to the issuance of the New Warrants, each party entitled to a New Warrant under this Plan shall take any and all actions necessary to be bound by the New Warrant Agreement. The New Warrant Agreement shall provide that the holders of New Warrants shall be subject to confidentiality obligations, restrictions against transfer to competitors, and restrictions against transfer that would result in Reorganized Holdings becoming subject to reporting requirements of section 12 or 15 of the Securities Exchange Act of 1934, as amended.

On the Effective Date, Reorganized Holdings shall issue the New Warrants to the Entities entitled to receive the New Warrants pursuant to the Plan. The issuance of the New Warrants shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests other than as set forth herein. Each distribution and issuance of the New Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

For the avoidance of doubt, any claimant's acceptance of the New Warrants (including any New Common Stock to be issued upon the exercise of the New Warrants) shall be deemed as its agreement to the Reorganized Holdings Organizational Documents (including the Shareholders Agreement), as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

The New Warrants are subject to dilution for the Management Incentive Plan. The Warrant Agreement will disclose further terms with respect to the New Warrants, including whether they are subject to dilution for anything other than the Management Incentive Plan. The New Warrant Agreement will be filed as soon as reasonably practicable, and in no event less than 7 days before the Voting Deadline.

2.       Equity Holders Settlement.

Effective as of October 17, 2018, Nine West Topco (a) shall, to the extent it has not yet previously done so, amend its previously filed 2017 U.S. partnership tax return to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its equity investment in Holdings; (b) shall not take any action that results in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the Interests in Holdings as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code or by subsequently amending Topco's 2017 U.S. partnership tax return to claim a worthless stock deduction on account of its equity investment in Holdings) until after the Effective Date (it being expressly acknowledged and agreed that Nine West Topco LLC shall be permitted to claim a worthless stock deduction on account of its Interest in Holdings in the taxable year in which the Effective Date occurs); (c) shall not knowingly permit any Person (other than Nine West Topco LLC) to own or take any action that would result in any

for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock and the New Warrants to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

16.    Retention of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Retained Causes of Action Schedule, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue and/or settle the Causes of Action, as appropriate, in their discretion and in accordance with the best interests of the Reorganized Debtors.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors, in each case through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action or to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

The Retained Causes of Action include any claims or Causes of Action against the Non-Released Parties. This includes former shareholders of The Jones Group Inc. for potential claims for fraudulent conveyance or fraudulent transfer in connection with the $1.183 billion distributed to them in the 2014 Transaction (a claim that, with prejudgment interest, could exceed $1.6 billion), and against the former directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates for the potential claims for breach of fiduciary duty in connection with the 2014 Transaction or Carve-Out Transactions.

Any value attributed to the Retained Causes of Action is speculative in nature. Many of the Retained Causes of Action relate to the Debtors' business operations, including the right to bring or settle potential claims against trade creditors, customers, and current or former employees. With respect to litigation against the Non-Released Parties, the Reorganized Debtors would need assess whether such claims are colorable or whether litigation would produce a benefit in light of potential legal costs. At this time, no party has proposed sources of funding for a litigation trust to pursue these claims or otherwise proposed a structure for such a trust that has the support of, among others, the Debtors' unsecured creditors at NWHI and the Unsecured Term Loan Lenders. Further, litigating the Retained Causes of Action at this time would likely take significant time and impose additional costs on the Estates.

"opt-out" provisions—pursuant to which rejecting classes, or classes that are deemed to reject the plan, can elect not to grant a release—are impermissible non-consensual releases. Further, the U.S. Trustee argues that the Plan's opt-out procedure is not sufficient to demonstrate consent to the Third-Party Releases contained in the Plan. The Debtors disagree. A number of courts have found that an opt-out procedure substantially similar to the procedure contemplated by the Plan is sufficient to demonstrate the consent of parties that do not opt out. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305–06 (Bankr. D. Del. 2013); *In re Tops Holding II Corporation*, No. 18-22219 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018) [Docket No. 765]; *In re Cumulus Media, Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769].

The U.S. Trustee also argues that Classes 1, 2, and 3 are Impaired under the Plan because the Classes are designated as Releasing Parties granting the Third-Party Releases to the Released Parties. The Debtors disagree that a release renders a claim "impaired" within the meaning of section 1124 of the Bankruptcy Code. A party's ability to release claims is not a legal attribute of a claim that can be altered by statute. In any event, the releases granted by Classes 1, 2, and 3 are consensual releases permitted under the Bankruptcy Code that do not render the Plan unconfirmable. *See In re Indianapolis Downs, LLC*, 486 B.R. at 305–06.

The Debtors disagree with the positions adopted by the U.S. Trustee. The Debtors believe that the releases, exculpation, and the injunction set forth in the Plan are customary for chapter 11 plan in this and other districts. The Debtors believe that applicable case law and the Bankruptcy Code permit the Plan's releases and that they are justified under the facts and circumstances of these ~~Chapter 11 Cases. The Debtors will meet their burden on the releases, exculpations, and injunctions at Confirmation.~~

chapter 11 cases. The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because the releases are related to, among other things, the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan, participated in good faith in negotiations surrounding the ~~Restructuring Support Agreement~~A&R RSA, the Prepetition RSA, the Plan, and the Restructuring Transactions, and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

3.    Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

4.    Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the

103

and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE XI.
## RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the holders of Allowed Claims and Allowed Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims and Allowed Interests than proposed under the Plan. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated:  November 912, 2018

NINE WEST HOLDINGS, INC.
on behalf of itself and its debtor affiliates

*/s/ Ralph Schipani*

Ralph Schipani
Interim Chief Executive Officer
Nine West Holdings, Inc.

COUNSEL:

James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*