REDACTED – MOTION TO SEAL PENDING

**KASOWITZ BENSON TORRES LLP**

David S. Rosner
Howard W. Schub
David J. Mark
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
drosner@kasowitz.com
hschub@kasowitz.com
dmark@kasowitz.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Nine West Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR
ENTRY OF AN ORDER GRANTING LEAVE, STANDING, AND AUTHORITY TO
COMMENCE AND PROSECUTE CERTAIN ADDITIONAL CLAIMS ON BEHALF OF
THE NWHI ESTATE AND EXCLUSIVE SETTLEMENT
AUTHORITY IN RESPECT OF SUCH CLAIMS**

---

[1] The Debtors in this chapter 11 case, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is: 1411 Broadway, New York, New York 10018.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTION AND VENUE ............................................................... 4

BACKGROUND ..................................................................................... 5

    A.    The LBO and Carve-Out Transactions ................................. 5

    B.    Sycamore Manipulates Estimates, Projections and Valuations Leading to LBO ............................................................................... 8

    C.    KKR Profits from Carve-Out Assets Following the LBO ................... 10

    D.    RemainCo's Immediate Financial Decline and Later Bankruptcy ...... 11

    E.    Rule 2004 Discovery ........................................................... 12

RELIEF REQUESTED .......................................................................... 12

BASIS FOR RELIEF ............................................................................. 12

I.    Legal Standard for Derivative Standing ......................................... 12

II.    The Committee Satisfies the Requirements for Derivative Standing ............... 13

    A.    The Proposed Claims Are Colorable ................................... 13

        1.    The Debtors Tacitly Admit that the Estate Has Colorable Claims Against KKR .................................................................. 13

        2.    The Estate Has Colorable Aiding and Abetting of Breach of Fiduciary Duty Claims Against KKR ....................................... 14

            (a)    A Multitude of Actions Give Rise to Aiding and Abetting Breach of Fiduciary Duty Claims Against KKR ................. 14

        3.    The Estate Has Colorable Recovery of Avoided Intentional and/or Constructive Fraudulent Transfers Claims Against KKR ............... 15

        4.    The Estate Has Colorable Claims for Unjust Enrichment Against KKR ................................................................................ 15

    B.    The Debtors Have Unjustifiably Refused to Prosecute the Proposed Claims ................................................................................ 16

C.    This Court Should Grant the Committee Exclusive Authority to Settle the
Proposed Claims ................................................................................................... 16

RESERVATION OF RIGHTS ................................................................................................. 16

NOTICE ................................................................................................................................... 17

CONCLUSION ......................................................................................................................... 17

REDACTED – MOTION TO SEAL PENDING

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

11 U.S.C. § 101 ...................................................................................................................1

11 U.S.C. § 105(a) ..........................................................................................................1, 5

11 U.S.C. § 544 .................................................................................................................15

11 U.S.C. § 550(a) ............................................................................................................15

11 U.S.C. § 1103(c) ....................................................................................................1, 4, 5

11 U.S.C. § 1109(b) ....................................................................................................1, 4, 5

28 U.S.C. § 157 ..................................................................................................................4

28 U.S.C. § 157(b)(2) .........................................................................................................4

28 U.S.C. § 1334 .................................................................................................................4

28 U.S.C. §1408 ..................................................................................................................5

28 U.S.C. § 1409 .................................................................................................................5

**Other Authorities**

Bankruptcy Rule 9019 ...................................................................................................4, 16

REDACTED – MOTION TO SEAL PENDING

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "Debtors") hereby submit this motion (the "Motion"), by and through its undersigned counsel, for entry of an order, pursuant to §§ 105(a), 1103(c), and 1109(b) of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), in substantially the form attached hereto as Exhibit A (the "Proposed Order") granting the Committee (A) leave, standing, and authority to commence and prosecute certain claims (the "Proposed Claims"), as set forth in more detail in the complaint attached hereto as Exhibit B (the "Complaint"), on behalf of the estate of Debtor NWHI against Kohlberg Kravis Roberts & Co. L.P., KKR Capital Markets LLC, MCS Capital Markets LLC, KKR Asset Management, LLC, KKR Asset Management Partners, LLP, CPS Managers Master Fund, L.P., Corporate Capital Trust, Inc., KKR Mezzanine Partners I, L.P., KKR Mezzanine Partners I Side-By-Side, L.P., and other KKR & Co., Inc. affiliates, the names of which are currently unknown to the Committee ("KKR" or "Defendant"); and (B) sole authority to compromise and settle the Proposed Claims on behalf of the NWHI estate.  In support of this Motion, the Committee, by its undersigned counsel, respectfully represents as follows.

## PRELIMINARY STATEMENT

1.      On October 5, 2018, the Official Committee of Unsecured Creditors filed its notice of motion seeking Entry of an Order Granting Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estate and Exclusive Settlement Authority in Respect of Such Claims.  D.I. 717 (the "Principal Motion").

2.      The Principal Motion seeks authority to prosecute claims against Sycamore Management Partners L.P., Sycamore Partners, L.P., Sycamore Partners A., L.P., Sycamore

Partners Management, L.L.C., Sycamore Fund I, and other Sycamore affiliates ("Sycamore");

Stefan Kaluzny and Peter Morrow, co-founders and principals of Sycamore, and directors of

NWHI in their individual capacities (the "Sycamore Principals"); Sycamore employees Ryan

McClendon, Adam Weinberger, and Dary Kopelioff (the "Sycamore Employees," and collectively

with Sycamore and the Sycamore Principals, the "Sycamore Defendants"); John T. McClain, the

Chief Financial Officer of Jones Group Inc. ("Jones Inc.") and director of Nine West Holdings,

Inc. ("NWHI"); the directors of Jones Inc. (the "Jones Inc. Directors"); the directors of Jasper

Apparel LLC ("Jasper Apparel"); the directors of Cortland Capital Market Services, LLC

("Cortland"); GLAS Trust Company, LLC ("GLAS"); and Wells Fargo Bank, National

Association ("Wells Fargo," and collectively with Cortland and GLAS, the "Lenders")

(collectively, the "Principal Motion Defendants").

3.      The Committee filed the Principal Motion for leave to prosecute claims held by

NWHI that the Debtors unjustifiably refuse to assert against the Principal Motion Defendants that

could yield a billion dollars or more in value for the Debtors' estate.  The Committee likewise files

the instant motion through its undersigned counsel to assert similar claims that the Debtors have

unjustifiably refused to assert against KKR, which aided and abetted Sycamore's breaches of

fiduciary duty.

4.      To avoid burdening the Court, the Motion incorporates the representations and

arguments of the Principal Motion.  In short, the Proposed Claims principally arise out of the April

8, 2014 leveraged buyout (the "LBO") of Jones Inc., in which (i) KKR, acting out of its own self-

interest, partnered with Sycamore to raise hundreds of millions of dollars to cash out Jones Inc.'s

former shareholders, and Jones Inc. was merged into NWHI under a parent corporation wholly-

owned by Sycamore ("Merger"), (ii) KKR substantially assisted Sycamore in causing NWHI to

2

incur over $800 million in new debt ("LBO Debt") principally to fund a portion of the payments

to shareholders, and (iii) immediately following the Merger, KKR, together with its partner,

Sycamore, purchased the Debtors' most valuable businesses, Jones Apparel, Kurt Geiger, and

Stuart Weitzman (collectively, the "Carve-Out Assets"), for hundreds of millions of dollars less

than they were worth (the "Carve-Out Transactions").  The Carve-Out Transactions were classic

self-dealing transfers, with KKR and Sycamore partnering to control both buyer and seller, and to

fix the transfer prices to meet their larger objectives.  KKR purchased ten percent of the Carve-

Out Assets at well below their fair value, and aided and abetted the overvaluation and over-

leveraging of NWHI by hundreds of millions of dollars, in an effort to benefit itself and Sycamore

and generously profit at the expense of the heavily indebted RemainCo (defined below).

5.      Indeed, less than two years after the Carve-Out Transactions were consummated,

KKR's partner Sycamore had made a profit of ***nearly $463 million*** by taking cash dividends from

the Carve-Out Asset businesses and then selling most of the businesses to third parties, all at the

expense of NWHI and its creditors.  As a co-equity investor in the transaction, KKR shared in

these profits.  Following the Carve-Out Transactions, only the Jeanswear business and Nine West

business (collectively, "RemainCo") remained at or as subsidiaries of NWHI.  These assets were

burdened with the more than $1.5 billion of debt at a time they had a fair market value of

approximately $1.1 billion.

6.      Although RemainCo was insolvent or rendered insolvent by the transaction,

Sycamore obtained a solvency opinion (the "RemainCo Solvency Opinion") from Sycamore's

long-standing advisor, Duff & Phelps, LLC ("Duff & Phelps") that was prepared to show that

NWHI was not rendered insolvent by the LBO and Carve-Out Transactions.  However, there were

obvious deficiencies in the RemainCo Solvency Opinion, including but not limited to inflated

REDACTED – MOTION TO SEAL PENDING

projections. Indeed, shortly after the LBO, KKR enlisted ███████████ to perform a post-LBO valuation of KKR's interest in RemainCo and the Carve-Out Assets. That valuation makes even clearer that the RemainCo Solvency Opinion was deficient.

7.    Post-LBO transactions prove that the price KKR and Sycamore paid for the Carve-Out Assets represented a fraction of their value. The amount KKR received from the Carve-Out far exceeded KKR's portion of it and Sycamore's $120 million equity investment in RemainCo. Sycamore and its Affiliates acquired the Carve-Out Assets for a meager $641 million and resold them in a series of transactions for over $1 billion, but not before KKR and Sycamore drained from them tens of millions of dollars in dividends for themselves. Principal Motion at ¶¶ 27-28.

8.    These facts cannot be disputed, and they expose Defendant to multiple claims, including aiding and abetting breach of fiduciary duty, recovery of avoided fraudulent conveyances, and unjust enrichment.

9.    Accordingly, the Committee seeks standing, pursuant to §§ 1103(c) and 1109(b) of the Bankruptcy Code, to prosecute the Proposed Claims in order to ensure that the full value of these assets is included as property of the Debtors' estate for the benefit of the Debtors' creditors. The Court should grant the Committee such standing because (a) the Proposed Claims are colorable and far more valuable to the Debtors' estate than as represented in the proposed settlement, and (b) the Debtors have unjustifiably declined to prosecute the Proposed Claims.

10.    Finally, the Court should grant the Committee exclusive authority to settle the Proposed Claims subject to Court approval in accordance with Bankruptcy Rule 9019, to prevent the Debtors from settling the case out from under the Committee at a woefully insufficient figure.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this

4

REDACTED – MOTION TO SEAL PENDING

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested

herein are §§ 105(a), 1103(c), and 1109(b) of title 11 of the Bankruptcy Code.

## BACKGROUND

12.    The Committee has attached to this motion as Exhibit B a copy of its Proposed

Complaint against Defendant.  Even based on the limited Rule 2004 discovery conducted to date,

the Committee submits that the claims set forth in the Proposed Complaint are "colorable" and

will be further fortified through full discovery.  The Committee refers the Court to the Proposed

Complaint for a full recitation of all relevant facts.  The Committee further refers the Court to the

background provided in paragraphs 20 through 58 of the Principal Motion, and fully incorporates

those paragraphs in this Motion.  What follows below is a brief summary of the key allegations,

specific to the claims against KKR.

### A.    The LBO and Carve-Out Transactions

13.    In June 2013, Jones Inc. began exploring options for the sale of all or some of its

businesses.[2]  Jones Inc. engaged in an eight-month sales process that was run by Citigroup Global

Markets Inc.[3]

14.    In July 2013, KKR partnered with Sycamore to submit an indication of interest to

purchase the entirety of Jones. Inc. for a price of $18 to $20 per share, which implied a total

enterprise value of between $2.4 billion and $2.6 billion.[4]

15.    On July 23, 2013, Jones Inc. opened a virtual data room containing additional

confidential diligence materials and gave access to these documents to KKR and Sycamore, as

well as to another financial sponsor who expressed preliminary interest in acquiring the entirety of

---

[2] Proposed Complaint ("Compl.") (Ex. B) ¶ 63.

[3] Compl. ¶ 7.

[4] Compl. ¶ 64.

Jones Inc. Jones Inc. also granted access to these materials to certain other parties that had expressed interest in acquiring discrete Jones Inc. business lines.[5]

16.    On September 16, 2013, representatives of KKR and Sycamore met with Citigroup. During the meeting, KKR and Sycamore advised Citigroup that after their "extensive additional diligence" they had "considerable reservations regarding the value of the Company," and that if they made a final proposal at all it would be "significantly lower" than $18 to $20 per share. KKR soon thereafter advised that it was no longer interested in acting as a principal equity investor in a Jones Inc. sale. Among the reasons KKR expressed internally were concerns over valuation, the amount of projected cost savings, and the ability to realize them.[6]

17.    On October 23, 2013, Sycamore offered to acquire Jones Inc. for $14 per share, which it later increased to $15 per share, reflecting an enterprise value of $2.2 billion. During a meeting on October 29, 2013, the Jones Inc. Board determined that $2.2 billion "represented a compelling value for the Company" and resolved to "proceed with discussions with Sycamore on that basis."[7]

18.    Sycamore was slated to buy the Carve-Out Assets, which were the most valuable pieces of Jones Inc., due to their strong performance as compared to the performance of the RemainCo, when Sycamore submitted its October 23, 2013 bid. On Sunday October 27 or Monday October 28, 2013—just ahead of Jones Inc.'s October 29, 2013 board meeting—Sycamore founder Stefan Kaluzny advised Citigroup that Sycamore intended to "transfer ownership of certain of the Company's" assets, including Jones Inc.'s most valuable businesses,

---

[5] Compl. ¶ 65.
[6] Compl. ¶ 66.
[7] Compl. ¶ 69.

REDACTED – MOTION TO SEAL PENDING

to "Sycamore [a]ffiliates substantially concurrently with the closing of the merger (such transfers being the 'carveout transactions' described further in the Merger Agreement)."[8]

19.    Despite its own concerns about Jones' valuation and the ability to realize adequate costs savings following a transaction, KKR offered to help Sycamore structure and fund Sycamore's proposed transaction.[9]  To that end, from October 2013 through the closing, KKR communicated frequently with Morrow and others at Sycamore to discuss business plans, projections, valuations, structuring, and funding of the Merger and LBO.[10]

20.    On December 19, 2013, Jones Inc.'s Board of Directors unanimously approved and executed an Agreement and Plan of Merger (the "Merger Agreement" or the "Merger") with two entities controlled by Sycamore: Jasper Parent LLC ("Jasper Parent") and Jasper Merger Sub, Inc. ("Merger Sub").[11]  Jones Inc.'s public shareholders were to receive $15.00 for each share of common stock, representing a total enterprise value of approximately $2.2 billion. Sycamore was the only party to make a bid for the entire company, and that bid expressly contemplated the contemporaneous Carve-Out Transactions.[12]

21.    The Merger was funded by approximately $800 million of new debt, $650 of rolled debt, cash proceeds from the Carve-Out Transactions, and a small amount of RemainCo equity.[13] Sycamore and KKR contributed $120 million in equity to RemainCo, but that amount constituted a paltry slice of the capital required to fund the transactions contemplated by the LBO.  KKR

---

[8] Compl. ¶ 71.
[9] Compl. ¶ 10.
[10] Compl. ¶ 169.
[11] Compl. ¶ 74.
[12] Compl. ¶ 8.
[13] Compl. ¶ 9.

thereby helped to leave RemainCo saddled with annihilating new debt to fund the LBO.[14]   The new debt incurred by NWHI in the LBO, discussed herein, is referred to as the "LBO Debt."

22.    The Jones Inc. shareholders approved the Merger on April 7, 2014, and the transaction closed on April 8, 2014.[15]   The surviving entity was renamed Nine West Holdings, Inc.[16]

23.    Following the closing of the LBO, NWHI completed the Carve-Out Transactions, transferring ownership of Jones Apparel (for $110 million), Kurt Geiger (for $136 million), and Stuart Weitzman (for $395 million) to Sycamore Affiliates in exchange for $641 million in aggregate cash, and leaving the Jeanswear business, Nine West business, and corporate-level assets and obligations with NWHI.[17]   KKR helped Sycamore structure and finance all of these transactions.[18]

24.    When the dust settled, RemainCo was left with a grand total of $1.55 billion in debt, far more than the enterprise was worth after selling the Carve-Out Assets to KKR and Sycamore for a pittance.[19]

**B.    Sycamore Manipulates Estimates,
Projections and Valuations Leading to LBO**

25.    Based on the discovery to date, it is clear that during the six-month period prior to the LBO, Sycamore engaged in an internal process whereby it consistently and artificially increased the forecasts for and therefore the purported value of RemainCo following the LBO,

---

[14] Compl. ¶ 80.
[15] Compl. ¶ 5.
[16] Compl. ¶ 35.
[17] Compl. ¶ 78.
[18] Compl. ¶ 33.
[19] Compl. ¶ 85.

while decreasing the forecasts for and therefore the value attributable to the Carve-Out Assets.[20] In that way, Sycamore was able to drastically over-lever RemainCo and ensure it could make substantial, immediate returns on the Carve-Out Assets, once such assets were stripped away from RemainCo and the claims of its pre-existing creditors.[21]

26.    KKR, which purchased almost 10 percent of the equity of RemainCo and the Carve-Out Assets as Sycamore's partner in the transaction, was well aware of Sycamore's unreasonable projections.[22]

27.    KKR's internal projections demonstrate that the grossly inflated projections Sycamore provided to Duff & Phelps were unjustifiable and improper.    KKR authored a memorandum on April 7, 2014—less than one month after Sycamore provided Duff & Phelps with a RemainCo adjusted 2014 EBITDA of $244 million and an adjusted 2017 EBITDA of $272 million—that projected significantly lower RemainCo EBITDA between 2014 and 2017. Specifically, KKR projected just $181.2 million in adjusted 2014 EBITDA and just $215 million in adjusted 2017 EBITDA.[23]

28.    Had Duff & Phelps used KKR's projections, it would have determined that RemainCo was insolvent.[24]    In fact, in an internal email mere weeks after the LBO, KKR acknowledged that the values Sycamore attributed to RemainCo and the Carve-Out Assets were "entirely subjective" and "arbitrary."[25]

---

[20] Compl. ¶¶ 19-21.

[21] Compl. ¶ 11.

[22] Compl. ¶¶ 19-20.

[23] Compl. ¶ 135.

[24] Compl. ¶ 20.

[25] Compl. ¶ 88.

29.    Moreover, KKR's advisors at ████████████ performed the RemainCo valuation after the LBO, and they valued RemainCo as of March 31, 2014, several days before the LBO closed.    Though cognizant of Sycamore's $236 million 2013 adjusted pro forma EBITDA calculation, ████████████ based its own valuation on a considerably lower estimate of ████ ████████—████████████ in unadjusted EBITDA and ████████████ in Sponsor Addbacks.[26]

30.    KKR and Sycamore ignored the glaringly apparent insolvency of the RemainCo because Sycamore's estimates and projections ensured that the $2.2 billion in total enterprise was split between RemainCo and the Carve-Out Assets in a manner favorable to KKR and Sycamore's investment scheme.    It was to Sycamore's and KKR's benefit to project an optimistic forecast for RemainCo, despite declining profits, and to diminish its estimates for the Carve-Out Assets, despite the materially bright projections available to Sycamore leading up to the LBO.    To maximize the debt on RemainCo and strip away NWHI's most valuable assets for below-market value, a larger portion of Jones Inc.'s enterprise value had to be attributed to RemainCo, and less to the Carve-Out Assets.[27]

### C.    KKR Profits from Carve-Out Assets Following the LBO

31.    After stripping the Carve-Out Assets from NWHI at below market, self-dealing prices, Sycamore and KKR became immediately bullish on the Carve-Out businesses.[28]    In a series of transactions beginning just months after the LBO and Carve-Out Transactions, affiliates of KKR

---

[26] Compl. ¶ 134.

[27] Compl. ¶¶ 13-14.

[28] Compl. ¶ 23.

and Sycamore, as the owners of the Carve-Out Assets, took dividends and sold the Carve-Out
Assets for a significant profit.[29]

32.    In total, KKR, Sycamore, and its Affiliates extracted approximately $463 million
of dividends and profit from the Carve-Out Assets, all while RemainCo's performance continued
to deteriorate until it collapsed into bankruptcy.[30]  These third-party transactions, discounted back
to the date of the LBO, establish a true fair market value for the Carve-Out Assets as of the date
Sycamore took them from RemainCo, and not the artificial, self-dealing prices at which Sycamore
and KKR caused RemainCo to transact.[31]

### D.    RemainCo's Immediate Financial Decline and Later Bankruptcy

33.    Following the LBO and Carve-Out Transactions, the Debtors and the Carve-Out
Assets moved in opposite directions. The Debtors' businesses and profits sharply declined, and
missed the Sycamore Solvency Opinion Forecasts by large amounts; but for the long-dated
maturities of its fund debt the Debtors would have been forced to enter bankruptcy many years
earlier.[32]  In contrast, the Carve-Out Entities all outperformed Sycamore's purported expectations,
and Sycamore and KKR profited immensely from the financial performance and disposition of the
Carve-Out Assets.[33]

34.    Specifically, the Debtors' adjusted EBITDA declined from $177 million in 2014,
to $95 million in 2015, to $62 million in 2016.[34]  These numbers were way below the projections
Sycamore put together, and KKR acquiesced to, in connection with the LBO in order to justify

---

[29] Compl. ¶ 2.
[30] Compl. ¶¶ 24, 179.
[31] Compl. ¶¶ 25-26.
[32] Compl. ¶¶ 105-111.
[33] Compl. ¶¶ 109-111.
[34] Compl. ¶ 120.

encumbering RemainCo with more than $1.5 billion in debt: $244 million in 2014, $254 million in 2015, and $263 million in 2016. The actual numbers were also lower than KKR's own base case projections of $181 million in 2014, $211 million in 2015 and $213 in 2016.[35]   The Debtors ultimately filed for bankruptcy relief under chapter 11 on April 6, 2018.

**E.**    **Rule 2004 Discovery**

35.    The Committee refers the Court to the Rule 2004 Discovery status provided in paragraphs 51, and 56 through 57 of the Principal Motion, and incorporates the entirety of those paragraphs in this Motion.

## RELIEF REQUESTED

36.    By this Motion, the Committee respectfully requests that the Court grant the Committee (i) leave, standing, and authority to commence and prosecute the Proposed Claims on behalf of the Debtors' estate, and (ii) sole authority to negotiate and settle such claims.   The Proposed Complaint attached heretofore as Exhibit B sets forth the Proposed Claims in more detail.

## BASIS FOR RELIEF

**I.**    **Legal Standard for Derivative Standing**

37.    The Court should grant the Committee derivative standing to prosecute the Proposed Claims on behalf of the Debtors' estate.   The Committee refers the Court to the standard for derivative standing as laid out in paragraph 59 of the Principal Motion, and fully incorporates them in this Motion.

---

[35] Compl. ¶ 135.

## II.    The Committee Satisfies the Requirements for Derivative Standing

### A.    The Proposed Claims Are Colorable

38.    As demonstrated by the Proposed Complaint, there are several highly colorable claims against KKR, including claims for aiding and abetting breach of fiduciary duty, recovery of avoided intentional and/or constructive fraudulent transfers, and unjust enrichment. These claims are the product of the Committee's intensive Rule 2004 Examination, which remains ongoing.

39.    The Committee refers the Court to the standard for colorable claims in New York as detailed in paragraph 60 of the Principal Motion, and fully incorporates them in this Motion.

40.    As discussed in the sections that follow, the Court should grant the Committee derivative standing because it can assert colorable aiding and abetting of breach of fiduciary duty, intentional and/or constructive fraudulent transfers, and unjust enrichment claims against Defendant.

### 1.    The Debtors Tacitly Admit that the Estate Has Colorable Claims Against KKR

41.    In the following subsections, we briefly describe the colorable bases for the NWHI estate's primary claims.  As a preliminary matter, however, it is important to remember that the Debtors themselves have effectively admitted that the estates' claims against Sycamore and KKR are colorable.  The Debtors propose not to abandon but to potentially preemptively settle the claims against KKR and the Principal Motion Defendants for consideration.  The potential settlement that the Debtors may seek to foist upon the unsecured creditors, while woefully inadequate, shows conclusively that Debtors agree that the estate's claims are "colorable."

13

### 2.    The Estate Has Colorable Aiding and Abetting of Breach of Fiduciary Duty Claims Against KKR

#### (a)    A Multitude of Actions Give Rise to Aiding and Abetting Breach of Fiduciary Duty Claims Against KKR

42.    Through its investigation, the Committee has also determined that the Debtors possess colorable claims for aiding and abetting breach of fiduciary duty against KKR as a result of its misconduct in connection with the LBO, the LBO Debt, and the Carve-Out Transactions. The Committee refers to the elements of aiding and abetting breach of fiduciary duty and the facts supporting such claims set forth in paragraphs 83 through 85 of the Principal Motion, and fully incorporates those paragraphs. For those and similar reasons, the Committee possesses colorable aiding and abetting breach of fiduciary duty claims against KKR. Specifically, KKR, which acted as de facto financial and capital markets advisor to Sycamore in connection with the LBO, aided and abetted Sycamore in its breach of fiduciary duties to RemainCo when it acted in favor of its own interests and directly against the interests of the Debtors in carving out the best assets from Jones Inc. for Sycamore and itself and saddling the Debtors with lower-performing assets and more than $1.5 billion in debt.

43.    KKR knew the value of Jones Inc. and the Carve-Out Assets, but nevertheless assisted in securing debt financing for the LBO, as well as in arranging the Merger, LBO Debt, and Carve-Out transactions. KKR knew that it and Sycamore would make a considerable profit through the LBO and subsequent Carve-Out Transactions—at the expense of NWHI—by selling those assets for far less than reasonably equivalent value, leaving NWHI with debt it would be unable to pay.

### 3. The Estate Has Colorable Recovery of Avoided Intentional and/or Constructive Fraudulent Transfers Claims Against KKR

44.    As set forth in the Principal Motion, the NWHI estate possesses meritorious recovery of avoided intentional and/or constructive fraudulent transfers claims related to the Merger, LBO Debt, and Carve-Out Transactions under §§ 544 and 550(a) of the Bankruptcy Code and applicable state law.  To the extent transfers were made to KKR, the NWHI estate possesses meritorious recovery claims against KKR under § 550(a) of the Bankruptcy Code and applicable state law.  The Committee refers to the elements of a constructive fraudulent transfer and the facts supporting such claims set forth in paragraphs 62 through 72 of the Principal Motion, as well as the elements of an intentional fraudulent transfer and the facts supporting those claims set forth in paragraphs 73 through 75, and fully incorporates those paragraphs.  For those and similar reasons, the Committee possesses colorable claims against KKR for recovery of avoided intentional and/or constructive fraudulent transfers.

### 4. The Estate Has Colorable Claims for Unjust Enrichment Against KKR

45.    The NWHI estate also possesses colorable claims for unjust enrichment against KKR by virtue of its wrongful acts and omissions and the wrongful receipt of payments and distributions relating to the LBO and Carve-Out Transactions.  The Committee refers to the elements of unjust enrichment and the facts supporting such claims set forth in paragraph 87 of the Principal Motion, and fully incorporates those paragraphs.  For those and similar reasons, the Committee possesses colorable unjust enrichment claims against KKR.

46.    KKR has been unjustly enriched by, among other things, receiving approximately 10 percent of the $463 million Sycamore extracted from RemainCo and the Carve-Out Assets through dividends and profits earned through their subsequent sale.[36]

47.    KKR's enrichment came at the expense of NWHI, which received grossly inadequate consideration for the Carve-Out Assets.  Equity and good conscience require restitution to NWHI, which was left insolvent and unable to pay its debts while KKR earned millions.

**B.    The Debtors Have Unjustifiably Refused to Prosecute the Proposed Claims**

48.    In order to be granted derivative standing, the Committee must also establish that the NWHI estate has unjustifiably failed to bring suit.  The Committee refers the Court to the standard to establish that the estate has unjustifiably failed to bring suit and the facts supporting that standard provided in paragraphs 95 through 98 of the Principal Motion, and fully incorporate that section in this Motion for those and similar reasons.

**C.    This Court Should Grant the Committee Exclusive Authority to Settle the Proposed Claims**

49.    This Court should also grant the Committee exclusive authority to settle the Proposed Claims, subject to Court approval in accordance with Bankruptcy Rule 9019.

50.    The Committee refers the Court to the reasoning as to why the Committee should have exclusive authority to settle the proposed claims as set forth in paragraph 99 of the Principal Motion, and fully incorporates that section in this Motion for those and similar reasons.

**<u>RESERVATION OF RIGHTS</u>**

51.    The Committee reserves its right to seek authority to commence and prosecute other claims and/or causes of action against the Defendants on behalf of the Debtors' estate.

---

[36] *See* Compl. ¶ 179.

## NOTICE

52.    This Motion was served on: (i) the Office of the United States Trustee for the Southern District of New York; (ii) the Debtors and their counsel; (iii) counsel to KKR; and (v) counsel for each of the Plaintiffs in the pending adversary proceedings.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) enter the proposed order, substantially in the form attached hereto as Exhibit A, granting the Committee standing to commence and prosecute the Proposed Claims on behalf of the Debtors' estate; and (ii) grant such additional relief as the Court may deem just, proper and equitable.

New York, New York

Dated:  October 11, 2018

KASOWITZ BENSON TORRES LLP

By: */s/ Howard W. Schub*

David S. Rosner
Howard W. Schub
David J. Mark
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
drosner@kasowitz.com
hschub@kasowitz.com
dmark@kasowitz.com

*Counsel to the Official Committee of Unsecured
Creditors of Nine West Holdings, Inc.*