REDACTED – MOTION TO SEAL PENDING

**<u>Exhibit B</u>**
**Complaint**

REDACTED – MOTION TO SEAL PENDING

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NINE WEST HOLDINGS, INC., *et al*., | Case No. 18-10947 (SCC) |
| Debtors.[1] | (Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the estate of Nine West Holdings, Inc., | |
| Plaintiff, | |
| -against- | Adversary Proceeding No. 18- |
| KOHLBERG KRAVIS ROBERTS & CO. L.P., KKR CAPITAL MARKETS LLC, MCS CAPITAL MARKETS LLC, KKR ASSET MANAGEMENT, LLC, KKR ASSET MANAGEMENT PARTNERS, LLP, CPS MANAGERS MASTER FUND, L.P., CORPORATE CAPITAL TRUST, INC., KKR MEZZANINE PARTNERS I L.P., and KKR MEZZANINE PARTNERS I SIDE-BY-SIDE L.P., | **COMPLAINT** |
| Defendants. | |

The Official Committee of Unsecured Creditors (the "Plaintiff" or the "Committee")

appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors"), on behalf of and as the representative of the estate of Nine West

Holdings, Inc. ("NWHI"), respectfully alleges as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076). The location of the Debtors' service address is: 1411 Broadway, New York, New York 10018.

REDACTED – MOTION TO SEAL PENDING

## NATURE OF THE ACTION

1.    This action arises out of a 2014 leveraged buyout ("LBO")[2] of the fashion company Jones Group Inc. ("Jones Inc.") that was engineered by private equity fund Sycamore Partners L.P. and its principals and certain affiliates ("Sycamore"), and, structured and financed, in part, by Kohlberg Kravis Roberts & Co. L.P. and its affiliated entities (as further defined below, "KKR"). The LBO left the surviving company – NWHI – deeply insolvent, and caused hundreds of millions of dollars in losses to its creditors, including pension funds, funded debt creditors, vendors and other commercial trading partners.

2.    Sycamore and KKR, in contrast, profited from the LBO, by (among other things) leaving NWHI with debts greatly in excess of its assets, and simultaneously causing NWHI to sell its crown jewel assets to other Sycamore affiliates (collectively, the "Sycamore Affiliates") for a fraction of their value, thereby removing such assets from the reach of NWHI's creditors. The Sycamore Affiliates acquired these assets for a total of just $641 million, and resold them in a series of transactions that began less than a year after the LBO *for more than $1 billion*, even after Sycamore and KKR siphoned off millions of dollars in dividends for themselves. The scheme effectively guaranteed that Sycamore, along with KKR, would profit from the LBO, regardless of what happened to the remaining company and its creditors.

3.    This massive windfall – and the creditors' even larger loss – were the product of rank self-dealing, multiple breaches of fiduciary and other duties, and actual and constructive fraud perpetrated by Sycamore and others. Accordingly, Plaintiff has brought a separate action on behalf of the estate of NWHI to: (i) avoid and recover $1 billion in conveyances made or incurred to the Sycamore Affiliates and their immediate and mediate transferees and others; (ii) avoid liens and

---

[2] As further defined below, the term "LBO" incorporates the Merger Agreement, LBO Debt, and Carve-Out Transactions.

obligations incurred by NWHI to the Lender Defendants; and (iii) recover damages from the fiduciaries of Jones Inc. and NWHI, as well as the defendants who aided and abetted those fiduciaries in connection with the disastrous, self-interested decisions and transactions they authored or allowed.

4.      Plaintiff likewise brings this action on behalf of the estate of <u>NWHI</u> to: (i) recover damages from KKR for aiding and abetting the Sycamore Fund Entities (defined below) and its principals, in connection with the disastrous, self-interested decisions and transactions they authored or allowed; (ii) recover any conveyances of the Carve-Out Assets made to KKR as an immediate or mediate subsequent transferee; and (iii) recover damages from KKR for unjust enrichment for payments, profits, fees, benefits, incentives, and other compensation it received in connection with the LBO.

5.      The LBO transactions were consummated on April 8, 2014. Prior to the LBO, Jones Inc. was a publicly traded wholesale and retail apparel and footwear company with brands such as Nine West, Anne Klein, Gloria Vanderbilt and others. Jones Inc.'s business had evolved into two clear segments – the higher growth, higher margin footwear business (which included the Stuart Weitzman and Kurt Geiger lines) and the lower growth, lower margin apparel business (which included jeanswear, the Nine West brand and other business lines).

6.      Jones Inc.'s lower margin apparel business (in particular) was beset with many of the same problems facing the industry generally. Like other fashion companies, Jones Inc.'s businesses suffered from a general decline in brick and mortar shopping (which impacted sales at Jones Inc.'s stores), a shift from branded apparel, and changing fashion trends. In addition, Jones Inc. had a significant wholesale component to its business that was hurt by the decline of large retailers like Sears, Bon-Ton and J.C. Penney, that had closed stores around the country and

REDACTED – MOTION TO SEAL PENDING

reduced their purchases from Jones Inc.  For these reasons and others, Jones Inc.'s performance and stock price lagged behind even that of other struggling apparel companies.

7.      In April 2013, after years of missing budgets and reporting disappointing earnings, and at the urging of at least one of its largest shareholders, Jones Inc.'s board of directors instructed its advisors at Citigroup to explore strategic options, including a potential sale of Jones Inc.  For eight months, more than a dozen sophisticated financial and strategic parties engaged with Jones Inc. and Citigroup, conducted due diligence and considered potential sale transactions.  All came away discouraged by their review of Jones Inc.'s confidential financial data and by Jones Inc.'s refusal to sell off its "crown jewels" – Stuart Weitzman and Kurt Geiger – separately from jeanswear, Nine West and other more challenged business lines.  One-by-one, every potential suitor except Sycamore dropped out.

8.      In late October 2013, Sycamore offered to buy all of Jones Inc. for $15 per share, a price that then implied a total enterprise value for the entire company of $2.2 billion.  Sycamore asked for exclusivity while the merger agreement was negotiated, but the Jones Inc. board refused, hoping that one of the many other potential buyers that had scrutinized Jones Inc.'s finances and operations would top Sycamore's $15 per share bid.  However, no other bid for the whole company ever materialized, and Jones Inc. entered into a merger agreement with Sycamore on December 19, 2013 (the "Merger Agreement").

9.      Pursuant to the Merger Agreement, Jones Inc. survived its merger with a Sycamore subsidiary created for that purpose, and changed its name to Nine West Holdings Inc. (NWHI). Simultaneously, NWHI borrowed approximately $800 million in asset-backed loans and secured and unsecured term loans that were guaranteed by substantially all of NWHI's operating subsidiaries (the "LBO Debt"), bringing NWHI's total post-transaction debt obligations to over

REDACTED – MOTION TO SEAL PENDING

$1.55 billion.  As part of the LBO, Sycamore (including the Sycamore principals who became NWHI's sole directors when the merger closed) caused NWHI to sell three businesses – one organized around the Stuart Weitzman brand ("Stuart Weitzman"), one organized around the Kurt Geiger brand ("Kurt Geiger") and one organized around certain apparel lines ("Jones Apparel," and with Stuart Weitzman and Kurt Geiger, the "Carve-Out Assets") – to the newly formed Sycamore Affiliates at below-market prices set solely by Sycamore (the "Carve-Out Transactions").

10.    KKR acted as de facto financial and capital markets advisor to Sycamore in connection with the LBO and co-invested with Sycamore in the acquisition of Jones Inc.  In exchange for KKR's approximate $29 million equity investment, KKR received close to a 10% equity interest of RemainCo and the Carve-Out Assets, consisting of 8,183 shares in each of Nine West, Kurt Geiger, Stuart Weitzman, and Jones Apparel and shared in the profits of the Sycamore Affiliates resulting from the Carve-Out Transactions.

11.    Not only did KKR help Sycamore strip NWHI of its crown jewels – Stuart Weitzman and Kurt Geiger – Sycamore set the prices paid by its Affiliates for all three of the Carve-Out Assets far below their actual value, ensuring Sycamore and KKR a hefty return on the LBO even if NWHI failed.  In contrast, NWHI was left with just two underperforming businesses – one organized around certain legacy and footwear businesses ("Nine West") and the other organized around Jones Inc.'s jeanswear lines ("Jeanswear").  Despite being hollowed-out by the Carve-Out Transactions, NWHI was required to fund the deal primarily through debt incurred by NWHI.  Worse still, NWHI immediately transferred most of the proceeds of the LBO Debt and the Carve-Out Transactions – about $1.2 billion – to former shareholders of Jones Inc. in exchange for

REDACTED – MOTION TO SEAL PENDING

no value.  NWHI, as it existed following the Carve-Out Transactions, is sometimes referred to herein, in Jones Inc.'s definitive proxy and elsewhere as "RemainCo."

12.     The LBO Debt lenders (together with their successors in interest, the "Lenders") knew that NWHI received no value in exchange for the loan amounts transferred to Jones Inc. shareholders.  Moreover, because the LBO Debt (but not Jones Inc.'s legacy debt) was guaranteed by NWHI's subsidiaries, the Lenders could afford to be cavalier about the precarious financial position in which NWHI was placed by the LBO.

13.     The final structure of the LBO effectively guaranteed Sycamore, and KKR, that they would profit handsomely no matter what happened to RemainCo and its creditors. Sycamore's equity contribution to RemainCo was just $108 million – less than 7% of the value of the debt with which RemainCo was left after the LBO – and Sycamore's own Affiliates bought the Carve-Out Assets for far less than they were worth.  Even if Sycamore's equity in RemainCo was entirely wiped out, Sycamore and KKR could make millions of dollars from the Sycamore Affiliates' resale of the Carve-Out Assets, all at the expense of NWHI and its creditors.  And indeed, that is exactly what happened.

14.     Two features of the LBO were crucial to Sycamore carrying out its scheme.  First, before the LBO, Jones Inc.'s business was not organized into the segments created by Sycamore through the LBO – Jeanswear, Nine West, Stuart Weitzman, Kurt Geiger and Jones Apparel. Hence, Sycamore was free to craft estimated historical financial information and projections for the new segments untethered by ordinary course Jones Inc. estimates and projections precisely matching those segments.  KKR participated in this scheme.  In fact, Sycamore informed KKR that Kurt Geiger and Stuart Weitzman were easily separable since they were run as separate businesses and never fully integrated; thereby again indicating their intention to subsequently sell

REDACTED – MOTION TO SEAL PENDING

the assets off after the LBO.   This supplied Sycamore with enormous flexibility in projecting the performance of the different businesses, and in apportioning Jones Inc.'s approximately $2.2 billion in total enterprise value between RemainCo on the one hand, and the Carve-Out Assets on the other.

15.    Second, the Carve-Out Transactions closed immediately after Sycamore acceded to ownership of the former Jones Inc. as a result of the merger.   ***Sycamore was thus literally "negotiating" with itself*** in setting the prices for the Carve-Out Assets, with no independent fiduciary looking out for RemainCo's interests.   Indeed, in its resolutions and the Merger Agreement itself, the legacy Jones Inc. board purported to specifically disclaim any opinion of, or responsibility for, the Carve-Out Transactions or the prices set unilaterally for the Carve-Out Assets by Sycamore.   Given this dynamic, it is no surprise that the Sycamore Affiliates acquired the Carve-Out Assets for far less than they were worth.

16.    Sycamore attempted to justify the low prices it set for the Carve-Out Assets by manipulating financial estimates and projections for the various businesses.   Beginning in late October 2013, and continuing through the closing of the LBO on April 8, 2014, Sycamore used those manipulated estimates and projections to prepare numerous valuations of RemainCo and the Carve-Out Assets.   Sycamore valued the entire Jones Inc. enterprise at approximately $2.2 billion in all of its valuations,[3] but Sycamore's allocations of that value between RemainCo and the Carve-Out Assets changed over time, moving inexorably in one direction.

17.    In its October 29, 2013 valuation, for example, Sycamore reckoned that RemainCo was worth about $1.33 billion, and that the Carve-Out Assets were collectively worth about $840

---

[3] By the time the LBO actually closed on April 8, 2014, Jones Inc.'s actual total enterprise value was approximately 2.1 billion, rather than the $2.2 billion Sycamore originally assumed, due to a reduction in the number of outstanding shares and increase in excess cash.

REDACTED – MOTION TO SEAL PENDING

million.  Sycamore, however, did not want its Affiliates to pay anything close to $840 million for the Carve-Out Assets (though they were worth far more).  In the months that followed, Sycamore's purported estimate of RemainCo's value steadily rose, while its estimate of the value of the Carve-Out Assets steadily fell, as illustrated in the chart below:

| Date | RemainCo Valuation (millions) | Carve-Out Valuation (millions) | Total Enterprise Value |
|---|---|---|---|
| 10/29/13 | $1,330 | $840 | $2,170 |
| 11/01/13 | $1,410 | $760 | $2,170 |
| 11/04/13 | $1,505 | $665 | $2,170 |
| 11/29/13 | $1,560 | $640 | $2,200 |
| 12/16/13 | $1,570 | $670 | $2,240 |
| 1/31/14 | $1,570 | $660 | $2,230 |
| 3/5/14 | $1,580 | $640 | $2,220 |

18.    By March 2014, conveniently, Sycamore's estimate of the value of RemainCo ($1.58 billion) was just above the amount of debt Sycamore imposed on it via the LBO ($1.551 billion), and Sycamore's estimate of the combined value of the Carve-Out Assets ($640 million) was just below the amount the Sycamore Affiliates paid for those assets in the LBO ($641 million).

19.    To justify its desired valuation splits, Sycamore prepared and shared with KKR more and more aggressive estimates and projections of RemainCo's performance, while artificially depressing its forecasts for the Carve-Out Assets.  Among other things, Sycamore piled on highly speculative "Sponsor Addbacks" that increased RemainCo's pro forma adjusted EBITDA for 2013 by approximately 20%, even as the actual performance of RemainCo's businesses continued to decline.  It was these estimates and projections – which were consistent with Sycamore's "upside" case, rather than its "base" case – that Sycamore supplied to Jones Inc. for publication in its 8-K in advance of the LBO, and to Duff & Phelps for purposes of performing a RemainCo solvency analysis.

20.    Remarkably, at the same time Sycamore provided Duff & Phelps with egregiously

REDACTED – MOTION TO SEAL PENDING

inflated and unsupportable upside projections needed to obtain a solvency opinion, RemainCo itself was forecasting far less in earnings for 2014 itself. And when Sycamore and KKR began performing their own internal valuations for RemainCo after the LBO, they abandoned the Sponsor Addbacks Sycamore had supplied to Duff & Phelps, relying instead on "unadjusted" EBITDA. In its internal models, Sycamore also materially reduced its RemainCo revenue projections. Had Duff & Phelps used those unadjusted figures in its solvency opinion, it would have found that RemainCo was deeply insolvent as of the closing of the LBO. But Duff & Phelps, a company Sycamore has engaged on more than 50 occasions, used Sycamore's adjusted, upside projections, just as Sycamore instructed.[4]

21.    The unreasonableness of those projections is also demonstrated by RemainCo's actual post-LBO performance, which never came close to the pie-in-the-sky estimates that Duff & Phelps relied on for its solvency opinion. For example, Sycamore's adjusted EBITDA projections exceeded RemainCo's actual results by $67 million in 2014, $159 million in 2015 and *a whopping $200 million in 2016*. Sycamore's revenue projections were also wildly off, overstating RemainCo's sales by $247 million in 2014, $430 million in 2015, and *$694 million in 2016*. There can be no serious doubt that Sycamore greatly, and knowingly, exaggerated RemainCo's likely future performance in the financial data and forecasts given to Duff & Phelps.

22.    Sycamore took just the opposite approach with respect to the Carve-Out Assets, preparing forecasts that greatly and obviously *under*estimated the value of those businesses. Indeed, Sycamore's projections were so unrealistically pessimistic that a Stuart Weitzman executive balked, noting that they were far too conservative compared to management's own five-year projections for Stuart Weitzman, and that projections for the other Carve-Out Assets were "in

---

[4] Duff & Phelps' LBO solvency opinion in this matter actually mistakenly included a reference to a different Sycamore portfolio company.

REDACTED – MOTION TO SEAL PENDING

the same boat." It was these deflated estimates and projections that Sycamore used to provide cover for the stripping of the Carve-Out Assets from NWHI for a fraction of their value.

23.    The $641 million price set by Sycamore for its Affiliates grossly undervalued the Carve-Out Assets.    As noted, the Sycamore Affiliates re-sold those same businesses for approximately $1.07 billion (not including net dividends) through a series of transactions that began very shortly after the LBO closed.    By July 2014, Sycamore had already begun gearing up to sell these assets.    Sycamore then caused Stuart Weitzman and Jones Apparel to pay about $160 million in dividends in September, 2014 – just months after the Merger – and resold Stuart Weitzman in January, 2015 for about $548 million.[5]    Later in 2015, Sycamore resold part of Jones Apparel for $75 million (it would later resell the rest for another $71 million) and sold Kurt Geiger for $371 million in December 2015.

24.    The following chart compares the self-dealing purchase prices set by Sycamore for the purchase of the Carve-Out Assets by the Sycamore Affiliates with the amounts Sycamore soon realized for those same assets through post-LBO sale and dividend transactions:

|  | LBO Price (April 8, 2014) | Resale Price and Net Dividends (Date) | Difference Between Price Paid and Resale Price |
|---|---|---|---|
| **Stuart Weitzman** | $395 million | $548 million (Jan. 2015) | $153 million |
| **Kurt Geiger** | $136 million | $371 million (Dec. 2015) | $235 million |
| **Jones Apparel** | $110 million | $145 million (Apr. 2015 and Jan. 2017) plus $40 million net dividend (Sept. 2014) | $ 75 million |
| **Total** | $641 million | $1.10 billion | $463 million |

---

[5] Sycamore sold Stuart Weitzman for $530 million plus a contingent earn-out of up to $44 million if the buyer hit certain post-sale milestones.  In its 2015 10K, the buyer booked its additional obligation to Sycamore in connection with the earn-out as approximately $18 million.

REDACTED – MOTION TO SEAL PENDING

25.     This market evidence demonstrates conclusively that NWHI received far less than equivalent value for the Carve-Out Assets.   Moreover, Duff & Phelps itself confirmed that the Carve-Out Assets were worth greatly in excess of the prices Sycamore paid.   For instance, in August 2014, Duff & Phelps prepared solvency opinions for two of the three Carve-Out Assets – Jones Apparel and Stuart Weitzman – to justify payments of dividends by those entities to Sycamore of more than $160 million.   In its opinions, Duff & Phelps concluded that just those two companies were collectively worth more than $1 billion as of early July 2014.   The notion that all three Carve-Out Assets together were worth only $641 million three months earlier is simply ludicrous.

26.     The overwhelming evidence of the Carve-Out Assets' true value also confirms RemainCo's insolvency following the LBO.   By the time the LBO closed in April 2014, market transactions and other evidence conclusively demonstrated Jones Inc.'s enterprise value was $2.1 billion.[6]   The market also established that the Carve-Out Assets were worth $1 billion at the time of the LBO.   Hence, RemainCo was necessarily worth far less than the $1.55 billion in debt on its balance sheet after the LBO, and was deeply insolvent, as illustrated in the chart below:

---

[6] When the LBO was announced at $15 per share, the enterprise value of Jones, Inc. was $2.2 billion.   The decline from the announcement date to the close date was caused by a reduction in net debt and share count.

REDACTED – MOTION TO SEAL PENDING



Source: Company records; LBO Funds Flow; Purchase Agreements
(1) Reflects $1.18 billion purchased equity plus $1.01 billion of Pre-LBO debt less $91 million of excess cash (assuming $10 million minimum cash requirement)
(2) 2015 SW Sale Value of $548 million (includes $18 million earnout adjustment) discounted to April 8, 2014 at 13.5% WACC, based on SW WACC per D&P Stuart Weitzman Solvency Analysis (August 28, 2014)
(3) 2015 KG Sale Value of $371 million discounted to April 8, 2014 at 13.5% WACC, based on KG WACC per D&P TJG PPA Report (August 7, 2014)
(4) 2015 JNY IP Sale Value of $75 million discounted to April 8, 2014 at 12.75% WACC, based on mid range WACC per D&P Jones Apparel Solvency Analysis (August 28, 2014)
(5) 2014 ApparelCo Dividend of $40 million discounted to April 8, 2014 at 12.75% WACC, based on mid range WACC per D&P Jones Apparel Solvency Analysis (August 28, 2014)
(6) 2017 Kasper Sale and A/R Dividend of $71 million discounted to April 8, 2014 at 12.75% WACC, 12.75% WACC, based on mid range WACC per D&P Jones Apparel Solvency Analysis (August 28, 2014)

27.     RemainCo and its stakeholders were let down by many actors in connection with the LBO and its aftermath, including the directors of Jones Inc., who buried their heads in the sand regarding the consequences to RemainCo's creditors of the Carve-Out Transactions and LBO debt, and of course by Sycamore, including the Sycamore principals who sat on NWHI's board of directors when NWHI incurred the LBO Debt and sold the Carve-Out Assets to the Sycamore Affiliates, in rank violation of their fiduciary duties of care and loyalty.

28.     Based on these facts and others set forth below, the Committee is seeking, in a separate action, to avoid the Carve-Out Transactions and LBO debt as intentional and/or constructive fraudulent transfers and recover the value of the Carve-Out Assets and payments made in connection with the LBO.  The Committee also asserted additional claims seeking redress for

the harm caused to RemainCo by the LBO, Carve-Out Transactions, and other wrongful acts taken by Sycamore, including, claims for breach of fiduciary duty. In this action, the Committee brings claims against KKR for aiding and abetting breach of fiduciary duty, to recover from KKR the full value of the Carve-Out Assets and other payments transferred to KKR, and for unjust enrichment.

## JURISDICTION AND VENUE

29.   The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the Southern District of New York (the "Southern District of New York") referring to the Bankruptcy Judges of the Southern District of New York all cases and proceedings arising under title 11 of the United States Code (the "Bankruptcy Code").

30.   This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).[7]

31.   Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409, because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

## THE PARTIES AND OTHER CONCERNED ENTITIES[8]

**The Plaintiff**

32.   Plaintiff is the Official Committee of Unsecured Creditors appointed in the above-

---

[7] Bankruptcy Rule 7008 requires the Committee to state whether it consents to the entry of final orders or judgments. The Committee has not yet determined its position on this issue but will do so promptly upon a grant of standing and prior to the filing of any final complaint.

[8] Plaintiff reserves the right to name additional defendants, either through the amendment of this complaint if standing is granted and such defendants are related to the defendants named herein, or through a subsequent motion for standing to bring claims against additional defendants. Such defendants may include, without limitation: (i) additional KKR entities that participated in the LBO and/or improperly benefited from the LBO, and (ii) professionals that aided and abetted the Fund Entities and its principals' breaches of fiduciary duties in connection with the LBO.

captioned cases by William K. Harrington, the United States Trustee for Region 2, under 11 U.S.C. §§ 1102(a) and (b), on April 19, 2018.[9]  The Committee is vested with the authority under Section 1103 of the Bankruptcy Code to investigate the acts, conduct, assets, liabilities and financial condition of the Debtors and "any other matter relevant to the case or to the formulation of the plan."  The Committee has been authorized to prosecute the claims set forth herein on behalf of the Debtors estates pursuant to the order of the Honorable Shelley C. Chapman dated [__].

**The Defendants**

33.    Upon information and belief, Defendants Kohlberg Kravis Roberts & Co. L.P., KKR Capital Markets LLC, MCS Capital Markets LLC, KKR Asset Management, LLC, KKR Asset Management Partners, LLP, CPS Managers Master Fund, L.P., Corporate Capital Trust, Inc., KKR Mezzanine Partners I, L.P., KKR Mezzanine Partners I Side-By-Side, L.P., and other KKR & Co., Inc. affiliates, the names of which are currently unknown to Plaintiff (collectively, "KKR"), participated in and helped structure the financing and equity investments of the LBO.

**Sycamore and Related Persons and Entities**

34.    Debtor Jasper Parent LLC ("Jasper Parent") is a Delaware limited liability company owned directly or indirectly by one or more of the Sycamore entities defined below as the Fund Entities.  Jasper Parent was formed by Sycamore solely for the purpose of entering into the Merger Agreement and related agreements.  Upon information and belief, Jasper Parent is and was owned, dominated and controlled by Kaluzny, Morrow and the Fund Entities.

35.    Non-Party Jasper Merger Sub., Inc. ("Merger Sub") was a Pennsylvania

---

[9] Members of the Official Committee of Unsecured Creditors in the *In re Nine West Holdings, Inc.* chapter 11 cases as of the date of appointment were Aurelius Capital Master, Ltd., GLAS Trust Company LLC, Hongkong Hing Wing Development Limited, Pension Benefit Guaranty Corporation, Simon Property Group, Stella International Trading (Macao Commercial Offshore) Limited, and U.S. Bank National Association.  Surefield Limited replaced Hongkong Hing Wing Development Limited on May 9, 2018.

REDACTED – MOTION TO SEAL PENDING

corporation wholly owned by Jasper Parent.  Merger Sub was formed solely to consummate the

LBO.  When the LBO closed, Merger Sub merged with and into Jones Inc.  Jones Inc. survived

the Merger, was renamed NWHI, and became a wholly-owned subsidiary of Jasper Parent (and

thus became an indirect subsidiary of one or more of the entities defined herein as the Fund

Entities).  Upon information and belief, Merger Sub and NWHI are and were owned, dominated

and controlled by Kaluzny, Morrow and the Fund Entities.

36.     Non-Party Nine West Topco LLC ("NW Topco") is a limited liability corporation

formed by Sycamore in connection with the LBO that directly or indirectly owns and owned Jasper

Parent, Merger Sub and NWHI.  Upon information and belief, NW Topco is and was owned,

dominated and controlled by Kaluzny, Morrow and the Fund Entities.

37.     Upon information and belief, Non-Parties Sycamore Partners, L.P., Sycamore

Partners A., L.P., Sycamore Partners Management, L.L.C., Sycamore Fund I, and other Sycamore

affiliates, the names of which are currently unknown to Plaintiff (collectively, the "Fund Entities"),

participated in designing and orchestrating the Merger Agreement, the Merger, the Carve-Out

Transactions and the LBO Debt (related transactions that are collectively referred to herein as the

"LBO").  Upon information and belief, one or more of the Fund Entities own, dominate and control

the entities defined below as the Sycamore Affiliates.

38.     Non-Party Jasper Apparel LLC ("Jasper Apparel") is a Delaware limited liability

company owned, dominated and controlled by Kaluzny, Morrow and the Fund Entities.

Substantially contemporaneous with the closing of the Merger, NWHI transferred Jones Apparel

to Jasper Apparel for less than reasonably equivalent value.  As used herein, the term Jasper

Apparel is inclusive of any other persons or entities that were initial transferees of Jones Apparel.

39.     Non-Party Jasper Footwear Limited ("Jasper Footwear") is a company organized

REDACTED – MOTION TO SEAL PENDING

pursuant to the laws of England and Wales and is owned, dominated and controlled by Kaluzny, Morrow and the Fund Entities. Jasper Footwear purchased Kurt Geiger substantially contemporaneous with the closing of the Merger at a purchase price far lower than the actual value of Kurt Geiger at the time. As used herein, the term Jasper Footwear is inclusive of any other persons or entities that were initial transferees of Kurt Geiger.

40.    Non-Party Jasper SW LLC ("Jasper SW") is a Delaware limited liability company formed, owned, dominated and controlled by Sycamore. Jasper SW LLC purchased Stuart Weitzman substantially contemporaneously with the closing of the Merger at a purchase price far lower than the actual value of Stuart Weitzman at the time. As used herein, the term Jasper SW is inclusive of any other persons or entities that were initial transferees of Stuart Weitzman. Jasper Apparel, Jasper Footwear, and Jasper SW, are collectively referred to herein as the "Sycamore Affiliates."

41.    The entities identified above as the Fund Entities, Jasper Apparel, Jasper SW and Jasper Footwear sometimes are referred to herein collectively as the "Sycamore Entities." The Sycamore Entities are part of a private equity fund complex known colloquially as "Sycamore Partners." Sycamore Partners specializes in retail and consumer investments and has approximately $10 billion in assets under management.

42.    Non-party Stefan Kaluzny is a co-founder of Sycamore Partners, and owns dominates and/or controls, directly or indirectly, the Sycamore Entities, Jasper Parent and NWHI. Kaluzny became a director of NWHI upon consummation of the LBO, and served in that capacity until September 24, 2018.

43.    Non-Party Peter Morrow is a co-founder of Sycamore Partners, and owns dominates and/or controls, directly or indirectly, the Sycamore Entities, Jasper Parent and NWHI.

REDACTED – MOTION TO SEAL PENDING

Morrow became a director of NWHI upon consummation of the LBO, and served in that capacity until September 24, 2018.

44.    Non-Party Adam Weinberger ("Weinberger") is a Vice President, Principal, and Managing Member at Sycamore.  Weinberger worked closely with the Lenders and other parties to arrange the LBO.  He was integrally involved in planning, negotiating, and executing the LBO, and aided and abetted Morrow, Kaluzny, and Sycamore in their rampant breaches of fiduciary duty.

45.    Non-Party Dary Kopelioff ("Kopelioff") is a Vice President and Principal at Sycamore.  As a Vice President and Principal at Sycamore, Kopelioff was integrally involved in planning, negotiating, and executing the LBO, and aided and abetted Morrow, Kaluzny, and Sycamore in their rampant breaches of fiduciary duty.

46.    Non-Party Ryan McClendon ("McClendon") is a Managing Director at Sycamore. As a Managing Director at Sycamore, Kopelioff was integrally involved in planning, negotiating, and executing the LBO, and aided and abetted Morrow, Kaluzny, and Sycamore in their rampant breaches of fiduciary duty.

47.    Nonparties John/Jane Doe 1-20 (the "Does") are employees of Sycamore prior to, during, and after the LBO who were involved in planning, negotiating, and executing the LBO and who aided and abetted Morrow, Kaluzny, and Sycamore in their rampant breaches of fiduciary duty.

48.    Nonparties John/Jane Does 21-40 are unnamed Sycamore entities, or investors in Sycamore entities, that were immediate or mediate transferees or beneficiaries of the transfers challenged herein, or the value thereof.

49.    The Fund Entities, Kaluzny, Morrow, Weinberger, Kopelioff, McClendon, and the

Does are sometimes referred to collectively herein as "Sycamore."

**The Lenders**

50.    Non-Party Morgan Stanley Senior Funding, Inc. ("Morgan Stanley" or the "Term Lender") was the original administrative agent and lead arranger for a $445 million term loan credit facility (the "Secured Term Loan") and a $300 million unsecured term loan credit facility (the "Unsecured Term Loan, and together with the Secured Term Loan, the "Secured Term Debt"), each of which was used in full or in part to finance payments to the Jones Inc. shareholders.

51.    Non-Party Cortland Capital Market Services, LLC ("Cortland") is the successor to Morgan Stanley as administrative agent for the Secured Term Loan.  As successor to Morgan Stanley, Cortland is charged with Morgan Stanley's knowledge.

52.    Non-Party GLAS Trust Company, LLC ("GLAS") is the successor to Morgan Stanley as administrative agent for the Unsecured Term Loan.  As successor to Morgan Stanley, GLAS is charged with Morgan Stanley's knowledge.

53.    Non-Party Wells Fargo Bank, National Association ("Wells Fargo" or the "ABL Lender") was the administrative agent and lead arranger for a $225 million secured ABL facility ("ABL Facility") created in connection with the LBO.

54.    Non-Parties John/Jane Roes 1-100 are lenders under the Secured Term Loan, Unsecured Term Loan, and ABL Facility.

55.    Non-Parties Cortland, GLAS, Wells Fargo, and John/Jane Roes 1-100, along with KKR, are collectively referred to as the "Lenders."

## BACKGROUND ON JONES INC. AND THE LBO

### I.    Jones Inc. Faces Secular and Other Challenges in Advance of the LBO

56.    Prior to the April 8, 2014 LBO, Jones Inc. was a publicly-traded company predominantly focused on a wholesale footwear and apparel business selling such brands as Nine

REDACTED – MOTION TO SEAL PENDING

West, Anne Klein, and Gloria Vanderbilt to retailers like Macy's, Lord & Taylor, and Walmart/Sam's Club. Mid-tier footwear and apparel businesses like Jones Inc. faced a challenging economic environment in 2013, driven in part by consumers' continuing recovery from the recession that began in 2008. Analysts predicted that these challenges would continue into 2014, and in fact, the performance of mid-tier footwear and apparel retailers continued to trend downwards through 2015 and 2016.

57.    Jones Inc. performed poorly in the years and months leading up to the LBO. Jones Inc.'s stock price hit a post-recession peak of $23.26 per share in early 2010 but fell to a low of $8.40 per share during late 2011 and never fully recovered, lagging far behind its peers. Sales were flat from 2011 to 2013—far below Jones Inc.'s projections of annual growth of between 5% and 6%. Jones Inc.'s EBITDA fell from $340 million in 2010 to $299 million in 2011, and to $294 in 2012. In 2013, it fell even further, to $254 million. EBITDA margins declined over this same period from 9.3% in 2010 to 6.7% in 2013.

58.    Jones Inc. had net losses in four of the last six years before the LBO, no revenue growth from 2011 to 2013, and a history of missing its forecasts and budgets. For instance, Jones Inc. missed its internal revenue targets by between 5-6% each year from 2011 to 2013 and missed its internal earnings per share targets by 33%, 9%, and 37% in 2011, 2012, and 2013, respectively.

59.    In early 2013, management reported to the Jones Inc. Board that Jones Inc. would record earnings below analyst consensus estimates for the first quarter of 2013, as well as then-current full-year guidance numbers. Jones Inc. prepared and publicly announced potential operational and financial restructuring initiatives in early 2013, but analysts were skeptical of Jones Inc.'s prospects.

60.     In the summer of 2013, for example, one analyst expressed doubt that "initiatives in place can meaningfully improve the operating performance" of Jones Inc., and another "encourage[ed] investors to reduce positions." Observers recognized that Stuart Weitzman and Kurt Geiger could drive margin expansion and international penetration, and worried that Jones Inc. would be tempted to sell just those businesses, which would leave an unattractive "overall brand portfolio" and "reduce the potential for future sales and growth." This turned out to be the blueprint for the Sycamore LBO. Indeed, in an email sent prior to the LBO, Sycamore founder Stefan Kaluzny stated that the businesses left behind with RemainCo, among others, were "crap."

## II.     Jones Inc. Shareholders and Board Look for an Exit

61.     In March 2013 the *Wall Street Journal* reported that at least one large shareholder was pressuring the Jones Inc. Board to consider a sale. In April, senior management began to field unsolicited calls from third parties indicating an interest in "exploring potential transactions to purchase all or a portion of the Company." One of those calls was from Sycamore.

62.     The Jones Inc. Board had previously engaged Citigroup to assist with the evaluation of strategic alternatives, including the sale of all or part of its business. Citigroup recognized from the beginning that finding a buyer for the company would be difficult, as Jones Inc. was a "challenged asset, and it was not clear that anyone could create value from this business . . . ."

63.     Beginning on June 7, 2013, Citigroup contacted ten financial and strategic parties, including Sycamore, which Citigroup identified as being potentially interested in a transaction involving the sale of all or part of Jones Inc. Following media reports on July 5, 2013 that Jones Inc. was in the early stages of a sale process, Jones Inc. received additional unsolicited indications of potential interest in a strategic transaction, bringing the total number of potentially interested parties to seventeen. These seventeen potential bidders were given access to a confidential

REDACTED – MOTION TO SEAL PENDING

information presentation prepared by Citigroup that contained detailed confidential financial information and projections for Jones Inc.

64.    In July 2013, Sycamore partnered with KKR to submit an indication of interest to purchase the entirety of Jones. Inc. for a price of $18 to $20 per share, which implied a total enterprise value of between $2.4 billion and $2.6 billion.  The bidders' interest in proceeding with a deal in that price range, however, would soon falter as they continued their diligence on the company.

65.    On July 23, 2013, Jones Inc. opened a virtual data room containing additional confidential diligence materials and gave access to these documents to Sycamore and KKR, as well as to another financial sponsor who expressed preliminary interest in acquiring the entirety of Jones Inc.  Jones Inc. also granted access to these materials to certain other parties that had expressed interest in acquiring discrete Jones Inc. business lines.

66.    On September 16, 2013, Citigroup met with representatives of KKR and Sycamore. During the meeting, Sycamore and KKR advised Citigroup that after their "extensive additional diligence" they had "considerable reservations regarding the value of the Company," and that if they made a final proposal at all it would be "significantly lower" than $18 to $20 per share.  Upon its due diligence and investigation, KKR soon thereafter concluded that it was no longer interested in acting as a principal equity investor in a Jones Inc. sale due to low valuation, weak management across all levels, and the inability to realize adequate cost savings.

67.    Sycamore then indicated interest in buying just Jones Inc.'s "footwear" business, which included the company's crown jewels – Stuart Weitzman and Kurt Geiger.  The Jones Inc. Board refused, but advised Sycamore that another party – identified in Jones Inc.'s proxy as "Strategic Party C" – had expressed interest in acquiring Jones Inc.'s "apparel" business, and

encouraged Sycamore to partner with Strategic Party C in a joint transaction that would result in a sale of the entire company.

68.     Thereafter, Sycamore and Strategic Party C engaged in further due diligence, including review of additional confidential financial information.  On October 23, Strategic Party C, like every other party except Sycamore, told the Jones Inc. Board that it was no longer interested in pursuing a transaction for the entirety of Jones Inc., citing execution risk and value-destructive separation costs associated with Sycamore's plan to break up Jones Inc. into several smaller businesses.

69.     On October 23, 2013, Sycamore offered to acquire Jones Inc. for $14 per share, which it later increased to $15 per share, reflecting an enterprise value of $2.2 billion.  During a meeting on October 29, 2013, the Jones Inc. Board determined that $2.2 billion "represented a compelling value for the Company" and resolved to "proceed with discussions with Sycamore on that basis."

70.     The Jones Inc. Board refused Sycamore's request for exclusivity, however, so that Jones Inc. "would remain free to consider alternative transactions."  But no alternative bid or transaction ever materialized, and on December 19, 2013 Jones Inc. entered into the Merger Agreement at the market-tested price of $2.2 billion for the entire Jones Inc. enterprise.

**III.     Sycamore Plans to Strip Away Carve-Out Assets for Far Less Than Their Value**

71.     On information and belief, Sycamore already had crafted its plan to sell to its Affiliates the most valuable pieces of Jones Inc. when Sycamore submitted its October 23, 2013 bid.  On Sunday October 27 or Monday October 28, 2013 – just ahead of Jones Inc.'s October 29, 2013 board meeting – Sycamore founder Stefan Kaluzny advised Citigroup that Sycamore intended to "transfer ownership of certain of the Company's" assets, including Jones Inc.'s most

valuable businesses, to "Sycamore [a]ffiliates substantially concurrently with the closing of the merger (such transfers being the 'carveout transactions' described further in the Merger Agreement)."

72.     Sycamore Fund I, the same Sycamore investment fund that indirectly invested also owned the Sycamore Affiliates that acquired the Carve-Out Assets.  Sycamore Fund I invested about $108 million in RemainCo – or about 7% of the total debt that RemainCo was left with after the LBO.  Hence, as long as Sycamore made sure its Affiliates stripped away the Carve-Out Assets cheaply enough, Sycamore Fund I could profit on a net basis *even if RemainCo failed entirely*. Sycamore trumpeted this very aspect of the transaction when it sought co-equity investors in the LBO, including KKR, which had advised Sycamore that it was worried about the astonishing amount of debt at Nine West.  And in an investor presentation from October 2014, Sycamore explained that one of the core principles that guided its investments in Jones Inc. was the separation of over- and under-performing businesses, for the express purpose of allowing a speedy return of capital to investors.

73.     Sycamore and Jones Inc. proceeded to negotiate a merger agreement that allowed Sycamore to unilaterally set the price for which its Affiliates would acquire the Carve-Out Assets. Just two weeks before the Merger Agreement was signed, Sycamore internally expressed doubts about the viability of Nine West and the wisdom of the LBO overall.  In an email dated December 5, 2013, Kopelioff wrote:  "Let's make sure we're taking a step back and thinking through whether we really want to do this.  *I'd keeping thinking about how we get comfortable NW isn't a doomed brand.*"  Despite these concerns, Sycamore proceeded to finalize the Merger Agreement, in light of the guaranteed profits it would earn from the Carve-Out Transactions.

REDACTED – MOTION TO SEAL PENDING

74.     On December 19, 2013, the Jones Inc. Board unanimously approved and executed the Merger Agreement (with the transactions contemplated therein, the "Merger") with two entities controlled by Sycamore:  Jasper Parent and Merger Sub.  The Merger Agreement required that Merger Sub would merge with and into Jones Inc. in one step.  Jones Inc. would survive the Merger and become a wholly-owned and privately held subsidiary of Jasper Parent, and would be renamed NWHI.

75.     Concurrently with the execution of the Merger Agreement, Jasper Parent "entered into three separate purchase agreements with certain controlled Affiliates of" Sycamore, pursuant to which Jasper Parent agreed to cause NWHI to sell Jones Apparel, Kurt Geiger and Stuart Weitzman to the Sycamore Affiliates concurrently with the Closing of the Merger.  As noted above, the businesses left behind with NWHI after consummation of the Carve-Out Transactions – Nine West and Jeanswear – are sometimes referred to in this Complaint (and in Jones Inc.'s definitive Proxy) as "RemainCo."

76.     Sycamore took advantage of two key features of the LBO structure to ensure Sycamore's Affiliates would obtain the Carve-Out Assets for a fraction of their actual value, and that Sycamore's exposure to RemainCo would be reduced.  First, Sycamore was able to negotiate the prices to be paid by the Sycamore Affiliates for each of the Carve-Out Assets *with itself*.  Each Carve-Out purchase agreement was signed by Sycamore founder Kaluzny on behalf of the seller entity, and by Sycamore co-founder Morrow on behalf of the buyer entity.  Indeed, the old Jones Inc. Board expressly disclaimed any view as to the fairness of the Carve-Out Transactions or the prices paid for them in its related resolutions and in the Merger Agreement itself.

77.     Second, Sycamore took advantage of the fact that before the LBO Jones Inc. was not organized into the same five segments created by Sycamore through the LBO – Nine West,

Jeanswear, Stuart Weitzman, Kurt Geiger and Jones Appel.  Hence, in the ordinary course of its business, Jones Inc. did not maintain historical financial information, and did not prepare projections, that matched precisely those post-LBO business segments.  Sycamore conceded this very fact in a presentation to investors in October 2014, noting that the pre-LBO Jones Inc. maintained "opaque" financial reporting that "made it difficult to determine true segment profitability."  This gave Sycamore leeway to manipulate valuation inputs like EBITDA for the newly separated businesses, and thus to manipulate the share of the combined Jones Inc. enterprise value attributable to RemainCo, on the one hand, and to the Carve-Out Assets on the other.

78.    Upon the closing of the LBO, Jasper Parent caused NWHI to complete the Carve-Out Transactions as planned, transferring ownership of Jones Apparel, Kurt Geiger and Stuart Weitzman to the aforementioned Sycamore Affiliates in exchange for just $641 million in aggregate consideration ($110 million for Jones Apparel, $395 million for Stuart Weitzman, and $136 million for Kurt Geiger).[10]  As discussed in more detail below, there can be no serious doubt that the Carve-Out Assets were actually worth $1 billion at the time of the LBO.

79.    As alleged further below, this is not the first time that Sycamore has been accused of blatant self-dealing and below-market prices in the context of an LBO.

### IV.    RemainCo Incurs Crushing New Debt to Fund the LBO

80.    To consummate the transactions contemplated by the LBO, it was necessary to pay $1.2 billion out to Jones Inc.'s shareholders and roll over or refinance close to $1 billion in existing debt.  Sycamore and KKR together contributed $120 million in equity to RemainCo, but that was of course a tiny fraction of the debt that RemainCo was left with after the LBO.

81.    Jones Inc. had about $250 million in pre-LBO unsecured 6.125% notes due in 2034

---

[10] This was inclusive of $38.5 million in transaction fees.  Therefore, the aggregate purchase price for the Carve-Out Assets was only $602.9 million.

REDACTED – MOTION TO SEAL PENDING

(the "2034 Notes").  The 2034 Notes were far from their maturity, had no change of control put right, and therefore had no choice but to remain in NWHI's post-LBO, post-Carve-Out Transaction capital structure.  Jones Inc. also had about $250 million in pre-LBO unsecured 5.125% notes due in 2014 ("2014 Notes"), which were redeemed in full in connection with the LBO.

82.    Pursuant to a change of control provision, in connection with the LBO, Merger Sub was required to redeem or refinance $400 million in unsecured 6.875% notes due in 2019 (the "Old 2019 Notes").  With access only to the misleading information made available to them by Sycamore and Jones Inc. concerning the value and performance of RemainCo and the Carve-Out Assets, most holders exchanged their Old 2019 Notes for newly issued 2019 notes bearing a higher interest rate of 8.25% (the "New 2019 Notes").  Holders of a few million worth of Old 2019 Notes redeemed, and the balance simply stayed in Old 2019 Notes which also rolled over to the surviving company's balance sheet.

83.    Sycamore agreed to layer still more debt on the surviving company to complete the LBO.  Hence, RemainCo was saddled with another $300 million Unsecured Term Loan and a $445 million Secured Term Loan arranged by Morgan Stanley, as well as an additional $60 million of New 2019 Notes.  NWHI is the sole borrower under both the Secured Term Loan and Unsecured Term Loan, while all other Debtors have guaranteed those obligations.  By insisting on the subsidiary guarantees, the Lenders primed all other unsecured debt, and greatly reduced the Lenders' exposure to a RemainCo insolvency.

84.    These borrowings were still not enough to fund the LBO, however.  Thus, Sycamore agreed that the meager consideration paid for the Carve-Out Assets by Jasper SW, Jasper Apparel, and Jasper Footwear would also be used to pay down Jones Inc. shareholders under the Merger Agreement, rather than be retained by RemainCo.  The Jones Inc. shareholders, in turn,

provided no consideration to RemainCo in exchange for the redemption of their shares.

85.     When the dust settled, RemainCo was left with a grand total of $1.55 billion in debt, far more than the enterprise was worth after selling the Carve-Out Assets to Sycamore for a pittance.   The Carve-Out Assets, in contrast, were left with just $466 million in total debt; and Sycamore's equity investments in the Carve-Out Assets were far larger than its equity investment in RemainCo on a percentage basis.   RemainCo's post-LBO debt balances are set forth below:

| Obligation | LBO Debt |
|---|---|
| Revolving Credit | $      69 |
| Senior Secured Term Loan | 445 |
| Unsecured Term Loan | 300 |
| Old 2019 Notes | 29 |
| New 2019 Notes | 427 |
| Rolled Guarantee Loan Notes | 10 |
| Rolled 2034 Notes | 250 |
| Capital Leases | 21 |
| Total | $  1,551 |

## V.     RemainCo Was Rendered Insolvent by the LBO

86.     As noted above, the Carve-Out Assets represented $1 billion of Jones Inc.'s total enterprise value, which was almost $2.1 billion at the time the LBO transaction closed.   RemainCo was therefore necessarily worth far less than the $1.55 billion in debt piled onto its balance sheet by the LBO, and was balance sheet insolvent.   Sycamore managed to create the illusion that RemainCo could support its LBO debt obligations – and provide cover for its Affiliates' below-market purchase of the Carve-Out Assets – by preparing wildly inaccurate projections and valuations of the RemainCo and Carve-Out Assets.   Those valuations, and Sycamore's manipulation of the estimates and projections leading to those valuations, are discussed in detail below.

REDACTED – MOTION TO SEAL PENDING

**A.  Sycamore   Reverse   Engineers   Its   Valuations   to   Arrive   at Desired Valuation Splits Between RemainCo and the Carve-Out Assets**

87.     The notion that Jones Inc.'s approximately $2.2 billion value in the months leading up to the LBO was comprised primarily of the RemainCo businesses never reflected reality, as indicated by Sycamore's own internal calculations and projections.   For example, in an internal valuation dated October 29, 2013 – the day the Jones Inc. Board first reviewed Sycamore's $15 per share bid – Sycamore estimated Jones Inc.'s total value at $2.17 billion, with $1.33 billion of that value ascribed to RemainCo, and $840 million in aggregate value ascribed to the Carve-Out Assets.

88.     This initial value allocation ultimately did not fit with Sycamore's plan.   To maximize the debt on RemainCo, and strip away NWHI's most valuable assets for below market value, a greater portion of Jones Inc.'s enterprise value had to be ascribed to RemainCo (and less to the Carve-Out Assets).   Over the course of the ensuing months, Sycamore prepared one internal valuation after another in which Sycamore's purported estimates of the value of RemainCo steadily increased and its estimates of the combined value of the Carve-Out Assets steadily decreased.   By March 2014, Sycamore had pushed its estimate for RemainCo's value up to $1.58 billion, and the value for the Carve-Out Assets down to a combined $640 million.   In an internal email just weeks after the LBO, KKR correctly recognized that the values attributed to RemainCo and the Carve-Out Assets by Sycamore were "entirely subjective" and "arbitrary."   Sycamore's changing valuations of RemainCo and the Carve-Out Assets are set forth in the chart below.

REDACTED – MOTION TO SEAL PENDING

| Date | RemainCo Valuation (millions) | Carve-Out Valuation (millions) | Total Enterprise Value |
|---|---|---|---|
| 10/23/13 | $1,300 | $790 | $2,090 |
| 10/29/13 | $1,330 | $840 | $2,170 |
| 11/01/13 | $1,410 | $760 | $2,170 |
| 11/04/13 | $1,505 | $665 | $2,170 |
| 11/29/13 | $1,560 | $640 | $2,200 |
| 12/16/13 | $1,570 | $670 | $2,240 |
| 1/31/14 | $1,570 | $660 | $2,230 |
| 3/5/14 | $1,580 | $640 | $2,220 |

**B. Sycamore Exaggerates Estimated 2013 EBITDA for RemainCo and Understates Estimated 2013 EBITDA for the Carve-Out Assets**

89.     Sycamore was able to engineer its preferred valuations splits by brazenly manipulating the inputs for those valuations.  Among other things, Sycamore (i) purported to "estimate" how RemainCo and the Carve-Out Assets would have performed in 2013 if they had then been operating independently during that year, and adjusted those estimates to reflect the impact of certain planned Sycamore restructuring initiatives and (ii) "projected" performance for RemainCo and each of the Carve-Out Assets for the years 2014 through 2018.  As discussed below, Sycamore's work distorted the value ascribed to RemainCo on the one hand and the Carve-Out Assets on the other.

**i.   RemainCo's "Unadjusted" 2013 EBITDA Climbs in Months Leading Up to the Closing of the LBO, Contrary to Actual Performance**

90.     Beginning at least as early as October 2013, Sycamore prepared estimates of "unadjusted" RemainCo EBITDA for 2013 with input from Jones Inc. management.  Sycamore referred to the EBITDA estimates as "unadjusted" because they did not include addbacks based on Sycamore's planned initiatives for the RemainCo businesses.

91.     In a valuation dated October 23, 2013, Sycamore assumed unadjusted 2013 RemainCo EBITDA would be $178 million.  By December 2013, Sycamore had increased its

estimate of RemainCo unadjusted EBITDA for 2013 to $189 million.  By April 2014, Sycamore had once again increased its estimate of baseline, unadjusted 2013 EBITDA, this time to $198 million—an amount that was $24 million higher than estimated RemainCo EBITDA of $174 million for the prior year (in 2012).

92.    Moreover, describing these baseline numbers as "unadjusted" is something of a misnomer, since they included substantial upward enhancements of questionable merit.  Audited financials prepared at Sycamore's request in connection with the LBO, if accurate, show that if RemainCo's businesses had been separately operated in 2013 with the proposed amount of LBO debt, they would have produced *a net loss of about $1 million*.  Truly "unadjusted" EBITDA – a non-GAAP measure – can be derived from the audited financials by adding interest expense, taxes and depreciation back to net income.  That exercise indicates that RemainCo's actual unadjusted EBITDA for 2013 was just $138 million – a far cry from the $198 million that Sycamore used as a baseline before applying another $38 million of its own addbacks to create an even more aggressive pro forma EBITDA (as discussed below).

93.    To arrive at the higher $198 million figure, Sycamore and its advisors piled on more than $60 million in adjustments (of a different variety than the $38 million in Sycamore "addbacks" discussed below) for items like "affiliated company transactions and transaction costs," "impairments and costs related to previously announced restructurings," and "purchase accounting adjustments."

### ii. Sycamore's Estimate of RemainCo's Hypothetical "Pro Forma" Adjusted 2013 EBITDA Climbs in Months Leading Up to the Closing of the LBO

94.    $198 million in EBITDA would not come close to the RemainCo valuation necessary to support the $1.55 million in debt with which RemainCo was left following the LBO. Sycamore further increased that EBITDA figure based on speculative restructuring initiatives

REDACTED – MOTION TO SEAL PENDING

concocted by Sycamore.  These amorphous Sponsor Addbacks were on top of the approximately $60 million in adjustments that already were propping up the baseline number (as discussed above).

95.      Like its estimates of "unadjusted" EBITDA, Sycamore's internal estimates of the value of the Sponsor Addbacks increased steadily between October 2013 and March 2014, rising from a low of $17 million to a high of $38 million, with pro forma EBITDA growing from $206 million in October 2013 to $236 million in March 2014 – the 2013 EBITDA figure used by Duff & Phelps in its LBO solvency opinion (discussed below).  Within RemainCo, nothing had changed to justify this increase of nearly 36%—on the contrary, actual performance during the period suggested that the headwinds faced by Nine West and Jeanswear would be even stronger than previously anticipated.

96.      Sycamore's $236 million estimate of 2013 RemainCo EBITDA appears even less rational when compared to Jones Inc.'s estimates of unadjusted EBITDA for 2013 of just $254 million *for the entire Jones Inc. enterprise, inclusive of RemainCo and the Carve-Out Assets*.  In addition, before Sycamore even placed a bid for the company, Jones Inc.'s management had considered undertaking many of the same types of restructuring initiatives comprising the $38 million in Sycamore addbacks, but had reckoned on just $40 million in improvements *across all businesses, including the Carve-Out Assets sold separately to the Sycamore Affiliates*.  Sycamore's prediction that planned initiatives at RemainCo alone would result in approximately the same amount was not realistic.  Indeed, Morgan Stanley warned potential investors that Sycamore's 2013 estimates "should not be relied upon."

REDACTED – MOTION TO SEAL PENDING

97.     Sycamore's steadily increasing adjustments – and adjustments to the adjustments – are summarized below, along with the rising RemainCo valuations those adjustments were clearly designed to yield:

| Date | RemainCo Pro Forma Unadjusted 2013 EBITDA ($ millions) | RemainCo Sponsor Addbacks (millions) | Total Sycamore RemainCo Pro Forma Adjusted 2013 EBITDA (millions) | Sycamore RemainCo Valuation (millions) |
|---|---|---|---|---|
| 10/23/13 | $178 | $28 | $206 | $1,300 |
| 10/29/13 | $187 | $28 | $215 | $1,330 |
| 11/01/13 | $187 | $28 | $215 | $1,410 |
| 11/04/13 | $188 | $28 | $216 | $1,505 |
| 11/29/13 | $188 | $17 | $205 | $1,560 |
| 12/16/13 | $189 | $29 | $218 | $1,570 |
| 1/31/14 | $195 | $36 | $231 | $1,570 |
| 3/5/14 | $198 | $38 | $236 | $1,580 |
| 4/8/14 | $198 | $38 | $236 | $1,666 |

98.     If those adjustments were overstated by even a relatively modest amount, eliminating the overstatement would result in insolvency at RemainCo.  For example, if Sycamore's 2013 EBITDA estimate of $236 million – which includes $60 million of company adjustments plus another $38 million in Sycamore Addbacks – were found to be overstated by just $21 million, it would result in insolvency based on the 7.2 multiple used by Duff & Phelps in its LBO solvency opinion.  The subjective nature of the enhancements, moreover, provided an opportunity for Sycamore and its advisors to bend RemainCo's value upward as the LBO approached.  Plaintiff has not yet been supplied with information sufficient even to identify what those adjustments are, much less substantiate their accuracy.

### iii. Sycamore Reduces 2013 EBITDA for Carve-Out Assets in Lead Up to the LBO

99.     Between October 2013 and March 2014, Sycamore's pro forma estimates of aggregate 2013 EBITDA for the Carve-Out Assets declined from $135 million to $97 million. Thus, at the same time that Sycamore was inflating its EBITDA estimates and valuations for RemainCo prior to the LBO, it was decreasing its EBITDA estimates for (and resulting valuations of) the Carve-Out Assets.

100.    Sycamore deflated its internal valuations of the Carve-Out Assets from $840 million on October 29, 2013, just days after Sycamore submitted a final Jones Inc. bid of $15.00 per share on October 26, 2013, to below the $641 million purchase price that Sycamore actually paid for the Carve-Out Assets on April 8, 2014.

### C. Sycamore Prepared Unrealistic and Unreliable Five-Year Forecasts

101.    Sycamore did not just manipulate historical EBITDA for 2013. It also significantly inflated the future projections for RemainCo's EBITDA, and significantly understated forecasted EBITDA for the Carve-Out Assets during the same period.

102.    The jumping-off point for Sycamore's five-year RemainCo projections was its 2013 pro forma adjusted EBITDA of $236 million—itself a fictitious number. In its forecast, Sycamore assumed that RemainCo's EBITDA would grow between 3.4% and 3.8% each year between 2014 and 2018. But because the starting point of $236 million was already inflated, each year thereafter was also necessarily inflated. Furthermore, by the time the LBO closed, it was clear that RemainCo's business was trending down, not up, and yet Sycamore's projections wrongly assumed that RemainCo's EBITDA and wholesale revenues would steadily increase, against the weight of the available evidence. Sycamore's projections of increasing revenue were

particularly unrealistic because Sycamore intended to close hundreds of RemainCo's retail stores, a move with obvious negative impacts on RemainCo's revenue stream.

103.    In addition, in creating its projections, Sycamore assumed that RemainCo would achieve steadily increasing EBITDA margins between 11.2% and 12.0%, whereas the company had failed to ever achieve margins greater than 8.2% in the absence of Sycamore's theoretical Sponsor Addbacks.   Sycamore also artificially enhanced projected RemainCo EBITDA by allocating approximately one-half of NWHI's shared services expenses to the Carve-Out Assets that Sycamore had decided to sell, and by removing all c-suite expenses from RemainCo's forecast. Furthermore, Sycamore also moved $72 million of future supposed one-time reorganization expenses "below the line" so that they would not detract from the projected adjusted EBITDA that Sycamore had calculated.

104.    At least some of these reorganization expenses, however, were not properly characterized as "one-time" expenses.  For example, Sycamore caused NWHI to engage Alvarez & Marsal as a restructuring adviser and classified that engagement as a one-time restructuring expense. *But Alvarez & Marsal never stopped working at NWHI*—indeed, they are there to this day.  Because the retention of Alvarez & Marsal was actually a permanent going-forward expense, amounting to $6 million per year, it should have been subtracted from Sycamore's calculation of RemainCo's adjusted EBITDA.

### D. Sycamore's EBITDA Estimates and Forecasts Were Counter to Contemporaneous Trends in Performance of the Businesses

105.    As Sycamore was preparing more and more aggressive 2013 estimates and 2014 to 2018 projections for RemainCo – during late October 2013 through April 2014 – the actual performance of Jones Inc. was moving in the opposite direction.  For example, in an internal Sycamore "Trend Analysis" presentation in December 2013, Sycamore observed that since

September 2013, Jones Inc.'s projected 2013 sales and gross profit had declined by $36 million and $18 million respectively, and that Jones Inc.'s fourth quarter estimates had "declined meaningfully." In the fourth quarter of 2013 alone, Jones Inc.'s projected sales and gross profit declined by $47 million and $20 million, respectively, relative to its Q4 estimates as of September 2013.

106.    Significantly, these problems overwhelmingly affected the RemainCo businesses – Nine West and Jeanswear – rather than the Carve-Out Assets. For instance, Nine West's projected fourth quarter 2013 sales declined by $30 million between September and December 2013, while gross profit declined by $9 million during that same time period. In a December 2013 presentation, Sycamore admitted that Nine West's fourth quarter 2013 trends were "weak" and "could result in a ~$6M shortfall to plan on gross margin." In addition, Jones Inc. management's projected annual sales and gross profit for 2013 and 2014 declined each period through the third month of 2014, indicating that, as time passed, Jones Inc.'s outlook for RemainCo was worsening. An uptick in EBITDA for RemainCo in Q1 2014 included substantial speculative adjustments and addbacks of uncertain validity. In any case, by the time the Q1 data was available, Sycamore already had turned in their hyper-optimistic projections used by Duff & Phelps in its solvency opinion and published to stakeholders. No quarter after Q1 2014, even on an adjusted basis, ever came close to meeting Sycamore's projections.

107.    Similarly, Jeanswear's projected sales declined by $17 million and gross profit declined by $3 million in that time period. RemainCo's open orders – *i.e.*, orders placed by wholesale customers that had not yet been filled – were also down from the prior year for every month between August 2013 and April 2014. In December 2013, Sycamore acknowledged that positive Jeanswear results earlier in the year were "likely not indicative of [the] long-term growth

REDACTED – MOTION TO SEAL PENDING

trajectory of the business," and that "the entire denim zone is weak."  Nevertheless, Sycamore stuck with its sunny forecasts for Jeanswear and RemainCo.

108.    Jones Inc.'s internal outlook for RemainCo was also worsening in the months leading up to and following the LBO.  In the first three months of 2014, Jones Inc.'s estimates of RemainCo's projected 2014 EBITDA steadily declined from an initial budget of $219 million—already well below the $244 million figure supplied by Sycamore to Duff & Phelps—to $206 million.   By April 2014, the month in which the LBO closed, management's EBITDA projections had declined even further, to $193 million.  Jones Inc.'s estimates of RemainCo's projected 2014 revenue likewise declined from an initial budget of $2,267 million to $2,153 million.  Sycamore received updated projections from Jones Inc. management on a monthly basis and was therefore fully aware of the decline in RemainCo's projected 2014 EBITDA and revenue, and the wide disparity between management's expected case and the forecast Sycamore alone created and supplied to Duff & Phelps:

REDACTED – MOTION TO SEAL PENDING

|  | RemainCo Projected 2014 Net Revenue (millions) | RemainCo Projected 2014 EBITDA (millions) |
|---|---|---|
| **Original 2014 Budget** | $2,267 | $219 |
| **Revised January 2014** | $2,238 | $214 |
| **Revised February 2014** | $2,221 | $212 |
| **Revised March 2014** | $2,164 | $206 |
| **Revised April 2014** | $2,153 | $193 |
| **Sycamore 2014 Forecast Supplied to Duff & Phelps April 4th Solvency Opinion** | $2,192 | $244 |

109.    Conversely, Sycamore assumed that the Carve-Out Assets would perform *worse* than suggested by information available to Sycamore during the run up to the LBO.  While Sycamore's internal valuations of the Carve-Out Assets were declining, Stuart Weitzman's and Kurt Geiger's prospects were actually *improving*.   For example, Jones Inc.'s full-year 2013 estimates for sales and gross profit for Stuart Weitzman and Kurt Geiger increased from the date of the initial bid (October 29, 2013) to December 2013.  Sycamore's counterfactual, pessimistic assessment of 2013 for the Carve-Out Assets had the desired effect of dramatically reducing their implied values from October 2013 to the closing of the LBO:

REDACTED – MOTION TO SEAL PENDING

| Date | Total Carve-Out Unadjusted EBITDA (millions) | Total Sycamore Carve-Out Valuation (millions) |
|---|---|---|
| 10/23/13 | $101 | $790 |
| 10/29/13 | $92 | $840 |
| 11/01/13 | $68 | $760 |
| 11/04/13 | $66 | $665 |
| 11/29/13 | $65 | $640 |
| 12/16/13 | $74 | $670 |
| 1/31/14 | $66 | $660 |
| 3/5/14 | $65 | $640 |

110.    As noted, Sycamore's pre-LBO projections for the Carve-Out Assets lagged far behind those supplied at the end of 2013 by Jones Inc.'s executives.  When Stuart Weitzman's Chief Audit Executive, Mario Pompeo, saw similar projections a few months after the LBO, he noted the material discrepancy from management's buoyant view of Stuart Weitzman's prospects in a July 20, 2014 email:

> I can tell you this - we may need to work closely with our friends at Sycamore on these projections. … I think most of the other segments of Jones that have been split-off are in the same boat. These projections are definitely NOT based on the last 5-year plan that I had submitted to Jones back in June (and updated in October) of 2013. Rather, they are much more conservative estimates that I believe to be much more in tune with what Sycamore pulled together during the whole debt subscription process this past Spring.

111.    In short, information available to Sycamore while it was preparing its projections in late 2013 and early 2014 should have caused Sycamore to increase its estimates for the Carve-Out Assets, and temper its projections for RemainCo, *but Sycamore did just the opposite*.

**VI.    In an Effort to Obtain a RemainCo Solvency Opinion, Sycamore Retains Its Usual Solvency Expert and Supplies Its "Upside" Case for RemainCo**

112.    To obtain a solvency opinion for RemainCo in connection with the LBO, Sycamore hired its long-time advisor, Duff & Phelps.  As of June 2018, Duff & Phelps had performed 59

REDACTED – MOTION TO SEAL PENDING

total engagements for Sycamore and its portfolio companies since Sycamore was founded in 2011, which generated millions of dollars in fees for Duff & Phelps.

113.    In preparing its solvency opinion for RemainCo (the "RemainCo Solvency Opinion"), Duff & Phelps relied on projections for RemainCo generated by Sycamore, set forth in the chart below:

| Year | Sycamore Projections – EBITDA (millions) |
|------|------------------------------------------|
| 2013 | $236 |
| 2014 | $244 |
| 2015 | $254 |
| 2016 | $263 |
| 2017 | $272 |
| 2018 | $282 |

114.    Duff & Phelps claimed in deposition testimony to have conducted some limited due diligence in connection with the projections provided by Sycamore.  The RemainCo Solvency Opinion, however, was based on the express assumption that "the Management Projections furnished to Duff & Phelps were reasonably prepared and based upon the best currently available information and good faith judgment of the person furnishing the same."  Duff & Phelps expressly "[r]elied upon the accuracy, completeness, and fair presentation" of these projections and "did not independently verify" them.

115.    As alleged above, however, Sycamore prepared its estimates and projections for RemainCo not in a good faith effort to divine the future prospects of that business, but to ensure that the $2.2 billion in total enterprise value was split between RemainCo and the Carve-Out Assets in a manner favorable to Sycamore's investment scheme.  As just one example, whereas the projections that Sycamore gave Duff & Phelps assumed that RemainCo would generate $244 million of EBITDA in 2014, Jones Inc. management's own projections from April of 2014

REDACTED – MOTION TO SEAL PENDING

projected just $193 million for that year.  Upon information and belief, neither Sycamore nor the Jones Group supplied Duff & Phelps the internal forecast for RemainCo set out in paragraph 108.

116.    There is evidence, moreover, that the projections Sycamore provided to Duff & Phelps represented Sycamore's most optimistic view of how RemainCo would perform, not its realistic forecast.  In addition to preparing "base case"—*i.e.*, most likely—projections, Sycamore also prepared "upside" and "downside" projections for RemainCo, which purported to illustrate RemainCo's prospects under more and less favorable assumptions.  These upside and downside cases were based on a projected five-year "exit EBITDA"—*i.e.*, RemainCo's projected adjusted EBITDA after five years, the period at which Sycamore hoped to exit the investment.  Between December 2013 and March 2014, Sycamore's base case projected exit EBITDA for RemainCo ranged between $240 million and $245 million, while its upside case ranged between $280 million and $285 million.

117.    But remarkably, when it came time to give projections to Duff & Phelps for the RemainCo Solvency Opinion, Sycamore asked Duff & Phelps to assume that RemainCo's EBITDA in five years would be $282 million—*consistent with Sycamore's upside case*, and about $40 million higher than its base case.  Yet Sycamore failed to inform either Duff & Phelps or the market that the RemainCo Solvency Opinion was based on Sycamore's upside projections.

118.    Even using Sycamore's manipulated projections, Duff & Phelps shows RemainCo perilously close to insolvency.  For instance, under its April 2014 discounted cash flow analysis, Duff & Phelps estimated RemainCo's value to be between $1.550 and $1.710 billion.  Had Duff & Phelps excluded the first three months of 2014 from its interim cash flows – as it should have done since the valuation was dated as of April 2014 – and applied the 12.5% weighted average

cost of capital ("WACC") that Duff & Phelps used a few months later in preparing the PPA, the DCF would have indicated that RemainCo was insolvent by more than $30 million.

119.    In short, Duff & Phelps's RemainCo Solvency Opinion should be given no weight, since it (i) was based on a faulty 2013 adjusted EBITDA number and unreliable projections provided by Sycamore, and (ii) implies a value to the Carve-Out Assets that is completely out of step with reality, and with later opinions supplied by Duff & Phelps itself (as discussed below).[11]

## VII.    RemainCo's Disastrous Post-LBO Performance Corroborates the Contemporaneous Evidence that Sycamore's Projections were Unreliable

120.    The deliberate inflation by Sycamore of its pre-LBO projections is corroborated by RemainCo's post-LBO performance, which never came close to matching Sycamore's exaggerated forecasts.   For instance, in 2014, RemainCo's unadjusted EBITDA fell to $177 million—$21 million less than the $198 million Sycamore claimed it had earned in 2013, $59 million less than the $236 million Sycamore said represented its true 2013 adjusted EBITDA, and $77 million less than Sycamore's projection for 2014 of $244 million.   This predictable disparity is starkly illustrated in the chart below:

---

[11] The credibility of the opinion is called further into doubt by the many previous solvency opinions Duff & Phelps has authored for Sycamore in other deals.   Indeed, as noted, the opinion in this matter was obviously copied in part from a prior opinion for Sycamore, as it inadvertently included a reference to one of Sycamore's other portfolio companies.



121.    Other key operating metrics also dramatically lagged Sycamore's forecasts in the post-LBO period:

| Negative Variance vs. Sycamore Projections | | | |
|---|---|---|---|
| | 2014 | 2015 | 2016 |
| Revenue | -11.3% | -19.4% | -30.7% |
| Gross Margin | -11.2% | -24.4% | -33.5% |
| Operating Margin | -118.7% | -130.4% | -109.5% |

122.    As discussed above, Sycamore was fully aware that RemainCo's performance was already declining in the lead up to the LBO.  But instead of considering the possibility that RemainCo's financial performance would continue its decline into 2014, Sycamore assumed RemainCo would experience an immediate and spectacular reversal of fortune under new management in the form of inflated adjusted numbers for 2013 and even higher numbers for 2014. This assumption was reckless, and as RemainCo's actual 2014 performance indicates, utterly unfounded.

123.    The actual cost of implementing Sycamore's turnaround strategy for RemainCo was also significantly greater than what Sycamore's estimates took into account.  Sycamore's estimates were based on an assumption (not disclosed publicly) that reorganization expenses would total $72 million and would be incurred only in 2014 and 2015.  In reality, however, these costs continued into 2016 and exceeded $120 million through that year.  In addition, even though these reorganization costs continued over several years, they were treated as below-the-line expenses that did not factor into Sycamore's calculation of $236 million adjusted pro forma 2013 EBITDA.

124.    RemainCo's debt also began to trade sharply downward within a few months of the LBO, as the market learned that RemainCo's actual performance cast doubt on the validity of the 2013 pro forma adjusted numbers.  As illustrated in the following chart, prices for the Old 2019 Notes, the New 2019 Notes and the 2034 Notes all fell dramatically – and kept falling – in the weeks and months after the disastrous LBO:



### VIII.    Sycamore Itself Disregarded the Adjusted EBITDA Figures It Supplied to Duff & Phelps When Sycamore Prepared Internal Valuations of RemainCo

125.    Sycamore performed quarterly valuations of RemainCo after the LBO, including one such valuation dated in September 2014.  In preparing its internal valuations, Sycamore did not use the projections that it gave to Duff & Phelps in connection with the RemainCo Solvency Opinion.  Rather than assuming an adjusted pro forma 2013 EBITDA of $236 million (the number given to Duff & Phelps), Sycamore based its valuation, in part, on an unadjusted 2013 EBITDA of $191 million, which, on information and belief, excluded the Sponsor Addbacks (and is $7 million less than the $198 million Sycamore had identified as "unadjusted" EBITDA in connection with the LBO).

126.    Indeed, the projections used by Sycamore in its third quarter 2014 RemainCo valuation are significantly lower across the board than those used by Duff & Phelps (and provided by Sycamore) just five months earlier.  Whereas Sycamore asked Duff & Phelps to assume an estimated adjusted 2014 EBITDA of $244 million for purposes of the RemainCo Solvency Opinion, Sycamore's third quarter 2014 valuation was based on a projected 2014 EBITDA of $190.7 million, with no apparent adjustment for the Sponsor Addbacks.

127.    And whereas Sycamore asked Duff & Phelps to assume adjusted EBITDA growth rates of between 3-4% between 2014 and 2018, Sycamore's internal valuations five months later assumed a significantly lower growth rate of 1.7%.  As a result, each year of EBITDA projections in Sycamore's third quarter 2014 internal valuation is significantly lower than the projections given to Duff & Phelps for the RemainCo Solvency Opinion.

128.    The substantial disparity between Sycamore's internal projections and the projections that Sycamore gave to Duff & Phelps for the RemainCo Solvency Opinion is summarized in the chart below.

| Projected EBITDA | | |
|---|---|---|
| Year | Duff & Phelps LBO Solvency Analysis, April 2014 (millions) | Sycamore Internal Valuation, September 2014 (millions) |
| 2014 | $244 | $191 |
| 2015 | $254 | $193 |
| 2016 | $263 | $196 |
| 2017 | $272 | $200 |
| 2018 | $282 | $204 |

129.    If Duff & Phelps had used Sycamore's internal projections from the third quarter of 2014 in its RemainCo Solvency Opinion, it would have determined that RemainCo was deeply insolvent at the time of the LBO.

130.    Sycamore itself prepared valuation figures implying RemainCo insolvency only a few short months after closing the LBO in 2014.  An internal deck entitled "Current Valuation Approach" that Sycamore appears to have created on October 17, 2014 identifies "LTM EBITDA" as just $190.7 million, a number which again appears to exclude the Sponsor Addbacks that Sycamore used to enhance the figures it supplied to Duff & Phelps for solvency purposes. Applying the 7.6x EBITDA multiple "assumed for valuation purposes" yields a value of just $1.449 billion for RemainCo, more than $100 million less than the amount of its debt at the close of the LBO.  Similarly, in an investor presentation from October 2014, Sycamore identified RemainCo's adjusted 2013 pro forma EBITDA as $211 million—significantly less than the $236 million supplied to Duff & Phelps—and again appears to have excluded the Sponsor Addbacks.

**IX.    None of the Parties Closest to the Deal Accepted Sycamore's EBITDA Estimates**

131.    Underscoring their lack of reliability, Sycamore's estimates were vastly higher than both Jones Inc. management's own projections and the projections relied on by other parties and professionals that analyzed Jones Inc. prior to the LBO.  As of December 2013, Jones Inc.

REDACTED – MOTION TO SEAL PENDING

management estimated 2013 unadjusted EBITDA at $254 million, lower than Sycamore's estimate at the same period of time.

132.    Analyst estimates of Jones Inc.'s 2013 EBITDA were also lower than Sycamore's estimates, with a median estimated unadjusted 2013 EBITDA of $256 million.  A sampling of analyst estimates of 2013 EBITDA for the entire Jones Inc. enterprise is provided in the chart below:

| Date | Analyst | 2013 Est. Unadj. EBITDA (millions) |
|---|---|---|
| 7/9/13 | Buckingham Research Group | $262 |
| 7/23/13 | Stephens | $248 |
| 7/31/13 | Barclays | $246 |
| 8/1/13 | Buckingham Research Group | $259 |
| 8/1/13 | Stephens | $260 |
| 10/31/13 | Buckingham Research Group | $256 |
| 10/31/13 | Stephens | $250 |
| 11/1/13 | Telsey Advisory Group | $246 |
| 12/20/13 | Buckingham Research Group | $256 |
| 12/20/13 | Stephens | $250 |
| 1/24/14 | Buckingham Research Group | $256 |

133.    The disparity between Sycamore's projections and the projections used by the rest of the world are even more dramatic when the Sponsor Addbacks are considered.  Including Addbacks, Sycamore calculated an adjusted 2013 EBITDA of *$354 million* for Jones Inc.—over $100 million higher than the estimates of Jones Inc.'s own management and virtually all analysts.

134.    A post-LBO valuation performed by ███████████ at the behest of KKR likewise casts significant doubt on the validity of the projections given by Sycamore to Duff & Phelps in connection with the RemainCo Solvency Opinion.  KKR was Sycamore's partner in the transaction, and purchased close to 10% of the equity of RemainCo and the Carve-Out Assets. The RemainCo valuation performed by KKR's advisors at ███████████, though undertaken after the LBO, valued RemainCo as of March 31, 2014, several days *before* the LBO closed.

REDACTED – MOTION TO SEAL PENDING

██████████████ was well aware of Sycamore's $236 million 2013 adjusted pro forma EBITDA calculation, but nevertheless based its valuation on a much lower estimate of ████████ (composed of ████████ in unadjusted 2013 EBITDA and ████████ in Sponsor Addbacks).

135.    The projections used internally by KKR further confirm that the inflated projections given by Sycamore to Duff & Phelps were unreasonable.  In a memorandum dated April 7, 2014, KKR projected significantly lower RemainCo EBITDA between 2014 and 2017 than the forecast Sycamore supplied to Duff & Phelps—including just $181.2 million in adjusted 2014 EBITDA (compared to $244 million provided to Duff & Phelps) and just $215 million in adjusted 2017 EBITDA (compared to $272 million provided to Duff & Phelps).  If Duff & Phelps had used KKR's projections, it would have determined that RemainCo was insolvent.  These discrepancies are set forth in the chart below:

| Year | 04/07/14 KKR Memo (millions) | Sycamore Forecast Provided to Duff & Phelps (millions) | Difference (millions) |
|------|------------------------------|--------------------------------------------------------|-----------------------|
| 2014 | $181.2 | $244.0 | $62.8 |
| 2015 | $211.5 | $254.0 | $42.5 |
| 2016 | $213.0 | $263.0 | $50.0 |
| 2017 | $215.1 | $272.0 | $56.9 |

136.    RemainCo projections also were prepared by Morgan Stanley, the original administrative agent and lead arranger for the Secured Term Debt.  A Morgan Stanley model dated April 4, 2018 included "downside case" projections, "base case" projections, and much higher projections that Morgan Stanley called the "Sycamore case."  The "Sycamore case" projections were materially identical to the projections Sycamore supplied to Duff & Phelps for its solvency opinion.  The chart below compares Morgan Stanley's base case and downside case with the Sycamore projections:

| Year | Downside | Base Case | Sycamore |
|------|----------|-----------|----------|
| 2013 | $224 | $224 | $236 |
| 2014 | $154 | $228 | $244 |
| 2015 | $114 | $238 | $254 |
| 2016 | $131 | $247 | $263 |
| 2017 | $140 | $256 | $272 |
| 2018 | $142 | $203 | $282 |

137.    The Morgan Stanley model did not include a solvency analysis for RemainCo. However, applying assumptions in the range used by Duff & Phelps to Morgan Stanley's projections results in a finding of RemainCo insolvency in virtually all scenarios.  Duff & Phelps used a long term growth rate of 2% in each of their RemainCo valuations, a WACC in its LBO solvency opinion ranging from 10.75% to 11.75%, and a WACC in its Purchase Price Allocation ("PPA," discussed below) valuation of 12.5%.  Using the solvency opinion range of WACCs (10.75% to 12.5%), and flexing the 2% long term growth rate by 100 basis points in either direction, Morgan Stanley's downside and base case projections show RemainCo insolvency in 38 out of 40 combinations.

**X.    Post-LBO Transactions and Duff & Phelps Opinions Demonstrate that the Price Paid by Sycamore for the Carve-Out Assets Represented a Fraction of Their Value**

138.    As indicated above, the series of Duff & Phelps opinions and Carve-Out

Transactions that began just months after the LBO demonstrate beyond any serious doubt that the Carve-Out Assets comprised far more of the approximately $2.1 billion enterprise value of Jones Inc. than was reflected in their $641 million purchase price. Those opinions and transactions are discussed in detail below.

### A. The August 2014 Purchase Price Allocation Report

139. In addition to preparing the RemainCo Solvency Opinion in connection with the LBO, Duff & Phelps also performed a purchase price allocation for Sycamore in August 2014. A PPA is required when one company acquires another in order to allocate and record, in accordance with GAAP, the allocation of the purchase price to specific assets. Although the PPA is dated August 7, 2014, its analysis is effective as of April 8, 2014—*i.e.*, the date on which the LBO and component Carve-Out Transactions closed. Duff & Phelps relied primarily on Sycamore's own projections, forecasts and financial data to form the basis of the PPA.

140. In the PPA, Duff & Phelps valued Jones Apparel Co. at *$310 million* as of April 8, 2014, a business that Sycamore purchased on April 8, 2014 for *just $110 million*. It follows inexorably that NWHI received far less than reasonably equivalent value when it sold Jones Inc. to a Sycamore Affiliate on the same day for just $110 million. So obvious is this point that a member of Sycamore's deal team actually claimed during his deposition that Duff & Phelps $310 million conclusion of value might be a "typo." It was no typo, as is obvious from the document itself, and as was expressly confirmed by Duff & Phelps at its own deposition.

141. Although not fully reflective of the damages to RemainCo, based on the valuations of the Carve-Out Assets determined by Duff & Phelps in the PPA, RemainCo's GAAP books and records for year-end 2014 recognized a *$218.5 million loss to RemainCo* associated with the sale of the Carve-Out Assets.

**B. The August 2014 Duff & Phelps Solvency Opinions and September 2014 Stuart Weitzman and Jones Apparel Dividends**

142.    In September 2014, just months after the LBO, Sycamore caused two of the three Carve-Out Assets to pay dividends to its equityholders (overwhelmingly made up of the Sycamore Affiliates and the rest held by KKR) totaling in excess of $160 million—substantially more than Sycamore and KKR's entire equity investment in RemainCo of $120 million.  In order to justify these exorbitant payouts, Sycamore needed opinions attesting to the solvency of the two corporations – Stuart Weitzman and Jones Apparel – and once again tapped its advisors at Duff & Phelps to provide the opinions.

143.    This time, however, Sycamore supplied projections to Duff & Phelps for Stuart Weitzman that were far more optimistic than the projections Sycamore supplied to Duff & Phelps in connection with the PPA and the LBO solvency opinion.  The disparity between the two sets of projections – which Sycamore supplied to Duff & Phelps nearly simultaneously – are stark:

|  | Stuart Weitzman Purchase Price Allocation (millions) | Stuart Weitzman Solvency Analysis (millions) |
|---|---|---|
| **2013 (Actual)** | $52.4 | $50.4 |
| **2014** | $58.8 | $56.9 |
| **2015** | $65.8 | $76.1 |
| **2016** | $69.7 | $101.0 |
| **2017** | $73.8 | $130.5 |
| **2018** | $78.0 | $164.6 |

144.    At his deposition, a Duff & Phelps witness named Chris Janssen claimed to have spoken with Sycamore's Adam Weinberger about the "very different forecasts" Sycamore provided regarding Stuart Weitzman.  Mr. Janssen testified, however, that he could not "recall the explanation" Weinberger supplied for "how the numbers could change so dramatically."

145.    During Mr. Weinberger's subsequent deposition, he testified that he did not remember having any conversation with Mr. Janssen at all concerning the two sets of projections, or any other topic relating to Duff & Phelps' solvency and purchase price adjustment opinions. Neither Janssen nor Weinberger could offer any explanation to justify the gulf between the two sets of projections.

146.    Unsurprisingly, the higher projections Sycamore supplied to Duff & Phelps in August 2014 when Sycamore was seeking to justify an $80 million dividend yielded a much higher valuation than did the lower projections Sycamore supplied for the same company when Sycamore was setting the price it would pay to purchase Stuart Weitzman. Specifically, in August Duff & Phelps concluded that Stuart Weitzman was worth $759 million, or about $364 million more than the $395 million that Sycamore paid just four months earlier. Moreover, the fact that Stuart Weitzman would even consider paying out a dividend so soon after being purchased is indicative of not just solvency, but of significant equity value—in stark contrast to RemainCo, which was insolvent upon the LBO.

**C.  Sycamore Resells Carve-Out Assets to Third Parties at Massive Profit**

147.    KKR was well aware that Sycamore's initial intentions were to divest Stuart Weitzman and Kurt Geiger quickly upon the LBO. Indeed, KKR believed that the sale of Stuart Weitzman and Kurt Geiger alone would enable it to fully recover its equity investment.

148.    As early as July 2014 – or a little more than 100 days after closing the LBO – KKR's Doug Tapley wrote in an email that "Sycamore let me know that they intend to exit th[e Stuart Weitzman] business very soon." And indeed, Sycamore Affiliates sold Stuart Weitzman to a third party for $548 million in January 2015, $153 million more than the Affiliates paid for the same business in the LBO.

149.    Similarly, KKR was also aware that Sycamore was going to divest Kurt Geiger

REDACTED – MOTION TO SEAL PENDING

quickly following the LBO. Sycamore was actively marketing Kurt Geiger for sale as early as January 2015, and it sold Kurt Geiger in December 2015 for $371 million, representing a $235 million premium over the LBO purchase price paid by Sycamore for the same business in April 2014.

150.    Sycamore sold a portion of the Jones Apparel business to a third party in April 2015 for $75 million, leaving behind a business called the Kasper Group ("Kasper"). Sycamore then sold Kasper back to NWHI in January 2017 for $40 million, while retaining $30 million in accounts receivable and $1 million in cash, for total consideration for the entire Jones Apparel Carve-Out of $146 million, at a time when RemainCo was deeply and obviously insolvent. Sycamore caused NWHI to fund the Kasper acquisition using the proceeds of NWHI's earlier sale of its Easy Spirit business—essentially using RemainCo as its own personal piggy bank to buy back an asset that Sycamore no longer wanted, when RemainCo should have been using that money to pay down its debt. When combined with the almost $80 million dividend Sycamore took from Jones Apparel in September 2014, the premium was about $76 million more than Sycamore paid in connection with the LBO.

151.    Together, these transactions imply an aggregate value for the Carve-Out Assets of about $1.23 billion, and as illustrated in the chart below, more than $460 million of that excess value went directly to equity, which was overwhelmingly owned by Sycamore:

REDACTED – MOTION TO SEAL PENDING

| | | Stuart Weitzman | Kurt Geiger | Jones Apparel | Total |
|---|---|---|---|---|---|
| **I.** | **Returns from Carve-Out Assets** | | | | |
| | Proceeds from Carve-Out Assets | | | | |
| | Post-LBO Carve-Out Asset Sales | $ 548 | $ 371 | $ 146 | $ 1,065 |
| | Post-LBO Carve-Out Dividends | 84 | - | 80 | 164 |
| | | 632 | 371 | 226 | 1,229 |
| | Less: Debt & Equity Investment | | | | |
| | LBO Debt | 260 | 116 | 90 | 466 |
| | LBO Equity | 135 | 20 | 20 | 175 |
| | Subsequent Debt Incurred | 85 | - | 40 | 125 |
| | | 480 | 136 | 150 | 766 |
| | Returns to Equity Holders | 152 | 235 | 76 | 463 |
| | Initial Equity Investment in Carve-Out Assets | | | | 175 |
| | Total % Return on Carve-Out Investment | | | | 264% |
| **II.** | **Adjustments for Returns to Sycamore Fund** | | | | |
| | Returns to All Equity Holders | 152 | 235 | 76 | 463 |
| | Less: KKR portion of returns (9.8% Ownership) | 15 | 23 | 7 | 45 |
| | Sycamore Fund returns on Carve-Out Assets | 137 | 212 | 69 | 417 |
| | Less: Sycamore Fund Loss of Equity in RemainCo | | | | 108 |
| | Aggregate Return to Sycamore Fund | | | | 309 |
| | Initial Equity Investment in LBO | | | | $ 266 |
| | Total % Return on Investment (net of the loss on RemainCo) | | | | 116% |

152.   As a result of these outsize returns from the Carve-Out Assets, Sycamore earned a 264% return on its investment in the Carve-Out Assets, and an impressive 116% return on the entire LBO, inclusive of its losses from RemainCo. Peter Morrow acknowledged this level of profitability in his deposition, estimating that Sycamore's all-in return on Jones Inc. was approximately $250 million *despite having lost the entirety of its investment in RemainCo.*

REDACTED – MOTION TO SEAL PENDING

## ADDITIONAL DISCOVERY IS CERTAIN TO YIELD EVEN
## MORE EVIDENCE OF WRONGDOING

153.    The wrongful conduct alleged above is, on information and belief, just the tip of the iceberg.  The Rule 2004 discovery taken by the Committee to date occurred on a compressed timeline.  Seemingly every day, new facts emerge that strengthen the Committee's claims.  For example, the Committee has only recently discovered that many of the key valuation spreadsheets maintained by Sycamore and others contained hidden worksheets with important data and calculations, and that significant valuation documents Morrow claimed in his deposition never to have seen were in fact emailed to him.

154.    In addition, in light of the compressed timeframe available for discovery, the Committee was unable to depose several important witnesses, including certain Sycamore and KKR officers and other employees with knowledge of the transactions, other current and former officers and directors of RemainCo and the Carve-Out Assets and representatives from Sycamore's LBO advisors.  Further discovery will only strengthen the Committee's claims.

## GROUNDS FOR RELIEF

### COUNT ONE
### Aiding and Abetting Breach of Fiduciary Duty

155.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

156.    Kaluzny and Morrow, as directors of NWHI, owed fiduciary duties of care and loyalty to NWHI and its stakeholders.

157.    The Fund Entities directly or indirectly owned the majority of the equity of NWHI following the LBO.  As majority and controlling shareholders of NWHI, the Fund Entities owed duties of care and loyalty to NWHI and its stakeholders.

REDACTED – MOTION TO SEAL PENDING

158.    As alleged above, NWHI was rendered insolvent by the LBO.  Accordingly, the fiduciary duties owed by Kaluzny, Morrow, and the Fund Entities extended to NWHI's creditors.

159.    Kaluzny, Morrow, and the Fund Entities abdicated and violated their fiduciary duties to NWHI in connection with the Carve-Out Transactions and LBO Debt.  Upon information and belief, neither Kaluzny, Morrow, the Fund Entities nor any other person acting in his or her capacity as a fiduciary for NWHI ever considered the impact of the LBO Debt or the Carve-Out Transactions on NWHI or its creditors.

160.    Indeed, the Committee has identified no resolutions, minutes or record of any kind suggesting that fiduciaries for NWHI ever deliberated, voted on, or considered the fairness or prudence of the Carve-Out Transactions or LBO Debt to or for NWHI at any time.

161.    Rather, Kaluzny, Morrow, and the Fund Entities disregarded their fiduciary duties to NWHI and its creditors entirely, and instead acted solely in the interests of themselves and KKR, designing and consummating the LBO transactions despite the obvious and enormous injury they would inflict on NWHI and its creditors.  Kaluzny, Morrow, and the Fund Entities' abandonment of their obligation to safeguard the interests of NWHI and its creditors constitutes a breach of the duty of care.

162.    Had any non-interested, non-conflicted fiduciary of NWHI ever considered the impact of the Carve-Out Transactions or LBO Debt on NWHI, they could not have approved them, or permitted them to proceed, without violating their fiduciary duties of care and good faith.  Not only did the LBO Debt and Carve-Out Transactions render NWHI deeply insolvent, the vast majority of the proceeds were paid directly to the former shareholders of Jones Inc. and provided no value of any kind to NWHI.  Approving and/or acquiescing in the LBO Debt under these circumstances constituted grossly negligent, reckless or willful misconduct.

163.     Kaluzny, Morrow, and the Fund Entities also plainly breached their duty of loyalty, including their duty to act in good faith, in connection with the LBO.  The interests of these defendants were not aligned with those of NWHI and its residual stakeholders – NWHI's creditors – in connection with the LBO.

164.     Kaluzny and Morrow caused NWHI to incur the LBO Debt and consummate the Carve-Out Transactions in their capacities as directors of Merger Sub and/or NWHI while also serving as principals of the Fund Entities.  In fact, Kaluzny executed the purchase agreements for the Carve-Out Assets on behalf of Jasper Parent, Morrow executed the Carve-Out Asset purchase agreements on behalf of the buyers, and Morrow and Kaluzny caused Jasper Parent to execute shareholder consents effectuating the Carve-Out Transactions by NWHI.  The terms of the Carve-Out Transactions thus failed to reflect the separate and distinct interests of NWHI as seller of the Carve-Out Assets, from those of the Sycamore Affiliates, as the purchasers of the Carve-Out Assets.  The interests of NWHI, and by extension, its creditors, were completely abandoned.

165.     The Carve-Out Transactions yielded hundreds of millions of dollars in profits to Sycamore in the months and years following the LBO through dividends and resale profits.  Through their ownership of and other interests in the Fund Entities, Kaluzny and Morrow likewise personally profited from the Carve-Out Transactions.

166.     By reason of the foregoing actions, Kaluzny, Morrow, and the Fund Entities, acting both individually and collectively, engaged in self-dealing, did not act in good faith, and breached their respective fiduciary duties.

167.     KKR knowingly participated in the breaches of fiduciary duty by Kaluzny, Morrow, and the Fund Entities.

168.    KKR not only partnered with Sycamore in its acquisition of Jones Inc., it served as a trusted advisor and de facto financial and capital markets advisor to Sycamore in connection with the LBO and had multiple business units involved in the process, including KKR Private Equity, KKR Capital Markets, KKR Asset Management, and MCS Capital Markets. These KKR entities successfully underwrote three separate credits and played a significant role in the diligence, structuring and financing of the transaction. KKR's creativity helped fulfill Sycamore's desire to split the company into distinct businesses and finance and capitalize each separately.

169.    In that capacity, KKR knowingly aided and abetted Kaluzny, Morrow, and the Fund Entities' breaches of fiduciary duty alleged herein by, among other things, (i) participating in devising the LBO structure, including the carve out and quick resale of Jones Inc.'s crown jewel assets; (ii) approving artificially low "historical" financial information and going-forward projections for the Carve-Out Assets to justify the low-ball purchase price; (iii) approving "historical" financial information and going-forward projections for RemainCo, including the Sponsor Addbacks, that were used to artificially inflate the value of RemainCo; (iv) disseminating and/or approving the dissemination of false and misleading projections to the public, including to the Lenders, prospective lenders, and rating agencies, (v) assisting in securing debt financing for the LBO, which left RemainCo with an unsustainable debt burden, and (vi) assisting in managing the overall LBO process. These activities were material to the breaches of fiduciary duty committed by Kaluzny, Morrow, and the Fund Entities, and constituted KKR's knowing participation in and facilitation of that wrongful conduct.

170.    KKR knew that the Fund Entities, and by extension Kaluzny and Morrow, would make a considerable profit through the Merger and subsequent Carve-Out Transactions by rendering NWHI insolvent. They knew that, through the LBO, the Fund Entities would earn a

profit at the expense of NWHI and its creditors.  They knew that, these direct financial benefits, rendered Kaluzny, Morrow, and the Fund Entities interested in, and/or lacking independence with respect to, the LBO.  Moreover, KKR also profited from these transactions.

171.    NWHI has been substantially damaged as a direct and proximate result of the actions of KKR in aiding and abetting the breaches of fiduciary duties set forth fully herein.

172.    Accordingly, Plaintiff is entitled to judgment against KKR in an amount to be determined at trial, including, but not limited to, the amount of the harm incurred by NWHI as a result of the LBO, and disgorgement of any payments made to them or from which they benefited that were made in connection with the LBO.

**COUNT TWO**
**Recovery of Avoided Intentional and/or Constructive Fraudulent Transfers**

173.    Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

174.    Plaintiff brings this claim under Section 550(a) of the Bankruptcy Code and the laws of the States of New York, Delaware, and Pennsylvania, as applicable.

175.    On April 8, 2014, NWHI and/or its affiliates transferred to the Sycamore Affiliates (i) Jones Apparel in exchange for $110 million, (ii) Kurt Geiger in exchange for $136 million and (iii) Stuart Weitzman in exchange for $395 million (the "Carve-Out Transfers").

176.    To the extent that the Committee is successful in avoiding the conveyance of the Carve-Out Transfers as intentional and/or constructive fraudulent transfers against Sycamore and the Sycamore Affiliates, the Committee may recover from KKR the full value of the Carve-Out Assets or the proceeds thereof at the time of the LBO, transferred to KKR as an immediate or mediate transferee, plus interest, for the benefit of the NWHI estate.

REDACTED – MOTION TO SEAL PENDING

## COUNT THREE
## Unjust Enrichment

177.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

178.    KKR has unjustly retained cash, credit, and other things of value that rightly belong to NWHI by virtue of its wrongful acts and omissions, and through the wrongful receipt of payments and distributions relating to the LBO.  Retention of those proceeds by KKR violates fundamental principles of justice, equity, and good conscience.

179.    KKR has been unjustly enriched by receiving approximately 10% of the $463 million Sycamore extracted from the Carve-Out Assets through dividends and profit earned through their subsequent sale and the fees it earned in arranging financing for the LBO.

180.    KKR is therefore liable to the Debtors for unjust enrichment.

181.    Plaintiff seeks restitution from KKR and an order of this Court disgorging all payments, transfers, credit, profit, fees, benefits, dividends, incentives, and other things of value obtained by KKR as a result of its wrongful conduct and aiding and abetting the breaches of fiduciary duty by Kaluzny, Morrow, and the Fund Entities.

182.    By virtue of the foregoing, Plaintiff is entitled to a judgment against KKR in the amount of the payments, profits, fees, benefits, incentives, and other compensation they received in connection with the LBO.

## RESERVATION OF RIGHTS

183.    The Committee reserves the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil or Bankruptcy Procedure, or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any third party.

REDACTED – MOTION TO SEAL PENDING

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

(a)    awarding Plaintiff damages in an amount to be determined at trial, including punitive damages;

(b)    recovering for the benefit of the estate all amounts transferred to KKR in connection with the Carve-Out Transactions and LBO;

(c)    imposing a constructive trust on the assets of KKR in the amount of all proceeds received by KKR in connection with the LBO and/or Carve-Out Transactions;

(d)    awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(e)    awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(f)    awarding Plaintiff such other and further relief as the Court deems just and proper.

New York, New York                         KASOWITZ BENSON TORRES LLP
Dated:  October 11, 2018

By: */s/ Howard W. Schub*
      David S. Rosner
      Howard W. Schub
      David J. Mark
      1633 Broadway
      New York, New York 10019
      Telephone: (212) 506-1700
      Facsimile: (212) 506-1800
      drosner@kasowitz.com
      hschub@kasowitz.com
      dmark@kasowitz.com

      *Counsel to the Official Committee of Unsecured Creditors of Nine West Holdings, Inc.*