James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) |  Chapter 11 |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | )  Case No. 18-10947 (SCC) |
| Debtors. | )  (Jointly Administered) |

**NOTICE OF FILING REVISED EXHIBIT TO DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO AN AMENDMENT TO THE TERM DIP FACILITY AND (B) PAY CERTAIN FEES AND EXPENSES**

**PLEASE TAKE NOTICE** that on December 4, 2018, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Enter into an Amendment to the Term DIP Facility and (B) Pay Certain Fees and Expenses* [Docket No. 923] (the "DIP Amendment Motion")[2] with the Court.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a new Exhibit B to the DIP Amendment Motion, which includes a redline showing revisions to the Term DIP Credit Agreement, which exhibit is attached hereto as **Exhibit 1**.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway, New York, New York 10018.

[2]    Capitalized terms used but not otherwise defined herein will have the meaning given to them in the DIP Amendment Motion.

**PLEASE TAKE FURTHER NOTICE** that copies of the DIP Amendment Motion and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Prime Clerk LLC at https://cases.primeclerk.com/ninewest.   You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated:  December 7, 2018

*/s/ Joseph M. Graham*
James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## <u>Exhibit 1</u>

**New Exhibit B to DIP Amendment Motion**

## AMENDMENT NO. 7 TO SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT

This **AMENDMENT NO. 7 TO SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** ("**Amendment**") is dated effective as of [_], 2018, by and among Nine West Holdings, Inc., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Company**"), Jasper Parent LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Holdings**"), Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, including any successor thereto, the "**Administrative Agent**") under the Loan Documents, and each Lender party hereto.

### W I T N E S S E T H :

WHEREAS, the Company, Holdings, the Administrative Agent, and the Lenders are parties to that certain Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement dated as of April 11, 2018 (as amended by that certain Amendment No. 1 to the Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement dated as of May 23, 2018, that certain Amendment No. 2 to the Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement dated as of June 7, 2018, that certain Amendment No. 3 to the Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement dated as of June 26, 2018, that certain Amendment No. 4 to the Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement dated as of August 22, 2018, that certain Amendment No. 5 to the Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement dated as of September 6, 2018 and that certain Amendment No. 6 to the Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement dated as of October 9, 2018, the "**Credit Agreement**");

WHEREAS, the Company has requested that certain Lenders party to the Credit Agreement provide commitments to make additional Loans in an aggregate principal amount of $22,000,000 (the "**Additional Loan Commitments**");

WHEREAS, the Company has requested that the Administrative Agent and the Lenders amend the Credit Agreement as set forth in Section 2 below; and

WHEREAS, subject to the terms hereof and the conditions set forth herein and the Amended Credit Agreement (as defined below), the Administrative Agent and the Lenders are willing to provide Additional Loan Commitments to the Borrower and to agree to certain amendments to the Credit Agreement as set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the parties to this Amendment hereby agree as follows:

SECTION 1.    <u>Definitions/References Generally</u>.  Except as otherwise defined in this Amendment, including the recitals hereto, terms defined in the Amended Credit Agreement are used herein as defined therein.  This Amendment shall constitute a Loan Document for all purposes of the Amended Credit Agreement and the other Loan Documents.  References in the Credit Agreement (including references to the Amended Credit Agreement) to "this Agreement"

(and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Amended Credit Agreement.

SECTION 2.  Amendments.   Subject to the satisfaction of the conditions precedent specified in Section 5 hereof, but effective as of the Amendment Effective Date, the Credit Agreement shall be amended to delete the stricken text (indicated textually in the same manner as the following example: stricken text) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages of the Credit Agreement attached as Exhibit A hereto (the Credit Agreement, as so amended pursuant to this Section 2, being referred to as the "**Amended Credit Agreement**").

SECTION 3.   Representations and Warranties.   Each Loan Party represents and warrants to the Lenders and the Administrative Agent that (a) the representations and warranties of the Borrower and each other Loan Party contained in Article V of the Amended Credit Agreement or any other Loan Document are true and correct in all material respects on and as of the date hereof (provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date), and as if each reference in said Article V of the Amended Credit Agreement or any other Loan Document to "this Agreement" included a reference to this Amendment (it being agreed that it shall be deemed to be an Event of Default under the Amended Credit Agreement if any of the foregoing representations and warranties shall prove to have been incorrect in any material respect when made), and (b) no Default or Event of Default has occurred and is continuing.

SECTION 4.  Fees.  The Borrower shall pay on the Amendment Effective Date:

(a) to the Administrative Agent for the account of each Lender according to its Pro Rata Share (determined as of the date hereof) with respect to the Loans outstanding on the Amendment Effective Date (prior to giving effect to this Amendment and excluding, for the avoidance of doubt, any Additional Loans) an amendment fee in an amount equal to 1.90% of the aggregate Loans outstanding on the Amendment Effective Date (prior to giving effect to this Amendment and excluding, for the avoidance of doubt, any Additional Loans) (the "**Amendment and Extension Fee**"); and

(b) to the Administrative Agent for the account of each Lender with an Additional Loan Commitment according to its Pro Rata Share (determined as of the Amendment Effective Date) with respect to the Additional Loan Commitments as of the Amendment Effective Date, an upfront fee in an amount equal to 3.00% of the aggregate amount of the Additional Loan Commitments as of the Amendment Effective Date (the "**Additional Loan Upfront Fee**").

SECTION 5.  Conditions Precedent.  The amendments set forth in Section 2 hereof shall become effective on the date on which the following conditions have been satisfied (such date, the "**Amendment Effective Date**"):

(a) the Administrative Agent having received originals, facsimiles or copies in .pdf format unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel:

    i. counterparts of this Amendment executed by the Borrower, the Guarantors, all Lenders party to the Credit Agreement, and the Administrative Agent;

    ii. a certificate signed by a Responsible Officer of the Borrower (x) attaching thereto a certified copy of an amendment to the ABL DIP Credit Agreement to amend the definition of "Scheduled Termination Date" therein to a date that is no earlier than March 31, 2019 and permit the Additional Loan Commitments and the Additional Loans, (y) certifying that no default or event of default under the ABL DIP Credit Agreement has occurred and is continuing and that the ABL Credit Agreement is in full force and effect and (z) certifying that the conditions specified in this Section 5 have been satisfied;

    iii. an updated Approved Budget acceptable to the Lenders; and

    iv. an opinion from Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters reasonably requested by Administrative Agent.

(b) prior to December 19, 2018, entry of an order (the "**Additional Loans Order**") of the Court in the Chapter 11 Cases acceptable to the Required Lenders, which order shall approve and authorize the Debtors to enter into and execute this Amendment and provide, among other things, that the Additional Loans shall constitute Term DIP Loans, this Amendment shall constitute a DIP Document, and the Obligations under the Amended Credit Agreement shall constitute Term DIP Obligations and benefit from the Term DIP Liens and the DIP Superpriority Claims, all as provided in the Final Order;

(c) payment to the applicable party of (i) the Amendment and Extension Fee and (ii) the Additional Loan Upfront Fee;

(d) the representations and warranties of the Borrower and each other Loan Party contained in Section 3 or any other Loan Document shall be true and correct in all material respects on and as of the Amendment Effective Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all

material respects as of such earlier date; *provided*, *further*, that, any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(e) no Default or Event of Default shall exist, or would result from any Borrowing of Additional Loans on the Amendment Effective Date or from the application of the proceeds thereof; and

(f) any Borrowing of Additional Loans on the Amendment Effective Date shall be for purposes and in amounts consistent with the Approved Budget (subject to the permitted variance) and the RSA.

Without limiting the generality of the provisions of the last paragraph of Section 9.03 of the Amended Credit Agreement, for purposes of determining compliance with the conditions specified in this Section 5, each Lender that has signed this Amendment shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Seventh Amendment Effective Date specifying its objection thereto.

SECTION 6. <u>Confirmation of Collateral Documents</u>.    Each Loan Party (a) confirms its obligations under the Collateral Documents, (b) confirms that its obligations under the Amended Credit Agreement are entitled to the benefits of the pledges and guarantees, as applicable, set forth in the Collateral Documents, (c) confirms that its obligations under the Amended Credit Agreement and including any debts, liabilities and other Obligations with respect to fees, interest and principal under the Additional Loans constitute "Secured Obligations" (as defined in the Security Agreement) and (d) agrees that the Amended Credit Agreement is the Credit Agreement under and for all purposes of the Collateral Documents. Each Loan Party, by its execution of this Amendment, hereby confirms that the Secured Obligations shall remain in full force and effect, and such Secured Obligations shall continue to be entitled to the benefits of the grant set forth in the Collateral Documents.

SECTION 8. <u>Lender Authorization and Direction</u>.   By their execution of this Amendment, each of the Lenders party hereto hereby authorizes and directs the Administrative Agent to execute this Amendment.

SECTION 9. <u>Miscellaneous</u>.   This Amendment shall be limited as written and nothing herein shall be deemed to constitute a waiver of any other term, provision or condition of the Credit Agreement or any other Loan Document in any other instance than as set forth herein or prejudice any right or remedy that the Administrative Agent or any Lender may have or may in the future have under the Credit Agreement or any other Loan Document.  Except as herein provided, the Credit Agreement and the other Loan Documents shall remain unchanged and in full force and effect.  This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Amendment by telecopy or other electronic imaging (including in .pdf format) means shall be as effective as delivery of a manually executed counterpart of this

Amendment.  Sections 10.15 and 10.16 of the Credit Agreement shall apply to this Amendment and shall be incorporated by reference.

[*Siganture pages follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

**NINE WEST HOLDINGS, INC.**, as Borrower

By: _____
    Name:
    Title:

**JASPER PARENT LLC**, as a Guarantor,

By: _____
    Name:
    Title:

**KASPER GROUP LLC**, as a Guarantor

By: _____
    Name:
    Title:

**ONE JEANSWEAR GROUP INC.**, as a Guarantor

By: _____
    Name:
    Title:

**KASPER U.S. BLOCKER LLC**, as a Guarantor

By: _____
    Name:
    Title:

**NINE WEST MANAGEMENT
SERVICE LLC**, as a Guarantor

By: _____
      Name:
      Title:

**NINE WEST DISTRIBUTION LLC**,
as a Guarantor

By: _____
      Name:
      Title:

**NINE WEST DEVELOPMENT LLC**,
as a Guarantor

By: _____
      Name:
      Title:

**NINE WEST JEANSWEAR HOLDING
LLC**, as a Guarantor

By: _____
      Name:
      Title:

**NINE WEST APPAREL HOLDING
LLC**, as a Guarantor

By: _____
      Name:
      Title:

**US KIC TOP HAT LLC**, as a Guarantor

By: _____

Name:

Title:

**CORTLAND CAPITAL MARKET SERVICES LLC**, as Administrative Agent,

By: _____

     Name:

     Title:

[_____], as a Lender,

By:  _____
Name:
Title:

[_____], as a Lender,

By:    _____
        Name:
        Title:

Exhibit A

EXHIBIT A

SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT
AGREEMENT

Dated as of April 11, 2018

among

NINE WEST HOLDINGS, INC.,
as debtor and debtor-in-possession
under Chapter 11 of the Bankruptcy Code,
as the Borrower,

JASPER PARENT LLC,
as Holdings,

CORTLAND CAPITAL MARKET SERVICES LLC,
as Administrative Agent,

and

THE LENDERS PARTY HERETO

# Table of Contents

Page

ARTICLE I Definitions and Accounting Terms ................................................................2

    SECTION 1.01 Defined Terms ........................................................................2

    SECTION 1.02 Other Interpretive Provisions ...........................................33

    SECTION 1.03 Accounting Terms ..............................................................34

    SECTION 1.04 Rounding .............................................................................34

    SECTION 1.05 References to Agreements, Laws, Etc ..............................34

    SECTION 1.06 Times of Day ......................................................................34

    SECTION 1.07 [Reserved ............................................................................34

    SECTION 1.08 [Reserved] ...........................................................................34

    SECTION 1.09 Currency Equivalents Generally .......................................34

ARTICLE II The Commitments and Borrowings ...........................................................35

    SECTION 2.01 The Loans ...........................................................................35

    SECTION 2.02 Borrowings of Loans .........................................................35

    SECTION 2.03 Prepayments .......................................................................36

    SECTION 2.04 Termination or Reduction of Commitments ....................37

    SECTION 2.05 Repayment of Loans ..........................................................37

    SECTION 2.06 Interest .................................................................................37

    SECTION 2.07 Fees .....................................................................................38

    SECTION 2.08 Computation of Interest and Fees ....................................38

    SECTION 2.09 Evidence of Indebtedness ..................................................38

    SECTION 2.10 Payments Generally ...........................................................39

    SECTION 2.11 Sharing of Payments, Etc. .................................................40

    SECTION 2.12 Priority and Liens ..............................................................40

    SECTION 2.13 Release .................................................................................41

ARTICLE III | Taxes, Increased Costs Protection and Illegality ................................41

    SECTION 3.01 Taxes ...................................................................................41

    SECTION 3.02 [Reserved] ...........................................................................47

    SECTION 3.03 [Reserved] ...........................................................................47

    SECTION 3.04 Increased Cost and Reduced Return; Capital Adequacy; Reserves
           on Loans .............................................................................47

#91466261v7

SECTION 3.05 [Reserved] ...........................................................................................48

SECTION 3.06 Designation of a Different Lending Office ........................................48

SECTION 3.07 Replacement of Lenders under Certain Circumstances ...........................48

SECTION 3.08 Survival ...............................................................................................49

ARTICLE IV Conditions Precedent to Borrowings ............................................................50

SECTION 4.01 Conditions to Closing Date Borrowing ............................................50

SECTION 4.02 Conditions to Delayed Draw Borrowing .........................................53

ARTICLE V Representations and Warranties ....................................................................54

SECTION 5.01 Existence, Qualification and Power; Compliance with Laws .................54

SECTION 5.02 Authorization; No Contravention ...................................................55

SECTION 5.03 Governmental Authorization ..........................................................55

SECTION 5.04 Binding Effect ...................................................................................55

SECTION 5.05 Financial Statements; No Material Adverse Effect ..........................56

SECTION 5.06 Litigation ..........................................................................................56

SECTION 5.07 Labor Matters ...................................................................................56

SECTION 5.08 Ownership of Property; Liens ..........................................................56

SECTION 5.09 Environmental Matters .....................................................................57

SECTION 5.10 Taxes .................................................................................................57

SECTION 5.11 ERISA Compliance ...........................................................................57

SECTION 5.12 Subsidiaries .......................................................................................58

SECTION 5.13 Margin Regulations; Investment Company Act ................................58

SECTION 5.14 Disclosure ..........................................................................................58

SECTION 5.15 Intellectual Property; Licenses, Etc .................................................59

SECTION 5.16 [Reserved] ..........................................................................................59

SECTION 5.17 [Reserved] ..........................................................................................59

SECTION 5.18 USA PATRIOT Act, OFAC, Etc. .....................................................59

SECTION 5.19 Collateral Documents ........................................................................60

SECTION 5.20 No Default ..........................................................................................60

SECTION 5.21 Insurance ............................................................................................60

SECTION 5.22 No Casualty .......................................................................................60

SECTION 5.23 Approved Budget ...............................................................................60

SECTION 5.24 Chapter 11 Cases; Orders. ................................................................60

#91466261v7

SECTION 5.25 Business and Property of the Loan Parties...............................................61

ARTICLE VI Affirmative Covenants.................................................................................61

SECTION 6.01 Financial Statements .................................................................62

SECTION 6.02 Certificates; Other Information ................................................63

SECTION 6.03 Notices ......................................................................................64

SECTION 6.04 Payment of Obligations.............................................................65

SECTION 6.05 Preservation of Existence, Etc .................................................66

SECTION 6.06 Maintenance of Properties.........................................................66

SECTION 6.07 Maintenance of Insurance .........................................................66

SECTION 6.08 Compliance with Laws ..............................................................66

SECTION 6.09 Books and Records....................................................................67

SECTION 6.10 Inspection Rights.......................................................................67

SECTION 6.11 Covenant to Guarantee Obligations and Give Security ............67

SECTION 6.12 Compliance with Environmental Laws ......................................68

SECTION 6.13 Further Assurances....................................................................69

SECTION 6.14 Approved Budget.......................................................................69

SECTION 6.15 [Reserved].................................................................................71

SECTION 6.16 Milestones .................................................................................71

SECTION 6.17 Restructuring Advisor; Cooperation with Restructuring Advisor. ...........72

SECTION 6.18 Investment Bankers; Cooperation with Investment Bankers....................72

SECTION 6.19 Advisors. ...................................................................................73

SECTION 6.20 Debtor-In-Possession Obligations.............................................74

SECTION 6.21 Status of Sale.............................................................................74

SECTION 6.22 Lender Calls. .............................................................................74

SECTION 6.23 Post-Closing Matters.................................................................74

ARTICLE VII Negative Covenants.................................................................................75

SECTION 7.01 Liens ..........................................................................................75

SECTION 7.02 Investments ...............................................................................79

SECTION 7.03 Indebtedness ..............................................................................80

SECTION 7.04 Fundamental Changes ...............................................................83

SECTION 7.05 Dispositions ...............................................................................83

SECTION 7.06 Restricted Payments ..................................................................85

iii

SECTION 7.07 Change in Nature of Business ................................................86

SECTION 7.08 Transactions with Affiliates ................................................86

SECTION 7.09 Burdensome Agreements ................................................87

SECTION 7.10 Use of Proceeds ................................................88

SECTION 7.11 Accounting Changes ................................................89

SECTION 7.12 Prepayments, Etc. of Indebtedness ................................................89

SECTION 7.13 Holdings ................................................90

SECTION 7.14 Liquidity ................................................90

SECTION 7.15 Orders ................................................90

SECTION 7.16 Repayment of Indebtedness ................................................90

SECTION 7.17 Reclamation Claims ................................................90

SECTION 7.18 Insolvency Proceeding Claims ................................................91

SECTION 7.19 Bankruptcy Actions ................................................91

SECTION 7.20 Subrogation ................................................91

ARTICLE VIII Events of Default and Remedies ................................................91

SECTION 8.01 Events of Default ................................................91

SECTION 8.02 Remedies upon Event of Default ................................................98

SECTION 8.03 Application of Funds ................................................99

ARTICLE IX Administrative Agent ................................................100

SECTION 9.01 Appointment and Authority of the Administrative Agent ................................................100

SECTION 9.02 Rights as a Lender ................................................101

SECTION 9.03 Exculpatory Provisions ................................................101

SECTION 9.04 Reliance by the Administrative Agent ................................................102

SECTION 9.05 Delegation of Duties ................................................103

SECTION 9.06 Non-Reliance on Administrative Agent and Other Lenders;
Disclosure of Information by Administrative Agent ................................................103

SECTION 9.07 Indemnification of Administrative Agent and Agent-Related
Persons ................................................103

SECTION 9.08 No Reliance, Etc ................................................104

SECTION 9.09 Resignation or Removal of Administrative Agent ................................................104

SECTION 9.10 [Reserved] ................................................105

SECTION 9.11 Collateral and Guaranty Matters ................................................105

SECTION 9.12 [Reserved] ................................................106

iv

SECTION 9.13 Conflicts ........................................................................................106

ARTICLE X Miscellaneous .....................................................................................106

SECTION 10.01 Amendments, Etc .........................................................................106

SECTION 10.02 Notices and Other Communications; Facsimile Copies .......................108

SECTION 10.03 No Waiver; Cumulative Remedies ..................................................110

SECTION 10.04 Attorney Costs and Expenses ........................................................111

SECTION 10.05 Indemnification by the Borrower ....................................................112

SECTION 10.06 Marshaling; Payments Set Aside ....................................................113

SECTION 10.07 Successors and Assigns ................................................................114

SECTION 10.08 Confidentiality .............................................................................118

SECTION 10.09 Right of Setoff .............................................................................119

SECTION 10.10 Interest Rate Limitation ................................................................119

SECTION 10.11 Counterparts; Integration; Effectiveness .........................................119

SECTION 10.12 Electronic Execution of Assignments and Certain Other
        Documents ....................................................................................120

SECTION 10.13 Survival of Representations and Warranties ......................................120

SECTION 10.14 Severability .................................................................................120

SECTION 10.15 GOVERNING LAW .......................................................................120

SECTION 10.16 WAIVER OF RIGHT TO TRIAL BY JURY ...........................................121

SECTION 10.17 Binding Effect .............................................................................121

SECTION 10.18 Judgment Currency .......................................................................121

SECTION 10.19 Lender Action ..............................................................................122

SECTION 10.20 Use of Name, Logo, etc. ...............................................................122

SECTION 10.21 USA PATRIOT Act Notice ..............................................................122

SECTION 10.22 Service of Process ........................................................................123

SECTION 10.23 No Advisory or Fiduciary Responsibility ..........................................123

SECTION 10.24 Acknowledgement and Consent to Bail-In of EEA Financial
        Institutions ...................................................................................123

#91466261v7

SCHEDULES

| | |
|---|---|
| I | Guarantors |
| II | Approved Budget |
| III | Material Properties |
| 1.01A | Certain Security Interests and Guarantees |
| 1.01B | Excluded Subsidiaries |
| 2.01 | Commitment |
| 5.08(b)(1) | Owned Real Property |
| 5.08(b)(2) | Leased Real Property |
| 5.11(a) | ERISA Compliance |
| 5.12 | Subsidiaries and Other Equity Investments |
| 6.23 | Post-Closing Matters |
| 7.01(b) | Existing Liens |
| 7.02(c) | Canadian Investments |
| 7.02(f) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.08 | Transactions with Affiliates |
| 7.09 | Existing Restrictions |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | DIP Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Guaranty |
| F | Security Agreement |
| G | Closing Checklist |
| H | [Reserved] |
| I | Non-Bank Certificates |
| J | Intercompany Subordination Agreement |
| K | Perfection Certificate |
| L | Interim Order |

#91466261v7

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
## TERM LOAN CREDIT AGREEMENT

This SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT ("**Agreement**") is entered into as of April 11, 2018, among NINE WEST HOLDINGS, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**" or the "**Company**"), JASPER PARENT LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Holdings**"), CORTLAND CAPITAL MARKET SERVICES LLC ("**Cortland**"), as administrative agent and collateral agent (in such capacities, including any successor thereto, the "**Administrative Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

PRELIMINARY STATEMENTS

WHEREAS, on April 6, 2018 (the "**Petition Date**"), (i) the Borrower, (ii) Holdings, (iii) Kasper Group LLC, a Delaware limited liability company, (iv) One Jeanswear Group, Inc., a New York corporation, (v) Nine West Management Service LLC, a Delaware limited liability company, (vi) Nine West Distribution LLC, a Delaware limited liability company, (vii) Nine West Development LLC, a Delaware limited liability company, (viii) Nine West Jeanswear Holding LLC, a Delaware limited liability company, (ix) Nine West Apparel Holdings LLC, a Delaware limited liability company, (x) Kasper U.S. Blocker LLC, a Delaware limited liability company, and (xi) US KIC Top Hat LLC, a Delaware limited liability company ((i) through (xi) collectively, the "**Debtors**" and each individually, a "**Debtor**"), commenced Chapter 11 Case Nos. 18-10947 through 18-10951, 18-10953 through 18-10954 and 18-10956 through 18-10959, as administratively consolidated at Chapter 11 Case No. 18-10947 (collectively, the "**Chapter 11 Cases**" and each individually, a "**Chapter 11 Case**") with the United States Bankruptcy Court for the Southern District of New York (the "**Court**").  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Lenders provided financing to the Borrower pursuant to that certain Term Loan Credit Agreement, dated as of April 8, 2014, by and among the Borrower, Holdings, Cortland as the successor to Morgan Stanley Senior Funding Inc., as administrative agent, and the lenders party thereto, and the other parties party thereto (the "**Prepetition Secured Term Loan Agreement**");

WHEREAS, the Borrower has requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrower, a secured, superpriority debtor-in-possession term loan facility in the maximum principal amount of $50,000,000 in the aggregate (and, on the Seventh Amendment Effective Date, an additional loan in an aggregate principal amount of up to $22,000,000 (collectively, the "**Term DIP Facility**"). The Loans under the Term DIP Facility will be made for purposes set forth in <u>Section 7.10</u>;

WHEREAS, the Borrower and each Guarantor have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property (subject to the limitations contained in the Loan Documents and the Orders (as hereinafter defined));

WHEREAS, the Borrower's and each Guarantor's business is a mutual and collective enterprise and the Borrower and the Guarantors believe that the Loan and other financial accommodations to the Borrower under this Agreement will enhance the aggregate borrowing powers of the Borrower and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Borrower and Guarantors;

WHEREAS, the Borrower and each Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in the Agreement;

WHEREAS, the Lenders' willingness to extend financial accommodations to the Borrower as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrower and the Guarantors and at the Borrower's and the Guarantors' request and in furtherance of the Borrower's and the Guarantors' mutual and collective enterprise; and

In consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

## ARTICLE I

## Definitions and Accounting Terms

SECTION 1.01 <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL DIP Administrative Agent**" means Wells Fargo Bank, National Association in its capacity as administrative agent and collateral agent under the ABL DIP Loan Documents, or any successor administrative agent and collateral agent under the ABL DIP Loan Documents.

"**ABL DIP Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of the date hereof, among the Borrower, Holdings, the other borrowers party thereto, the lenders party thereto and ABL DIP Administrative Agent, as in effect on the Closing Date and as the same may be amended from time to time in accordance with the Interim Order or Final Order (as applicable), provided that the prior written consent of the Administrative Agent (at the direction of the Required Lenders) shall be required with respect to any amendments which (i) add any scheduled amortization or require payments of principal in addition to those set forth in the ABL DIP Credit Agreement as in effect on the Closing Date, (ii) shorten the final stated maturity of the revolving loans under

the ABL DIP Credit Agreement earlier than the Scheduled Termination Date, (iii) add additional financial covenants or make any financial covenants in existence on the Closing Date more restrictive, (iv) add additional conditions to funding of the term loans under the ABL DIP Credit Agreement, (v) impose limitations, directly or indirectly, on the payment of the Loans beyond those in effect on the Closing Date, (vi) increase the Revolving Credit Commitments (as defined therein) or the FILO Commitments (as defined therein), (vii) increase the fees payable thereunder or (viii) take any liens or security interests in assets of any Loan Party except as contemplated by the Loan Documents and the Orders or otherwise adversely affect the rights of the Administrative Agent or the Secured Parties with respect to the Collateral.

"**ABL DIP Facility**" means the asset-based revolving credit facilities under the ABL DIP Credit Agreement.

"**ABL DIP Loan Documents**" means the ABL DIP Credit Agreement and the other "Loan Documents" as defined in the ABL DIP Credit Agreement.

"**ABL DIP Obligations**" means "Obligations" as defined in the ABL DIP Credit Agreement.

"**ABL DIP Secured Bank Product Agreement**" means any "Secured Bank Product Agreement under and as defined in the ABL DIP Credit Agreement.

"**ABL DIP Secured Cash Management Agreement**" means any "Secured Cash Management Agreement" under and as defined in the ABL DIP Credit Agreement.

"**ABL DIP Secured Hedge Agreement**" means any "Secured Hedge Agreement" under and as defined in the ABL DIP Credit Agreement.

"**Acceptable Confirmation Order**" means an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion).

"**Acceptable Disclosure Statement**" means the disclosure statement relating to the Acceptable Plan in all material respects consistent with the RSA as in effect as of the Closing Date and otherwise satisfactory to the Required Lenders in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders in their reasonable discretion).

"**Acceptable Disclosure Statement Approval Order**" means an order of the Bankruptcy Court approving the Acceptable Disclosure Statement, in form and substance reasonably satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof so long as such amendment, supplement, or modification is reasonably satisfactory to the Required Lenders).

"**Acceptable Plan**" means a plan of reorganization for each of the Chapter 11 Cases that provides for the payment of the Obligations in full in cash on the effective date of such plan and that contains customary releases and exculpations in favor of the Administrative

Agent and the Lenders (in their respective capacities as such) that are satisfactory to the Required Lenders in their reasonable discretion.

"**Actual Cash Receipts**" means the sum of all cash receipts received by the Loan Parties (excluding any borrowings under this Agreement or the ABL DIP Credit Agreement) during the relevant period of determination which corresponds to the budgeted cash receipts described in the line item contained in the Approved Budget under the heading "Total Receipts", as determined in a manner consistent with the Approved Budget.

"**Actual Disbursement Amount**" means the sum of all cash expenditures (excluding the line item titled "Prepetition Relief" under the heading "Total Operating Disbursements" contained in the Approved Budget) made by the Loan Parties during the relevant period of determination which corresponds to each of the budgeted cash expenditures (other than "Prepetition Relief") described in the line items contained in the Approved Budget under the heading "Total Operating Disbursements" determined in a manner consistent with the Approved Budget.

"**Actual Net Operating Cash Flow Amount**" means the actual net operating cash flow (excluding, for the avoidance of doubt, professional fees) of the Loan Parties during the relevant period of determination which corresponds to the line item contained in the Approved Budget under the heading "Net Operating Cash Flow" determined in a manner consistent with the Approved Budget.

"**Actual Net Cash Flow Amount**" means the actual net cash flow (including, for the avoidance of doubt, professional fees) of the Loan Parties during the relevant period of determination which corresponds to the line item contained in the Approved Budget under the heading "Net Cash Flow" determined in a manner consistent with the Approved Budget.

"**Actual Prepetition Relief Amount**" means the actual expenditures in respect of prepetition obligations by the Loan Parties during the relevant period of determination which corresponds to the line item contained in the Approved Budget under the heading "Prepetition Relief" determined in a manner consistent with the Approved Budget.

"**Additional Loan Commitment**" means, as to each Lender, its obligation to make a Loan to the Borrower hereunder, expressed as an amount representing the maximum principal amount of the Additional Loans to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The initial amount of each Lender's Additional Loan Commitment is set forth on Schedule 2.01 under the caption "Additional Loan Commitment" or, otherwise, in the Assignment and Assumption, pursuant to which such Lender shall have assumed its Commitment, as the case may be. As of the Seventh Amendment Effective Date, the aggregate amount of the Additional Loan Commitment is $22,000,000.

"**Additional Loan**" has the meaning specified in section 2.01(iii).

"**Additional Loans Order**" has the meaning specified the Seventh Amendment.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Administrative Agent Fee Letter**" means that certain fee letter dated as of April 11, 2018 between the Administrative Agent and the Borrower.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. For the avoidance of doubt, neither the Administrative Agent nor any of its affiliates shall be deemed to be an Affiliate of Holdings, the Borrower or any of their respective Subsidiaries.

"**Agent Parties**" has the meaning specified in Section 10.02(d).

"**Agent-Related Persons**" means the Administrative Agent, together with its Affiliates, and the officers, directors, employees, agents, attorneys-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"**Aggregate Commitments**" means, at any time, the Commitments of all the Lenders. As of the Closing Date, the Aggregate Commitments are $50,000,000 at such time.

"**Agreement**" means this Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, as amended, restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.18.

"**Applicable Rate**" means a percentage per annum equal to ten percent (10.00%).

"**Approved Budget**" means the budget prepared by the Borrower in the form of Schedule II and initially furnished to the Administrative Agent on the Closing Date and which is approved by, and in form and substance satisfactory to, the Required Lenders in their reasonable discretion, as the same may be updated, modified or supplemented from time to time as provided in Section 6.14.

"**Approved Budget Variance Report**" means a weekly report provided by the Borrower to the Administrative Agent (i) showing, in each case, by line item the Actual Cash Receipts, the Actual Disbursement Amount, the Actual Net Operating Cash Flow Amount, the Actual Net Cash Flow Amount, and the Actual Prepetition Relief Amount, Excess Availability and total available liquidity for the last day of the Prior Week and the Cumulative Four-Week Period (or, solely in the case of the Actual Prepetition Relief Amount, for the Cumulative

#9166261v7

Period), noting therein all variances, on a line-item and cumulative basis, from the amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrower. The Approved Budget Variance Report shall be in a form, and shall contain supporting information, satisfactory to the Required Lenders in their reasonable discretion.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Asset Sale Proceeds Pledged Account**" means a segregated deposit account furnished by a depository bank acceptable to the Administrative Agent and subject to the sole dominion and control of the Administrative Agent, into which solely the cash proceeds from any Disposition of Term Priority Collateral are deposited.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of <u>Exhibit D</u> or any other form approved by the Administrative Agent.

"**Attorney Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Automatic Stay**" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. Section 101 et seq.) as now or hereafter in effect, or any successor thereto.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"**Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

#9146626lv7

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrowing**" means a borrowing consisting of Loans made on the same date.

"**Budgeted Cash Receipts**" means the line item contained in the Approved Budget under the heading "Total Receipts" during the relevant period of determination

"**Budgeted Disbursement Amount**" means the expenditures described in the line items (other than the line item titled "Prepetition Relief") contained in the Approved Budget under the heading "Total Operating Disbursements" during the relevant period of determination.

"**Budgeted Net Cash Flow Amount**" means the expenditures described in the line items contained in the Approved Budget under the heading "Net Cash Flow" during the relevant period of determination.

"**Budgeted Net Operating Cash Flow Amount**" means the line item contained in the Approved Budget under the heading "Net Operating Cash Flow" during the relevant period of determination.

"**Budgeted Prepetition Relief Amount**" means the expenditures described in the line items contained in the Approved Budget under the heading "Prepetition Relief" during the relevant period of determination.

"**Business**" means the business of designing, manufacturing, procuring, marketing, licensing, selling (including through retail and outlet stores, concessions and e-commerce sites) and distributing contemporary apparel, footwear, and jeanswear products and related accessories (including jewelry and handbags) or any other business reasonably related to the foregoing.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the jurisdiction where the Administrative Agent's Office with respect to Obligations is located.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carve-Out**" has the meaning assigned to the term "Carve Out" in the Interim Order (or Final Order, when applicable).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)    Dollars;

(b)    in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business and not for speculation;

(c)    readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000;

(e)    repurchase obligations for underlying securities of the types described in clauses (c) and (d) above or clause (g) below entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)    commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of creation thereof;

(g)    marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

(i)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); and

(j)    investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (i) above.

#9146626lv7

In the case of Investments by any Foreign Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (j) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (j) and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, *provided* that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Cash Management Services**" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit card processing, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173), and all Laws relating thereto and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means the earliest to occur of:

(a) the Permitted Holders ceasing to be the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Securities Exchange Act of 1934), of more than 50% of the outstanding economic and voting Equity Interests of Holdings; or

(b) any "Change of Control" (or any comparable term) in any document pertaining to the ABL DIP Facility or any other Post-Petition Material Indebtedness of the Loan Parties; or

#9146261v7

(c)    except pursuant to a transaction permitted hereunder, Holdings ceases to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting Equity Interests of the Borrower and each Subsidiary Guarantor (other than transactions permitted under the Final Order).

Notwithstanding the foregoing, the transactions contemplated by the RSA, including the Sale, shall not constitute a "Change of Control" hereunder.

"**Chapter 11 Cases**" has the meaning specified in the preamble hereto.

"**Closing Checklist**" means the closing checklist attached hereto as Exhibit G.

"**Closing Date**" means April 11, 2018.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Co-Investors**" means any of KKR Asset Management LLC and certain of its Affiliates, on their own behalf or on behalf of certain of their managed accounts, in their capacities as holders of Equity Interests of Holdings (or any of the direct or indirect parent companies of Holdings).

"**Collateral**" means (i) all the "Collateral" (or equivalent term) as defined in any Collateral Document, and (ii) the "Collateral" as referred to in the Orders, it being understood that "Collateral" shall include (x) all such "Collateral" irrespective of whether any such property was excluded pursuant to the Prepetition Loan Documents, (y) the "Prepetition Collateral" as defined the Orders and (z) the "DIP Collateral" as defined in the Orders; provided that, for the avoidance of doubt, the DIP Term Loan Proceeds Account and the Asset Sale Proceeds Pledged Account constitute Collateral.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(iv) or pursuant to Section 6.11 or Section 6.13 at such time, duly executed by each Loan Party party thereto;

(b)    subject to the Orders, all Obligations shall have been unconditionally guaranteed by Holdings, each Subsidiary of the Borrower that is not an Excluded Subsidiary, including those that are listed on Schedule I hereto (each, a "**Guarantor**"), and any Subsidiary of the Borrower that Guarantees any Prepetition Debt or any Indebtedness incurred by the Borrower pursuant to the ABL DIP Facility (or is a co-borrower with the Borrower thereunder) shall be a Guarantor hereunder;

(c)    subject to the Orders, the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment), the Obligations and the Guaranty shall have been secured by a perfected first-priority security interest (subject to non-consensual Liens permitted by Section 7.01) in (i) all the Equity Interests of the Borrower, (ii) all Equity Interests

#9146261v7

of each direct, Wholly-Owned Subsidiary (other than an Excluded Subsidiary) that is directly owned by the Borrower or any Subsidiary Guarantor and (iii) 65% of the issued and outstanding Equity Interests of (A) each Wholly-Owned Domestic Subsidiary substantially all of the assets of which constitute the Equity Interests in one or more Foreign Subsidiaries and (B) each wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor; and

(d)       except to the extent otherwise provided hereunder and subject to the Orders, the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment), including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected first-priority security interest in substantially all other tangible and intangible personal property of the Borrower and each Guarantor (excluding Excluded Assets, but including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, and proceeds of the foregoing, including for the avoidance of doubt, all Unencumbered Property together with all proceeds thereof ), in each case, with the priority required by the Collateral Documents, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents; *provided* that any such security interests in the Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment) and the Orders.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, collateral assignments, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Sections 4.01(a)(iv), 6.11 or 6.13, the Guaranty, the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment) and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" means, collectively, the Initial Commitment ~~and~~, the Delayed Draw Commitment and the Additional Loan Commitment.  As of the Closing Date, the aggregate principal amount of all Initial Commitments and all Delayed Draw Commitments was $50,000,000 and as of the Seventh Amendment Effective Date, the amount of all Additional Loan Commitments is $~~50,000,000~~22,000,000.

"**Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"**Committed Loan Notice**" means a notice of a Borrowing, which shall be substantially in the form of Exhibit A.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Company**" has the meaning specified in the introductory paragraph to this Agreement.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Responsible Officer certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto.

"**Constituent Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Cortland**" means Cortland Capital Market Services LLC and its successors and assigns.

"**Court**" has the meaning specified in the preamble hereto.

"**Cumulative Four-Week Period**" means the four-week period up to and through the Saturday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"**Cumulative Period**" means the period from the Closing Date up to and through the Saturday of the most recent week then ended.

"**Current Asset Collateral**" means all the "ABL Priority Collateral" as defined in the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment).

"**Debtor**" has the meaning specified in the preamble hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

#9146661v7

receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to the Applicable Rate plus 2.0% per annum, to the fullest extent permitted by applicable Laws.

"**Delayed Draw Commitment**" means, as to each Lender, its obligation to make a Loan to the Borrower hereunder, expressed as an amount representing the maximum principal amount of the Delayed Draw Loan to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The initial amount of each Lender's Commitment is set forth on Schedule 2.01 under the caption "Delayed Draw Commitment" or, otherwise, in the Assignment and Assumption, pursuant to which such Lender shall have assumed its Commitment, as the case may be. As of the Closing Date, the aggregate amount of the Delayed Draw Commitment is $25,000,000.

"**Delayed Draw Date**" means the first date on which all the conditions precedent in Section 4.02 are satisfied or waived in accordance with Section 10.01.

"**Delayed Draw Loan**" has the meaning specified in section 2.01(~~b~~ii).

"**DIP Collateral**" means the "DIP Collateral" as defined in the Orders.

"**DIP Liens**" shall have the meaning assigned to such term in the Orders.

"**DIP Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"**DIP Term Loan Proceeds Account**" means a segregated deposit account furnished by a depository bank acceptable to the DIP Term Loan Agent, which will be subject to the sole dominion and control of the Administrative Agent, into which solely the cash proceeds of the Facility are deposited.

"**DIP Termination Date**" means the earliest of (a) the Scheduled Termination Date, (b) the effective date of any Chapter 11 plan for the reorganization of the Borrower or any other Debtor, (c) the date on which the Obligations become due and payable pursuant to Section 8.02, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code (it being understood that the Sale does not constitute a sale of all or substantially all of the Debtors' assets), (e) the date of conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Administrative Agent at the direction of Required Lenders, (f) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has

been entered into and become effective prior thereto, and (g) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Administrative Agent at the direction of Required Lenders.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disproportionate Modification**" has the meaning specified in the definition of "Final Order"

"**Disproportionately Affected Lender**" has the meaning specified in the definition of "Final Order".

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the latest Maturity Date of the Loans at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings, the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings, the Borrower or their Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the effective date of the Plan of Reorganization pursuant to an order of the Court.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.07(b)(iii)).

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "**Claims**"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in (including any limited or general partnership interest and any limited liability company membership interest in)) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

15

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of its respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of its respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of its respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of its respective ERISA Affiliates; (f) the failure to satisfy the minimum funding standard (within the meaning of Section 302(c) of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived; (g) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (h) the imposition of a lien under Section 303(k) of ERISA with respect to any Pension Plan; or (i) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA or 430 of the Code).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Events and Circumstances**" shall mean (i) the filing of the Chapter 11 Cases, (ii) events specifically described in the declaration in support of the Chapter 11 Cases, dated on or about the date hereof and (iii) the incurrence of any claim or liability that is Pre-Petition, unsecured and junior in priority to the Obligations.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Assets**" has the meaning specified in the Security Agreement and shall include any assets specifically excluded from the Collateral in the Interim Order (or, if applicable, the Final Order).

"**Excluded Subsidiary**" means each of the Subsidiaries of Holdings set forth on Schedule 1.01B; *provided*, *however*, that no such Subsidiary shall be deemed an "Excluded

16

Subsidiary" for purposes of this Agreement or the other Loan Documents in the event such Subsidiary (a) is an obligor under the ABL DIP Loan Documents or in respect of any of the ABL DIP Obligations or (b) becomes a Debtor.

"**Facility**" means the Commitments or Loans with respect to the Initial Loans, the Delayed Draw Loans, the Additional Loans or all Loans, as the context may require.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the date hereof or any successor provision that is substantively the equivalent thereof (and, in each case, any regulations promulgated thereunder or official interpretations thereof), any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**FCPA**" has the meaning specified in Section 5.18.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three U.S. banks of recognized standing selected by the Administrative Agent.

"**Final Order**" means, collectively, the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders (and in the case of any such modification that directly and adversely affects any Lender in a materially disproportionate manner as compared to other Lenders (any such Lender, a "**Disproportionately Affected Lender**" and any such modification, a "**Disproportionate Modification**"), as are satisfactory to each Disproportionately Affected Lender) in their (or its) sole discretion), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Administrative Agent and the Required Lenders waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent (acting at the direction of the Required Lenders (and in the case of ant Disproportionate Modification, each Disproportionately Affected Lender)), which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims. At any time after the Seventh Amendment Effective Date, any references to the "Final Order" shall be to the Final Order as modified by the Additional Loans Order and shall include the Additional Loans Order.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Court.

"**Financial Statements**" means the financial statements of Holdings and its Subsidiaries delivered in accordance with Section 6.01(a), 6.01(b) and 6.01(c).

"**Fiscal Month**" means a fiscal month of any Fiscal Year.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"**FIRREA**" means the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended from time to time.

"**Foreign Lender**" has the meaning specified in Section 3.01(b).

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, Holdings or any Subsidiary of Holdings with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then (x) such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and (y) the Borrower shall provide the Administrative Agent financial statements and other financial information reasonably requested by the Administrative Agent setting forth a reconciliation between calculations of such provision made before and after giving effect to such change in GAAP. Without limiting the foregoing and notwithstanding any other provision contained in this Agreement, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts

18

and ratios referred to herein shall be made, in accordance with GAAP as in effect on the Closing Date (including, without limitation, in a manner such that any obligations relating to a lease, as of the Closing Date, that would be accounted for by the Borrower and its Subsidiaries as an operating lease and not as Capitalized Lease Obligations (and shall not constitute Indebtedness hereunder).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**Primary Obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement". For avoidance of doubt, the Borrower shall cause any Subsidiary (other than an Excluded Subsidiary) that is not a Guarantor to Guarantee the Obligations by causing such Subsidiary to execute a supplement to the Guaranty in substantially the form attached thereto, and any such Subsidiary shall be a Guarantor hereunder for all purposes.

#9146261v7

"**Guaranty**" means (a) the guaranty made by Holdings and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to clause (b) of the definition of "Collateral and Guarantee Requirement," substantially in the form of Exhibit E and (b) each other guaranty and guaranty supplement delivered pursuant to Section 6.11.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, all hazardous or toxic substances, and all wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes regulated pursuant to any Environmental Law.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning specified in Section 10.08.

"**Initial Commitment**" means, as to each Lender, its obligation to make a Loan to the Borrower hereunder upon entry of the Interim Order, expressed as an amount representing the maximum principal amount of the Initial Loan to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The initial amount of each Lender's Commitment is set forth on Schedule 2.01 under the caption "Initial Commitment" or, otherwise, in the Assignment and Assumption, pursuant to which such Lender shall have assumed its Commitment, as the case may be. As of the Closing Date, the aggregate amount of the Initial Commitment is $25,000,000.

"**Initial Loan**" has the meaning specified in section 2.01(i).

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means an agreement executed by Holdings, the Borrower and each Subsidiary, in substantially the form of Exhibit J.

"**Intercreditor Acknowledgment**" means that certain Acknowledgment and Agreement, dated as of the date hereof, by and among the Administrative Agent, the ABL Agent (as defined in the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgement)), the ABL DIP Administrative Agent and the Prepetition Secured Term Loan Agent, and acknowledged by the Loan Parties.

"**Interest Payment Date**" means the last Business Day of each calendar month and the Scheduled Termination Date.

21

"**Interim Order**" means, collectively, the order of the Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, substantially in the form of Exhibit L hereto or otherwise in form and substance satisfactory to the Administrative Agent and the Required Lenders (and in the case of any Disproportionate Modification, each Disproportionately Affected Lender) , which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower and Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Court.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"**Investment Banker**" has the meaning specified in Section 6.18.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Joint Venture**" means (a) any Person which would constitute an "equity method investee" of the Borrower or any of its Subsidiaries and (b) any Person in whom the Borrower or any of its Subsidiaries beneficially owns any Equity Interest that is not a Subsidiary (other than an Excluded Subsidiary).

"**Judgment Currency**" has the meaning specified in Section 10.18.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or

#9146261v7

administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Leases**" means, with respect to any Person, all of those leasehold estates in real property of such Person, as lessee, as such may be amended, supplemented or otherwise modified from time to time.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender". As of the Closing Date, Schedule 2.01 sets forth the name of each Lender.

"**Lenders' Advisors**" means any financial advisor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Administrative Agent or the attorneys or other advisors of the Administrative Agent.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided* that in no event shall an operating lease in and of itself be deemed a Lien.

"**Liquidity**" means, at any time, an amount equal to (a) the unrestricted domestic cash and Cash Equivalents of the Borrower and the Guarantors at such time plus (b) the principal amount of loans available for borrowing under the ABL DIP Credit Agreement after giving effect to the outstanding extensions of credit thereunder, the borrowing base formula and all applicable reserves, holdbacks, minimum availability tests and conditions to borrowing thereunder.

"**Loan**" means an extension of credit by a Lender to the Borrower under Article II.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the DIP Notes, (c) the Guaranty, (d) the Administrative Agent Fee Letter, (e) the Collateral Documents, (f) all Approved Budgets and Approved Budget Variance Reports and (g) and all other agreements, instruments, documents and certificates identified in the Closing Checklist executed and delivered to, or in favor of, Administrative Agent or any Lenders or and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to Administrative Agent or any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or

schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each other Guarantor.

"**Management Stockholders**" means the members of management of Holdings or any of its Subsidiaries who are investors in Holdings or any direct or indirect parent thereof.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract".

"**Material Adverse Effect**" means, other than, in the case of clause (a) below, the commencement and continuation of the Chapter 11 Cases, as customarily would occur as a result of the Chapter 11 Cases, the events leading up thereto, the effect of the bankruptcy, conditions in the industry in which the Borrower operates in as existing on the Closing Date and/or consummation of transactions contemplated by the Loan Parties' "first day" pleadings reviewed by the Administrative Agent and the Required Lenders, any event, circumstance or condition that has had a materially adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or financial condition of Holdings and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document to which any of the Loan Parties is a party, (c) the perfection or priority of the Liens granted pursuant to the Loan Documents or the Orders or (d) the rights and remedies of the Lenders or the Administrative Agent under any Loan Document.

"**Material Assets**" means one or more assets of a Loan Party with a fair market value of $2,500,000 as determined by the Borrower in its reasonable discretion.

"**Material Indebtedness**" means Indebtedness having an aggregate outstanding principal amount of $15,000,000 or more (including, for purposes of calculation amounts owing to all creditors in the aggregate under any combined or syndicated credit arrangement) and shall include, at all times, the ABL DIP Obligations, the Prepetition Secured Term Loan Obligations, and all Indebtedness under the Prepetition Senior Notes and the Prepetition Unsecured Term Loan Facility.

"**Material Property**" means any warehouse or distribution center of the Loan Parties set forth on Schedule III hereto.

"**Maturity Date**" means the DIP Termination Date.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Milestone**" has the meaning specified in Section 6.16.

#91466261v7

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of its ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)    with respect to the Disposition of any asset by the Borrower or any of its Subsidiaries or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of its Subsidiaries) over (ii) the sum of the (A) principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents, the ABL DIP Loan Documents or the Prepetition Secured Term Loan Documents), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Subsidiary in connection with such Disposition or Casualty Event, (C) taxes or distributions made pursuant to Section 7.06(g)(i) or (g)(iii) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), (D) in the case of any Disposition or Casualty Event by a non-Wholly-Owned Subsidiary, the pro-rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (D)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a Wholly-Owned Subsidiary as a result thereof, and (E) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or its Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E); and

(b) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Subsidiary of the Borrower or any direct or indirect parent of the Borrower, the excess, if any, of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other

customary expenses, incurred by the Borrower or such Subsidiary in connection with such incurrence or issuance.

"**New First Lien Term Loan Facility**" has the meaning specified in the RSA.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07(f).

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees and expenses that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document.

"**Order(s)**" means, as applicable, and as the context may require, the Interim Order or the Final Order and the Additional Loans Order, whichever is then applicable.

"**Other Taxes**" has the meaning specified in Section 3.01(f).

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of its ERISA Affiliates or to which any Loan Party or any of its ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Perfection Certificate**" means a certificate in the form of Exhibit K or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time.

26

"**Permitted Holder**" means any of (a) the Sponsor, (b) the Management Stockholders and (c) the Co-Investors, provided that for purposes of the definition of "Change of Control" in clause (a) therein, the Co-Investors shall not constitute Permitted Holders at any time that they hold voting power equal to more than 20% of the ordinary voting power of all Equity Interests collectively held by the Sponsor, the Management Stockholders and the Co-Investors.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the preamble hereto.

"**Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of its ERISA Affiliates.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Debt**" has the meaning specified in the Security Agreement.

"**Pledged Equity**" has the meaning specified in the Security Agreement.

"**Post-Petition**" means the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"**Pre-Petition**" means the time period immediately prior to the filing of the applicable Chapter 11 Case.

"**Prepetition ABL Credit Agreement**" means that certain asset-based revolving credit agreement dated as of April 8, 2014, among the Borrower, Holdings, the guarantors party thereto, the lenders party thereto and Wells Fargo Bank, National Association, as administrative agent and collateral agent, as the same may be amended, restated, replaced, modified or supplemented from time to time prior to the date hereof.

"**Prepetition ABL Facility**" means that certain asset-based revolving facility provided pursuant to the Prepetition ABL Credit Agreement.

"**Prepetition ABL Priority Collateral**" means the "Prepetition ABL Priority Collateral" as defined in the Orders.

"**Prepetition Debt**" means the Indebtedness under (i) the Prepetition Secured Term Loan Facility, (ii) the Prepetition ABL Facility, (iii) the Prepetition Senior Notes, and (iv) the Prepetition Unsecured Term Loan Facility.

"**Prepetition Intercreditor Agreement**" means the intercreditor agreement dated as of April 8, 2014 among Holdings, the Borrower, the ABL DIP Administrative Agent, the Prepetition Secured Term Loan Agent and the Prepetition Unsecured Term Loan Agent, in form

#9146261v7

reasonably satisfactory to the Required Lenders, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"**Prepetition Secured Term Loan Agent**" means Cortland in its capacity as successor administrative agent and collateral agent for the lenders under the Prepetition Secured Term Loan Agreement.

"**Prepetition Secured Term Loan Agreement**" has the meaning specified in the preamble hereto.

"**Prepetition Secured Term Loan Documents**" means the Prepetition Secured Term Loan Agreement and the other "Loan Documents" as defined in the Prepetition Secured Term Loan Agreement (as in effect on the date hereof and as amended or modified).

"**Prepetition Secured Term Loan Facility**" means the term loan facility provided pursuant to the Prepetition Secured Term Loan Agreement.

"**Prepetition Secured Term Loan Obligations**" means the "Obligations" as defined in the Prepetition Unsecured Term Loan Agreement.

"**Prepetition Senior Notes**" means (i) the 6.125% Senior Notes Due 2034 in aggregate principal amount of $250.0 million issued pursuant to that certain indenture dated November 22, 2004, by and among Nine West Holdings, Inc., as Issuer, and U.S. Bank, National Association, as Indenture Trustee, (ii) the 6.875% Senior Notes Due 2019 in aggregate principal amount of $28.5 million issued pursuant to that certain indenture dated March 7, 2011, by and among Nine West Holdings, Inc., as Issuer, and U.S. Bank, National Association, as Indenture Trustee, and (iii) 8.25% Senior Notes Due 2019 in aggregate principal amount of $426.7 million issued pursuant to that certain indenture dated April 23, 2014, by and among Nine West Holdings, Inc., as Issuer, and U.S. Bank, National Association, as Indenture Trustee.

"**Prepetition Senior Notes Indenture**" means the Indenture dated as of April 23, 2014 by and between the Company, as Issuer, and U.S. Bank National Association, as Trustee, with respect to the issuance of the Pre-Petition Senior Notes, as amended and in effect as of the Closing Date.

"**Prepetition Term Priority Collateral**" means the "Prepetition Term Priority Collateral" as defined in the Orders.

"**Prepetition Unsecured Term Lender**" means each "Lender" as defined in the Prepetition Unsecured Term Loan Agreement.

"**Prepetition Unsecured Term Loan**" means the "Loan" as defined in the Prepetition Unsecured Term Loan Agreement.

"**Prepetition Unsecured Term Loan Agent**" means Morgan Stanley Senior Funding Inc., as administrative agent and collateral under the Prepetition Unsecured Term Loan Agreement, or any successor administrative agent and collateral agent under the Prepetition Unsecured Term Loan Agreement.

#9146261v7

"**Prepetition Unsecured Term Loan Agreement**" means that certain Unsecured Term Loan Credit Agreement, dated as of April 8, 2014, by and among the Company, as borrower, Holdings, the lenders party thereto and the Prepetition Unsecured Term Loan Agent, as amended, restated, replaced, modified or supplemented from time to time prior to the date hereof.

"**Prepetition Unsecured Term Loan Documents**" means "Loan Documents" as defined in the Prepetition Unsecured Term Loan Agreement.

"**Prepetition Unsecured Term Loan Facility**" means the term loan facility provided pursuant to the Prepetition Unsecured Term Loan Agreement.

"**Prepetition Unsecured Term Obligations**" means the "Obligations" as defined in the Prepetition Unsecured Term Loan Agreement.

"**Prior Week**" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"**Priority Carve-Out**" means an amount equal to the sum of: the ABL Professional Fee Carve Out Cap (as defined in the applicable Order), plus the Post-Carve Out Trigger Notice Cap (as defined in the applicable Order), plus the amounts set forth in clauses (a)(i) and (a)(ii) of paragraph 6 (Carve-Out) of the Interim Order (or the corresponding paragraph of the Final Order, when applicable), plus any amounts set forth in clause (a)(iii) of paragraph 6 (Carve-Out) of the Interim Order (or the corresponding paragraph of the Final Order, when applicable) to the extent not covered by the ABL Professional Fee Carve Out Cap.

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments and, if applicable and without duplication, Loans of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of ~~the Aggregate~~all Commitments and, if applicable and without duplication, Loans under the applicable Facility or Facilities at such time.

"**Public Lender**" has the meaning specified in Section 6.02.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Register**" has the meaning specified in Section 10.07(c).

"**Related Indemnified Person**" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents, advisors and representatives of such Indemnitee, in the case of this clause (c), acting at the instructions of such Indemnitee; *provided* that each reference to a controlled affiliate or controlling person in this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation or syndication of the Facility or the ABL DIP Facility.

#91466261v7

"**Remedies Notice Period**" has the meaning specified in the Interim Order (or Final Order, when applicable).

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of (a) the aggregate outstanding Loans and (b) the aggregate unused Commitments.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party or any other individual designated in writing to the Administrative Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Amount**" has the meaning specified in Section 2.03(b)(ii).

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or Holdings' stockholders, partners or members (or the equivalent Persons thereof).

"**RSA**" means that certain Restructuring Support Agreement dated as of April 6, 2018, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Sale**" means the sale pursuant to section 363 of the Bankruptcy Code of certain assets related to the Debtors' Nine West, Bandolino and associated brands, and certain working capital and other assets, that constitute "Purchased Assets" as defined in the Stalking Horse APA.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Scheduled Termination Date**" means ~~January 15~~March 31, 2019.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means, collectively, the Security Agreement executed by the Loan Parties, substantially in the form of Exhibit F, together with each other Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Seventh Amendment**" means that certain Amendment No. 7 to this Agreement, dated effective as of [__], 2018.

"**Seventh Amendment Effective Date**" means the "Amendment Effective Date" (as defined in the Seventh Amendment), which date is [__], 2018.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Event of Default**" means each of the Events of Default specified in Sections 8.01(a), 8.01(b) (solely as it applies to Sections 6.14(a) (other than any immaterial breaches), 6.14(b) (only with respect to a breach in excess of 5% of each of the relevant thresholds for the Actual Cash Receipts, Actual Disbursement Amount, and Actual Net Operating Cash Flow Amount and excluding a breach under clauses (iv) and (v) relating to a breach of the Actual Net Cash Flow Amount and the Actual Prepetition Relief Amount, respectively), 6.14(c) (solely with respect to an Event of Default arising from the Borrower's failure to deliver a certificate as required thereunder, within two (2) Business Days of the relevant delivery date specified therein), 6.16, 7.14, 7.15, 7.18 or 7.19), 8.01(e) (solely to the extent the applicable default has resulted in acceleration of the relevant Indebtedness), 8.01(i), 8.01(j), 8.01(l), 8.01(m) or 8.01(o).

"**Specified Sale Process Default**" has the meaning assigned to the term "Specified Sale Process Default" under and as defined in the ABL DIP Credit Agreement.

"**Specified Store Closing Sales**" means the closure of substantially all of the Loan Parties' retail Stores and the liquidation of assets related thereto by the Loan Parties.

"**Sponsor**" means Sycamore Partners Management, L.L.C. and any of its Affiliates and funds or partnerships managed by it or any of its Affiliates, but not including, however, any portfolio company of any of the foregoing.

#9146661v7

"**Stalking Horse APA**" means that certain Asset Purchase Agreement, dated as of April 5, 2018, by and among ABG Nine West, LLC, Nine West Holdings, Inc., Nine West Development, LLC, and ABG Intermediate Holdings 2 LLC.

"**Store**" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by the Borrower or any Subsidiary.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings.

"**Supermajority Lenders**" means, as of any date of determination, Lenders having more than 77.5% of the sum of (a) the aggregate outstanding Loans and (b) the aggregate unused Commitments.

"**Superpriority Claim**" means any administrative expense claim in the case of any Loan Party having priority over any and all administrative expenses, diminution claims and all other priority claims against the Obligors, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules,

32

a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" has the meaning specified in Section 3.01(a).

"**Term DIP Facility**" has the meaning specified in the preamble to this Agreement.

"**Term DIP Priority Collateral**" means the "Term DIP Priority Collateral" as defined in the Orders.

"**Term Priority Collateral**" has the meaning assigned to such term in the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment).

"**Unencumbered Property**" shall mean all property identified in paragraph 8(b)(i) of the Interim Order.

"**Uniform Commercial Code**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**U.S. Lender**" has the meaning specified in Section 3.01(d).

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Wholly-Owned Subsidiary**" of a Person means a Subsidiary of such Person, all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

#9146626v7

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02 <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation, except in the case of computations of time periods.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(v)    Unless otherwise expressly indicated herein, the words "above" and "below", when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(vi)    The terms "Lender" and "Administrative Agent" include, without limitation, their respective successors and assigns.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including".

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

#91466261v7

SECTION 1.03  <u>Accounting Terms</u>.   All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.

SECTION 1.04  <u>Rounding</u>.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05  <u>References to Agreements, Laws, Etc</u>.   Unless otherwise expressly provided herein, (a) references to Constituent Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all appendices, exhibits and schedules thereto and all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.06  <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.07  [Reserved].

SECTION 1.08  [Reserved].

SECTION 1.09  <u>Currency Equivalents Generally</u>.

(a)     For purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

## ARTICLE II

## The Commitments and Borrowings

SECTION 2.01  <u>The Loans</u>.

Subject to the terms and conditions set forth herein and in the Orders and relying upon the representations and warranties herein set forth, each Lender severally and not jointly agrees, (i) following entry of the Interim Order and satisfaction of the conditions to Borrowing set forth in Section 4.01, to make to the Borrower a single term loan denominated in Dollars (the "**Initial Loan**") in an aggregate principal amount equal to its Initial Commitment on the Closing Date and, (ii)  following entry of the Final Order and following satisfaction of the conditions to

#91466261v7

Borrowing set forth in Section 4.02, to make one final term loan denominated in Dollars to the Borrower (the "**Delayed Draw Loan**") in an aggregate principal amount equal to its Delayed Draw Commitment and (iii) following the Seventh Amendment Effective Date and the entry of the Additional Loans Order, and following and subject to the satisfaction of the conditions to Borrowing set forth in Section 4.03, to make an additional loan denominated in Dollars to the Borrower (such loan, the "**Additional Loan**") in an aggregate principal amount equal to its Additional Loan Commitment.   The loan proceeds of the Initial Loan and, the Delayed Draw Loan and the Additional Loan (net of any fees and expenses payable on the applicable funding date) shall be deposited in the DIP Term Loan Proceeds Account.  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed on the Delayed Draw Date. Following the making of the Initial Loan, the Initial Commitment of such Lender shall terminate, and following the making of the Delayed Draw Loan, the Delayed Draw Commitment of such Lender in respect of the Delayed Draw Loans shall terminate and following the making of the Additional Loan, the Additional Loan Commitment of such Lender in respect of the Additional Loans shall terminate.  To the extent not terminated earlier, (i) each Lender's Initial Commitment and Delayed Draw Commitment shall terminate immediately and without further action on the date that is four (4) Business Days following the Final Order Entry Date and (ii) each Lender's Additional Loan Commitment shall terminate immediately and without further action on the date that is four (4) Business Days following entry of the Additional Loans Order. Once funded, each Initial Loan and, Delayed Draw Loan and Additional Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents.

SECTION 2.02  Borrowings of Loans.

(a)    Each Borrowing shall be made upon the Borrower's irrevocable written notice to the Administrative Agent. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. three (3) Business Days prior to the requested date of any Borrowing. Each Borrowing shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Each Committed Loan Notice shall specify the requested date of the Borrowing (which shall be a Business Day) and the principal amount of Loans to be borrowed.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans. In the case of each Borrowing, each Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 1:00 p.m., on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 or Section 4.03, as the case may be (and, if such Borrowing is on the Closing Date, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan

36

on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

SECTION 2.03  Prepayments.

(a)  *Optional*.

The Borrower may, upon written notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York time) three (3) Business Days prior to any date of prepayment of Loans; and (2) any partial prepayment of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. Any prepayment of a Loan shall be accompanied by all accrued interest thereon. Each prepayment of the Loans pursuant to this Section 2.03(a) shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(b)  *Mandatory*.

(i)  [Reserved].

(ii)  If (x) Holdings, the Borrower or any of its Subsidiaries Disposes of any property or assets (other than (I) any Disposition of any property or assets permitted by Section 7.05(a), (b), (d) (to the extent constituting a Disposition to the Borrower or a Subsidiary that is a Guarantor), (e), (h), (i), (l), (p) and (t), (II) so long as the ABL DIP Credit Agreement is in effect, any Disposition of Current Asset Collateral) or (y) any Casualty Event occurs, which results in the realization or receipt by Holdings, the Borrower or such Subsidiary of Net Cash Proceeds, the Borrower shall prepay on or prior to the date which is two (2) Business Days after the date of the realization or receipt of such Net Cash Proceeds, an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds realized or received; *provided*, *further*, no prepayment shall be required pursuant to this Section 2.03(b)(ii) except in accordance with the Orders, the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment), (III) mandatory prepayments required under Section 2.03(b), to the extent attributable to Foreign Subsidiaries, will not be required if the repatriation of Net Cash Proceeds is prohibited or delayed by applicable local law from being repatriated to the United States; *provided* that Holdings, the Borrower and the applicable Foreign Subsidiary shall use commercially reasonable efforts to take all actions required by applicable law to permit the repatriation of the relevant amounts; and (IV) if the Borrower determines in good faith that the repatriation of such Net Cash Proceeds could have material adverse tax consequences for Holdings, Borrower or its Subsidiaries if all or a portion of the funds required to make a mandatory prepayment were upstreamed or transferred as a distribution or dividend (a "**Restricted Amount**"), the amount the Borrower will be required to mandatorily prepay shall be reduced by the Restricted Amount until such time as it may upstream or transfer such Restricted Amount without incurring such tax

#9146626lv7

liability, *provided* that, if not previously repatriated and applied to such prepayment within twelve months, an amount (after reduction for the amount of any Taxes that would have been payable or reserved against if the amount of such prepayment were actually repatriated whether or not a repatriation actually occurs) shall be applied to prepay the Loans; *provided, further,* that nothing in this Section 2.03 shall require Holdings, the Borrower or any Subsidiary to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(iii)    If Holdings, the Borrower or any Subsidiary incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is one (1) Business Day after the receipt of such Net Cash Proceeds.

(iv)    Each prepayment pursuant to clauses (ii) through (iii) of this Section 2.03(b) shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment.

(v)    Notwithstanding any other provisions of this Section 2.03(b), in connection with each prepayment of Loans pursuant to this Section 2.03(b), the Borrower shall provide the Administrative Agent at least three (3) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof.

(c)    *Interest*.  All prepayments under this Section 2.03 shall be accompanied by all accrued interest thereon.

SECTION 2.04  <u>Termination or Reduction of Commitments</u>.  On each date of funding of a Loan by a Lender hereunder, such Lender's Commitment shall be reduced by the principal amount of the Loan funded by such Lender.  To the extent not terminated earlier, <u>(i)</u> the <u>Initial Commitments and the Delayed Draw</u> Commitments shall terminate on the date that is four (4) Business Days following the Final Order Entry Date<u> and (ii) the Additional Loan Commitments shall terminate on the date that is four (4) Business Days after the entry of the Additional Loans Order</u>.

SECTION 2.05  <u>Repayment of Loans</u>.    The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the DIP Termination Date the aggregate principal amount of all Loans outstanding on such date, together with accrued and unpaid interest on the principal amount to be paid on the DIP Termination Date without further application to or order from the Court or earlier, if otherwise required by the terms hereof.

SECTION 2.06  <u>Interest</u>.

(a)    Subject to the provisions of Section 2.06(b), each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate.

(b)    The Borrower shall pay interest on past due amounts hereunder at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued

and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

SECTION 2.07  Fees.

(a)    The Borrower shall pay to the Administrative Agent such fees in the amounts and at the times specified as may be agreed to in writing from time to time by Holdings or any of its Subsidiaries and the Administrative Agent (including, without limitation, all amounts owing under the Administrative Agent Fee Letter).

(b)    The Borrower shall pay to the Administrative Agent on the Closing Date for the account of each Lender according to its Pro Rata Share an upfront fee in an amount equal to 7.75% of the aggregate Commitments on the Closing Date.

(c)    The Borrower shall pay to the Administrative Agent on the earlier of (i) the DIP Termination Date and (ii) the repayment in full of the Loans, (x) with respect to the Initial Loans and the Delayed Draw Term Loans, for the account of each Lender according to its Pro Rata Share of the Initial Loans and the Delayed Draw Term Loans outstanding on such date, an exit fee in an amount equal to 2.00% of the aggregate amount of the Initial Commitments and the Delayed Draw Commitments on the Closing Date. and (y) with respect to the Additional Loans, for the account of each Lender according to its Pro Rata Share of the Additional Loans outstanding on such date, an exit fee in an amount equal to 1.00% of the aggregate Additional Loan Commitments on the Seventh Amendment Effective Date.

The fees payable hereunder shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

SECTION 2.08  Computation of Interest and Fees.  All computations of fees and interest shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.09  Evidence of Indebtedness.

(a)    The Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall

#9146661v7

be prima facie evidence absent manifest error of the amount of the Borrowings made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.09(a), and by each Lender in its account or accounts pursuant to Section 2.09(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

SECTION 2.10  Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. (New York, New York time), may, in the Administrative Agent's discretion, in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    Unless the Borrower has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder for the account of any Lender, that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to such Lender. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day

40

Funds, then such Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share (or other applicable share provided for under this Agreement) of such of the outstanding Loans or other Obligations then owing to such Lender.

SECTION 2.11  Sharing of Payments, Etc.. If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) remit the amount so received to Administrative Agent for distribution to the other Lenders in accordance with the provisions of this Agreement.

SECTION 2.12  Priority and Liens. The relative priorities of the Liens with respect to the Collateral shall be as set forth in the Interim Order (and, when entered, the Final

Order).  All of the Liens described herein shall be effective and perfected upon entry of the Interim Order without the necessity of the execution or recordation of filings by the Debtors of security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order and, when entered, the Final Order.

Each of the Loan Parties agrees that to the extent that its obligations under the Loan Documents have not been satisfied in full in cash, (i) its obligations under the Loan Documents shall not be discharged by any order confirming a reorganization plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Agents and the Lenders pursuant to the Orders and the Liens granted to the Agents and the Lenders pursuant to the Orders shall not be affected in any manner by any order confirming a reorganization plan; provided that such obligations shall be discharged upon such satisfaction in full in cash.

SECTION 2.13 <u>Release</u>.   Each of the Borrower and the Guarantors hereby acknowledge effective upon entry of the Final Order, and subject to the terms thereof, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or their respective Subsidiaries' liability to repay the Administrative Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or any Lender.  Upon entry of the Final Order, the Borrower and the Guarantors, each in their own right and on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever release and discharge the Administrative Agent and Lenders and all of Administrative Agent's and Lenders' officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, each solely in their capacity as such (collectively, the "**Released DIP Parties**") of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Final Order, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

## **ARTICLE III|**

## **Taxes, Increased Costs Protection and Illegality**

SECTION 3.01 <u>Taxes</u>.

(a)    Except as required by law, any and all payments by the Borrower or any Guarantor to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, and all liabilities (including additions to tax, penalties and interest) with respect thereto, excluding, in the case of each Agent and each Lender, (i) taxes imposed on or measured by net income (however denominated, and including branch profits and similar taxes), and franchise or similar taxes, imposed by the United States, the jurisdiction (or any political subdivision thereof) under the laws of which it is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (ii) taxes imposed by reason of any connection between such Agent or Lender and any taxing jurisdiction other than a connection arising solely by executing or entering into any Loan Document, receiving payments thereunder or having been a party to, performed its obligations under, or enforced, any Loan Documents, (iii) subject to Section 3.01(e), any U.S. federal tax that is (or would be) required to be withheld with respect to amounts payable hereunder in respect of an Eligible Assignee (pursuant to an assignment under Section 10.07) on the date it becomes an Eligible Assignee to the extent such tax is in excess of the tax that would have been applicable had such assigning Lender not assigned its interest arising under any Loan Document (unless such assignment is at the express written request of the Borrower) and (iv) any U.S. federal withholding taxes imposed as a result of the failure of any Agent or Lender to comply with the provisions of Sections 3.01(b) and 3.01(c) (in the case of any Foreign Lender, as defined below) or the provisions of Section 3.01(d) (in the case of any U.S. Lender, as defined below), (v) any taxes imposed on any amount payable to or for the account of any Agent or Lender as a result of the failure of such recipient to satisfy the applicable requirements under FATCA to establish that such payment is exempt from withholding under FATCA, (vi) amounts excluded pursuant to Section 3.01(f) hereto, and (vii) penalties and interest on the foregoing amounts (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges and liabilities being hereinafter referred to as "**Taxes**"). If the Borrower or a Guarantor is required to deduct any Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01(a)), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or Guarantor shall make such deductions, (iii) the Borrower or Guarantor shall pay the full amount deducted to the relevant taxing authority, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as practicable thereafter), the Borrower or Guarantor shall furnish to such Agent or Lender (as the case may be) the original or a facsimile copy of a receipt evidencing payment thereof to the extent such a receipt has been made available to the Borrower or Guarantor (or other evidence of payment reasonably satisfactory to the Administrative Agent). If the Borrower or Guarantor fails to pay any Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence that has been made available to the Borrower or Guarantor, the Borrower or Guarantor shall indemnify such Agent and such Lender for any incremental Taxes that may become payable by such Agent or such Lender arising out of such failure.

#9146626lv7

(b)    To the extent it is legally able to do so, each Agent or Lender (including an Eligible Assignee to which a Lender assigns its interest in accordance with Section 10.07) that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each a "**Foreign Lender**") agrees to complete and deliver to the Borrower and the Administrative Agent on or prior to the date on which the Agent or Lender (or Eligible Assignee) becomes a party hereto, two (2) accurate, complete and original signed copies of whichever of the following is applicable: (i) IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, certifying that it is entitled to benefits under an income tax treaty to which the United States is a party; (ii) IRS Form W-8ECI certifying that the income receivable pursuant to any Loan Document is effectively connected with the conduct of a trade or business in the United States; (iii) if the Foreign Lender is not (A) a bank described in Section 881(c)(3)(A) of the Code, (B) a 10-percent shareholder described in Section 871(h)(3)(B) of the Code, or (C) a controlled foreign corporation related to the Borrower within the meaning of Section 864(d) of the Code, the applicable certificate to that effect in substantially the form attached hereto as Exhibits I-1 through I-4 (a "**Non-Bank Certificate**") and an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, certifying that the Foreign Lender is not a United States person; (iv) to the extent a Lender is not the beneficial owner for U.S. federal income tax purposes, IRS Form W-8IMY (or any successor forms) of the Lender, accompanied by, as and to the extent applicable, a Form W-8BEN or IRS Form W-8BEN-E, as applicable, Form W-8ECI, Non-Bank Certificate, Form W-9, Form W-8IMY (or other successor forms) and any other required supporting information from each beneficial owner (it being understood that a Lender need not provide certificates or supporting documentation from beneficial owners if (x) the Lender is a "qualified intermediary" or "withholding foreign partnership" for U.S. federal income tax purposes and (y) such Lender is as a result able to establish, and does establish, that payments to such Lender are, to the extent applicable, entitled to an exemption from or, if an exemption is not available, a reduction in the rate of, U.S. federal withholding taxes without providing such certificates or supporting documentation); or (v) any other form prescribed by applicable requirements of U.S. federal income tax law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable requirements of law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(c)    In addition, each such Lender shall, to the extent it is legally entitled to do so, (i) promptly submit to the Borrower and the Administrative Agent two (2) accurate, complete and original signed copies of such other or additional forms or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant taxing authorities) as may then be applicable or available to secure an exemption from or reduction in the rate of U.S. federal withholding tax (A) on or before the date that such Lender's most recently delivered form, certificate or other evidence expires or becomes obsolete or inaccurate in any material respect, (B) after the occurrence of a change in the Foreign Lender's circumstances requiring a change in the most recent form, certificate or evidence previously delivered by it to the Borrower and the Administrative Agent, and (C) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and (ii) promptly notify the Borrower and the Administrative Agent of any change in the Foreign Lender's circumstances which would modify or render invalid any claimed exemption or reduction.

44

(d)    Each Agent or Lender that is a "United States person" (within the meaning of Section 7701(a)(3) of the Code) (each a "**U.S. Lender**") agrees to complete and deliver to the Borrower and the Administrative Agent two (2) original copies of accurate, complete and signed IRS Form W-9 or successor form certifying that such Agent or Lender is not subject to United States backup withholding tax (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or inaccurate in any material respect, (iii) after the occurrence of a change in the Agent's or Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(e)    If a payment made to a Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or the Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.1(e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    Notwithstanding anything else herein to the contrary (but subject to the succeeding sentence), if a Lender, Eligible Assignee or Agent is subject to any U.S. federal tax that is (or would be) required to be withheld with respect to amounts payable hereunder at a rate in excess of zero percent at the time such Lender, Eligible Assignee or Agent becomes a party to this Agreement or otherwise acquires an interest in the Loan, or pursuant to a law or other legal requirement in effect at such time (including a law with a delayed effective date), such tax (including additions to tax, penalties and interest imposed with respect to such tax) shall be considered excluded from Taxes (unless and until such time as such Lender, Eligible Assignee or Agent subsequently provides forms and certifications that establish to the reasonable satisfaction of Borrower and the Administrative Agent that such Lender, Eligible Assignee or Agent is subject to a lower rate of tax, at which time tax at such lower rate (including additions to tax, penalties and interest imposed with respect to such tax) shall be considered so excluded for periods during which such forms and certifications remain valid and are sufficient, under the law in effect at the time such forms and certifications are provided (including any law with a delayed effective date), to establish that such Lender, Eligible Assignee or Agent is subject to such lower rate of tax) except, in the case of an Eligible Assignee, to the extent the Lender's assignor was entitled to additional amounts or indemnity payments immediately prior to the assignment (unless such assignment is made at the express written request of the Borrower). Further, the Borrower shall not be required pursuant to this Section 3.01 to pay any additional amount to, or to indemnify, any Lender, Eligible Assignee or Agent, as the case may be, to the extent that such Lender, Eligible Assignee or Agent becomes subject to Taxes subsequent to the Closing Date (or,

if later, the date such Lender, Eligible Assignee or Agent becomes a party to this Agreement or otherwise acquires an interest in the Loan) solely as a result of a change in the place of organization or place of doing business of such Lender, Eligible Assignee or Agent (or any applicable beneficial owner), a change in the Lending Office of such Lender or Eligible Assignee (or any applicable beneficial owner) (other than at the written request of the Borrower to change such Lending Office), a change that results in such Lender or Eligible Assignee (or any applicable beneficial owner) being described in clauses (A), (B) or (C) of Section 3.01(b)(iii) or otherwise as a result of any change in the circumstances of such Lender, Eligible Assignee or Agent, other than a Change in Law, occurring after the date that such Lender, Eligible Assignee or Agent becomes a party to this Agreement or otherwise acquires an interest in the Loan.

(g)    The Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Assignment and Assumption, grant of a Participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document, except to the extent that any such change is requested in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(f) being hereinafter referred to as "**Other Taxes**").

(h)    If any Taxes or Other Taxes are directly asserted against any Agent or Lender with respect to any payment received by such Agent or Lender in respect of any Loan Document, such Agent or Lender may pay such Taxes or Other Taxes and the Borrower will promptly indemnify and hold harmless such Agent or Lender for the full amount of such Taxes and Other Taxes (and any Taxes and Other Taxes imposed on amounts payable under this Section 3.01), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted. Payments under this Section 3.01(g) shall be made within ten (10) days after the date Borrower receives written demand for payment from such Agent or Lender.

(i)    A Participant shall not be entitled to receive any greater payment under Section 3.01 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(j)    If the Borrower determines in good faith that a reasonable basis exists for contesting any taxes for which indemnification has been demanded hereunder, the relevant Lender or the relevant Agent, as applicable, shall cooperate with the Borrower in a reasonable challenge of such taxes if so requested by the Borrower, provided that (a) such Lender or Agent determines in its reasonable discretion that it would not be prejudiced by cooperating in such challenge, (b) the Borrower pays all related expenses of such Agent or Lender and (c) the Borrower indemnifies such Lender or Agent for any liabilities or other costs incurred by such party in connection with such challenge. The preceding sentence shall not be construed to require any Agent or Lender to make available its tax returns (or any other information that it deems confidential) to the Borrower, Holdings or any other Person.

#9146621v7

(k)    If any Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or Holdings, as the case may be or with respect to which the Borrower or Holdings, as the case may be has paid additional amounts pursuant to this Section 3.01, it shall promptly remit such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or Holdings, as the case may be under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses incurred by the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower or Holdings, as the case may be, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower or Holdings, as the case may be (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall provide the Borrower with a copy of any notice of assessment or other evidence reasonably available of the requirement to repay such refund received from the relevant Governmental Authority (*provided* that such Lender or the Administrative Agent may delete any information therein that such Lender or the Administrative Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (j), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower or Holdings pursuant to this paragraph (j) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower, Holdings or any other Person.

(l)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (g) with respect to such Lender, it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to mitigate the effect of any such event, including by designating another Lending Office for any Loan affected by such event and by completing and delivering or filing any tax-related forms which such Lender is legally able to deliver and which would reduce or eliminate any amount of Taxes or Other Taxes required to be deducted or withheld or paid by the Borrower; provided that such efforts are made at the Borrower's expense and on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no economic, legal or regulatory disadvantage, and provided further that nothing in this Section 3.01(k) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (g).

(m)    Notwithstanding any other provision of this Agreement, the Borrower and the Administrative Agent may deduct and withhold any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents, subject to the provisions of this Section 3.01.

#9146626lv7

(n)    With respect to any Lender's claim for compensation under this Section 3.01, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(o)    The agreements in this Section 3.01 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

SECTION 3.02  [Reserved].

SECTION 3.03  [Reserved].

SECTION 3.04  Increased Cost and Reduced Return; Capital Adequacy; Reserves on Loans.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Taxes covered by Section 3.01, any taxes and other amounts described in clauses (i) through (vii) of the first sentence of Section 3.01(a) that are imposed with respect to payments for or on account of any Agent or any Lender under any Loan Document and Other Taxes); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Loans made by such Lender that is not otherwise accounted for in this clause (a);

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it to a level below that which such Lender or such Lender's holding company

48

could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in clause (a) or (b) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.05  [Reserved].

SECTION 3.06 <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

SECTION 3.07 <u>Replacement of Lenders under Certain Circumstances</u>.  If (i) any Lender requests compensation under Section 3.04, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement and the related Loan

49

Documents to one or more Eligible Assignees (provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person) that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.07(b)(iv);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the DIP Notes shall be deemed to be canceled upon such failure;

(d)    the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender;

(e)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(f)    such assignment does not conflict with applicable Laws.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**".

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 3.08  Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

#9146261v7

# ARTICLE IV

## Conditions Precedent to Borrowings

SECTION 4.01 <u>Conditions to Closing Date Borrowing</u>. The obligation of each Lender to make a Borrowing hereunder on the Closing Date is subject to the satisfaction or due waiver in accordance with Section 10.01 of each of the following conditions precedent on or prior to the date that is not more than two (2) Business Days after the Interim Order Entry Date, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals, facsimiles or copies in .pdf format (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel:

(i)    a Committed Loan Notice in accordance with the requirements hereof;

(ii)    executed counterparts of this Agreement and the Guaranty;

(iii)    a DIP Note executed by the Borrower in favor of each Lender that has requested a Note at least two (2) Business Days in advance of the Closing Date;

(iv)    each Collateral Document set forth on <u>Schedule 1.01A</u> required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party party thereto, together with:

i.    evidence that all other actions, recordings and filings that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent; and

ii.    the Perfection Certificate executed and delivered by each Loan Party party thereto;

(v)    such certificates of good standing from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vi)    an opinion from Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters, entry of the Interim Order and other matters reasonably requested by Administrative Agent;

51

(vii)    [Reserved];

(viii)    [Reserved];

(ix)    evidence that all insurance (including title insurance) required to be maintained pursuant to the Loan Documents has been obtained and is in effect and that the Collateral Agent has been named as loss payee and/or additional insured, as applicable, under each insurance policy with respect to such insurance as to which the Collateral Agent shall have requested to be so named; and

(x)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Administrative Agent with respect to the Loan Parties (in each case dated as of a date reasonably satisfactory to the Administrative Agent);

*provided*, *however*, that, each of the requirements set forth in clause (ix) above, including the delivery of documents and instruments necessary to satisfy the Collateral and Guarantee Requirement shall not constitute conditions precedent to the Borrowing on the Closing Date after the Borrower's use of commercially reasonable efforts to provide such items on or prior to the Closing Date if the Borrower agrees to deliver, or cause to be delivered, such search results, documents and instruments, or take or cause to be taken such other actions as may be required to perfect such security interests within  thirty (30) days after the Closing Date (subject to extensions approved by the Administrative Agent in its reasonable discretion).

(b)    All fees and expenses required to be paid hereunder or under the Administrative Agent Fee Letter and all reasonable and documented out-of-pocket expenses (including, for the avoidance of doubt, all Attorney Costs) invoiced at least two (2) Business Days before the Closing Date shall have been paid in full in cash.

(c)    [Reserved].

(d)    The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(e)    The Administrative Agent shall have received, in form and substance reasonably satisfactory to it, at least four (4) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree in its discretion) all documentation and other information requested in writing by it at least seven (7) days prior to the Closing Date in order to allow the Administrative Agent and the Lenders to comply with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(f)    The Administrative Agent shall have received all such financial statements reasonably requested by the Administrative Agent.

(g)    The Administrative Agent and the Lenders shall have received the initial Approved Budget.

#9146626lv7

(h)     The Petition Date shall have occurred, and the Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Chapter 11 Cases

(i)     The RSA shall have become effective and binding in accordance with its terms, and no Secured TL Lender Trigger Event, Unsecured TL Lender Trigger Event or Company Trigger Event (as each is defined in the RSA) shall have occurred.

(j)     The Chapter 11 Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(k)     A motion, in form and substance satisfactory to the Lenders, seeking approval of the DIP Facilities, shall have been filed in each of the Chapter 11 Cases within one (1) day of the Petition Date.

(l)     The Interim Order shall have been entered by no later than five (5) calendar days after the Petition Date, and such Order shall not have been reversed, modified, stayed or vacated absent prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) or subject to any motion for reversal, modifications, amendment, appeal, leave to appeal, or stay.

(m)     The Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Required Lenders.

(n)     All material "first day" orders intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" hearing shall have been entered by the Bankruptcy Court.

(o)     The Administrative Agent and the Lenders shall have received evidence, in form and substance reasonably satisfactory to the Administrative Agent, that, prior to or concurrently with the effectiveness of this Agreement, the ABL DIP Facility shall be in full force and effect.

(p)     Other than the Events and Circumstances, or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Term DIP Facility, the Collateral or the transactions contemplated thereby.

(q)     Subject to entry of the Orders, the Administrative Agent, for the benefit of the Lenders, shall have a valid and perfected Lien on and security interest in the Collateral of the Debtors on the basis and with the priority set forth herein.

(r)     Other than the Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Term DIP Facility or the exercise by the Administrative Agent at the direction of the Lenders of its rights as a secured party with respect to the Collateral.

#9146626lv7

(s)    A certificate signed by a Responsible Officer of the Borrower (i) certifying that the conditions specified in this Section 4.01 have been satisfied, and (ii) attaching true, correct and complete copies of the ABL DIP Credit Agreement and each other material ABL DIP Loan Document, together with all exhibits, schedules, amendments, supplements and modifications thereto, which documents shall be in form and substance satisfactory to the Administrative Agent and (iii) certifying that all of the documents delivered pursuant to clause (ii) above are in full force and effect.

(t)    All other Loan Documents, each duly executed by the applicable Loan Parties, and any other items set forth on the Closing Checklist attached hereto as Exhibit G, each in form and substance reasonably satisfactory to the Required Lenders.

(u)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(v)    No trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets.

(w)    The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the Closing Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that, any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(x)    No Default or Event of Default shall exist, or would result from such Borrowing or from the application of the proceeds thereof.

(y)    Such Borrowing shall be for purposes and in amounts consistent with the Approved Budget (subject to the permitted variance) and the RSA.

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 4.02  Conditions to Delayed Draw Borrowing.  The obligation of each Lender to make a Borrowing hereunder on the Delayed Draw Date is subject to the following conditions precedent on or prior to the date that is not more than four (4) Business Days after the Final Order Entry Date, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)    The Closing Date shall have occurred.

54

(b)      The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the Delayed Draw Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that, any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(c)      The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)      No Default or Event of Default shall exist, or would result from the Borrowing.

(e)      Each Borrowing shall be for purposes and in amounts consistent with the Approved Budget (subject to the permitted variance) and the RSA.

(f)      At any time prior to the Final Order Entry Date, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders or the Administrative Agent (with the consent of the Required Lenders).

(g)      The Final Order Entry Date shall have occurred no later than June 26, 2018 (unless such period is extended by the Required Lenders or the Administrative Agent (with the consent of the Required Lenders)) and the Final Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay.

(h)      All material "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Court, shall be acceptable to the Required Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

SECTION 4.03  Conditions to Additional Loan Borrowing.  The obligation of each Lender to make an Additional Loan hereunder on any date is subject to the following conditions precedent, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)      The Closing Date and the Seventh Amendment Effective Date shall have occurred.

(b)      The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of such date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that, any representation and warranty that is

#9146261v7

qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(c)    The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)    No Default or Event of Default shall exist, or would result from the Borrowing.

(e)    Such Borrowing shall be for purposes and in amounts consistent with the Approved Budget (subject to the permitted variance) and the RSA.

(f)    The Final Order and the Additional Loans Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay.

(g)    All material "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Court, shall be acceptable to the Required Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

## ARTICLE V

### Representations and Warranties

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

SECTION 5.01 Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all corporate or other organizational power and authority to (i) own or lease its assets and, subject to entry of the Interim Order (and Final Order, when applicable), carry on its business and (ii) subject to entry of the Interim Order (and Final Order, when applicable) and to the further approval of the Court for transactions outside of the ordinary course of business, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e) above, to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.02 Authorization; No Contravention.   Upon entry of the Interim Order (and Final Order, when applicable) and subject to its terms, (a) the execution, delivery and

56

performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action and (b) neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party nor the consummation of the Transactions will (i) contravene the terms of any of such Person's Constituent Documents, (ii) other than violations arising as a result of the commencement of the Chapter 11 Cases and except as otherwise excused by the Court, result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Subsidiaries (other than as permitted by Section 7.01) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) other than violations arising as a result of the commencement of the Chapter 11 Cases and except as otherwise excused by the Court, violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (ii) and (iii) above, to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, Material Adverse Effect.

SECTION 5.03  Governmental Authorization.  Except the entry of or pursuant to the terms of the Interim Order (and Final Order, when applicable), no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.04  Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party hereto and thereto. Upon entry of the Interim Order (and Final Order, when applicable), this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

SECTION 5.05  Financial Statements; No Material Adverse Effect.

(a)    The Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

57

(b)    Following the funding of the Initial Loans on the Closing Date pursuant to Section 2.01, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries for fiscal years 2018 through and including 2022, copies of which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

SECTION 5.06    Litigation.  Except for the Chapter 11 Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.07    Labor Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes against any of the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened and (b) hours worked by and payment made based on hours worked to employees of each of the Borrower or its Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.08    Ownership of Property; Liens.

(a)    Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all real property that is owned by the Loan Parties, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date.

SECTION 5.09    Environmental Matters.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries is in compliance with all Environmental Laws in all jurisdictions in which each Loan Party and each of its Subsidiaries, as the case may be, is currently doing business (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries

58

has become subject to any pending, or to the knowledge of the Borrower, threatened Environmental Claim or any other Environmental Liability.

(b)    None of the Loan Parties or any of their respective Subsidiaries has treated, stored, transported or disposed of Hazardous Materials at or from any currently or formerly operated real estate or facility relating to its business in a manner that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.10  Taxes.    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and its Subsidiaries have timely filed all Federal and state and other tax returns and reports required to be filed, and have timely paid all Federal and state and other taxes, assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and payable, except those which are being contested in good faith by appropriate actions diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

SECTION 5.11  ERISA Compliance.

(a)    Except as set forth in Schedule 5.11(a) or as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)    (i) No ERISA Event has occurred within the one-year period prior to the date on which this representation is made or deemed made; (ii) no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan; (iii) none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iv) none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and (v) neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan, insolvent (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA) and no such Multiemployer Plan is expected to be, insolvent or in endangered or critical status, except, with respect to each of the foregoing clauses of this Section 5.11(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and neither Holdings nor any Subsidiary has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan.

#9146626lv7

SECTION 5.12 <u>Subsidiaries</u>.  As of the Closing Date, neither Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed in <u>Schedule 5.12</u>, and all of the outstanding Equity Interests in Holdings, the Borrower and the Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by Holdings or any other Loan Party are owned free and clear of all security interests of any person except (i) those created under the Collateral Documents, the Prepetition Secured Term Loan Documents or under the ABL DIP Loan Documents (which Liens shall be subject to the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment) and the Orders) and (ii) any nonconsensual Lien that is permitted under Section 7.01. As of the Closing Date, <u>Schedule 5.12</u> (a) sets forth the name and jurisdiction of each Loan Party and each Subsidiary thereof, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13 <u>Margin Regulations; Investment Company Act</u>.

(a)    As of the Closing Date, none of the Collateral is Margin Stock. No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U of the Board of Governors of the United States Federal Reserve System.

(b)    Neither the Borrower nor any Guarantor is an "investment company" under the Investment Company Act of 1940.

SECTION 5.14 <u>Disclosure</u>.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this Section 5.14, such information and data shall not include projections and pro forma financial information or information of a general economic or general industry nature.

SECTION 5.15 <u>Intellectual Property; Licenses, Etc</u>.  The Borrower and the Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, service marks, trade names, domain names, copyrights, technology, software, trade secrets, know-how database rights, rights of privacy and publicity, licenses, registrations or applications for registration therefor and other intellectual property or similar proprietary rights throughout the world (collectively, "**IP Rights**") that are necessary for or used in the operation of their respective businesses as currently conducted and as proposed to be conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the

60

knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any rights held by any Person except for such infringements, misuses, misappropriations or violations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16    [Reserved].

SECTION 5.17    [Reserved].

SECTION 5.18    USA PATRIOT Act, OFAC, Etc.   To the extent applicable, each of the Loan Parties and their  Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department Office of Foreign Assets Control ("**OFAC**") (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the Bank Secrecy Act as amended in relevant part by the USA PATRIOT Act. Neither Holdings nor, to the knowledge of Holdings based on reasonable inquiry, any Loan Party or any director, officer, agent, or employee of any Loan Party, is currently the subject of any United States sanctions administered by OFAC, and the Loan Parties will not, directly or, knowingly, indirectly, use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities or business of or with any Person, or in any country that, at the time of such financing,  is the subject of any United States sanctions administered by OFAC. No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") or any other applicable anti-corruption laws. Holdings and its Subsidiaries have conducted their businesses in compliance, in all material respects, with applicable anti-corruption laws and the FCPA and Holdings and its Subsidiaries will conduct their business in compliance, in all material respects, with such laws and with the representation and warranty contained herein.

SECTION 5.19    Collateral Documents.   Except as otherwise contemplated hereby or under any other Loan Documents, subject to entry of the Interim Order (and Final Order, when applicable) and subject to the terms thereof, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Administrative Agent of any Pledged Debt and any Pledged Equity required to be delivered pursuant to the applicable Collateral Documents), are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien (subject to Liens permitted by Section 7.01 and subject to the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment) and the applicable Order) on all right, title and interest of the respective Loan Parties in the Collateral described therein.

SECTION 5.20  <u>No Default</u>.  No Default has occurred or is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

SECTION 5.21  <u>Insurance</u>.   The insurance maintained by or on behalf of Holdings, the Borrower and the Subsidiaries is in such amounts (with no greater risk retention) and against such risks as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.

SECTION 5.22  <u>No Casualty</u>.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance), condemnation or eminent domain proceeding that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.23  <u>Approved Budget</u>. The initial Approved Budget, attached hereto as Schedule II, which was delivered to the Administrative Agent on or prior to the Closing Date, and each subsequent Approved Budget was prepared in good faith based upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget.  To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the Approved Budget.  The Borrower shall deliver to the Administrative Agent updates to the Approved Budget in accordance with Section 6.14.

SECTION 5.24  <u>Chapter 11 Cases; Orders</u>.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Priority Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, to the extent set forth in the Interim Order or the Final Order.

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended.  The Loan Parties are in compliance in all material respects with the Order.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the DIP Termination Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Court.

SECTION 5.25 Business and Property of the Loan Parties.    Unless the Administrative Agent otherwise agrees, upon and after the Closing Date, no Loan Party nor any of their respective Subsidiaries proposes to engage in any business other than those businesses in which such entity is engaged on the date of this Agreement or that are reasonably related thereto and activities necessary to conduct the foregoing. On the Closing Date, subject to the entry of the Interim Order and the other "first day orders," the Loan Parties and their Subsidiaries has good and marketable title to, valid leasehold interests in, or valid licenses or other rights to use all personal property and possess all of the rights and consents necessary for the conduct of such businesses.

## ARTICLE VI

## Affirmative Covenants

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall remain unpaid or unsatisfied, each of Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Subsidiaries to:

SECTION 6.01 Financial Statements.   Deliver to the Administrative Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    within ninety (90) days after the end of each Fiscal Year of Holdings (or within thirty (30) days after the Closing Date (or such later date as the Administrative Agent may agree in its discretion) with respect to the audit for the Fiscal Year ending December 31, 2017), a Consolidated balance sheet of Holdings and its Subsidiaries as at the end of such Fiscal Year, and

#9146261v7

the related consolidated statements of income or operations, stockholders' equity and cash flows for such Fiscal Year, together with related notes thereto and management's discussion and analysis describing results of operations, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion (which opinion may be subject to a "going concern" or like qualification or exception but solely with respect to the audit for the Fiscal Year ending December 31, 2017, shall not be subject to any other exception or qualification as to the scope of such audit) of, solely for the Fiscal Year ending December 31, 2017, BDO USA, LLP or any other independent registered public accounting firm of nationally recognized standing;

(b)    within forty-five (45) days after the first three Fiscal Quarters of Holdings, a Consolidated balance sheet of Holdings and its Subsidiaries as of the end of such Fiscal Quarter, and the related consolidated statements of income or operations, for such Fiscal Quarter, and the elapsed portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes; and

(c)    within thirty (30) days after the end of each Fiscal Month of Holdings, a Consolidated balance sheet of Holdings and its Subsidiaries as of the end of such Fiscal Month, and the related consolidated statements of income or operations, for such Fiscal Month, and the elapsed portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Month of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes.

Notwithstanding the foregoing, the obligations in paragraph (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of Holdings and its Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of Holdings that holds all of the Equity Interests of Holdings or (B) Holdings' or such entity's Form 10-K filed with the SEC; provided that, with respect to each of clauses (A) and (B), to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to Holdings and its Subsidiaries on a standalone basis, on the other hand.

SECTION 6.02  Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    Concurrently with the delivery of the financial statements referred to in Sections 6.01(a), (b) and (c), a duly completed Compliance Certificate signed by the chief executive officer or the chief financial officer of the Borrower;

(b)    if applicable, promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Holdings or the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any Material Indebtedness or pursuant to the terms of the ABL DIP Credit Agreement or the Prepetition Debt, in each case, so long as such statements or reports are not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(d)    promptly upon obtaining knowledge thereof, the imposition of any new reserves and any changes in the eligibility criteria set forth in the borrowing base (or the components thereof) in the DIP ABL Credit Agreement;

(e)    together with the delivery of each Compliance Certificate delivered pursuant to Section 6.02(a), (i) a report setting forth the information required by Section 3.03(c) of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last such report) and (ii) a description of each event, condition, or circumstance during the Fiscal Month covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.03(b);

(f)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request; and

(g)    on the date on which the delivery of financial statements is required to be made pursuant to Section 6.01(a), the Borrower shall furnish to the Administrative Agent a description, in detail reasonably satisfactory to the Administrative Agent, of all material insurance coverage maintained by the Loan Parties, together with evidence thereof.

Documents required to be delivered pursuant to Section 6.01(a), (b) or (c) or Section 6.02(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative

#9146661v7

Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material nonpublic information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

SECTION 6.03 <u>Notices</u>. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent:

(a)     of the occurrence of any Default, Event of Default, or any "Default" or "Event of Default" as defined in the ABL DIP Credit Agreement or Prepetition Debt or with respect to other Material Indebtedness;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(d)     of the filing of any Lien for unpaid Taxes against any Loan Party in excess of $250,000;

(e)     (1) as soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all material proposed orders and pleadings that (x) impact the legal or

economic rights of the Secured Parties or that are materially adverse to the interests of the Secured Parties or (y) inconsistent with the Approved Budget or the terms of the Loan Documents, in each case related to (A) the Chapter 11 Cases and (B) the Prepetition Secured Term Loan Facility, this Agreement and the credit facilities contemplated thereby, the Prepetition Unsecured Term Loan Facility, the ABL DIP Facility and/or any sale contemplated in accordance with the Milestones and any plan of reorganization and/or any disclosure statement related thereto (each of which material proposed orders or pleadings must, to the extent related to the foregoing, be in form and substance reasonably satisfactory to the Required Lenders), (2) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, and (3) each report, notice or certificate required to be delivered to any of the lenders or agents under the ABL DIP Credit Agreement;

(f)     of any failure by any Loan Party to pay rent as and when required by the applicable Lease (giving effect to any grace periods included therein) at any of the Loan Parties' distribution centers or warehouses; and

(g)     of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a) - (g) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 6.04 <u>Payment of Obligations</u>.  Subject to the Order and the terms thereof, pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities (a) in respect of taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property and (b) all lawful claims of landlords, warehousemen, customs brokers, freight forwarders, in each case, incurred on a Post-Petition basis and in accordance with the Approved Budget, and except, in each case, to the extent (i) any such tax, assessment, charge or levy is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (ii) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 6.05  <u>Preservation of Existence, Etc</u>.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks, service marks and trade names and other IP Rights, except in the case of clause (a) or (b) to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by <u>Article VII</u>.

SECTION 6.06  <u>Maintenance of Properties</u>.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its Material Properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

SECTION 6.07  <u>Maintenance of Insurance</u>.  Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. Each policy of insurance shall as appropriate, (i) name the Administrative Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders as the loss payee thereunder.

SECTION 6.08  <u>Compliance with Laws</u>.  Comply (a) in all material respects with its Constituent Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases and (b) the Bankruptcy Code, the Bankruptcy Rules, the Orders and any other order of the Court in all material respects.

SECTION 6.09  <u>Books and Records</u>.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or its Subsidiary, as the case may be.

SECTION 6.10  <u>Inspection Rights</u>.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts

#9146661v7

therefrom and to discuss its affairs, finances and accounts with its directors and officers), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10; *provided*, *further*, that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 6.10, none of the Borrower or any of its Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

    SECTION 6.11  Covenant to Guarantee Obligations and Give Security.  At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

    (a)    (x) upon the formation or acquisition of any new direct or indirect Wholly-Owned Subsidiary by any Loan Party or any Subsidiary becoming a Wholly-Owned Subsidiary, in each case which Subsidiary is not an Excluded Subsidiary, (y) upon the acquisition of any material assets by the Borrower or any other Loan Party or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

    (i)    within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after each such event or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion:

        i.    [reserved];

        ii.    cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents, as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents

#9146261v7

in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

iii.    in each case unless such certificates have been delivered to any agent under any Prepetition Debt, cause each such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Administrative Agent; and

iv.    take and cause the applicable Subsidiary and each direct or indirect parent of such applicable Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) may be necessary in the reasonable opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid perfected Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law);

(ii)    within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after the request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request, and

(b)    the Borrower shall obtain the security interests and Guarantees set forth on Schedule 1.01A on or prior to the dates corresponding to such security interests and Guarantees set forth on Schedule 1.01A.

SECTION 6.12  Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

#9146661v7

SECTION 6.13  Further Assurances.  Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties, promptly upon reasonable request by the Administrative Agent or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments (including filings with the U.S. Patent and Trademark Office, the U.S. Copyright Office or any foreign equivalents of the foregoing) as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

SECTION 6.14  Approved Budget.

(a)    The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted under Section 6.14(b)).  The initial Approved Budget shall depict, on a weekly and line item basis for the first thirteen (13) week period from the Closing Date, (1) (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses of the Loan Parties' professionals and advisors budgeted on a monthly basis), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flow, (iv) projected Borrowing Base, FILO Borrowing Base and Excess Availability (each as defined in the ABL DIP Credit Agreement as in effect on the date hereof), and (v) the Term DIP Facility availability and total available liquidity, and (2) the other items set forth therein and such other information requested by the Administrative Agent, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent (it being acknowledged and agreed that the initial Approved Budget attached hereto as Schedule II is approved by and satisfactory to the Administrative Agent).  The Approved Budget shall be updated, modified or supplemented by the Borrower from time to time and upon the reasonable request of the Administrative Agent, but in any event the Approved Budget shall be updated by the Borrower not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be deemed an Approved Budget unless the Administrative Agent, acting at the direction of the Required Lenders in their reasonable discretion, objects by written notice delivered to the Borrower on or within five (5) Business Days after the receipt of such updated, modified or supplemented budget; *provided, however,* that in the event the Administrative Agent objects, the current Approved Budget shall remain the Approved Budget until and the Administrative Agent and the Loan Parties agree as to an updated, modified or supplemented budget.  Each Approved Budget delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent.  Each Approved Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable.

(b)    Commencing with the fourth full calendar week following the Petition Date and for each calendar week thereafter, the Borrower shall not permit (i) the Actual Cash Receipts (without giving effect to borrowings and repayments under this Agreement and the ABL DIP Credit Agreement), measured as at the end of any Cumulative Four-Week Period to be less

71

than ninety percent (90%) of the Budgeted Cash Receipts (without giving effect to borrowings and repayments under this Agreement and the ABL DIP Credit Agreement), measured as at the end of any Cumulative Four-Week Period, (ii) the Actual Disbursement Amount, measured on a Cumulative Four-Week Period to exceed one hundred and ten percent (110%) of the Budgeted Disbursement Amount, measured for any such Cumulative Four-Week Period, (iii) the Actual Net Operating Cash Flow Amount, measured on a Cumulative Four-Week Period to be less than (A) if the applicable budgeted amount is greater than $0, ninety percent (90%) and (B) if the applicable budgeted amount is less than $0, one hundred and ten percent (110%), in each case, of the Budgeted Net Operating Cash Flow Amount, measured for any such Cumulative Four-Week Period, (iv) the Actual Net Cash Flow Amount, measured on a Cumulative Four-Week Period to be less than (A) if the applicable budgeted amount is greater than $0, ninety percent (90%) and (B) if the applicable budgeted amount is less than $0, one hundred and ten percent (110%), in each case, of the Budgeted Net Cash Flow Amount, measured for any such Cumulative Four-Week Period and (v) the Actual Prepetition Relief Amount, measured on a Cumulative Period, to exceed one hundred and five percent (105%) of the Budgeted Prepetition Relief Amount, measured for any such Cumulative Period.

(c)    The Borrower shall deliver to the Administrative Agent on or before 5:00 p.m. (New York City time) on the third Business Day of each week (commencing on the third Business Day of the first full calendar week following the Petition Date) a certificate including such detail as is reasonably satisfactory to the Administrative Agent, signed by a Responsible Officer of the Borrower certifying that (i) the Loan Parties are in compliance with the covenants contained in Section 6.14(b) above and (ii) no Default or Event of Default with respect to the Approved Budget has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, together with (A) a comparison for the Prior Week of the Actual Cash Receipts (and each line item thereof), the Actual Disbursement Amount (and each line item thereof other than the line item titled "Prepetition Relief"), the Actual Net Operating Cash Flow Amount and the Actual Net Cash Flow Amount (and each line item thereof) for such Prior Week to the Budgeted Cash Receipts (and each line item thereof), the Budgeted Disbursement Amount (and each line item thereof other than the line item titled "Prepetition Relief"), Budgeted Net Operating Cash Flow Amount and the Budgeted Net Cash Flow Amount (and each line item thereof) for such Prior Week, (B) a cumulative comparison for the Cumulative Four-Week Period of the Actual Cash Receipts (and each line item thereof), the Actual Disbursement Amount (and each line item thereof other than the line item titled "Prepetition Relief"), the Actual Net Operating Cash Flow Amount, the Actual Net Cash Flow Amount (and each line item thereof) for such Cumulative Four-Week Period to the Budgeted Cash Receipts (and each line item thereof), the Budgeted Disbursement Amount (and each line item thereof other than the line item titled "Prepetition Relief"), the Budgeted Net Operating Cash Flow Amount and the Budgeted Net Cash Flow Amount (and each line item thereof) for such Cumulative Four-Week Period, (C) a cumulative comparison for the Cumulative Period of the Actual Prepetition Relief Amount for such Cumulative Period to the Budgeted Prepetition Relief Amount for such Cumulative Period and (D) an Approved Budget Variance Report, each of which shall be prepared by the Borrower as of the last day of the Cumulative Four-Week Period and shall be in form reasonably satisfactory to the Administrative Agent.

#9146661v7

(d)    The Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts (including, without limitation, professional fees) to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein. The Administrative Agent and the Lenders acknowledge and agree that the line items in the Approved Budget for payment of professional fees are estimates only, and the Loan Parties remain obligated to pay any and all professional fees in accordance with their agreements with respect thereto (and subject to the Court's approval, as applicable) and nothing herein shall preclude or prohibit the payment of professional fees.

SECTION 6.15  [Reserved].

SECTION 6.16  Milestones.  Comply with each of the following milestones (the "**Milestones**"):

(i)    No later than 14 calendar days after the Petition Date the Debtors shall have filed a prearranged Acceptable Plan.

(ii)    No later than 14 calendar days after the Petition Date the Debtors shall have filed an Acceptable Disclosure Statement and a motion seeking approval of an Acceptable Disclosure Statement.

(iii)    The Bankruptcy Court's shall have entered the Final Order on or before June 26, 2018.

(iv)    No later than ~~November 30, 2018~~January 25, 2019, the Debtors shall have received at least one irrevocable and legally binding commitment, in form and substance reasonably satisfactory (or satisfactory solely with respect to any condition, contingency, or other provision in such commitment that poses a material risk to the parties being able to close or fund the New First Lien Term Loan Facility pursuant to such commitment, other than a condition, contingency, or other provision relating to the closing of the Sale) to the Required Lenders, to enter into the New First Lien Term Loan Facility.

(v)    [Reserved]

(vi)    The Bankruptcy Court's entry of an Acceptable ~~Disclosure Statement Approval~~Confirmation Order on or before ~~November 1~~March 12, ~~2018~~2019.

(vii)    [Reserved]~~.~~

(viii)    ~~The~~If the Bankruptcy ~~Court's shall~~Court denies the entry of an Acceptable Confirmation Order or shall not have entered an Acceptable Confirmation Order on or before ~~December 21, 2018~~March 12, 2019, then the Debtors shall, no later than the earlier of March 26, 2019 and the date that is 14 days after the date of such denial, have filed a plan of reorganization or liquidation that is in form and substance acceptable to the Required Lenders.

(ix)    The effective date of an Acceptable Plan shall have occurred not later than ~~January 15~~March 31, 2019.

SECTION 6.17  Restructuring Advisor; Cooperation with Restructuring Advisor.

(i)    The Loan Parties shall continue to engage and retain Alvarez & Marsal North America, LLC ("**Alvarez**") or such other restructuring advisor reasonably acceptable to the Administrative Agent (each, a "**Restructuring Advisor**").    The retention of any Restructuring Advisor shall be on terms and conditions (including as to scope of engagement) reasonably satisfactory to the Administrative Agent.  The Administrative Agent hereby confirms that, as of the Closing Date, the existing engagement of Alvarez as the Restructuring Advisor shall satisfy the applicable requirements set forth in this *clause (a)*.  The Restructuring Advisor shall be retained by and at the sole cost and expense of the Loan Parties and solely on behalf of the Loan Parties at all times;

(ii)    The Loan Parties shall cooperate with the Restructuring Advisor in all material respects.  The Loan Parties hereby (i) authorize the Administrative Agent (or its agents or advisors) to communicate directly with the Restructuring Advisor regarding any and all matters related to the Loan Parties and their Affiliates, including, without limitation, all financial reports and projections developed, reviewed or verified by the Restructuring Advisor and all additional information, reports and statements reasonably requested by the Administrative Agent (it being understood that the Chief Financial Officer of the Company will be invited to participate in such communications), and (ii) authorize and direct each Restructuring Advisor to provide the Administrative Agent (or its agents or advisors) with copies of reports and other information or materials prepared or reviewed by such Restructuring Advisor as the Administrative Agent may reasonably request (in each case, other than (1) disclosure subject to bona fide attorney-client privilege or similar privilege or constitutes attorney work product, or (2) in respect of which disclosure to the Administrative Agent (or other agents or advisors) is prohibited by Law or by bona fide third party contract or confidentiality obligation).

SECTION 6.18  Investment Bankers; Cooperation with Investment Bankers.

(a)    The Loan Parties shall continue to engage and retain Lazard Ltd. ("**Lazard**") or such other investment banker reasonably acceptable to the Administrative Agent (each, an "**Investment Banker**").  The retention of any Investment Banker shall be on terms and conditions (including as to scope of engagement) reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).  The Administrative Agent hereby confirms that, as of the Closing Date, the existing engagement of Lazard as the Investment Banker shall satisfy the applicable requirements set forth in this clause (a).  The Investment Banker shall be retained by and at the sole cost and expense of the Loan Parties and solely on behalf of the Loan Parties at all times;

74

(b)     The Loan Parties shall cooperate with the Investment Banker in all material respects.  The Loan Parties hereby (i) authorize the Administrative Agent and the Lenders (or their respective agents or advisors) to communicate directly with the Investment Banker regarding any and all matters related to the Loan Parties and their Affiliates, including, without limitation, all financial reports and projections developed, reviewed or verified by the Investment Banker and all additional information, reports and statements reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) (it being understood that the Chief Financial Officer of the Company will be invited to participate in such communications), and (ii) authorize and direct each Investment Banker to provide the Administrative Agent and the Lenders (or their agents or advisors) with copies of reports and other information or materials prepared or reviewed by such Investment Banker as the Administrative Agent may reasonably request (in each case, other than (1) disclosures that constitute non-financial trade secrets or non-financial trade secrets or non-financial proprietary information, (2) disclosure subject to bona fide attorney-client privilege or similar privilege or constitutes attorney work product, or (3) in respect of which disclosure to the Administrative Agent (or other agents or advisors) is prohibited by Law or by bona fide third party contract or confidentiality obligation).

SECTION 6.19  Advisors.

The Loan Parties shall pay all reasonable and documented out-of-pocket fees and expenses of (i) the Administrative Agent (including, all Attorney Costs of Davis Polk & Wardwell LLP, as counsel to the Administrative Agent) and (ii) the Lenders (including, in the case of counsel, financial advisors and other outside professional advisors to (x) in the case of counsel, all Attorney Costs of Kramer Levin Naftalis & Frankel LLP (to the extent permitted under the applicable Order), Davis Polk & Wardwell LLP and King & Spalding LLP and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders in each relevant jurisdiction, and (y) in the case of outside financial advisor, all reasonable fees, costs, disbursements and expenses of the Lenders' outside financial advisors Moelis & Company LLC (to the extent permitted under the applicable Order), Morris Tbeile (to the extent permitted under the applicable Order), Ducera Partners LLC and Guggenheim Securities (pursuant to the terms of its engagement letter with the Borrower as in effect on the date hereof), and all such reasonable and documented fees and expenses set forth in this Section 6.19 ("**Advisor Costs**") shall constitute Obligations and be secured by the Collateral.  The Lenders shall be entitled to retain or continue to retain (either directly or through counsel) any Lenders' Advisors the Lenders may deem necessary to provide advice, analysis and reporting for the benefit of the Lenders, subject to the reasonable consent of the Loan Parties.  The Loan Parties and their advisors, including the Restructuring Advisor and the Investment Banker, shall grant access to, and cooperate in all respects with, the Administrative Agent, the Lenders, Lenders' Advisors, and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner (in each case, other than (1) disclosures that constitute non-financial trade secrets or non-financial proprietary information, (2) disclosure subject to bona fide attorney-client privilege or similar privilege or constitutes attorney work product, or (3) in respect of which disclosure to the Administrative Agent (or its agents or advisors) is prohibited by Law or by bona fide third party contract or confidentiality obligation).

#9146626lv7

SECTION 6.20  Debtor-In-Possession Obligations.    The Loan Parties shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Court.

SECTION 6.21  Status of Sale.

Promptly upon the Administrative Agent's written request (acting at the direction of the Required Lenders), each Loan Party shall provide the Administrative Agent with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to the Sale or any other transaction and copies of any such bids and any updates, modifications or supplements to such information and materials.

SECTION 6.22  Lender Calls.

The Loan Parties shall host the following telephonic conference calls with the Administrative Agent, the Lenders and the Lenders' Advisors, if requested by the Administrative Agent:

(i)   No less frequently than once every two (2) weeks, a call with the Restructuring Advisor to discuss the contents of the Approved Budget Variance Report;

(ii)  No less frequently than once every two (2) weeks, a call with the Investment Banker to discuss (i) the financial operations and performance of the Loan Parties' business, or (ii) such other matters relating to the Loan Parties as the Administrative Agent (or its agents or advisors) shall reasonably request (in each case, subject to protection as necessary in respect of bona fide attorney-client privilege); and

(iii) No less frequently than once every two (2) weeks, a call with the appropriate Loan Party professionals to discuss the status of landlord negotiations.

Notwithstanding the foregoing, nothing herein shall require the Loan Parties to provide information if (1) such information constitutes non-financial trade secrets or non-financial proprietary information, (2) such information is subject to bona fide attorney-client privilege or similar privilege or constitutes attorney work product, or (3) the disclosure of such information to the Administrative Agent (or other agents or advisors) is prohibited by Law or by bona fide third party contract or confidentiality obligation.

SECTION 6.23  Post-Closing Matters.

Notwithstanding the conditions precedent set forth in Section 4.01 above, the Borrower has informed the Administrative Agent and the Lenders that certain items required to be delivered to the Administrative Agent or otherwise satisfied as conditions precedent to the effectiveness of this Agreement will not be delivered to the Administrative Agent as of the date hereof. As an accommodation to the Borrower, the Administrative Agent and the Lenders have agreed to make this Agreement effective notwithstanding that such conditions have not been satisfied (but subject to the other conditions set forth herein). In consideration of such accommodation, the Borrower hereby agree to take each of the actions described on Schedule 6.23 attached hereto, in

76

each case in the manner and by the dates set forth thereon, or such later dates as may be agreed to by the Administrative Agent in its sole discretion or by the Required Lenders.

## ARTICLE VII

## <u>Negative Covenants</u>

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall remain unpaid or unsatisfied, each of Holdings and the Borrower shall not (and, with respect to Section 7.13, only Holdings shall not), nor shall Holdings or the Borrower permit any Subsidiary to:

SECTION 7.01 <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens created pursuant to any Loan Document;

(b)     Liens existing on the Closing Date and set forth on <u>Schedule 7.01(b);</u>

(c)     Liens for taxes, assessments or governmental charges arising Post-Petition, in an aggregate amount not to exceed $300,000 that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP;

(d)     statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens arise in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     subject to the Orders and the terms thereof, (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Subsidiaries;

(f)     deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business, in each case in accordance with the Approved Budget;

77

(g)    easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole, or the use of the property for its intended purpose;

(h)    Liens arising from judgments or orders for the payment of money arising Post-Petition not constituting an Event of Default under Section 8.01(g);

(i)    [Reserved];

(j)    leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(k)    Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business that are not overdue for a period of more than thirty (30) days or that are being contested in good faith by appropriate actions, for which appropriate reserves have been established in accordance with GAAP and (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business;

(l)    Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(m)    Liens consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Disposition would have been permitted on the date of the creation of such Lien;

(n)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary incurred pursuant to Sections 7.03(b);

(o)    Liens in favor of the Borrower or a Subsidiary securing Indebtedness permitted under Section 7.03(d);

(p)    [Reserved];

(q)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases (other than Capitalized

Leases) or non-exclusive licenses entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(r)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02 and reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(t)     Liens that are customary contractual rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower or any of its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(u)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with any letter of intent or purchase agreement established prior to the Petition Date;

(v)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(w)     purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements or similar public filings filed prior to the Petition Date in the ordinary course of business;

(x)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(y)     (i) Liens securing obligations in respect of Indebtedness permitted under Section 7.03(r)(i) and obligations in respect of any ABL DIP Secured Hedge Agreement and any ABL DIP Secured Cash Management Agreement permitted under Section 7.03(r)(ii) that are subject to the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment) and the Orders and (ii) Liens securing obligations in respect of Indebtedness permitted under any ABL DIP Secured Bank Product Agreement;

(z)     [Reserved];

(aa)    any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

#9146661v7

(bb)    [Reserved];

(cc)    without duplication of, or aggregation with, any other Lien permitted under any other clause of this Section 7.01, other Liens (not covering Current Asset Collateral) securing obligations outstanding in an aggregate principal amount not to exceed $750,000 at any time outstanding determined as of the date of incurrence;

(dd)    Liens or rights of setoff against credit balances of the Borrower or any of its Subsidiaries with Credit Card Issuers or Credit Card Processors (each, as defined in the ABL DIP Credit Agreement) or amounts owing by such Credit Card Issuers or Credit Card Processors to the Borrower or any of its Subsidiaries in the ordinary course of business, in each case subject to the Cash Management Order (as defined in the ABL DIP Credit Agreement, as in effect on the Closing Date) but not Liens on or rights of setoff against any other property or assets of any Borrower or any of its Subsidiaries pursuant to the Credit Card Agreements (as defined in the ABL DIP Credit Agreement, as in effect on the Closing Date), as in effect on the date hereof, to secure the obligations of the Borrower or any of its Subsidiaries to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(ee)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)    deposits of cash made prior to the Petition Date with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(gg)    Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course of business and not given in connection with the issuance of Indebtedness or (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of their Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower and their Subsidiaries; and

(hh)    Liens on the Collateral granted to provide adequate protection pursuant to the Interim Order (and, when entered, the Final Order).

Notwithstanding the foregoing, Liens permitted under this Section 7.01 other than the Liens securing the ABL DIP Facility (solely to the extent set forth in the Orders) shall at all times be junior and subordinate to the Liens under the Loan Documents and the applicable Order securing the Obligations. The prohibition provided for in this Section 7.01 specifically includes any effort by any Debtor, any Committee or any other party in interest in the Chapter 11 Cases, as applicable, to prime or create pari passu to any claims, Liens or interests of the Administrative Agent and the Lenders, any Lien, in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected."

SECTION 7.02  Investments.  Make or hold any Investments, except:

#9146626lv7

(a)    Investments by Holdings, the Borrower or any of their Subsidiaries in assets that are Cash Equivalents;

(b)    to the extent permitted by the Approved Budget, loans or advances to officers, directors and employees of Holdings, the Borrower or any of their Subsidiaries for reasonable and customary business related travel, entertainment, relocation and analogous ordinary business purposes;

(c)    Investments (i) by (A) Holdings in any Loan Party and (B) the Borrower or any Subsidiary that is a Loan Party in the Borrower or any Subsidiary that is a Loan Party; *provided* that Investments by the Borrower in any Subsidiary outside of the ordinary course of business shall not exceed, at any time outstanding $500,000 (other than to the extent such Investment is consistent with the Approved Budget), (ii) by any Non-Loan Party in any other Non-Loan Party that is a Subsidiary, (iii) by any Non-Loan Party in the Borrower or any Subsidiary that is a Loan Party and (iv) without duplication of any other clauses of this Section 7.02, by any Loan Party in any Foreign Subsidiary other than Foreign Subsidiaries organized under the laws of Canada or any province thereof; *provided* that (A) any such Investments made pursuant to this clause (iv) in the form of intercompany loans shall be evidenced by notes that have been pledged (individually or pursuant to a global note) to the Administrative Agent for the benefit of the Lenders, (B) any such Investment made pursuant to this clause (iv) shall be used solely to fund payroll and other Investments in international operations in the ordinary course of business consistent with the Approved Budget and (C) the aggregate amount of Investments made pursuant to this clause (iv) shall not exceed $1,000,000 in any Fiscal Month;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business in accordance with the Approved Budget, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Sections 7.01, 7.03 (other than Section 7.03(c)(ii) or (d)), 7.04 (other than Section 7.04(f)), 7.05(other than Section 7.05(e)) and 7.06 (other than Section 7.06(d)), respectively;

(f)    Investments existing on the date hereof and set forth on <u>Schedule 7.02(f)</u>;

(g)    Investments in Swap Contracts permitted under Section 7.03;

(h)    [Reserved];

(i)    [Reserved];

(j)    [Reserved];

(k)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

#9146261v7

(l)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment;

(m)    loans and advances to Holdings in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 7.06(g);

(n)    [Reserved];

(o)    To the extent permitted by the Approved Budget, advances of payroll payments to employees in the ordinary course of business;

(p)    [Reserved];

(q)    [Reserved]; and

(r)    Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business in accordance with the Approved Budget.

SECTION 7.03 <u>Indebtedness</u>.    Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

(a)    Indebtedness under the Loan Documents and the Prepetition Secured Term Loan Documents;

(b)    (i) Indebtedness existing on the date hereof set forth on <u>Schedule 7.03(b)</u> and (ii) intercompany Indebtedness outstanding on the date hereof; *provided* that all such Indebtedness of any Loan Party owed to any Non-Loan Party shall be subject to the Intercompany Subordination Agreement;

(c)    (i) Guarantees by Holdings, the Borrower and their Subsidiaries in respect of Indebtedness of the Borrower or any Subsidiary otherwise permitted hereunder (except that a Subsidiary that is not a Loan Party may not, by virtue of this Section 7.03(c), Guarantee Indebtedness that such Subsidiary could not otherwise incur under this Section 7.03); *provided* that (A) no Guarantee by any Subsidiary of the ABL DIP Facility shall be permitted unless such Subsidiary shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) any Guaranty by a Loan Party of Indebtedness of a Subsidiary that would have been permitted as an Investment by such Loan Party in such Subsidiary under Section 7.02(c);

(d)    Indebtedness of the Borrower or any of the Subsidiaries owing to the Borrower or any other Subsidiary to the extent constituting an Investment consistent with the

82

Approved Budget and permitted by Section 7.02; *provided* that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be unsecured and subject to the Intercompany Subordination Agreement;

(e)    [Reserved];

(f)    Indebtedness in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)    [Reserved];

(h)    [Reserved];

(i)    Indebtedness representing deferred compensation to employees of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(j)    [Reserved];

(k)    [Reserved];

(l)    [Reserved];

(m)    Indebtedness in respect of Cash Management Services, netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof;

(n)    [Reserved];

(o)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)    Indebtedness incurred by the Borrower or any of the Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(q)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice and in accordance with the Approved Budget;

#9146261v7

(r)    (i) Indebtedness in an aggregate principal amount not to exceed $247,523,512.50 at any time outstanding under the ABL DIP Facility plus any amounts of interest, fees and expenses thereunder and (ii) the amount of obligations in respect of any ABL DIP Secured Hedge Agreement, any ABL DIP Secured Cash Management Agreement and any ABL DIP Secured Bank Product Agreement at any time outstanding and not incurred in violation of Section 7.03(f) or Section 7.03(m) (as applicable); provided that Indebtedness under the ABL DIP Facility is subject to the Orders;

(s)    (i) Indebtedness in respect of the Prepetition Senior Notes in an aggregate principal amount not to exceed $705,166,000 at any time outstanding plus any amounts of interest, fees and expenses thereunder and (ii) Indebtedness under the Prepetition Unsecured Term Loan Facility (including any guarantees thereof) in an aggregate principal amount not to exceed $300,000,000 at any time outstanding plus any amounts of interest, fees and expenses thereunder;

(t)    Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this clause (t) and then outstanding, does not exceed $1,000,000;

(u)    [Reserved];

(v)    [Reserved]; and

(w)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (v) above.

Notwithstanding the foregoing, no Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Subsidiary becomes a Guarantor.

Notwithstanding anything to the contrary contained in this Agreement, Indebtedness incurred pursuant to the ABL DIP Facility may only be incurred pursuant to Section 7.03(r).

Notwithstanding any of the foregoing, and except for the Priority Carve-Out, no Indebtedness permitted under this Section 7.03 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of the Administrative Agent and the Lenders as set forth herein and in the applicable Order, other than (x) Indebtedness under the ABL DIP Credit Agreement permitted under Section 7.03(r).

SECTION 7.04 Fundamental Changes.    Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)    [Reserved];

(b)      (i) any Excluded Subsidiary may merge or consolidate with or into any other Subsidiary of the Borrower that is not a Loan Party, (ii) any Subsidiary may merge or consolidate with or into any other Subsidiary of the Borrower that is a Loan Party, (iii) any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States shall be permitted and (iv) any Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders, *provided*, in the case of clauses (ii) through (iv), that (A) no Event of Default shall result therefrom, (B) no Change of Control shall result therefrom and (C) the surviving Person (or, with respect to clause (iv), the Person who receives the assets of such dissolving or liquidated Subsidiary that is a Guarantor) shall be a Loan Party;

(c)      [Reserved];

(d)      [Reserved];

(e)      [Reserved]; and

(f)      so long as no Default exists or would result therefrom, any Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02 (other than Section 7.02(e)); *provided* that the continuing or surviving Person shall be the Borrower or a Subsidiary, which together with each of its Subsidiaries, shall have complied with the applicable requirements of Section 6.11.

SECTION 7.05  Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)      Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries;

(b)      Dispositions of inventory and goods held for sale in the ordinary course of business;

(c)      [Reserved];

(d)      Dispositions of property to the Borrower or to another Loan Party (other than Holdings); *provided* that if the transferor of such property is a Loan Party the transferee thereof must be a Loan Party (other than Holdings) in which event the Administrative Agent shall retain its perfected Lien on the property so disposed of, subject to the same priority as existed prior to such Disposition or otherwise in accordance with the Approved Budget;

(e)      Dispositions permitted by Sections 7.02 (other than Section 7.02(e)), 7.04 and 7.06 (other Section 7.06(d)) and Liens permitted by Section 7.01 (other than Section 7.01(m));

(f)      Dispositions of property pursuant to sale-leaseback transactions; *provided* that the Net Cash Proceeds thereof are applied in accordance with Section 2.03(b)(ii);

#9146261v7

(g)      Dispositions of Cash Equivalents; provided that the Borrower shall then be in compliance with Section 8.12 of the ABL DIP Credit Agreement;

(h)      leases, subleases, non-exclusive licenses or non-exclusive sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(i)      transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(j)      Dispositions of property (other than Current Asset Collateral and Intellectual Property that is material to the conduct of the business of the Loan Parties) not otherwise permitted under this Section 7.05, provided that (x) at the time of such Disposition, no Default or Event of Default shall exist or would result from such Disposition and (y) the aggregate fair market value of all the property so disposed of shall not exceed $500,000;

(k)      [Reserved];

(l)      Dispositions of accounts receivable in connection with the collection or compromise thereof (and not in connection with any factoring or similar arrangement);

(m)      [Reserved];

(n)      [Reserved];

(o)      [Reserved];

(p)      the unwinding of any Swap Contract;

(q)      [Reserved];

(r)      the Specified Store Closing Sales and the Sale;

(s)      [Reserved]; and

(t)      the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any immaterial IP Rights;

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(e), (i), (p) and (t) and except for Dispositions from the Borrower or a Subsidiary that is a Loan Party to the Borrower or a Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith..

SECTION 7.06  Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

#9146661v7

(a)    each Subsidiary may make Restricted Payments to the Borrower and the Loan Parties (other than Holdings), in each case solely to the extent such declaration or payment would not violate the Approved Budget;

(b)    [Reserved];

(c)    [Reserved];

(d)    to the extent constituting Restricted Payments, Holdings, the Borrower and their Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02 (other than Section 7.02(e)), 7.04 or 7.08 (other than Sections 7.08(a) or (j));

(e)    [Reserved];

(f)    [Reserved];

(g)    the Borrower may make Restricted Payments to Holdings, in each case solely to the extent such declaration or payment would not violate the Approved Budget:

(i)    the proceeds of which will be used to pay (or make Restricted Payments to any direct or indirect parent of Holdings to pay) the actual tax liability to any foreign, federal, state or local jurisdiction in respect of the income or operations of Holdings (and/or its Subsidiaries that are disregarded entities or otherwise taxed as flow through entities or included in a combined, consolidated, affiliated or unitary group with Holdings or any of its parent entities), provided that the aggregate Restricted Payments to pay tax liabilities shall not exceed the taxes that would have been payable by Holdings and/or its Subsidiaries that are Loan Parties if (i) Holdings were taxed as a C corporation for U.S. income tax purposes; and (ii) each of Holdings' Subsidiaries that are Loan Parties were treated as a disregarded entity for U.S. income tax purposes (or included in a combined, consolidated, affiliated or unitary group with Holdings);

(ii)    the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) operating costs and expenses of Holdings or its direct or indirect parents incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of the Borrower and its Subsidiaries; and

(iii)    the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent of Holdings which does not own other Subsidiaries besides Holdings, its Subsidiaries and the direct or indirect parents of Holdings to pay) franchise taxes and other fees, taxes and expenses required to maintain its corporate existence.

SECTION 7.07 <u>Change in Nature of Business</u>. Engage in any material line of business substantially different from the Business as conducted by Holdings, the Borrower and

the Subsidiaries on the Closing Date and business activities ancillary thereto and consistent with past practice.

SECTION 7.08  <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of Holdings or the Borrower, whether or not in the ordinary course of business, other than:

(a)    transactions between or among the Loan Parties; <u>provided</u> that transactions between the Borrower and any Loan Party outside of the ordinary course of business shall be on terms substantially as favorable to the Borrower as would be obtainable by Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate,

(b)    transactions on terms substantially as favorable to Holdings, the Borrower or such Subsidiary as would be obtainable by Holdings, the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)    [Reserved],

(d)    [Reserved],

(e)    [Reserved],

(f)    employment and severance arrangements between Holdings, the Borrower and their Subsidiaries and their respective officers and employees in the ordinary course of business and consistent with the Approved Budget,

(g)    the non-exclusive licensing of trademarks, copyrights or other IP Rights in the ordinary course of business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(h)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Subsidiaries or any direct or indirect parent of Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries, in each case consistent with the Approved Budget, <u>provided</u> that, no payments under this clause (h) shall be permitted to any of the Permitted Holders,

(i)    any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on <u>Schedule 7.08</u>, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date),

(j)    Restricted Payments permitted under Section 7.06,

(k)    [Reserved],

(l)    [Reserved],

#9146261v7

(m)    [Reserved],

(n)    [Reserved], and

(o)    payments to or from, and transactions with, Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by Holdings and its Subsidiaries in such Joint Venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02.

SECTION 7.09 <u>Burdensome Agreements</u>.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Excluded Subsidiary to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facility and the Obligations under the Loan Documents and the Prepetition Secured Term Loan Obligations under the Prepetition Secured Term Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(i)    (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on <u>Schedule 7.09</u>,

(ii)    [Reserved],

(iii)    represent Indebtedness of a Subsidiary that is not a Loan Party that is permitted by Section 7.03,

(iv)    are customary restrictions that arise in connection with (x) any Lien permitted by Sections 7.01(a), (l), (m), (s), (t)(i), (t)(ii), (u) and (y) and relate to the property subject to such Lien or (y) any Disposition permitted by Section 7.05 applicable pending such Disposition solely to the assets subject to such Disposition,

(v)    are customary provisions in joint venture agreements and other similar agreements applicable to Joint Ventures permitted under Section 7.02 and applicable solely to such Joint Venture entered into in the ordinary course of business,

(vi)    are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness and the proceeds and products thereof and, in the case of the Prepetition Secured Term Loan Facility and the ABL DIP Facility, permit the Liens securing the Obligations without restriction (subject to the Prepetition Intercreditor Agreement (as ~~supplementd~~<u>supplemented</u> by the Intercreditor Acknowledgment)),

(vii)    are customary restrictions on leases, subleases, non-exclusive licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto,

89

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(o)(i), (r) or (t) to the extent that such restrictions apply only to the property or assets securing such Indebtedness,

(ix)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Subsidiary,

(x)    are customary provisions restricting assignment of any agreement entered into in the ordinary course of business,

(xi)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business,

(xii)    are customary restrictions contained in the Prepetition Secured Term Loan Documents, the Prepetition Unsecured Term Loan Documents, the ABL DIP Loan Documents, the Prepetition Senior Notes Indenture and the Prepetition Senior Notes, or

(xiii)    arise in connection with cash or other deposits permitted under Section 7.01.

SECTION 7.10    <u>Use of Proceeds</u>.

(a)    Use the proceeds of any Borrowing for purposes other than the following except as otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders) (i) for the payment of prepetition amounts as authorized by the Court pursuant to orders approving the first day motions filed by the Loan Parties; (ii) in accordance with the terms of the Term DIP Facility and the Orders (A) for the payment of working capital and other general corporate needs of the Borrower, the Guarantors and their respective Subsidiaries in the ordinary course of business, (B) for the payment of Chapter 11 expenses, including Taxes, allowed professional fees, costs and expenses for advisors, consultants, counsel and other professionals retained by the Borrower or (C) to pay fees and expenses related to the Term DIP Facility; (iii) to repay amounts outstanding pursuant to the ABL DIP Credit Agreement or (iv) otherwise in accordance with the Approved Budget.

(b)    Without in any way limiting the foregoing in subsection (a) above, no Collateral, proceeds of the Loans, any portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Loan Parties, the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens (as defined in the Order) or the Prepetition Liens (as defined in the Order); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Administrative Agent, the Lenders, the Prepetition Secured Term Loan Agent or the Prepetition Secured Term Lenders, and each of their respective

officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (collectively, the "**Released Parties**"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Liens granted under the Loan Documents, the Loan Documents, the Prepetition Secured Term Loan Documents or the Prepetition Secured Term Loan Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Secured Term Loan Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent or the Lenders hereunder or under any of the Loan Documents, or (B) the Prepetition Secured Term Loan Agent or the Prepetition Secured Term Lenders under any of the Prepetition Secured Term Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the Administrative Agent's or the Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the Orders); or (vi) except as set forth in the applicable Order with respect to the Remedies Hearing (as defined in such Order), objecting to, contesting, or interfering with, in any way, the Administrative Agent's and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; *provided*, *however*, that no more than $25,000 in the aggregate of the Collateral, the Carve-Out, proceeds from the borrowings under the Term DIP Facility or any other amounts, may be used by the Committee to investigate claims and/or liens of the Prepetition Unsecured Term Loan Agent and Prepetition Secured Term Lenders under the Prepetition Unsecured Term Loan Agreement.

SECTION 7.11  <u>Accounting Changes</u>.  Make any change in fiscal year.

SECTION 7.12  <u>Prepayments, Etc. of Indebtedness</u>.

(a)    Other than pursuant to an order of the Court (including any Order) and in accordance with the Approved Budget, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations, (ii) the Obligations (as defined and under the ABL DIP Credit Agreement), (iv) payments approved in writing by the Administrative Agent and (v) any payments in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases in accordance with the Approved Budget.

(b)    Amend, modify or change in any manner materially adverse to the interests of the Lenders any term or condition of (i) the Constituent Documents of any Loan Party or any of their Subsidiaries, or (ii) any of the ABL DIP Loan Documents, in each case, other than with the prior written consent of the Administrative Agent not to be unreasonably withheld or delayed (provided that immaterial amendments of an administrative, mechanical, ministerial or technical nature may be made so long as contemporaneous notice thereof is given to the Administrative Agent), or any documents relating to any other Material Indebtedness.

SECTION 7.13  <u>Holdings</u>.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto): (i) its ownership of the Equity Interests of the Borrower, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the Prepetition Secured Term Loan Documents, the ABL DIP Facility, the Prepetition Unsecured Term Loan Documents and the Prepetition Senior Notes, (iv) [Reserved], (v) making contributions to the capital of its Subsidiaries and guaranteeing the obligations of its Subsidiaries in each case solely to the extent permitted hereunder, (vi) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and the Borrower, (vii) [Reserved], (viii) providing indemnification to officers and directors and (ix) activities incidental to the businesses or activities described in clauses (i) to (viii) of this Section 7.13.

SECTION 7.14  <u>Liquidity</u>.  Allow Liquidity at any time to be less than $10,000,000.

SECTION 7.15  <u>Orders</u>.  Notwithstanding anything to the contrary herein, no Loan Party shall use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of Paragraph 26 (*Limitations on Use of DIP Financing Proceeds and Collateral*) of the Interim Order, and the corresponding paragraph of the Final Order.

SECTION 7.16  <u>Repayment of Indebtedness</u>.  Without limiting any other provision hereof, except pursuant to the Approved Budget, without express prior written consent of the Administrative Agent at the direction of Required Lenders and pursuant to an order of the Court (including any Order) after notice and a hearing, no Loan Party shall make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

SECTION 7.17  <u>Reclamation Claims</u>.  No Loan Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $1,000,000.

SECTION 7.18  <u>Insolvency Proceeding Claims</u>.  No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the applicable Order or with the written consent of the Administrative Agent at the direction of Required Lenders.

#9146661v7

SECTION 7.19 <u>Bankruptcy Actions</u>.  No Loan Party shall seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, at the direction of Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Order or any of the other Loan Documents.

SECTION 7.20 <u>Subrogation</u>.  No Loan Party shall assert any right of subrogation or contribution against any other Loan Party.

## ARTICLE VIII

## Events of Default and Remedies

SECTION 8.01 <u>Events of Default</u>.  Each of the events referred to in clauses (a) through (p) of this Section 8.01 shall constitute an "**Event of Default**":

(a)    *Non-Payment*.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*.  The Borrower, its Subsidiary or, in the case of Section 7.13, Holdings, fails to perform or observe any term, covenant or agreement contained in (i) Section 6.07 (other than with respect to maintenance of insurance on Term Priority Collateral) and such failure continues for five (5) Business Days after receipt by the Borrower of written notice thereof from the Administrative Agent or (ii) any of Sections 6.01(a), 6.01(b), 6.01(c), 6.02(a), 6.03(a), 6.05(a), Section 6.07 (with respect to maintenance of insurance on Term Priority Collateral), 6.14(b), 6.14(c), 6.16, 6.17, 6.18, 6.19, 6.20, 6.21, 6.22, 7.10 or <u>Article VII</u>; or

(c)    *Other Defaults*.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for ten (10) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith (including, without limitation, any Approved Budget, Approved Budget Variance Report or Compliance Certificate) shall be untrue in any material respect when made or deemed made; or

(e)    *Cross-Default*.  Except for defaults occasioned by the filing of the Chapter 11 Cases, entry into this Agreement or the ABL DIP Credit Agreement and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or Subsidiary not to comply, any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in

respect of the DIP ABL Facility or any other Material Indebtedness (other than Indebtedness hereunder), or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness, or

(f)     *Insolvency Proceedings, Etc*.  any Subsidiary that is not a Debtor institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)     *Judgments*.  There is entered against any Loan Party or any Subsidiary (i) a final judgment or order for the payment of money in an aggregate amount exceeding $5,000,000 (to the extent not paid or covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of twenty (20) or more consecutive days during which such judgment or order is not subject to the Automatic Stay or (y) any one or more non-monetary judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, including divestment of a material asset of any Loan Party, and (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) such judgment or order shall not be subject to the Automatic Stay; or

(h)     *ERISA*.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party or its ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any of its ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, (iii) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable law or plan terms that would reasonably be expected to result

#9146261v7

in a Material Adverse Effect or (iv) the PBGC or other appropriate Governmental Authority or any Multiemployer Plan imposes any Lien on the Collateral having a priority senior to or pari passu with the Liens and the security interests granted under the Loan Documents or under the Prepetition Secured Term Loan Documents or the ABL DIP Loan Documents; or

(i)      *Invalidity of Loan Documents*.    Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document any Loan Document; or

(j)      *Collateral Documents*.    (i) The Order or any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.11 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create, or any Lien purported to be created by the Order or any Collateral Document shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01; or

(k)      *Invalidity of Prepetition Intercreditor Agreement or Intercreditor Acknowledgment*.    The provisions of the Prepetition Intercreditor Agreement or the Intercreditor Acknowledgment shall for any reason be revoked or invalidated, in whole or in part, or otherwise cease to be in full force and effect, or any Loan Party, the Prepetition Secured Term Loan Agent, any Prepetition Secured Term Lender, the DIP Agent or any ABL DIP Lender or any Affiliate of any of the foregoing shall have commenced a suit or an action, including any motion or adversary proceeding in the Chapter 11 Cases, contesting in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not have the priority contemplated by this Agreement, the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment).

(l)      *Change of Control*.    There occurs any Change of Control; or

(m)      *Conduct of Business*.    (i) Any Loan Party shall be enjoined, restrained or in any way prevented by the order of any Governmental Authority from conducting any material part of its business for five (5) days or more or (ii) except as otherwise expressly permitted hereunder (including with respect to the Specified Store Closing Sales), the Loan Parties shall suspend the operation of their business, taken as a whole, in the ordinary course, liquidate all or a material portion of their assets or Store locations, taken as a whole, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of any material portion of their business, taken as a whole (or any Loan Party shall take action in furtherance of the foregoing by vote of its board of directors (or equivalent governing body)); or

(n)    *Loss of Collateral*.  There occurs any uninsured loss of any portion of the Current Asset Collateral with a market or book value in excess of $1,000,000;

(o)    *Chapter 11 Cases*.  There occurs any of the following in the Chapter 11 Cases:

i.    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or that is consented to by the Administrative Agent and Required Lenders; (B) to grant any Lien other than Liens permitted pursuant to Section 7.01 upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent; or (D) any other action or actions materially adverse to the Administrative Agent or Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral; or

ii.    the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that is not an Acceptable Plan; or

iii.    (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order, the Final Order or the Cash Management Order without the written consent of the Administrative Agent (at the direction of the Required Lenders) or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order or the Interim Order, the Final Order or the Cash Management Order shall otherwise not be in full force and effect or (B) any Loan Party or any Subsidiary shall fail to comply with the Order in any material respect; or

iv.    the Final Order is not entered immediately following the expiration of the Interim Order, and in any event on or before June 26, 2018; or

v.    the payment of, or application for authority to pay, any Pre-Petition claim without Administrative Agent's prior written consent (at the direction of the Required Lenders) unless in accordance with the Approved Budget, "first day" orders, or the RSA; or

vi.    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral; or

vii.    (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale (excluding the Sale) without the

Administrative Agent's consent (at the direction of the Required Lenders) of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable; or

viii.    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code; or

ix.    any Loan Party shall file a motion seeking, or the Court shall enter an order granting, relief from or modifying the Automatic Stay (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any material Collateral, (B) approving any settlement or other stipulation not approved by the Administrative Agent (acting at the direction of the Required Lenders) (which approval shall not be unreasonably withheld) with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $2,500,000 or more or (D) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

x.    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Administrative Agent or any Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on either the Administrative Agent, or such Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Administrative Agent, or any Lender under the Loan Documents to any other claim, or (y) have a Material Adverse Effect on the rights and remedies of the Administrative Agent, or any Lender under any Loan Document or the collectability of all or any portion of the Obligations; or

xi.    the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan; or

xii.    the entry of an order in the Chapter 11 Cases terminating or modifying the exclusive right of any Loan Party to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code; or

97

xiii.    the failure of any Loan Party to perform in all material respects any of its material obligations under the Interim Order, the Final Order, the Cash Management Order, or any Acceptable Confirmation Order, sale of all or substantially all assets under Section 363 of the Bankruptcy Code (excluding, for the avoidance of doubt, the Sale), or the Specified Store Closing Sales or to perform in any material respect its obligations under any order of the Court approving bidding procedures; or

xiv.    the existence of any claims or charges, or the entry of any order of the Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, the ABL DIP Credit Agreement, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (B) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent (at the direction of the Required Lenders)), whichever is in effect; or

xv.    the Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of Administrative Agent (at the direction of the Required Lenders); or

xvi.    an order in the Chapter 11 Cases shall be entered (A) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties or (B) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

xvii.    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent (at the direction of the Required Lenders), of the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code; or

xviii.    an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

#9146626 1v7

xix.    an order materially adversely impacting the rights and interests of the Administrative Agent and the Lenders under the Loan Documents, as determined by the Required Lenders, shall have been entered by the Court or any other court of competent jurisdiction; or

xx.    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent, or any Lender with respect to the Obligations, or without the consent of the Administrative Agent (at the direction of the Required Lenders), the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any Pre-Petition Agent, or the Pre-Petition Lenders that is inconsistent with the Order; or

xxi.    without the Administrative Agent's consent (at the direction of Required Lenders), the entry of any order by the Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents and the ABL DIP Loan Documents; or

xxii.    any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of Material Assets (constituting Collateral or otherwise) outside the ordinary course of business and not otherwise expressly contemplated by the RSA or otherwise permitted hereunder; or

xxiii.    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) in respect of certain creditors as may be reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders) and (C) permitted under this Agreement, in each case, to the extent authorized or required by one or more "first day" or "second day" orders or any of the Orders (or other orders with the consent of the Administrative Agent (at the direction of the Required Lenders)) and consistent with the Approved Budget; or

xxiv.    [Reserved]

xxv.    without the Administrative Agent's consent (at the direction of the Required Lenders), any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Administrative Agent's or the ABL DIP Administrative Agent's liens and security interests; or (B) to modify or affect any of the rights of the Administrative Agent, the Lenders or the ABL DIP Administrative Agent under the Orders, the Loan Documents, or the ABL DIP Credit

#9146261v7

Agreement and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases; or

xxvi.    the filing by any of the Loan Parties of a plan of reorganization under Chapter 11 of the Bankruptcy Code other than an Acceptable Plan; or

xxvii.    any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 8.01(p) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal.

SECTION 8.02  Remedies upon Event of Default.    Subject to the Order and the terms thereof, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Court, the Administrative Agent may with the consent of, and shall at the request of, (i) in the case of any Specified Event of Default, the Required Lenders and (ii) in the case of any other Event of Default, the Supermajority Lenders take any or all of the following actions:

(a)    declare Commitments of each Lender to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

(d)    the Administrative Agent may, and, at the request of the Required Lenders shall:

(A)    declare all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and/or

(B)    declare that the application of the Carve-Out has occurred through the delivery of a Carve-Out Trigger Notice (as defined in the Order) to the Borrower;

(C)    subject to the Remedies Notice Period, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Administrative Agent pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); and/or

(D)    subject to the Remedies Notice Period, (A) exercise on behalf of itself and the Secured Parties all rights and remedies available to it and the Secured Parties under the Loan

#9146261v7

Documents or applicable Law or (B) take any and all actions described in the Order, including, without limitation, those actions specified in the Order after the occurrence of any Specified Sale Process Default.

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents.

Subject to the Order, the Automatic Stay shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable Law, without further notice, motion or application to, hearing before, or order from, the Court.

SECTION 8.03  Application of Funds.  Following the occurrence and continuance of an Event of Default, subject to the terms of the Order, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

#9146261v7

# ARTICLE IX

## Administrative Agent

SECTION 9.01  <u>Appointment and Authority of the Administrative Agent</u>.

(a)        Each Lender hereby irrevocably appoints Cortland to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this <u>Article IX</u> (other than Sections 9.09 and 9.11) are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any such provision.

(b)        The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article IX</u> (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including the Intercreditor Acknowledgment), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Administrative Agent shall bind the Lenders.

SECTION 9.02  <u>Rights as a Lender</u>.  Any Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not Administrative Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate)

102

and acknowledge that no Administrative Agent shall be under any obligation to provide such information to them.

SECTION 9.03 <u>Exculpatory Provisions</u>. The Administrative Agent shall have no duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported

to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

SECTION 9.04   <u>Reliance by the Administrative Agent</u>.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by such Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 9.05   <u>Delegation of Duties</u>.   The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub agents appointed by the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. The exculpatory provisions of this Article shall apply to any such sub agent and to the Agent-Related Persons of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 9.06   <u>Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Administrative Agent</u>.   Each Lender acknowledges that no Agent-

Related Person has made any representation or warranty to it, and that no act by Administrative Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to Administrative Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by Administrative Agent herein, Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 9.07 <u>Indemnification of Administrative Agent and Agent-Related Persons</u>.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) from and against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of

rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided*, *further*, that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

SECTION 9.08  No Reliance, Etc.  Administrative Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable. Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with Administrative Agent, any other Lender, Holdings, the Borrower or any of their respective Subsidiaries. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 9.09  Resignation or Removal of Administrative Agent.    The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. In addition, the Required Lenders shall have the right, at any time, with or without cause, to remove the Administrative Agent.  Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed), to appoint a successor, which shall be a Lender, a bank or a trust company with an office in the United States, or an Affiliate of any such Lender, bank or trust company with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) or

106

removed Administrative Agent and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Administrative Agent.

SECTION 9.10  [Reserved].

SECTION 9.11  Collateral and Guaranty Matters.   Each of the Lenders irrevocably authorizes the Administrative Agent and the Administrative Agent agrees that it will:

(a)    release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)    [Reserved];

(c)    release any Guarantor from its obligations under the Guaranty if (i) in the case of any Subsidiary, such Person ceases to be a Subsidiary as a result of a transaction or designation permitted hereunder or (ii) in the case of Holdings, as a result of a transaction permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of the ABL DIP Facility, the Prepetition Senior Notes, the Prepetition Secured Term Loan Facility or the Prepetition Unsecured Term Loan Facility; and

(d)    [Reserved].

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11. In each case as specified in this Section 9.11, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or

to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

SECTION 9.12  [Reserved].

SECTION 9.13  Conflicts.  If any provision in this Agreement or any other Loan Document expressly conflicts with any provision in the Interim Order or Final Order, the provisions in the applicable Order shall govern and control.

## ARTICLE X

## Miscellaneous

SECTION 10.01  Amendments, Etc.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of each Lender directly affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.01 or Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.05 or 2.06 without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (i) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided* that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    change any provision of this Section 10.01 or the definition of "Required Lenders", "Supermajority Lenders" or "Pro Rata Share" or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby;

(e)    other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

108

(f)      other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)      change Section 2.11, Section 8.03 or any other provision of this Agreement, or add any provision to this Agreement in a manner that would alter the pro rata sharing of payments required hereunder as of the date hereof without the prior written consent of each Lender;

(h)      without the prior written consent of all Lenders, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) except as provided by operation of applicable Law or in the Prepetition Intercreditor Agreement (as supplemented by the Intercreditor Acknowledgment), subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien;

(i)      change the definition of "Specified Event of Default" or the lead-in clause to Section 8.02 without the written consent of the Supermajority Lenders; or

(j)      change the provisions relating to Disproportionate Modifications and Disproportionately Affected Lenders contained in the definition of "Interim Order" or "Final Order" (or the definitions of "~~Disproprotionate~~Disproportionate Modification" or "Disproportionately Affected Lender") without the written consent of each Lender affected thereby;

and *provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; and (ii) Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure errors or omissions of a technical nature or ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in this Section 10.01, if at any time after the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to

109

in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

SECTION 10.02  Notices and Other Communications; Facsimile Copies.

(a)    General.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Holdings, the Borrower or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (c).

(b)    Electronic Communication. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

(c)    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

#9146626lv7

(d)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS AND THE PLATFORM. In no event shall the Administrative Agent or any of its Agent-Related Persons (collectively, the "**Agent Parties**") have any liability to Holdings, the Borrower, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided, however*, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)    Change of Address.    Each of Holdings, the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(f)    Reliance by the Administrative Agent.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices

111

to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 10.03  No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Each Lender, solely in its capacity as such, agrees that, except with the written consent of the Administrative Agent, it will not take any enforcement action hereunder or under any other Loan Document, accelerate the Obligations under any Loan Document, or exercise any right that it might otherwise have under applicable law or otherwise to credit bid at foreclosure sales, UCC sales, any sale under Section 363 of the Bankruptcy Code or other similar Dispositions of Collateral. Notwithstanding the foregoing, however, a Lender may take action to preserve or enforce its rights against a Loan Party where a deadline or limitation period is applicable that would, absent such action, bar enforcement of the Obligations held by such Lender, including the filing of proofs of claim in a case under the Bankruptcy Code.

Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Loan Parties, the Administrative Agent and each Secured Party solely in its capacity as such agrees that (i) other than the Administrative Agent, no other Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the other Loan Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private Disposition (including pursuant to Section 363 of the Bankruptcy Code), (A) the Administrative Agent, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such Disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such Disposition and (B) the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such Disposition.

Each of the Lenders hereby irrevocably authorizes the Administrative Agent, on behalf of all Secured Parties, to take any of the following actions upon the instruction of the Required Lenders: (a) consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any such Disposition or other transfer pursuant to the applicable provisions of the Bankruptcy Code, including Section 363 thereof; (b) credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the

112

Bankruptcy Code, including under Section 363 thereof; (c) credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC; (d) credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure or other Disposition conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or (e) estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party; it being understood that no Lender shall be required to fund any amounts in connection with any purchase of all or any portion of the Collateral by the Administrative Agent pursuant to the foregoing clauses (b), (c) or (d) without its prior written consent.

Each Lender and each other Secured Party agrees that the Administrative Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion of the Collateral; *provided* that, in connection with any credit bid or purchase under clause (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent on a ratable basis.

SECTION 10.04 <u>Attorney Costs and Expenses</u>.  The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Lenders, for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Kramer Levin Naftalis & Frankel LLP (to the extent permitted under the applicable Order), Davis Polk & Wardwell LLP, King & Spalding LLP and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and (b) to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of Administrative Agent and two counsel to the Lenders taken as a whole (and, if reasonably necessary, one local counsel in any relevant material jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)). The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion. The Borrower and each other Loan Party hereby acknowledge that the Administrative Agent and/or any Lender may receive a benefit, including without limitation, a discount, credit or other

#9146626v7

accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with the Administrative Agent and/or such Lender, including, without limitation, fees paid pursuant to this Agreement or any other Loan Document.

SECTION 10.05 <u>Indemnification by the Borrower</u>.    The Borrower shall indemnify and hold harmless the Administrative Agent, each Lender and their respective Affiliates, directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of counsel to the Administrative Agent, one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of an actual or reasonably perceived conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Indemnified Persons as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee (excluding the Administrative Agent) or any of its Related Indemnified Persons (excluding the Administrative Agent or any Related Indemnified Persons) as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under the Facility and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates. To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar

information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within twenty (20) Business Days after written demand therefor. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. This Section 10.05 shall not apply to Taxes, or amounts excluded from the definition of Taxes pursuant to clauses (i) through (vii) of the first sentence of Section 3.01(a), that are imposed with respect to payments to or for the account of any Agent or any Lender under any Loan Document, which shall be governed by Section 3.01. This Section 10.05 also shall not apply to Other Taxes or to taxes covered by Section 3.04.

SECTION 10.06  Marshaling; Payments Set Aside.  None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 10.07  Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.04, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section, or (iv) to an SPC in accordance with

115

the provisions of subsection (g) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Agent-Related Persons of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

i.    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

ii.    in any case not described in subsection (b)(i)i of this Section, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a) has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided, however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)ii of this Section and, in addition:

i.    the consent of the Borrower (such consent not to be unreasonably withheld) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment, (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (3) the Borrower has not responded to the Administrative Agent within ten (10) Business Days of a written request for such consent; and

116

ii.      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)     <u>Assignment and Assumption</u>.    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; *provided further that* in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recordation fee shall be payable for all such assignments.    The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  All assignments shall be by novation.

(v)     <u>No Assignments to Certain Persons</u>.  No such assignment shall be made (A) to Holdings, the Borrower or any of the Borrower's Subsidiaries, (B) any of the Borrower's Affiliates or (C) to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) of this Section.

(c)     The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall, be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice, *provided* that the information contained in the Register which is shared with each Lender (other than the Administrative Agent and its Affiliates) shall be limited to the entries with respect to such Lender including the Commitment of, or principal amount of and stated interest on the Loans owing to such Lender. This Section

#9146626|v7

10.07(c) and Section 2.09 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clause (d) thereof) that directly affects such Participant. Subject to clause (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01(b) and (c) or Section 3.01(d) or Section 3.01(e), as applicable (it being understood that the documentation required under Sections 3.1(b), (c), (d) and (e) shall be delivered to the participating Lender), and subject to the requirements and limitations in Section 3.1)) and 3.04 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.11 as though it were a Lender.

(e)     <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply and does in fact comply with Section 3.01 as though it were a Lender. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder relating to the exemption from withholding for portfolio interest on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). A Lender shall not be obligated to disclose the Participant Register to any Person except to the extent such disclosure is necessary to establish that any Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury regulations. The entries in the Participant

Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01 or 3.04), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

SECTION 10.08 <u>Confidentiality</u>.    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed

to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender) or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

For purposes of this Section, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 10.09 <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, subject to the Order and the terms thereof, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final, in whatever

currency but excluding any payroll, trust and tax withholding accounts) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.10  <u>Interest Rate Limitation</u>.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 10.11  <u>Counterparts; Integration; Effectiveness</u>.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 10.12  <u>Electronic Execution of Assignments and Certain Other Documents</u>.    The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic

#9146626lv7

Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 10.13  Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

SECTION 10.14  Severability.   If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.15  GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK..

(b)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURT (THE "BANKRUPTCY COURT") AND IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE

122

AGENT AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

SECTION 10.16 <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.17 <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 10.18 <u>Judgment Currency</u>.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be

discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

SECTION 10.19 <u>Lender Action</u>.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party solely in its capacity as a Lender hereunder, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 9.04). The provision of this Section 10.19 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.20 <u>Use of Name, Logo, etc.</u>  The Administrative Agent and the Lenders may publish in the ordinary course customary advertising material relating to the financing transactions contemplated by this Agreement using the name or logo of any Loan Party.

SECTION 10.21 <u>USA PATRIOT Act Notice</u>.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification numbers of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act. The Lender may be required to report this information, or report the failure to comply with such requests for information, to appropriate governmental authorities, in certain circumstances without informing the Loan Party that such information has been reported.

SECTION 10.22 <u>Service of Process</u>.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY

#9146661v7

PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 10.23 <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Administrative Agent nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings their respective Affiliates, and none of the Administrative Agent nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 10.24 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including, if applicable:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

#9146261v7

       i.     a reduction in full or in part or cancellation of any such liability;

       ii.    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

       iii.   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

#9146661v7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**NINE WEST HOLDINGS, INC.**, as Borrower

By: _____
    Name:
    Title:

**JASPER PARENT LLC**, as a Guarantor,

By: _____
    Name:
    Title:

**KASPER GROUP LLC**, as a Guarantor

By: _____
    Name:
    Title:

**ONE JEANSWEAR GROUP INC.**, as a Guarantor

By: _____
    Name:
    Title:

**KASPER U.S. BLOCKER LLC**, as a Guarantor

By: _____
    Name:
    Title:

**NINE WEST MANAGEMENT
SERVICE LLC**, as a Guarantor


By: _____
      Name:
      Title:


**NINE WEST DISTRIBUTION LLC**,
as a Guarantor


By: _____
      Name:
      Title:


**NINE WEST DEVELOPMENT LLC**,
as a Guarantor


By: _____
      Name:
      Title:


**NINE WEST JEANSWEAR HOLDING
LLC**, as a Guarantor


By: _____
      Name:
      Title:


**NINE WEST APPAREL HOLDING LLC**,
as a Guarantor


By: _____
      Name:
      Title:


[Signature Page to Nine West DIP Term Loan Credit Agreement]

**US KIC TOP HAT LLC**, as a Guarantor

By: _____

     Name:

     Title:

**CORTLAND CAPITAL MARKET SERVICES LLC**, as Administrative Agent,

By: _____

Name:
Title:

#9146626lv7

[_____], as a Lender,

By:  _____
     Name:
     Title:

#91466261v7

[_____], as a Lender,

By: _____

Name:

Title:

#91466261v7

## SCHEDULE 2.01

Commitments

Initial Commitments and Delayed Draw Commitments

| Lender | Initial Commitment | Delayed Draw Commitment |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Additional Loan Commitments

| Lender | Additional Loan Commitment |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |