Susheel Kirpalani
Benjamin I. Finestone
Kate Scherling
Rex Lee
Jordan Harap
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Counsel to GLAS Trust Company LLC*

Jeffrey D. Pawlitz
Michael R. Handler
David Zubricki
**KING & SPALDING, LLP**
1185 Avenue of the Americas
New York, New York 10036
Telephone:   (212) 556-2100
Facsimile:   (212) 556-2222

*Counsel to the Ad Hoc Group of Crossover Lenders*

Kenneth H. Eckstein
Douglas H. Mannal
David E. Blabey Jr.
Rachael L. Ringer
**KRAMER LEVIN NAFTALIS & FRANKEL, LLP**
1177 Avenue of the Americas
New York, New York 10036
Telephone:   (212) 715-9100
Facsimile:   (212) 715-8100

*Counsel to Brigade Capital Management*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re | ) Chapter 11 |
| NINE WEST HOLDINGS, INC., *et al.*[1] | ) Case No. 18-10947 (SCC) |
| Debtors. | ) Jointly Administered |

## UNSECURED TERM LOAN LENDERS' OBJECTION
## TO CREDITORS' COMMITTEE'S STANDING MOTION AND
## STATEMENT IN SUPPORT OF CONFIRMATION OF THE PLAN

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076). The location of the Debtors' service address is: 1411 Broadway, New York, New York 10018.

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ............................................................................1

II.   RELEVANT FACTUAL BACKGROUND.........................................................9

    A.    The 2014 LBO .......................................................................................9

    B.    Banks, Sycamore, And KKR Commit Hundreds Of Millions Of Debt And
        Equity To Fund The Merger ...................................................................10

    C.    The Market Provides High Demand For RemainCo Debt ....................12

    D.    Holders Of Old 2019 Notes Choose To Reinvest In RemainCo Rather
        Than Receive 101% Cash Payment ......................................................12

    E.    The LBO Debt And Post-LBO Issuance Of New 2019 Notes...............13

    F.    Morgan Stanley Conducts Its Own Customary And Significant Due
        Diligence ...............................................................................................14

        1.    Morgan Stanley's Diligence In August 2013 Through December
                2013.........................................................................................16

        2.    Morgan Stanley's Diligence After Signing Debt Commitment
                Letter Through Closing..............................................................21

    G.    Solvency Opinion..................................................................................23

    H.    Solvency Certificates ...........................................................................23

    I.    The Market Evidence Establishes That NWHI Was Solvent ................24

    J.    Intervening Events ...............................................................................24

    K.    The Debtors' Bankruptcy......................................................................25

        1.    The 363 Sale ............................................................................25

        2.    Committee Investigation And Chapter 11 Plan Negotiations...................26

III.   OBJECTION................................................................................................30

    A.    The Committee's Constructive Fraudulent Conveyance Claim Against The
        Unsecured Term Loan Lenders Is Not Colorable .................................33

        1.    Under Well Settled Law, Knowledge Of a Fraudulent Scheme Is
                Required And The Committee Alleges None ...........................33

        2.    The Committee's Allegations Against Sycamore Directly
                Contradict Its Assertion That Morgan Stanley Knew That
               Sycamore's Projections Were Inflated......................................36

        3.    Morgan Stanley Had No Constructive Knowledge That The LBO
                Was A Fraudulent Transfer.......................................................37

i

4.      The Committee's Few Remaining Allegations Regarding Morgan Stanley And Other Unsecured Term Loan Lenders Are Incorrect, Implausible, Or Irrelevant ..........................................................44

5.      The Extraordinary Relief Sought—Avoidance of the Unsecured Term Loan—Requires A Showing That RemainCo Was Rendered Insolvent (Not Merely Undercapitalized) ...................................46

B.      The Debtors Have Not Unjustifiably Refused To Prosecute The UTL Challenge ....................................................................................49

1.      The Debtors Are Not Refusing To Prosecute—They Are Proposing To Compromise .............................................................49

2.      The Debtors Have No Conflict With Respect To The Unsecured Term Loan Lenders ................................................................50

3.      Any Cost-Benefit Analysis Weighs Decidedly Against Granting Standing ................................................................................51

IV.    STATEMENT IN SUPPORT OF PLAN AND PLAN SETTLEMENTS ......................59

A.      The Parties Supporting the Plan Are Likely To Succeed In Litigation Of Any Component of the Intercreditor Plan Settlement............................62

1.      The Unsecured Term Loan Claims Are Not Subject To Avoidance .........63

2.      The Guarantor Subsidiaries Have Valid Subrogation Claims Against NWHI ........................................................................63

3.      The Guarantor Subsidiaries Have Valid Pre- And Postpetition Intercompany Claims against NWHI .......................................67

4.      The Allocation Of Assets Is Appropriate....................................70

5.      The Allocation Of Administrative Expenses Is Appropriate ...................73

6.      The Plan Valuation Is Appropriate ............................................76

B.      The Remainder Of The *Iridium* Factors Are Satisfied............................77

V.     CONCLUSION.............................................................................79

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ............................................................... 69, 78

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*,
  156 B.R. 414 (S.D.N.Y. 1993) ........................................................................ 60, 61

*In re Am. Hous. Found.*,
  785 F.3d 143 (5th Cir. 2015) ................................................................................ 43

*Arochem Int'l, Inc. v. Buirkle*,
  968 F.2d 266 (2d Cir. 1992) .................................................................................. 46

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................................... 36

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
  256 B.R. 663 (Bankr. S.D.N.Y. 2000) .................................................................. 35

*Bank of Nova Scotia v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
  No. 02-B-41729, 2008 WL 3919198 ..................................................................... 56

*Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*,
  269 F.3d 726 (6th Cir. 2001) ................................................................................ 69

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994) .................................................................... 47

*In re Bethlehem Steel Corp.*,
  No. 01-15288 (BRL), 2004 WL 601656 (Bankr. S.D.N.Y. Mar. 22, 2004) ......... 66

*In re BH S & B Holdings LLC*,
  420 B.R. 112 (Bankr. S.D.N.Y. 2009) .................................................................. 69

*In re Boston Generating, LLC*,
  440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010) ..................................................... 48

*Broadway Houston Mack Dev. LLC v. Kohl*,
  71 A.D. 3d 937 (N.Y. App. Div. 2010) ................................................................ 66

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank (In re Fabrikant & Sons, Inc.)*,
  447 B.R. 170 (Bankr. S.D.N.Y. 2011) .................................................................. 34

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank (In re Fabrikant & Sons, Inc.),*
    480 B.R. 480 (S.D.N.Y. 2012) ........................................................................ 34, 35, 45, 46

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank (In re Fabrikant & Sons, Inc.),*
    541 F. App'x 55 (2d Cir. 2013) ............................................................................ 34

*In re Caesars Entertainment Operating Co.,*
    561 B.R. 457 (Bankr. N.D. Ill. 2016) ................................................................. 50

*In re Celotex Corp.,*
    289 B.R. 460 (Bankr. M.D. Fla. 2003) ............................................................. 65

*In re Charter Commc'ns,*
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................. 77

*Chemical Bank v. Meltzer,*
    93 N.Y.2d 296 (N.Y. 1999) ............................................................................. 66

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC),*
    439 B.R. 284 (S.D.N.Y. 2010) .................................................................... 38, 39, 43

*Cosoff v. Rodman (In re W.T. Grant Co.),*
    699 F.2d 599 (2d Cir. 1983) ........................................................................... 61

*In re Cumulus Media Inc.,*
    No. 17-13381 (SCC) (Bankr. S.D.N.Y.) ....................................................... 48, 75

*In re Dewey & LeBoeuf LLP,*
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ........................................................... 49, 61

*In re Eagle Creek Subdivision, LLC,*
    No. 08-04292-8-JRL, 2009 WL 313383 (Bankr. E.D.N.C. Feb. 5, 2009) ............... 73

*In re Energy Future Holdings Corp.,*
    No. 14-10979 (CSS) (Bankr. D. Del. Sept. 16, 2014) ................................... 73, 74

*First Bank of Ams. v. Motor Car Funding, Inc.,*
    257 A.D.2d 287 (N.Y. App. Div. 1999) ......................................................... 55

*Gerseta Corporation v. Equitable Trust Co. of New York,*
    241 N.Y. 418 (NY. Ct. App. 1926) ............................................................... 65

*Globe Commc'n Corp. v. R.C.S. Rizzoli Periodici, S.p.A.,*
    729 F. Supp. 973 (S.D.N.Y. 1990) ................................................................ 46

*Gold v. First Tenn. Bank (In re Taneja),*
    743 F.3d 423 (4th Cir. 2014) ......................................................................... 43

*Gowan v. Patriot Group (In re Dreier LLP)*,
    452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011)..................................................................... 38

*Gowan v. Wachovia Bank (In re Dreier LLP)*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...................................................... 35, 38, 46

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ...................................................... 4, 33, 35, 38, 54

*HBE Leasing Corp. v. Frank*,
    837 F. Supp. 57 (S.D.N.Y. 1993) ...................................................................... 34

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)..................................................... 48, 49

*In re Kaiser Steel Corp.*,
    89 B.R. 150 (Bankr. D. Colo. 1988) ................................................................... 65

*Laski v. State*,
    217 A.D. 420 (N.Y. Ct. App. 1926)..................................................................... 66

*In re Majestic Capital, Ltd.*,
    No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011)..................................... 57

*Marshall v. Picard (In re Bernard L. Madoff Inv. Securities LLC)*,
    740 F.3d 81 (2d Cir. 2014) ................................................................................ 38

*In re MF Global Inc.*,
    No. 11-2790, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012)..................... 61

*Mills v. IRS*,
    840 F.2d 229 (4th Cir. 1988) ............................................................................. 69

*In re Morrison*,
    555 B.R. 92 (Bankr. D. Mass. 2016) .................................................................. 65

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) .............................................................................. 62

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994).............................................................................. 61

*New England Dairies v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores)*,
    351 F.3d 86 (2d Cir. 2003) .......................................................................... 58, 73

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) .............................................................................. 61

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ................................................... 49, 59, 60, 69

*In re Nirvana Rest.*,
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ................................................................ 47

*In re Nortel Networks*,
    532 B.R. 494 (Bankr. D. Del. 2015) ........................................................... 71, 73

*Official Comm. of Equity Sec. Holders of Adelphia Comm'ns Corp. v. Official Comm. of
Unsecured Creditors of Adelphia Comm'ns Corp. (In re Adelphia Comm'ns Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ................................................................ 31

*Official Comm. of Equity Sec. Holders of Adelphia Comm'ns Corp. v. Official Comm. of
Unsecured Creditors of Adelphia Comm'ns Corp. (In re Adelphia Comm'ns Corp.)*,
    544 F.3d 420 (2d Cir. 2008) ........................................................................... 30

*In re Old CarCo LLC (f/k/a/ Chrysler LLC)*,
    No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) ...................................... 57

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*,
    177 B.R. 791 (S.D.N.Y. 1995) ........................................................................ 60

*In re Robbins Intern.*,
    275 B.R. 456 (Bankr. S.D.N.Y. 2002) ............................................................... 64

*Rossetti v. Ambulatory Surgery Ctr. of Brooklyn*,
    125 A.D.3d 548 (N.Y. App. Div. 2015) ........................................................... 55

*In re Sabine Oil & Gas Corp.*,
    547 B.R. 503 (Bankr. S.D.N.Y. 2016) ....................................... 31, 35, 50, 52, 53

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Invs. Sec. LLC (In re Madoff)*,
    No. 08-01789, 2018 WL 4833984 (Bankr. S.D.N.Y. Oct. 3, 2018) ...................... 45

*Smart World Technologies, LLC v. Juno Online Servs., Inc. (In re Smart World Technologies,
LLC)*,
    423 F.3d 166 (2d Cir. 2005) ........................................................... 30, 50, 57, 58

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) ............................................................................... 51

*In re Sunbeam Corp.*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) ............................................................... 34

*In re Toys "R" US, Inc. et al*,
    No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 25, 2017) ....................................... 74

*U.S. Bank N.A. v. DHL Global Forwarding (In re Evergreen Solar, Inc.)*,
   No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) .......................................................... 57

*United States v. Fidelity Capital Corp.*,
   920 F.2d 827 (11th Cir. 1991) ........................................................................................... 69

*Unsecured Creditors Comm. of Debtor STN Enters. v. Noyes (In re STN Enters.)*,
   779 F.2d 901 (2d Cir. 1985) .............................................................................................. 31

*VFB LLC v. Campbell Soup Co.*,
   2005 WL 2234606 (D. Del. Sept. 13, 2005) ................................................................ 48, 49

*VFB LLC v. Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007) .............................................................................................. 47

*In re Westmoreland Coal Company, et*,
   No. 18-35672 (DRJ) (Bankr. E.D. Tex. Nov. 14, 2018)..................................................... 74

*Wolf v. Weinstein*,
   372 U.S. 633 (1963)........................................................................................................... 58

## Statutory Authorities

11 U.S.C. § 105(a) ........................................................................................................ 58, 73

11 U.S.C. § 330(a) ............................................................................................................. 74

11 U.S.C. § 1106(a)(1) ....................................................................................................... 57

11 U.S.C. § 1121(b) ........................................................................................................... 27

11 U.S.C. § 1121(d)(1) ....................................................................................................... 27

11 U.S.C. § 1123(b)(3) .................................................................................................. 50, 59

11 U.S.C. § 1123(b)(3)(A) ........................................................................................... 3, 7, 60

11 U.S.C. § 509................................................................................................ 63, 64, 65, 66

11 U.S.C. § 548(c) ............................................................................................................. 35

N.Y. Debt. & Cred. Law § 273 ........................................................................................... 47

N.Y. Debt. & Cred. Law § 274............................................................................................ 47

N.Y. Debt. & Cred. Law § 278(1) ....................................................................................... 35

GLAS Trust Company LLC, solely in its capacity as successor Administrative Agent under the Unsecured Term Loan Credit Agreement, dated April 8, 2014 ("GLAS"), Brigade Capital Management, LP, and the Ad Hoc Group of Crossover Lenders (collectively, the "Unsecured Term Loan Lenders")[2] file this (i) objection to the Motion of the Official Committee of Unsecured Creditors (the "Committee") for Entry of an Order Granting Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respect of Such Claims [Docket Nos. 756 and 757] (the "Standing Motion" or "Mot."), and (ii) statement in support of confirmation of the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") [Docket No. 836] (collectively, the "Brief").

## I.    PRELIMINARY STATEMENT[3]

1.    Under *all* likely litigation outcomes in this case, the structurally-senior Unsecured Term Loan Lenders are entitled to payment in full on account of their claims against the Debtors—through both an entitlement to nearly all of the reorganized equity and a majority of any litigation claims held by the NWHI estate.   However, the Plan provides the Unsecured Term Loan Lenders with significantly less than a full recovery.   In an effort to avoid unnecessary and protracted litigation, the Plan reflects a series of compromises that were heavily negotiated at arm's-length between the Unsecured Term Loan Lenders and the Debtors and their independent directors, with substantial concessions given by the Unsecured Term Loan Lenders, inuring to the benefit of NWHI-only creditors.   In addition to the resolutions of inter-debtor

---

[2] As of the date hereof, the Unsecured Term Loan Lenders collectively hold more than 80% of the outstanding Unsecured Term Loan Claims.   As the context implies, the term Unsecured Term Loan Lenders in this brief may refer to all holders of Unsecured Term Loan Claims, as a general matter, at various points in time.

[3] Capitalized terms not otherwise defined in the Preliminary Statement have the meanings given to them below. Capitalized terms not otherwise defined in this Brief shall have the meanings given to them in the Plan or Disclosure Statement, as applicable.

claims and intercreditor litigation, and the allocation of value as a result thereof, the Plan also resolves what would be protracted and exceedingly expensive litigation against the Sponsors arising out of prepetition transactions in exchange for a $105 million contribution to the estates.[4] Remarkably, the Committee has rejected *all* of those settlements, and instead seeks standing to pursue costly and uncertain litigation not only against the Sponsors but also against the Secured and Unsecured Term Loan Lenders. However, for the reasons discussed herein, the Committee's Standing Motion should be denied, and the Plan should be confirmed, as it amply satisfies the requirements of the Bankruptcy Code.

### *Committee Standing*

2.      With respect to the Committee's pursuit of its putative fraudulent conveyance claim against the Unsecured Term Loan Lenders, the Committee fails to establish either component of the two-part test to obtain standing. *First*, the UTL Challenge is not colorable. Even assuming the Committee were to prove each and every allegation in its Proposed Complaint, including that NWHI was rendered insolvent by the LBO in 2014 in the face of overwhelming contemporaneous market evidence to the contrary, the UTL Challenge would fail under well-settled Second Circuit law, which requires that the plaintiff establish that the lender knew of the allegedly "fraudulent scheme" the lender funded into. Here, assuming the Committee is able to establish *today* that NWHI was insolvent *four years ago*, there is no allegation, let alone evidence, that the original Administrative Agent and sole initial Unsecured Term Loan Lender, Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), knew or should

---

[4] The Debtors' brief in support of confirmation of the Plan provides ample support for the reasonableness of the Estate Action Settlement, both standing alone and as part of a comprehensive series of settlements set forth in the Plan. Without repeating the facts and arguments set forth in the Debtors' brief, the Unsecured Term Loan Lenders join in those arguments in support of confirmation of the Plan. Similarly, the Unsecured Term Loan Lenders reserve their rights to join in the arguments asserted in the objections to the STN Motion filed by other parties.

have known that it was investing in a "fraudulent scheme" or, at a minimum, that NWHI would be rendered insolvent by the LBO.

3.       To the contrary, the extensive Rule 2004 discovery taken by the Committee confirms that Morgan Stanley advanced $300 million in funds in good faith, after conducting extensive due diligence, and without knowledge of any fraudulent scheme.    This is unsurprising.    After all, at the time of the LBO, NWHI offered a cash payment of 101% of face value to the holders of $400 million of Old 2019 Notes.    Only 1% of those holders turned down the cash-out option, with the overwhelming majority instead choosing to remain invested in NWHI and exchange those Old 2019 Notes for New 2019 Notes that were unsecured and unguaranteed, and agented by Morgan Stanley based on precisely the same financial information relied upon to advance funds under the Unsecured Term Loan.    Notwithstanding this information symmetry, the holders of these same New 2019 Notes are now trying to challenge the LBO transaction—and the Secured and Unsecured Term Loans—in an effort to obtain preferential treatment with respect to their claims against NWHI, which would only serve to create an inequitable windfall that the law of this Circuit will not countenance in the absence of knowledge by one group of lenders of a fraudulent scheme that prejudiced another group of lenders.    In light of the lack of colorability, the UTL Challenge is without merit and the Debtors certainly have not unjustifiably failed to pursue such claim.

4.       *Second*, even assuming *arguendo* the claim were colorable, the Debtors are not unjustifiably refusing to pursue the claim; rather, they have determined to settle the UTL Challenge exercising their reasonable business judgment pursuant to section 1123(b)(3)(A) of the Bankruptcy Code under a plan of reorganization.    This settlement and the material financial concessions by the Unsecured Term Loan Lenders provided therein—particularly in light of the

3

low likelihood of success of pursuing claims to avoid the Unsecured Term Loan Claims—falls squarely within the range of reasonableness and should be confirmed as part of the Plan.

5.    ***Colorability.***    The law is clear: a lender who provides value to the debtor by advancing actual funds is subject to claim avoidance solely to the extent such lender lent money with "knowledge of the entire scheme that renders [their] exchange with the debtor fraudulent." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).    Despite this controlling standard, the Committee failed to plead facts that would satisfy this fundamental requirement. After spending tens of millions of dollars on an unprecedented Rule 2004 investigation, the Committee does not allege any facts that even imply that Morgan Stanley knew of the fraudulent scheme the Committee otherwise alleges with respect to Sycamore, including that NWHI allegedly was to be rendered insolvent by the LBO.    Nor does the Committee sufficiently allege the existence of red flags that would have placed Morgan Stanley on inquiry notice.    Instead, the Proposed Complaint alleges the *opposite—i.e.,* that Sycamore concealed the "internal" truth from all parties, including Morgan Stanley, the Secured Term Loan Lenders, Unsecured Term Loan Lenders, other creditors, and the market generally by presenting compelling evidence to creditors and the market generally that NWHI would be solvent following the closing of the LBO.

6.    The record from the Committee's Rule 2004 investigation confirms that Morgan Stanley advanced funds in good faith and without knowledge of any fraudulent scheme.    Mere knowledge of the proposed flow of funds, in the absence of knowledge of a fraudulent scheme, does not satisfy the Second Circuit standard.    Indeed, the Committee's investigation shows that Morgan Stanley: (i) was not aware of any red flags of a fraudulent scheme; (ii) did not believe NWHI would be rendered insolvent; (iii) conducted extensive diligence in accordance with its

4

customary practices, including business, financial, legal, and accounting diligence; (iv) requested and received information from management, sponsors Sycamore and KKR, and BDO, as auditor; (v) reviewed PwC's quality of earnings report, which was an independent assessment and evaluation of the financial position of RemainCo; (vi) post-commitment, continued to diligently monitor RemainCo's financial performance up until the time of the LBO's closing in April 2014; (vii) stress-tested RemainCo's ability to service and pay back the term loan facilities; (viii) received a solvency certificate from NWHI's CFO, and a representation that, after giving effect to the LBO, RemainCo would be solvent; (ix) had every reason to believe that the projections provided to it by Sycamore—which was investing significant equity in the LBO—were reasonable; and (x) conducted reasonable diligence on the projections, including submitting follow-up questions for further information.   Critically, Morgan Stanley was willing to commit hundreds of millions of dollars of capital to the transaction, belying any notion that it knew or had reason to believe that NWHI would be rendered insolvent as a result of the LBO.

7.       With respect to the threshold requirement of knowledge, the Committee points to no fact that was uncovered, or should have been uncovered, by Morgan Stanley that would have put it on actual or constructive notice of RemainCo's alleged insolvency.   Instead, the Committee insists that, in addition to the extensive due diligence Morgan Stanley indisputably performed, it should also have undertaken an unprecedented, hypothetical analysis contrary to the standard diligence that is customarily relied upon in the lending market.   As is customary, Morgan Stanley stress-tested Sycamore's projections to evaluate whether RemainCo would be able to service its debt.   That is, instead of simply accepting these projections, Morgan Stanley and its financial advisors posited a hypothetical decline in earnings to analyze and test cash flows on a conservative basis.   As the Committee's own Rule 2004 investigation confirms, the stress-

testing, undertaken by evaluating future cash flows, indicated that RemainCo *was* projected to be able to pay its debts as they came due, even under downside scenarios.    Notwithstanding Morgan Stanley's diligence, the Committee takes pieces from both the Morgan Stanley stress-test analysis and the solvency analysis undertaken by Duff & Phelps, and combines them in a way that no real-world analysis would.    The Committee suggests this hypothetical, hybrid analysis supports the argument that Morgan Stanley should have known that it was funding an insolvent borrower.    This approach is seriously flawed.    The approach relies on a distortion of Morgan Stanley's stress-testing of Sycamore's projections, which was done for purposes of evaluating cash flows, not solvency.    The Committee's hypothetical exercise is one that lenders simply do not do and are not expected or required by the financial markets or applicable law to do—and the Committee does not allege that Morgan Stanley had any reason to have undertaken this exercise.    As a matter of law, this extraordinary, made-for-litigation test is insufficient to establish "knowledge of an entire scheme that renders [an] exchange with the debtor fraudulent," and the Committee points to no case suggesting otherwise.

8.    Moreover, even assuming Morgan Stanley were on inquiry notice that the Debtors may have become insolvent by the LBO (it was not)—*i.e.*, assuming *arguendo* that Morgan Stanley conducted the hypothetical exercise of the Committee's creation—Morgan Stanley diligently investigated RemainCo's financial position, resolving any putative concern.    Thus, under no circumstance is the Unsecured Term Loan avoidable; therefore, the UTL Challenge is not colorable.

9.    ***Unjustifiable Refusal.***    Even assuming *arguendo* that the UTL Challenge were colorable, the Committee cannot demonstrate that NWHI has "unjustifiably failed" to sue to avoid NWHI's liability to the Unsecured Term Loan Lenders.    NWHI has not failed to assert

6

such claims—rather, it seeks to settle the UTL Challenge (subject to Court approval) as it is authorized to do under section 1123(b)(3)(A) of the Bankruptcy Code.   It bears emphasizing that the relationship between NWHI and the Unsecured Term Loan Lenders is arm's-length and classic debtor-creditor.   There is no conflict as between NWHI and the Unsecured Term Loan Lenders, and, indeed, the terms of NWHI's settlement of the UTL Challenge substantially mirror the indisputably arm's-length terms agreed to between the Unsecured Term Loan Lenders and the holders of NWHI's bonds in the failed intercreditor settlement read into the Court's record.

10.    As discussed below, rather than prosecute tenuous claims against the Secured Term Loan Lenders and Unsecured Term Loan Lenders, the Debtors reasonably determined to settle those claims under the Plan.

### *Plan Settlement Of The UTL Challenge*

11.    Notwithstanding the Committee's allegations, the Unsecured Term Loan Lenders have valid claims against NWHI for approximately $305 million (the "Unsecured Term Loan Claims"), representing a substantial portion of the non-intercompany unsecured claims against NWHI.   In addition, by virtue of their valid claims against the Guarantor Subsidiaries (the validity of which even the Committee does not challenge), the Unsecured Term Loan Lenders are the derivative beneficiaries of claims held by the Guarantor Subsidiaries against NWHI, including (i) a $263 million secured subrogation claim (or postpetition administrative priority intercompany claim) arising in favor of NWD as a result of the paydown of the Secured Term Loan Claims as part of the 363 Sale, (ii) additional subrogation claims resulting from assets of the Guarantor Subsidiaries being used to satisfy the remaining amounts due to the Secured Term Loan Lenders, and (iii) prepetition intercompany claims asserted against NWHI, the result of which is that NWHI is a net payor to the Guarantor Subsidiaries.

12.     Rather than settle with the Debtors, the Unsecured Term Loan Lenders could have litigated each of these claims.  If successful, the Unsecured Term Loan Lenders would be entitled to payment in full on account of their claims.  As evidenced by the chart below, however, instead of litigating these claims, the Unsecured Term Loan Lenders and the Debtors have agreed to settle each of these claims under the Plan, resulting in a material reduction in the Unsecured Term Loan Claim recoveries and increase in NWHI-only creditor recoveries:



13.     As the chart above illustrates, the Unsecured Term Loan Lenders agreed to accept treatment on account of their claims that shifts approximately $45 million in value that would otherwise inure to the benefit of the Unsecured Term Loan Lenders to the other creditors of NWHI.  In order for the Unsecured Term Loan Lenders to receive *less* than the 84.2%

recoveries they are receiving under the settlement Plan, this Court would have to conclude that the Debtors' settlements are not reasonable because it is somehow significantly more likely than not that *each of these categories of claims is avoidable.*   Based on these facts and applicable law, such a conclusion is not plausible.   The Estate Action UTL Settlement clearly falls within the range of reasonableness and should be approved in connection with the Plan.

14.     For all of these reasons, the Committee's Standing Motion should be denied and the Plan should be confirmed.

15.     This Brief is divided into the following sections: **Section II** sets forth the relevant factual background supporting the Brief; **Section III** sets forth the Unsecured Term Loan Lenders' objection to the Committee's Standing Motion seeking standing to pursue claims to avoid the Unsecured Term Loan; and **Section IV** sets forth the bases for confirmation of the settlement Plan that has the support of the Unsecured Term Loan Lenders, focusing in particular on the bases for approval of the Intercreditor Plan Settlement under Bankruptcy Rule 9019.

## II.      RELEVANT FACTUAL BACKGROUND

### A.     The 2014 LBO

16.     In June 2013, publicly-traded Jones Group Inc. ("Jones") began exploring options for the sale of some or all of its business.   Jones undertook a several month sale process in which it received expressions of interest from several parties.   On October 23, 2013, Sycamore Partners L.P. (with its affiliates, "Sycamore") submitted a bid to acquire the entire company priced at $14 per share, which it later increased to $15 per share.

17.     On December 19, 2013, Jones's board of directors unanimously approved and executed an Agreement and Plan of Merger (the "Merger Agreement") with two entities controlled by Sycamore: Jasper Parent LLC ("Jasper Parent") and a subsidiary entity to be

merged into Nine West Holdings, Inc. ("NWHI", or "RemainCo"), which would become a wholly owned subsidiary of Jasper Parent (the "Merger").

18.    Also on December 19, 2013, Jasper Parent entered into three purchase agreements, pursuant to which Jones Apparel, Kurt Geiger, and Stuart Weitzman (collectively, the "Carve-Out Assets") were to be sold to certain Sycamore affiliates upon the closing of the Merger (the "Carve-Out Transactions" and together with the Merger, the "LBO").

19.    Jones's shareholders approved the LBO on April 7, 2014, and the LBO closed on April 8, 2014 (the "Closing").

## B.    Banks, Sycamore, And KKR Commit Hundreds Of Millions Of Debt And Equity To Fund The Merger

20.    In connection with the execution of the Merger Agreement, on December 19, 2013, a group of financing parties, including Morgan Stanley, Jefferies Finance LLC, MCS Corporate Lending, LLC, MCS Capital Markets, LLC, Wells Fargo Bank, National Association ("Wells Fargo"), Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith, Inc. (collectively, the "Initial Lenders"), submitted a commitment letter (the "Debt Commitment Letter"), in which they committed to provide to RemainCo (i) a $250 million senior secured asset based revolving facility (the "ABL Facility"), (ii) a $400 million senior secured term loan facility (the "Secured Term Loan"), and (iii) a $525 million senior unsecured bridge facility (the "Bridge Loan"). The Unsecured Term Loan (defined below) was not provided for at this time in view of the $395 million equity commitment described below.

21.    Pursuant to the Debt Commitment Letter, Morgan Stanley committed to fund $170 million of the Secured Term Loan and more than $223 million of the Bridge Loan. The Debt Commitment Letter also provided that Morgan Stanley would serve as Administrative

Agent, Joint Lead Arranger, and Joint Bookrunner of both the Secured Term Loan and the Bridge Loan.[5]

22.    The Debt Commitment Letter was binding, providing that the Initial Lenders'—including Morgan Stanley's—commitments were not conditioned upon successful syndication.[6] The availability of funding was, however, conditioned on the company's representation that, after giving effect to the LBO, RemainCo would be solvent.[7]

23.    In terms of equity, in December 2013, Sycamore committed to contribute $551 million to the LBO—$395 million to RemainCo[8] and $156 million to the Carve-Out Transactions.    KKR Asset Management LLC and affiliates (collectively, "KKR" and with Sycamore, the "Sponsors") committed to contribute an additional $60 million to the LBO.[9] Sycamore reserved its right to reduce its equity financing commitment dollar-for-dollar for cash proceeds of any unsecured term loan facility raised in excess of $25 million.[10]    Because an unsecured term loan was in fact subsequently placed based upon significant market demand, the Sponsors ultimately contributed $120 million to RemainCo ($108 million from Sycamore and $12 million from KKR).[11]

---

[5] Debt Commitment Letter (MS-InReNineWest-00031393) (Finestone Ex. 1) at Schedule 1.   "Finestone Ex." references refer to exhibits attached to the accompanying Declaration of Benjamin I. Finestone in Support of the Brief, filed contemporaneously herewith.

[6]  *Id.* at ¶ 3.

[7]  *Id.* at ¶ 6.

[8]  *Id.* at A-1.

[9]  Jones Group Inc. Definitive Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed March 6, 2014 (the "Proxy") (Finestone Ex. 2) at 9.

[10]  *Id.* at 7, 77.

[11]  Mot. ¶ 25.

### C.    The Market Provides High Demand For RemainCo Debt

24.    During syndication, Morgan Stanley observed significant investor demand for participation in the Secured Term Loan.[12]    The Secured Term Loan was nearly 4-times oversubscribed, with $1.6 billion of investor demand.[13]

25.    As a result of the strong market demand for RemainCo debt, on February 26, 2014, the Debt Commitment Letter was amended to provide for the Unsecured Term Loan, in an amount up to $250 million.[14]    Market demand for participation in the Unsecured Term Loan was similarly strong, and the facility was oversubscribed by approximately 2.5-times.[15]

26.    On March 4, 2014, the Debt Commitment Letter was further amended to, among other things, (i) increase the size of the Unsecured Term Loan from $250 million to $300 million to reflect market demand, and (ii) reduce the size of the ABL Facility from $250 million to $225 million.[16]

### D.    Holders Of Old 2019 Notes Choose To Reinvest In RemainCo Rather Than Receive 101% Cash Payment

27.    On March 24, 2014, holders of Jones's $400 million 6.875% Senior Notes due 2019 (the "Old 2019 Notes") were given the option to cash out their Old 2019 Notes at 101% of their face amount, or exchange their Old 2019 Notes for new 8.25% Unsecured Notes (the "New 2019 Notes"), also due in 2019, to be issued by NWHI (the "2019 Note Exchange").

---

[12]  Deposition transcript of Julie Lilienfeld (Morgan Stanley 30(b)(6) witness), August 2, 2018 (the "Lilienfeld Tr.") (Finestone Ex. 3) at 189:16-190:10.

[13]  *Id.* at 299:4-17.

[14]  Project Skyline Amendment No. 2 to Commitment Letter, dated February 26, 2014 (MS-InReNineWest-00038401) (Finestone Ex. 4).

[15]  Lilienfeld Tr. at 299:18-25.

[16]  Project Skyline Amendment No. 3 to Commitment Letter, dated March 4, 2014 (MS-InReNineWest-00040031) (Finestone Ex. 5).

12

28.     The New 2019 Notes would be structurally junior to the new term loans. Nevertheless, of the $400 million of Old 2019 Notes, 91.7% of the holders ($366.8 million in notes) opted to re-invest in the New 2019 Notes (the "Exchanging 2019 Noteholders").[17]   Only 1.2% of the holders of the Old 2019 Notes ($4.8 million) opted to cash out.[18]   The balance of Old 2019 Notes retained their position, subject to the structural seniority of the new term loans, like the New 2019 Notes.

29.     Because virtually all holders of Old 2019 Notes opted to exchange rather than cash out, the Bridge Loan became unnecessary.

30.     In sum, investors across the capital structure, with the same knowledge about the LBO as Morgan Stanley, voluntarily invested in $426.8 million of New 2019 Notes ($366.8 million in exchanged notes and $60 million in additional New 2019 Notes[19]) and $120 million in equity, all of which were subject to the structural seniority of the Secured and Unsecured Term Loans.

**E.      The LBO Debt And Post-LBO Issuance Of New 2019 Notes**

31.     In connection with the Merger, on April 8, 2014, NWHI entered into the Unsecured Term Loan Credit Agreement (as amended, the "Unsecured Term Loan Credit Agreement"), by and among NWHI as Borrower, Jasper Parent, Morgan Stanley, as Administrative Agent, and the Unsecured Term Loan Lenders.   The Unsecured Term Loan Credit Agreement provides for a $300 million unsecured term loan (the "Unsecured Term Loan", and with the Secured Term Loan, and other sources of debt financing for the LBO, the "LBO Debt").

---

[17]  Declaration of Ralph Schipani, Interim Chief Executive Officer of Nine West Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 6] at ¶ 46.

[18]  *Id.*

[19]  *See* ¶ 35 *infra.*

32.     Morgan Stanley was the sole initial lender under Unsecured Term Loan Credit Agreement.[20]

33.     The Unsecured Term Loan is guaranteed by six of NWHI's operating subsidiaries (the "Guarantor Subsidiaries").[21]

34.     Also on April 8, 2014, NWHI and the Guarantor Subsidiaries entered into a $445 million Secured Term Loan Credit Agreement.   Morgan Stanley was the initial Administrative Agent under that facility as well.   NWHI also drew approximately $129 million of the $225 million ABL Facility, which was administered and arranged by Wells Fargo.[22]

35.     After the closing, NWHI issued $60 million of additional New 2019 Notes, the proceeds of which were used to pay down a portion of the ABL Facility.[23]   Like the New 2019 Notes which were the subject of the 2019 Note Exchange, these New 2019 Notes did not have the benefit of any subsidiary guarantees and were thus structurally junior to the Secured and Unsecured Term Loans.

**F.      Morgan Stanley Conducts Its Own Customary And Significant Due Diligence**

36.     Morgan Stanley, which acted as the Joint Lead Arranger, Joint Bookrunner, and original Administrative Agent for both the Secured Term Loan and the Unsecured Term Loan, conducted extensive due diligence of Jones between August 2013 and April 2014.[24]   Over this

---

[20] As of the closing of the Merger, on April 8, 2014, Morgan Stanley was the sole "Lender under the Credit Agreement" with the Assignees to be assigned their loans from Morgan Stanley after the Closing.   *See* Unsecured Term Loan Credit Agreement (Finestone Ex. 6) at Schedule 2.01 (providing that Morgan Stanley is the sole "Lender" at closing); Project Skyline – Senior Unsecured RemainCo Term Loan Facility Master Consent to Assignment (Finestone Ex. 7) at 1 (providing the Debtors' consent to Morgan Stanley's assignment of the Unsecured Term Loan to "Approved Assignees" "after the Closing Date") (SP00294016).

[21] Unsecured Term Loan Credit Agreement (Finestone Ex. 6) at Schedule I.

[22] Email from M. Stavrakos, dated April 8, 2014 (attaching Total Jones Group Sources and Uses Summary) (WF00019664) (Finestone Ex. 8).

[23] Lilienfeld Tr. (Finestone Ex. 3) at 34:3-14.

[24] *See, e.g.*, *id.* at 44:10-15; 56:10-57:5.

period, Morgan Stanley's diligence of the LBO was spread across multiple teams: (i) Investment

Banking; (ii) Leveraged Finance; (iii) Credit; (iv) Ratings Advisory; and (v) Syndicate.[25]

During the course of its diligence, Morgan Stanley received information from Jones

management, Sycamore, KKR, Pricewaterhouse Coopers ("PwC"), and BDO USA, LLC

("BDO").[26]  In addition to countless emails requesting and receiving information, Morgan

Stanley participated in at least 28 calls and meetings with these parties.[27]  No red flags were

perceived.[28]

---

[25] *Id.* at 35:12-23; *see also* Project Skyline Organizational Book (MS-InReNineWest-00031609) (Finestone Ex. 9) at 9-10.

[26] Lilienfeld Tr. at 62:22-64:18, 76:3-78:21.

[27] *See, e.g.*, Email from P. Sifusson, dated Aug. 19, 2013 (MS-InReNineWest-00004866) (Finestone Ex. 10) (attaching management forecast of historical and projected segment EBITDA, in advance of Aug. 20 call between Morgan Stanley, KKR, and Sycamore); Email from P. Morrow, dated Oct. 23, 2013 (MS-InReNineWest-00004954) (Finestone Ex. 11) (scheduling Oct. 24 call between Morgan Stanley and Sycamore to discuss Morgan Stanley diligence questions); Email from P. Morrow, dated Oct. 30, 2013 (MS-InReNineWest-00005021) (Finestone Ex. 12) (scheduling Oct. 31 call between Morgan Stanley and Sycamore to discuss updates on Nine West diligence and Sycamore's preliminary views on Jeanswear); *see also* Email from V. Prabhu, dated Oct. 31, 2013 (MS-InReNineWest-00005029) (Finestone Ex. 13) (following up after Oct. 31 call); Email from C. Dampier, dated Nov. 1, 2013 (MS-InReNineWest-00005062) (Finestone Ex. 14) (attaching list of model questions in advance of call between Morgan Stanley and Sycamore); Email from V. Prabhu, dated Nov. 13, 2013 (MS-InReNineWest-00005175) (Finestone Ex. 15) (scheduling Nov. 14 call to discuss Morgan Stanley's understanding of the company's retail strategy); Email from J. Dunlop, dated Nov. 24, 2013 (MS-InReNineWest-00005247) (Finestone Ex. 16) (scheduling Nov. 25 call to discuss updated Nine West and Jeanswear models); Email from J. Dunlop, dated Nov. 26, 2013 (MS-InReNineWest-00005270) (Finestone Ex. 17) (scheduling Nov. 27 call to discuss additional questions and information requests from Morgan Stanley); Email from J. Dunlop, dated Dec. 3, 2013 (MS-InReNineWest-00005326) (Finestone Ex. 18) (scheduling Dec. 4 call between Morgan Stanley, PwC, and Sycamore); Calendar invitation for Project Skyline Timing Discussion, scheduled for Jan. 7, 2014 (Finestone Ex. 19) (MS-InReNineWest-00031752); Email from P. Fossati, dated Jan. 10, 2014 (MS-InReNineWest-00031765) (Finestone Ex. 20) (noting participation in rating agency presentation call); Calendar invitation from Skyline RAP Drafting Session, scheduled for Jan. 10, 2014 (MS-InReNineWest-00005536) (Finestone Ex. 21); Email from J. Dunlop, dated Jan. 15, 2014 (MS-InReNineWest-00006048) (Finestone Ex. 22) (listing attendees for Jan. 16 meeting); Email from J. Dunlop, dated Jan. 26, 2014 (MS-InReNineWest-00032668) (Finestone Ex. 23) (listing attendees for Jan. 27 RAP rehearsal); Email from S. Hesse, dated Feb. 5, 2014 (MS-InReNineWest-00049486) (Finestone Ex. 24) (sending materials in advance of call re: offering memorandum); Email from D. Kopelioff, dated Feb. 8, 2014 (MS-InReNineWest-00033542) (Finestone Ex. 25) (scheduling Feb. 9 call with Sycamore, Morgan Stanley, the company, and their counsel); Email from J. Dunlop, dated Feb. 9, 2014 (MS-InReNineWest-00033548) (Finestone Ex. 26) (scheduling Feb. 10 call); Email from J. Lilienfeld, dated Feb. 10, 2014 (MS-InReNineWest-00020221) (Finestone Ex. 27) (sending materials in advance of 3pm call with Moody's); Calendar invitation for Call with S&P on Nine West Holdings, scheduled for Feb. 10, 2014 (MS-InReNineWest-00008152) (Finestone Ex. 28) (call with S&P); Email from V. Prabhu, dated Feb. 11, 2014 (MS-InReNineWest-00008261) (Finestone Ex. 29) (scheduling meeting with Morgan Stanley, Sycamore, and company management in advance of lender meeting); Email from D. Lee, dated Feb. 13, 2014 (MS-InReNineWest-00008482) (Finestone Ex. 30) (bank lender meeting rescheduled for Feb. 14); Calendar invitation for Nine West Investor Question Discussion, scheduled for Feb. 18, 2014 (MS-InReNineWest-00008615); (Finestone Ex. 31) Calendar invitation for Nine West Unsecured Term Loan Call, dated Feb. 23, 2014

15

37.     Morgan Stanley's diligence proceeded in two phases: (i) from August 2013 until the Debt Commitment Letter was signed in December 2013, during which time Morgan Stanley's diligence was focused on business, financial, accounting, and legal[29] due diligence of Jones and RemainCo;[30] and (ii) after the Debt Commitment Letter was signed until the closing of the LBO in April 2014, when Morgan Stanley's diligence efforts focused on preparing lender and credit rating agency presentations and documentation for the term loan facilities.[31]

### 1.    Morgan Stanley's Diligence In August 2013 Through December 2013

38.     On August 1, 2013, Morgan Stanley sent to Sycamore and KKR its preliminary views on financing a potential purchase of Jones.[32]

39.     In August 2013, Morgan Stanley met with members of Jones's senior management.[33] Jones's management provided Morgan Stanley with a comprehensive management presentation, which included, among other things, an overview of Jones's business

---

(MS-InReNineWest-00008773) (Finestone Ex. 32); Email from P. Fossati, dated Feb. 23, 2014 (MS-InReNineWest-00021220) (Finestone Ex. 33) (scheduling Feb. 24 S&P update call); Calendar invitation for Nine West Moody's Update, scheduled for Feb. 24, 2014 (MS-InReNineWest-00008837) (Finestone Ex. 34); Calendar invitation for Nine West Financing Update, scheduled for Feb. 25, 2014 (MS-InReNineWest-00008928) (Finestone Ex. 35); Calendar invitation for Nine West Call re: 2019 Notes (MS-InReNineWest-00009063) (Finestone Ex. 36); Calendar invitation for Nine West Holdings Business / Accounting Diligence Call, scheduled for Mar. 20, 2014 (MS-InReNineWest-00040644) (Finestone Ex. 37); Email from J. Lilienfeld, dated Mar. 31, 2014 (MS-InReNineWest-00041109) (Finestone Ex. 38) (scheduling all-hands update call); Email from S. Roberge, dated Apr. 14, 2014 (MS-InReNineWest-00042541) (Finestone Ex. 39) (attaching question lists for business, financial, and auditor due diligence in advance of Apr. 15 call); Email from J. Ransom, dated Apr. 15, 2014 (MS-InReNineWest-00009420) (Finestone Ex. 40) (attending pre-launch call); Email from S. Roberge, dated April 22, 2014 (MS-InReNineWest-00042590) (Finestone Ex. 41) (attaching "Business and Financial Bringdown" due diligence questions for April 23 call).

[28]  Lilienfeld Tr. (Finestone Ex. 3) at 280:25-281:4.

[29]  Morgan Stanley retained Shearman & Sterling LLP to act as its legal advisor in connection with the LBO.  *Id.* at 146:15-16.

[30]  *Id.* at 60:11-61:20.

[31]  *Id.* at 56:10-57:5.

[32]  Email from P. Fossati, dated Aug. 1, 2013 (MS-InReNineWest-00004813) (Finestone Ex. 42).

[33]  Lilienfeld Tr. (Finestone Ex. 3) at 44:10-17.

and portfolio brands, historical financial performance, financial trends and outlook, and key strategic initiatives.[34]

40.    Morgan Stanley's diligence process accelerated in October 2013.    That month, it received access to the Jones data room, which was initially established by Citigroup in connection with Jones's exploration of a potential sale of its businesses.[35]

41.    On October 19, 2013, Morgan Stanley sent to Sycamore a pages-long list of preliminary diligence questions.[36]   These questions related to: (i) Jones's general business strategy (*e.g.*, brands, product trends, distribution channels); (ii) financials (*e.g.*, audited, budgeted, historical, and projected financials, quality of earning reports, cash balances, EBITDA adjustments); (iii) market analysis (*e.g.*, major competitors, industry studies, market reports); (iv) sourcing and suppliers (*e.g.*, supplier and agent lists, purchase financing structures, capacity utilization rates of plants); (v) design, sales, and operations (*e.g.*, sales force information, shipping methods and logistics, distribution facilities, online infrastructure); (vi) customers (*e.g.*, top customers relationship information, purchase history, marketing philosophy); (vii) management and personnel (*e.g.*, key executives, organizational charts, benefit programs, union contracts); and (viii) other miscellaneous issues (*e.g.*, intellectual property).[37]

42.    On October 22, 2013, Sycamore sent responses to Morgan Stanley's initial due diligence request list, as well as documents that Sycamore identified as responsive to Morgan

---

[34]  Project Skyline Management Presentation, dated August 2013 (MS-InReNineWest-00009551) (Finestone Ex. 43).

[35]  Email from P. Fosatti, dated Oct. 20, 2013 (MS-InReNineWest-00004925) (Finestone Ex. 44).

[36]  Email from V. Prabhu, dated Oct. 19, 2013 (MS-InReNineWest-00018313) (Finestone Ex. 45).

[37]  Project Nine Due Diligence List, dated Oct. 18, 2013 (MS-InReNineWest-00018308) (Finestone Ex. 46).

Stanley's requests, including profitability analyses, third-party studies, contracts, and financial spreadsheets.[38]

43.     Morgan Stanley supplemented its initial diligence requests throughout its several-month diligence process.  In fact, Sycamore created a "Diligence Tracker" to manage and respond to Morgan Stanley's extensive requests,[39] and continued to provide information responsive to these requests.[40]

44.     Important information for Morgan Stanley's due diligence included financial models projecting the RemainCo businesses' (known as Nine West Co. and Jeanswear) future performance.[41]  Sycamore provided its model in early October 2013.[42]  To evaluate these models, Morgan Stanley relied on the information available in the Jones data room,[43] and the diligence information received from Sycamore.[44]  In reviewing the models, Morgan Stanley

---

[38]  Email from P. Morrow, dated Oct. 22, 2013 (Finestone Ex. 47) (MS-InReNineWest-00018319) (attaching zip file containing responsive due diligence documents).

[39]  Email from P. Morrow, dated Oct. 22, 2013 (MS-InReNineWest-00018319) (Finestone Ex. 47) (attaching Diligence Tracker).

[40]  *See, e.g.*, Email from P. Morrow, dated Oct. 29, 2013 (MS-InReNineWest-00004967) (Finestone Ex. 48) (sending overview of Jeanswear); Email from P. Morrow, dated Oct. 29, 2013 (MS-InReNineWest-00004982) (Finestone Ex. 49) (sending updated view of overall company, updated slides, and Nine West Co. model); Email from P. Morrow, dated Nov. 5, 2013 (MS-InReNineWest-00005085) (Finestone Ex. 50) (requesting call to answer Morgan Stanley questions relating to Nine West Co. and Jeanswear); Email from P. Morrow, dated Nov. 13, 2013 (MS-InReNineWest-00005142) (Finestone Ex. 51) (attaching information requested by Morgan Stanley and scheduling call once Morgan Stanley completed its review); Email from A. Weinberger, dated Nov. 27, 2013 (MS-InReNineWest-00005330) (Finestone Ex. 52) (responding to Morgan Stanley requests for information on retail overhead savings and broken out financials); Email from A. Weinberger, dated Dec. 3, 2013 (MS-InReNineWest-00005340) (Finestone Ex. 53) (sending requested diligence information to Morgan Stanley); Email from P. Fossati, dated Dec. 11, 2013 (MS-InReNineWest-00063461) (Finestone Ex. 54) (confirming to Nine West counsel that Morgan Stanley received Nine West projections from Sycamore).

[41]  Lilienfeld Tr. (Finestone Ex. 3) at 80:19-81:4.

[42]  *See, e.g.*, Email from P. Morrow, dated Oct. 10, 2013 (MS-InReNineWest-00004875) (Finestone Ex. 55) (sending model).

[43]  Email from V. Prabhu, dated Nov. 5, 2013 (MS-InReNineWest-00005079) (Finestone Ex. 56) ("We continue to dig through the data room to answer many of our questions [relating to model inputs].   Here are [a] few items we haven't been able to answer.").

[44]  *See, e.g.,* Email from P. Morrow, dated Nov. 1, 2013 (MS-InReNineWest-00005034) (Finestone Ex. 57) (responding to Morgan Stanley questions regarding Jeanswear EBITDA numbers).

would "look at [Sycamore's] assumptions and diligence them … to become comfortable that they were appropriate, and if there were any questions, … would ask and get further information."[45]

45.    With respect to the increased EBITDA projections for RemainCo in its October 29, 2013 model, Sycamore explained, for example, that "the numbers have moved around a bit with higher EBITDA but more restructuring cost at Nine West Co.," and offered to discuss changes in the model.[46]   Morgan Stanley noted that these higher EBITDA numbers were "validat[ed]" by PwC in its comprehensive due diligence reports for each of Nine West Co. and Jeanswear (together the "PwC Report"), which showed, among other things, that the actual September 2012 through September 2013 EBITDA numbers for both Nine West Co. and Jeanswear were substantially higher than the numbers previously assumed in Sycamore's models.[47]

46.    The PwC Report, which Morgan Stanley received, was a comprehensive diligence report which included, among other things, quality of earnings analyses, as well as estimates regarding the costs of operating the NWHI business, including one-time costs, potential transition services issues, net working capital analyses, and tax considerations.[48]   The PwC Report in turn was based upon PwC's own extensive due diligence, which was based upon, among other things, (i) information provided by management in the online data room, (ii)

---

[45] Lilienfeld Tr. (Finestone Ex. 3) at 290:3-14; *see also, e.g.*, Email from V. Prabhu, dated Oct. 31, 2013 (MS-InReNineWest-00005029) (Finestone Ex. 13) ("Can you let me know who from your team we can coordinate with for model questions?").

[46] Email from P. Morrow, dated Oct. 29, 2013 (MS-InReNineWest-00004982) (Finestone Ex. 49).

[47] Email from V. Prabhu, dated Nov. 28, 2013 (MS-InReNineWest-00005298) (Finestone Ex. 58) ("Great to see validation of higher EBITDA."), replying to email from P. Morrow, dated Nov. 28, 2013 (MS-InReNineWest-00005294) (Finestone Ex. 59) ("Please find attached the PwC reports for Nine West and Jeanswear.   As you will see, LTM Sep '13 EBITDA is materially above what we have in our model for 2013 for both businesses.").

[48] Email from P. Morrow, dated Nov. 28, 2013 (MS-InReNineWest-00005294) (Finestone Ex. 59) ("Please find attached the PwC reports for Nine West and Jeanswear.").   *See also, e.g.*, PwC Draft Due Diligence Report for Nine West Co., dated Nov. 27, 2013 (MS-InReNineWest-00043551) (Finestone Ex. 60).

information directly emailed to PwC by Jones, and (iii) information obtained over the course of fifteen meetings and conference calls with various members of Jones management.[49]  Morgan Stanley was aware of the process undertaken and materials considered by PwC, as they were set forth in the contents of the report.[50]  PwC also walked Morgan Stanley through PwC's main assumptions and conclusions.[51]

47.  Morgan Stanley's Credit team also prepared its own internal credit model in order to evaluate RemainCo's ability to repay the term loans.[52]  This credit model was based on a "base" case and a "downside" case.[53]  And Morgan Stanley's model showed that RemainCo *could* pay its debts through maturity.[54]  Consistent with Morgan Stanley's typical practice, the "base" case in its credit model was based on a reduction of the projections received from the equity sponsor (*i.e.*, Sycamore), while the "downside" case was a hypothetical simulation of an economic shock such as "stressing the business through a downturn in the economy,"[55] without regard to the likelihood of such a downside scenario actually occurring.

---

[49]  *See, e.g.*, PwC Draft Due Diligence Report for Nine West Co., dated Nov. 27, 2013 (MS-InReNineWest-00043551) (Finestone Ex. 60) at 81-90.

[50]  *Id.*

[51]  *See, e.g.*, Email from V. Prabhu, dated Dec. 2, 2013 (MS-InReNineWest-00005302) (Finestone Ex. 61) ("[C]an we schedule a call with PwC to walk us through their main assumptions/ conclusions?"); Email from J. Dunlop, dated Dec. 3, 2013 (MS-InReNineWest-00005326) (Finestone Ex. 18) (Morgan Stanley coordinating call with PwC).

[52]  Lilienfeld Tr. (Finestone Ex. 3) at 82:12-83:4.

[53]  *Id.*

[54]  *Id.* at 277:24-278:6.

[55]  *Id.* at 160:13-15; 277:8-12.  Thus, the Committee's allegation that "RemainCo projections … were prepared by Morgan Stanley" (Proposed Compl. ¶ 147) is misleading, since Morgan Stanley simply applied certain standard discounts to projections prepared by Sycamore.  Likewise, while the Committee alleges that "Morgan Stanley warned potential investors that Sycamore's 2013 estimates 'should not be relied upon,'" (*Id.* ¶ 107), that is a mischaracterization of a note in the New 2019 Notes Offering Memorandum, which stated only that that "given our financial statements were prepared in connection with the Transactions, they should not be relied upon *as being representative of our financial position or operational results had we operated on a standalone basis*."  Offer to Exchange Any and All Outstanding 6.8755 Senior Notes due 2019 of The Jones Group Inc., Jones Apparel Group Holdings, Inc., Jones Apparel Group USA, Inc. and JAG Footwear, Accessories and Retail Corporation for 8.250%

20

48.     After conducting this due diligence, and upon receiving approvals from its internal leveraged finance and credit committees, [56] Morgan Stanley signed the Debt Commitment Letter on December 19, 2013, committing to fund nearly $400 million of RemainCo debt (*i.e.*, $170 million of the Secured Term Loan and approximately $225 million of the Bridge Loan).[57]

### 2.    Morgan Stanley's Diligence After Signing Debt Commitment Letter Through Closing

49.     After the Debt Commitment Letter was signed, Morgan Stanley continued its due diligence in preparation for offering the Secured Term Loan and, later, the Unsecured Term Loan, to potential investors, making presentations to the credit rating agencies, and the Closing of these facilities.

50.     In early January, 2014, Morgan Stanley prepared presentations to Moody's Corporation ("Moody's") and Standard & Poor's Financial Service LLC ("S&P").   The final versions of the ratings agencies presentations (the "RAPs") were presented to Moody's on January 28, 2014 and to S&P on January 30, 2014.[58]   The RAPs included, among other things, financial performance, accounting diligence, including the quality of earnings of RemainCo's businesses, and market and brand information.[59]   After the meetings with the ratings agencies,

---

Senior Notes due 2019 of Nine West Holdings, Inc., dated March 24, 2014 (the "New 2019 Notes Offering Memorandum") (MS-InReNineWest-00000437) (Finestone Ex. 62) at v. (emphasis added).

[56] Lilienfeld Tr. at 112:6-113:21.

[57] Debt Commitment Letter (MS-InReNineWest-00031393) (Finestone Ex. 1) at Schedule 1.

[58] Nine West Moody's Rating Agency Presentation (MS-InReNineWest-00010567) (Finestone Ex. 63); Nine West Holdings S&P Rating Agency Presentation (MS-InReNineWest-00015105) (Finestone Ex. 64).

[59] *Id.*

Morgan Stanley performed further due diligence to respond to the rating agencies' follow-up questions.[60]    Moody's and S&P ultimately assigned "stable" outlooks for the debt.[61]

51.    Meanwhile, Morgan Stanley prepared offering documents for the Secured Term Loan, and a "teaser" for the Bridge Loan.[62]    Morgan Stanley also performed due diligence to prepare a presentation to potential investors at a "bank meeting" that took place on February 14, 2014.[63]    The presentation was divided into a public lenders presentation and a private lenders supplement.    Following the bank meeting, Morgan Stanley continued to perform financial due diligence, as it worked with Sycamore to answer follow-up questions from potential investors.[64]

52.    Morgan Stanley's accounting due diligence during this period included a review of the February 2014 audit prepared by BDO of the Jones's footwear and jeanswear businesses for 2011, 2012, and 2013.[65]

---

[60] *See, e.g.*, Email from J. Dunlop, dated Jan. 31, 2014 (MS-InReNineWest-00007985) (Finestone Ex. 65) ("Please see below for the initial follow-up request from Moody's. We have included draft answers … but will likely need [Sycamore] and management's help on the item related to remaining retail stores. Please let us know when would be a convenient time to discuss.").

[61] Moody's Press Release (MS-InReNineWest-00018201) (Finestone Ex. 66) (concluding outlook "stable" on expectation of good overall liquidity and saving measures identified, notably the continued closing of unprofitable store locations, wind-down of unprofitable brands, and elimination of public company costs, enabling company to improve operating margins over next 12-18 months); Standard & Poor's Research Update for Jasper Merger Sub Inc. (Nine West) (MS-InReNineWest-00021914) (Finestone Ex. 67) (concluding outlook "stable" on expectation of rationalization of unprofitable, noncore business lines and gradual reduction in debt).

[62] *See, e.g.*, Confidential Information Memorandum, for $400 million senior secured term loan facility, dated February 2014 (MS-InReNineWest-00019278) (Finestone Ex. 68); Email from V. Prabhu, dated Jan. 20, 2014 (MS-InReNineWest-00018698) (Finestone Ex. 69) ("Sycamore Team – Please see attached for a WIP bridge teaser…. Let us know when you are free for a call to go over your comments.").

[63] *See. e.g.*, Email from J. Lilienfeld, dated Feb. 13, 2014 (MS-InReNineWest-00008498) (Finestone Ex. 70) (referencing next day's bank meeting).

[64] Email from J. Dunlop, dated Feb. 17, 2014 (MS-InReNineWest-00008584) (Finestone Ex. 71) ("Please find attached some initial questions we have received from investors….    Believe we are able to answer many of them, but there are a few items below where we wanted [Sycamore's] input.").    Morgan Stanley also created an "Investor Tracker", which identified specific questions raised by investors and Morgan Stanley's responses to them.    Skyline Investor Tracker – Business Related Questions, dated Feb. 17, 2014 (MS-InReNineWest-00001634) (Finestone Ex. 72).

[65] Jones Footwear and Jeanswear Consolidated Financial Statements for Years Ended December 31, 2013, 2012, and 2011 (MS-InReNineWest-00001583-633) (Finestone Ex. 73); Lilienfeld Tr. (Finestone Ex. 3) at 63:10-64:18.

22

53.     Before entering into the February 26, 2014 amendment to the Debt Commitment Letter, which provided for the new Unsecured Term Loan, Morgan Stanley was required to, and did, receive the approval of its leveraged finance committee.[66]

## G.     Solvency Opinion

54.     On April 4, 2014, Duff & Phelps issued a solvency opinion with respect to RemainCo (the "Solvency Opinion"), in which it concluded that, after giving effect to the consummation of the LBO, RemainCo (i) would be solvent, (ii) its assets would be greater than the amount required to pay its probable liabilities, (iii) would be able to pay its respective debts as they come due, and (iv) would not have an unreasonably small amount of assets or capital.[67] Morgan Stanley was aware that a solvency opinion was being provided in connection with the LBO.

## H.     Solvency Certificates

55.     In connection with the Closing, Morgan Stanley demanded and received from NWHI's Chief Financial Officer, as a condition to borrowing, a certificate of solvency (the "Solvency Certificate.")[68]    Specifically, the CFO certified that "as of the date hereof and after giving effect to the Acquisition and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and any other funded indebtedness incurred to consummate the Acquisition, that … the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of the Borrower and its Subsidiaries, on a consolidated basis…." [69]

---

[66] Lilienfeld Tr. (Finestone Ex. 3) at 70:6-16.

[67] Duff & Phelps Solvency Opinion Letter, dated April 4, 2014 (NINEWEST00000236) (Finestone Ex. 74) at 6.

[68] Unsecured Term Loan Credit Agreement (Finestone Ex. 6) at § 4.01(a)(vi); Exhibit K.

[69] Solvency Certificate for Unsecured Term Loan Credit Agreement (MS-InReNineWest-00043695) (Finestone Ex. 75).

Morgan Stanley, in its capacity as Administrative Agent under the Secured Term Loan, received a separate certificate of solvency in connection with that credit agreement as well, which also certified that NWHI and its subsidiaries would be solvent after the LBO.[70]

## I.    The Market Evidence Establishes That NWHI Was Solvent

56.    All of the NWHI debt traded *up* after the LBO closed.    Prior to the LBO, the $250 million of 6.125% Senior Notes due 2034 (the "2034 Notes") were trading at approximately 80 cents.[71]    Upon the Closing, the 2034 Notes traded up to approximately 90 cents, and continued to trade above their pre-LBO trading levels for several months.[72] Meanwhile, the New 2019 Notes also traded up following Closing and then traded between 90 and 100 cents during the six months following the LBO.[73]    And the Unsecured Term Loan traded nearly at par for fifteen months following the LBO.[74]

57.    In addition, more than 90% (or $366.8 million) of holders of Old 2019 Notes chose to forego a 101% cash recovery and instead exchange their Old 2019 Notes for New 2019 Notes, which were unsecured, structurally subordinated debt instruments.    Only 1% of the holders opted for the 101% cash payment.    And after the LBO was consummated, NWHI issued an *additional* $60 million of New 2019 Notes at par.

## J.    Intervening Events

58.    In the four years following the Closing of the LBO, NWHI continued to pay its debts as they came due, and continued to remain current on trade obligations, landlord payments, and debt service obligations.    Subsequent to the LBO, however, due to a downturn in the retail

---

[70] Solvency Certificate for Secured Term Loan Credit Agreement (MS-InReNineWest-00043698) (Finestone Ex. 76).

[71] BRG Nine West Holdings, Inc. Presentation, dated May 2018 (NINEWEST00035782) (Finestone Ex. 77) at 14.

[72] *Id.*

[73] *Id.*

[74] *Id.*

markets, NWHI lost substantial business from large customers, key customer and distribution channels increased margin pressures, and trends in the retail industry began shifting away from the Debtors' styles of denim, clothes, and shoes.   In addition, geopolitical issues impacted key partners of NWHI, putting pressure on NWHI's international distribution network and joint venture partners.

59.    Notably, at the time of the LBO and for years thereafter, no creditor suggested that the LBO transaction was a fraudulent conveyance or that the LBO Debt (including the Secured Term Loan and Unsecured Term Loan) were voidable.

## K.    The Debtors' Bankruptcy

60.    On April 6, 2018 (the "Petition Date"), nearly four years after the closing of the LBO, NWHI and the Guarantor Subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

61.    On April 19, 2018, the United States Trustee for Region 2 appointed the Committee to represent the interests of all of the Debtors' unsecured creditors.   The Committee is comprised of seven members, including GLAS.   Five out of the seven Committee members hold or represent holders of claims exclusively against NWHI—*i.e.*, without any claims against the Debtors' subsidiaries.[75]

### 1.    The 363 Sale

62.    On July 3, 2018, the Debtors consummated the sale (the "363 Sale") of certain working capital assets (the "Working Capital Assets") as well as the Nine West, Bandolino, and associated brand intellectual property (the "IP Assets") to Authentic Brands Group for $348.3

---

[75] Verified Statement of the Official Committee of Unsecured Creditors of Nine West Holdings, Inc., *et al.*, Pursuant to Bankruptcy Rule 2019 [Docket No. 269].

million, a staggering $148 million above the value provided in the initial stalking horse bid announced on the Petition Date—$140 million of which related directly to the IP Assets.[76]

63.    Of the purchase price, approximately $77 million was allocated to the working capital assets that were owned by NWHI.    In addition, $263 million of the purchase price was for the IP Assets owned by Nine West Development LLC ("NWD"), a Guarantor Subsidiary. Of the remainder, $6 million related to certain royalty-related creditors, and $2.3 million related to assumed severance obligations.    The proceeds of the IP Assets constituted Term Priority Collateral (as defined in the ABL Intercreditor Agreement), and therefore the entire $263 million in proceeds from the sale of NWD's assets were used to pay down the Secured Term Loan.[77] The receipt of these proceeds by NWD, and subsequent the disbursement of the proceeds by NWHI to the lenders under the Secured Term Loan as a paydown of their claims was accounted for and reflected in the Debtors' monthly operating report.[78]

### 2.    Committee Investigation And Chapter 11 Plan Negotiations

64.    As part of a resolution of contested issues in connection with the Debtors' proposed debtor-in-possession financing at the outset of the case, the Debtors and the Committee agreed to a "standstill" period to allow the Committee time to pursue its investigation of claims relating to the Merger and Carve-Out Transactions, during which time the Debtors would not file a plan that settled any such potential claims, and the Committee would not file a motion seeking standing to pursue such potential claims.    That "standstill" period was set to expire in mid-August, and was ultimately extended to mid-September.

---

[76] Asset Purchase Agreement, Schedule 2.1(a)(iv) [Docket No. 20, Exh. B]; *see also* U.S. Trademark Assignment No. 900459141, July 20, 2018, *available at: http://legacy-assignments.uspto.gov/assignments/assignment-tm-6414-0658.pdf* (showing assignment of the Nine West and Bandolino trademarks from NWD to Authentic Brands Group).

[77] The proceeds of the Working Capital Assets were used to pay down the outstanding obligations under the DIP ABL/FILO Facility.

[78] Monthly Operating Report [Docket No. 576] at 4.

65.    On June 5, 2018, the Committee obtained Court approval to commence its investigation of the Debtors and numerous third parties—including Morgan Stanley as the original Administrative Agent for the Unsecured Term Loan (the "Rule 2004 Investigation").[79] On August 7, 2018, the Committee filed a supplemental motion pursuant to Rule 2004 seeking additional discovery from certain Unsecured Term Loan Lenders,[80] which motion was granted.[81]

66.    In connection with the Rule 2004 Investigation, the Committee has obtained and reviewed over 100,000 documents and taken 11 depositions. The Committee's Rule 2004 Investigation was in addition to the investigation of estate claims conducted by the Debtors' independent directors, which investigation has included the review of hundreds of thousands of documents and extensive legal and factual analyses.[82]

67.    On August 31, 2018, the Debtors' filed their second motion pursuant to section 1121 of the Bankruptcy Code to extend plan exclusivity.[83]    No party objected.    Accordingly,

---

[79] Order Granting the Motion of Official Committee of Unsecured Creditors for the Entry of an Order Pursuant to Bankruptcy Code Section 105 Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016 Authorizing Expedited Discovery of the Debtors and Third Parties [Docket No. 355].

[80] Notice of Presentment of Supplemental Motion of Official Committee of Unsecured Creditors for the Entry of an Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016 Authorizing Expedited Document Discovery of Third Parties [Docket No. 559].

[81] Order Granting the Supplemental Motion of Official Committee of Unsecured Creditors for the Entry of an Order Pursuant to Bankruptcy Code Section 105 Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016 Authorizing Expedited Discovery of Third Parties [Docket No. 587].

[82] Declaration of Daniel H. Golden in Support of the Motion ("Golden Decl."), Ex. K (Letter from Thomas Walper to D. Zensky and H. Schub, August 30, 2018).

[83] Notice of Debtors' Motion For Entry of a Second Order (A) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (B) Granting Related Relief [Docket No. 653].    Section 1121(b) of the Bankruptcy Code provides that "only a debtor may file a plan until after 120 days after the date of the order for relief under this chapter."    11 U.S.C. § 1121(b). Under section 1121(d)(1), upon request of a party in interest, the court may for cause increase the 120-period under section 1121(b).    *Id.* § 1121(d)(1).

the Court issued an order on September 14, 2018, extending the Debtors' exclusivity period through and including October 29, 2018.[84]

68.     During this time, negotiations among the parties regarding the terms of a chapter 11 plan were proceeding in earnest.

69.     On September 25, 2018, creditors agreed on the principal terms of an intra-creditor settlement (the "Creditor Settlement").    On September 26, 2018, creditors put the terms of their agreement on the record at a hearing before the Court.    The Committee stood in support of this settlement—pursuant to which, among other things, the Unsecured Term Loan Lenders would receive 92.5% of the reorganized equity based on a $600 million total enterprise value[85] and $40 million of cash.[86]    Immediately following the hearing at which the Creditor Settlement was announced, the Debtors received a letter from Stefan Kaluzny (chairman of the Belk board of directors, a former director of NWHI, and Sycamore's co-founder) indicating that Belk would no longer be doing business with the Debtors going forward.    At this time, the parties to the Creditor Settlement were working to try to negotiate and finalize material documentation and terms underpinning the Creditor Settlement within the time periods prescribed therein, as many issues were left to be addressed in the term sheet (including, among other things, the mechanics for the cash payment to the Unsecured Term Loan Lenders, releases for management, and the preservation of certain claims by the reorganized Debtors).    Ultimately, the Creditor Settlement was not consummated.

---

[84] Second Order (A) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (B) Granting Related Relief [Docket No. 653].

[85] This is equal to the "Plan Settlement TEV" of $600 million, discussed below.

[86] See Golden Decl., Ex. N (Creditor Settlement Term Sheet); Golden Decl., Ex. P (Sept. 26, 2018 Hr'g Tr.) at 11:5-6; 17-19 (attorney for Committee stating that the major economic terms of the creditor settlement were acceptable to the Committee).

70.     In the midst of the parties' efforts to document the Creditor Settlement and/or any alternative chapter 11 plan, the Committee made the strategic decision to seek standing to pursue claims against, among other parties, the Unsecured Term Loan Lenders.    The Committee's Standing Motion seeks standing and authority to commence and prosecute over twenty claims (the "Proposed Claims") against dozens of putative defendants, including a claim to avoid the ABL Facility, the Secured Term Loan Claim, and the Unsecured Term Loan Claim, and any related transfers, as constructive fraudulent conveyances (as that Proposed Claim relates to the Unsecured Term Loan, the "UTL Challenge").    The Standing Motion also asks the Court to strip the Debtors of their exclusive authority to settle estate claims and give that authority exclusively to the Committee.    Notably, and without explanation, the Standing Motion does not seek standing to bring any claims to avoid the New 2019 Notes (or any portion thereof, including the additional $60 million in New 2019 Notes), issued in conjunction with the LBO.

71.     Shortly after the Standing Motion was filed, the Debtors filed their proposed plan of reorganization on October 17, 2018 (the "Plan"),[87] which is predicated on a settlement of intercreditor and intercompany claims and potential litigation, including claims to avoid any of the LBO Debt.    It is also premised upon a settlement of the litigation against the Sponsors, in exchange for a contribution of $105 million to the NWHI estate for the benefit of creditors.

72.     Substantially similar to the terms of the Creditor Settlement, the Plan provides, among other things, as follows:

- Unsecured Term Loan Claims to receive: (i) 92.5% of the reorganized equity; and (ii) one-third of the Estate Action Settlement (which equals $35 million cash—$5 million less than what the Committee endorsed in connection with the Creditor Settlement); and

---

[87] Notice of Filing of the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 749].

29

- Non-Unsecured Term Loan unsecured claims at NWHI to receive: (i) 7.5% of the reorganized equity (less any equity to be distributed to unsecured creditors of the subsidiaries); (ii) warrants for 20% of the reorganized company with a strike price based on a $650 million Total Enterprise Value, on terms identical to those provided in the Creditor Settlement; and (iii) two-thirds of the Estate Action Settlement (which $70 million in cash).

73.     Given that the split of recoveries between the Unsecured Term Loan Lenders and the non-Unsecured Term Loan unsecured creditors of NWHI are strikingly similar under the current Plan to those provided for under the Creditor Settlement, it is difficult to square the Committee's support for the Creditor Settlement with its Standing Motion as it relates to the UTL Challenge.   It is likewise difficult to understand how the substantial concessions by the Unsecured Term Loan Lenders—resulting in the distribution of 7.5% of the reorganized equity, warrants for 20% of the reorganized equity, and $70 million in cash to creditors that would largely (if not entirely) be out of the money—do not fall squarely within the range of reasonableness under Bankruptcy Rule 9019 and applicable case law.

## III.    OBJECTION

74.     Under certain circumstances, courts have held that a creditors' committee may sue on behalf of the estate, but these precedents do not "undermine [] the debtor's central role in handling the estate's legal affairs…." *Official Comm. of Equity Sec. Holders of Adelphia Comm'ns Corp. v. Official Comm. of Unsecured Creditors of Adelphia Comm'ns Corp. (In re Adelphia Comm'ns Corp.)*, 544 F.3d 420, 424 (2d Cir. 2008) (Sotomayor, J.).   Thus, bankruptcy courts must act as gatekeepers in considering whether to override the decision of a debtor-in-possession—the estate's only fiduciary—and confer standing on another party to litigate or settle estate claims.   *See Smart World Technologies, LLC v. Juno Online Servs., Inc. (In re Smart World Technologies, LLC)*, 423 F.3d 166, 175 (2d Cir. 2005) ("[T]he debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only

30

fiduciary" in contrast to a creditors' committee, which "owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate").

75.    The Court's role in the context of derivative standing "is to protect the estate and ensure that the proposed litigation reasonably can be expected to be a sensible expenditure of estate resources that will not impair reorganization."    *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 516 (Bankr. S.D.N.Y. 2016) (internal quotation marks omitted).    Therefore, before granting derivative standing, the court must be satisfied that: (i) the proposed claim is "colorable"; and (ii) the debtor unjustifiably refused to pursue the claim.    *Unsecured Creditors Comm. of Debtor STN Enters. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985). In considering failure to bring suit, the court should "consider whether an action asserting the proposed claims would be likely to benefit the reorganization estate, and as part of any such analysis, [the court should] assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."    *Official Comm. of Equity Sec. Holders of Adelphia Comm'ns Corp. v. Official Comm. of Unsecured Creditors of Adelphia Comm'ns Corp. (In re Adelphia Comm'ns Corp.)*, 330 B.R. 364, 374 (Bankr. S.D.N.Y. 2005) (footnotes and internal quotation marks omitted).

76.    With respect to the UTL Challenge, the Committee fails to satisfy its burden of proving either of these two required elements.    *First*, the Committee has failed to establish, as it must under controlling Second Circuit law, that Morgan Stanley, the original Administrative Agent and sole initial Unsecured Term Loan Lender, knew or should have known that it was funding a fraudulent conveyance—*i.e.*, at a minimum, that RemainCo would be rendered insolvent by the LBO.    The Committee does not even allege as much.    And the Committee's

own Rule 2004 Investigation establishes that Morgan Stanley: (i) was faced with a plurality of contemporaneous market indicators that RemainCo would be a solvent and viable business; (ii) received solvency certificates and a contractual representation that RemainCo would be solvent immediately after the LBO and after giving effect to RemainCo's incurrence of the LBO Debt; and (iii) nevertheless, conducted its own, signficiant due diligence consistent with its internal practices and standards and those prevailing in the industry, which confirmed that RemainCo would be able to pay its debts as they came due.   In sum, assuming *arguendo* that RemainCo was rendered insolvent by the LBO, Morgan Stanley was not on actual or constructive notice of this hypothetical fact.

77.    *Second*, the Debtors have not unjustifiably refused to prosecute the UTL Challenge.   To the contrary, they are seeking to exercise their exclusive authority to settle the UTL Challenge under the Plan and pursuant to Bankruptcy Rule 9019.

78.    *Third*, the costs of pursuing the UTL Challenge far outweigh any potential benefit, where foregoing a compromise with the Unsecured Term Loan Lenders to pursue a claim that has little if any chance of success will not only add to the astonishing administrative burn of these cases, but also leave the Debtors without any apparent path towards emergence. Indeed, the Debtors already have requested an incremental $22 million in debtor-in-possession financing to provide a bridge to a mid-March confirmation and exit from bankruptcy.[88]   Pursuit of the UTL Challenge would not only necessitate incremental funding, but may also require the Debtors to refinance up to $72 million of Term DIP obligations as a result of a potential Event of Default under the Term DIP Credit Agreement and acceleration of the obligations thereunder

---

[88] Notice of Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Enter into an Amendment to the Term DIP Facility and (B) Pay Certain Fees and Expenses [Docket No. 923].

32

triggered by the NWHI Debtor litigating the UTL Challenge.[89]    The Committee's Motion

should be denied.

A.    **The Committee's Constructive Fraudulent Conveyance Claim Against The Unsecured Term Loan Lenders Is Not Colorable**

1.    **Under Well Settled Law, Knowledge Of a Fraudulent Scheme Is Required And The Committee Alleges None**

79.    The UTL Challenge is *fundamentally distinct* from the Proposed Claims against

Sycamore.    In contrast to the Committee's allegations concerning Sycamore—predicated on the

notion that Sycamore acquired assets for less than they were worth—the Unsecured Term Loan

Lenders advanced $300 million of real funds to the Debtors in exchange for debt on a dollar-for-

dollar basis.    Those debt proceeds, advanced at Closing, constitute fair consideration.    Only by

"collapsing" the incurrence of the Unsecured Term Loan with NWHI's subsequent transfers to

shareholders can the Committee argue a lack of fair consideration.    The Committee, however,

does not allege what is required to sustain this argument.

80.    The Second Circuit has carefully delineated the "collapsing doctrine" as it might

apply to the Unsecured Term Loan Lenders.    Lenders who provide value to the debtor by

advancing actual funds are subject to claim avoidance *solely to the extent* such lenders lent

money with "knowledge of the entire scheme that renders her exchange with the debtor

fraudulent."    *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).    The holding in

*HBE Leasing* is not ambiguous or equivocal.    Indeed, the Second Circuit distinguished its rule

as "contrary to the approach taken by the District Court," *id.*, which avoided a mortgage without

---

[89]  The pursuit of the UTL Challenge, and the effect that it would have on the Debtors' reorganization prospects, may also result in an Event of Default under the ABL DIP Facility as a result of, among other things, the Debtors' loss of plan exclusivity.    At best, this would result in a costly amendment to the ABL DIP Facility and likely reduce the Debtors' borrowing availability thereunder, further straining liquidity.

assessing the knowledge or good faith of the mortgagor, *HBE Leasing Corp. v. Frank*, 837 F.

Supp. 57, 61 (S.D.N.Y. 1993).

81.    Courts in this district have repeatedly followed the rule of *HBE Leasing*.   In

2002, Judge Gonzalez dismissed (on the pleadings) fraudulent transfer claims against lenders

premised on "collapsing," due to the absence of any allegations that the lenders "knew or

consciously avoided discovering that" the corporate acquisitions that the lenders were funding

were alleged fraudulent transfers "or that the Debtor was insolvent or that it would be rendered

insolvent as a result of the" acquisition.   *See In re Sunbeam Corp.*, 284 B.R. 355, 372-73

(Bankr. S.D.N.Y. 2002).

82.    In 2011, Judge Bernstein dismissed (on the pleadings) fraudulent transfer claims

against lenders premised on "collapsing," due to the failure to allege "the requisite actual or

constructive knowledge" on the part of the lenders that they were funding fraudulent transfers,

notwithstanding allegations that could "raise some doubts as to … financial stability"—which

decision was affirmed by Judge Sullivan and again by the Second Circuit.   *Buchwald Capital*

*Advisors LLC v. JP Morgan Chase Bank (In re Fabrikant & Sons, Inc.)*, 480 B.R. 480, 488-89

(S.D.N.Y. 2012) (Sullivan, J.) ("*Fabrikant II*") (affirming Judge Bernstein's decision (447 B.R.

170 (Bankr. S.D.N.Y. 2011) ("*Fabrikant I*")), *aff'd*, 541 F. App'x 55, 57 (2d Cir. 2013)

("*Fabrikant III*") ("Trustee failed to plausibly allege that the defendants had actual or

constructive knowledge of the purported fraudulent reconveyance scheme.").

83.    Again in 2011, Judge Bernstein dismissed (on the pleadings) fraudulent transfer

claims against a lender premised on "collapsing", due to the failure to allege that the lender had

"awareness of any fraudulent scheme", notwithstanding that the lender "may have had reason to

question Marc's honesty and the accounting for and source of all of the funds used by him and

Dreier LLP….."  *Gowan v. Wachovia Bank (In re Dreier LLP)*, 453 B.R. 499, 513 (Bankr. S.D.N.Y. 2011) ("*Dreier II*").

84.    Thus, this string of on-point case law provides a well-established rule: *lenders who advance real funds are not subject to claim avoidance unless a plaintiff is able to demonstrate that the lenders knew or should have known that they were funding a fraudulent scheme or an insolvent company.*[90]

85.    It is striking that the Committee disregards such unambiguous Circuit precedent and progeny, instead asserting that knowledge of a fraudulent scheme or insolvency is "not required in order to satisfy the collapsing analysis." (Mot. ¶ 67; Proposed Compl. at ¶ 208).[91] But its reason for doing so is clear—*nowhere* has the Committee alleged facts supporting any

---

[90] Notwithstanding the "collapsing" rubric, the knowledge requirement is not novel to the Bankruptcy Code.  As noted in *HBE Leasing*, the "existence of a knowledge requirement [in order to strip a lender of its provision of fair consideration] reflects the [New York Uniform Fraudulent Conveyance Act's] policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme."  *HBE Leasing*, 48 F.3d at 636 (quoting N.Y. Debt & Cred. Law § 278(1)), which is the "parallel state-law provision" of the "good faith" defense under section 548(c) of the Bankruptcy Code.  *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 663, 676 (Bankr. S.D.N.Y. 2000).  In other words, the knowledge requirement in the "collapsing" analysis is analogous to section 548(c) of the Bankruptcy Code.  *Dreier II*, 453 B.R. at 513 ("The 'knowledge' requirement under [the collapsing analysis] reflects the policy of the Uniform Fraudulent Conveyance Act to protect innocent purchasers for value who received the debtor's property without awareness of any fraudulent scheme … and is closely connected to the requirement of 'good faith.'").

[91] The Committee may argue, in error, that this Court's well-reasoned decision in *Sabine* somehow scaled-back the Second Circuit's holding in *HBE Leasing* requiring knowledge on the part of a lender in order to strip that lender of the benefit of the reasonably equivalent value provided to a debtor under the collapsing doctrine.  *First*, consistent with *HBE Leasing*, the Court in *Sabine* noted that the law is "focused on the knowledge and intent of the parties" and that collapsing requires considering if "all of the parties involved had knowledge of the multiple transactions." *Sabine*, 547 B.R. at 541 ("the parties negotiated with full knowledge … and no contradictory evidence was introduced at the Hearing").  There were no facts that the lenders were unaware of.  *Id.* at 537 (no dispute that "Legacy Forest and the Legacy Sabine Subsidiaries were balance sheet insolvent at the time of the Combination.").

*Second*, the Court was faced with a distinct assertion of "selective" collapsing by the committee in that case, with respect to matters beyond "assessing reasonably equivalent value."  *Id.* at 540.  Very recently, favorably citing this Court's decision in *Sabine*, Judge Sullivan (who affirmed Judge Bernstein in *Fabrikant II*), underscored this distinction.  *See In re Tribune Company Fraudulent Conveyance Litigation, Multidistrict Litigation*, No. 11-02296 (RJS) [Docket No. 7659] at 14 (collapsing against a lender in an LBO context "bears little resemblance" to collapsing multi-tiered transactions as discussed in *Sabine*).

assertion that Morgan Stanley had either actual or constructive knowledge that the LBO would render NWHI insolvent.[92]

### 2. The Committee's Allegations Against Sycamore Directly Contradict Its Assertion That Morgan Stanley Knew That Sycamore's Projections Were Inflated

86.    Not only does the Committee fail to allege any facts suggesting that Morgan Stanley knew about any fraudulent scheme, its entire story is in *direct tension* with the notion that Morgan Stanley knowingly funded a fraudulent conveyance.   The Committee repeatedly alleges that Sycamore hid from all parties an alternate reality concerning RemainCo's financial position:

- Sycamore Defendants were "integrally involved in planning, negotiating, and executing the LBO, including disseminating and/or approving the dissemination of *false and misleading projections to the public, **including to the Lender Defendants**, prospective lenders, and rating agencies*." (Proposed Compl. ¶ 234) (emphasis added).

- "It was only Sycamore's *manipulation* of RemainCo's estimated and projected performance in the run up to the LBO that *prevented RemainCo's insolvency from being obvious to all.*" (Mot. ¶ 15) (emphasis added).

- "Sycamore provided uber-aggressive five-year projections *secretly premised on Sycamore's upside case*, while representing to Duff & Phelps that that it was the best, most accurate and most likely estimate for RemainCo's performance." (Mot. ¶ 33) (emphasis added).

- "Yet Sycamore *failed to inform* either Duff & Phelps *or the market* that the RemainCo Solvency Opinion was based on Sycamore's upside projections." (Proposed Compl. ¶ 128) (emphasis added).

- "For example, the Committee has only recently discovered that many of the key valuation spreadsheets maintained by Sycamore and others contained *hidden worksheets* with important data and calculations…."   (Proposed Compl. ¶ 180) (emphasis added).

---

[92]  The Committee's conclusory and unsupported statement (Proposed Compl. ¶ 208) that "Morgan Stanley also had actual or constructive knowledge that the LBO would render NWHI insolvent" is insufficient.  *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

- This gave Sycamore leeway to ***manipulate*** valuation inputs like EBITDA for the newly separated businesses, and thus to ***manipulate*** the share of the $2.2 billion combined Jones enterprise value attributable to RemainCo, on the one hand, and to the Carve-Out Assets on the other.    (Proposed Compl. ¶ 88) (emphasis added).

- "***Sycamore managed to create <u>the illusion</u> that RemainCo could support its LBO debt obligations***—and provide cover for its Affiliates' below-market purchase of the Carve-Out Assets—by preparing wildly inaccurate projections and valuations of the RemainCo and Carve-Out Assets.   Those valuations, and Sycamore's ***manipulation*** of the estimates and projections leading to those valuations, are discussed in detail below." (Proposed Compl. ¶ 97) (emphasis added).

- "With access only to ***the <u>misleading information</u>*** made available to them by Sycamore and Jones concerning the value and performance of RemainCo and the Carve-Out Assets, most holders exchanged their Old 2019 Notes for newly issued 2019 notes…."   (Proposed Compl. ¶ 93) (emphasis added).

- "Sycamore's estimates were based on an assumption (***not disclosed publicly***) that reorganization expenses would total $72 million and would be incurred only in 2014 and 2015."   (Proposed Compl. ¶ 134) (emphasis added).

87.    Thus, the Committee's own allegations cement the conclusion that Morgan Stanley advanced funds in good faith and without the requisite knowledge for collapsing. Indeed, the Committee admits that, under their allegations, Sycamore fraudulently misled the "Lender Defendants, prospective lenders, and ratings agencies."   (Proposed Compl. ¶ 234). Assuming that the lenders *were* fraudulently misled as the Committee alleges, avoiding *their* claims would create an intellectually inconsistent result whereby the defrauded lenders lent hundreds of millions of dollars in good faith, but are now left with no avenue to collect.

88.    Moreover, as discussed below, Morgan Stanley acted reasonably and in accordance with usual and customary practices in connection with the LBO Debt.

### 3.    Morgan Stanley Had No Constructive Knowledge That The LBO Was A Fraudulent Transfer

89.    In the absence of any factual allegations of Morgan Stanley's *actual* knowledge of RemainCo's insolvency, the Committee must allege facts sufficient to show that Morgan Stanley

37

had *constructive* knowledge. While there is "some ambiguity as to the precise test for constructive knowledge," *HBE Leasing*, 48 F.3d at 636, the Second Circuit in *HBE Leasing* "appears to have applied a rigorous test" akin to "conscious avoidance" or "conscious ignorance." *Gowan v. Patriot Group (In re Dreier LLP)*, 452 B.R. 391, 447, 450 (Bankr. S.D.N.Y. 2011) ("*Dreier I*") (citing *HBE Leasing*, 48 F.3d at 637).

90.    The Committee does not come close to meeting this test. In order to demonstrate that Morgan Stanley was consciously ignorant, and therefore had the requisite constructive knowledge, of RemainCo's insolvency, the Committee must sufficiently allege that Morgan Stanley "had information that put it on inquiry notice that [NWHI] was insolvent or that the transfer might be made with a fraudulent purpose," *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 90 n.11 (2d Cir. 2014), *and*, if it did, that Morgan Stanley failed to reasonably follow up with due diligence as to the facts giving rise to that inquiry notice. *Dreier II*, 453 B.R. at 513 (asking if "diligent inquiry would have discovered the fraudulent purpose of the transfer.").

91.    As illustrated below and in the Committee's Proposed Complaint, the Committee includes no allegation that Morgan Stanley consciously avoided knowledge of any fraudulent scheme. Nor does the Committee allege any red flag perceived by Morgan Stanley such that it was on inquiry notice. In addition, assuming it were (for the sake of the analysis), Morgan Stanley conducted significant due diligence, and uncovered no fraudulent scheme.

### (a)    Morgan Stanley Was Not On Inquiry Notice That The LBO Would Render NWHI Insolvent

92.    The Committee has not alleged any "red flag" information that would have put a reasonably prudent banking institution in Morgan Stanley's position on "inquiry notice" that the LBO would render NWHI insolvent. *See Christian Bros. High Sch. Endowment v. Bayou No*

*Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 313 (S.D.N.Y. 2010) (asking "whether the alleged 'red flag' information would have put a reasonably prudent institutional hedge fund investor on inquiry notice that Bayou was insolvent or that it had a fraudulent purpose in making the redemption payments") (emphasis omitted).    To the contrary, Morgan Stanley was faced with fact upon fact evincing the exact opposite.    Many of these facts were market-based.    Others were representations obtained from NWHI, as well as the fact that NWHI obtained a solvency opinion issued by a leading firm in the market.

93.    Thus, even assuming *arguendo* that NWHI *was* rendered insolvent by the LBO, the contemporaneous facts indicated to Morgan Stanley that RemainCo was going to be nothing short of a healthy, solvent borrower.    *See id.* at 315 n.29 (considering credible evidence that other similarly situated investors did not suspect insolvency after learning of alleged "red flag" information to be relevant to the issue of defendants' inquiry notice).

94.    ***Old 2019 Noteholders' decision to re-invest in NWHI rather than take payment in full in cash.***    Morgan Stanley, which administered the 2019 Note Exchange, was well aware that more than 90% (or $366.8 million) of holders of Old 2019 Notes chose to forego a 101% recovery and instead exchange their Old 2019 Notes for New 2019 Notes.    The Exchanging 2019 Noteholders made this election with knowledge of the LBO, including the Carve-Out Transactions, which were disclosed in the New 2019 Notes Offering Memorandum.[93]    The New 2019 Notes Offering Memorandum also detailed NWHI's post-LBO capital structure, including the New 2019 Notes' structural subordination to the Secured Term Loan, and structural subordination to the Unsecured Term Loan, which were guaranteed by NWHI's operating

---

[93]    *See* New 2019 Notes Offering Memorandum (MS-InReNineWest-00000437) (Finestone Ex. 62) at 34-46.

subsidiaries.[94]    The Exchanging 2019 Noteholders would not have chosen to forego a 101% recovery on their Old 2019 Notes in order to re-invest hundreds of millions of dollars in NWHI unless they believed that NWHI would be a viable business able to repay its post-LBO debts, including (i) the semiannual coupon payments required under the New 2019 Note Indenture, and (ii) the principal obligations underlying the structurally subordinated New 2019 Notes.

95.    ***The Unsecured Term Loan was oversubscribed.***    With knowledge of the Carve-Out Transactions, RemainCo's post-LBO debt structure, and that Sycamore's equity investment would be reduced for each dollar of Unsecured Term Loan raised, above $25 million, the market was eager to lend to RemainCo—even on an unsecured basis.    In fact, the $300 million Unsecured Term Loan was oversubscribed by approximately ***2.5 times***.    Morgan Stanley, which ran the syndication process, was therefore aware that sophisticated lenders shared its view that the LBO would not render RemainCo insolvent.

96.    ***Sycamore and KKR committed to invest hundreds of millions of dollars to RemainCo.***    Regardless of the Committee's allegations regarding Sycamore's "internal"[95] fraudulent motivation, from Morgan Stanley's perspective, sophisticated investors had committed to contribute hundreds of millions of dollars of equity to RemainCo.    Indeed, Morgan Stanley was aware that after conducting months of diligence, Sycamore committed to invest $395 million in RemainCo, while KKR committed to contribute $60 million to the LBO.

97.    ***Solvency Certificates.***    In connection with the Closing, Morgan Stanley demanded and received from NWHI's Chief Financial Officer, as a condition to borrowing, a

---

[94] *Id.* at 69-72.

[95] The Proposed Complaint uses the word "internal" as it relates to alleged Sycamore manipulations at least thirty times.

Solvency Certificate.[96]   The CFO certified that "as of the date hereof and after giving effect to the Acquisition and the incurrence of the indebtedness and obligations being incurred in connection with the Credit Agreement and any other funded indebtedness incurred to consummate the Acquisition, that … the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of the Borrower and its Subsidiaries, on a consolidated basis…."[97] Morgan Stanley, in its capacity as Administrative Agent under the Secured Term Loan, received a separate Solvency Certificate in connection with that credit agreement as well, which also certified that NWHI and its subsidiaries would be solvent after the LBO.[98]

98.   *Solvency Representation*.   In connection with the Unsecured Term Loan Credit Agreement, Morgan Stanley secured a representation from NWHI that "[o]n the Closing Date after giving effect to the Transactions, the Borrower and its Restricted Subsidiaries, on a consolidated basis, are Solvent."[99]

99.   *Solvency Opinion.*   In April 2014, Duff & Phelps provided the Company with its Solvency Opinion, which concluded that, after giving effect to the consummation of the LBO, RemainCo (i) would be solvent, (ii) its assets would be greater than the amount required to pay its probable liabilities, (iii) would be able to pay its respective debts as they come due, and (iv) would not have an unreasonably small amount of assets or capital.[100]

---

[96]   Unsecured Term Loan Credit Agreement (Finestone Ex. 6) at § 4.01(a)(vii); Exhibit K.

[97]   Solvency Certificate for Unsecured Term Loan Credit Agreement (MS-InReNineWest-00043695) (Finestone Ex. 75).

[98]   Solvency Certificate for Secured Term Loan Credit Agreement (MS-InReNineWest-00043698) (Finestone Ex. 76).

[99]   Unsecured Term Loan Credit Agreement (Finestone Ex. 6) § 5.16.

[100]   Duff & Phelps Solvency Opinion Letter, dated April 4, 2014 (NINEWEST00000236) (Finestone Ex. 74).   In the face of the numerous external data points known to Morgan Stanley at the time of the Closing, the Committee resorts to manufacturing an allegation which suggests that had Morgan Stanley done X, it would have seen Y: "[i]f

41

100.    Notwithstanding the foregoing, the Committee posits that "[i]f the methodology utilized by Duff & Phelps in the solvency analysis prepared for RemainCo in connection with the LBO is applied to the Morgan Stanley projections rather than the artificially inflated Sycamore projections, NWHI is shown to be insolvent in virtually all scenarios."   (Proposed Compl. ¶ 209).

101.    But, this is not a red flag or even a fact allegation at all.   Because there is no reason why Morgan Stanley would have engaged in the Committee's hypothetical exercise.

102.    As the Committee acknowledges, Morgan Stanley's projections were never created for the purpose of conducting a solvency analysis.   (Mot. ¶ 68) ("The Morgan Stanley model did not include a solvency analysis for NWHI.").   The purpose of Morgan Stanley's stressed credit test was to evaluate RemainCo's ability—based on certain conservative projected cash-flows—to repay the debt that Morgan Stanley underwrote and syndicated.[101]   And, in every scenario, the test was *passed*—Morgan Stanley's credit model showed that RemainCo *could* pay its debts through maturity.[102]

103.    Such stress-testing is undertaken in connection with "every transaction" brought to Morgan Stanley's credit committee.[103]   Morgan Stanley's "typical" practice is to "haircut sponsor assumptions" to determine a "base case" and to simulate an economic shock such as "stressing the business through a downturn in the economy" to determine a "downside" case, without regard to the likelihood of such scenarios.[104]

---

the methodology utilized by Duff & Phelps in the solvency analysis prepared for RemainCo in connection with the LBO is applied to the Morgan Stanley projections rather than the artificially inflated Sycamore projections, NWHI is shown to be insolvent in virtually all scenarios."   (Proposed Compl. ¶ 209).

[101] Lilienfeld Tr. (Finestone Ex. 3) at 160:25-161:10; 275:16-276:4.

[102] *Id.* at 277:19-278:6.

[103] *Id.* at 160:25-161:10; 161:23-162:5.

[104] *Id.* at 160:10-18; 277:8-12.

104.    And, to be certain, it would have gone against standard industry practice for Morgan Stanley to run its own solvency analysis as the Committee suggests might have been done in its made-for-litigation universe.   *See Bayou Grp.*, 439 B.R. at 315 n.29 ("While the tests for inquiry notice and diligent investigation are objective, they are informed by the reality of the transferee's market and industry.").

105.    At bottom, the Committee does not allege that Morgan Stanley saw any red flag; rather, the Committee alleges that Morgan Stanley would have seen a red flag if it had done something that it never does, never intended to do, and is not customary in the industry to do.

### (b)    Assuming *Arguendo* Morgan Stanley Had Inquiry Notice Of NWHI's Alleged Insolvency, It Undertook Reasonable Due Diligence

106.    Assuming for the sake of the analysis that Morgan Stanley *was* on "inquiry notice" regarding NWHI's alleged insolvency or any "fraudulent scheme" (it was not), it undertook a more than reasonable, diligent investigation with respect to the term loans and NWHI's financial condition.   *See In re Am. Hous. Found.*, 785 F.3d 143, 164 (5th Cir. 2015) ("once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement").   In conducting its diligence, Morgan Stanley acted in accordance with "reasonable commercial standards" and "abide[d] by routine business practice."   *Gold v. First Tenn. Bank (In re Taneja)*, 743 F.3d 423, 430-31 (4th Cir. 2014) (noting that the court's inquiry regarding industry standards "serves to establish the correct context in which to consider what the transferee knew or should have known").

107.    As detailed in section II.F *supra*, Morgan Stanley conducted *extensive* due diligence in connection with the LBO, as would be expected of a major institution agreeing to

underwrite hundreds of millions of dollars of debt.    Over the course of its months'-long

diligence process:

- Morgan Stanley conducted its typical, customary due diligence, including business, financial, legal, and accounting diligence with respect to the LBO.[105]

- With respect to its financial diligence, Morgan Stanley received information from Jones management, Sycamore, and KKR, and reviewed the BDO Audit Report and the PwC Report.[106]

- Morgan Stanley did not simply accept Sycamore's projections, but rather did diligence on them "to become comfortable that [the assumptions] were appropriate, and if there was any question about them, [Morgan Stanley] would ask and get further information."    Ultimately, Morgan Stanley did not have reason to believe that the projections Sycamore provided were unreasonable.[107]

- Morgan Stanley viewed the PwC Report, which itself was the product of significant due diligence, as an "independent assessment and evaluation of the different financials of the company as well as the EBITDA and adjustments to EBITDA."[108]

108.    In light of the foregoing, the Committee does not (and cannot) take issue with

Morgan Stanley's due diligence process.

**4.    The Committee's Few Remaining Allegations Regarding Morgan Stanley And Other Unsecured Term Loan Lenders Are Incorrect, Implausible, Or Irrelevant**

109.    The Committee's remaining allegations regarding Morgan Stanley and other

Unsecured Term Loan Lenders are either implausible, incorrect, or irrelevant.

110.    *First*, the Committee's allegation that Morgan Stanley had "minimal exposure" to

the LBO Debt is incorrect.    (Proposed Compl. ¶ 211).    In December 2013, Morgan Stanley

committed to fund $170 million of the Secured Term Loan and over $223 million to fund the

---

[105] Lilienfeld Tr. (Finestone Ex. 3) at 60:214-61:16; 273:11-18.

[106] *Id.* at 63:7-64:18.

[107] *Id.* at 290:3-11.

[108] *Id.* at 77:25-78:14.

Bridge Loan.[109]    This commitment to provide RemainCo with almost $400 million was not conditioned upon the successful syndication of those facilities.[110]    Moreover, as of the Closing, Morgan Stanley was the sole initial lender under the Unsecured Term Loan.[111]

111.    *Second,* the Committee's allegation that Morgan Stanley was motivated to earn "fees" is highly implausible.    (Proposed Compl. ¶ 211).    Morgan Stanley would not risk nearly $400 million in order to earn fees for arranging the Unsecured Term Loan.    *See Fabrikant II,* 480 B.R. at 488-89 (finding complaint's "wholly conclusory" allegation that banks took massive risk of continuing lending relationships with the debtors on the speculative hope that there may be sufficient liquidity to obtain repayment because they "were clouded in judgment due to lavish commissions" was "highly implausible, bordering on the absurd" since "the loss of principal would have far outweighed the commissions earned on the loans"); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Invs. Sec. LLC (In re Madoff),* No. 08-01789, 2018 WL 4833984, at *23-25 (Bankr. S.D.N.Y. Oct. 3, 2018) (finding allegation that bank made billions of dollars of risky loans for reputational reasons and to compete with rival bank to be implausible). Similarly, the Committee's implication that Morgan Stanley would participate in a transaction and commit hundreds of millions of dollars because it stood to benefit from the redemption of its Jones stock in connection with the LBO (Proposed Compl. ¶¶ 22; 211) also "requires an inference that is highly implausible, bordering on the absurd."    *Fabrikant II,* 480 B.R. at 489.

112.    *Finally,* in the absence of actual evidence that Morgan Stanley, the sole initial lender, knew or should have known that the LBO would render RemainCo insolvent, the Committee cites to the internal email of a single, subsequent Unsecured Term Loan Lender,

---

[109]   Debt Commitment Letter, (Finestone Ex. 1) at Schedule 1.

[110]   *Id.* at ¶ 3.

[111]   *See* ¶ 32, *supra.*

which stated that it "seemed pretty likely" that RemainCo would be in "real trouble" in the following three years.    (Proposed Compl. ¶ 208).

113.    It is unremarkable that employees of a lender considering whether to participate in a loan would discuss the credit risk of the potential borrower—that is what *every lender does in every transaction*.    Moreover, the one lender on which the Committee self-servingly chooses to focus, after assessing the credit-risk, *did* participate in the Unsecured Term Loan and, in fact, according to the Committee, was "[o]ne of the largest lenders" to the Unsecured Term Loan. (*Id.* ¶ 208).    At best, the Committee has included a sole allegation that "merely raise[d] some doubts as to the Debtors' financial stability [but that] hardly r[o]se to the level of suggesting fraud."    *Fabrikant II*, 480 B.R. at 488 ("[S]ignals of general infirmities in a company, which could merely reflect a poor business model, incompetent management, … insufficient capital, and a host of other deficiencies other than fraud, are inadequate to trigger inquiry notice.") (internal quotation marks omitted); *see also Dreier II*, 453 B.R. at 513 (finding that it was insufficient to allege merely that lender "may have had reason to question Marc's honesty and the accounting for and source of all of the funds used by him and Dreier LLP").    And there is no allegation that Morgan Stanley was alerted to this email.

### 5.    The Extraordinary Relief Sought—Avoidance of the Unsecured Term Loan—Requires A Showing That RemainCo Was Rendered Insolvent (Not Merely Undercapitalized)

114.    Separate from the requirements of collapsing, under New York law, which would apply to the UTL Challenge,[112]  in order to avoid the Unsecured Term Loan, the Committee will

---

[112] Under New York's choice-of-law principles, courts will conduct an "interest analysis" with respect to choice-of-law issues concerning torts, including fraudulent conveyances, which analysis considers the parties' domiciles and the locus of the tort.    *Arochem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (citations omitted).    Here, the laws of New York—where the LBO was planned, negotiated, and closed—will apply to the UTL Challenge. *See Globe Commc'n Corp. v. R.C.S. Rizzoli Periodici, S.p.A.*, 729 F. Supp. 973, 976 (S.D.N.Y. 1990) (focus is on the "last event necessary to the cause of action").    And, as the Committee acknowledges, NWHI, and Jones before

have to show that NWHI was rendered insolvent by the LBO—*i.e.*, a showing of mere undercapitalization would be insufficient.    While New York law provides for the avoidance of both conveyances *and* obligations where the transaction left the debtor insolvent, only conveyances (not obligations) are subject to avoidance where the debtor was left with unreasonably small capital.[113]    This an important distinction, because a plaintiff seeking to avoid an obligation cannot avail itself of the "easier" test of undercapitalization, which would be "something short of insolvency."    *In re Best Prods. Co.*, 168 B.R. 35, 56 (Bankr. S.D.N.Y. 1994).[114]

115.    Here, the Court need not look further than the numerous market indicators of NWHI's solvency in order to conclude that the Committee will not be able to overcome the "formidable" hurdle of establishing that NWHI was insolvent.    *Best Prods*, 163 B.R. at 53 (discussing the "formidable obstacle[]" of proving insolvency under New York law); *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (relying on "objective evidence from the public equity and debt markets" in determining the financial condition of a

---

it, both had their headquarters in New York (Mot. ¶ 82) (arguing for application of New York's statute of limitations).

[113]    *Compare* New York Debt. & Cred. Law § 273 (providing that a *conveyance made or obligation incurred* by an insolvent person without receiving fair consideration in return is constructively fraudulent as to creditors) *with id.* § 274 (providing that *only a conveyance made* by a person who "is engaged or about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital" without receiving fair consideration in return is constructively fraudulent as to creditors); *see also In re Nirvana Rest.*, 337 B.R. 495, 508 (Bankr. S.D.N.Y. 2006) ("NYDCL § 274 does not invalidate fraudulent obligations").

[114]    According to Judge Brozman:

Since almost everybody would agree that the statutory test [for unreasonably small capital] requires something short of insolvency, one might be tempted to conclude that [the debtor] would have an easier time of it than with the insolvency grounds for constructive fraud.    But there is another difficulty with the [unreasonably small capital] section of the DCL as well, for it designates as avoidable only a "conveyance" whereas the section on insolvency designates as avoidable both a "conveyance" and "obligation incurred."    This distinction was not lost on the examiner, who discussed the possibility that [the debtor] would be unable to avoid the incurrence of unsecured debt.    This would be significant given that a substantial amount of LBO debt was unsecured.

*Best Prods.*, 168 B.R. at 56.

company).    This Court—joined by others in the Southern District of New York†—has routinely found that contemporaneous market evidence is the *key* indicator of a company's value.    *See, e.g.*, *In re Bos. Generating, LLC*, 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010) (Chapman, J.) ("[A]bsent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."); *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y.), May 1, 2018 Hr'g. Tr. at 179:21-22 ("The market is the reality through which you test the valuation" of a company).

116.    The contemporaneous market evidence underscores the solvency of NWHI at the time of the LBO.

- The holders of $400 million of 2019 Notes—*the same holders who are now challenging the LBO and the Unsecured Term Loan Claims on the grounds that NWHI was insolvent*—were given the option to cash out their notes at 101% or exchange them for New 2019 Notes against NWHI (that were unsecured and without any guarantees) with a slightly higher interest rate, and *only 1%* of those holders chose to exercise the cash-out option at 101%, while *99%* chose either to exchange or retain their notes;

- The Secured Term Loan and Unsecured Term Loan were *oversubscribed*; the Secured Term Loan was 4.0x oversubscribed, and the Unsecured Term Loan was 2.5x oversubscribed;

- Following the consummation of the LBO, RemainCo was able to issue an *additional* $60 million of unsecured New 2019 Notes that were also structurally subordinated to the term loan debt and did not have the benefit of any guarantees from the Guarantor Subsidiaries;[115]  and

---

[115]  NWHI's continued ability to access the capital markets after the LBO closed is powerful evidence of NWHI's continued solvency post-LBO.    *See In re Iridium Operating LLC*, 373 B.R. 283, 349 (Bankr. S.D.N.Y. 2007) (citing the fact that Iridium raised money in the capital markets post-transaction as "an indication of both solvency and capital adequacy").    And the fact that the New 2019 Notes are *unsecured* debt provides particularly persuasive evidence of NWHI's solvency.    *See VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606, at *15, *32 (D. Del. Sept. 13, 2005) (citing post-transaction issuance of unsecured bonds, which were contractually subordinated to the debtor's credit facility such that "the Banks had to be paid in full before the bondholders could recover, in the event of a bankruptcy or liquidation of [the debtor]" as evidence of debtor's solvency).

- NWHI's unsecured debt (including the 2034 Notes) traded up after the closing the LBO.[116]

## B. The Debtors Have Not Unjustifiably Refused To Prosecute The UTL Challenge

117.    Assuming *arguendo* that the UTL Challenge were colorable (it is not), the Court should still deny the Motion because the Debtors have not unjustifiably refused to prosecute the claim.    The Committee cannot satisfy this test for derivative standing because (i) the Debtors have proposed a plan of reorganization providing for the settlement of the UTL Challenge, (ii) the Committee has not alleged any disabling conflict that would have caused the Debtors to settle rather than otherwise litigate the UTL Challenge *and* the settlement is on terms substantially similar to those previously supported by the Committee, and (iii) even assuming the Debtors were not seeking to settle the UTL Challenge, any refusal by the Debtor to prosecute the UTL Challenge is more than justified when the limited benefits to the Debtors' estates is weighed against the significant costs of giving the Committee derivative standing to prosecute the claim.

### 1.    The Debtors Are Not Refusing To Prosecute—They Are Proposing To Compromise

118.    As this Court has recognized, "[c]ompromise and settlement are at the heart and soul of every successful chapter 11 proceeding."    *In re NII Holdings*, 536 B.R. 61, 65 (Bankr. S.D.N.Y. 2015); *see also In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) ("As a general matter, settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.") (internal quotation marks omitted).    Here, the Debtors have proposed a

---

[116] The trading prices of NWHI's unsecured debt after the LBO also are indicators that NWHI was not rendered insolvent by the LBO.    *See Iridium*, 373 B.R. at 292-93 ("[T]he Court is persuaded that contemporaneous market data for Iridium's publicly traded securities are both consistent with substantial enterprise value and inconsistent with insolvency."); *VFB*, 2005 WL 2234606, at *16 (citing fact that debtor's bonds "continued to trade at near par value" for six months after their issuance, despite a decline in the debtor's coverage ratio, as indication of a debtor's continued solvency).

plan of reorganization that includes a proposed resolution of the UTL Challenge under section 1123(b)(3) of the Bankruptcy Code.

119.    The right of a debtor-in-possession to settle and compromise estate claims is prime.    Indeed, "numerous provisions in the Bankruptcy Code establish[] the debtor's authority to manage the estate and its legal claims."    *Smart World*, 423 F.3d at 174.    Seeking to exercise its statutory rights does not, and cannot, equate to a debtor in possession's "unjust refusal" to prosecute.

120.    Rather, as the Court acknowledged in *Sabine*, a debtor's right to settle estate claims—subject to court approval—trumps a committees' request for derivative standing. *Sabine*, 547 B.R. at 568 ("[B]ecause the Debtors propose to settle the Bucket II Claims in the context of a plan, the Court will abstain from ruling on the colorability of the Bucket II Claims pending a hearing on confirmation of a plan."); *see also In re Caesars Entertainment Operating Co.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016) ("The debtors' decision to forego pursuing the claims in favor of settling them through a plan is a reasonable exercise of the debtors' judgment.").    As discussed below, the settlements contemplated in the Plan are reasonable and clearly satisfy the Rule 9019 standards.

**2.      The Debtors Have No Conflict With Respect To The Unsecured Term Loan Lenders**

121.    There can be no allegation that the Debtors or their advisors have any conflict of interest with respect to the Unsecured Term Loan Lenders.    The Unsecured Term Loan Lenders, Morgan Stanley, and GLAS are each completely unaffiliated with the Debtors and do not, along with their respective advisors, have any particular relationship with the Debtors or Sycamore beyond that of debtor-creditor relationship.

122.    In the absence of any conflict, there is even less of a basis to strip the Debtor of its right to settle the UTL Challenge.   By way of analogy, under state law, where there is no conflict of interest, absent an abuse of discretion, a company's decision to resolve a derivative claim will be respected by the courts.   *See Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990).

123.    Moreover, the Committee cannot argue any abuse of discretion in view of the fact that, in connection with the Creditor Settlement, it has previously endorsed a proposed settlement of the UTL Challenge on substantially similar economic terms.

**3.      Any Cost-Benefit Analysis Weighs Decidedly Against Granting Standing**

**(a)      Allowing The Committee To Prosecute The UTL Challenge Would Come At A Significant Cost To The Estates**

124.    Even if the UTL Challenge were colorable (it is not), the probability of successfully avoiding the Unsecured Term Loan is extremely low.   As discussed above, the Committee must overcome the formidable hurdle of proving that NWHI was rendered insolvent by the LBO—not just left with insufficient capital as is customarily alleged in connection with challenged leveraged buy-outs—*and* that the lenders knew or should have known of a putative "fraudulent scheme."

125.    Meanwhile, the costs to the estates of litigating the UTL Challenge would be crippling.   The Debtors already have requested an incremental $22 million debtor-in-possession financing to provide a bridge to a mid-March confirmation of the Debtors' Plan and exit from bankruptcy.   If the Court awards standing to the Committee to prosecute the UTL Challenge, the Debtors would need in excess of the incremental $22 million they have already requested and would likely be forced to refinance up to $72 million of existing Term DIP obligations as a result of such grant of standing constituting an Event of Default under the Term DIP Credit Agreement and acceleration of the obligations thereunder.

51

126.    If the Court awards standing to the Committee to prosecute the UTL Challenge, the Debtors' Plan cannot proceed to confirmation, leaving the Debtors without any clear path towards emergence from bankruptcy.   Courts have denied standing on this basis alone.   *See Sabine*, 547 B.R. at 516 ("Courts have denied standing where the proposed litigation would delay resolution of the reorganization proceeding by impeding approval of the pending plan of reorganization.") (internal quotation marks omitted).

127.    The cost of this bankruptcy has already been significant.   Allowing this bankruptcy proceeding to devolve into further litigation will result in enormous additional administrative expenses.   The Debtors' monthly operating reports reflect that there have been more than $52 million[117] in professional fees incurred in these cases.   Much of these costs has been incurred in connection with the Committee's investigation of the Proposed Claims.   In fact, as of October 31, 2018, the Committee's professionals have sought reimbursement of approximately $21.1 million from the Debtors' estates,[118] much of which was on account of the Rule 2004 Investigation and related work.

128.    This is only the beginning.   Indeed, the Committee has alleged that it has only scraped "the tip of the iceberg."   (Proposed Compl. ¶ 180).   Prosecution of the UTL Challenge threatens to add tens of millions more as a result of additional document review, depositions, and briefing.

129.    Moreover, it is impossible to square the Committee's position with its duties to ***all*** unsecured creditors.   By prolonging the Debtors' bankruptcy proceedings, the prospects of a successful reorganization are greatly diminished and the recoveries for creditors (including the

---

[117] *See* Docket Nos. 463, 464, 576, 608, 699, 801, 905.

[118] *See* Docket Nos. 477, 478, 502, 552, 553, 554, 555, 620, 621, 622, 623, 705, 706, 707, 716, 809, 810, 811, 812, 915, 916, 917, 918.

Unsecured Term Loan Lenders) at the Guarantor Subsidiaries will undoubtedly diminish. Nevertheless, the Committee, apparently acting solely for the benefit of NWHI's unsecured creditors, is willing to trade that value for what it believes to be incremental value through litigation.

130.     The Debtors are justified in refusing to allow estate resources to be wasted in such a manner, and the Court should enforce the second prong of *STN*, which exists precisely to guard against such an undesirable outcome.   *See Sabine*, 547 B.R. at 517 ("Requiring bankruptcy court approval conditioned upon the litigation's effect on the estate helps prevent committees and individual creditors from pursuing adversary proceedings that may provide them with private benefits but results in a net loss to the entire estate.") (internal quotation marks omitted).

### (b)     Avoidance Of The Unsecured Term Loan Would Not Add Value To The Estates

131.     Not only will there be tremendous costs imposed upon the Debtors' estates if the Committee is granted standing to prosecute the UTL Challenge, but there will be zero additional value achieved even if the Committee is somehow successful.   That is, avoiding the Unsecured Term Loan would not result in additional value to NWHI; rather, the result would simply be a reallocation of existing value among NWHI's creditors.

132.     Further, if the Committee is granted standing to prosecute the UTL Challenge, any purported value of the UTL Challenge to non-Unsecured Term Loan NWHI unsecured creditors must be weighed against the effect it will have on the NWHI's estate's business value and hopes for reorganizing as a going concern.   It is likely that the granting of standing to prosecute the UTL Challenge will force the Debtors to resort to a plan of liquidation, which would result in a significant reduction in the business value at NWHI and the other Debtors.   In that scenario, any economic recovery for NWHI creditors on account of NWHI business assets

will be significantly reduced (if not eliminated), and all of the Debtors' stakeholders, including employees and trade counterparties, will be significantly harmed.

### (c)    In Any Event, The Entire Obligation Cannot Be Avoided

133.    The entire Unsecured Term Loan cannot be avoided under any scenario, because a portion of the proceeds from the LBO Debt, including the Unsecured Term Loan, was used to pay down existing debt.[119]    At the time of the LBO, Jones had approximately $1 billion of existing debt, approximately $345 million of which was paid down by the $805 million Merger-related LBO Debt.[120]    The Debtors thus received the "fair equivalency" of the more than forty percent of the Merger-related LBO Debt that was used to retire existing debt.    *See HBE Leasing*, 48 F.3d at 637 (finding transaction would not constitute a fraudulent conveyance even if collapsed into a single transaction where the debt proceeds may have been used for legitimate corporate expenditures).    Therefore, even assuming a one hundred percent probability of success (which is certainly not the case), only the portion of the Unsecured Term Loan that was not used to repay existing debt can be avoided.

### (d)    Avoidance of the Unsecured Term Loan Will Give Rise To "Replacement" Indemnification, Contract, and Tort Claims Against NWHI

134.    The Committee's UTL Challenge is predicated on a determination that NWHI was insolvent upon entry into the Unsecured Term Loan Credit Agreement.    However, pursuant to section 4.01(a)(vii) of the Unsecured Term Loan Credit Agreement, John T. McClain, as the

---

[119]  *See, e.g.*, Unsecured Term Loan Credit Agreement, (Finestone Ex. 6) at Schedule II ("Transaction Description") at ¶ (j) (providing that the proceeds of "RemainCo Facilities" which included the ABL Facility, the Secured Term Loan, and the Unsecured Term Loan, would be used to pay, among other things "the Closing Date Refinancing"); *see also* (MS-InReNineWest-00022041) (Finestone Ex. 78) (draft funds flow spreadsheet showing that proceeds of the Secured Term Loan and Unsecured Term Loan were commingled in a single account from which LBO-related costs, including paydown of pre-LBO debt, were made).

[120]  The pre-LBO debt repaid was: approximately $78 million outstanding under the existing asset backed facility; approximately $263 million to redeem the 2014 Notes; and approximately $5 million on account of Old 2019 Notes that opted to cash out.    *See* Email from M. Stavrakos, dated April 8, 2014 (WF00019664) (Finestone Ex. 8) (attaching Total Jones Group Sources and Uses Summary).

CFO of the borrower (now known as NWHI), signed and delivered a Solvency Certificate to Morgan Stanley, as the original Administrative Agent of the Unsecured Term Loan, certifying that RemainCo would be solvent after giving effect to the LBO.    If that certification was false, Morgan Stanley could assert claims against Mr. McClain, in his capacity as CFO, for, among other things,[121] (i) fraudulent inducement of entry into the Unsecured Term Loan Credit Agreement based upon Mr. McClain's knowing misrepresentation of its solvency, *see Rossetti v. Ambulatory Surgery Ctr. of Brooklyn*, 125 A.D.3d 548, 549 (N.Y. App. Div. 2015) (finding that lender successfully stated a cause of action for fraudulent inducement by alleging that defendant knowingly misrepresented that it was solvent), and (ii) a fraud claim against Mr. McClain because Morgan Stanley would not have entered into the Unsecured Term Loan Credit Agreement had RemainCo been insolvent.    *See First Bank of Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287 (N.Y. App. Div. 1999) (finding that misrepresentation of facts gives rise to fraud claim as well as breach of contract claim where defendant allegedly breached contractual warranties by intentionally misrepresenting material facts regarding the underlying loans).    If Mr. McClain is found liable, he may in turn assert an indemnification, contribution and/or reimbursement claim against NWHI, which would eliminate through replacement any avoidance of the Unsecured Term Loan Lenders' claims.

135.    In addition, in an abundance of caution, GLAS, on behalf of the Unsecured Term Loan Lenders, has filed contingent, protectives claims against NWHI in the event that the Unsecured Term Loan is avoided based upon NWHI's representations to Morgan Stanley and/or the Unsecured Term Loan Lenders that it would be solvent upon the Closing.[122]    Among these

---

[121]  The Unsecured Term Loan Credit Agreement is governed by New York law.    *See* Unsecured Term Loan Credit Agreement (Finestone Ex. 6) § 10.15.

[122]  *See id.* § 5.16 ("On the Closing Date after giving effect to the Transactions, the Borrower and its Restricted Subsidiaries, on a consolidated basis, are solvent); Solvency Certificate (Finestone Ex. 75) ("the Borrower and its

potential replacement claims are: (i) a breach of contract claim against NWHI based upon NWHI's breach of representations and warranties regarding its solvency status, *see Bank of Nova Scotia v. Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), No. 02-B-41729, 2008 WL 3919198, at *4 (S.D.N.Y. Aug. 22, 2008) (finding that lender was entitled to recover damages for borrower's breach of contract because borrower provided inaccurate leverage ratios in its compliance certificates), (ii) a claim for fraudulent inducement of entry into the Unsecured Term Loan Credit Agreement based upon NWHI's knowing misrepresentation of its solvency, and (iii) a fraud claim against NWHI because Morgan Stanley would not have entered into the Unsecured Term Loan Credit Agreement had RemainCo been insolvent.

136.    If the Unsecured Term Loan Lenders (including Morgan Stanley) prevailed on even a single tort or contract claim, including any claim against Mr. McClain giving rise to an indemnification claim against NWHI, NWHI could be liable for damages in the full amount of the avoided Unsecured Term Loan Claim and related damages.    Thus, any benefit to NWHI's estate from the avoidance of the Unsecured Term Loan would be negated by these replacement or resulting claim(s) against the NWHI estate.

## C.    Under Any And All Circumstances, The Committee Cannot Have "Exclusive" Authority To Settle The UTL Challenge

137.    Even if the Committee could convince the Court that it has asserted colorable claims that would benefit the estates, there is no authority to provide the Committee with "exclusive" authority to settle those claims.    While a committee may obtain derivative standing to litigate and settle an estate claim, that grant of standing cannot strip a debtor in possession of its own authority to settle that claim.

---

Subsidiaries do not intend to, and do not believe that they will, incur debts or liabilities, on a consolidated basis, beyond their ability to pay such debts and liabilities as they mature.").

138.    The Committee cites to three unpublished orders to support its claim that "[s]imilar relief has been granted by this and other courts in similar circumstances."    (Mot. ¶ 99).[123]    In those three cases, the debtor-in-possession or trustee either consented to, or did not contest, the grant of exclusive settlement authority to a non-debtor.    In fact, there is no reported decision in which a court has granted exclusive settlement authority to a non-debtor over the debtor's objection, let alone a case such as this in which the debtor has actually *exercised* its authority to settle an estate claim (subject to the Court's approval).

139.    That courts do not grant exclusive settlement authority over estate claims to non-debtors is not surprising, given that there is no statutory basis for doing so.    Rule 9019 "vests authority to settle or compromise *solely* in the debtor-in-possession," which, according to the Second Circuit, "is hardly surprising in light of the numerous provisions in the Bankruptcy Code establishing the debtor's authority to manage the estate and its legal claims."    *Smart World*, 423 F.3d at 174 (emphasis added).    Among other provisions, section 323(a) of the Bankruptcy Code provides that the debtor in possession, as the legal representative of the bankruptcy estate, has the power to sue and be sued on the estate's behalf, "which presumably includes the derivative power to settle suits."    *Id.* at 174-75.    "In other words, § 323 implies what Rule 9019 expressly states—that it is the debtor-in-possession, as legal representative of the estate, who is vested with the power to settle the estate's claims."    *Id.* at 175.    Similarly, section 1106(a)(1) of the Bankruptcy Code makes the debtor in possession "accountable for all property [of the estate] received."    11 U.S.C. § 1106(a)(1).    "Courts therefore have interpreted § 1106(a)(1) to include the duty to appear and prosecute, or defend against, any cause of action on behalf of the estate

---

[123]  The Committee cites three orders: *In re Old CarCo LLC (f/k/a/ Chrysler LLC)*, No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) [Docket No. 5151 at ¶ 2]; *In re Majestic Capital, Ltd.*, No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011) [Docket No. 211 at ¶ 3]; *U.S. Bank N.A. v. DHL Global Forwarding* (*In re Evergreen Solar, Inc.*), No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) [Docket No. 382 at ¶ 3].

that may benefit or adversely affect the property of the debtor's estate." *Smart World*, 423 F.3d at 175. Thus, "[i]n making the debtor-in-possession accountable for the estate's legal claims, Congress vested the debtor with the responsibility to determine how best to handle those claims." *Id.*

140.    In contrast, there is no statutory basis for giving a committee the unilateral right to take control over an estate's legal causes of action. *See id.* at 182-83 ("If § 1109(b) were construed as giving creditors the unilateral right to take control of the estate's legal causes, it would conflict not only with the plain text of Rule 9019, but also with those provisions of the Bankruptcy Code assigning the debtor-in-possession the duty to act as the estate's legal representative…."). And section 105(a) of the Bankruptcy Code does not provide an independent basis upon which the Court can grant the Committee exclusive settlement authority. *See New England Dairies v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores)*, 351 F.3d 86, 91-92 (2d Cir. 2003) ("[A]n exercise of section 105 power [must] be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.").

141.    Congress vested the debtor in possession with the duty to prosecute or settle estate claims based upon the best interests of the estate because the debtor in possession is the estate's *sole* fiduciary. *See Smart World*, 423 F.3d at 175 (citing *Wolf v. Weinstein*, 372 U.S. 633, 649-50 (1963)) (emphasis added). Meanwhile, a creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate. *See Smart World*, 423 F.3d at 175 n.12. In this case, the Committee is the fiduciary for unsecured creditors of the subsidiary Debtors *and* for unsecured creditors of NWHI. The Committee is thus faced with the impossible task of maximizing recoveries for the subsidiary Debtors'

unsecured creditors, who will own the majority the reorganized business (provided the Debtors are able to emerge from chapter 11), and maximizing the recoveries of NWHI's unsecured creditors, whose recoveries would come substantially as a result of the Proposed Claims, which threatens the value of the reorganized business.

142.    The Debtors have exercised their authority as the sole legal representative of, and fiduciary to, their estates by entering into a settlement agreement with the Unsecured Term Loan Lenders that would resolve the UTL Challenge.   The Committee has not made a single allegation that there is any conflict of interest between the Unsecured Term Loan Lenders and the Debtors such that this compromise would be anything other than an arm's-length agreement, and in fact has stated that claims against the Unsecured Term Loan Lenders "should be resolved without litigation and as part of a plan of reorganization."[124] The Debtors have done just that, and have incorporated the proposed settlement into their proposed plan of reorganization, as is contemplated by section 1123(b)(3) of the Bankruptcy Code.   Therefore, Rule 9019 should provide the framework for the Court's consideration of the proposed settlement with the Unsecured Term Loan Lenders.   *See NII Holdings*, 536 B.R. at 65.   As discussed below, that settlement, together with the other settlements set forth in the Plan, satisfies the standards of Rule 9019 and is in the best interests of the estates, such that the Plan should be confirmed.

## IV.    STATEMENT IN SUPPORT OF PLAN AND PLAN SETTLEMENTS

143.    The Plan contemplates numerous intercreditor and inter-debtor settlements that were the result of arm's-length negotiations with the Debtors and their independent directors. By seeking confirmation of the Plan, the Debtors are not asking this Court for an express determination on the validity of the Unsecured Term Loan Claims, subrogation claims, or any

---

[124] *See* Supplemental Motion of Official Committee of Unsecured Creditors for the Entry of An Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016 Authorizing Expedited Document Discovery of Third Parties [Docket No. 559] ¶ 14.

other pre- or postpetition intercompany claims.   Rather, the Debtors are asking this Court to approve the *settlements* of these issues—collectively comprising the Estate Action UTL Settlement—through the Plan.   Indeed, this settlement facilitates a substantial distribution to creditors of NWHI that might otherwise be left with little (if any) recoveries on account of their claims if these issues were litigated to judgment.[125]   Because the Estate Action UTL Settlement is the direct product of the Intercreditor Plan Settlement, the bases for approval of that Intercreditor Plan Settlement as part of the Plan are discussed in detail herein.

144.    Under section 1123 of the Bankruptcy Code, a chapter 11 plan may (i) provide for the settlement of any claim belonging to the debtor or to its estate, and (ii) include any other appropriate provision not inconsistent with the Bankruptcy Code.   11 U.S.C. §§ 1123(b)(3)(A) and (b)(6).   Plan settlements proposed under section 1123(b) are routinely evaluated under the standards used to approve settlements under Bankruptcy Rule 9019.   *See, e.g., NII Holdings*, 536 B.R. at 65; *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same.").   Rule 9019 empowers bankruptcy courts to approve a settlement agreement where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best interests of the estate."   *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs,*

---

[125] Beyond the recoveries facilitated by substantial concessions given by the Unsecured Term Loan Lenders—who, as a legal matter, are otherwise entitled to payment in full on their claims—the Plan also facilitates an immediate cash recovery to creditors of NWHI as a result of a $105 million contribution from the Sponsors to resolve potential litigation relating to the 2014 Transaction and the Carve-Out Transactions.   A cash recovery on the effective date of the Plan eliminates the speculative nature, inherent risk and substantial cost associated with litigation complexities associated with the establishment of a litigation trust to pursue these claims and preserves the value of the business as a going concern without a litigation overhang post-confirmation.   The Estate Action Settlement is addressed in detail in the Debtors' brief in support of confirmation, and the Unsecured Term Loan Lenders join in the arguments in support of the Estate Action Settlement and confirmation as set forth in that brief.

*Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993) (citation omitted); *In re Dewey & LeBoeuf LLP*, 478

B.R. 627, 640 (Bankr. S.D.N.Y. 2012).    The court's analysis is not a mechanical process, but

rather contemplates a "range of reasonableness … which recognizes the uncertainties of law and

fact in any particular case and the concomitant risks and costs necessarily inherent in taking any

litigation to completion…."    *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

145.    "As a general matter, '[s]ettlements and compromises are favored in bankruptcy

as they minimize costly litigation and further parties' interests in expediting the administration of

the bankruptcy estate.'"    *Dewey*, 478 B.R. at 640 (*quoting In re MF Global Inc.*, No. 11-2790,

2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012)).    Bankruptcy courts should

consider and factor in the debtor's exercise of its business judgment when reviewing a proposed

settlement and may rely on the opinion of the debtor, parties to the settlement, and professionals.

*Dewey*, 478 B.R. at 641.    To approve a proposed settlement, a court "need not conduct a mini-

trial" or decide the numerous issues of law and fact raised by the settlement.    *Id.* at 640-41

(internal quotations omitted).    Rather, a court should "canvass the issues and see whether the

settlements 'fall[] below the lowest point in the range of reasonableness.'"    *Cosoff v. Rodman*

*(In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotations omitted).

"Although a judge must consider the fairness of the settlement to the estate and its creditors, the

judge is not required to assess the minutia of each and every claim."    *Nellis v. Shugrue*, 165

B.R. 115, 123 (S.D.N.Y. 1994).

146.    In deciding whether a particular settlement falls within the "range of

reasonableness," courts in the Second Circuit consider the following so-called "*Iridium* factors":

(i) the balance between the litigation's possibility of success and the settlement's future benefits;

(ii) the likelihood of complex and protracted litigation, "with its attendant expense,

inconvenience, and delay"; (iii) the paramount interests of creditors; (iv) whether other parties in interest support the settlement; (v) the nature and breadth of releases to be obtained by officers and directors; (vi) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; and (vii) "the extent to which the settlement is the product of arm's-length bargaining." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

147.    As set forth below, and as will be amply demonstrated at the confirmation hearing, each of the *Iridium* factors weighs heavily in favor of approval of the Estate Action UTL Settlement and confirmation of the Plan.

## A.    The Parties Supporting the Plan Are Likely To Succeed In Litigation Of Any Component of the Intercreditor Plan Settlement

148.    The settlements relating to the Plan's treatment of the UTL Challenge and the inter-debtor and/or intercreditor issues can be broken down into five main categories: (i) avoidance of the Unsecured Term Loan Claims; (ii) subrogation claims and rights of the Guarantor Subsidiaries against NWHI; (iii) intercompany claims held by the Guarantor Subsidiaries against NWHI (including pre- and postpetition intercompany claims); (iv) allocation of assets and expenses among the Debtor estates; and (v) Plan valuation.  Importantly, not only do the Unsecured Term Loan Lenders have valid claims against NWHI, they *also* have valid claims against the Guarantor Subsidiaries who in turn have claims against NWHI.  Aggregating these claims results in a clear entitlement of the Unsecured Term Loan Lenders to payment in full under the Plan, but recognizing that there are litigable issues presented by these claims, the Unsecured Term Loan Lenders have agreed to significant compromises through the Plan for the benefit of other NWHI creditors.  Given the complexities involved in such litigation and the

costs and delay that would result therefrom, and the Unsecured Term Loan Lenders' likelihood of success if any one of these issues were litigated, the settlements embodied in the Plan are well within the range of reasonableness and the Plan should be confirmed. Thus, whether considered individually or globally, an analysis of the possibility of success on the merits versus the benefits of the settlements weighs in favor of this Court's approval of each component of the Intercreditor Plan Settlement.

### 1. The Unsecured Term Loan Claims Are Not Subject To Avoidance

149. As discussed in detail above, the Unsecured Term Loan Claims against NWHI and the Guarantor Subsidiaries are not subject to avoidance. The Unsecured Term Loan Lenders gave fair consideration to the Debtors (with no basis to "collapse" the transactions, as Morgan Stanley had no knowledge of any "fraudulent scheme"), and market evidence supports the Debtors' solvency at the time of the LBO. In light of the low likelihood of success in pursuing any claims to avoid the Unsecured Term Loan Claims and the significant direct and indirect costs to the NWHI estate arising therefrom, the benefits of settling these claims under the Plan *far outweigh* any speculative benefits that could be achieved for NWHI-only creditors in litigation.

### 2. The Guarantor Subsidiaries Have Valid Subrogation Claims Against NWHI

150. The Guarantor Subsidiaries have substantial secured subrogation claims against NWHI resulting from transactions occurring during the Chapter 11 Cases. These claims, arising under section 509 of the Bankruptcy Code, provide a great deal of value to the Guarantor Subsidiaries, as compensation for their assets being used to pay down the Secured Term Loan Claims.

151. As discussed above, NWHI was the primary borrower under both the Secured Term Loan and the Unsecured Term Loan, with the Guarantor Subsidiaries serving as guarantors

of both loans.    During the bankruptcy cases, the Debtors consummated the 363 Sale of, among

other things, the IP Assets owned by NWD (a Guarantor Subsidiary) to Authentic Brands Group

for net proceeds of $263 million on account of those IP Assets.    Those proceeds were used to

repay, in part, the outstanding obligations under the Secured Term Loan.    In addition, the Plan

objectors have indicated that they expect that the assets of the Guarantor Subsidiaries will also be

used to satisfy the remainder of the Secured Term Loan Claims under the Plan, meaning that the

assets of the Guarantor Subsidiaries will be used to satisfy the *entirety* of the Secured Term Loan

Claims.    Putting aside the equity of essentially requiring the Secured Term Lenders to collect

first from the subsidiaries before looking to the assets of NWHI, the net result of the satisfaction

of the Secured Term Loan Claims in full by the Guarantor Subsidiaries is that the Guarantor

Subsidiaries have (or will have) secured subrogation claims against NWHI totaling over $432

million.

152.    Under Section 509 of the Bankruptcy Code, "an entity that is liable with the

debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim,

is subrogated to the rights of such creditor to the extent of such payment."    11 U.S.C. § 509; *see

also In re Robbins Intern.*, 275 B.R. 456, 470-71 (Bankr. S.D.N.Y. 2002).    Here, the paydown

of the Secured Term Loan Claims by the Guarantor Subsidiaries fits squarely within the confines

of section 509 of the Bankruptcy Code: (i) the Guarantor Subsidiaries were liable with NWHI on

account of the Secured Term Loan Claims; (ii) the Secured Term Loan Lenders have claims

against NWHI as primary obligor on such claims; (iii) the Guarantor Subsidiaries paid such

claims with the proceeds of their assets; and therefore (iv) the Guarantor Subsidiaries are

subrogated to the rights of the Secured Term Loan Lenders to the extent of such payment (here,

the entirety of the Secured Term Loan Claims). The events giving rise to the subrogation

claims can be illustrated as follows:



Subrogation Claim

153. The Committee has previously asserted that, to satisfy section 509 of the

Bankruptcy Code, the Guarantor Subsidiaries must meet a five-factor test. *See, e.g., In re*

*Kaiser Steel Corp.*, 89 B.R. 150, 152 (Bankr. D. Colo. 1988) (applying a test for equitable

subrogation that requires that (i) the subrogee made the payment to protect his or her own

interest, (ii) the subrogee did not act as a volunteer, (iii) the subrogee was not primarily liable for

the debt paid, (iv) the subrogee paid off the entire encumbrance, and (v) subrogation would not

work any injustice to the rights of the junior lienholder). While the Unsecured Term Loan

Lenders dispute the applicability of this test (which is nowhere found in the text of the

Bankruptcy Code[126]), each of the five factors are nevertheless easily met here:

---

[126] "There is disagreement among the courts over the interrelationship between equitable subrogation under state law and subrogation under Bankruptcy Code § 509, specifically 'as to whether § 509 preempts any other form of subrogation theory, or whether equitable subrogation criteria are the test under § 509, or whether equitable subrogation is an alternative method to § 509.'" *In re Morrison*, 555 B.R. 92, 94-95 (Bankr. D. Mass. 2016) (quoting *In re Celotex Corp.*, 289 B.R. 460, 469 (Bankr. M.D. Fla. 2003)).

- *Payment Made to Protect Subrogee's Interests.* The Guarantor Subsidiaries are contractually obligated to honor their guarantees, as parties could pursue remedies against the guarantors directly. The guarantors are protecting their own interests in using their assets to make the payment. *See Gerseta Corporation v. Equitable Trust Co. of New York*, 241 N.Y. 418, 426 (NY. Ct. App. 1926).

- *Guarantors did not Volunteer Payment.* The guarantors are contractually obligated to pay the Secured Term Loan Claims, and are not volunteers. *See Broadway Houston Mack Dev. LLC v. Kohl*, 71 A.D. 3d 937 (N.Y. App. Div. 2010) ("A party seeking subrogation can establish that its payments were not voluntary . . . by pointing to a contractual obligation.").

- *Guarantors are Secondary Obligors.* For purposes of a subrogation analysis, guarantors—like the Guarantor Subsidiaries—are not primary obligors. *See Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 304 (N.Y. 1999) (holding that guarantors were not precluded from asserting a subrogation claim merely because the guaranty referred to them as "primary obligors").

- *The Entire Debt was Repaid.* Through the paydown from the IP Asset proceeds and the paydown of the Secured Term Loan Claims under the Plan, the entirety of the Secured Term Loan Claims will be repaid. The Secured Term Loan Lenders' consent to the reduction of their claim through the waiver of default interest does not change this analysis. *See, e.g., In re Bethlehem Steel Corp.*, No. 01–15288 (BRL), 2004 WL 601656, at *5 (Bankr. S.D.N.Y. Mar. 22, 2004) ("In addressing the requirement of 'payment in full,' the Second Circuit has held that when an underlying creditor compromises its claim against a debtor for less than full value, without any additional recourse against the debtor, the creditor's claim will be deemed to be 'paid in full' for purposes of section 509(c) of the Bankruptcy Code and the secondary obligor will not be subordinated.") (internal quotation marks omitted).

- *No Injustice.* Allowing the Guarantor Subsidiaries' subrogation claim will not "work injustice to the rights of those who have equal or superior [claims]." *Laski v. State,* 217 A.D. 420, 421-22 (N.Y. Ct. App. 1926). And even if NWHI-only creditors were to argue that the allowance of these claims would somehow "work injustice" to their claims against NWHI, any purported "injustice" has been remedied by the *settlement* of those claims under the Plan. The real "injustice" is the suggestion that the Secured Term Loan Claims should be marshalled to the assets of the Guarantor Subsidiaries *before* seeking any of their recoveries from the assets at NWHI, the primary obligor on the Secured Term Loan.

154.     Accordingly, the Guarantor Subsidiaries would have the ability to assert

*substantial* secured subrogation claims against NWHI, entitling those Guarantor Subsidiaries to

essentially the entirety of NWHI's limited assets.[127]    The Plan, however, settles these subrogation claims by allocating value to creditors of NWHI in the form of reorganized equity and a greater percentage of the proceeds from litigation.    Settling the subrogation claims on the terms set forth in the Plan avoids the costs and risks associated with the full litigation of these issues (as well as the exercise of any appellate rights), while providing the Debtors and creditors of NWHI with certainty with respect to distributions on account of their unsecured claims against NWHI (which, by definition, would be subordinate to any secured subrogation claims that could have been asserted by the Guarantor Subsidiaries).    In addition, the settlement of the Guarantor Subsidiaries' subrogation claims assisted in facilitating the comprehensive Intercreditor Plan Settlement, without which the Debtors' estates would be faced with significant delay and uncertainty in resolving these cases.

### 3.    The Guarantor Subsidiaries Have Valid Pre- And Postpetition Intercompany Claims against NWHI

155.    In addition to the subrogation rights of the Guarantor Subsidiaries against NWHI, those Guarantor Subsidiaries also have claims against NWHI arising out of pre- and postpetition intercompany transactions.    On balance, any efforts to challenge these claims would be difficult, highly fact-based, and not likely to succeed under the case law—all weighing in favor of the generous settlements of these issues set forth in the Plan.

---

[127] It is important to also note that the subrogation claims that could be asserted by the Guarantor Subsidiaries are not limited to just the paydown of the Secured Term Loan with the IP Assets owned by NWD, but, to the extent the assets of the Guarantor Subsidiaries are used for the full paydown of the Secured Term Loan by the Guarantor Subsidiaries under the Plan, the Guarantor Subsidiaries' subrogation claims would be equal to the full amount of the Secured Term Loan Claims.    Thus, while the allocation of proceeds from the sale of the IP Assets to NWD is appropriate for the reasons discussed below, even if a portion of that value were reallocated to NWHI, the Guarantor Subsidiaries would still have subrogation claims against NWHI well in excess of the value of NWHI's tangible assets.    And though the secured subrogation claims would have a lien on substantially all of the assets of NWHI, to the extent the value of those assets was insufficient to repay the secured claim, any unsecured deficiency claim would be entitled to participate *pro rata* in any other distributions made to unsecured creditors by NWHI.

156.    ***NWD Has $263 Million Administrative Intercompany Claim against NWHI.***
*First*, to the extent the Guarantor Subsidiaries determine *not* to assert a right of subrogation against NWHI for the repayment of the Secured Term Loan Claims, Guarantor Subsidiary NWD would have a postpetition intercompany claim against NWHI for the transfer of its proceeds to NWHI which were used to repay the Secured Term Loan Claims.   Under the language of the Cash Management Order "[a]ll Intercompany Claims between Debtors arising after the Petition Date shall be accorded administrative expense status in accordance with section 503(b) and 364(b) of the Bankruptcy Code…."[128]   Because NWHI repaid the Secured Term Loan Claims with the proceeds of the IP Assets belonging to NWD, in order for NWHI to make that payment, the proceeds from the IP Assets must have been transferred (or be deemed to have been transferred) from NWD to NWHI, giving rise to a $263 million postpetition intercompany claim. Such a transfer is reflected in the Debtors' monthly operating report for July 2018, which reflects a $263 million receivable for NWD, and a $263 million distribution from NWHI to pay down the Secured Term Loan Claims.[129]   Per the Cash Management Order, that claim is entitled to administrative expense priority.

157.    ***Guarantor Subsidiaries Have $700 Million Net Intercompany Claims Against NWHI.*** In addition to potential postpetition intercompany claims favoring the Guarantor Subsidiaries, the Debtors' books and records reflect approximately $700 million in net *prepetition* intercompany claims asserted by the Guarantor Subsidiaries against NWHI.   As discussed at length in the Disclosure Statement, the Debtors believe that the intercompany claims reflected on the Debtors' books and records and the intercompany claims model maintained by

---

[128]  *See* Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief [Docket No. 428] at ¶12.

[129]  Monthly Operating Report [Docket No. 576] at 4.

the Debtors' professionals accurately reflect the Debtors' internal accounting system and is the best evidence of the Debtors' intercompany claims accounting. Given that NWHI is a *net payor* to the Guarantor Subsidiaries on account of these intercompany claims, NWHI-only creditors (and the Committee, on their behalf) likely will argue that the Debtors' books and records should be disregarded and the intercompany claims should be recharacterized to avoid any diversion or dilution of value from NWHI.

158. Recharacterizing intercompany claims reflected on the Debtors' books and records, however, is no easy task. Courts in this district and elsewhere must undertake an analysis of a multi-factor test to determine whether claims should be characterized as debt or equity. *In re BH S & B Holdings LLC*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) (Judge Glenn adopting the multi-factor test from *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001)). These multi-factor tests vary among courts, with some courts choosing to apply different or additional factors, all of which are dependent upon the facts and circumstances of the intercompany claims and all of which require an in-depth analysis of the facts and intent behind the intercompany transactions. This analysis would also require a review of *each* of the intercompany balances to determine which, if any, were the subject of recharacterization. Undoubtedly, there are factors here that militate in favor of treating intercompany claims and balances as true debt and enforceable claims. And importantly, a debtor's book entries *can be respected as true debt claims* even in the absence of formal documentation, fixed maturities, or fixed interest payments. *See, e.g.*, *Mills v. IRS*, 840 F.2d 229, 233 (4th Cir. 1988) (loans evidenced only by book entries treated as debt); *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 838 (11th Cir. 1991) (holding under Georgia law that book entry is sufficient formality to characterize an obligation as loan); *In re Adelphia*

*Commc'ns Corp.*, 368 B.R. 140, 192 (Bankr. S.D.N.Y. 2007) ("intercompany accounts have been held to be sufficient documentation of debt").

159.    None of these issues is determinative on its own, however, and a court would be required to supervise considerable discovery and undertake complex factual and legal analysis of each intercompany claim individually if these issues were litigated to judgment.    *See, e.g.*, *In re NII Holdings, Inc.*, 536 B.R. 61, 118 (Bankr. S.D.N.Y. 2015) (noting, in the context of the approval of a settlement of a dispute over recharacterization of intercompany claims represented as receivables and payables on the debtors' books and records, that were recharacterization of such claims are be litigated, "considerable discovery would be required for each transaction, followed by complex and lengthy litigation, the outcome of which would be uncertain"). Because the uncertainty and costs associated with litigating the validity of the Debtors' intercompany balances could have negatively impacted all creditor recoveries, the Plan settles these issues with the Unsecured Term Loan Lenders agreeing to forego recoveries to which they would otherwise be entitled through their claims against the Guarantor Subsidiaries in favor of NWHI-only creditors.    This settlement, therefore, is eminently reasonable and in the best interests of the estates and creditors.

### 4.    The Allocation Of Assets Is Appropriate

160.    Because these cases are largely broken up into two silos (NWHI and the Guarantor Subsidiaries), there exists a need to properly determine how to allocate the value of each silo's assets.    Of the Debtors' assets, the allocation of two distinct assets have been the primary subjects of debate: the "jewelry business" and the IP Assets.

161.    ***Jewelry Business***. Other than certain litigation assets, the only other asset arguably residing at NWHI is the "Jewelry Group" business of the Debtors.    The Debtors' Jewelry Group business amounts to approximately 11% of the FY2019 EBITDA.    And while

certain inventory and employees associated with the Jewelry Group business reside at NWHI, much of the intellectual property and brands associated with the Jewelry Group business actually resides with NWD, not NWHI.   Thus, NWD (and the creditors of NWD) have a valid argument that NWHI is *not* entitled to the entirety of the value of the Jewelry Group business and instead a significant portion of that value should be attributed to the subsidiaries whose assets are used to support that business.

162.    Litigating issues regarding the allocation of the Jewelry Group business, however, would be hotly contested and would necessarily involve experts and a detailed understanding of each component comprising a "business", including what it means for a business to "reside" with an entity.[130]   To avoid this litigation, in the context of the intercreditor settlements, the Debtors have essentially given the full value of the Jewelry Group business to NWHI, as they have allocated under the Plan 11% of the equity value to NWHI, which equals the portion of FY2019 EBITDA related to the Jewelry Group business.   Agreeing to the value of the Jewelry Group business at NWHI and allocating equity to NWHI-only creditors on account of this business value is a substantial concession by the Unsecured Term Loan Lenders.[131]

163.    **IP Assets**.   It is undisputed that NWD, a Guarantor Subsidiary, possessed legal title to the IP Assets sold in the 363 Sale.   Because of the potential implications of the paydown of the Secured Term Loan Claims from the proceeds of these IP Assets discussed in detail above, NWHI-only creditors (and the Committee on their behalf) have argued that the Court should ignore the legal ownership of the IP Assets, and instead reallocate a portion of the value from the

---

[130]  Indeed, an argument could be made that the value of the Jewelry Group business is only equal to the amount that exceeds the value of the brands that NWD could sell.

[131]  It bears repeating that this value would be collateral under the secured subrogation claim that can be asserted by the Guarantor Subsidiaries and, absent the agreement of the Unsecured Term Loan Lenders, would not be available to NWHI creditors.

IP Assets to NWHI, using the unique decision from *In re Nortel Networks*, 532 B.R. 494 (Bankr. D. Del. 2015) as precedent to support such a reallocation.

164.   In *Nortel*, the Canadian debtors argued that a Master R&D Agreement ("MRDA") to which various debtors were party, was determinative of the ownership of the contested intellectual property assets.   The bankruptcy court acknowledged that the words of the agreement, which, among other things, vested the Canadian debtors with "legal title" to the assets, supported the Canadian debtors' views on allocation.   *Id*. at 538.   However, relying on *Canadian law*, the court held that this language did not control, and, in the absence of any other governing document or viable allocation theory, the court essentially invented a "pro rata" allocation model.   As a result, *Nortel* is distinguishable for a variety of reasons.   To begin with, Canadian law differs in material respects from New York law on issues of contract interpretation.   Among other things, Canadian courts will consider evidence of surrounding circumstances, *even when a contract is unambiguous*.   *Id*. at 535, 540.   Thus, the court was free to disregard the language in the MRDA that appeared to grant title of the contested assets to the Canadian debtors.   Under U.S. laws, the documentation governing the IP Assets—including the U.S. Patent and Trademark Office records and the asset purchase agreement from the 363 Sale itself —are controlling and establish NWD's legal title to the IP Assets.   *Second*, the factors on which the *Nortel* court based its determination to depart from the language of the MRDA are not present here.   Among other things, (i) the Debtors routinely observe corporate separateness of their entities, and they did so with respect to the IP Assets that are legally owned by NWD, and (ii) as discussed in detail in the Disclosure Statement, the Nine West and Bandolino brand recognition is dependent on the trademarks themselves; the IP Assets were not being actively developed or maintained by other entities without accounting for such costs

through the creation of intercompany claims and balances.    On the contrary, NWHI routinely charged its subsidiaries for general and administrative expenses incurred, with those charges reflected through intercompany balances.    *Third*, the *Nortel* court went to repeated pains to emphasize just how unique, unprecedented, and extraordinary the circumstances were in that case.    *Id*. at 560 ("Pro rata is, to say the least, an extraordinary result."); *id.* at 553 (referencing "unprecedented, massive, and complex dispute"); *id.* at 554 (pro rata allocation was "driven by the unique facts").    *Finally*, the holding in *Nortel*, premised almost exclusively on section 105(a) of the Bankruptcy Code, *id*. at 554, is simply incompatible with the law.    The Second Circuit is clear: section 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."    *New England Dairies v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores)*, 351 F.3d 86, 92 (2d Cir. 2003) (citations and quotations omitted).    To take assets from one debtor and give them to another under the guise of "allocation" would be to create substantive rights for NWHI and its creditors at the expense of the substantive rights of NWD and its creditors—a result the Bankruptcy Code prohibits.

165.    Notwithstanding that there is no legal basis for reallocating any value from the IP Assets to NWHI (or any entity other than NWD), the Plan does *not* provide for the diversion of all assets of NWHI to the Guarantor Subsidiaries as a result of the claims that can be asserted as a result of allocation and the paydown of the Secured Term Loan Claims.    Rather, the Plan settles these issues through the allocation of substantial value to NWHI for the benefit of non-Unsecured Term Loan creditors at that entity.

### 5.    The Allocation Of Administrative Expenses Is Appropriate

166.    The Plan contemplates an "administrative expense allocation" that—contrary to how it has been characterized to date—operates as a *settlement* of the allocation of administrative

expenses incurred since the Petition Date.    As courts in numerous jurisdictions have recognized, professional fees and administrative expenses should be allocated among debtors in accordance with the benefits accruing to each estate.    *See, e.g.*, *In re Energy Future Holdings Corp.*, 14-10979 (CSS) [Docket No. 13599] (Bankr. D. Del. October 31, 2018) (allocating professional fees based on which debtor benefited from the services at the time they were rendered); *In re Eagle Creek Subdivision, LLC*, No. 08-04292-8-JRL, 2009 WL 313383, at *3 (Bankr. E.D.N.C. Feb. 5, 2009) ("Section 330(a) of the Bankruptcy Code allows for the payment of professionals' fees that are necessary or beneficial to the case in which they are incurred. 11 U.S.C. § 330(a).    It follows that each case must stand on its own when determining the allocation of professionals' fees among parallel debtors.").

167.    Without quantifying the exact dollars incurred, a substantial amount of the professional fees and expenses incurred to date (in particular by professionals for the Debtors and the Committee) have been associated with the investigation of potential claims and causes of action arising out of the Merger and Carve-Out Transaction.    The primary beneficiary of these efforts—and to whom the expenses should be allocated—is NWHI and its creditors.    To date, however, professionals have not undertaken an allocation of their fees and expenses among Debtor estates as has become more commonplace in complex chapter 11 cases with multiple silos.    *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) [Docket No. 2066] (Bankr. D. Del. Sept. 16, 2014); *In re Toys "R" US, Inc. et al*, No. 17-34665 (KLP) [Docket No. 746] (Bankr. E.D. Va. Oct. 25, 2017); *In re Westmoreland Coal Company, et al*., No. 18-35672 (DRJ) [Docket No. 495] (Bankr. E.D. Tex. Nov. 14, 2018).    In the absence of allocation by the professionals or the Court, the professional fee and expense burden has largely been borne by the non-NWHI Debtors.    In an effort to avoid costly and time-consuming litigation over the proper

74

allocation of every dollar of professional fees, the parties supporting the Plan agreed to the NWHI Administrative Expense Allocation, whereby the Unsecured Term Loan Lenders agreed not to challenge allocation of professional fees and expenses generated during the first six months of the Chapter 11 Cases (and therefore keep intact the current allocation of professional fees and expenses between NWHI and the non-NWHI Debtors, which the Unsecured Term Loan Lenders believe places a materially greater burden on the non-NWHI Debtors than would result from a proper allocation). Instead, in light of the fact that the NWHI-only creditors and the Committee (on their behalf) are expected to be the sole plan objectors, the NWHI Administrative Expense Allocation shifts only the incremental administrative expenses incurred in connection with those Plan objections, as NWHI would be the sole beneficiary of such objections.

168.    Absent agreement over the proper allocation of professional fee administrative expenses among the Debtors' estates, the Debtors would be forced to analyze the relevant professionals' time records and expenses and determine which Debtor entity for whose benefit such fees and expenses were incurred such that those expenses can be properly allocated. This would unquestionably require that the Debtors withhold *all* cash distributions from NWHI through the establishment of reserves, with the administrative claims reconciliation and allocation to be determined post-confirmation and post-effective date. Distributions to all creditors of NWHI would be substantially delayed and further diminished as a result of additional costs incurred in the reconciliation and allocation process itself (including litigation related thereto). The settlement of the allocation of administrative expenses in the manner set forth in the Plan is designed to avoid this result, and to facilitate the implementation of the settlements and distributions contemplated therein for the benefit of all creditors.

### 6.    The Plan Valuation Is Appropriate

169.    The Plan assumes a "Plan Settlement TEV" of $600 million as a settlement of substantial disputes regarding valuation.   While the Debtors' valuation range set forth in the Disclosure Statement does range from $575 million to $675 million, the $600 million Plan Settlement TEV reflects an understanding that—despite the Debtors' undertaking of a marketing process for the sale of the remaining businesses —no party offered in excess of even the *low end* of the Debtors' valuation range.   *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y.), May 1, 2018 Hr'g. Tr. at 179:21-22 ("The market is the reality through which you test the valuation" of a company); *see also id*. at 182:6-184:5 (citing *Genco*, in which Judge Lane explained "[i]f you had a valuation such as [objectors] that suggests almost half a billion dollars of potential difference from our valuation, I would think we would have a line out the door like a Starbucks, where people would be clamoring to take advantage of this situation.   In particular, I would have thought Och-Ziff and Aurelius would be standing there with their checkbooks buying this company, and we don't have that[]" and "the debtors' views on value are supported by the lack of interest in the debtors' assets by equity-holders and the market.").

170.    Despite the fact that the market has failed to offer values in excess of the Debtors' and the Plan's valuations, to settle any question that the Unsecured Term Loan Lenders are receiving equity at a substantial discount, the Plan actually provides NWHI creditors with warrants for 20% of the reorganized equity with a strike price based on a $650 million enterprise value.   Thus, if the Debtors' remaining businesses really are worth in excess of $650 million, those creditors have a means by which to reap the benefits of that value through the warrants provided under the Plan.

\*        \*        \*

76

171.    Taken as a whole, the foregoing analysis demonstrates that the Unsecured Term Loan Lenders can credibly argue that they are entitled to *substantially all* of the value of NWHI, including the proceeds of any Estate Causes of Action belonging to NWHI.    But the Plan does not provide the Unsecured Term Loan Lenders with all such value.    Nor does the Plan require a finding from this Court that each (or any one) of the claims is not without any risk.    Instead, the Plan contemplates *substantial* discounts to each of these issues to ensure distributions to other creditors of NWHI.    As illustrated in paragraph 12 above, even an assumption of a 50% discount on account of *each* of the claims for avoidance of the Unsecured Term Loan Claims at NWHI, the Guarantor Subsidiaries' subrogation claims against NWHI, and intercompany claims *still* yields a recovery in excess of that being provided to the Unsecured Term Loan Lenders under the Plan.    Given that the Court need only find that the settlements fall above the *lowest point* in the range of reasonableness, the settlements set forth in the Plan clearly balance the likelihood of success on the merits with the benefits of settlement, and satisfy the Bankruptcy Rule 9019 standards.

## B.    The Remainder Of The *Iridium* Factors Are Satisfied

172.    Each of the other *Iridium* factors are easily satisfied in this case:

▪    *Settlements were the Product of Arm's-Length Bargaining*.    The Plan, including the Intercreditor Plan Settlement, was proposed in good faith and each of the settlements reached were the product of arm's-length negotiations.    There is simply no basis to allege that the Debtors are incapable of settling inter-estate issues without the retention of separate counsel or advisors, particularly when the Unsecured Term Loan Lenders negotiated across the table from the Debtors on each of the issues in question. In fact, the case law holds to the contrary.    Such a requirement would not only be "an absurdity", *In re General Growth Props., Inc.*, May 20, 2009 Retention Hearing Tr., 38:01-08, No. 09-11977 [Docket No. 4368], but also financially unviable, especially in case like this, already overburdened with professional fees.    Courts have frequently allowed for the settlement of intercompany issues through a Plan by a Debtor representing all estates.    *See, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 270-71 (Bankr. S.D.N.Y. 2009) (holding it was appropriate for debtors' board to evaluate plan on a company-wide, rather than debtor-by-debtor, basis, and overruling noteholders' objections); *In re Residential Capital, LLC*, No. 12-12020 [Docket No.

4415] (denying motion prosecuted by White & Case to disqualify debtors' and creditors' committee's counsel from participating in settlement negotiations regarding inter-debtor claims and disputes).

- *Settlements are in the Interests of Creditors.* Each of the settlements in the Plan, including the Intercreditor Plan Settlement, are clearly in the best interests of creditors. Indeed, the creditors most benefitting from the Intercreditor Plan Settlement are the unsecured creditors of NWHI because, as discussed above, the Guarantor Subsidiaries (and thus the Unsecured Term Loan Lenders) have a legal entitlement to the vast majority of the value from NWHI. Rather than asserting a full entitlement to this value, however, the Plan settles these disputes in favor of NWHI creditors by shifting substantial value in the form of equity in the reorganized company, warrants for reorganized equity, and two-thirds of the cash consideration from the Estate Action Settlement. Importantly, the Plan provides certainty as to distributions for each creditor group and a framework for the Debtors' expeditious emergence from bankruptcy, curbing the overwhelming administrative burn in these cases to date.

- *Likelihood of Protracted Litigation.* Because of the interdependent nature of the settlements embodied in the Plan, the only likely alternative to the present Plan structure if one major aspect of the settlement were rejected would be the full and costly litigation of each of the disputed issues, including subrogation claims, plan valuation, allocation of asset values and allocation of distributions, and numerous other issues now resolved comprehensively under the Plan. Not only would this destroy the significant progress achieved by the parties through negotiations, but in those circumstances, overall creditor recoveries would most certainly decrease as the Debtors' estates would continue to be burdened with significant legal expenses, and individual creditor recoveries would be highly uncertain and dependent on the outcome of complex and hotly contested litigation discussed above. These are precisely the concerns echoed by Judge Gerber when approving the settlement of interdebtor issues in Adelphia. *Adelphia Commc'ns Corp.*, 368 B.R. at 241-43 (approving plan settlement of interdebtor issues where litigation would be "extremely complex and expensive to litigate").

- *Parties were Counseled by Experienced Advisors.* There can be no doubt that the parties in this case and that are supporting the Plan have been counseled by highly sophisticated, experienced advisors throughout this case. Between professionals for the Debtors (Kirkland, Alvarez & Marsal, Lazard), the independent directors (Munger Tolles & Olson, Berkeley Research Group), the equity holders (Proskauer, Zolfo Cooper, Milbank), the Secured Term Lenders (Davis Polk, Ducera), and the Unsecured Term Loan Lenders (Quinn Emmanuel, Kramer Levin, Moelis, King & Spalding, and Guggenheim), all parties had the benefit of skilled advisors throughout Plan negotiations.

- *Breadth of Releases.* The various estate and third-party releases contained in the Plan were integral parts of the settlements, and as will be demonstrated at the

78

confirmation hearing, the releases (including in particular the releases of the Unsecured Term Loan Lenders) are appropriate and consistent with the Second Circuit's standards.

173.    For each of the foregoing reasons, the Unsecured Term Loan Lenders submit that an analysis of the *Iridium* factors demonstrates that the Intercreditor Plan Settlement in the Plan falls well within the range of reasonableness, is fair, equitable, and in the best interests of the estates, and should be approved by the Court.

<h2 style="text-align:center">V.    <u>CONCLUSION</u></h2>

WHEREFORE, for the foregoing reasons, the Unsecured Term Loan Lenders respectfully request that the Court deny the Committee's Standing Motion with prejudice, and confirm the Plan.

DATED:    December 10, 2018
          New York, New York

/s/ Benjamin I. Finestone
Susheel Kirpalani
Benjamin I. Finestone
Kate Scherling
Rex Lee
Jordan Harap
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Counsel to GLAS Trust Company, LLC*

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Douglas H. Mannal
David E. Blabey Jr.
Rachael L. Ringer
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 715-9100
Facsimile:    (212) 715-8100

*Counsel to Brigade Capital Management, LP*

/s/ Jeffrey D. Pawlitz
Jeffrey D. Pawlitz (admitted pro hac vice)
Michael R. Handler (admitted pro hac vice)
David Zubricki (admitted pro hac vice)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel to the Ad Hoc Group of Crossover Lenders*