Hearing Date: January 28, 2019
Hearing Time: 10:00 A.M.

WILLIAM K. HARRINGTON
United States Trustee for Region 2
New York, New York 10014
Telephone: (212) 510-0500
By: Susan A. Arbeit
   Brian Masumoto
Trial Attorneys

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

| | |
|---|---|
| In re: | Chapter 11 |
| NINE WEST HOLDINGS, INC., *et al*., | Case No. 18-10947 (SCC) |
| Debtors, | (Jointly Administered) |

-----------------------------------------------------------

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

TO:   THE HONORABLE SHELLEY C. CHAPMAN,
      UNITED STATES BANKRUPTCY JUDGE

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), through counsel, respectfully submits this objection (the "Objection") to confirmation of the Debtors' First Amended Joint Plan of Reorganization (the "Plan"), pursuant to Chapter 11 of the Bankruptcy Code. ECF No. 867.  In support of this objection the United States Trustee respectfully states as follows:

**I. INTRODUCTION**

The United States Trustee objects to confirmation of the Plan to the extent certain provisions do not comply with the Bankruptcy Code and applicable case law.  Specifically, the

Court should not approve payment of Restructuring Expenses[1] because these payments are not authorized under section 503(b) of the Bankruptcy Code. Additionally, the Plan improperly imposes deemed consent upon three categories of creditors to overly broad third party releases that give immunity to a myriad of claims, not least of all fraud, gross negligence, and willful misconduct.

## II. STATEMENT OF FACTS

**A.     General Background**

1.      On April 6, 2018, Nine West Holdings, Inc. and its debtor affiliates (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). ECF No. 1. The cases are being jointly administered for procedural purposes only. ECF No. 68. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of Bankruptcy Code. No trustee or examiner has been appointed in these cases.

---

[1]     Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Disclosure Statement, Plan, and First Amended and Restated Restructuring Support Agreement.

2.      On April 19, 2018, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") pursuant to section 1102(a) of the Bankruptcy Code. ECF No. 126. The Committee is currently composed of the following members: (a) Aurelius Capital Master, Ltd.; (b) GLAS Trust Company LLC ("GLAS Trust"); (c) Pension Benefit Guaranty Corporation; (d) Simon Property Group; (e) Surefield Limited; (f) Stella International Trading (Macao Commercial Offshore) Limited; and (g) U.S. Bank National Association. See Second Amended Appointment of Official Committee of Unsecured Creditors, ECF No. 346.

3.      On October 17, 2018, the Debtors filed the First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and related disclosure statement. ECF Nos. 749 and 750. On November 9, 2018, the Debtors filed an amended plan and further amended disclosure statement. ECF Nos. 836 and 837. On November 12, 2018, the Debtors filed a revised disclosure statement for the Plan. ECF No. 845.

4.      By Order entered on November 14, 2018, the Court approved the disclosure statement. ECF No. 864. The hearing on confirmation of the Plan is scheduled to start on January 28, 2019. On November 14, 2018, the Debtors filed the Solicitation Version of the Debtors' Plan and the Solicitation Version of the Debtors' Disclosure Statement for the Plan (the "Disclosure Statement"). ECF Nos. 867 and 868.

5.      On January 7, 2019, the Debtors filed a Plan Supplement to the Plan (the "Plan Supplement"). ECF No. 1045.

**B.    Restructuring Expenses**

6.    Among the terms of the Plan is the Debtors' agreement to pay the reasonable and documented professional fees and expenses of the (a) Ad Hoc Secured TL Lender Group Advisors, (b) Brigade Advisors, (c) Ad Hoc Crossover TL Lender Group Advisors, and (d) Unsecured TL Agent Fees. Plan, Art. XII.D. at 59.  More specifically, the Plan provides that

> All Restructuring Expenses, incurred up to (and including) the Effective Date shall be treated as Allowed Administrative Claims and shall be paid in full in Cash on the Effective Date; provided that each party and its counsel shall provide the Debtors or Reorganized Debtors with summary invoices (redacted for any potentially privileged material) for which it seeks payment.

Plan, Art. XII.D. at 59.[2]

7.    Restructuring Expenses are defined in the Plan as "all reasonable, actual, and documented fees and expenses payable under the [First Amended and Restated] Restructuring Support Agreement or DIP Order, to the extent not otherwise paid pursuant to the DIP Order or other order of the Court." Plan, Art. I.A. at 15, ¶ 163.

8.    Restructuring Expenses in the First Amended and Restated Restructuring Support Agreement (the "A&R RSA"), which is attached as Exhibit C to the Disclosure Statement, are defined as

> all reasonable and documented fees and expenses owed by the Company and incurred by the Ad Hoc Secured TL Lender Group Advisors, the Brigade Advisors, and the Ad Hoc Crossover TL Lender Group Advisors, and the Unsecured TL Agent Fees, in each case, in accordance with their respective fee letters or engagement letters, any applicable Bankruptcy Court order, or as otherwise agreed by the Company in connection with the execution of this Agreement.

---

[2]    The Plan also provides that it is a condition precedent to confirmation that the Restructuring Expenses incurred on or before the Effective Date be paid in full. Plan, Art. IX.A at 56, ¶ 8.

A&R RSA, Sect. 1 at 8.

9. The Ad Hoc Secured TL Lender Group Advisors are defined as "Davis Polk & Wardwell LLP and Ducera Partners LLC, and, with the reasonable consent of the Company, such other or additional counsel, financial advisors, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring." Id. at 3.

10. The Brigade Advisors are defined as "Kramer Levin Naftalis & Frankel LLP, Moelis & Company, LLC, and Morris Tbeile, and, with the reasonable consent of the Company, such other or additional counsel, financial advisors, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring." Id. at 4.

11. The Ad Hoc Crossover TL Lender Group Advisors are defined as "King & Spalding, LLP, Guggenheim Securities, LLC, and with the reasonable consent of the Company, such other or additional counsel, financial advisors, consultants, and/or other professionals or experts that are necessary to the implementation of the Restructuring." Id. at 3.

12. The Unsecured TL Agent Fees are defined as "any fees of the Unsecured TL Agent, including fees for professionals retained by the Unsecured TL Agent in connection with these Chapter 11 Cases, including Quinn Emanuel Urquhart & Sullivan LLP, Sullivan & Worcester LLP, and such other or additional counsel, consultants, and/or professionals or experts that are necessary to the implementation of the Restructuring." A&R RSA, Sect. 1 at 10.

13. The Unsecured TL Agent are defined as "GLAS Trust Company LLC as successor agent under the Prepetition Unsecured TL Credit Agreement." Id. at 9.

C.      **Management Incentive Plan**

14.     According to the Plan, on the effective date, all grants under the Management Incentive Plan (the "MIP") shall be reserved for directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized Holdings Board. Plan, Art. IV.F. at 35.  The term "Management Incentive Plan" is defined as the post-effective date plan "which shall provide for New Common Stock or other equity or similar interests in Reorganized Holdings to be reserved for directors, officers and employees of the Reorganized Debtors. . . ." Plan, Art. I.A. at 10, ¶ 104.

15.     The Plan Supplement states that the Debtors will set aside "up to an aggregate of ten percent of the New Common Stock, on a fully diluted, fully distributed basis." Plan Supplement at 31. The Plan Supplement also states that grants made pursuant to the MIP "shall be at the discretion of the Reorganized Holdings Board" and "terms and conditions (including with respect to participants, allocation, structure, and timing and extent of issuance, if any, and vesting will be determined at the sole discretion of the Reorganized Holdings Board after the Effective Date." Id.

D.      **Third-Party Releases**

16.     Among other things, the Plan includes a third-party release. The Third-Party Release does not include a carve-out for fraud, gross negligence, or willful misconduct. Plan, Art. VIII.C at 51-52.

17. The definition of Releasing Party under the Third-Party Release includes (a) all holders of claims who abstain from voting and do not opt out of the release on their ballot, (b) all holders that vote to reject the Plan and do not opt out of the releases on their ballot, and (c) all holders of claims that are deemed to reject the Plan and do not opt out of the release on their notice. Plan, Art I.A. at 14, ¶ 154.[3]

---

[3] Releasing Party is defined as:

> (a) the Consenting Secured Lenders; (b) the Secured Term Loan Agent; (c) the Consenting Unsecured Lenders; (d) the Unsecured Term Loan Agent; (e) the Prepetition ABL/FILO Secured Parties; (f) the DIP Lenders; (g) the DIP Agents; (h) the Sponsor; (i) the Minority Equity Holders; (j) all holders of Claims that vote to accept the Plan; (k) all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third Party Release; (l) all holders of Claims entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third Party Release; (m) all other holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; and (n) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing in clauses (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Plan, Art I.A. at 14, ¶ 154

18.     The Plan provides for twelve categories of parties that are considered to be Released Parties. See Plan, Art I,A. at 14, ¶ 153. These twelve categories of parties consist of the Debtors, the Debtors' current and former officers, directors and managers, the Reorganized Debtors, the Secured Term Loan Lenders and their Agent, the Unsecured Term Loan Lenders and their Agent, the Prepetition ABL/FILO Secured Parties, the DIP Lenders and Agents, the Sponsor, and the Minority Equity Holders. The definition of each of these twelve categories is broad in scope in that each category extends to <u>inter alia</u> the respective party's current and former equity holders, officers, directors, managers, principals, successors, predecessors, fund advisors, employees, current and former Affiliates, partners, attorneys, accountants, investment bankers, and other professionals.

### III.    OBJECTION

**A.    Confirmation Standards and Statutory Framework**

There are two relevant statutes governing chapter 11 plan provisions and confirmation. Section 1123(b)(6) allows plan proponents to include terms that are "not inconsistent with the applicable provisions" of the Code. 11 U.S.C. § 1123(b)(6). Section 1129 of the Bankruptcy Code authorizes the bankruptcy court to confirm a plan only when it "complies with the applicable provisions of the Code." 11 U.S.C. 1129. The plan proponent bears the burden of establishing compliance with section 1129. <u>In re Charter Commc'ns</u>, 419 B.R. 221, 243-44 (Bankr. S.D.N.Y. 2009) (citing <u>Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.)</u>, 994 F.2d 1160, 1165 (5th Cir. 2993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both

under §1129(a) and in a cramdown")); In re Worldcom, Inc., No. 02-13533 (AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing In re Briscoe Enters.).

**B.    The Court Should Not Approve Payment of Restructuring Expenses Because They Are Not Authorized under Section 503(b) of the Bankruptcy Code**

Section 503(b) of the Bankruptcy Code governs administrative expenses. Section 503(b)(2) grants administrative expense priority to professionals who have been retained under the Bankruptcy Code. Section 503(b)(4) specifically addresses reimbursement to creditors of professional fee expenses and is the exclusive avenue for the payment of these type of administrative expenses. See In re Lehman Bros. Holdings, Inc., 508 B.R. 283, 289 (S.D.N.Y. 2014). To the extent a plan provision based on a restructuring support agreement seeks to circumvent section 503(b), the broader business judgment rule for the approval of such provision should not apply. Id. citing RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012) ("RadLAX") ([N]either the need for flexibility. . . can justify a plan provision that is merely a backdoor to administrative expenses . . . . [T]he federal scheme cannot remain comprehensive if interested parties . . . in each case are free to tweak the law to fit their preferences").

In the instant case, the Plan requires the Debtors to pay in full in cash on the Effective Date all reasonable and documented fees and expenses payable under the A&R RSA. Plan, Art. I.A. at 15, ¶ 163; Art. XII.D. at 59. The A&R RSA requires the Debtors to pay and reimburse all reasonable fees and expenses of (1) the Ad Hoc Secured TL Lender Group Advisors (which includes Davis Polk and Ducera Partners), (2) the Bridgade Advisors (which includes Kramer Levin, Moelis, and Morris Tbeile), (3) the Ad Hoc Crossover TL Lender Group Advisors (which includes King & Spalding and Guggenheim), and (4) the Unsecured TL Agent Fees

9

(which includes the fees of Quinn Emanuel and Sullivan). A&R RSA, Sect. 12 at 33.

The Plan treats the claims of the unretained professionals of each of the creditors listed above as allowed administrative expenses without any of these professionals having to meet their evidentiary burden for making a substantial contribution under section 503(b). Plan, Art. XII.D. at 59. Under the Plan, the Court is to have no say as to whether the fees and expenses of this privileged group of professionals are to be paid. The total amount of fees and expenses at issue are unknown and the Debtors have inappropriately delegated to themselves the sole right to review these undisclosed fees and expenses. In so doing they seek to usurp the Court's authority to review and approve the fee requests under the appropriate statutory standards. This is even more troublesome as the Court and other parties in interest have no information on whether any of the fees of GLAS Trust, a member of the Committee, were incurred in the performance of its duties on the Creditors' Committee.

The plain meaning of the Bankruptcy Code's text is clear and determinative. The "general language of a [Bankruptcy Code] statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." RadLAX, 132 S. Ct. at 2071 (internal quotation, citation, and modification omitted). This rule "is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." Id. (internal quotation and citation omitted). Here, the payment provisions in both the Plan and A&R RSA conflict with the statutory standards and procedures for payment of administrative expenses.

Accordingly, these professional fees and expenses cannot be approved unless and until the unretained professionals file an application with the Court and demonstrate to the Court's

satisfaction that they made a "substantial contribution" in the case pursuant to section 503(b)(3)(D). See generally, Lehman. To the degree that "substantial contribution" is proven, then the standards as set forth in section 330 of the Bankruptcy Code apply in determining the extent the fees and expenses of a professional are reimbursable under section 503(b)(4). See, e.g., In re Wind N'Wave, 509 F.3d 938, 944 (9th Cir. 2007); In re Celotex Corp., 227 F.3d 1336, 1341 (11th Cir. 2000).

C.   **The MIP**

The Plan describes a MIP.  Plan, Art IV.F. at 35.  However, the Plan Supplement makes clear that all grants of the MIP will be at the sole discretion of the Reorganized Holdings Board after the Effective Date. Plan Supplement at 31. The parties have been in discussion to agree upon language making it clear that nothing in the Plan, Plan Supplement, or any further supplements thereto will approve or be deemed to approve any terms of the MIP.  The United States Trustee reserves the right to supplement this objection in the event the parties are unable to agree upon the appropriate language.

D.   **The Plan Improperly Imposes Deems Consent to Overly Broad Releases that Give Immunity for Claims for Fraud, Gross Negligence, and Willful Misconduct on Three Categories of Creditors**

The Plan improperly deems that the Released Parties are released by (1) holders of Impaired Claims who abstain from voting and do not opt out of the Third-Party Release, (2) holders who voted to reject the Plan but do not opt out of the Third-Party Release, and (3) holders of claims who are deemed to reject the Plan but do not opt out of the Third-Party Release. Plan, Art. I.A. at 14, ¶ 154.

The Court in In re SunEdison, Inc., 576 B.R. 45, 13-14 (Bankr. S.D.N.Y. 2017) ruled that creditors who did not affirmatively vote could not be deemed to consent to the releases in the plan. The Court in SunEdison cited to the following language in In re Chassix Holdings, 533 B.R. 54, 81 (Bankr. S.D.N.Y. 2015) ("Chassix"):

> Charging all inactive creditors with full knowledge of the scope and implications of the Proposed third party *releases*, and implying a "consent" to the third party *releases* based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.

Emphasis in original.

Further, the SunEdison Court held that the debtors have failed to sustain their burden of proving that the Court had subject matter jurisdiction to approve the third party releases. In re SunEdison, Inc., 576 B.R. 453 (Bankr. S.D.N.Y. 2017). In that case, the non-voting releasors did not consent to the release, the creditors were not being paid in full, and the third party claims would have been extinguished rather than channeled to a fund for payment. Id. What's more, the debtors did not identify which third party claims would directly impact their reorganization and given the scope of the release, the Court determined that it is likely that many of the claims would not impact the reorganization. Id. Thus, the Court granted the debtors leave to propose a modified form of release under the condition that they must specify the release by name or readily identifiable group and the claims to be released, demonstrate how the outcome of the claims to be released might have a conceivable effect on the debtors' estates and show that this is one of the rare cases involving unique circumstances in which the release of the claims is appropriate under Metromedia. Id.

The Chassix Court also made clear its opposition to requiring creditors to opt out of the releases. The Court faced, with a more narrowly tailored third-party release than here, required

the debtors to revise the definition of "Consenting Creditors" in the plan and did not permit an opt-out procedure for creditors who abstained from voting, voted to reject the plan, or were deemed to accept or reject the plan. Chassix, 533 B.R. at 80-82.

Here, pursuant to Article VIII.C of the Plan, the Debtors propose to release the Released Parties (which includes the holders of claims and interests deemed to consent to the releases) from all claims by the Releasing Parties related to the Debtors or their prepetition activity, including any potential causes of action for fraud, gross negligence, and willful misconduct. Courts in this district generally do not allow "blanket immunity" to non-debtor released parties. See In re Dynegy, Inc., 486 B.R. 585, 595 (Bankr. S.D.N.Y. 2013) (chapter 11 plan may not include nondebtor releases that grant "blanket immunity" to nondebtor parties, but releases that include carve-out for causes of action based on theories of gross negligence, willful misconduct, fraud, or criminal conduct is not a prohibited "blanket release."); In re DBSD N. Am., Inc., 419 B.R. 179, 219 (Bankr. S.D.N.Y. 2009) (finding that the non-debtor release provision was consensual and within the scope of releases permitted in the Second Circuit because there was no release of gross negligence, willful misconduct, fraud, or criminal conduct and the release covered only conduct in connection with the chapter 11 case).  See also, Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005) ("the potential for abuse is heightened when releases afford blanket immunity").

While the United States Trustee is not taking a position on whether sophisticated parties involved in a bankruptcy case can affirmatively consent to third-party release provisions that provide blanket immunity, cases interpreting New York law, which will govern if the Plan is confirmed, have held that "[p]ublic policy . . . forbids a party's attempt to escape liability,

through a contractual clause, for damages occasioned by 'grossly negligent conduct.'" <u>Indus. Risk Insurers v . Port.J.</u>, 387 F. Supp. 2d. 299, 306-308 (S.D.N.Y. 2005), <u>aff'd in part, remanded in part sub. nom</u> <u>Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.</u>, 493 F.3d 283 (2d Cir. 2007); <u>see</u> also, <u>Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.</u>, Case No. 05-CV-6734T, 2012 WL 1067664, *10 (W.D.N.Y. March 22, 2012) (same).

Accordingly, creditors or parties in interest who abstain from opting out of these releases should not be deemed to have consented to the Third-Party Releases in the Plan. Moreover, the Plan, if confirmed, will provide releases to a wide range of third parties. Specifically, not only are twelve categories of specified parties- including the Debtors and the Reorganized Debtors – being released (see definition of "Released Parties," Plan at Art I.A. at 14, ¶ 153), but any Affiliate or person in any way currently related to or formerly related to one of these specified parties and their respective current or former affiliates, as well as all of their predecessors, successors, current and former directors, managers, officers, directors, principals, advisory board members, financial advisors, partners, shareholders, agents, equity holders, managing members, members, investment bankers, consultants, representatives, and other professionals. <u>Id</u>. The Debtors have not met their burden to prove that the Court has subject matter jurisdiction to release the potentially thousands of persons who qualify as Released Parties from claims of the creditors who abstain from opting out of the Third-Party Releases. See <u>In re SunEdison, Inc.</u>, 576 B.R. at 463.

## IV.  CONCLUSION

WHEREFORE, the United States Trustee respectfully submits that the Court sustain the Objection of the United States Trustee and grant such other relief as is just.

Dated: New York, New York
    January 11, 2019

                                        Respectfully submitted,

                                        WILLIAM K. HARRINGTON
                                        UNITED STATES TRUSTEE

                    By:    */s/ Susan A. Arbeit*
                          Susan A. Arbeit
                          Brian Masumoto
                          Trial Attorneys
                          201 Varick Street, Suite 1006
                          New York, New York 10014
                          Tel. No. (212) 510-0500