| | |
|---|---|
| James H.M. Sprayregen, P.C. | James A. Stempel (admitted *pro hac vice*) |
| Christopher J. Marcus, P.C. | Joseph M. Graham (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Angela M. Snell (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS LLP** |
| 601 Lexington Avenue | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| New York, New York 10022 | 300 North LaSalle Street |
| Telephone:    (212) 446-4800 | Chicago, Illinois 60654 |
| Facsimile:    (212) 446-4900 | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF DEBTORS' THIRD AMENDED JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on January 20, 2019, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111] (the "Second Amended Plan"). Terms used but not defined herein have the meanings ascribed to them in the Second Amended Plan or the Third Amended Plan (as defined herein), as applicable.

**PLEASE TAKE FURTHER NOTICE** that on February 4, 2019, the Bankruptcy Court commenced a contested hearing on the confirmation of the Second Amended Plan (the "Confirmation Hearing").

**PLEASE TAKE FURTHER NOTICE** that on February 8, 2019, the Debtors announced a settlement incorporating further amendments to the Second Amended Plan and resolving the objections of the 2019 Notes Trustee, the 2034 Notes Trustee, and the Ad Hoc Group of Unsecured Noteholders.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076). The location of the Debtors' service address is: 1411 Broadway, New York, New York 10018.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Third Amended Plan"), attached hereto as **Exhibit 1**, which incorporates the global settlement announced on the record at the hearing on February 8, 2019. The Debtors, the Official Committee of Unsecured Creditors (the "UCC"), the Secured Term Loan Lenders, the Unsecured Term Loan Lenders, the Equity Holders, the 2019 Notes Trustee, the 2034 Notes Trustee, and the Ad Hoc Group of Unsecured Noteholders each support confirmation of the Third Amended Plan.

**PLEASE TAKE FURTHER NOTICE** that the Third Amended Plan alters or enhances the recoveries of the following classes as described below:

| | | | | | |
|---|---|---|---|---|---|
| **Comparison of Creditor Recoveries** | | | | | |
| **Class** | **Classified Claims** | **Estimated Allowed Claims** | **Estimated % Recovery Under the First Amended Plan** | **Estimated % Recovery Under the Second Amended Plan** | **Estimated % Recovery Under the Third Amended Plan** |
| 5A | Unsecured Term Loan Claims | $305,099,461 | 84.2% | 82.2% | 78.8%[2] |
| 5B | 2034 Notes Claims | $255,997,396 | 10.8%–12.0% | 18.9% | 22.8%[3] |
| 5C | 2019 Notes Claims | $476,002,016 | 10.8%–12.0% | 18.9% | 20.1%[3] |
| 5D | General Unsecured Claims against NWHI | $157,897,543 | 10.8%–12.0% | 18.9% | 20.1%[3] |
| 5E | General Unsecured Claims against Nine West Development LLC | $92,843 | 100% | 100% | 100% |
| 5F | General Unsecured Claims against Nine West Management Service LLC | $2,705,054 | 13.1% | 14.3% | 13.4%[4] |

---

[2] The estimated recovery percentage to Unsecured Term Loan Claims assumes (a) no recovery to Class 5A on account of Administrative Expense Savings, and (b) no recovery to Class 5A on account of Professional Fee Savings. The failure to include such savings does not mean that there will ultimately not be such savings.

[3] The recovery percentage to holders of claims in Classes 5B, 5C, and 5D shall be less than the percentage noted above if such holders exercise the Cash-Out Option. For further detail regarding the exact reduction, please see the Third Amended Plan, or please contact the advisors to the Debtors or the UCC.

[4] The estimated recovery percentages for holders of Claims in Classes 5F, 5G, 5H, and 5I are on account of distributions of New Common Stock, which equity distributions have remained constant since the First Amended Plan. Reduced recoveries under the Third Amended Plan compared to the Second Amended Plan reflect changes in projected equity value due to an increase in projected debt at emergence under the Third Amended Plan and not any change in the amount of New Common Stock distributed to these Classes.

| 5G | General Unsecured Claims against Nine West Distribution LLC | $76,133 | 6.7% | 7.4% | 6.9%[4] |
| 5H | General Unsecured Claims against One Jeanswear Group Inc. | $2,386,675 | 22.2% | 24.3% | 22.7%[4] |
| 5I | General Unsecured Claims against Kasper Group LLC | $1,994,648 | 13.2% | 14.4% | 13.5%[4] |

**PLEASE TAKE FURTHER NOTICE** that the modified recoveries for Classes 5A–5I are the result of additional settlements and compromises between the case parties and are further described and implemented in the Third Amended Plan. The enhanced recoveries for the 2019 Notes Claims, the 2034 Notes Claims, and the General Unsecured Claims against Nine West Holdings, Inc. under the Third Amended Plan are the result of the following modifications and agreements in comparison to the Second Amended Plan:[5]

- **Equity Holders Settlement**: The Equity Holders have agreed to increase their cash contribution from $115 million to $120 million.

- **Distribution of the Equity Holders Settlement**: The UTLs will receive $16.25 million of the Equity Holders Settlement Proceeds (versus 25% of the Distributable Equity Holders Settlement Proceeds under the Second Amended Plan) and holders of Class 5B, 5C, and 5D Claims will receive a pro rata distribution of $48.75 million from the Equity Holders Settlement (versus 75% of the Distributable Equity Holders Settlement Proceeds under the Second Amended Plan). The remaining $55 million of the Equity Holders Settlement Proceeds will vest in the Debtors, which may be used to pay the sources and uses under the Plan.

- **NWHI-Only Unsecured Creditor Cash Recoveries**: In addition to their share of the Equity Holders Settlement Proceeds, the holders of Claims in Classes 5B, 5C, and 5D will also receive $29,400,000 in Cash from (a) the first $5,000,000 from the Professional Fee Savings,[6] and (b) $24,400,000 from the Debtors.

---

[5]  The following summary of the material modifications in the Third Amended Plan in comparison to the Second Amended Plan are qualified in their entirety by reference to the Third Amended Plan. To the extent that there exists any inconsistency between this summary and the provisions of the Third Amended Plan, the Third Amended Plan shall control.

[6]  Funding of this amount is not a condition precedent to the Effective Date.

- **Unsecured Term Loan Lender Cash Recoveries**:[7] In addition to their share of the Equity Holders Settlement Proceeds, the holders of Claims in Class 5A will also receive Cash in an amount equal to (a) the Administrative Expense Savings and (b) the Professional Fee Savings in excess of $5,000,000.

- **Equity of the Reorganized Debtors**: The Third Amended Plan includes revised equity splits, with the holders of Unsecured Term Loan Claims in Class 5A now receiving 91.5% of the New Common Stock (versus 90% under the Second Amended Plan) and NWHI-only unsecured creditors in Classes 5B, 5C, and 5D receiving approximately 8% of the New Common Stock (versus approximately 9.5% under the Second Amended Plan). General Unsecured Creditors at the Debtor subsidiaries will continue to receive approximately 0.5% of the New Common Stock. The New Common Stock distributed to each creditor is subject to dilution by the New Warrants and Management Incentive Plan.

- **New Warrants**: The amount of New Common Stock available upon exercise of the New Warrants has been reduced from 25 percent to 20 percent (subject to dilution by the Management Incentive Plan). Terms of the New Warrants are otherwise unchanged.

- **Non-Released Party Trust**: The allocation of the Non-Released Party Trust Distributable Proceeds has been modified such that the first $2.5 million of Non-Released Party Trust Distributable Proceeds shall be distributed to holders of the 2034 Notes Claims, with Non-Released Party Trust Distributable Proceeds in excess of $2.5 million to be distributed on a pro rata basis to holders of Allowed 2034 Notes Claims (based on an allowed claims amount of $319,996,745), Allowed 2019 Notes Claims, and Allowed Class 5D General Unsecured Claims against NWHI. The Non-Released Party Trust Loan provided by the Reorganized Debtors pursuant to the Second Amended Plan has been eliminated in the Third Amended Plan. Instead, on the Effective Date, the Ad Hoc Group of Unsecured Noteholders will provide the approximately $7.7 million Non-Released Party Trust Loan to the Non-Released Party Trust.[8] The Third Amended Plan also provides that the Non-Released Party Trust Advisory Board will consist of four representatives selected by the Ad Hoc Group of Unsecured Noteholders and one selected by the UCC.[9]

- **Elimination of GUC Cash-Out Option**: **The GUC Cash-Out Option in the Second Amended Plan has been eliminated, and all elections pursuant to the GUC Cash-Out Form are null and void, and of no further force or**

---

[7]  The Unsecured Term Loan Lenders will also receive $3.7 million in cash, which represents the amount of fees and expenses incurred by the Unsecured Term Loan Agent and will be subject to the Unsecured Term Loan Agent Charging Lien.

[8]  The terms of the Non-Released Party Trust Loan will be set forth in the Plan Supplement.

[9]  The identity of these individuals will be disclosed prior to the Effective Date.

**effect.** Accordingly, holders of General Unsecured Claims in Classes 5D, 5E, 5F, 5G, 5H, and 5I will not be entitled to receive cash in exchange for their Non-Cash Distributions as set forth in the Second Amended Plan.

- **<u>Non-Released Party Trust Cash-Out Option</u>**:  The Third Amended Plan provides the Cash-Out Option to holders of Claims in Classes 5B, 5C, and 5D, other than members of the Ad Hoc Group of Unsecured Noteholders.  Under the Cash-Out Option, holders of Claims in Classes 5B, 5C, and 5D (other than members of the Ad Hoc Group of Unsecured Noteholders) shall have the opportunity to irrevocably elect to receive either (1) their pro rata portion of cash equal to 1.78% of such holders' Allowed Claim,[10] or (2) their pro rata portion of Non-Released Party Trust Interests.[11]  The members of the Ad Hoc Group of Unsecured Noteholders will provide a commitment to fund the Cash-Out Option.[12]

- **<u>Elimination of NWHI Administrative Expense Settlement</u>**: Under the Second Amended Plan, the Debtors settled allocation issues with respect to professional and administrative expenses incurred in the chapter 11 cases pursuant to the NWHI Administrative Expense Settlement, which charged 35 percent of such expenses against the Equity Holders Settlement Proceeds available for distribution to holders of Claims in Classes 5A, 5B, 5C, and 5D. The NWHI Administrative Expense Settlement has been eliminated under the Third Amended Plan.

- **<u>Payment of Ad Hoc Group of Noteholders' Fees and Expenses</u>**:  The Third Amended Plan now provides that the reasonable, actual, and documented fees and expenses incurred by the Ad Hoc Group of Unsecured Noteholders in the amount of $12.5 million will be payable as Restructuring Expenses, or pursuant to a substantial contribution application under section 503(b) of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the modifications in the Third Amended Plan are not conditioned upon acceptance of the Plan, and there shall be no adverse consequences for any creditor who does not change its vote to ACCEPT the Plan; *provided, however*, that any holder of a Claim that previously voted to REJECT the Plan may, at any time prior to the conclusion of the Confirmation Hearing, change its vote to ACCEPT the Plan by contacting the Debtors or the Solicitation Agent in accordance with the Solicitation Procedures. The Solicitation Agent may be contacted at ninewestballots@primeclerk.com.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit 2</u>** is a redline of the Third Amended Plan reflecting cumulative changes from the Second Amended Plan.  Parties

---

[10]  The total amount of claims that will have the opportunity to participate in the Cash-Out Option is estimated to be approximately $350 million.

[11]  The pro rata portion of Non-Released Party Trust Interests available to such holders will be determined pursuant to the terms of the Third Amended Plan.

[12]  The terms of this commitment will be set forth in the Plan Supplement.

should review the redline to understand all of the modifications incorporated in the Third Amended Plan.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Third Amended Plan, other than those objections (or variations of such objections) already filed by the Office of the United States Trustee [Docket No. 1069] and the Securities Exchange Commission [Docket No. 1070], must be filed with the Bankruptcy Court and served on or before **February 22, 2019, at 12:00 p.m.  prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing has been adjourned to **February 25, 2019 at 1:00 p.m., prevailing Eastern Time**.  The Confirmation Hearing for the Third Amended Plan will continue at that time before the Honorable Shelley C. Chapman, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004-1408.

**PLEASE TAKE FURTHER NOTICE** that the Third Amended Plan and copies of all documents filed in these chapter 11 cases are available free of charge by (a) calling the Debtors' restructuring hotline at (855) 628-7533 within the United States or Canada or, outside of the United States or Canada, by calling +1 (917) 651-0324; (b) visiting https://cases.primeclerk.com/ninewest; and/or (c) writing to Nine West Holdings, Inc. Ballot processing, c/o Prime Clerk, LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.    You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.nysb.uscourts.gov.

| | |
|---|---|
| New York, New York | */s/ Joseph M. Graham* |
| Dated:  February 15, 2019 | James H.M. Sprayregen, P.C. |
| | Christopher J. Marcus, P.C. |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:     (212) 446-4800 |
| | Facsimile:      (212) 446-4900 |
| | - and - |
| | James A. Stempel (admitted *pro hac vice*) |
| | Joseph M. Graham (admitted *pro hac vice*) |
| | Angela M. Snell (admitted *pro hac vice*) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:     (312) 862-2000 |
| | Facsimile:      (312) 862-2200 |
| | *Counsel to the Debtors and Debtors in Possession* |

**<u>Exhibit 1</u>**

**Third Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated:  February 15, 2019

---

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway New York, New York 10018.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ................................................................................................................. 1

    A.    Defined Terms ................................................................................................. 1
    B.    Rules of Interpretation ................................................................................... 22
    C.    Computation of Time ...................................................................................... 23
    D.    Governing Law ............................................................................................... 23
    E.    Reference to Monetary Figures ...................................................................... 23
    F.    Nonconsolidated Plan ..................................................................................... 23

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS ............. 23

    A.    DIP Claims ...................................................................................................... 24
    B.    Administrative Claims .................................................................................... 24
    C.    Payment of Fees and Expenses under DIP Order ........................................... 25
    D.    Professional Fee Claims ................................................................................. 25
    E.    Priority Tax Claims ........................................................................................ 26

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................... 27

    A.    Classification of Claims and Interests ........................................................... 27
    B.    Treatment of Claims and Interests ................................................................. 28
    C.    Special Provision Governing Unimpaired Claims ......................................... 36
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 36
    E.    Subordinated Claims ...................................................................................... 37
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ........... 37
    G.    Intercompany Interests. .................................................................................. 37
    H.    Controversy Concerning Impairment ............................................................. 37

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................... 37

    A.    Sources of Consideration for Plan Distributions ........................................... 37
    B.    Equity Holders Settlement .............................................................................. 39
    C.    General Settlement of Claims and Interests ................................................... 39
    D.    The Non-Released Party Trust ........................................................................ 40
    E.    Cash-Out Option ............................................................................................. 42
    F.    Shareholders Agreement ................................................................................ 43
    G.    Management Incentive Plan ............................................................................ 43
    H.    Reorganized Holdings Board ......................................................................... 43
    I.    Restructuring Transactions ............................................................................. 44
    J.    Corporate Existence ....................................................................................... 44
    K.    Vesting of Assets in the Reorganized Debtors ............................................... 44
    L.    Cancellation of Existing Securities and Agreements ..................................... 44
    M.    Corporate Action ............................................................................................ 46
    N.    Reorganized Debtors Organizational Documents .......................................... 46
    O.    Exemption from Certain Taxes and Fees ....................................................... 47
    P.    Exemption from Securities Act Registration .................................................. 47
    Q.    Retention of Causes of Action ....................................................................... 47

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............. 48

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .................... 48
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................... 49
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................. 49

i

| | | |
|---|---|---:|
| D. | Dispute Resolution | 50 |
| E. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. | 50 |
| F. | Indemnification Obligations | 50 |
| G. | Director and Officer Liability Insurance Policies | 50 |
| H. | Insurance Policies and Surety Bonds | 51 |
| I. | Collective Bargaining Agreement | 51 |
| J. | Workers Compensation Program | 52 |
| K. | Benefit Programs | 52 |
| L. | Pension Plan | 52 |
| M. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 52 |
| N. | Reservation of Rights | 53 |
| O. | Nonoccurrence of Effective Date | 53 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ... 53

| | | |
|---|---|---:|
| A. | Timing and Calculation of Amounts to Be Distributed | 53 |
| B. | Distributions Generally | 53 |
| C. | Rights and Powers of Disbursing Agent | 54 |
| D. | Delivery of Distributions; Undeliverable or Unclaimed Distributions | 54 |
| E. | Distributions on Account of Claims or Interests Allowed After the Effective Date. | 56 |
| F. | Compliance with Tax Requirements | 56 |
| G. | Allocations Between Principal and Accrued Interest | 56 |
| H. | No Postpetition Interest on Claims. | 56 |
| I. | Foreign Currency Exchange Rate. | 56 |
| J. | Setoffs and Recoupment | 57 |
| K. | Claims Paid or Payable by Third Parties. | 57 |
| L. | Single Satisfaction of Claims; Distributions on Account of Obligations of Multiple Debtors | 58 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ... 58

| | | |
|---|---|---:|
| A. | Allowance of Claims | 58 |
| B. | Claims and Interests Administration Responsibilities | 58 |
| C. | Estimation of Claims | 58 |
| D. | Adjustment to Claims Without Objection | 59 |
| E. | Time to File Objections to Claims | 59 |
| F. | Disallowance of Claims | 59 |
| G. | Amendments to Claims | 59 |
| H. | No Distributions Pending Allowance | 60 |
| I. | Distributions After Allowance | 60 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ... 60

| | | |
|---|---|---:|
| A. | Discharge of Claims and Termination of Interests | 60 |
| **B.** | **Debtor Release** | 60 |
| **C.** | **Third-Party Release** | 61 |
| **D.** | **Exculpation** | 62 |
| **E.** | **Release of Liens** | 63 |
| **F.** | **Injunction** | 63 |
| G. | Certain Government Matters | 64 |
| H. | Challenge Period; No Disgorgement; Release of Escrowed Sale Proceeds Payment | 65 |
| I. | Protections Against Discriminatory Treatment | 65 |
| J. | Document Retention | 65 |
| K. | Reimbursement or Contribution | 65 |
| L. | Term of Injunctions or Stays | 66 |
| M. | Subordination Rights | 66 |

ii

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN..........................................66

    A.    Conditions Precedent to the Effective Date ....................................................66
    B.    Waiver of Conditions ........................................................................................67
    C.    Effect of Failure of Conditions .......................................................................67

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .......................67

    A.    Modification and Amendments.........................................................................67
    B.    Effect of Confirmation on Modifications.........................................................68
    C.    Revocation or Withdrawal of Plan ...................................................................68

ARTICLE XI. RETENTION OF JURISDICTION ..........................................................................68

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................................70

    A.    Immediate Binding Effect ................................................................................70
    B.    Additional Documents ......................................................................................71
    C.    Payment of Statutory Fees. ...............................................................................71
    D.    Payment of Certain Fees ..................................................................................71
    E.    Statutory Committee and Cessation of Fee and Expense Payment ..................71
    F.    Rights of Purchaser Under 363 Sale Order .....................................................72
    G.    Reservation of Rights.......................................................................................72
    H.    Successors and Assigns.....................................................................................72
    I.    Notices .............................................................................................................72
    J.    Entire Agreement .............................................................................................75
    K.    Exhibits ............................................................................................................76
    L.    Non-Severability of Plan Provisions ...............................................................76
    M.    Votes Solicited in Good Faith ..........................................................................76
    N.    Conflicts ...........................................................................................................76
    O.    Closing of Chapter 11 Cases ...........................................................................77

KE 58496119

## INTRODUCTION

Nine West Holdings, Inc. and its Debtor affiliates in the above-captioned Chapter 11 Cases propose this joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the First Amended Plan. The Disclosure Statement does not discuss the modifications made to the First Amended Plan that are reflected in the Second Amended Plan and the Third Amended Plan. Therefore, holders of Claims and Interests should refer to (i) the redline of the Third Amended Plan against the Second Amended Plan, (ii) the Original Plan Amendment Notice, and (iii) the Supplemental Plan Amendment Notice to review and understand the modifications that have been made to the Second Amended Plan that are incorporated in the Third Amended Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.    "*2014 Transaction*" means the 2014 going-private buyout transaction led by the Sponsor in which The Jones Group Inc. and all affiliated brands were purchased pursuant to that certain Agreement and Plan of Merger, dated as of December 19, 2013, among The Jones Group Inc., Holdings, and Jasper Merger Sub, Inc.

2.    "*2019 Notes*" means, collectively, (i) the 6.875% senior unsecured notes due March 2019 and (ii) the 8.25% senior unsecured notes due March 2019, in each case issued pursuant to the 2019 Notes Indentures.

3.    "*2019 Notes Claims*" means all Claims against NWHI arising under, derived from, or based on the 2019 Notes Indentures.

4.    "*2019 Notes Indentures*" means, collectively, (i) the Indenture, dated as of March 7, 2011, by and between NWHI, as issuer, and U.S. Bank National Association, as indenture trustee, providing for 6.875% senior unsecured notes due March 2019, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, and (ii) the Indenture, dated as of April 23, 2014, by and between NWHI, as issuer, and U.S. Bank National Association, as indenture trustee, providing for 8.25% senior unsecured notes due March 2019, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

5.    "*2019 Notes Indenture Trustee*" means U.S. Bank National Association, or any predecessor or successor thereto, as trustee under the 2019 Notes Indentures.

6.    "*2034 Notes*" means the 6.125% senior unsecured notes due November 2034 issued pursuant to the 2034 Notes Indenture.

7.    "*2034 Notes Claims*" means all Claims against NWHI arising under, derived from, or based on the 2034 Notes Indenture.

8.    "*2034 Notes Indenture*" means the Indenture, dated as of November 22, 2004, by and between NWHI, as issuer, and Wilmington Savings Fund Society, FSB as indenture trustee, providing for 6.125% senior unsecured notes due 2034, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

KE 58496119

9.       "*2034 Notes Indenture Trustee*" means Wilmington Savings Fund Society, FSB, or any predecessor or successor thereto, as trustee under the 2034 Notes Indenture.

10.      "*363 Sale*" means the sale of the Debtors' Nine West®, Bandolino®, or associated brands, or related working capital assets, as approved by the 363 Sale Order.

11.      "*363 Sale Order*" means the *Order (A) Approving the Sale of Substantially All Assets of the Debtors' Nine West, Bandolino, and Associated Brands Free and Clear of all Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts, and (D) Granting Related Relief* [Docket No. 404].

12.      "*Ad Hoc Group of Crossover Lenders*" means the group of unaffiliated holders of Secured Term Loan Claims and Unsecured Term Loan Claims identified at Docket No. 700, filed on September 28, 2018.

13.      "*Ad Hoc Group of Unsecured Noteholders*" means the group of unaffiliated holders of 2034 Notes Claims, 2019 Notes Claims, and Unsecured Term Loan Claims identified at Docket No. 968, filed on December 13, 2018.

14.      "*Ad Hoc Secured Lender Group*" means the group of unaffiliated holders of Secured Term Loan Claims identified at Docket No. 565, filed on August 7, 2018.

15.      "*Administrative Claim Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than (x) Professional Fee Claims and (y) Administrative Claims arising in the ordinary course of business), which shall be the first Business Day that is 30 days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code shall be the Claims Bar Date.

16.      "*Administrative Claim Objection Bar Date*" means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of (1) the first Business Day that is 90 days after the Effective Date and (2) the first Business Date that is 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claim Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

17.      "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

18.      "*Administrative Expense Savings*" means the aggregate amount of Cash from the following formula: (a) $142,800,000 *less* (b) the amount of fees and expenses actually incurred by the entities identified on Exhibit B to the Second Amended Plan through the Effective Date, prior to any Professional Fee Savings *less* (c) $7,000,000.

19.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such person as if the Person were a Debtor.

20.      "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim which is or has been timely Filed by the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above,

2

such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt: (x) a Proof of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law; and (z) there shall be no requirement that (1) the Secured Term Loan Agent, Unsecured Term Loan Agent, or DIP Agents or (2) any Secured Term Loan Lender, Unsecured Term Loan Lender, or DIP Lender File a Proof of Claim in respect of any Secured Term Loan Claim, Unsecured Term Loan Claim, or DIP Claim, as applicable, for such Claim to be Allowed. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

21.    "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors and the Requisite Unsecured Lenders.

22.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or similar remedies that may be brought by or on behalf of the Debtors or the Estates, including Causes of Action or defenses arising under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer law.

23.    "*Ballot*" means the form or forms distributed to certain holders of Claims entitled to vote on the First Amended Plan by which such parties may indicate acceptance or rejection of the Plan, *provided* that the Debtors will not re-solicit votes with respect to the acceptance or rejection of the Second Amended Plan or the Third Amended Plan.

24.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

25.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

26.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules or orders of the Bankruptcy Court, as now in effect or hereafter amended.

27.    "*Brigade*" means Brigade Capital Management L.P. and its accounts and managed funds.

28.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

29.    "*Carve-Out Businesses*" means those certain businesses purchased from NWHI, including Stuart Weitzman®, Kurt Geiger®, and the Jones Apparel Group (which included both the Jones New York and Kasper® brands), in connection with the 2014 Transaction.

30.    "*Carve-Out Transactions*" means the sale of the Carve-Out Businesses to entities owned or controlled by the Sponsor, the Minority Equity Holders, and/or their respective current and former Affiliates in connection with the 2014 Transaction.

31.    "*Cash*" or "*$*" means the legal tender of the United States of America of the equivalent thereof, including bank deposits and checks.

32.    "*Cash-Out Election*" means an irrevocable election, pursuant to the Supplemental Cash-Out Election Form, by a holder of an Allowed Claim in Classes 5B, 5C, or 5D (other than a member of the Ad Hoc Group of Unsecured Noteholders) to receive the Cash-Out Option.

33.    "*Cash-Out Option*" means the Pro Rata share of Cash which holders of an Allowed Claim in Classes 5B, 5C, or 5D (other than members of the Ad Hoc Group of Unsecured Noteholders) irrevocably elect, pursuant to the Supplemental Cash-Out Election Form, which election must be received by the Debtors or Reorganized Debtors, as applicable, no later than March 22, 2019, to receive instead of the Non-Released Party Trust Interest distributions such holder would otherwise receive, as set forth in, and subject to the terms of, Article IV.E of the Plan.

34.    "*Cash-Out Option Funding*" means the requisite funding provided to the Debtors by the Funding Entities for the Cash-Out Option.

35.    "*Causes of Action*" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever (including those of the Debtors and/or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

36.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated and jointly administered cases commenced by the Debtors in the Bankruptcy Court and styled *In re Nine West Holdings, Inc., et al.*, No. 18-10947 (SCC).

37.    "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or an Estate.

38.    "*Claims Bar Date*" means the dates established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims, pursuant to:  (a) the *Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 248], entered by the Bankruptcy Court on May 15, 2018; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

39.    "*Claims Objection Bar Date*" shall mean the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Filed on or before the day that is before 180 days after the Effective Date.

KE 58496119

40.    "**_Claims Register_**" means the official register of Claims maintained by the Notice, Claims, and Balloting Agent.

41.    "**_Class_**" means a category of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

42.    "**_Class I Non-Released Party Trust Interests_**" means the interests in the Non-Released Party Trust, to be distributed on a Pro Rata basis to holders of Claims in Class 5B as set forth herein, which shall entitle such holder to its pro rata potion (based on percentage of interests held by such holder) of the first $2,500,000 in Non-Released Party Trust Distributable Proceeds.

43.    "**_Class II Non-Released Party Trust Interests_**" means the interests in the Non-Released Party Trust, to be distributed on a Pro Rata basis to holders of Claims (a) in Class 5B (provided that solely for purposes of calculating such interests, the amount of the Class 5B 2034 Notes Claims shall be Allowed in the amount of $319,996,745), and (b) in Classes 5C and 5D, as set forth herein, which shall entitle such holder to its pro rata portion (based on percentage of interests held by such holder) of the Non-Released Party Trust Distributable Proceeds in excess of the first $2,500,000.

44.    "**_Collective Bargaining Agreement_**" means that certain Collective Bargaining Agreement by and between Kasper Group LLC and certain locals of the New York Metropolitan Area Joint Board, as the same may have been amended from time to time.

45.    "**_Committee_**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on April 19, 2018.

46.    "**_Commitment Letter_**" means the letter from the Funding Entities pursuant to which the Funding Entities have committed to fund the Cash-Out Option Funding into an interest-bearing escrow account and provide the Non-Released Party Trust Loan to the Non-Released Party Trust.

47.    "**_Confirmation_**" means the entry of the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

48.    "**_Confirmation Date_**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

49.    "**_Confirmation Hearing_**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

50.    "**_Confirmation Order_**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order must be acceptable to the Debtors, the Requisite Unsecured Lenders, the Requisite Secured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, the Sponsor (solely with respect to any provisions in the Confirmation Order that would materially modify Article VIII.B, Article VIII.C, Article VIII.D, Article IV.B, or the defined terms Equity Holders Settlement or Equity Holders Settlement Proceeds in a manner adverse to the Sponsor), the Minority Equity Holder (solely with respect to any provisions in the Confirmation Order that would materially modify Article VIII.B, Article VIII.C, Article VIII.D, Article IV.B, or the defined terms Equity Holders Settlement or Equity Holders Settlement Proceeds in a manner adverse to the Minority Equity Holder), and the Committee (it being understood and agreed by the foregoing parties that the form of Confirmation Order filed on the case docket concurrently with this Third Amended Plan is acceptable).

51.    "**_Consenting Secured Lenders_**" means the Consenting Secured TL Lenders (as defined in the Restructuring Support Agreement).

52.    "**_Consenting Term Loan Lenders_**" means the Consenting Secured Lenders and the Consenting Unsecured Lenders.

KE 58496119

53.    "**Consenting Unsecured Lenders**" means the Consenting Unsecured TL Lenders (as defined in the Restructuring Support Agreement).

54.    "**Consummation**" means "substantial consummation" as defined in section 1101(2) of the Bankruptcy Code.

55.    "**Contingent DIP ABL Obligations**" means all of the Debtors' obligations under the DIP ABL/FILO Documents and the DIP Order that are contingent and/or unliquidated (including those set forth in Section 12.4 and Section 12.5 of the DIP ABL/FILO Credit Agreement), other than DIP ABL/FILO Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

56.    "**Contingent DIP Term Loan Obligations**" means all of the Debtors' obligations under the DIP Term Loan Documents and the DIP Order that are contingent and/or unliquidated (including those set forth in Section 10.04 and Section 10.05 of the DIP Term Loan Credit Agreement), other than DIP Term Loan Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

57.    "**Contingent Secured Term Loan Obligations**" means all of the Debtors' obligations under the Secured Term Loan Credit Agreement and the Secured Term Loan Documents that are contingent and/or unliquidated (including those set forth in Section 10.04 and Section 10.05 of the Secured Term Loan Credit Agreement), other than Secured Term Loan Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

58.    "**Cure Claim**" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

59.    "**D&O Liability Insurance Policies**" means, collectively, (a) all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', members', trustees', managers', and officers' liability as of the Petition Date, and (b) all insurance policies (including any "tail policy") for directors', members', trustees', managers', and officers' liability maintained by the Debtors, the Estates, or the Reorganized Debtors as of the Effective Date.

60.    "**Debtor**" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

61.    "**Debtor Release**" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.B of the Plan.

62.    "**Debtors**" means, collectively, (a) Jasper Parent LLC, (b) NWHI, (c) Kasper Group LLC, (d) Kasper U.S. Blocker LLC, (e) Nine West Apparel Holdings LLC, (f) Nine West Development LLC, (g) Nine West Distribution LLC, (h) Nine West Jeanswear Holding LLC, (i) Nine West Management Service LLC, (j) One Jeanswear Group, Inc., and (k) US KIC Top Hat LLC.

63.    "**DIP ABL/FILO Agent**" means Wells Fargo Bank, National Association in its capacity as administrative agent and collateral agent and as FILO Agent under the DIP ABL/FILO Credit Agreement, together with its respective successors and assigns in such capacities.

64.    "**DIP ABL/FILO Claims**" means all Claims of the DIP ABL/FILO Agent and the DIP ABL/FILO Lenders arising under, derived from, secured by, or based on the DIP ABL/FILO Credit Agreement, the DIP ABL/FILO Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP ABL/FILO Facility.

KE 58496119

65.     "*DIP ABL/FILO Credit Agreement*" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of April 11, 2018, by and among the Debtors, the DIP ABL/FILO Lenders party thereto, and the DIP ABL/FILO Agent, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

66.     "*DIP ABL/FILO Documents*" means the DIP ABL/FILO Credit Agreement and all other agreements, documents, and instruments related thereto, executed in connection therewith, or evidencing the loans and obligations thereunder, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their terms and the terms of the DIP Order.

67.     "*DIP ABL/FILO Facility*" means that certain debtor-in-possession financing facility available pursuant to the terms and conditions of the DIP ABL/FILO Credit Agreement and the DIP Order.

68.     "*DIP ABL/FILO Lenders*" means the banks, financial institutions, and other lenders party to the DIP ABL/FILO Credit Agreement from time to time.

69.     "*DIP Agents*" means, collectively, the DIP ABL/FILO Agent and the DIP Term Loan Agent.

70.     "*DIP Claims*" means, collectively, the DIP ABL/FILO Claims and the DIP Term Loan Claims.

71.     "*DIP Credit Agreements*" means, collectively, the DIP ABL/FILO Credit Agreement and the DIP Term Loan Credit Agreement.

72.     "*DIP Documents*" means, collectively, the DIP ABL/FILO Documents and the DIP Term Loan Documents.

73.     "*DIP Facilities*" means those certain debtor-in-possession financing facilities pursuant to the DIP Credit Agreements and the DIP Order.

74.     "*DIP Lenders*" means, collectively, the DIP ABL/FILO Lenders and the DIP Term Loan Lenders.

75.     "*DIP Order*" means, collectively:  the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 80]; the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* [Docket No. 450]; and the *Order Authorizing the Debtors to Obtain Additional Postpetition Financing, (B) Increasing the Amount of Indebtedness Secured By Liens and Granted Superpriority Administrative Expense Status, (C) Authorizing the Debtors to Amend the Term DIP Credit Agreement, and (D) Granting Related Relief* [Docket No. 1062], authorizing, among other things, the Debtors to enter into the DIP Credit Agreements and incur postpetition obligations thereunder.

76.     "*DIP Term Loan Agent*" means Cortland Capital Market Services LLC, in its capacity as administrative agent and collateral agent under the DIP Term Loan Credit Agreement, together with its respective successors and assigns in such capacities.

77.     "*DIP Term Loan Claims*" means all Claims of the DIP Term Loan Agent and the DIP Term Loan Lenders arising under, derived from, secured by, or based on the DIP Term Loan Credit Agreement the DIP Term Loan Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Term Loan Facility.

7

78.     "**DIP Term Loan Documents**" means the DIP Term Loan Credit Agreement and all other agreements, documents, and instruments related thereto, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their terms and the terms of the DIP Order.

79.     "**DIP Term Loan Credit Agreement**" means that certain Credit Agreement, dated as of April 11, 2018, by and among the Debtors, the DIP Term Loan Lenders party thereto and the DIP Term Loan Agent, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the DIP Order.

80.     "**DIP Term Loan Facility**" means that certain debtor-in-possession financing facility available pursuant to the terms and conditions of the DIP Term Loan Credit Agreement and the DIP Order.

81.     "**DIP Term Loan Lenders**" means the banks, financial institutions, and other lenders party to the DIP Term Loan Credit Agreement from time to time.

82.     "**Disbursing Agent**" means the Debtors, or the Entity or Entities selected by the Debtors to make or facilitate distributions contemplated under the Plan.

83.     "**Disclosure Statement**" means the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 868], dated as of November 14, 2018, as may be amended, supplemented, or modified from time to time (with the consent of the Requisite Term Loan Lenders, such consent not to be unreasonably withheld, conditioned, or delayed), including all exhibits and schedules thereto and references therein that relate to the First Amended Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

84.     "**Disclosure Statement Order**" means the order by the Bankruptcy Court approving the Disclosure Statement [Docket No. 864].

85.     "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

86.     "**Distribution Record Date**" means the record date for purposes of determining which holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date as is designated in a Final Order of the Bankruptcy Court.

87.     "**DTC**" means The Depository Trust Company.

88.     "**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions precedent specified in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) no stay of the Confirmation Order is in effect, which shall be the day Consummation occurs.

89.     "**Entity**" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

90.     "**Equity Holders Settlement**" means the settlement of the Estate Causes of Action and claims arising on or before the Effective Date made, or which could have been made, against the Sponsor, the Minority Equity Holders, and their respective current and former Affiliates (including Belk, Inc.), and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts, or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals,

in each case solely in their capacity as such, including any matter arising out of or relating to the 2014 Transaction, the Carve-Out Businesses and/or their ownership or operation of the Debtors or the Carve-Out Businesses, and/or any action or inaction taken by any of them in connection with any steps taken to eliminate, suspend, or otherwise reduce in any manner any business or other commercial dealings done or to be done by Belk, Inc. with any of the Debtors; *provided*, *however*, that notwithstanding anything herein to the contrary, (a) the Equity Holders Settlement shall not settle or release any claims or Causes of Action against any of the following, each in their capacity as such, in connection with any matter arising out of or relating to the 2014 Transaction or the Carve-Transactions, and with respect to (ii) and (iii), for conduct occurring on or before April 8, 2014: (i) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (ii) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (iii) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc., and (b) the Equity Holders Settlement does not release any claims by any of the Debtors, the Reorganized Debtors, or Belk, Inc. arising out of or related to ordinary course business dealings with respect to products or services ordered by Belk, Inc. from the Debtors, the Estates, or the Reorganized Debtors (including any amounts due and owing among such parties or any Causes of Action arising out of or related thereto).

91.     "*Equity Holders Settlement Proceeds*" means $120,000,000 contributed to the Estates by the Sponsor and the Minority Equity Holder.

92.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

93.     "*Estate Action STL Settlement*" means the settlement of all Estate Causes of Action and claims arising on or before the Effective Date made, or which could have been made, against the Secured Term Loan Agent or any current or former Secured Term Loan Lender, in each case solely in their capacity as such, including any challenge to the validity, enforceability, priority of the Secured Term Loan Credit Agreement, or the Secured Term Loan Claims thereunder, or any payments of interest or principal thereon, in exchange for the waiver of default interest during the Chapter 11 Cases and the distributions provided herein.  For the avoidance of doubt, the Estate Action STL Settlement shall not settle, and shall not release, any claims or Causes of Action (excluding, for the avoidance of doubt, any claims or Causes of Action that could be asserted against the Secured Term Loan Agent or any of the Secured Term Loan Lenders arising out of or relating to the validity, enforceability, or priority of the Secured Term Loan Credit Agreement, or the Secured Term Loan Claims thereunder, or any payments of interest or principal thereon) against any of the following, each solely in their capacity as such (and, if applicable, not in their capacity as the Secured Term Loan Agent or current or former Secured Term Loan Lenders), in connection with any matter arising out of or relating to the 2014 Transaction or the Carve-Transactions, and with respect to (b) and (c), for conduct occurring on or before April 8, 2014: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc.

94.     "*Estate Action UTL Settlement*" means the settlement of all Estate Causes of Action and claims arising on or before the Effective Date made, or which could have been made, against the Unsecured Term Loan Agent or any current or former Unsecured Term Loan Lender, in each case solely in their capacity as such, including any challenge to the validity, enforceability, priority of the Unsecured Term Loan Credit Agreement, or the Unsecured Term Loan Claims thereunder, or any payments of interest or principal thereon, to allow the Debtors to provide the distributions to holders of Claims against NWHI set forth herein.  For the avoidance of doubt, the Estate Action UTL Settlement shall not settle, and shall not release, any claims or Causes of Action (excluding, for the avoidance of

KE 58496119

doubt, any claims or Causes of Action that could be asserted against the Unsecured Term Loan Agent or any of the Unsecured Term Loan Lenders arising out of or relating to the validity or enforceability of the Unsecured Term Loan Credit Agreement, or the Unsecured Term Loan Claims thereunder, or any payments of interest or principal thereon) against any of the following, each solely in their capacity as such (and, if applicable, not in their capacity as the Unsecured Term Loan Agent or current or former Unsecured Term Loan Lenders), in connection with any matter arising out of or relating to the 2014 Transaction or the Carve-Transactions, and with respect to (b) and (c), for conduct occurring on or before April 8, 2014: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc.

95. "*Estate Causes of Action*" means any Causes of Action held by any Estate.

96. "*Exculpated Parties*" means collectively, and in each case solely in its or their capacity as such: (a) the Debtors; (b) the Reorganized Debtors, (c) the Debtors' current and former officers, directors, and managers; (d) the Secured Term Loan Lenders; (e) the Secured Term Loan Agent; (f) the Unsecured Term Loan Lenders; (g) the Unsecured Term Loan Agent; (h) the Prepetition ABL/FILO Secured Parties; (i) the DIP Lenders; (j) the DIP Agents; (k) DTC; (l) each member of the Ad Hoc Group of Unsecured Noteholders; (m) the 2019 Notes Indenture Trustee; (n) the 2034 Notes Indenture Trustee; (o) the Sponsor and Belk, Inc.; (p) the Minority Equity Holders; (q) the Committee and each of its members; (r) each of the parties to the Restructuring Support Agreement; (s) each member of the Ad Hoc Group of Crossover Lenders; (t) each member of the Ad Hoc Secured Lender Group; (u) Brigade; (v) the Funding Entities; and (w) with respect to each of the foregoing entities in clauses (a) through (v), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, and Affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided, however*, that notwithstanding anything herein to the contrary, (i) none of the following Persons or Entities, each solely in their capacity as such, shall be Exculpated Parties, regardless of whether they would otherwise meet the Exculpated Parties definition: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc., (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc., and (ii) the exculpation in favor of any Exculpated Party does not release any claims by any of the Debtors, the Reorganized Debtors, or Belk, Inc. arising out of or related to ordinary course business dealings with respect to products or services ordered by Belk, Inc. from the Debtors, the Estates, or the Reorganized Debtors (including any amounts due and owing among such parties or any Causes of Action arising out of or related thereto).

97. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

98. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code, which amount is 2.06% per annum.

99. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice, Claims, and Balloting Agent.

KE 58496119

100.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be Filed relating to such order shall not cause such order to not be a Final Order.

101.     "*First Amended Plan*" means the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 867], dated November 14, 2018, and which was subject of the Disclosure Statement.

102.     "*First Cash-Out Election Form*" means the procedures and election form attached to the Second Amended Plan as Exhibit A, a customized version of which was mailed to the holders of General Unsecured Claims in Classes 5D, 5E, 5F, 5G, 5H, and 5I, which election form is null and void and shall have no further force and effect.

103.     "*Funding Entities*" means the members of the Ad Hoc Group of Unsecured Noteholders that commit to provide the Cash-Out Option Funding and the Non-Released Party Trust Loan.

104.     "*General Unsecured Claim*" means any Claim that is not secured and is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an Unsecured Term Loan Claim, (e) a 2034 Notes Claim, (f) a 2019 Notes Claim, or (g) an Intercompany Claim.

105.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

106.     "*GUC Subsidiary Equity Pool*" means a pool of 0.519% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants (or the equivalent value of Cash thereof as a result of the election of the Cash-Out Option by such holders), established to fund recoveries to holders of General Unsecured Claims in Classes 5E, 5F, 5G, 5H, and 5I.

107.     "*Holdings*" means Debtor Jasper Parent LLC.

108.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

109.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.  For the avoidance of doubt, and notwithstanding anything herein to the contrary, Indemnification Obligations assumed shall not include any obligations to indemnify any Person(s) or Entities that may be defendants in or otherwise liable in connection with a Non-Released Party Trust Cause of Action; *provided*, *however*, that nothing in this sentence shall have any effect on any applicable director and officer liability insurance policy.

110.     "*Indenture Trustees*" mean the 2019 Notes Indenture Trustee and the 2034 Notes Indenture Trustee.

111.     "*Indenture Trustee Charging Lien*" means any Lien or other priority in payment to which any of the Indenture Trustees is entitled, pursuant to each of the applicable Indentures or any ancillary documents, instruments or agreements.

KE 58496119

112.    "***Initial Distribution Date***" means the date on which the Disbursing Agent shall make initial distributions to holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date but in no event shall be later than 30 days after the Effective Date.

113.    "***Intercompany Claim***" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date.

114.    "***Intercompany Interest***" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

115.    "***Interest***" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

116.    "***Interim Compensation Order***" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 356], entered by the Bankruptcy Court on June 5, 2018, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

117.    "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

118.    "***Lien***" means a lien as defined in section 101(37) of the Bankruptcy Code.

119.    "***Management Incentive Plan***" means the post-Effective Date management incentive plan, which shall provide for New Common Stock or other equity or similar interests in Reorganized Holdings to be reserved for directors, officers, and employees of the Reorganized Debtors (in an amount up to but no greater than 10% of the New Common Stock) and shall be reasonably acceptable to the Debtors and the Requisite Unsecured Lenders.

120.    "***Minimum Exit Cash Requirement***" means the amount of Cash necessary for the Debtors to meet all Cash payment obligations under the Plan, excluding existing Cash on the balance sheet and the New ABL Facility financing, which amount will be determined by the Debtors in consultation with the Required Unsecured Lenders and the Committee.

121.    "***Minority Equity Holders***" means investment funds managed or advised by, or Affiliates of, KKR Credit Advisors (US) LLC, KKR Capital Markets LLC, and/or Kohlberg Kravis Roberts & Co., L.P., solely in their capacity as lenders to, underwriters of, and/or holders of direct or indirect debt or equity interests in Holdings and/or any of the Carve-Out Businesses.

122.    "***New ABL Facility***" means an up to $200 million senior secured asset-based revolving credit facility that shall contain such other terms reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

123.    "***New ABL Facility Documents***" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the New ABL Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

124.    "***New Common Stock***" means the common stock, limited liability company membership units, or the functional equivalent thereof of Reorganized Holdings to be issued upon consummation of the Plan.

125.    "***New Debt***" means, collectively, the New ABL Facility and the New Secured Facility.

126.    "***New Debt Agreements***" means, collectively, the credit agreements for the New ABL Facility and the New Secured Facility.

127.    "***New Debt Documents***" means, collectively, the New ABL Facility Documents and the New Secured Facility Documents.

128.    "***New Secured Facility***" means a new secured term loan facility or facilities (to be funded in any tranche or tranches necessary to raise such financing) in the amount of at least the Minimum Exit Cash Requirement, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

129.    "***New Secured Facility Documents***" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the New Secured Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

130.    "***New Warrant Agreement***" means the warrant agreement for the issuance of the New Warrants, the form of which shall be included in the Plan Supplement and the terms of which shall be consistent with this Plan and otherwise reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications (other than with respect to the percentage of shares of New Common Stock, for which the New Warrants may be exercised, which will be modified to reflect the terms of this Third Amended Plan) to the form filed in the Plan Supplement at Docket No. 1146) and the Committee.

131.    "***New Warrants***" means the new five year warrants to be issued in accordance with the terms of the New Warrant Agreement, entitling the holders of such warrants to convert the warrants to 20% of the shares of the New Common Stock (subject to dilution pursuant to the Management Incentive Plan), at a strike price calculated based on a total enterprise value of $625 million.

132.    "***Non-Released Party Trust***" means the trust that will be created to pursue the Non-Released Party Trust Causes of Action following the Effective Date in accordance with the terms of this Plan and the Non-Released Party Trust Agreement.

133.    "***Non-Released Party Trust Agreement***" means the trust agreement that, among other things, establishes the Non-Released Party Trust, and describes the powers, duties, and responsibilities of the Non-Released Party Trustee, the form of which shall be in form and substance reasonably acceptable to the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Debtors (in consultation with the Requisite Unsecured Lenders, *provided* that the Requisite Unsecured Lenders will have reasonable consent rights with respect to any obligations included in the Non-Released Party Trust Agreement that directly require the Reorganized Debtors to act, or not act, as the case may be, after the Effective Date) and which shall be included in the Plan Supplement, and the material terms of which are included in the Plan; *provided*, *however*, that to the extent the terms of Article IV.D of the Plan conflict with the Non-Released Party Trust Agreement, the Non-Released Party Trust Agreement shall control, with the Plan controlling in all other respects.

134.    "***Non-Released Party Trust Assets***" means the Non-Released Party Trust Causes of Action and the Cash proceeds from the Non-Released Party Trust Loan; *provided* that neither the Debtors nor the Reorganized Debtors shall have any obligation to provide any funding to the Non-Released Party Trust.

135.    "***Non-Released Party Trust Advisory Board***" means the advisory board that shall appoint the Non-Released Party Trustee and shall oversee the Non-Released Party Trust in accordance with the Non-Released Party Trust Agreement, the initial members of which shall consist of (a) four members selected by the Ad Hoc Group

13

of Unsecured Noteholders and (b) one member selected by the Committee. After the Effective Date, the members of the Non-Released Party Trust Advisory Board shall be appointed in accordance with the terms of the Non-Released Party Trust Agreement.

136.    "***Non-Released Party Trust Beneficiaries***" means the holders of Non-Released Party Trust Interests.

137.    "***Non-Released Party Trust Causes of Action***" means all claims and Causes of Action arising under state or federal law owned by, or asserted by or on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates, in respect of matters arising out of or relating to the 2014 Transaction or the Carve-Out Transactions (i) against any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction or their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.) or (ii) for conduct occurring on or before April 8, 2014, regardless of whether the Debtors were insolvent at the time of the event giving rise to the claim or Cause of Action at issue; *provided, however*, that the foregoing shall not include claims and Causes of Action against any Released Parties, solely in their capacities as such, or claims and Causes of Action settled or released by the Equity Holders Settlement, the Estate Action STL Settlement, the Estate Action UTL Settlement, or paragraphs F(xii) and 26 of the DIP Order; and *provided, further*, that "Non-Released Party Trust Causes of Action" shall include all claims and Causes of Action arising under state or federal law owned by, or asserted by or on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates, in respect of matters arising out of or relating to the 2014 Transaction or the Carve-Out Transactions, regardless of whether the Debtors were insolvent at the time of the event giving rise to the claim or Cause of Action at issue, against each of the following, solely in their capacity as such, (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc. For the avoidance of doubt, the failure to specifically identify an Entity or Person in the immediately preceding sentence does not mean that such Entity or Person may not be subject to a Non-Released Party Trust Cause of Action.

138.    "***Non-Released Party Trust Distributable Proceeds***" means all actual proceeds of the Non-Released Party Trust Causes of Action, net of any amounts (a) used to repay any funding for the Non-Released Party Trust in accordance with the terms of such funding, (b) used to pay the Non-Released Party Trust Expenses, and (c) as otherwise provided in accordance with the Non-Released Party Trust Agreement.

139.    "***Non-Released Party Trust Expenses***" means all reasonable fees, costs, and expenses of and incurred by the Non-Released Party Trust, including legal and other professional fees, costs, and expenses, administrative fees and expenses, insurance fees, taxes, and escrow expenses, which shall be paid in accordance with the Non-Released Party Trust Agreement; *provided, however*, that neither the Debtors nor the Reorganized Debtors shall be required in any event to pay the Non-Released Party Trust Expenses.

140.    "***Non-Released Party Trusts Interests***" means, collectively, the Non-Released Party Trust Interests Class I and the Non-Released Party Trust Interests Class II.

141.    "***Non-Released Party Trust Loan***" means the financing incurred to fund the Non-Released Party Trust Expenses, which shall consist of a loan of approximately $7.7 million, provided by the Funding Entities to the Non-Released Party Trust, the form of which shall be included in the Plan Supplement and shall be acceptable to the Debtors, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee. For the avoidance of doubt, the Reorganized Debtors shall have no obligations under the Non-Released Party Trust Loan.

KE 58496119

142.    "***Non-Released Party Trust Transfer Agreement***" means the agreement respecting transfer of documents, information, and Privileges from the Debtors, the Reorganized Debtors (solely in their capacity as successors to the Debtors), and the Committee to be entered into among the Non-Released Party Trustee, NWHI, on behalf of itself and the other Debtors, and the Committee, the terms of which shall be consistent with this Plan and otherwise reasonably acceptable to the Debtors, the Required Unsecured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee.

143.    "***Non-Released Party Trustee***" means the Person designated by the Non-Released Party Trust Advisory Board to serve as the trustee of the Non-Released Party Trust, who shall be identified and disclosed prior to the Effective Date, and any successor thereto appointed pursuant to the Non-Released Party Trust Agreement.

144.    "***Notice, Claims, and Balloting Agent***" means Prime Clerk LLC, in its capacity as notice, claims, and balloting agent for the Debtors and any successor.

145.    "***NWHI***" means Debtor Nine West Holdings, Inc.

146.    "***Original Plan Amendment Notice***" means the *Notice of Filing of Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No 1111].

147.    "***Other Priority Claim***" means any Claim against any of the Debtors described in section 507(a) of the Bankruptcy Code to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

148.    "***Other Secured Claim***" means any Secured Claim that is not a DIP Claim, a Secured Term Loan Claim, or a Secured Tax Claim.

149.    "***Pension Plan***" means the Pension Plan for Associates of Nine West Group Inc.

150.    "***Person***" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

151.    "***Petition Date***" means April 6, 2018, the date on which each of the Debtors commenced the Chapter 11 Cases.

152.    "***Plan***" means this Third Amended Plan, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement, which is incorporated herein by reference and made part of the Plan as if set forth herein.

153.    "***Plan Equity Value***" means Plan Settlement TEV, less the aggregate outstanding amount of New Debt as of the Effective Date.

154.    "***Plan Settlement TEV***" means $600 million.

155.    "***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, the initial draft of certain of such documents shall be Filed by the Debtors seven calendar days prior to the Voting Deadline, and additional documents Filed with the Bankruptcy Court prior to the Effective Date, as may be amended, supplemented, altered, or modified from time to time subject to any applicable consent rights as set forth in the Restructuring Support Agreement or this Plan and in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Assumed Executory Contracts and Unexpired Leases Schedule; (b) the Rejected Executory Contracts and Unexpired Leases Schedule; (c) the Retained Causes of Action Schedule; (d) the form of the Reorganized Holdings Organizational Documents; (e) the Management Incentive Plan; (f) the form of the New Debt Agreements; (g) the identity of the members of the Reorganized Holdings Board and any executive management for Reorganized Holdings; (h) the form of the New Warrant Agreement; (i) the Restructuring Steps Memorandum; (j) the form of the Non-Released Party Trust Agreement; (k) the form of documentation for the Non-Released Party Trust Loan; (l) the form of Non-Released Party Trust Transfer Agreement; (m) the Supplemental Cash-Out Election Form; (n) the Commitment Letter; and (o) any other necessary

documentation related to the Restructuring Transactions.  The documents comprising the Plan Supplement shall be subject to any applicable consent rights as set forth in the Restructuring Support Agreement and this Plan.

156.    "*Prepetition ABL/FILO Agent*" means Wells Fargo Bank, National Association in its capacity as administrative agent and collateral agent and as FILO Agent under the Prepetition ABL/FILO Credit Agreement.

157.    "*Prepetition ABL/FILO Credit Agreement*" means that certain Credit Agreement dated as of April 8, 2014, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among the Debtors, the Prepetition ABL/FILO Agent and the Prepetition ABL/FILO Lenders.

158.    "*Prepetition ABL/FILO Claim*" means any Claim arising under, derived from, based upon, or secured by the Prepetition ABL/FILO Documents, which Claims shall be deemed Allowed Claims.

159.    "*Prepetition ABL/FILO Documents*" means the Prepetition ABL/FILO Credit Agreement and any other agreements or documents executed in connection therewith or related thereto or evidencing the loans and obligations thereunder.

160.    "*Prepetition ABL/FILO Credit Facility*" means the prepetition senior secured revolving credit facility provided by the Prepetition ABL/FILO Lenders.

161.    "*Prepetition ABL/FILO Lenders*" means the lenders party to the Prepetition ABL/FILO Credit Agreement from time to time.

162.    "*Prepetition ABL/FILO Secured Parties*" means the Prepetition ABL/FILO Agent and the Prepetition ABL/FILO Lenders.

163.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

164.    "*Prepetition Credit Facilities*" means, collectively, the Prepetition ABL/FILO Credit Facility, the Secured Term Loan Facility, the Unsecured Term Loan Facility, the 2019 Notes, and the 2034 Notes.

165.    "*Prepetition Debt Documents*" means, collectively, the Prepetition ABL/FILO Documents, Secured Term Loan Documents, the Unsecured Term Loan Documents, the 2019 Indentures, and the 2034 Indenture.

166.    "*Privilege*" means any attorney-client privilege, work product protection, or other privilege, protection or immunity (a) held by (i) any or all of The Jones Group Inc., the Debtors, or the Estates, (ii) the board of directors or any special committee of the board of directors of any of The Jones Group Inc., the Debtors, or the Estates (including any director in his or her capacity as such), or (iii) the Committee, and (b) attaching to any documents, communications, or thing (whether written or oral), including all electronic information, relating to the 2014 Transaction or Carve-Out Transactions that was created on or before the Effective Date, subject to the limitations as set forth in the Non-Released Party Trust Transfer Agreement.

167.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

168.    "*Professional*" means an Entity retained in the Chapter 11 Cases in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

169.    "*Professional Fee Claims*" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and regardless of

16

whether a monthly fee statement or interim fee application has been Filed for such fees and expenses. To the extent a Bankruptcy Court or higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

170.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided* that the Professional Fee Escrow shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

171.    "*Professional Fee Escrow Amount*" means the total amount of Professional fees and expenses estimated pursuant to Article II.D.3 of the Plan.

172.    "*Professional Fee Savings*" means the aggregate savings, if any, on the payment of fees and expenses to the entities identified on Exhibit B to the Second Amended Plan through either a voluntary reduction of such fees and expenses by such entities or by way of successful objection to any fee applications or means of receiving payment filed by such entities or the Debtors; *provided*, *however*, that nothing herein shall (a) override, amend, or otherwise modify any provisions of the DIP Order, including those related to the payment of fees and expenses authorized to be paid thereunder, (b) authorize any challenge to fees and expenses previously paid pursuant to the DIP Order for which the applicable Review Period (as defined in the DIP Order) has expired, or (c) authorize any entities or parties not already permitted under paragraph 21 of the DIP Order to object to the payment of fees and expenses for the DIP Secured Parties and Prepetition Secured Parties (each as defined in the DIP Order) with standing to do so; *provided*, *further*, that the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders, and the Reorganized Debtors shall work in good faith and use commercially reasonable efforts to obtain such fee reductions or resolve objections to such fees. The reasonable and documented cost of preparing and filing any formal objections to fee applications by the Reorganized Debtors shall be paid by the Reorganized Debtors, subject to consultation with the Ad Hoc Group of Unsecured Noteholders, and up to $750,000 of such documented fees and expenses shall be funded out of any aggregate savings hereunder prior to the first $5 million to be paid to Classes 5B, 5C, and 5D, *provided*, *however*, that the payment of such costs shall not reduce the $5 million to be provided to Classes 5B, 5C, and 5D. Any fees and expenses for fee objections incurred in excess of $750,000 shall be paid by the Reorganized Debtors. For the avoidance of doubt, the realization of any Professional Fee Savings shall not delay emergence and is not a condition precedent to the Consummation of the Plan.

173.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

174.    "*Proof of Interest*" means a proof of Interest Filed against any of the Debtor in the Chapter 11 Cases.

175.    "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date.

176.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

17

177. "***Rejected Executory Contracts and Unexpired Leases Schedule***" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors and the Requisite Unsecured Lenders.

178. "***Released Party***" means each of the following solely in its or their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Secured Term Loan Lenders; (d) the Secured Term Loan Agent; (e) the Unsecured Term Loan Lenders; (f) the Unsecured Term Loan Agent; (g) the Prepetition ABL/FILO Secured Parties; (h) the DIP Lenders; (i) the DIP Agents; (j) the holders of 2019 Notes Claims; (k) the holders of 2034 Notes Claims; (l) the 2019 Notes Indenture Trustee; (m) the 2034 Notes Indenture Trustee; (n) the Debtors' current and former officers, directors, and managers; (o) the Sponsor and Belk, Inc.; (p) the Minority Equity Holders; (q) the Committee and each of its members; (r) each member of the Ad Hoc Group of Unsecured Noteholders; (s) each member of the Ad Hoc Group of Crossover Lenders; (t) each member of the Ad Hoc Secured Lender Group; (u) Brigade; (v) each of the parties to the Restructuring Support Agreement; (w) the Funding Entities; and (x) with respect to each of the foregoing entities in clauses (a) through (w), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; *provided*, *however*, that notwithstanding anything herein to the contrary, (i) none of the following Persons or Entities, each solely in their capacity as such, shall be Released Parties, regardless of whether they would otherwise meet the Released Parties definition: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc., and (ii) the release in favor of any Released Party does not release any claims by any of the Debtors, the Reorganized Debtors, or Belk, Inc. arising out of or related to ordinary course business dealings with respect to products or services ordered by Belk, Inc. from the Debtors, the Estates, or the Reorganized Debtors (including any amounts due and owing among such parties or any Causes of Action arising out of or related thereto).

179. "***Releasing Party***" means each of the following in their capacity as such: (a) the Consenting Secured Lenders; (b) the Secured Term Loan Agent; (c) the Consenting Unsecured Lenders; (d) the Unsecured Term Loan Agent; (e) the Prepetition ABL/FILO Secured Parties; (f) the DIP Lenders; (g) the DIP Agents; (h) the Sponsor; (i) the Minority Equity Holders; (j) the Committee; (k) each member of the Ad Hoc Group of Unsecured Noteholders; (l) each member of the Ad Hoc Group of Crossover Lenders; (m) each member of the Ad Hoc Secured Lender Group; (n) Brigade; (o) the 2019 Notes Indenture Trustee; (p) the 2034 Notes Indenture Trustee; (q) all holders of Claims that vote to accept the Plan; (r) all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (s) all holders of Claims entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt out of the Third-Party Release; (t) all holders of Claims that are deemed to accept the Plan and do not elect to opt out of the Third-Party Release; (u) all other holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt out of the Third-Party Release; (v) the Funding Entities; and (w) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (v), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members (other than with respect to the foregoing clause (jj)), management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* holders of Claims in the foregoing clauses (r), (s), (t), and (u) who otherwise had the option to opt out of the Third-Party Release shall, after entry of the Confirmation Order, be sent an opt-out form with which to opt out of the Third-Party Release for any Released Party

KE 58496119

added to the Plan after the First Amended Plan, which shall be in form and substance reasonably acceptable to the Debtors and the Committee.

180.    "*Reorganized Debtors*" means Reorganized Holdings and each of the Debtors, or any successor(s) thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

181.    "*Reorganized Debtors Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each Reorganized Debtor, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications to the form filed in the Plan Supplement at Docket No. 1145), and the Committee.

182.    "*Reorganized Holdings*" means either (a) Holdings, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

183.    "*Reorganized Holdings Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Holdings.

184.    "*Reorganized Holdings Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, including any Shareholders Agreement, of Reorganized Holdings, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications to the form filed in the Plan Supplement at Docket No. 1145), and the Committee.

185.    "*Requisite Secured Lenders*" means the Requisite Consenting Secured TL Lenders (as defined in the Restructuring Support Agreement).

186.    "*Requisite Term Loan Lenders*" means, collectively, the Requisite Secured Lenders and Requisite Unsecured Lenders.

187.    "*Requisite Unsecured Lenders*" means the Requisite Consenting Unsecured TL Lenders (as defined in the Restructuring Support Agreement).

188.    "*Restructuring Expenses*" shall mean all (a) reasonable, actual, and documented fees and expenses payable under the Restructuring Support Agreement (provided that notwithstanding the Restructuring Support Agreement, the Unsecured Term Loan Agent will not be paid such fees and expenses pursuant to the Plan and will instead exercise its Unsecured Term Loan Agent Charging Lien) or DIP Order, to the extent not otherwise paid pursuant to the DIP Order or other order of the Court, and (b) all reasonable, actual, and documented fees and expenses of the Ad Hoc Group of Unsecured Noteholders in the amount of $12,500,000.

189.    "*Restructuring Steps Memorandum*" means the summary of the transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement.

190.    "*Restructuring Support Agreement*" means that certain First Amended and Restated Restructuring Support Agreement, dated as of October 17, 2018, by and among the Debtors, the Consenting Secured Lenders, the Consenting Unsecured Lenders, the Sponsor, and the Minority Equity Holders, as the same may be amended, modified, or amended and restated from time to time in accordance with its terms.

191.    "*Restructuring Transactions*" means the transactions described in Article IV.I of the Plan.

192.     "*Retained Causes of Action*" means those Causes of Action held by the Debtors and their Estates that are not otherwise released under this Plan or transferred to the Non-Released Party Trust, including those Causes of Action identified on the Retained Causes of Action Schedule.

193.     "*Retained Causes of Action Schedule*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred, including to the Non-Released Party Trust pursuant to the Plan, which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee and included in the Plan Supplement.

194.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be or may have been amended, modified, or supplemented from time to time.

195.     "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

196.     "*Second Amended Plan*" means the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111], dated January 20, 2019.

197.     "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

198.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

199.     "*Secured Term Loan 363 Payment*" means the payment of $263,000,000 in Cash to holders of Secured Term Loan Claims pursuant to the 363 Sale Order.

200.     "*Secured Term Loan Agent*" means Cortland Capital Market Services LLC in its capacity as administrative agent under the Secured Term Loan Credit Agreement, and Morgan Stanley Senior Funding, Inc. as predecessor administrative agent.

201.     "*Secured Term Loan Agent Charging Lien*" means any Lien or other priority in payment to which the Secured Term Loan Agent is entitled, pursuant to the Secured Term Loan Documents.

202.     "*Secured Term Loan Claims*" means all Claims against any Debtor arising under, derived from, or based on the Secured Term Loan Credit Agreement.

203.     "*Secured Term Loan Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of April 8, 2014, by and among NWHI, as borrower, Jasper Parent LLC, as holdings, the Secured Term Loan Agent, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

204.     "*Secured Term Loan DIP Order Payments*" means the payment of prepetition accrued and unpaid interest in the amount of $5,693,962.53 in Cash to holders of Secured Term Loan Claims pursuant to Section 16(e)(i) of the DIP Order.

KE 58496119

205. "***Secured Term Loan Documents***" means the Secured Term Loan Credit Agreement and any other Loan Document (as defined in the Secured Term Loan Credit Agreement) and any other document related to or evidencing the loans and obligations thereunder.

206. "***Secured Term Loan Facility***" means the prepetition senior secured term loan facility provided by the Secured Term Loan Lenders.

207. "***Secured Term Loan Lender***" means the banks, financial institutions, and other lenders party to the Secured Term Loan Credit Agreement from time to time, each in its capacity as such a party.

208. "***Securities Act***" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

209. "***Security***" means a security as defined in section 2(a)(1) of the Securities Act.

210. "***Shareholders Agreement***" means the shareholder agreement, limited liability company agreement, or similar agreement that will govern the rights and obligations of holders of New Common Stock, the form of which shall be included with the other Reorganized Holdings Organizational Documents to be included in the Plan Supplement and which shall be reasonably satisfactory to the Debtors, the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications to the form filed in the Plan Supplement at Docket No. 1145), and the Committee.

211. "***Sponsor***" means investment funds managed or advised by, or Affiliates of, Sycamore Partners Management, L.P., in their capacity as majority holders of direct or indirect equity interests in Holdings and/or any of the Carve-Out Businesses or otherwise, and the Sycamore Affiliates and Sycamore (as named and defined in the UCC Standing Motions).

212. "***Sponsor Advisory Agreement***" means the agreement(s), dated April 8, 2014, between the Debtors and the Sponsor under which the Debtors agreed to pay management, advisory, and/or like fees and expenses to the Sponsor and any related contract, document, or amendments, modifications, or supplements.

213. "***Supplemental Cash-Out Election Form***" means the procedures and election form to be included in the Plan Supplement (which shall be in a form reasonably acceptable to the Debtors, the Committee, the 2019 Notes Indenture Trustee, the 2034 Note Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Requisite Unsecured Lenders), a customized version of which will be mailed to the holders of Claims in Classes 5B, 5C, and 5D (other than the members of the Ad Hoc Group of Unsecured Noteholders) by no later than February 20, 2019.

214. "***Supplemental Plan Amendment Notice***" means the *Notice of Filing of Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, to which the Third Amended Plan is attached.

215. "***Third Amended Plan***" means this chapter 11 plan of reorganization.

216. "***Third-Party Release***" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.C of the Plan. For the avoidance of doubt, no Third-Party Release shall be given to any Person or Entity that may be a defendant in a Non-Released Party Trust Cause of Action.

217. "***UCC Standing Motions***" means the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respective Such Claims* [Docket No. 718] and the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing, and Authority to Commence and Prosecute Certain Additional Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respect of Such Claims* [Docket No. 731].

218. "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of New York.

219.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

220.    "*Unimpaired*" means, with respect to a Claim or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

221.    "*Unsecured Term Loan Agent*" means GLAS Trust Company LLC in its capacity as administrative agent under the Unsecured Term Loan Credit Agreement, and Morgan Stanley Senior Funding, Inc. as predecessor administrative agent.

222.    "*Unsecured Term Loan Agent Charging Lien*" means any Lien or other priority in payment to which the Unsecured Term Loan Agent is entitled, pursuant to the Unsecured Term Loan Agent Documents.

223.    "*Unsecured Term Loan Claims*" means all Claims against any Debtor arising under, derived from, or based on the Unsecured Term Loan Documents.

224.    "*Unsecured Term Loan Credit Agreement*" means that certain Unsecured Term Loan Credit Agreement, dated as of April 8, 2014, by and among NWHI, as borrower, Jasper Parent LLC, as holdings, the Unsecured Term Loan Agent, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

225.    "*Unsecured Term Loan Documents*" means the Unsecured Term Loan Credit Agreement and any other Loan Document (as defined in the Unsecured Term Loan Credit Agreement) and any other document related to or evidencing the loans and obligations thereunder.

226.    "*Unsecured Term Loan Facility*" means the prepetition term loan facility provided by the Unsecured Term Loan Lenders.

227.    "*Unsecured Term Loan Lender*" means the banks, financial institutions, and other lenders party to the Unsecured Term Loan Credit Agreement from time to time, each in its capacity as such a party.

228.    "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on January 14, 2019.

B.    *Rules of Interpretation*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) except with respect to Article II.A, Article II.C,

22

Article II.D, Article III.B.4, and Article III.B.5, any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) references to "Proofs of Claim," "holders of Claims," "disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "disputed Interests," and the like as applicable; (15) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (16) any effectuating provisions may be interpreted by the Debtors (subject to the Restructuring Support Agreement) or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.  To the extent a rule of law or procedure is supplied by the Bankruptcy Code, the Bankruptcy Rules, and the decisions and standards of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the United States District Court for the Southern District of New York, and the Bankruptcy Court, as applicable, shall govern and control.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

KE 58496119

A.    *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, and expenses.

Except to the extent that a holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Loan Claim, each such holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash of such holder's Allowed DIP Term Loan Claim on the Effective Date.

Except to the extent that a holder of an Allowed DIP ABL/FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL/FILO Claim, each such holder of an Allowed DIP ABL/FILO Claim shall receive indefeasible payment in full in Cash of such holder's Allowed DIP ABL/FILO Claim on the Effective Date.  As used in this paragraph "payment in full in Cash" shall mean the indefeasible payment in full in Cash of all DIP ABL/FILO Claims (including all fees and expenses of the DIP ABL/FILO Agent through the Effective Date), the cancellation, backing, or cash collateralization of letters of credit under the DIP ABL/FILO Facility in accordance with the terms of the DIP ABL/FILO Documents, the termination of the DIP ABL/FILO Agent's and DIP ABL/FILO Lenders' obligation to extend credit under the DIP ABL/FILO Facility, and the receipt by the DIP ABL/FILO Agent of a countersigned payoff letter in form and substance satisfactory to the DIP ABL/FILO Agent.  The ABL/FILO DIP Liens (as defined in the DIP Order) shall not be released until the satisfaction of the DIP ABL/FILO Claims in accordance with this Article II.A.

Immediately upon receipt of the payments required in this Article II.A, and except with respect to the Contingent DIP Term Loan Obligations and Contingent DIP ABL Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Term Loan Documents or the DIP ABL/FILO Documents, as applicable, as provided below), the DIP Documents shall be deemed cancelled, all Liens on property of the Debtors or the Reorganized Debtors, as applicable, arising out of such DIP Documents shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agents or the DIP Lenders and all guarantees of the Debtors or Reorganized Debtors, as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders.  The DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Contingent DIP Term Loan Obligations and the Contingent DIP ABL Obligations shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order, and (ii) the DIP Facilities and the DIP Documents shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (1) the Contingent DIP Term Loan Obligations and the Contingent DIP ABL Obligations and (2) the relationships among the DIP Agents and the DIP Lenders, as applicable, including those provisions relating to the rights of the DIP Agents and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.  After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agents and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facilities in accordance with the terms thereof and/or the DIP Order.  The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agents or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

B.    *Administrative Claims*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (after consultation with the Requisite Term Loan Lenders and the Committee) or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid

24

portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims, must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, the Debtors' or Reorganized Debtors' property, or the Estates, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      *Payment of Fees and Expenses under DIP Order*

On the later of (1) the Effective Date and (2) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses, and disbursements of the DIP Agents and DIP Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the applicable DIP Order. All payments of fees, expenses, or disbursements pursuant to this Article II.C shall be subject in all respects to the terms of the DIP Order.

D.      *Professional Fee Claims*

1.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.      Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no

KE 58496119

other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, or the Committee (subject to Article XII.E of the Plan). Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and the Committee (solely to the extent as set forth in Article XII.E of the Plan) may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, Reorganized Debtors, and the Committee (solely to the extent as set forth in Article XII.E of the Plan), as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

E.    *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such

Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. Solely to the extent required by the Bankruptcy Code, Allowed Priority Tax Claims will be paid with interest at the applicable non-default rate under non-bankruptcy law.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, except that (1) Class 5B, Class 5C, and Class 5D shall be vacant at each Debtor other than NWHI, (2) Class 5E shall be vacant at each Debtor other than Nine West Development LLC, (3) Class 5F shall be vacant at each Debtor other than Nine West Management Service LLC, (4) Class 5G shall be vacant at each Debtor other than Nine West Distribution LLC, (5) Class 5H shall be vacant at each Debtor other than One Jeanswear Group Inc., (6) Class 5I shall be vacant at each Debtor other than Kasper Group LLC, (7) Class 5J shall be vacant at each Debtor other than Jasper Parent LLC, Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, and (8) Class 7 shall be vacant at each Debtor other than Holdings.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 5A | Unsecured Term Loan Claims | Impaired | Entitled to Vote |
| 5B | 2034 Notes Claims | Impaired | Entitled to Vote |

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 5C | 2019 Notes Claims | Impaired | Entitled to Vote |
| 5D | General Unsecured Claims against NWHI | Impaired | Entitled to Vote |
| 5E | General Unsecured Claims against Nine West Development LLC | Impaired | Entitled to Vote |
| 5F | General Unsecured Claims against Nine West Management Service LLC | Impaired | Entitled to Vote |
| 5G | General Unsecured Claims against Nine West Distribution LLC | Impaired | Entitled to Vote |
| 5H | General Unsecured Claims against One Jeanswear Group Inc. | Impaired | Entitled to Vote |
| 5I | General Unsecured Claims against Kasper Group LLC | Impaired | Entitled to Vote |
| 5J | General Unsecured Claims against Non-Operating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Interests in Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

Subject to Article VI hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Debtors or Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated herein, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

28

1.    <u>Class 1 - Other Priority Claims</u>

    (a)    *Classification*:  Class 1 consists of all Other Priority Claims.

    (b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim and the applicable Debtor (after consultation with the Requisite Term Loan Lenders and the Committee) or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Priority Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

        (i)    payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or

        (ii)    such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

    (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 - Other Secured Claims</u>

    (a)    *Classification*:  Class 2 consists of all Other Secured Claims.

    (b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim and the applicable Debtor (after consultation with the Requisite Term Loan Lenders and the Committee) or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Secured Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

        (i)    payment in full in Cash of the unpaid portion of such holder's Allowed Other Secured Claim on the later of the Effective Date and such date such Other Secured Claim becomes an Allowed Other Secured Claim;

        (ii)    Reinstatement of such holder's Allowed Other Secured Claim;

        (iii)    the applicable Debtor's interest in the collateral securing such holder's Other Secured Claim; or

        (iv)    such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan.

KE 58496119

3.    <u>Class 3 - Secured Tax Claims</u>

(a)    *Classification*:  Class 3 consists of all Secured Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Secured Tax Claim and the applicable Debtor or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Secured Tax Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

(i)    payment in full in Cash of the unpaid portion of such holder's Allowed Secured Tax Claim on the later of the Effective Date and such date such Secured Tax Claim becomes an Allowed Secured Tax Claim; or

(ii)    equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years from the Petition Date, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the option of the Reorganized Debtors to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)    *Voting*:  Class 3 is Unimpaired under the Plan.  Each holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of a Secured Tax Claim is not entitled to vote to accept or reject the Plan.

4.    <u>Class 4 - Secured Term Loan Claims</u>

(a)    *Classification*:  Class 4 consists of all Secured Term Loan Claims.

(b)    *Allowance*:  On the Effective Date, the Secured Term Loan Claims shall be Allowed in an aggregate amount equal to $432,798,741, plus interest at the non-default rate, fees, costs, charges, and other Secured Term Loan Claims arising under the Secured Term Loan Documents (with any interest accruing at the non-default rate) accruing after the Petition Date up to and including the Effective Date, which Allowed amount does not reflect (i) the Secured Term Loan 363 Sale Payment and (ii) the Secured Term Loan DIP Order Payments.

(c)    *Treatment*:  On the Effective Date, except to the extent that a holder of an Allowed Secured Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Term Loan Claim, each holder of an Allowed Secured Term Loan Claim shall receive payment in full in Cash of the unpaid portion of its Allowed Secured Term Loan Claim.

(d)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Secured Term Loan Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 5A - Unsecured Term Loan Claims</u>

(a)    *Classification*:  Class 5A consists of all Unsecured Term Loan Claims.

(b)    *Allowance*:  On the Effective Date, the Unsecured Term Loan Claims shall be Allowed in an aggregate amount equal to $305,099,461.

KE 58496119

(c)    *Treatment*:  Except to the extent that a holder of an Allowed Unsecured Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Term Loan Claim, each such holder of an Allowed Unsecured Term Loan Claim shall receive its Pro Rata share of:

   (i)    91.5% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants;

   (ii)   $16,250,000 in Cash from the Equity Holders Settlement Proceeds;

   (iii)  $3,700,000 from the Debtors;[2]

   (iv)   Cash in an amount equal to the Administrative Expense Savings; and

   (v)    Cash from the Professional Fee Savings in excess of $5,000,000.

(d)    *Voting*:  Class 5A is Impaired under the Plan.  Holders of Unsecured Term Loan Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 5B - 2034 Notes Claims</u>

(a)    *Classification*:  Class 5B consists of all 2034 Notes Claims.

(b)    *Allowance*:  On the Effective Date, the 2034 Notes Claims shall be Allowed in an aggregate amount equal to $255,997,396.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed 2034 Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 2034 Notes Claim, each such holder of an Allowed 2034 Notes Claim shall receive:

   (i)    its Pro Rata share (based on the aggregate amount of Allowed Claims in Classes 5B, 5C, and 5D) of:

      (1)    $48,750,000 in Cash from the Equity Holders Settlement Proceeds;

      (2)    the first $5,000,000 in Cash from the Professional Fee Savings;

      (3)    $24,400,000 in Cash from the Debtors;

      (4)    7.981% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants; and

      (5)    the New Warrants; and

   (ii)   Either:

      (1)    Consideration consisting of:

---

2    Amount represents Debtors' payment in full satisfaction of fees and expenses of Unsecured Term Loan Agent payable through the exercise of its Unsecured Term Loan Agent Charging Lien.

KE 58496119

    a.    its Pro Rata share of the Class I Non-Released Party Trust Interests; and

    b.    its Pro Rata share (based on (A) an Allowed 2034 Notes Claim in the amount of $319,996,745, (B) the Allowed Claims in Class 5C, and (C) the Allowed Claims in Class 5D) of the Class II Non-Released Party Trust Interests; or

(2)    solely to the extent that such holder is not a member of the Ad Hoc Group of Unsecured Noteholders, the Cash-Out Option to the extent such holder timely elects to receive the Cash-Out Option.

(d)    *Voting*:  Class 5B is Impaired under the Plan.  Holders of 2034 Notes Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 5C - 2019 Notes Claims</u>

(a)    *Classification*:  Class 5C consists of all 2019 Notes Claims.

(b)    *Allowance*:  On the Effective Date, the 2019 Notes Claims shall be Allowed in an aggregate amount equal to $476,002,016.

(c)    *Treatment:*  Except to the extent that a holder of an Allowed 2019 Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 2019 Notes Claim, each such holder of an Allowed 2019 Notes Claim shall receive:

(i)    its Pro Rata share (based on the aggregate amount of Allowed Claims in Classes 5B, 5C, and 5D) of:

(1)    $48,750,000 in Cash from the Equity Holders Settlement Proceeds;

(2)    the first $5,000,000 in Cash from the Professional Fee Savings;

(3)    $24,400,000 in Cash from the Debtors;

(4)    7.981% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants; and

(5)    the New Warrants; and

(ii)    Either:

(1)    its Pro Rata share (based on (A) an Allowed 2034 Notes Claim in the amount of $319,996,745, (B) the Allowed Claims in Class 5C, and (C) the Allowed Claims in Class 5D) of the Class II Non-Released Party Trust Interests; or

(2)    solely to the extent that such holder is not a member of the Ad Hoc Group of Unsecured Noteholders, the Cash-Out Option to the extent such holder timely elects to receive the Cash-Out Option.

(d)    *Voting:*  Class 5C is Impaired under the Plan.  Holders of 2019 Notes Claims are entitled to vote to accept or reject the Plan.

8.     <u>Class 5D - General Unsecured Claims against NWHI</u>

    (a)     *Classification*:  Class 5D consists of all General Unsecured Claims against NWHI.

    (b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5D agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5D, each such holder of an Allowed General Unsecured Claim in Class 5D shall receive:

        (i)     its Pro Rata share (based on the aggregate amount of Allowed Claims in Classes 5B, 5C, and 5D) of:

            (1)     $48,750,000 in Cash from the Equity Holders Settlement Proceeds;

            (2)     the first $5,000,000 in Cash from the Professional Fee Savings;

            (3)     $24,400,000 in Cash from the Debtors;

            (4)     7.981% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants; and

            (5)     the New Warrants; and

        (ii)     Either:

            (1)     its Pro Rata share (based on (A) an Allowed 2034 Notes Claim in the amount of $319,996,745, (B) the Allowed Claims in Class 5C, and (C) the Allowed Claims in Class 5D) of the Class II Non-Released Party Trust Interests; or

            (2)     solely to the extent that such holder is not a member of the Ad Hoc Group of Unsecured Noteholders, the Cash-Out Option to the extent such holder timely elects to receive the Cash-Out Option.

    (c)     *Voting*:  Class 5D is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5D are entitled to vote to accept or reject the Plan.

9.     <u>Class 5E - General Unsecured Claims against Nine West Development LLC</u>

    (a)     *Classification*:  Class 5E consists of all General Unsecured Claims against Nine West Development LLC

    (b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5E agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5E, each such holder of an Allowed General Unsecured Claim in Class 5E shall receive its Pro Rata share of 0.039% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

    (c)     *Voting*:  Class 5E is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5E are entitled to vote to accept or reject the Plan.

KE 58496119

10. <u>Class 5F - General Unsecured Claims against Nine West Management Service LLC</u>

   (a) *Classification*:  Class 5F consists of all General Unsecured Claims against Nine West Management Service LLC.

   (b) *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5F agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5F, each such holder of an Allowed General Unsecured Claim in Class 5F shall receive its Pro Rata share of 0.147% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

   (c) *Voting*:  Class 5F is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5F are entitled to vote to accept or reject the Plan.

11. <u>Class 5G - General Unsecured Claims against Nine West Distribution LLC</u>

   (a) *Classification*:  Class 5G consists of all General Unsecured Claims against Nine West Distribution LLC.

   (b) *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5G agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5G, each such holder of an Allowed General Unsecured Claim in Class 5G shall receive its Pro Rata share of 0.002% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

   (c) *Voting*:  Class 5G is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5G are entitled to vote to accept or reject the Plan.

12. <u>Class 5H - General Unsecured Claims against One Jeanswear Group Inc.</u>

   (a) *Classification*:  Class 5H consists of all General Unsecured Claims against One Jeanswear Group Inc.

   (b) *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5H agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5H, each such holder of an Allowed General Unsecured Claim in Class 5H shall receive its Pro Rata share of 0.221% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

   (c) *Voting*:  Class 5H is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5H are entitled to vote to accept or reject the Plan.

13. <u>Class 5I - General Unsecured Claims against Kasper Group LLC</u>

   (a) *Classification*:  Class 5I consists of all General Unsecured Claims against Kasper Group LLC.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5I agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5I, each such holder of an Allowed General Unsecured Claim in Class 5I shall receive its Pro Rata share of 0.110% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants.

(c)     *Voting*:  Class 5I is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5I are entitled to vote to accept or reject the Plan.

14.     <u>Class 5J - General Unsecured Claims against Non-Operating Debtors</u>

(a)     *Classification*:  Class 5J consists of all General Unsecured Claims against Jasper Parent LLC, Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, if any.

(b)     *Treatment*:  Allowed General Unsecured Claims in Class 5J, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of General Unsecured Claims in Class 5J will not receive any distribution on account of such Allowed General Unsecured Claims.

(c)     *Voting*:  Class 5J is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5J are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

15.     <u>Class 6 - Intercompany Claims</u>

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  On the Effective Date, all Intercompany Claims shall be, as determined by the Debtors with the reasonable consent of the Requisite Unsecured Lenders, either: (i) Reinstated, (ii) converted to equity, or (iii) cancelled and shall receive no distribution on account of such Claims and may be compromised, extinguished, or settled after the Effective Date.

(c)     *Voting*:  Class 6 is either Impaired or Unimpaired under the Plan.  Holders of Intercompany Claims are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

16.     <u>Class 7 - Interests in Holdings</u>

(a)     *Classification*:  Class 7 consists of all Interests in Holdings.

(b)     *Treatment*:  On the Effective Date, all Interests in Holdings will be discharged, cancelled, released, and extinguished, and will be of no further force or effect, and holders of Interests in Holdings will not receive any distribution on account of such Interests in Holdings.

(c)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Interests in Holdings are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

KE 58496119

17. Class 8 - Intercompany Interests

(a)    *Classification*: Class 8 consists of all Intercompany Interests.

(b)    *Treatment*: On the Effective Date, Intercompany Interests shall be, as determined by the Debtors with the reasonable consent of the Requisite Unsecured Lenders, either: (i) Reinstated, or (ii) discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

(c)    *Voting*: Class 8 is Impaired or Unimpaired under the Plan. Holders of Intercompany Interests are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

18. Class 9 - Section 510(b) Claims

(a)    *Classification*: Class 9 consists of all Section 510(b) Claims.

(b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

(c)    *Treatment*: Allowed Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)    *Voting*: Class 9 is Impaired under the Plan. Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, such holders (if any) are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve

the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules; *provided* that this Article III.D shall not limit the respective rights of each party to the Restructuring Support Agreement, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, or the Committee.

E.    *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

F.    *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.    *Intercompany Interests*.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Sources of Consideration for Plan Distributions*

The Reorganized Debtors will fund distributions and other sources and uses contemplated by the Plan with (1) Cash on hand, (2) the issuance and distribution of New Common Stock, New Warrants, and Non-Released Party Trust Interests, (3) proceeds from the New Debt, (4) the Equity Holders Settlement Proceeds, (5) the Cash-Out Option Funding, (6) the Administrative Expense Savings, and (7) the Professional Fee Savings.

KE 58496119

1.    New Common Stock

On the Effective Date, Reorganized Holdings shall issue the New Common Stock to the Entities entitled to receive the New Common Stock pursuant to the Plan.  The issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests. All of the shares of New Common Stock issued (including any New Common Stock to be issued upon the exercise of the New Warrants) pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

For the avoidance of doubt, any claimant's acceptance of New Common Stock, shall be deemed as its agreement to the Reorganized Holdings Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

2.    New Debt

On the Effective Date, contemporaneously with the satisfaction of the DIP Claims in accordance with Article II.A hereof, Reorganized Holdings and one or more Reorganized Debtors shall enter into the New Debt on the terms and conditions set forth in the New Debt Documents.  On and after the Effective Date, the New Debt Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Debt, including the New Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Debt.

On the Effective Date, immediately upon receipt of the payments required in Article II.A hereof, all of the liens and security interests to be granted in accordance with the terms of the New Debt Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Debt Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New Debt Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

3.    New Warrants; New Warrant Agreement

As described herein, the holders of Allowed Claims in Classes 5B, 5C, and 5D shall receive their Pro Rata share of New Warrants under the Plan. The New Warrants shall only be exercisable as follows: (a) during the 5-year term of the New Warrants, upon a change of control event consummated through a sale or a merger at a strike price based on a $625 million total enterprise value on a net (cashless exercise) basis; and (b) during the 5-year term of the New Warrants, for Cash only at the option of the holder of the New Warrants at a strike price based on a $625 million total enterprise value, but only if such Cash election is made before a change of control event consummated through a sale or a merger. No adjustments will be made to the New Warrants' strike price, except solely in the event of dividends to shareholders, share repurchases, stock splits, above-market self-tenders, and other customary anti-dilution protections, to be set forth in the New Warrant Agreement. In addition, the New Warrant Agreement shall provide that the New Warrants shall not (x) have any Black-Scholes or similar "cash out" protections in the event of a change of control transaction for less than the strike price, (y) have any covenants, or (z) entitle the New Warrant holders to any corporate governance rights.

KE 58496119

On the Effective Date, Reorganized Holdings shall issue the New Warrants to the Entities entitled to receive the New Warrants pursuant to the Plan. The issuance of the New Warrants shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests other than as set forth herein. Each distribution and issuance of the New Warrants under the Plan shall be governed by the New Warrant Agreement.

For the avoidance of doubt, any claimant's acceptance of the New Warrants (including any New Common Stock to be issued upon the exercise of the New Warrants) shall be deemed as its agreement to the New Warrant Agreement and the Reorganized Holdings Organizational Documents (including the Shareholders Agreement), as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

B.    *Equity Holders Settlement*

Effective as of October 17, 2018, Nine West Topco (i) shall, to the extent it has not yet previously done so, amend its previously filed 2017 U.S. partnership tax return to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its equity investment in Holdings; (ii) shall not take any action that results in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the Interests in Holdings as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code or by subsequently amending Topco's 2017 U.S. partnership tax return to claim a worthless stock deduction on account of its equity investment in Holdings) until after the Effective Date (it being expressly acknowledged and agreed that Nine West Topco LLC shall be permitted to claim a worthless stock deduction on account of its Interest in Holdings in the taxable year in which the Effective Date occurs); (iii) shall not knowingly permit any Person (other than Nine West Topco LLC) to own or take any action that would result in any person owning directly, indirectly, or constructively (by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the Interests in Holdings until on or after the Effective Date; (iv) shall not change its taxable year to be other than the calendar year until after the Effective Date; and (v) take or refrain from taking any other action requested by the Company in its reasonable discretion in order to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its direct or indirect equity investment in Holdings; *provided*, *however*, that the Debtors understand, acknowledge, and agree that none of the Sponsor, the Minority Equity Holders, or any of their respective Affiliates make any representations or warranties with respect to the existence, realization, or value of any tax attributes of any of the Debtors.

On the Effective Date and subject to the satisfaction (but not waiver) of the condition set forth in Article IX.A.7, hereof, the Sponsor shall contribute, or cause to be contributed, to the Estates the full amount of the Equity Holders Settlement Proceeds. The Equity Holders Settlement Proceeds will be used as follows: (1) Cash in the amount of $55,000,000 of the Equity Holders Settlement Proceeds shall vest in the Debtors (which the Debtors and/or Reorganized Debtors, as applicable, may use to fund the sources and uses under the Plan) and (2) Cash in the amount of $65,000,000 of the Equity Holders Settlement Proceeds shall be distributed to the holders of Claims in Classes 5A, 5B, 5C, and 5D in accordance with Article III.B hereof.

Effective as of October 17, 2018, an Affiliate of the Sponsor has caused its Affiliate, Belk, Inc., to enter into a covenant agreement whereby Belk, Inc. has agreed to make certain required minimum purchases of product from NWHI for the periods specified therein.

C.    *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan, including the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code

KE 58496119

and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors; *provided*, *however*, notwithstanding anything to the contrary in the Plan, the Non-Released Party Trust Causes of Action shall be transferred to and vest in the Non-Released Party Trust on the Effective Date.

D.      *The Non-Released Party Trust*

1.      Creation of Non-Released Party Trust

On the Effective Date, the Reorganized Debtors (solely in their capacity as successors to the Debtors) and the Non-Released Party Trustee shall execute the Non-Released Party Trust Agreement and the Non-Released Party Trust Transfer Agreement and shall take all steps necessary to establish the Non-Released Party Trust in accordance with the Plan, which shall be for the benefit of the Non-Released Party Trust Beneficiaries.  Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Non-Released Party Trust all of their rights, title and interest in and to all of the Non-Released Party Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Non-Released Party Trust Assets shall automatically vest in the Non-Released Party Trust free and clear of all Claims and Liens, subject only to (a) Non-Released Party Trust Interests and (b) the expenses of the Non-Released Party Trust as provided for in the Non-Released Party Trust Agreement.  Also on the Effective Date, subject to, in all respects, the terms of the Non-Released Party Trust Transfer Agreement, all Privileges held by the Debtors, the Reorganized Debtors (solely in their capacity as successors to the Debtors), and the Committee shall transfer to and vest exclusively in the Non-Released Party Trust.

The Non-Released Party Trust shall be governed by the Non-Released Party Trust Agreement and administered by the Non-Released Party Trustee.  The powers, rights, and responsibilities of the Non-Released Party Trustee shall be specified in the Non-Released Party Trust Agreement.  The Non-Released Party Trustee shall hold and distribute the Non-Released Party Trust Assets in accordance with the Plan and the Non-Released Party Trust Agreement.  Other rights and duties of the Non-Released Party Trustee and the Non-Released Party Trust Beneficiaries shall be as set forth in the Non-Released Party Trust Agreement and the Non-Released Party Trust Transfer Agreement.

After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the Non-Released Party Trust Assets except to the extent set forth in the Non-Released Party Trust Agreement.  To the extent that any Non-Released Party Trust Assets cannot be transferred to the Non-Released Party Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Non-Released Party Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Non-Released Party Trust shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Non-Released Party Trust Assets on behalf of the Reorganized Debtors for the benefit of the Non-Released Party Trust Beneficiaries.  Notwithstanding the foregoing, all net proceeds of such Non-Released Party Trust Assets shall be transferred to the Non-Released Party Trust to be distributed in accordance with this Plan.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall have no obligation to provide any funds or financing to the Non-Released Party Trust, other than the obligation to contribute the Non-Released Party Trust Assets, and under no circumstances will the expenses of the Non-Released Party Trust be paid or reimbursed by the Debtors or the Reorganized Debtors, as applicable.

KE 58496119

2.        <u>Transfer of Assets and Causes of Action to Non-Released Party Trust</u>

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Non-Released Party Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301-7701-4(d), and the Non-Released Party Trustee will take this position on the Non-Released Party Trust's tax return accordingly.  The Non-Released Party Trust Beneficiaries shall be treated as the grantors of the Non-Released Party Trust and as the deemed owners of the Non-Released Party Trust Assets.  For U.S. federal income tax purposes, the transfer of assets to the Non-Released Party Trust will be deemed to occur as (a) a first-step transfer of the Non-Released Party Trust Assets to the holders of Class 5B, 5C, and 5D Claims (or to the Funding Entities for holders of Class 5B, 5C, and 5D Claims that elect the Cash-Out Option, to the extent available) and, to the extent the Non-Released Party Trust Assets are allocable to disputed Claims, to the disputed claims reserve described in the subsequent paragraph and (b) a second-step transfer by such holders and, to the extent relevant with respect to the disputed claims reserve, to the Non-Released Party Trust.  As a result, the transfer of the Non-Released Party Trust Assets to the Non-Released Party Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets.  As soon as possible after the transfer of the Non-Released Party Trust Assets to the Non-Released Party Trust, the Non-Released Party Trustee shall make a good faith valuation of the Non-Released Party Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, Non-Released Party Trustee, and the holders of Claims receiving Non-Released Party Trust Interests shall take consistent positions with respect to the valuation of the Non-Released Party Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Non-Released Party Trust shall in no event be dissolved later than 5 years from the creation of such Non-Released Party Trust unless the Bankruptcy Court, upon motion within the 6-month period prior to the 5th anniversary (or within the 6-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Non-Released Party Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Non-Released Party Trust Assets.

With respect to amounts, if any, in a reserve for disputed claims, the Debtors expect that such account will be treated as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for such disputed claims reserve and will be subject to tax annually on a separate entity basis.  Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the disputed claims reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

3.        <u>The Administration of the Non-Released Party Trust and Powers of the Non-Released Party Trustee</u>

The Non-Released Party Trust shall be administered by the Non-Released Party Trustee pursuant to the Non-Released Party Trust Agreement.  In the event of any inconsistency solely between this Article IV.D of the Plan and the Non-Released Party Trust Agreement, the Non-Released Party Trust Agreement shall control, with the Plan controlling in all other cases.  In the event of any inconsistency solely between this Article IV.D of the Plan and the Non-Released Party Trust Transfer Agreement, the Non-Released Party Trust Transfer Agreement shall control, with the Plan controlling in all other cases.  All compensation for the Non-Released Party Trustee and other costs of administration for the Non-Released Party Trust shall be paid by the Non-Released Party Trust in accordance with this Plan and the Non-Released Party Trust Agreement.

The Non-Released Party Trust Agreement generally will provide for, among other things:  (a) the payment of the Non-Released Party Trust Expenses; (b) the payment of other reasonable expenses of the Non-Released Party Trust, including the cost of pursuing the Non-Released Party Trust Causes of Action; (c) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (d) the investment of Cash by the Non-Released Party Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the Non-Released Party Trust Assets; and (f) litigation of any Non-Released Party Trust

Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Non-Released Party Trust Causes of Action.

Except as otherwise ordered by the Bankruptcy Court, the Non-Released Party Trust Expenses shall be paid from the Non-Released Party Trust Assets in accordance with the Plan and Non-Released Party Trust Agreement.

The Non-Released Party Trustee, on behalf of the Non-Released Party Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Non-Released Party Trust Assets in accordance with the Plan and the Non-Released Party Trust Agreement.

The Non-Released Party Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Non-Released Party Trust. Any such indemnification shall be the sole responsibility of the Non-Released Party Trust and payable solely from the Non-Released Party Trust Assets, and the Debtors or the Reorganized Debtors shall have no obligations related to such indemnification.

In furtherance of and consistent with the purpose of the Non-Released Party Trust and the Plan, the Non-Released Party Trustee, for the benefit of the Non-Released Party Trust, shall (a) hold the Non-Released Party Trust Assets for the benefit of the Non-Released Party Trust Beneficiaries, (b) make distributions of Non-Released Party Trust Distributable Proceeds as provided herein and in the Non-Released Party Trust Agreement, and (c) have the power and authority to prosecute and resolve any Non-Released Party Trust Causes of Action. The Non-Released Party Trustee shall be responsible for all decisions and duties with respect to the Non-Released Party Trust and the Non-Released Party Trust Assets, except as otherwise provided in the Non-Released Party Trust Agreement. In all circumstances, the Non-Released Party Trustee shall act in the best interests of the Non-Released Party Trust Beneficiaries.

4.    Cooperation and Privilege

To effectively investigate, prosecute, compromise, and/or settle the Non-Released Party Trust Causes of Action on behalf of the Non-Released Party Trust, the Non-Released Party Trustee and its counsel and representatives may require reasonable access to documents and information relating to the Non-Released Party Trust Causes of Action in the possession of the Debtors, the Reorganized Debtors, and/or the Committee, and in such event, must be able to obtain such information from the Reorganized Debtors and the Committee on a confidential basis and in common interest, without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, the Non-Released Party Trust Transfer Agreement shall provide for the Non-Released Party Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtors) and the Committee's records and information, relating to the 2014 Transaction and Carve-Out Transactions, including electronic records or documents, as further detailed in, and subject in all respects to, the Non-Released Party Trust Transfer Agreement. The Non-Released Party Trust Transfer Agreement shall also provide that as of the Effective Date, and subject in all respects to the terms of the Non-Released Party Trust Transfer Agreement, all Privileges held by the Debtors, the Reorganized Debtors (solely in their capacity as successors to the Debtors, and the Committee shall transfer to and vest exclusively in the Non-Released Party Trust, and that the Reorganized Debtors shall preserve all of the Debtors' records and documents (including all electronic records or documents) related to the 2014 Transaction and the Carve-Out Transactions for the later of a period of 5 years after the Effective Date or until such later time as the Non-Released Party Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved.

E.    Cash-Out Option

As set forth in Article III.B herein, each holder of a Claim in Classes 5B, 5C, and 5D (other than members of the Ad Hoc Group of Unsecured Noteholders) shall have the opportunity to irrevocably elect to receive either (1) its Pro Rata portion of Non-Released Party Trust Interests or (2) its Pro Rata portion of Cash equal to 1.78% of its Allowed Claim. All Cash-Out Elections shall be made pursuant to and subject to the terms of the Supplemental Cash-Out Election Form and this Article IV.E. To make a valid Cash-Out Election, an eligible holder must submit a Supplemental Cash-Out Election Form so that it is received by the Debtors or Reorganized Debtors, as applicable, no later than March 22, 2019. Any dispute with regard to the timeliness or validity of a Cash-Out Election or the

KE 58496119

eligibility of a holder to make a Cash-Out Election shall be resolved by the Debtors or the Reorganized Debtors, as applicable, in consultation with the advisors to the Committee. To the extent any holder of a Claim made an election pursuant to the First Cash-Out Election Form, such election shall have no force or effect.

On the Effective Date, the Funding Entities shall transfer the Cash-Out Funding to the Debtors to be held in an interest-bearing escrow account in accordance with the Commitment Letter. The Cash-Out Funding amounts shall only be used to fund the Cash-Out Option to eligible holders of Allowed Class 5B, 5C, and 5D Claims that make a valid Cash-Out Election. To the extent holders of an Allowed Class 5B, 5C, or 5D Claim (other than members of the Ad Hoc Group of Unsecured Noteholders) make a valid Cash-Out Election, the Non-Released Party Trust Interests distributions that would have otherwise been distributed if such holder had not exercised the Cash-Out Option shall be distributed to the Funding Entities in accordance with their Pro Rata contribution to the Cash-Out Option Funding.

As soon as is reasonably practicable following expiration of the deadline to submit the Supplemental Cash-Out Election Form, the Reorganized Debtors shall provide the Funding Entities, the advisors to the Committee, and the Non-Released Party Trustee with a register of all holders of Class 5B, 5C, and 5D Claims who have elected the Cash-Out Option.

Any Cash-Out Funding amounts not distributed to eligible electing holders pursuant to the Cash-Out Option shall be returned to the Funding Entities according to their Pro Rata contribution to the Cash-Out Option Funding as soon as practicable after the deadline for eligible holders to submit the Supplemental Cash-Out Election Form. The Debtors, in consultation with advisors to the Committee, shall use commercially reasonable efforts to resolve any disputes with respect to the Allowance of a Claim whose holder made a Cash-Out Election as soon as reasonably practicable after the deadline to submit the Supplemental Cash-Out Election Form.

F.    *Shareholders Agreement*

On the Effective Date, Reorganized Holdings shall enter into and deliver the Shareholders Agreement, in substantially the form included in the Plan Supplement, to each holder of New Common Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

G.    *Management Incentive Plan*

On the Effective Date, all grants under the Management Incentive Plan shall be reserved for directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized Holdings Board and in accordance with the Management Incentive Plan to be included in the Plan Supplement. For the avoidance of doubt, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall approve, or deem to approve, any terms of the Management Incentive Plan, other than the reservation of grants as set forth in the immediately preceding sentence.

H.    *Reorganized Holdings Board*

The Reorganized Holdings Board shall initially consist of seven members, and shall include the Chief Executive Officer and one independent director, each of which shall be selected by the Requisite Unsecured Lenders and shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.

Notwithstanding the foregoing, each holder of Unsecured Term Loan Claims that is a Consenting Unsecured Lender prior to the Petition Date and who holds as of the Petition Date and continues to hold as of the Effective Date: (1) at least 10% but less than 30% of the aggregate principal amount of Unsecured Term Loan Claims, shall have the right to appoint one director to the Reorganized Holdings Board; and (2) more than 30% of the aggregate principal amount of Unsecured Term Loan Claims, shall have the right to appoint two directors to the Reorganized Holdings Board, *provided* that notwithstanding the rights of the Consenting Unsecured Lenders set forth in the foregoing clauses (1) and (2), nothing herein shall limit in any way the Consenting Unsecured Lenders' rights to select directors based on their respective holdings of New Common Stock as provided in the Reorganized Holdings Organizational Documents.

I.    *Restructuring Transactions*

On and after the Confirmation Date, the Debtors or Reorganized Debtors, may take all actions, subject to the Restructuring Support Agreement, as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Holdings, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (5) the execution and delivery of the New Debt Documents, and any filings related thereto; (6) this issuance of the New Common Stock; (7) all transactions necessary to establish the Non-Released Party Trust; (8) all transactions necessary to effectuate the Cash-Out Option; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

J.    *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtors Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

K.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Non-Released Party Trust Agreement), on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.    *Cancellation of Existing Securities and Agreements*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, and in the case of the DIP Claims, subject to satisfaction of such Claims in accordance with Article II.A hereof: (1) all notes, instruments, certificates, shares, bonds, indentures, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and other documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors giving rise to any rights or obligations relating to Claims or Interests, including the

KE 58496119

Secured Term Loan Claims, the Unsecured Term Loan Claims, the 2019 Notes Claims, the 2034 Notes Claims, the DIP Claims, and Interests in Holdings, shall be deemed cancelled and surrendered without any need for a holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, and any non-Debtor parties, thereunder or in any way related thereto shall be deemed satisfied in full and released and discharged, *provided* that notwithstanding Confirmation or Consummation and notwithstanding the releases contained in Article VIII of the Plan (except with respect to clause (f) below), any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions as specified under the Plan, (b) allowing the Indenture Trustees, the DIP Agents, the Unsecured Term Loan Agent, and the Secured Term Loan Agent to make distributions pursuant to the Plan, (c) preserving the Secured Term Loan Agent's, the Unsecured Term Loan Agent's and the Indenture Trustees' rights to compensation and indemnification as against any money or property distributable to holders of Secured Term Loan Claims, Unsecured Term Loan Claims, 2034 Notes Claims, or 2019 Notes Claims, as applicable, including permitting the Secured Term Loan Agent, Unsecured Term Loan Agent, and each of the Indenture Trustees to maintain, enforce, and exercise their respective Secured Term Loan Agent Charging Lien, Unsecured Term Loan Agent Charging Lien, or Indenture Trustee Charging Liens, as applicable, against such distributions, (d) preserving all rights, including rights of enforcement, of the Indenture Trustees, the DIP Agents, the Unsecured Term Loan Agent, and the Secured Term Loan Agent against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the holders of the 2034 Notes Claims, 2019 Notes Claims, DIP Claims, the Unsecured Term Loan Claims, or Secured Term Loan Claims, as applicable, pursuant and subject to the terms of the applicable Indenture as in effect on the Effective Date, (e) preserving all rights of the Indenture Trustees, Unsecured Term Loan Agent, and Secured Term Loan Agent, and the holders of the 2019 Notes Claims, the 2034 Notes Claims, the Unsecured Term Loan Claims, and Secured Term Loan Claims to the extent necessary for the Non-Released Party Trust to pursue all of the Non-Released Party Trust Causes of Action on behalf of the Non-Released Party Trust Beneficiaries, (f) subject in all respects to the releases contained in Article VIII of the Plan, authorizing and allowing each of the Indenture Trustees, solely upon instruction and direction, or any other person who may act, pursuant to the terms of the applicable Indenture (which provisions shall be preserved for the purposes of this subsection (f); *provided* that only those holders of 2034 Notes Claims and 2019 Notes Claims who did not exercise the Cash-Out Election shall be considered holders of outstanding securities for purposes of such instruction and direction), the Confirmation Order, and the terms of the Non-Released Party Trust (which may only be given in accordance with the terms of the Confirmation Order), to pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law, solely to the extent necessary to pursue such claims against any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), and in connection therewith, providing further that the Indenture Trustee's rights, protections, immunities, and exculpations, including rights to compensation, indemnification, and charging liens and the right to maintain, enforce, and exercise such rights are preserved, *provided, however,* that the foregoing shall not include claims and Causes of Action against any Released Parties, solely in their capacities as such, or claims and Causes of Action settled or released by the Equity Holders Settlement, the Estate Action STL Settlement, the Estate Action UTL Settlement, or paragraphs F(xii) and 26 of the DIP Order, (g) permitting the Indenture Trustees, the DIP Agents, and the Secured Term Loan Agent to enforce any obligation (if any) owed to such Indenture Trustee, DIP Agent, the Unsecured Term Loan Agent, or the Secured Term Loan Agent under the Plan, (h) permitting the Indenture Trustee, DIP Agent, the Unsecured Term Loan Agent, or Secured Term Loan Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other Court, and (i) permitting the DIP Agents, the DIP Lenders, the Secured Term Loan Agent, and the Secured Term Loan Lenders to assert any right with respect to the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, or the Contingent Secured Term Loan Obligations, as applicable; *provided, however,* that (i) the first proviso in this Article IV.L shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (ii) except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. Each of the Indenture Trustees shall be discharged and shall have no further obligation or liability except as provided in the Plan and the Confirmation Order, and after the performance by the Indenture Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or

Confirmation Order, each of the Indenture Trustees shall be relieved of and released from any obligations and duties arising under the Plan, Confirmation Order, and the applicable indentures, (i) unless specifically set forth in or provided for under the Plan or the Confirmation Order and (ii) except with respect to such other rights of the Indenture Trustees, that pursuant to the applicable indentures, survive the termination of such indentures. For the avoidance of doubt, nothing in this provision shall effectuate a cancellation of any New Common Stock or New Warrants.

Except as provided in this Plan, on the Effective Date, the DIP Agents, the Secured Term Loan Agent, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Documents and the Secured Term Loan Documents, as applicable. The commitments and obligations (if any) of the Secured Term Loan Lenders and/or the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents or the Secured Term Loan Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Documents or DIP Order are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.

If the record holder of either of the 2019 Notes or the 2034 Notes is DTC or its nominee or another securities depository or custodian thereof, and such 2019 Notes or 2034 Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of such 2019 Notes or 2034 Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

M.    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the issuance of the New Common Stock and the New Warrants; (2) the selection of the directors, officers, managers, and members for Reorganized Holdings and the other Reorganized Debtors; (3) implementation of the Restructuring Transactions; and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Holdings and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Holdings, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, or members of the Debtors, Reorganized Holdings, or the other Reorganized Debtors. On or before the Effective Date, as applicable, the appropriate officers or other authorized persons of the Debtors, Reorganized Holdings, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Holdings and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.M shall be effective notwithstanding any requirements under non-bankruptcy law.

N.    *Reorganized Debtors Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtors will file such Reorganized Debtors Organizational Documents as are required to be filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective Reorganized Debtors Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized Debtors Organizational Documents.

O.        *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

P.        *Exemption from Securities Act Registration*

Pursuant to section 1145 of the Bankruptcy Code, except as noted below, the offering, issuance, and distribution of the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) in respect of Claims as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) are not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) have not been such an "affiliate" within 90 days of such transfer, and (iii) are not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock, the New Warrants, or the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

The Debtors do not intend for the Non-Released Party Trust Interests to be "securities" under applicable laws.  Notwithstanding this intention, to the extent such units are deemed to be "securities," the issuance of such units under the Plan is exempt, pursuant to (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder (including with respect to an entity that is an "underwriter").

Q.        *Retention of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII hereof, the Reorganized Debtors or the Non-Released Party Trustee, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action and Non-Released Party Trust Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Retained Causes of Action Schedule, if applicable, and the Reorganized Debtors' or the Non-Released Party Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue and/or settle the Causes of Action (other than the Non-Released Party Trust Causes of Action), as appropriate, in their discretion and in accordance with the best interests of the Reorganized Debtors, and the Non-Released Party Trustee may pursue and/or settle the Non-Released Party Trust

Causes of Action, as appropriate, in its discretion and in accordance with the Non-Released Party Trust Agreement and the best interests of the Non-Released Party Beneficiaries.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors or the Non-Released Party Trustee, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, or the Non-Released Party Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Unless any Non-Released Party Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court Final Order, the Non-Released Party Trustee expressly reserves all Non-Released Party Trust Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Non-Released Party Trust Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Non-Released Party Trustee, as applicable, reserve and shall retain the Causes of Action and the Non-Released Party Trust Causes of Action, as applicable, notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors and any Non-Released Party Trust Causes of Action shall vest in the Non-Released Party Trust, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors or the Non-Released Party Trustee, as the case may be, in each case through their or its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action or Non-Released Party Trust Causes of Action, as applicable.

The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Non-Released Party Trustee, subject to and in accordance with the Non-Released Party Trust Agreement, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Non-Released Party Trust Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to its own terms; (3) those that have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (4) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; (5) the Sponsor Advisory Agreement, which shall be rejected, and any and all claims arising therefrom shall be waived and any Proof of Claim arising therefrom shall be deemed withdrawn upon the Effective Date; or (6) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

KE 58496119

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease Schedule at any time up to forty-five days after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the effective date of such rejection, or (2) the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.**

Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims in Class 5D, Class 5E, Class 5F, Class 5G, Class 5H, Class 5I, or Class 5J (depending on which Debtor such Claim is asserted against) and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VI of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable. The Debtors, prior to the Effective Date with the reasonable consent of the Requisite Unsecured Lenders and the Committee, or the Reorganized Debtors after the Effective Date, as applicable, may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of

49

provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      Dispute Resolution

In the event of a timely filed objection regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code, the Cure Claim shall only be paid following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption (and, if applicable, assignment). The timing for the resolution of any such objection shall be governed by the contract assumption procedures approved as part of the Disclosure Statement Order or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

E.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

F.      Indemnification Obligations

Notwithstanding anything in the Plan to the contrary (except as provided in this Article V.F), each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such (excluding any Person(s) or Entities that may be defendants in or otherwise liable in connection with a Non-Released Party Trust Cause of Action, *provided*, *however*, that nothing in this sentence shall have any effect on any applicable director and officer liability insurance policy). Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any Reorganized Holdings Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations. Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to indemnify any Person or Entity for any contribution made by such Person or Entity, or on such Person's or Entity's behalf, to the Debtors or to any holder of any Claim or Interests as consideration for any release provided pursuant to this Plan, or any costs or expenses related thereto.

G.      Director and Officer Liability Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all director and officer liability insurance policies and any agreements, documents, and instruments related thereto. The

50

Reorganized Debtors shall maintain all of its unexpired D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, and managers, which coverage shall be through the Effective Date of the Plan, and all such directors, members, trustees, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations (other than with respect to any Person(s) or Entities that may be defendants in a Non-Released Party Trust Cause of Action as set forth in Article V.F) related to the foregoing D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

The Debtors and/or the Reorganized Debtors, as applicable, are authorized to purchase D&O Liability Insurance Policies (including a "tail" policy), subject to the reasonable consent of the Requisite Unsecured Lenders and the Committee, for the benefit of the Debtors' directors, members, trustees, officers, and managers (excluding any Person(s) or Entities that may be defendants in a Non-Released Party Trust Cause of Action under the Plan), which D&O Liability Insurance Policies shall be effective as of the Effective Date. On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

H.    *Insurance Policies and Surety Bonds*

Each of the Debtors' insurance policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.G of the Plan) and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan or the Plan Supplement, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims. Except as set forth in Article V.G of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to the any Claims Bar Date or similar deadline governing cure amounts or Claims.

On the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order, and (3) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business. The applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing Surety Bonds as they become due prior to the execution and issuance of new Surety Bonds. Surety bond providers shall have the discretion to replace (or issue name-change riders with respect to) any existing surety bonds or related general agreements of indemnity with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity.

I.    *Collective Bargaining Agreement*

The Collective Bargaining Agreement and any agreements, documents, or instruments relating thereto, is treated as and deemed to be an Executory Contract under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed the Collective Bargaining Agreement and any agreements, documents, and instruments related thereto. All Proofs of Claim Filed for amounts due under the Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein. On the

Effective Date, any Proofs of Claim Filed with respect to the Collective Bargaining Agreement shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

J.    *Workers Compensation Program*

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate, and (2) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation, and (c) workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

K.    *Benefit Programs*

Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Confirmation Date, and except for (1) Executory Contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 or 1129(a)(13) of the Bankruptcy Code) and (2) Executory Contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts: all employee compensation and benefit programs of the Debtors, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under this Article V, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Confirmation Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Confirmation Date shall survive Confirmation of the Plan; *provided*, *however*, that the Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue; *provided*, *further*, *however*, that nothing herein shall extend or otherwise modify the duration of such period or prohibit the Debtors or the Reorganized Debtors from modifying the terms and conditions of such employee benefits and retiree benefits as otherwise permitted by such plans and applicable non-bankruptcy law.

L.    *Pension Plan*

As of the Effective Date, the Reorganized Debtors shall continue (and shall continue their obligations with respect to) the Pension Plan in accordance with, and subject to, its terms, ERISA, the Internal Revenue Code, and applicable law, and shall preserve all of their rights thereunder. All Proofs of Claim filed on account of Claims in connection with the termination of the Pension Plan shall be deemed withdrawn as of the Effective Date without any further action of the Debtors or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, no provision in the Plan or the Confirmation Order, or proceeding within the Chapter 11 Cases, shall in any way be construed as discharging, releasing, or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision, including for breach of fiduciary duty.

M.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

KE 58496119

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

N.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

O.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter (which in no event shall be later than the later of (a) 30 days after the Effective Date or (b) 30 days following the deadline to elect the Cash-Out Option), each holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class; *provided, however*, to the extent the distributions to holders of Allowed General Unsecured Claims, Allowed 2019 Notes Claims, and Allowed 2034 Notes Claims on the Initial Distribution Date are only partial distributions due to the existence of Disputed Claims pursuant to Article VI.E hereof, such partial distribution shall be no less than 50% of the amount of such holder's total expected distribution, as determined by the Debtors or Reorganized Debtors, as applicable, in their reasonable discretion. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

The New Common Stock shall be deemed to be issued as of the Effective Date to the holders of Claims entitled to receive New Common Stock pursuant to Article III hereof.

B.      *Distributions Generally*

Except as otherwise provided in the Plan and/or (with respect to Non-Released Party Trust Interests) the Non-Released Party Trust Agreement, distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Distributions to holders of Secured Term Loan Claims and Unsecured Term Loan Claims shall be subject in all respects to the right of the Secured Term Loan Agent and the Unsecured Term Loan Agent, as applicable, to assert its Secured Term Loan Agent Charging Lien and Unsecured Term Loan Agent Charging Lien, as applicable, against such distributions. Notwithstanding anything herein to the contrary, distributions to the Non-Released Party Trust Beneficiaries shall be made by the Non-Released Party Trustee as and when provided for in the Non-Released Party Trust Agreement.

Notwithstanding any provision of the Plan to the contrary, distributions to holders of 2034 Notes Claims and 2019 Notes Claims shall be made to or at the direction of each of the applicable Indenture Trustees, each of which shall act as Disbursing Agent for distributions to the respective holders of 2034 Notes Claims or 2019 Notes Claims under the 2034 Notes Indenture or the 2019 Notes Indentures, as applicable. The Indenture Trustees shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct. The Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of 2034 Notes Claims and 2019 Notes Claims to the extent consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of each Indenture Trustee to assert its Indenture Trustee Charging Lien against such distributions. All distributions to be made to holders of 2034 Notes Claims and 2019 Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the 2034 Notes Indenture or the 2019 Notes Indentures, as applicable.

C.    *Rights and Powers of Disbursing Agent*

1.    Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as reasonably deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions; Undeliverable or Unclaimed Distributions*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, with respect to holders of Secured Term Loan Claims, distributions shall be made to such holders that are listed on the register or related document maintained by the Secured Term Loan Agent. The Distribution Record Date shall not apply to the Indenture Trustees with respect to holders of 2034 Notes Claims or the 2019 Notes Claims.

2.    Delivery of Distributions

(a)    Initial Distribution Date

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' books and records or the register or related document maintained by, as

KE 58496119

applicable, the DIP Agents, the Secured Term Loan Agent, the Unsecured Term Loan Agent, or the Indenture Trustees as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided*, *further*, that the address for each holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a holder holds more than one Claim in any one Class, all Claims of the holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

(b)    Quarterly Distribution Date

Except as otherwise determined by the Reorganized Debtors in their sole discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Interests under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.H of the Plan.

3.    Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claims against the Debtors or their property.

4.    No Fractional Shares

No fractional shares of New Common Stock or the New Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of shares of New Common Stock or New Warrants that are not a whole number, such New Common Stock or New Warrants shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock and New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding; *provided*, *however*, the total number of authorized shares of New Common Stock and New Warrants pursuant to the Reorganized Holdings Organizational Documents and the New Warrant Agreement shall be in an amount sufficient such that all creditors entitled to receive shares of New Common Stock and New Warrants under the Plan will each receive at least one share of New Common Stock and one New Warrant.

5.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

KE 58496119

E.    *Distributions on Account of Claims or Interests Allowed After the Effective Date.*

1.    <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Reorganized Debtors and the applicable holder of such Claim or Interest agree otherwise.  The Reorganized Debtors and the Non-Released Party Trustee shall work together in good faith with respect to Disputed Claims and the Disputed Claims Reserve (as such term is defined in the Non-Released Party Trust Agreement), including distributions on Disputed Claims Allowed after the Effective Date.

2.    <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided* that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated holders of Allowed Claims pursuant to the Plan.

F.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.    *Allocations Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the DIP Order, or the Confirmation Order, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

I.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

J.      *Setoffs and Recoupment*

Except as otherwise provided herein and subject to applicable law or order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim or Interest, set off against any Allowed Claim or Interest (which setoff shall be made against the Allowed Claim or Interest, not against any distributions to be made under the Plan with respect to such Allowed Claim or Interest), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a holder is entitled under the Plan shall be made on account of the Claim or Interest, as reduced after application of the setoff described above.  In no event shall any holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors, as applicable, unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim or Interest; *provided* that, where there is no written agreement between the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced, as applicable, the Debtors' or Reorganized Debtors' rights to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, all rights of counterparties to unexpired leases of nonresidential real property (whether assumed or rejected) for setoff, recoupment, and subrogation are preserved and shall continue unaffected by Confirmation or the occurrence of the Effective Date.

K.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Reorganized Debtors on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Reorganized Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor or the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a

KE 58496119

waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.    *Single Satisfaction of Claims; Distributions on Account of Obligations of Multiple Debtors*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the Allowed Claim plus applicable interest, if any.

Notwithstanding the foregoing and in accordance with the Plan distributions in Article III.B.4 and Article III.B.5, for all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Allowance of Claims*

On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall be responsible for and shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, and shall have the exclusive authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any disputed Claim or Interest.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy

KE 58496119

Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Additionally, any Claim that is duplicative or redundant with another Claim against the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors. Absent such

authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (for the avoidance of doubt, the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, and the Contingent Secured Term Loan Obligations, in each case, are not discharged hereunder) or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall provide a release or discharge of any Retained Causes of Action or any Non-Released Party Trust Causes of Action.

B.    **Debtor Release**

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing entities, from any and all claims, obligations,**

rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Debt Documents, the Prepetition Credit Facilities, the 2014 Transaction, the Carve-Out Businesses, the ownership and/or operation of the Debtors and/or the Carve-Out Businesses by the Sponsor and the Minority Equity Holders, the Restructuring Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the 363 Sale, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. For the avoidance of doubt and without limiting the scope of the foregoing Debtor Release, this Debtor Release releases any and all claims and Causes of Action against the Secured Term Loan Agent, the Unsecured Term Loan Agent, the Prepetition ABL/FILO Agent, the Minority Equity Holders, Sycamore (as defined in the UCC Standing Motions), the Sycamore Affiliates (as defined in the UCC Standing Motions), and the Lender Defendants (as defined in the UCC Standing Motions), set forth in the Proposed Complaint (as defined in the UCC Standing Motions).

Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release (a) any post-Effective Date obligations of any Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Retained Causes of Action, or (c) any Non-Released Party Trust Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

C.      *Third-Party Release*

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the

KE 58496119

Debtors, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Debt Documents, the Prepetition Credit Facilities, the 2014 Transaction, the Carve-Out Businesses, the ownership and/or operation of the Debtors and/or the Carve-Out Businesses by the Sponsor and the Minority Equity Holders, the Restructuring Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the 363 Sale, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. For the avoidance of doubt and without limiting the scope of the foregoing Third-Party Release, this Third-Party Release releases any and all claims and Causes of Action against the Secured Term Loan Agent, the Unsecured Term Loan Agent, the Prepetition ABL/FILO Agent, the Minority Equity Holders, Sycamore (as defined in the UCC Standing Motions), the Sycamore Affiliates (as defined in the UCC Standing Motions), and the Lender Defendants (as defined in the UCC Standing Motions), set forth in the Proposed Complaint (as defined in the UCC Standing Motions).

Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release or impair (a) any post-Effective Date obligations of any Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Retained Causes of Action, (c) any Non-Released Party Trust Causes of Action, or (d) the ability of any Releasing Party to object to any request for payment on account of Professional Fee Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of claims released by the Third-Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Third-Party Release. Upon entry of the Confirmation Order, the Debtors will send an opt-out form to holders of Claims in clauses (o), (p), (q), and (r) of the definition of Releasing Parties to provide such holders with an opportunity to opt out of the Third-Party Release for any Released Party added to the Plan after the First Amended Plan, which opt-out form shall be approved by the Confirmation Order.

**D.      Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for (a) any prepetition action taken or omitted to be taken in connection with, or related to, formulating, negotiating, or preparing the Plan or the Restructuring Support Agreement, or (b) any postpetition action taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Restructuring Support Agreement), the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the 363 Sale transactions and documents, the New Debt Documents, the DIP Facilities, the DIP Documents, and/or the Restructuring Transactions, the Cash-Out Option, or selling or issuing the New Debt, the Non-Released Party

Trust Interests, the New Common Stock, the New Warrants, and/or any other Security or instrument to be offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; *provided, however*, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Restructuring Support Agreement and the Plan. Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims. For the avoidance of doubt, no Person or Entity that may be a defendant in a Non-Released Party Trust Cause of Action shall receive any exculpation under this Article VIII.D, solely in its capacity as such.

## E.    Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim or Secured Tax Claim, satisfaction in full of the portion of the Other Secured Claim or Secured Tax Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. The ABL/FILO DIP Liens and Term DIP Liens (in each case, as defined in the DIP Order) shall not be released until the payment in full in Cash of the DIP ABL/FILO Claims or DIP Term Loan Claims, as applicable, in accordance with Article II.A of the Plan.

## F.    Injunction

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized

**Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims, claims, or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, claim, or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, claims, or Interests released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims, claims, and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan; _provided, however,_ that the foregoing shall not enjoin any Consenting Term Loan Lender from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.**

G.      *Certain Government Matters*

As to any Governmental Unit, nothing in the Plan or Confirmation Order shall limit or expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action.

Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Confirmation Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors or Reorganized Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases after the Effective Date.  Nor shall anything in the Confirmation Order or the Plan:  (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan, or the Bankruptcy Code.

Moreover, nothing in the Confirmation Order or the Plan shall release or exculpate any non-Debtor, including any non-Debtor Released Parties, from any liability to any Governmental Unit, including any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the non-Debtor Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-Debtor Released Parties for any liability whatsoever; *provided, however,* that the foregoing sentence shall not (a) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code or (b) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

Nothing contained in the Plan or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including the Debtors and the Reorganized Debtors, nor shall the Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax

consequences of this Plan, nor shall anything in this Plan or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under section 505 of the Bankruptcy Code.

H.      *Challenge Period; No Disgorgement; Release of Escrowed Sale Proceeds Payment*

Notwithstanding anything to the contrary in the DIP Order (including paragraphs 17 and 26 thereof) or any other order of the Bankruptcy Court, upon the Effective Date (1) the Challenge Period (as defined in the DIP Order) shall have expired and all provisions of the DIP Order that are contingent or become effective upon the expiration of the Challenge Period shall be in full force and effect, including clauses (a) through (e) of paragraph 26(b), (2) the Non-Stipulated Claims (as defined in the DIP Order) shall be stipulated to and released by the Debtors, which stipulation and release shall be binding upon all parties in interests, including the Committee, (3) any Adequate Protection Payment, Adequate Protection Fees and Expenses, Sale Proceeds Payment (as each term is defined in the DIP Order), payments received by the Prepetition ABL/FILO Secured Parties (as defined in the DIP Order) in connection with the ABL/FILO Refinanced Loans (as defined in the DIP Order), or any payment realized by the Prepetition Secured Parties (as defined in the DIP Order), including upon the exercise of remedies pursuant to paragraph 10 of the DIP Order shall be deemed to be indefeasible and shall not be subject to disgorgement, recharacterization, or reallocation pursuant to section 506(b) of the Bankruptcy Code or any other remedy, and (4) the Prepetition Secured Term Loan Agent is authorized to disburse any portion of the Sale Proceeds Payment held by the Prepetition Secured Term Loan Agent pursuant to the Escrow Agreement (as defined in the DIP Order) to any Prepetition Term Loan Lender in accordance with the DIP Order, regardless of whether such Prepetition Term Loan Lender submitted a Certification (as defined in the DIP Order). Notwithstanding the foregoing, if Confirmation of the Plan is reversed upon appeal, the provisions of the DIP Order (including paragraphs 17 and 26 thereof and any provisions governing the Challenge Period) shall be in full force and effect and subject to any subsequently confirmed chapter 11 plan or plans in the Chapter 11 Cases.

I.      *Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors; *provided*, *however*, that the Reorganized Debtors shall not dispose of any documents that relate to the Non-Released Party Trust Causes of Action without the prior consent of the Non-Released Party Trustee.

K.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

KE 58496119

L.      *Term of Injunctions or Stays*

        Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect following the Effective Date in accordance with their terms.

M.      *Subordination Rights*

        The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

        Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, the Reorganized Debtors, their respective property, and holders of Claims and Interests and is fair, equitable, and reasonable.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

        It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

        1.    the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been stayed, modified, or vacated on appeal;

        2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

        3.    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

        4.    the New ABL Facility Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements, and the Debtors shall have issued the indebtedness contemplated thereby;

        5.    the New Secured Facility Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements, and the Debtors shall have issued the indebtedness contemplated thereby;

6. the Reorganized Holdings Organizational Documents and the Reorganized Debtors Organizational Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect, and the New Common Stock and the New Warrants shall have been issued;

7. the Equity Holders Settlement shall have been approved by the Bankruptcy Court and the payments contemplated thereby shall have been made, and the Belk Commitment Agreement (as defined in the Restructuring Support Agreement) shall be in full force and effect;

8. the Non-Released Party Trust shall have been established pursuant to the Non-Released Party Trust Agreement, all Non-Released Party Trust Causes of Action shall have been contributed to, and shall have vested in, the Non-Released Party Trust, the Non-Released Party Trust Transfer Agreement shall have been executed, and the proceeds of the Non-Released Party Loan shall have been loaned to the Non-Released Party Trust;

9. all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all attorneys, advisors, and other professionals payable under the Restructuring Support Agreement, the DIP Order, or the Plan shall have been paid in Cash; and

10. the Commitment Letter shall be in full force and effect and the Cash-Out Option Funding shall have been placed into escrow pursuant to the terms of the Commitment Letter.

B.    *Waiver of Conditions*

Subject to and without limiting the rights to each party to the Restructuring Support Agreement, the conditions to Consummation set forth in Article IX may be waived by the Debtors, with the reasonable consent of (x) the Requisite Unsecured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee, (y) the Requisite Secured Lenders (solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.5, and Article IX.A.9) and (z) the Sponsor and the Minority Equity Holders (solely with respect to the condition set forth in Article IX.A.7), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.    *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or claims by any holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan and subject to and not limiting the respective rights of each party to the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, subject to any applicable consent rights as set forth in the Restructuring Support Agreement and the reasonable consent of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders with respect to any other modifications, whether such modification is material or immaterial prior to Confirmation, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan; *provided*, *however*, that the consent of the Committee (without limitation or qualification), the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders shall be required with respect to any modifications that adversely impact (i) the distributions, recoveries, or rights of the holders of Claims (w) solely with respect to the Committee, in Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I, (x) solely with respect to the 2034 Notes Indenture Trustee, in Class 5B, (y) solely with the respect to the 2019 Notes Indenture Trustee, in Class 5C, and (z) solely with respect to the Ad Hoc Group of Unsecured Noteholders, in

KE 58496119

Classes 5B and 5C, or (ii) the respective consent rights of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders provided hereunder. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan) and any consent rights as set forth in the Restructuring Support Agreement and the reasonable consent of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan after Confirmation, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided* that (i) any modifications or amendments that impact the treatment of the DIP Claims shall require the consent of the applicable DIP Agent and (ii) any modifications or amendments that adversely impact (x) the distributions, recoveries, or rights of the holders of Claims (1) solely with respect to the Committee, in Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I, (2) solely with respect to the 2034 Notes Indenture Trustee, in Class 5B, (2) solely with respect to the 2019 Notes Indenture Trustee, in Class 5C, and (3) solely with respect to the Ad Hoc Group of Unsecured Noteholders, in Classes 5B and 5C, or (y) the respective consent rights of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group or Unsecured Noteholders provided hereunder, shall require the consent of the Committee (without qualification or limitation), the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans of reorganization, in each case subject to any applicable consent rights as set forth in the Restructuring Support Agreement and the reasonable consent of the Committee; *provided*, *however*, that the 2019 Notes Indenture Trustee's, the 2034 Notes Indenture Trustee's, the Ad Hoc Group of Unsecured Noteholders', and the Committee's rights with respect to any plan of reorganization Filed after the withdrawal or revocation of the Plan are preserved. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption (or assumption and assignment) or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, claims, or Interests; (b) prejudice in any manner the rights of such Debtor, any holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any holder, or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction (except where otherwise specifically noted below) over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

KE 58496119

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Accrued Professional Compensation Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4. ensure that distributions to holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12. resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

13. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clauses, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15. enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.    adjudicate, decide, and resolve any cases, controversies, suits, or disputes related to (and/or arising under, as applicable) the Non-Released Party Trust, the Non-Released Party Trust Agreement, the Non-Released Party Trust Transfer Agreement, the Non-Released Party Trustee, and/or the Non-Released Party Trust Causes of Action; *provided*, *however*, that the Bankruptcy Court's jurisdiction shall not be exclusive with respect to the adjudication and resolution of the Non-Released Party Trust Causes of Action;

22.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

24.    enforce all orders previously entered by the Bankruptcy Court;

25.    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Non-Released Party Trust Agreement, the Non-Released Party Trust Transfer Agreement, or any contract, instrument, release, or other agreement or document that is entered into or delivered pursuant thereto or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

26.    hear any other matter not inconsistent with the Bankruptcy Code; and

27.    enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

KE 58496119

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

Each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors) shall pay all U.S. Trustee quarterly fees pursuant to section 1930(a)(6) of the Judicial Code, together with any interest thereon pursuant to 31 U.S.C. § 3717, on or before the Effective Date in Cash, based on disbursements in and outside the ordinary course of the Debtors' business and Plan payments. Thereafter, U.S. Trustee quarterly fees and any applicable interest shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) until the earlier of entry of a final decree closing such Chapter 11 Case or an order of dismissal or conversion, whichever occurs first.

D.      *Payment of Certain Fees*

Prior to the hearing on Confirmation of the Plan, the Brigade Advisors and the Ad Hoc Crossover TL Lender Group Advisors (each as defined in the Restructuring Support Agreement), in each case only for amounts that are not otherwise paid pursuant to the DIP Order, and the Ad Hoc Group of Unsecured Noteholders' (or its advisors, either individually or jointly) will file motions seeking payment on account of Restructuring Expenses as a substantial contribution under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code. Unless otherwise agreed to by the Debtors, the Committee, the Requisite Unsecured Lenders, and the Ad Hoc Group of Unsecured Noteholders, the form of order approving such substantial contribution motion for the Brigade Advisors and the Ad Hoc Crossover TL Lender Group Advisors shall require a 20% holdback of all fees and expenses payable pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code pending the final allowance of all Professional Fee Claims, subject to agreement by the Debtors, the Committee, the Requisite Unsecured Lenders, and the Ad Hoc Group of Unsecured Noteholders to release such funds earlier. Such parties will seek approval of such motions prior to Confirmation of the Plan. If such motions are not approved, pursuant to the Plan and sections 1123(a)(6) and 363(b) of the Bankruptcy Code, the Debtors will seek to pay in full in Cash on the Effective Date all Restructuring Expenses, incurred up to (and including) the Effective Date and the U.S. Trustee reserves its rights to object to such payment; *provided* that each party and its counsel shall provide the Debtors, the Reorganized Debtors, and the Committee with summary invoices (redacted for any potentially privileged material) for which it seeks payment. Notwithstanding the foregoing sentence, if the substantial contribution motions are approved by the Bankruptcy Court, the foregoing sentence shall be moot and of no further force or effect with respect to the Plan other than that the Debtors will pay in full in Cash on the Effective Date all Allowed Administrative Claims in accordance with the terms of the orders approving such motions. For the avoidance of doubt, any amounts due under the DIP Order that are Restructuring Expenses or otherwise due under the DIP Order shall be paid in full in Cash on the Effective Date.

The Debtors and after the Effective Date the Reorganized Debtors shall continue to pay, reimburse, and honor the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, and the Contingent Secured Term Loan Obligations. Counsel to each of the DIP Agents, the DIP Term Loan Lenders, the Secured Term Loan Agent, and the Secured Term Loan Lenders shall be authorized to disburse any and all retainer monies in its possession to reimburse the reasonable fees and expenses of such counsel.

E.      *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except that the Committee will stay in existence solely for the following limited purposes and shall be paid as set forth as follows: (i) for purposes pursuant to which it will receive payment for its fees and expenses from the Reorganized Debtors, it may (a) File and prosecute final fee applications, (b) participate in any adversary proceeding commenced on or before the Effective Date in which the Committee (or any member thereof solely in

their capacity as such) is named as a defendant, including any appeals thereof, and (c) on and after the Effective Date, the Committee (with the assistance of its attorneys) will monitor the distributions to Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I for a period of one year, *provided* that such monitoring will be limited to (1) assurance that the Cash-Out Option is effectuated pursuant to the Plan and (2) the receipt of a schedule of distributions 14 days in advance of each Quarterly Distribution Date identifying which distributions will be made on such Quarterly Distribution Date and resolving, in good faith, any questions the Committee may have with respect to such schedule and distribution (with all such monitoring described in sections (1) and (2) of subsection (c) subject to a maximum amount of $30,000 in documented fees and expenses), and (ii) for purposes pursuant to which it will receive payment for its fees and expenses from the Non-Released Party Trust, it may comply with its obligations pursuant to the Non-Released Party Trust Transfer Agreement, *provided*, *however*, that such fees shall not include any time spent investigating the Non-Released Party Trust Causes of Action.  Except as set forth in the prior sentence, the Debtors, the Estates, the Reorganized Debtors, and the Non-Released Party Trust shall not be responsible for paying any fees or expenses incurred by any statutory committees, including counsel and advisors thereto, after the Effective Date.

F.    *Rights of Purchaser Under 363 Sale Order*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the rights of the Purchaser (as defined in the 363 Sale Order) under the 363 Sale Order.

G.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  Neither the Plan, the Filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests unless and until the Effective Date has occurred.

H.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

I.    *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by courier or registered or certified mail (return receipt requested), or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

1.    If to the Debtors, to:

Nine West Holdings, Inc.
1411 Broadway
New York, New York 10018
Attn:    Patricia Anne Lind (plind@ninewestholdings.com)

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Christopher J. Marcus (christopher.marcus@kirkland.com)

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:    James A. Stempel (james.stempel@kirkland.com)
          Joseph M. Graham (joe.graham@kirkland.com)
          Angela M. Snell (angela.snell@kirkland.com)
          Jaimie R. Fedell (jaimie.fedell@kirkland.com)

2.    Counsel to the Consenting Secured Lenders, the Secured Term Loan Agent, and DIP Term Loan Agent

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:    Marshall Huebner (marshall.huebner@davispolk.com)
          Darren S. Klein (darren.klein@davispolk.com)
          Adam L. Shpeen (adam.shpeen@davispolk.com)

3.    Counsel to the Consenting Unsecured Lenders

King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Attn:    Jeffrey D. Pawlitz (jpawlitz@kslaw.com)
          Michael R. Handler (mhandler@kslaw.com)
          David S. Zubricki (dzubricki@kslaw.com)

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:    Douglas Mannal (dmannal@kramerlevin.com)
          Rachael Ringer (rringer@kramerlevin.com)

4.    Counsel to the DIP ABL/FILO Agent

Morgan Lewis & Bockius LLP
One Federal Street
Boston, Massachusetts 02110
Attn:    Julia Frost-Davies (julia.frost-davies@morganlewis.com)
          Amelia C. Joiner (amelia.joiner@morganlewis.com)

and

Greenberg Traurig, LLP
One International Place
Boston, Massachusetts 02110
Attn:    Jeffrey M. Wolf (wolfje@gtlaw.com)

5.   Counsel to the Ad Hoc Group of Unsecured Noteholders

      Sidley Austin LLP
      One South Dearborn
      Chicago, Illinois 60603
      Attn:   Matthew A. Clemente (mclemente@sidley.com)
           Dennis M. Twomey (dtwomey@sidley.com)

6.   Counsel to the Committee

      Akin Gump Strauss Hauer & Feld LLP
      One Bryant Park
      New York, New York 10036
      Attn:   Daniel H. Golden (dgolden@akingump.com)
           Arik Preis (apreis@akingump.com)
           Jason Rubin (jrubin@akingump.com)

7.   Counsel to the Sponsor and Belk, Inc.

      Proskauer Rose LLP
      11 Times Square
      New York, New York 10036-8299
      Attn: Michael T. Mervis (mmervis@proskauer.com)

      and

      Proskauer Rose LLP
      70 West Madison Street
      Suite 3800
      Chicago, Illinois 60602
      Attn: Mark K. Thomas (mthomas@proskauer.com)

      and

      Proskauer Rose LLP
      2029 Century Park East
      Suite 2400
      Los Angeles, California 90067-3010
      Attn: Peter J. Young (pyoung@proskauer.com)

8.   Counsel to the Minority Equity Holders

      Milbank, Tweed, Hadley & McCloy LLP
      1850 K Street NW, Suite 1100
      Washington, DC 20006
      Attn: Andrew M. Leblanc (aleblanc@milbank.com)

9.   The 2019 Notes Indenture Trustee

      U.S. Bank National Association
      Global Corporate Trust Services
      60 Livingston Avenue, EP-MN-WS1D
      St. Paul, Minnesota 55107
      Attn: Julie Becker (julie.becker@usbank.com)

KE 58496119

with copies (which shall not constitute notice) to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020-1095
Attn:    J. Christopher Shore (cshore@whitecase.com)
           Philip Abelson (philip.abelson@whitecase.com)

and

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Attn:    John R. Ashmead (ashmead@sewkis.com)
           Arlene Alves (alves@sewkis.com)

10.  The 2034 Notes Indenture Trustee

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, Delaware 19801
Attn: Patrick J. Healy (phealy@wsfsbank.com)

with copies (which shall not constitute notice) to:

Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, New York 10036-6516
Attn:  Robert J. Lack (rlack@fklaw.com)

and

Kilpatrick Townsend & Stockton LLP
1114 Avenue of the Americas
New York, New York 10036
Attn:  David M. Posner (dposner@kilpatricktownsend.com)

After the Effective Date, the Reorganized Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*J.        Entire Agreement*

Except as otherwise indicated, on the Effective Date, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which have become merged and integrated into the Plan on the Effective Date.  To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan

75

Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

K.      Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Balloting Agent at https://cases.primeclerk.com/ninewest/ or (for a fee) the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

L.      Non-Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, with the reasonable consent of each of the Debtors, the Requisite Unsecured Lenders, the Requisite Secured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  Notwithstanding the foregoing, the release, injunction, exculpation, and compromise provisions of the Plan are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Consenting Term Lenders, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

M.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

N.      Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

O.      *Closing of Chapter 11 Cases*

Each of the Debtors shall, promptly after the full administration of its Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close its Chapter 11 Case.

*[Remainder of Page Intentionally Left Blank]*

KE 58496119

Respectfully submitted, as of February 15, 2019.

Nine West Holdings, Inc. (for itself and all Debtors)

By:     */s/ Ralph Schipani*
Name:   Ralph Schipani
Title:    Interim Chief Executive Officer

**Exhibit 2**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' ~~SECOND~~THIRD AMENDED JOINT PLAN OF REORGANIZATION**

**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James A. Stempel (admitted *pro hac vice*)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated:  ~~January 20~~February 15, 2019

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway New York, New York 10018.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ...................................................................................................................... 1

    A.     Defined Terms ............................................................................................................. 1
    B.     Rules of Interpretation ............................................................................................... 22
    C.     Computation of Time ................................................................................................. 23
    D.     Governing Law ........................................................................................................... 23
    E.     Reference to Monetary Figures .................................................................................. 23
    F.     Nonconsolidated Plan ................................................................................................ 23

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS ......... 23

    A.     DIP Claims ................................................................................................................. 24
    B.     Administrative Claims ............................................................................................... 24
    C.     Payment of Fees and Expenses under DIP Order ....................................................... 25
    D.     Professional Fee Claims ............................................................................................. 25
    E.     Priority Tax Claims .................................................................................................... 26

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................... 27

    A.     Classification of Claims and Interests ....................................................................... 27
    B.     Treatment of Claims and Interests ............................................................................. 28
    C.     Special Provision Governing Unimpaired Claims ..................................................... 36
    D.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 36
    E.     Subordinated Claims .................................................................................................. 37
    F.     Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ........... 37
    G.     Intercompany Interests. .............................................................................................. 37
    H.     Controversy Concerning Impairment ......................................................................... 37

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................................. 37

    A.     Sources of Consideration for Plan Distributions ....................................................... 37
    B.     Equity Holders Settlement ......................................................................................... 39
    C.     General Settlement of Claims and Interests ............................................................... 39
    ~~D.~~     ~~NWHI Administrative Expense Settlement~~ ............................................................ ~~38~~
    ~~E.~~D.     The Non-Released Party Trust ................................................................................... 40
    ~~F.~~E.     ~~GUC~~ Cash-Out Option ............................................................................................. 42
    ~~G.~~F.     Shareholders Agreement ............................................................................................ 43
    ~~H.~~G.     Management Incentive Plan ....................................................................................... 43
    ~~I.~~H.     Reorganized Holdings Board ..................................................................................... 43
    ~~J.~~I.     Restructuring Transactions ........................................................................................ 44
    ~~K.~~J.     Corporate Existence ................................................................................................... 44
    ~~L.~~K.     Vesting of Assets in the Reorganized Debtors .......................................................... 44
    ~~M.~~L.     Cancellation of Existing Securities and Agreements ................................................. 44
    ~~N.~~M.     Corporate Action ....................................................................................................... 46
    ~~O.~~N.     Reorganized Debtors Organizational Documents ...................................................... 46
    ~~P.~~O.     Exemption from Certain Taxes and Fees ................................................................... 47
    ~~Q.~~P.     Exemption from Securities Act Registration .............................................................. 47
    ~~R.~~Q.     Retention of Causes of Action ................................................................................... 47

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 48

    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases ................. 48
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases .................... 49

KE 58496119

C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.................................49
D.      Dispute Resolution .........................................................................................................................50
E.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases............50
F.      Indemnification Obligations............................................................................................................50
G.      Director and Officer Liability Insurance Policies ..........................................................................50
H.      Insurance Policies and Surety Bonds .............................................................................................51
I.      Collective Bargaining Agreement ..................................................................................................51
J.      Workers Compensation Program ...................................................................................................52
K.      Benefit Programs ............................................................................................................................52
L.      Pension Plan ...................................................................................................................................52
M.      Modifications, Amendments, Supplements, Restatements, or Other Agreements .........................52
N.      Reservation of Rights .....................................................................................................................53
O.      Nonoccurrence of Effective Date ...................................................................................................53

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................................................53

A.      Timing and Calculation of Amounts to Be Distributed..................................................................53
B.      Distributions Generally ..................................................................................................................53
C.      Rights and Powers of Disbursing Agent ........................................................................................54
D.      Delivery of Distributions; Undeliverable or Unclaimed Distributions ..........................................54
E.      Distributions on Account of Claims or Interests Allowed After the Effective Date. .....................56
F.      Compliance with Tax Requirements ...............................................................................................56
G.      Allocations Between Principal and Accrued Interest .....................................................................56
H.      No Postpetition Interest on Claims.................................................................................................56
I.      Foreign Currency Exchange Rate. ..................................................................................................56
J.      Setoffs and Recoupment ................................................................................................................57
K.      Claims Paid or Payable by Third Parties ........................................................................................57
L.      Single Satisfaction of Claims; Distributions on Account of Obligations of Multiple
        Debtors............................................................................................................................................58

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ......................................................................................................................................58

A.      Allowance of Claims.......................................................................................................................58
B.      Claims and Interests Administration Responsibilities....................................................................58
C.      Estimation of Claims ......................................................................................................................58
D.      Adjustment to Claims Without Objection .......................................................................................59
E.      Time to File Objections to Claims ..................................................................................................59
F.      Disallowance of Claims ..................................................................................................................59
G.      Amendments to Claims ...................................................................................................................59
H.      No Distributions Pending Allowance .............................................................................................60
I.      Distributions After Allowance ........................................................................................................60

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................60

A.      Discharge of Claims and Termination of Interests .........................................................................60
**B.      Debtor Release**................................................................................................................................60
**C.      Third-Party Release** ......................................................................................................................61
**D.      Exculpation** ...................................................................................................................................62
**E.      Release of Liens** ...........................................................................................................................63
**F.      Injunction**......................................................................................................................................63
G.      Certain Government Matters ...........................................................................................................64
H.      Challenge Period; No Disgorgement; Release of Escrowed Sale Proceeds Payment ....................65
I.      Protections Against Discriminatory Treatment ...............................................................................65
J.      Document Retention ........................................................................................................................65
K.      Reimbursement or Contribution .....................................................................................................65
L.      Term of Injunctions or Stays ..........................................................................................................66

KE 58496119

M.      Subordination Rights ............................................................................................... 66

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........................................ 66

A.      Conditions Precedent to the Effective Date ............................................................ 66
B.      Waiver of Conditions ............................................................................................... 67
C.      Effect of Failure of Conditions ............................................................................... 67

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................................... 67

A.      Modification and Amendments ................................................................................ 67
B.      Effect of Confirmation on Modifications ................................................................ 68
C.      Revocation or Withdrawal of Plan .......................................................................... 68

ARTICLE XI. RETENTION OF JURISDICTION ......................................................................................... 68

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................................................................... 70

A.      Immediate Binding Effect ........................................................................................ 70
B.      Additional Documents .............................................................................................. 71
C.      Payment of Statutory Fees. ...................................................................................... 71
D.      Payment of Certain Fees .......................................................................................... 71
E.      Statutory Committee and Cessation of Fee and Expense Payment ......................... 71
F.      Rights of Purchaser Under 363 Sale Order ............................................................. 72
G.      Reservation of Rights ............................................................................................... 72
H.      Successors and Assigns ............................................................................................ 72
I.      Notices ..................................................................................................................... 72
J.      Entire Agreement ..................................................................................................... 75
K.      Exhibits .................................................................................................................... 76
L.      Non-Severability of Plan Provisions ....................................................................... 76
M.      Votes Solicited in Good Faith .................................................................................. 76
N.      Conflicts ................................................................................................................... 76
O.      Closing of Chapter 11 Cases ................................................................................... 77

iii

**INTRODUCTION**

Nine West Holdings, Inc. and its Debtor affiliates in the above-captioned Chapter 11 Cases propose this joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the First Amended Plan. The Disclosure Statement does not discuss the modifications made to the First Amended Plan that are reflected in the Second Amended Plan. These modifications are described in and the Third Amended Plan Amendment Notice. Therefore, holders of Claims and Interests should refer to (i) the redline of the FirstThird Amended Plan against the Second Amended Plan and, (ii) the Original Plan Amendment Notice, and (iii) the Supplemental Plan Amendment Notice to review and understand the modifications that have been made to the Second Amended Plan that are incorporated in the Third Amended Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      "*2014 Transaction*" means the 2014 going-private buyout transaction led by the Sponsor in which The Jones Group Inc. and all affiliated brands were purchased pursuant to that certain Agreement and Plan of Merger, dated as of December 19, 2013, among The Jones Group Inc., Holdings, and Jasper Merger Sub, Inc.

2.      "*2019 Notes*" means, collectively, (i) the 6.875% senior unsecured notes due March 2019 and (ii) the 8.25% senior unsecured notes due March 2019, in each case issued pursuant to the 2019 Notes Indentures.

3.      "*2019 Notes Claims*" means all Claims against NWHI arising under, derived from, or based on the 2019 Notes Indentures.

4.      "*2019 Notes Indentures*" means, collectively, (i) the Indenture, dated as of March 7, 2011, by and between NWHI, as issuer, and U.S. Bank National Association, as indenture trustee, providing for 6.875% senior unsecured notes due March 2019, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, and (ii) the Indenture, dated as of April 23, 2014, by and between NWHI, as issuer, and U.S. Bank National Association, as indenture trustee, providing for 8.25% senior unsecured notes due March 2019, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

5.      "*2019 Notes Indenture Trustee*" means U.S. Bank National Association, or any predecessor or successor thereto, as trustee under the 2019 Notes Indentures.

5.6.      "*2034 Notes*" means the 6.125% senior unsecured notes due November 2034 issued pursuant to the 2034 Notes Indenture.

6.7.      "*2034 Notes Claims*" means all Claims against NWHI arising under, derived from, or based on the 2034 Notes Indenture.

7.8.      "*2034 Notes Indenture*" means the Indenture dated as of November 22, 2004, by and between NWHI, as issuer, and Wilmington Savings Fund Society, FSB as indenture trustee, providing for 6.125% senior unsecured notes due 2034, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

1

9.        "*2034 Notes Indenture Trustee*" means Wilmington Savings Fund Society, FSB, or any predecessor or successor thereto, as trustee under the 2034 Notes Indenture.

8.10.    "*363 Sale*" means the sale of the Debtors' Nine West®, Bandolino®, or associated brands, or related working capital assets, as approved by the 363 Sale Order.

9.11.    "*363 Sale Order*" means the *Order (A) Approving the Sale of Substantially All Assets of the Debtors' Nine West, Bandolino, and Associated Brands Free and Clear of all Claims, Liens, Rights, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts, and (D) Granting Related Relief* [Docket No. 404].

12.        "*Ad Hoc Group of Crossover Lenders*" means the group of unaffiliated holders of Secured Term Loan Claims and Unsecured Term Loan Claims identified at Docket No. 700, filed on September 28, 2018.

13.        "*Ad Hoc Group of Unsecured Noteholders*" means the group of unaffiliated holders of 2034 Notes Claims, 2019 Notes Claims, and Unsecured Term Loan Claims identified at Docket No. 968, filed on December 13, 2018.

14.        "*Ad Hoc Secured Lender Group*" means the group of unaffiliated holders of Secured Term Loan Claims identified at Docket No. 565, filed on August 7, 2018.

10.15.    "*Administrative Claim Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than (x) Professional Fee Claims and (y) Administrative Claims arising in the ordinary course of business), which shall be the first Business Day that is 30 days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code shall be the Claims Bar Date.

11.16.    "*Administrative Claim Objection Bar Date*" means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of (1) the first Business Day that is 90 days after the Effective Date and (2) the first Business Date that is 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claim Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

12.17.    "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

18.        "*Administrative Expense Savings*" means the aggregate amount of Cash from the following formula: (a) $142,800,000 *less* (b) the amount of fees and expenses actually incurred by the entities identified on Exhibit B to the Second Amended Plan through the Effective Date, prior to any Professional Fee Savings *less* (c) $7,000,000.

13.19.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such person as if the Person were a Debtor.

14.20.    "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim which is or has been timely Filed by the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above,

such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt: (x) a Proof of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law; and (z) there shall be no requirement that (1) the Secured Term Loan Agent, Unsecured Term Loan Agent, or DIP Agents or (2) any Secured Term Loan Lender, Unsecured Term Loan Lender, or DIP Lender File a Proof of Claim in respect of any Secured Term Loan Claim, Unsecured Term Loan Claim, or DIP Claim, as applicable, for such Claim to be Allowed.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.

15.21.    "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors and the Requisite Unsecured Lenders.

16.22.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or similar remedies that may be brought by or on behalf of the Debtors or the Estates, including Causes of Action or defenses arising under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer law.

17.23.    "*Ballot*" means the form or forms distributed to certain holders of Claims entitled to vote on the First Amended Plan by which such parties may indicate acceptance or rejection of the Plan, *provided* that the Debtors will not re-solicit votes with respect to the acceptance or rejection of the Second Amended Plan or the Third Amended Plan.

18.24.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

19.25.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

20.26.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules or orders of the Bankruptcy Court, as now in effect or hereafter amended.

27.      "*Brigade*" means Brigade Capital Management L.P. and its accounts and managed funds.

21.28.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

KE 58496119

22.29.    "*Carve-Out Businesses*" means those certain businesses purchased from NWHI, including Stuart Weitzman®, Kurt Geiger®, and the Jones Apparel Group (which included both the Jones New York® and Kasper® brands), in connection with the 2014 Transaction.

23.30.    "*Carve-Out Transactions*" means the sale of the Carve-Out Businesses to entities owned or controlled by the Sponsor, the Minority Equity Holders, and/or their respective current and former Affiliates in connection with the 2014 Transaction.

24.31.    "*Cash*" or "*$*" means the legal tender of the United States of America of the equivalent thereof, including bank deposits and checks.

32.    "*Cash-Out Election*" means an irrevocable election, pursuant to the Supplemental Cash-Out Election Form, by a holder of an Allowed Claim in Classes 5B, 5C, or 5D (other than a member of the Ad Hoc Group of Unsecured Noteholders) to receive the Cash-Out Option.

33.    "*Cash-Out Option*" means the Pro Rata share of Cash which holders of an Allowed Claim in Classes 5B, 5C, or 5D (other than members of the Ad Hoc Group of Unsecured Noteholders) irrevocably elect, pursuant to the Supplemental Cash-Out Election Form, which election must be received by the Debtors or Reorganized Debtors, as applicable, no later than March 22, 2019, to receive instead of the Non-Released Party Trust Interest distributions such holder would otherwise receive, as set forth in, and subject to the terms of, Article IV.E of the Plan.

34.    "*Cash-Out Option Funding*" means the requisite funding provided to the Debtors by the Funding Entities for the Cash-Out Option.

25.35.    "*Causes of Action*" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever (including those of the Debtors and/or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

26.36.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated and jointly administered cases commenced by the Debtors in the Bankruptcy Court and styled *In re Nine West Holdings, Inc., et al.,* No. 18-10947 (SCC).

27.37.    "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or an Estate.

28.38.    "*Claims Bar Date*" means the dates established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims, pursuant to:  (a) the *Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 248], entered by the Bankruptcy Court on May 15, 2018; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.39.    "*Claims Objection Bar Date*" shall mean the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Filed on or before the day that is before 180 days after the Effective Date.

KE 58496119

30.40.   "*Claims Register*" means the official register of Claims maintained by the Notice, Claims, and Balloting Agent.

41.   "*Class*" means a category of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

42.   "*Class I Non-Released Party Trust Interests*" means the interests in the Non-Released Party Trust, to be distributed on a Pro Rata basis to holders of Claims in Class 5B as set forth herein, which shall entitle such holder to its pro rata potion (based on percentage of interests held by such holder) of the first $2,500,000 in Non-Released Party Trust Distributable Proceeds.

31.43.   "*Class II Non-Released Party Trust Interests*" means the interests in the Non-Released Party Trust, to be distributed on a Pro Rata basis to holders of Claims (a) in Class 5B (provided that solely for purposes of calculating such interests, the amount of the Class 5B 2034 Notes Claims shall be Allowed in the amount of $319,996,745), and (b) in Classes 5C and 5D, as set forth herein, which shall entitle such holder to its pro rata portion (based on percentage of interests held by such holder) of the Non-Released Party Trust Distributable Proceeds in excess of the first $2,500,000.

32.44.   "*Collective Bargaining Agreement*" means that certain Collective Bargaining Agreement by and between Kasper Group LLC and certain locals of the New York Metropolitan Area Joint Board, as the same may have been amended from time to time.

33.45.   "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on April 19, 2018.

46.   "*Commitment Letter*" means the letter from the Funding Entities pursuant to which the Funding Entities have committed to fund the Cash-Out Option Funding into an interest-bearing escrow account and provide the Non-Released Party Trust Loan to the Non-Released Party Trust.

34.47.   "*Confirmation*" means the entry of the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

35.48.   "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

36.49.   "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

37.50.   "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order must be acceptable to the Debtors, the Requisite Unsecured Lenders, the Requisite Secured Lenders, and the Committee.the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, the Sponsor (solely with respect to any provisions in the Confirmation Order that would materially modify Article VIII.B, Article VIII.C, Article VIII.D, Article IV.B, or the defined terms Equity Holders Settlement or Equity Holders Settlement Proceeds in a manner adverse to the Sponsor), the Minority Equity Holder (solely with respect to any provisions in the Confirmation Order that would materially modify Article VIII.B, Article VIII.C, Article VIII.D, Article IV.B, or the defined terms Equity Holders Settlement or Equity Holders Settlement Proceeds in a manner adverse to the Minority Equity Holder), and the Committee (it being understood and agreed by the foregoing parties that the form of Confirmation Order filed on the case docket concurrently with this Third Amended Plan is acceptable).

38.51.   "*Consenting Secured Lenders*" means the Consenting Secured TL Lenders (as defined in the Restructuring Support Agreement).

39.52.   "*Consenting Term Loan Lenders*" means the Consenting Secured Lenders and the Consenting Unsecured Lenders.

40.53.    "*Consenting Unsecured Lenders*" means the Consenting Unsecured TL Lenders (as defined in the Restructuring Support Agreement).

41.54.    "*Consummation*" means "substantial consummation" as defined in section 1101(2) of the Bankruptcy Code.

42.55.    "*Contingent DIP ABL Obligations*" means all of the Debtors' obligations under the DIP ABL/FILO Documents and the DIP Order that are contingent and/or unliquidated (including those set forth in Section 12.4 and Section 12.5 of the DIP ABL/FILO Credit Agreement), other than DIP ABL/FILO Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

43.56.    "*Contingent DIP Term Loan Obligations*" means all of the Debtors' obligations under the DIP Term Loan Documents and the DIP Order that are contingent and/or unliquidated (including those set forth in Section 10.04 and Section 10.05 of the DIP Term Loan Credit Agreement), other than DIP Term Loan Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

44.57.    "*Contingent Secured Term Loan Obligations*" means all of the Debtors' obligations under the Secured Term Loan Credit Agreement and the Secured Term Loan Documents that are contingent and/or unliquidated (including those set forth in Section 10.04 and Section 10.05 of the Secured Term Loan Credit Agreement), other than Secured Term Loan Claims that are paid in full in Cash on or prior to the Effective Date and contingent indemnification obligations as to which a Claim has been asserted on or prior to the Effective Date.

45.58.    "*Cure Claim*" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

46.59.    "*D&O Liability Insurance Policies*" means, collectively, (a) all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', members', trustees', managers', and officers' liability as of the Petition Date, and (b) all insurance policies (including any "tail policy") for directors', members', trustees', managers', and officers' liability maintained by the Debtors, the Estates, or the Reorganized Debtors as of the Effective Date.

47.60.    "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

48.61.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.B of the Plan.

49.62.    "*Debtors*" means, collectively, (a) Jasper Parent LLC, (b) NWHI, (c) Kasper Group LLC, (d) Kasper U.S. Blocker LLC, (e) Nine West Apparel Holdings LLC, (f) Nine West Development LLC, (g) Nine West Distribution LLC, (h) Nine West Jeanswear Holding LLC, (i) Nine West Management Service LLC, (j) One Jeanswear Group, Inc., and (k) US KIC Top Hat LLC.

50.63.    "*DIP ABL/FILO Agent*" means Wells Fargo Bank, National Association in its capacity as administrative agent and collateral agent and as FILO Agent under the DIP ABL/FILO Credit Agreement, together with its respective successors and assigns in such capacities.

51.64.    "*DIP ABL/FILO Claims*" means all Claims of the DIP ABL/FILO Agent and the DIP ABL/FILO Lenders arising under, derived from, secured by, or based on the DIP ABL/FILO Credit Agreement, the DIP ABL/FILO Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP ABL/FILO Facility.

~~52.~~65.    "**DIP ABL/FILO Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of April 11, 2018, by and among the Debtors, the DIP ABL/FILO Lenders party thereto, and the DIP ABL/FILO Agent, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

~~53.~~66.    "**DIP ABL/FILO Documents**" means the DIP ABL/FILO Credit Agreement and all other agreements, documents, and instruments related thereto, executed in connection therewith, or evidencing the loans and obligations thereunder, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their terms and the terms of the DIP Order.

~~54.~~67.    "**DIP ABL/FILO Facility**" means that certain debtor-in-possession financing facility available pursuant to the terms and conditions of the DIP ABL/FILO Credit Agreement and the DIP Order.

~~55.~~68.    "**DIP ABL/FILO Lenders**" means the banks, financial institutions, and other lenders party to the DIP ABL/FILO Credit Agreement from time to time.

~~56.~~69.    "**DIP Agents**" means, collectively, the DIP ABL/FILO Agent and the DIP Term Loan Agent.

~~57.~~70.    "**DIP Claims**" means, collectively, the DIP ABL/FILO Claims and the DIP Term Loan Claims.

~~58.~~71.    "**DIP Credit Agreements**" means, collectively, the DIP ABL/FILO Credit Agreement and the DIP Term Loan Credit Agreement.

~~59.~~72.    "**DIP Documents**" means, collectively, the DIP ABL/FILO Documents and the DIP Term Loan Documents.

~~60.~~73.    "**DIP Facilities**" means those certain debtor-in-possession financing facilities pursuant to the DIP Credit Agreements and the DIP Order.

~~61.~~74.    "**DIP Lenders**" means, collectively, the DIP ABL/FILO Lenders and the DIP Term Loan Lenders.

~~62.~~75.    "**DIP Order**" means, collectively:  the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 80]; the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* [Docket No. 450]; and the *Order Authorizing the Debtors to Obtain Additional Postpetition Financing, (B) Increasing the Amount of Indebtedness Secured By Liens and Granted Superpriority Administrative Expense Status, (C) Authorizing the Debtors to Amend the Term DIP Credit Agreement, and (D) Granting Related Relief* [Docket No. 1062], authorizing, among other things, the Debtors to enter into the DIP Credit Agreements and incur postpetition obligations thereunder.

~~63.~~76.    "**DIP Term Loan Agent**" means Cortland Capital Market Services LLC, in its capacity as administrative agent and collateral agent under the DIP Term Loan Credit Agreement, together with its respective successors and assigns in such capacities.

~~64.~~77.    "**DIP Term Loan Claims**" means all Claims of the DIP Term Loan Agent and the DIP Term Loan Lenders arising under, derived from, secured by, or based on the DIP Term Loan Credit Agreement the DIP Term Loan Documents, or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Term Loan Facility.

65.78.    "*DIP Term Loan Documents*" means the DIP Term Loan Credit Agreement and all other agreements, documents, and instruments related thereto, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their terms and the terms of the DIP Order.

66.79.    "*DIP Term Loan Credit Agreement*" means that certain Credit Agreement, dated as of April 11, 2018, by and among the Debtors, the DIP Term Loan Lenders party thereto and the DIP Term Loan Agent, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the DIP Order.

67.80.    "*DIP Term Loan Facility*" means that certain debtor-in-possession financing facility available pursuant to the terms and conditions of the DIP Term Loan Credit Agreement and the DIP Order.

68.81.    "*DIP Term Loan Lenders*" means the banks, financial institutions, and other lenders party to the DIP Term Loan Credit Agreement from time to time.

69.82.    "*Disbursing Agent*" means the Debtors, or the Entity or Entities selected by the Debtors to make or facilitate distributions contemplated under the Plan.

70.83.    "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 868], dated as of November 14, 2018, as may be amended, supplemented, or modified from time to time (with the consent of the Requisite Term Loan Lenders, such consent not to be unreasonably withheld, conditioned, or delayed), including all exhibits and schedules thereto and references therein that relate to the First Amended Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

71.84.    "*Disclosure Statement Order*" means the order by the Bankruptcy Court approving the Disclosure Statement [Docket No. 864].

72.85.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

73.    "*Distributable Equity Holders Settlement Proceeds*" means the amount of the Equity Holders Settlement Proceeds less the NWHI Administrative Expense Settlement.

74.86.    "*Distribution Record Date*" means the record date for purposes of determining which holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date as is designated in a Final Order of the Bankruptcy Court.

75.87.    "*DTC*" means The Depository Trust Company.

76.88.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions precedent specified in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) no stay of the Confirmation Order is in effect, which shall be the day Consummation occurs.

77.89.    "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

78.90.    "*Equity Holders Settlement*" means the settlement of the Estate Causes of Action and claims arising on or before the Effective Date made, or which could have been made, against the Sponsor, the Minority Equity Holders, and their respective current and former Affiliates (including Belk, Inc.), and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts,

KE 58496119

or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case solely in their capacity as such, including any matter arising out of or relating to the 2014 Transaction, the Carve-Out Businesses and/or their ownership or operation of the Debtors or the Carve-Out Businesses, and/or any action or inaction taken by any of them in connection with any steps taken to eliminate, suspend, or otherwise reduce in any manner any business or other commercial dealings done or to be done by Belk, Inc. with any of the Debtors; *provided*, *however*, that notwithstanding anything herein to the contrary, (a) the Equity Holders Settlement shall not settle or release any claims or Causes of Action against any of the following, each in their capacity as such, in connection with any matter arising out of or relating to the 2014 Transaction or the Carve-Transactions, and with respect to (ii) and (iii), for conduct occurring on or before April 8, 2014: (i) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (ii) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (iii) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc., and (b) the Equity Holders Settlement does not release any claims by any of the Debtors, the Reorganized Debtors, or Belk, Inc. arising out of or related to ordinary course business dealings with respect to products or services ordered by Belk, Inc. from the Debtors, the Estates, or the Reorganized Debtors (including any amounts due and owing among such parties or any Causes of Action arising out of or related thereto).

~~79.~~91.    "***Equity Holders Settlement Proceeds***" means $~~115~~120,000,000 contributed to the Estates by the Sponsor and the Minority Equity Holder.

~~80.~~92.    "***Estate***" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

~~81.~~93.    "***Estate Action STL Settlement***" means the settlement of all Estate Causes of Action and claims arising on or before the Effective Date made, or which could have been made, against the Secured Term Loan Agent or any current or former Secured Term Loan Lender, in each case solely in their capacity as such, including any challenge to the validity, enforceability, priority of the Secured Term Loan Credit Agreement, or the Secured Term Loan Claims thereunder, or any payments of interest or principal thereon, in exchange for the waiver of default interest during the Chapter 11 Cases and the distributions provided herein. For the avoidance of doubt, the Estate Action STL Settlement shall not settle, and shall not release, any claims or Causes of Action (excluding, for the avoidance of doubt, any claims or Causes of Action that could be asserted against the Secured Term Loan Agent or any of the Secured Term Loan Lenders arising out of or relating to the validity, enforceability, or priority of the Secured Term Loan Credit Agreement, or the Secured Term Loan Claims thereunder, or any payments of interest or principal thereon) against any of the following, each solely in their capacity as such (and, if applicable, not in their capacity as the Secured Term Loan Agent or current or former Secured Term Loan Lenders), in connection with any matter arising out of or relating to the 2014 Transaction or the Carve-Transactions, and with respect to (b) and (c), for conduct occurring on or before April 8, 2014: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc.

~~82.~~94.    "***Estate Action UTL Settlement***" means the settlement of all Estate Causes of Action and claims arising on or before the Effective Date made, or which could have been made, against the Unsecured Term Loan Agent or any current or former Unsecured Term Loan Lender, in each case solely in their capacity as such, including any challenge to the validity, enforceability, priority of the Unsecured Term Loan Credit Agreement, or the Unsecured

Term Loan Claims thereunder, or any payments of interest or principal thereon, to allow the Debtors to provide the distributions to holders of Claims against NWHI set forth herein. For the avoidance of doubt, the Estate Action UTL Settlement shall not settle, and shall not release, any claims or Causes of Action (excluding, for the avoidance of doubt, any claims or Causes of Action that could be asserted against the Unsecured Term Loan Agent or any of the Unsecured Term Loan Lenders arising out of or relating to the validity or enforceability of the Unsecured Term Loan Credit Agreement, or the Unsecured Term Loan Claims thereunder, or any payments of interest or principal thereon) against any of the following, each solely in their capacity as such (and, if applicable, not in their capacity as the Unsecured Term Loan Agent or current or former Unsecured Term Loan Lenders), in connection with any matter arising out of or relating to the 2014 Transaction or the Carve-Transactions, and with respect to (b) and (c), for conduct occurring on or before April 8, 2014: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc.

83.95. "*Estate Causes of Action*" means any Causes of Action held by any Estate.

84.96. "*Exculpated Parties*" means collectively, and in each case solely in its or their capacity as such: (a) the Debtors; (b) the Reorganized Debtors, (c) the Debtors' current and former officers, directors, and managers; (d) the Secured Term Loan Lenders; (e) the Secured Term Loan Agent; (f) the Unsecured Term Loan Lenders; (g) the Unsecured Term Loan Agent; (h) the Prepetition ABL/FILO Secured Parties; (i) the DIP Lenders; (j) the DIP Agents; (k) DTC; (l) each member of the Ad Hoc Group of Unsecured Noteholders; (m) the 2019 Notes Indenture Trustee; (n) the 2034 Notes Indenture Trustee; (o) the Sponsor and Belk, Inc.; (mp) the Minority Equity Holders; (nq) the Committee and each of its members; (or) each of the parties to the Restructuring Support Agreement; (s) each member of the Ad Hoc Group of Crossover Lenders; (t) each member of the Ad Hoc Secured Lender Group; (u) Brigade; (v) the Funding Entities; and (pw) with respect to each of the foregoing entities in clauses (a) through (ev), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, and Affiliates, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, *however*, that notwithstanding anything herein to the contrary, (i) none of the following Persons or Entities, each solely in their capacity as such, shall be Exculpated Parties, regardless of whether they would otherwise meet the Exculpated Parties definition: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc., (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc., and (ii) the exculpation in favor of Belk, Inc.any Exculpated Party does not release any claims by any of the Debtors, the Reorganized Debtors, or Belk, Inc. arising out of or related to ordinary course business dealings with respect to products or services ordered by Belk, Inc. from the Debtors, the Estates, or the Reorganized Debtors (including any amounts due and owing among such parties or any Causes of Action arising out of or related thereto).

85.97. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

86.98. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code, which amount is 2.06% per annum.

KE 58496119

87.99.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice, Claims, and Balloting Agent.

88.100.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be Filed relating to such order shall not cause such order to not be a Final Order.

89.101.    "*First Amended Plan*" means the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 867], dated November 14, 2018, and which was subject of the Disclosure Statement.

102.    "*First Cash-Out Election Form*" means the procedures and election form attached to the Second Amended Plan as Exhibit A, a customized version of which was mailed to the holders of General Unsecured Claims in Classes 5D, 5E, 5F, 5G, 5H, and 5I, which election form is null and void and shall have no further force and effect.

103.    "*Funding Entities*" means the members of the Ad Hoc Group of Unsecured Noteholders that commit to provide the Cash-Out Option Funding and the Non-Released Party Trust Loan.

90.104.    "*General Unsecured Claim*" means any Claim that is not secured and is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an Unsecured Term Loan Claim, (e) a 2034 Notes Claim, or (f) a 2019 Notes Claim, or (g) an Intercompany Claim.

91.105.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

92.    "*GUC Cash-Out Option*" means the Pro Rata share of Cash which holders of an Allowed General Unsecured Claim in Classes 5D, 5E, 5F, 5G, 5H, and 5I irrevocably elect, pursuant to the GUC Cash-Out Election Form, which election must be received by the Debtors no later than February 15, 2019, to receive in lieu of the New Common Stock, the New Warrants, and/or the Non-Released Party Trust Interests distributions such holder would otherwise receive, as set forth in, and subject to the terms of, Article IV.F of the Plan.

93.    "*GUC Cash-Out Election Form*" means the form procedures and election form attached hereto as **Exhibit A**, a customized version of which will be mailed to the holders of General Unsecured Claims in Classes 5D, 5E, 5F, 5G, 5H, and 5I.

94.106.    "*GUC Subsidiary Equity Pool*" means a pool of 0.519% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants (or the equivalent value of Cash thereof as a result of the election of the GUC Cash-Out Option by such holders), established to fund recoveries to holders of General Unsecured Claims in Classes 5E, 5F, 5G, 5H, and 5I.

95.107.    "*Holdings*" means Debtor Jasper Parent LLC.

96.108.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

KE 58496119

97.109.  "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.  For the avoidance of doubt, and notwithstanding anything herein to the contrary, Indemnification Obligations assumed shall not include any obligations to indemnify any Person(s) or Entities that may be defendants in or otherwise liable in connection with a Non-Released Party Trust Cause of Action; *provided, however,* that nothing in this sentence shall have any effect on any applicable director and officer liability insurance policy.

98.110.  "*Indenture Trustees*" mean the trustees under the 2019 Notes IndenturesIndenture Trustee and the 2034 Notes Indenture Trustee.

99.111.  "*Indenture Trustee Charging Lien*" means any Lien or other priority in payment to which any of the Indenture Trustees is entitled, pursuant to each of the applicable Indentures or any ancillary documents, instruments or agreements.

100.112.  "*Initial Distribution Date*" means the date on which the Disbursing Agent shall make initial distributions to holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date but in no event shall be later than 30 days after the Effective Date.

101.113.  "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date.

102.114.  "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

103.115.  "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

104.116.  "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 356], entered by the Bankruptcy Court on June 5, 2018, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

105.117.  "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

106.118.  "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

107.119.  "*Management Incentive Plan*" means the post-Effective Date management incentive plan, which shall provide for New Common Stock or other equity or similar interests in Reorganized Holdings to be reserved for directors, officers, and employees of the Reorganized Debtors (in an amount up to but no greater than 10% of the New Common Stock) and shall be reasonably acceptable to the Debtors and the Requisite Unsecured Lenders.

108.    "*Maximum GUC Cash-Out Amount*" means the aggregate amount of Cash to be distributed to holders of Allowed General Unsecured Claims who elect to participate in the GUC Cash-Out Option, which amount shall not exceed $24.9 million.

109.120. "*Minimum Exit Cash Requirement*" means the amount of Cash necessary for the Debtors to meet all Cash payment obligations under the Plan, excluding existing Cash on the balance sheet and the New ABL Facility financing, which amount will be determined by the Debtors in consultation with the Required Unsecured Lenders and the Committee.

110.121. "*Minority Equity Holders*" means investment funds managed or advised by, or Affiliates of, KKR Credit Advisors (US) LLC, KKR Capital Markets LLC, and/or Kohlberg Kravis Roberts & Co., L.P., solely in their capacity as lenders to, underwriters of, and/or holders of direct or indirect debt or equity interests in Holdings and/or any of the Carve-Out Businesses.

111.122. "*New ABL Facility*" means an up to $200 million senior secured asset-based revolving credit facility that shall contain such other terms reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

112.123. "*New ABL Facility Documents*" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the New ABL Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

113.124. "*New Common Stock*" means the common stock, limited liability company membership units, or the functional equivalent thereof of Reorganized Holdings to be issued upon consummation of the Plan.

114.125. "*New Debt*" means, collectively, the New ABL Facility and the New Secured Facility.

115.126. "*New Debt Agreements*" means, collectively, the credit agreements for the New ABL Facility and the New Secured Facility.

116.127. "*New Debt Documents*" means, collectively, the New ABL Facility Documents and the New Secured Facility Documents.

117.128. "*New Secured Facility*" means a new secured term loan facility or facilities (to be funded in any tranche or tranches necessary to raise such financing) in the amount of at least the Minimum Exit Cash Requirement, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

118.129. "*New Secured Facility Documents*" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the New Secured Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.

119.130. "*New Warrant Agreement*" means the warrant agreement for the issuance of the New Warrants, the form of which shall be included in the Plan Supplement and the terms of which shall be consistent with this Plan and otherwise reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee. the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications (other than with respect to the percentage of shares of New Common Stock, for which the New Warrants may be exercised, which will be modified to reflect the terms of this Third Amended Plan) to the form filed in the Plan Supplement at Docket No. 1146) and the Committee.

120.131. "*New Warrants*" means the new five year warrants to be issued in accordance with the terms of the New Warrant Agreement, entitling the holders of such warrants to convert the warrants to 2520% of the shares of the

New Common Stock (subject to dilution pursuant to the Management Incentive Plan), at a strike price calculated based on a total enterprise value of $625 million.

~~121.    "*Non-Cash Distribution*" means each of the New Common Stock, the New Warrants, and/or the Non-Released Party Trust Interests, as applicable, to which a holder of a General Unsecured Claim in Classes 5D, 5E, 5F, 5G, 5H, and 5I is entitled to pursuant to Article III.B of the Plan.~~

~~122.~~132.  "*Non-Released Party Trust*" means the trust that will be created to pursue the Non-Released Party Trust Causes of Action following the Effective Date in accordance with the terms of this Plan and the Non-Released Party Trust Agreement.

~~123.~~133.  "*Non-Released Party Trust Agreement*" means the trust agreement that, among other things, establishes the Non-Released Party Trust, and describes the powers, duties, and responsibilities of the Non-Released Party Trustee, the form of which shall be in form and substance reasonably acceptable to the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Debtors (in consultation with the Requisite Unsecured Lenders, *provided* that the Requisite Unsecured Lenders will have reasonable consent rights with respect to any obligations included in the Non-Released Party Trust Agreement that directly require the Reorganized Debtors to act, or not act, as the case may be, after the Effective Date) and which shall be included in the Plan Supplement, and the material terms of which are included in the Plan; *provided, however, that to the extent the terms of Article IV.D of the Plan conflict with the Non-Released Party Trust Agreement, the Non-Released Party Trust Agreement shall control, with the Plan controlling in all other respects.*

~~124.~~134.  "*Non-Released Party Trust Assets*" means the Non-Released Party Trust Causes of Action and the Cash proceeds from the Non-Released Party Trust Loan; *provided that neither the Debtors nor the Reorganized Debtors shall have any obligation to provide any funding to the Non-Released Party Trust.*

135.    "*Non-Released Party Trust Advisory Board*" means the advisory board that shall appoint the Non-Released Party Trustee and shall oversee the Non-Released Party Trust in accordance with the Non-Released Party Trust Agreement, the initial members of which shall consist of (a) four members selected by the Ad Hoc Group of Unsecured Noteholders and (b) one member selected by the Committee.  After the Effective Date, the members of the Non-Released Party Trust Advisory Board shall be appointed in accordance with the terms of the Non-Released Party Trust Agreement.

~~125.~~136.  "*Non-Released Party Trust Beneficiaries*" means the holders of Non-Released Party Trust Interests.

~~126.~~137.  "*Non-Released Party Trust Causes of Action*" means all claims and Causes of Action arising under state or federal law owned by, or asserted by or on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates, in respect of matters arising out of or relating to the 2014 Transaction or the Carve-Out Transactions (i) against any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction or their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.) or (ii) for conduct occurring on or before April 8, 2014,  regardless of whether the Debtors were insolvent at the time of the event giving rise to the claim or Cause of Action at issue; *provided, however*, that the foregoing shall not include claims and Causes of Action against any Released Parties, solely in their capacities as such, or claims and Causes of Action settled or released by the Equity Holders Settlement, the Estate Action STL Settlement, the Estate Action UTL Settlement, or paragraphs F(xii) and 26 of the DIP Order; and *provided, further*, that "Non-Released Party Trust Causes of Action" shall include all claims and Causes of Action arising under state or federal law owned by, or asserted by or on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates, in respect of matters arising out of or relating to the 2014 Transaction or the Carve-Out Transactions, regardless of whether the Debtors were insolvent at the time of the event giving rise to the claim or Cause of Action at issue, against each of the following, solely in their capacity as such, (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or

KE 58496119

mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc.  For the avoidance of doubt, the failure to specifically identify an Entity or Person in the immediately preceding sentence does not mean that such Entity or Person may not be subject to a Non-Released Party Trust Cause of Action.

~~127.~~138. "*Non-Released Party Trust Distributable Proceeds*" means all actual proceeds of the Non-Released Party Trust Causes of Action, net of any amounts (a) used to repay any funding for the Non-Released Party Trust ~~Loan~~ in accordance with ~~its~~the terms of such funding, (b) used to pay the Non-Released Party Trust Expenses, and (c) as otherwise provided in accordance with the Non-Released Party Trust Agreement.

~~128.~~139. "*Non-Released Party Trust Expenses*" means all reasonable fees, costs, and expenses of and incurred by the Non-Released Party Trust~~ee~~, including legal and other professional fees, costs, and expenses, administrative fees and expenses, insurance fees, taxes, and escrow expenses, which shall be paid in accordance with the Non-Released Party Trust Agreement~~;~~, *provided*, *however*, that neither the Debtors nor the Reorganized Debtors shall be required in any event to pay the Non-Released Party Trust Expenses ~~other than as may be paid from the proceeds of the Non-Released Party Trust Loan~~.

~~129.~~140. "*Non-Released Party Trust*s *Interests*" means ~~the interests in~~, collectively, the Non-Released Party Trust~~, to be distributed on a pro rata basis to holders of Claims in Classes 5B, 5C, and 5D, as set forth herein; it being understood that to the extent a holder of Claims in~~ Interests Class ~~5D elects the GUC Cash-Out Option, the Debtors will be purchasing such interests and such interests shall vest in the Reorganized Debtors.~~ I and the Non-Released Party Trust Interests Class II.

~~130.~~141. "*Non-Released Party Trust Loan*" means the financing incurred to fund the Non-Released Party Trust Expenses, which shall consist of ~~a $5~~loan of approximately $7.7 million ~~term loan with a 20% PIK interest rate and a full make whole if taken out at any time prior to the second anniversary~~, provided by the ~~Reorganized Debtors~~Funding Entities to the Non-Released Party Trust, the form of which shall be included in the Plan Supplement and shall be acceptable to the Debtors, ~~Requisite~~ the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured ~~Lenders~~Noteholders, and the Committee~~, unless the Committee determines within 7 days following the conclusion of the Confirmation Hearing, in consultation with~~.  For the avoidance of doubt, the Reorganized Debtors~~, that~~ shall have no obligations under the Non-Released Party Trust ~~shall not avail itself of such financing~~Loan.

~~131.~~142. "*Non-Released Party Trust Transfer Agreement*" means the agreement respecting transfer of documents, information, and Privileges from the Debtors, the Reorganized Debtors (solely in their capacity as successors to the Debtors), and the Committee to be entered into ~~between~~among the Non-Released Party Trustee~~ and,~~, NWHI, on behalf of itself and the other Debtors, and the Committee, the terms of which shall be consistent with this Plan and otherwise reasonably acceptable to the Debtors, the Required Unsecured Lenders, ~~and the Committee.~~the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee.

~~132.~~143. "*Non-Released Party Trustee*" means the Person designated by the ~~Committee~~Non-Released Party Trust Advisory Board to serve as the trustee of the Non-Released Party Trust, who shall be identified and disclosed prior to the Effective Date, and any successor thereto appointed pursuant to the Non-Released Party Trust Agreement.

~~133.~~144. "*Notice, Claims, and Balloting Agent*" means Prime Clerk LLC, in its capacity as notice, claims, and balloting agent for the Debtors and any successor.

~~134.~~145. "*NWHI*" means Debtor Nine West Holdings, Inc.

KE 58496119

135.    "*NWHI Administrative Expense Settlement*" means the allocation of 35% of the Professional Administrative Expenses to NWHI, which allocation shall be charged against the Equity Holders Settlement Proceeds and thereby reduce the Equity Holders Settlement Proceeds available for distribution to holders of allowed Claims in Classes 5A, 5B, 5C, and 5D on a dollar for dollar basis, as set forth in Article IV.D of the Plan, but which, for the avoidance of doubt, shall not reduce the Equity Holder Settlement Proceeds contributed to the Estates by the Sponsor and the Minority Equity Holder.

146.    "*Original Plan Amendment Notice*" means the *Notice of Filing of Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No 1111].

~~136.~~147. "*Other Priority Claim*" means any Claim against any of the Debtors described in section 507(a) of the Bankruptcy Code to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

~~137.~~148. "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, a Secured Term Loan Claim, or a Secured Tax Claim.

~~138.~~149. "*Pension Plan*" means the Pension Plan for Associates of Nine West Group Inc.

~~139.~~150. "*Person*" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

~~140.~~151. "*Petition Date*" means April 6, 2018, the date on which each of the Debtors commenced the Chapter 11 Cases.

~~141.~~152. "*Plan*" means this ~~Second~~Third Amended Plan, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement, which is incorporated herein by reference and made part of the Plan as if set forth herein.

~~142.    "*Plan Amendment Notice*" means the *Notice of Filing of Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, which notice shall be in form and substance reasonably acceptable to the Debtors, the Committee, and the Required Unsecured Term Lenders, and to which the Second Amended Plan shall be attached.~~

~~143.~~153. "*Plan Equity Value*" means Plan Settlement TEV, less the aggregate outstanding amount of New Debt as of the Effective Date.

~~144.~~154. "*Plan Settlement TEV*" means $600 million.

~~145.~~155. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, the initial draft of certain of such documents shall be Filed by the Debtors seven calendar days prior to the Voting Deadline, and additional documents Filed with the Bankruptcy Court prior to the Effective Date, as may be amended, supplemented, altered, or modified from time to time subject to any applicable consent rights as set forth in the Restructuring Support Agreement or this Plan and in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Assumed Executory Contracts and Unexpired Leases Schedule; (b) the Rejected Executory Contracts and Unexpired Leases Schedule; (c) the Retained Causes of Action Schedule; (d) the form of the Reorganized Holdings Organizational Documents; (e) the Management Incentive Plan; (f) the form of the New Debt Agreements; (g) the identity of the members of the Reorganized Holdings Board and any executive management for Reorganized Holdings; (h) the form of the New Warrant Agreement; (i) the Restructuring Steps Memorandum; (j) the form of the Non-Released Party Trust Agreement; (k) the form of documentation for the Non-Released Party Trust Loan; (l) the form of Non-Released Party Trust Transfer Agreement; ~~and (m~~(m) the Supplemental Cash-Out Election Form; (n) the Commitment Letter; and (o) any other necessary documentation related to the Restructuring Transactions.  The documents comprising the Plan Supplement shall be subject to any applicable consent rights as set forth in the Restructuring Support Agreement and this Plan.

~~146.~~156. "*Prepetition ABL/FILO Agent*" means Wells Fargo Bank, National Association in its capacity as administrative agent and collateral agent and as FILO Agent under the Prepetition ABL/FILO Credit Agreement.

~~147.~~157. "*Prepetition ABL/FILO Credit Agreement*" means that certain Credit Agreement dated as of April 8, 2014, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among the Debtors, the Prepetition ABL/FILO Agent and the Prepetition ABL/FILO Lenders.

~~148.~~158. "*Prepetition ABL/FILO Claim*" means any Claim arising under, derived from, based upon, or secured by the Prepetition ABL/FILO Documents, which Claims shall be deemed Allowed Claims.

~~149.~~159. "*Prepetition ABL/FILO Documents*" means the Prepetition ABL/FILO Credit Agreement and any other agreements or documents executed in connection therewith or related thereto or evidencing the loans and obligations thereunder.

~~150.~~160. "*Prepetition ABL/FILO Credit Facility*" means the prepetition senior secured revolving credit facility provided by the Prepetition ABL/FILO Lenders.

~~151.~~161. "*Prepetition ABL/FILO Lenders*" means the lenders party to the Prepetition ABL/FILO Credit Agreement from time to time.

~~152.~~162. "*Prepetition ABL/FILO Secured Parties*" means the Prepetition ABL/FILO Agent and the Prepetition ABL/FILO Lenders.

~~153.~~163. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

~~154.~~164. "*Prepetition Credit Facilities*" means, collectively, the Prepetition ABL/FILO Credit Facility, the Secured Term Loan Facility, the Unsecured Term Loan Facility, the 2019 Notes, and the 2034 Notes.

~~155.~~165. "*Prepetition Debt Documents*" means, collectively, the Prepetition ABL/FILO Documents, Secured Term Loan Documents, the Unsecured Term Loan Documents, the 2019 Indentures, and the 2034 Indenture.

~~156.~~166. "*Privilege*" means any attorney-client privilege, work-product protection, or other privilege, protection, or immunity (a) held by (i) any or all of The Jones Group Inc., the Debtors, or the Estates, ~~or~~ (ii) the board of directors or any special committee of the board of directors of any of The Jones Group Inc., the Debtors, or the Estates (including any director in his or her capacity as such), or (iii) the Committee, and (b) attaching to any documents, communications, or thing (whether written or oral), including all electronic information, relating to the 2014 Transaction or Carve-Out Transactions that was created on or before ~~April 30, 2016; *provided, however*, that Privilege shall not include any attorney-client privilege, work-product protection, or other privilege, protection, or immunity attaching~~the Effective Date, subject to ~~any investigation into the 2014 Transaction,~~ the ~~Carve-Out Transactions, or any other actions included~~limitations as set forth in the ~~UCC Standing Motions~~Non-Released Party Trust Transfer Agreement.

~~157.~~167. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

~~158.~~168. "*Professional*" means an Entity retained in the Chapter 11 Cases in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

~~159.    "*Professional Administrative Expense Estimate*" means the estimated Professional Administrative Expenses, to be determined by the Debtors, with the consent of the Requisite Unsecured Lenders and the Committee~~

KE 58496119

(such consent not to be unreasonably withheld, conditioned or delayed), following the Confirmation Date and prior to the Effective Date.

160.    "*Professional Administrative Expenses*" means the aggregate Allowed administrative expenses incurred by the Estates on account of Professional Fee Claims, fees and expenses incurred by the Estates pursuant to Article II.D.4 from the Confirmation Date to the Effective Date, fees and expenses to be paid by the Estates in accordance with the DIP Order, and professional fees and expenses paid pursuant to the Plan and/or Restructuring Support Agreement from and after the Petition Date, in each case to the extent approved or authorized by the Bankruptcy Court. An exhibit listing all professionals that are covered by this provision is attached hereto as **Exhibit B**.

161.169. "*Professional Fee Claims*" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses. To the extent a Bankruptcy Court or higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

162.170. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount; *provided* that the Professional Fee Escrow shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

163.171. "*Professional Fee Escrow Amount*" means the total amount of Professional fees and expenses estimated pursuant to Article II.D.3 of the Plan.

172.    "*Professional Fee Savings*" means the aggregate savings, if any, on the payment of fees and expenses to the entities identified on Exhibit B to the Second Amended Plan through either a voluntary reduction of such fees and expenses by such entities or by way of successful objection to any fee applications or means of receiving payment filed by such entities or the Debtors; *provided*, *however*, that nothing herein shall (a) override, amend, or otherwise modify any provisions of the DIP Order, including those related to the payment of fees and expenses authorized to be paid thereunder, (b) authorize any challenge to fees and expenses previously paid pursuant to the DIP Order for which the applicable Review Period (as defined in the DIP Order) has expired, or (c) authorize any entities or parties not already permitted under paragraph 21 of the DIP Order to object to the payment of fees and expenses for the DIP Secured Parties and Prepetition Secured Parties (each as defined in the DIP Order) with standing to do so; *provided*, *further*, that the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders, and the Reorganized Debtors shall work in good faith and use commercially reasonable efforts to obtain such fee reductions or resolve objections to such fees. The reasonable and documented cost of preparing and filing any formal objections to fee applications by the Reorganized Debtors shall be paid by the Reorganized Debtors, subject to consultation with the Ad Hoc Group of Unsecured Noteholders, and up to $750,000 of such documented fees and expenses shall be funded out of any aggregate savings hereunder prior to the first $5 million to be paid to Classes 5B, 5C, and 5D, *provided*, *however*, that the payment of such costs shall not reduce the $5 million to be provided to Classes 5B, 5C, and 5D. Any fees and expenses for fee objections incurred in excess of $750,000 shall be paid by the Reorganized Debtors. For the avoidance of doubt, the realization of any Professional Fee Savings shall not delay emergence and is not a condition precedent to the Consummation of the Plan.

164.173. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

165.174. "*Proof of Interest*" means a proof of Interest Filed against any of the Debtor in the Chapter 11 Cases.

166.175. "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date.

KE 58496119

167.176. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

168.177. "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors and the Requisite Unsecured Lenders.

169.178. "*Released Party*" means each of the following solely in its or their capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Secured Term Loan Lenders; (d) the Secured Term Loan Agent; (e) the Unsecured Term Loan Lenders; (f) the Unsecured Term Loan Agent; (g) the Prepetition ABL/FILO Secured Parties; (h) the DIP Lenders; (i) the DIP Agents; (j) the holders of 2019 Notes Claims; (k) the holders of 2034 Notes Claims; (l) the 2019 Notes Indenture Trustee; (m) the 2034 Notes Indenture Trustee; (n) the Debtors' current and former officers, directors, and managers; (ko) the Sponsor and Belk, Inc.; (lp) the Minority Equity Holders; (mq) the Committee and each of its members; (nr) each member of the Ad Hoc Group of Unsecured Noteholders; (s) each member of the Ad Hoc Group of Crossover Lenders; (t) each member of the Ad Hoc Secured Lender Group; (u) Brigade; (v) each of the parties to the Restructuring Support Agreement; (w) the Funding Entities; and (ox) with respect to each of the foregoing entities in clauses (a) through (nw), such Entity and its current and former Affiliates, and such Entities' current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, managing members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; *provided*, *however*, that notwithstanding anything herein to the contrary, (i) none of the following Persons or Entities, each solely in their capacity as such, shall be Released Parties, regardless of whether they would otherwise meet the Released Parties definition: (a) any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), (b) directors, officers, or managers of The Jones Group Inc. and its subsidiaries and Affiliates, and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for The Jones Group Inc., and (ii) the release in favor of Belk, Inc. any Released Party does not release any claims by any of the Debtors, the Reorganized Debtors, or Belk, Inc. arising out of or related to ordinary course business dealings with respect to products or services ordered by Belk, Inc. from the Debtors, the Estates, or the Reorganized Debtors (including any amounts due and owing among such parties or any Causes of Action arising out of or related thereto).

170.179. "*Releasing Party*" means each of the following in their capacity as such: (a) the Consenting Secured Lenders; (b) the Secured Term Loan Agent; (c) the Consenting Unsecured Lenders; (d) the Unsecured Term Loan Agent; (e) the Prepetition ABL/FILO Secured Parties; (f) the DIP Lenders; (g) the DIP Agents; (h) the Sponsor; (i) the Minority Equity Holders; (j) the Committee; (k) each member of the Ad Hoc Group of Unsecured Noteholders; (l) each member of the Ad Hoc Group of Crossover Lenders; (m) each member of the Ad Hoc Secured Lender Group; (n) Brigade; (o) the 2019 Notes Indenture Trustee; (p) the 2034 Notes Indenture Trustee; (q) all holders of Claims that

vote to accept the Plan; (l̶r) all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Release; (m̶s) all holders of Claims entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Release; (n̶t) all holders of Claims that are deemed to accept the Plan and do not elect to opt out of the Third-Party Release; (u) all other holders of Claims and Interests who are deemed to reject the Plan and do not elect to opt-out of the Third-Party Release; (v) the Funding Entities; and (o̶w) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a)- through (n̶v), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members (other than with respect to the foregoing clause (j)), management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, *provided* holders of Claims in the foregoing clauses (l̶), (m̶r), (s), (t), and (n̶u) who otherwise had the option to opt out of the Third-Party Release shall, after entry of the Confirmation Order, be sent an opt-out form with which to opt out of the Third-Party Release for any Released Party added to the Plan after the First Amended Plan, which shall be in form and substance reasonably acceptable to the Debtors and the Committee.

171.180. "*Reorganized Debtors*" means Reorganized Holdings and each of the Debtors, or any successor(s) thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

172.181. "*Reorganized Debtors Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each Reorganized Debtor, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications to the form filed in the Plan Supplement at Docket No. 1145), and the Committee.

173.182. "*Reorganized Holdings*" means either (a) Holdings, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

174.183. "*Reorganized Holdings Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Holdings.

175.184. "*Reorganized Holdings Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents, including any Shareholders Agreement, of Reorganized Holdings, the terms of which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, and the Committee.the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications to the form filed in the Plan Supplement at Docket No. 1145), and the Committee.

176.185. "*Requisite Secured Lenders*" means the Requisite Consenting Secured TL Lenders (as defined in the Restructuring Support Agreement).

177.186. "*Requisite Term Loan Lenders*" means, collectively, the Requisite Secured Lenders and Requisite Unsecured Lenders.

178.187. "*Requisite Unsecured Lenders*" means the Requisite Consenting Unsecured TL Lenders (as defined in the Restructuring Support Agreement).

179.188. "*Restructuring Expenses*" shall mean all (a) reasonable, actual, and documented fees and expenses payable under the Restructuring Support Agreement (provided that notwithstanding the Restructuring Support Agreement, the Unsecured Term Loan Agent will not be paid such fees and expenses pursuant to the Plan and will instead exercise its Unsecured Term Loan Agent Charging Lien) or DIP Order, to the extent not otherwise paid

pursuant to the DIP Order or other order of the Court, and (b) all reasonable, actual, and documented fees and expenses of the Ad Hoc Group of Unsecured Noteholders in the amount of $12,500,000.

180.189. "*Restructuring Steps Memorandum*" means the summary of the transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement.

181.190. "*Restructuring Support Agreement*" means that certain First Amended and Restated Restructuring Support Agreement, dated as of October 17, 2018, by and among the Debtors, the Consenting Secured Lenders, the Consenting Unsecured Lenders, the Sponsor, and the Minority Equity Holders, as the same may be amended, modified, or amended and restated from time to time in accordance with its terms.

182.191. "*Restructuring Transactions*" means the transactions described in Article IV.I of the Plan.

183.192. "*Retained Causes of Action*" means those Causes of Action held by the Debtors and their Estates that are not otherwise released under this Plan or transferred to the Non-Released Party Trust, including those Causes of Action identified on the Retained Causes of Action Schedule.

184.193. "*Retained Causes of Action Schedule*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred, including to the Non-Released Party Trust pursuant to the Plan, which shall be reasonably acceptable to the Debtors, the Requisite Unsecured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee and included in the Plan Supplement; *provided, however,* the schedule of the Non-Released Party Trust Causes of Action shall be acceptable to the Committee in its sole discretion.

185.194. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be or may have been amended, modified, or supplemented from time to time.

186.195. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

187.196. "*Second Amended Plan*" means the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, [Docket No. 1111], dated January [•],20, 2019.

188.197. "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

189.198. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

190.199. "*Secured Term Loan 363 Payment*" means the payment of $263,000,000 in Cash to holders of Secured Term Loan Claims pursuant to the 363 Sale Order.

191.200. "*Secured Term Loan Agent*" means Cortland Capital Market Services LLC in its capacity as administrative agent under the Secured Term Loan Credit Agreement, and Morgan Stanley Senior Funding, Inc. as predecessor administrative agent.

KE 58496119

192.201. "*Secured Term Loan Agent Charging Lien*" means any Lien or other priority in payment to which the Secured Term Loan Agent is entitled, pursuant to the Secured Term Loan Documents.

193.202. "*Secured Term Loan Claims*" means all Claims against any Debtor arising under, derived from, or based on the Secured Term Loan Credit Agreement.

194.203. "*Secured Term Loan Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of April 8, 2014, by and among NWHI, as borrower, Jasper Parent LLC, as holdings, the Secured Term Loan Agent, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

195.204. ———— "*Secured Term Loan DIP Order Payments*" means the payment of prepetition accrued and unpaid interest in the amount of $5,693,962.53 in Cash to holders of Secured Term Loan Claims pursuant to Section 16(e)(i) of the DIP Order.

196.205. "*Secured Term Loan Documents*" means the Secured Term Loan Credit Agreement and any other Loan Document (as defined in the Secured Term Loan Credit Agreement) and any other document related to or evidencing the loans and obligations thereunder.

197.206. "*Secured Term Loan Facility*" means the prepetition senior secured term loan facility provided by the Secured Term Loan Lenders.

198.207. "*Secured Term Loan Lender*" means the banks, financial institutions, and other lenders party to the Secured Term Loan Credit Agreement from time to time, each in its capacity as such a party.

199.208. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

200.209. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

201.210. "*Shareholders Agreement*" means the shareholder agreement, limited liability company agreement, or similar agreement that will govern the rights and obligations of holders of New Common Stock, the form of which shall be included with the other Reorganized Holdings Organizational Documents to be included in the Plan Supplement and which shall be reasonably satisfactory to the Debtors, the Requisite Unsecured Lenders, the Ad Hoc Group of Unsecured Noteholders (solely with respect to any modifications to the form filed in the Plan Supplement at Docket No. 1145), and the Committee.

202.211. "*Sponsor*" means investment funds managed or advised by, or Affiliates of, Sycamore Partners Management, L.P., in their capacity as majority holders of direct or indirect equity interests in Holdings and/or any of the Carve-Out Businesses or otherwise, and the Sycamore Affiliates and Sycamore (as named and defined in the UCC Standing Motions).

203.212. "*Sponsor Advisory Agreement*" means the agreement(s), dated April 8, 2014, between the Debtors and the Sponsor under which the Debtors agreed to pay management, advisory, and/or like fees and expenses to the Sponsor and any related contract, document, or amendments, modifications, or supplements.

213.    "*Supplemental Cash-Out Election Form*" means the procedures and election form to be included in the Plan Supplement (which shall be in a form reasonably acceptable to the Debtors, the Committee, the 2019 Notes Indenture Trustee, the 2034 Note Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Requisite Unsecured Lenders), a customized version of which will be mailed to the holders of Claims in Classes 5B, 5C, and 5D (other than the members of the Ad Hoc Group of Unsecured Noteholders) by no later than February 20, 2019.

214.    "*Supplemental Plan Amendment Notice*" means the *Notice of Filing of Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, to which the Third Amended Plan is attached.

215.    "***Third Amended Plan***" means this chapter 11 plan of reorganization.

~~204.~~216. "***Third-Party Release***" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.C of the Plan.  For the avoidance of doubt, no Third-Party Release shall be given to any Person or Entity that may be a defendant in a Non-Released Party Trust Cause of Action.

~~205.~~217. "***UCC Standing Motions***" means the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respective Such Claims* [Docket No. 718] and the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing, and Authority to Commence and Prosecute Certain Additional Claims on Behalf of the NWHI Estate and Exclusive Settlement Authority in Respect of Such Claims* [Docket No. 731].

~~206.~~218. "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of New York.

~~207.~~219. "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

~~208.~~220. "***Unimpaired***" means, with respect to a Claim or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

~~209.~~221. "***Unsecured Term Loan Agent***" means GLAS Trust Company LLC in its capacity as administrative agent under the Unsecured Term Loan Credit Agreement, and Morgan Stanley Senior Funding, Inc. as predecessor administrative agent.

~~210.~~222. ———"***Unsecured Term Loan Agent Charging Lien***" means any Lien or other priority in payment to which the Unsecured Term Loan Agent is entitled, pursuant to the Unsecured Term Loan Agent Documents.

~~211.~~223. "***Unsecured Term Loan Claims***" means all Claims against any Debtor arising under, derived from, or based on the Unsecured Term Loan Documents.

~~212.~~224. "***Unsecured Term Loan Credit Agreement***" means that certain Unsecured Term Loan Credit Agreement, dated as of April 8, 2014, by and among NWHI, as borrower, Jasper Parent LLC, as holdings, the Unsecured Term Loan Agent, and the lenders party thereto, as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

~~213.~~225. "***Unsecured Term Loan Documents***" means the Unsecured Term Loan Credit Agreement and any other Loan Document (as defined in the Unsecured Term Loan Credit Agreement) and any other document related to or evidencing the loans and obligations thereunder.

~~214.~~226. "***Unsecured Term Loan Facility***" means the prepetition term loan facility provided by the Unsecured Term Loan Lenders.

~~215.~~227. "***Unsecured Term Loan Lender***" means the banks, financial institutions, and other lenders party to the Unsecured Term Loan Credit Agreement from time to time, each in its capacity as such a party.

~~216.~~228. "***Voting Deadline***" means 4:00 p.m. (prevailing Eastern Time) on January 14, 2019.

B.    *Rules of Interpretation*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions

means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) except with respect to Article II.A, Article II.C, Article II.D, Article III.B.4, and Article III.B.5, any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) references to "Proofs of Claim," "holders of Claims," "disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "disputed Interests," and the like as applicable; (15) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (16) any effectuating provisions may be interpreted by the Debtors (subject to the Restructuring Support Agreement) or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor. To the extent a rule of law or procedure is supplied by the Bankruptcy Code, the Bankruptcy Rules, and the decisions and standards of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the United States District Court for the Southern District of New York, and the Bankruptcy Court, as applicable, shall govern and control.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, and expenses.

Except to the extent that a holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Loan Claim, each such holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash of such holder's Allowed DIP Term Loan Claim on the Effective Date.

Except to the extent that a holder of an Allowed DIP ABL/FILO Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL/FILO Claim, each such holder of an Allowed DIP ABL/FILO Claim shall receive indefeasible payment in full in Cash of such holder's Allowed DIP ABL/FILO Claim on the Effective Date. As used in this paragraph "payment in full in Cash" shall mean the indefeasible payment in full in Cash of all DIP ABL/FILO Claims (including all fees and expenses of the DIP ABL/FILO Agent through the Effective Date), the cancellation, backing, or cash collateralization of letters of credit under the DIP ABL/FILO Facility in accordance with the terms of the DIP ABL/FILO Documents, the termination of the DIP ABL/FILO Agent's and DIP ABL/FILO Lenders' obligation to extend credit under the DIP ABL/FILO Facility, and the receipt by the DIP ABL/FILO Agent of a countersigned payoff letter in form and substance satisfactory to the DIP ABL/FILO Agent. The ABL/FILO DIP Liens (as defined in the DIP Order) shall not be released until the satisfaction of the DIP ABL/FILO Claims in accordance with this Article II.A.

Immediately upon receipt of the payments required in this Article II.A, and except with respect to the Contingent DIP Term Loan Obligations and Contingent DIP ABL Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Term Loan Documents or the DIP ABL/FILO Documents, as applicable, as provided below), the DIP Documents shall be deemed cancelled, all Liens on property of the Debtors or the Reorganized Debtors, as applicable, arising out of such DIP Documents shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agents or the DIP Lenders and all guarantees of the Debtors or Reorganized Debtors, as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. The DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (i) the Contingent DIP Term Loan Obligations and the Contingent DIP ABL Obligations shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order, and (ii) the DIP Facilities and the DIP Documents shall continue in full force and effect after the Effective Date with respect to any obligations thereunder governing (1) the Contingent DIP Term Loan Obligations and the Contingent DIP ABL Obligations and (2) the relationships among the DIP Agents and the DIP Lenders, as applicable, including those provisions relating to the rights of the DIP Agents and the DIP Lenders to expense reimbursement, indemnification and other similar amounts (either from the Debtors or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facilities in accordance

KE 58496119

with the terms thereof. After the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agents and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agents and the DIP Lenders after the Effective Date that survive termination or maturity of the DIP Facilities in accordance with the terms thereof and/or the DIP Order. The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agents or any of the DIP Lenders under any of the foregoing provisions in accordance with the terms of the DIP Documents and the DIP Order.

B.      *Administrative Claims*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (after consultation with the Requisite Term Loan Lenders and the Committee) or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims, must be Filed and served on the Reorganized Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims, holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, the Debtors' or Reorganized Debtors' property, or the Estates, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      *Payment of Fees and Expenses under DIP Order*

On the later of (1) the Effective Date and (2) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses, and disbursements of the DIP Agents and DIP Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the applicable DIP Order. All payments of fees, expenses, or disbursements pursuant to this Article II.C shall be subject in all respects to the terms of the DIP Order.

KE 58496119

D.      *Professional Fee Claims*

1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.    <u>Professional Fee Escrow Account</u>

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.    <u>Professional Fee Escrow Amount</u>

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    <u>Post-Confirmation Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, or the Committee (subject to Article XII.E of the Plan). Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention

or compensation for services rendered after such date shall terminate, and the Debtors and the Committee (solely to the extent as set forth in Article XII.E of the Plan) may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, Reorganized Debtors, and the Committee (solely to the extent as set forth in Article XII.E of the Plan), as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

E.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. Solely to the extent required by the Bankruptcy Code, Allowed Priority Tax Claims will be paid with interest at the applicable non-default rate under non-bankruptcy law.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, except that (1) Class 5B, Class 5C, and Class 5D shall be vacant at each Debtor other than NWHI, (2) Class 5E shall be vacant at each Debtor other than Nine West Development LLC, (3) Class 5F shall be vacant at each Debtor other than Nine West Management Service LLC, (4) Class 5G shall be vacant at each Debtor other than Nine West Distribution LLC, (5) Class 5H shall be vacant at each Debtor other than One Jeanswear Group Inc., (6) Class 5I shall be vacant at each Debtor other than Kasper Group LLC, (7) Class 5J shall be vacant at each Debtor other than Jasper Parent LLC, Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, and (8) Class 7 shall be vacant at each Debtor other than Holdings.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Secured Term Loan Claims | Impaired | Entitled to Vote |
| 5A | Unsecured Term Loan Claims | Impaired | Entitled to Vote |
| 5B | 2034 Notes Claims | Impaired | Entitled to Vote |
| 5C | 2019 Notes Claims | Impaired | Entitled to Vote |
| 5D | General Unsecured Claims against NWHI | Impaired | Entitled to Vote |
| 5E | General Unsecured Claims against Nine West Development LLC | Impaired | Entitled to Vote |
| 5F | General Unsecured Claims against Nine West Management Service LLC | Impaired | Entitled to Vote |
| 5G | General Unsecured Claims against Nine West Distribution LLC | Impaired | Entitled to Vote |
| 5H | General Unsecured Claims against One Jeanswear Group Inc. | Impaired | Entitled to Vote |
| 5I | General Unsecured Claims against Kasper Group LLC | Impaired | Entitled to Vote |
| 5J | General Unsecured Claims against Non-Operating Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Interests in Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

29

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**     *Treatment of Claims and Interests*

        Subject to Article VI hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Debtors or Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated herein, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

       1.     <u>Class 1 - Other Priority Claims</u>

        (a)     *Classification*:  Class 1 consists of all Other Priority Claims.

        (b)     *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim and the applicable Debtor (after consultation with the Requisite Term Loan Lenders and the Committee) or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Priority Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

           (i)     payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or

           (ii)     such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

        (c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan.

       2.     <u>Class 2 - Other Secured Claims</u>

        (a)     *Classification*:  Class 2 consists of all Other Secured Claims.

        (b)     *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim and the applicable Debtor (after consultation with the Requisite Term Loan Lenders and the Committee) or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Secured Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

           (i)     payment in full in Cash of the unpaid portion of such holder's Allowed Other Secured Claim on the later of the Effective Date and such date such Other Secured Claim becomes an Allowed Other Secured Claim;

           (ii)     Reinstatement of such holder's Allowed Other Secured Claim;

(iii)  the applicable Debtor's interest in the collateral securing such holder's Other Secured Claim; or

(iv)  such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired.

(c)  *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan.

3.  <u>Class 3 - Secured Tax Claims</u>

(a)  *Classification*: Class 3 consists of all Secured Tax Claims.

(b)  *Treatment*: Except to the extent that a holder of an Allowed Secured Tax Claim and the applicable Debtor or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Secured Tax Claim, each such holder shall receive, at the option of the applicable Debtor or Reorganized Debtor, as applicable:

(i)  payment in full in Cash of the unpaid portion of such holder's Allowed Secured Tax Claim on the later of the Effective Date and such date such Secured Tax Claim becomes an Allowed Secured Tax Claim; or

(ii)  equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years from the Petition Date, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the option of the Reorganized Debtors to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)  *Voting*: Class 3 is Unimpaired under the Plan. Each holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of a Secured Tax Claim is not entitled to vote to accept or reject the Plan.

4.  <u>Class 4 - Secured Term Loan Claims</u>

(a)  *Classification*: Class 4 consists of all Secured Term Loan Claims.

(b)  *Allowance*: On the Effective Date, the Secured Term Loan Claims shall be Allowed in an aggregate amount equal to $432,798,741, plus interest at the non-default rate, fees, costs, charges, and other Secured Term Loan Claims arising under the Secured Term Loan Documents (with any interest accruing at the non-default rate) accruing after the Petition Date up to and including the Effective Date, which Allowed amount does not reflect (i) the Secured Term Loan 363 Sale Payment and (ii) the Secured Term Loan DIP Order Payments.

(c)  *Treatment*: On the Effective Date, except to the extent that a holder of an Allowed Secured Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Term Loan Claim, each holder of an Allowed Secured Term Loan Claim shall receive payment in full in Cash of the unpaid portion of its Allowed Secured Term Loan Claim.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Secured Term Loan Claims are entitled to vote to accept or reject the Plan.

5.     Class 5A - Unsecured Term Loan Claims

(a)     *Classification*:  Class 5A consists of all Unsecured Term Loan Claims.

(b)     *Allowance*:  On the Effective Date, the Unsecured Term Loan Claims shall be Allowed in an aggregate amount equal to $305,099,461.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed Unsecured Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Term Loan Claim, each such holder of an Allowed Unsecured Term Loan Claim shall receive its Pro Rata share of:

(i)     ~~90~~91.5% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants~~; and~~

(ii)     ~~25% of the~~$16,250,000 in Cash from the ~~Distributable~~ Equity Holders Settlement Proceeds~~;~~

(iii)     $3,700,000 from the Debtors;[2]

(iv)     Cash in an amount equal to the Administrative Expense Savings; and

~~(ii)~~(v)     Cash from the Professional Fee Savings in excess of $5,000,000.

(d)     *Voting*:  Class 5A is Impaired under the Plan.  Holders of Unsecured Term Loan Claims are entitled to vote to accept or reject the Plan.

6.     Class 5B - 2034 Notes Claims

(a)     *Classification*:  Class 5B consists of all 2034 Notes Claims.

(b)     *Allowance*:  On the Effective Date, the 2034 Notes Claims shall be Allowed in an aggregate amount equal to $255,997,396.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed 2034 Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 2034 Notes Claim, each such holder of an Allowed 2034 Notes Claim shall receive~~ its Pro Rata share  (based on the aggregate amount of (A) Allowed Claims in Classes 5B and 5C, and (B) the Allowed Claims in Class 5D) of~~:

(i)     ~~9.481~~its Pro Rata share (based on the aggregate amount of Allowed Claims in Classes 5B, 5C, and 5D) of:

(1)     $48,750,000 in Cash from the Equity Holders Settlement Proceeds;

(2)     the first $5,000,000 in Cash from the Professional Fee Savings;

---

[2]     Amount represents Debtors' payment in full satisfaction of fees and expenses of Unsecured Term Loan Agent payable through the exercise of its Unsecured Term Loan Agent Charging Lien.

KE 58496119

(3)        $24,400,000 in Cash from the Debtors;

(1)(4)    7.981% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants; and

(2)(5)    the New Warrants; and

(ii)    Either:

(1)    Consideration consisting of:

a.    the its Pro Rata share of the Class I Non-Released Party Trust Interests; and

(ii)    75% of the Cash from the Distributable Equity Holders Settlement Proceeds.

b.    its Pro Rata share (based on (A) an Allowed 2034 Notes Claim in the amount of $319,996,745, (B) the Allowed Claims in Class 5C, and (C) the Allowed Claims in Class 5D) of the Class II Non-Released Party Trust Interests; or

(2)    solely to the extent that such holder is not a member of the Ad Hoc Group of Unsecured Noteholders, the Cash-Out Option to the extent such holder timely elects to receive the Cash-Out Option.

(d)    *Voting*:  Class 5B is Impaired under the Plan.  Holders of 2034 Notes Claims are entitled to vote to accept or reject the Plan.

7.    Class 5C - 2019 Notes Claims

(a)    *Classification*:  Class 5C consists of all 2019 Notes Claims.

(b)    *Allowance*:  On the Effective Date, the 2019 Notes Claims shall be Allowed in an aggregate amount equal to $476,002,016.

(c)    *Treatment:*  Except to the extent that a holder of an Allowed 2019 Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 2019 Notes Claim, each such holder of an Allowed 2019 Notes Claim shall receive its Pro Rata share (based on the aggregate amount of (A) Allowed Claims in Classes 5B and 5C, and (B) the Allowed Claims in Class 5D) of:

(i)    9.481 its Pro Rata share (based on the aggregate amount of Allowed Claims in Classes 5B, 5C, and 5D) of:

(1)    $48,750,000 in Cash from the Equity Holders Settlement Proceeds;

(2)    the first $5,000,000 in Cash from the Professional Fee Savings;

(3)    $24,400,000 in Cash from the Debtors;

(1)(4)    7.981% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants; and

(2)(5)    the New Warrants; and

KE 58496119

(ii)        the Either:

(3)(1)    its Pro Rata share (based on (A) an Allowed 2034 Notes Claim in the amount of $319,996,745, (B) the Allowed Claims in Class 5C, and (C) the Allowed Claims in Class 5D) of the Class II Non-Released Party Trust Interests; andor

(ii)        75% of the Cash from the Distributable Equity Holders Settlement Proceeds.

(2)        solely to the extent that such holder is not a member of the Ad Hoc Group of Unsecured Noteholders, the Cash-Out Option to the extent such holder timely elects to receive the Cash-Out Option.

(d)        *Voting:* Class 5C is Impaired under the Plan.  Holders of 2019 Notes Claims are entitled to vote to accept or reject the Plan.

8.    Class 5D - General Unsecured Claims against NWHI

(a)        *Classification*:  Class 5D consists of all General Unsecured Claims against NWHI.

(b)        *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5D agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5D, each such holder of an Allowed General Unsecured Claim in Class 5D shall receive its Pro Rata share (based on the aggregate amount of (A) Allowed Claims in Classes 5B and 5C, and (B) the Allowed Claims in Class 5D) of:

(i)        its Pro Rata share (based on the aggregate amount of Allowed Claims in Classes 5B, 5C, and 5D) of:

(1)        $48,750,000 in Cash from the Equity Holders Settlement Proceeds;

(2)        the first $5,000,000 in Cash from the Professional Fee Savings;

(3)        $24,400,000 in Cash from the Debtors;

(i)        7.981Either:

(1)        Consideration consisting of:

(2)(4)    9.481% of the New Common Stock, subject to dilution by the Management Incentive Plan and the New Warrants; and

(3)(5)    the New Warrants; and

(ii)        Either:

(4)(1)    its Pro Rata share (based on (A) an Allowed 2034 Notes Claim in the amount of $319,996,745, (B) the Allowed Claims in Class 5C, and (C) the Allowed Claims in Class 5D) of the Class II Non-Released Party Trust Interests; or

(5)(2)    the GUC solely to the extent that such holder is not a member of the Ad Hoc Group of Unsecured Noteholders, the Cash-Out Option to the extent such holder of an Allowed General Unsecured Claim timely elects to receive the GUC Cash-Out Option; and.

(ii)    75% of the Cash from the Distributable Equity Holders Settlement Proceeds.

(c)    *Voting*:  Class 5D is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5D are entitled to vote to accept or reject the Plan.

9.    Class 5E - General Unsecured Claims against Nine West Development LLC

(a)    *Classification*:  Class 5E consists of all General Unsecured Claims against Nine West Development LLC

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5E agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5E, each such holder of an Allowed General Unsecured Claim in Class 5E shall receive either:

(c)(b)    its Pro Rata share of 0.039% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants; or.

(i)    the GUC Cash-Out Option to the extent such holder of an Allowed General Unsecured Claim timely elects to receive the GUC Cash-Out Option.

(d)(c)    *Voting*:  Class 5E is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5E are entitled to vote to accept or reject the Plan.

10.    Class 5F - General Unsecured Claims against Nine West Management Service LLC

(a)    *Classification*:  Class 5F consists of all General Unsecured Claims against Nine West Management Service LLC.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5F agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5F, each such holder of an Allowed General Unsecured Claim in Class 5F shall receive either:

(c)(b)    its Pro Rata share of 0.147% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants; or.

(i)    the GUC Cash-Out Option to the extent such holder of an Allowed General Unsecured Claim timely elects to receive the GUC Cash-Out Option.

(d)(c)    *Voting*:  Class 5F is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5F are entitled to vote to accept or reject the Plan.

11.    Class 5G - General Unsecured Claims against Nine West Distribution LLC

(a)    *Classification*:  Class 5G consists of all General Unsecured Claims against Nine West Distribution LLC.

(b)        *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5G agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5G, each such holder of an Allowed General Unsecured Claim in Class 5G shall receive either:

(c)(b)    its Pro Rata share of 0.002% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants; or.

(i)        the GUC Cash Out Option to the extent such holder of an Allowed General Unsecured Claim timely elects to receive the GUC Cash Out Option.

(d)(c)    *Voting*:  Class 5G is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5G are entitled to vote to accept or reject the Plan.

12.    Class 5H - General Unsecured Claims against One Jeanswear Group Inc.

(a)        *Classification*:  Class 5H consists of all General Unsecured Claims against One Jeanswear Group Inc.

(b)        *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5H agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5H, each such holder of an Allowed General Unsecured Claim in Class 5H shall receive either:

(c)(b)    its Pro Rata share of 0.221% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants; or.

(i)        the GUC Cash Out Option to the extent such holder of an Allowed General Unsecured Claim timely elects to receive the GUC Cash Out Option.

(d)(c)    *Voting*:  Class 5H is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5H are entitled to vote to accept or reject the Plan.

13.    Class 5I - General Unsecured Claims against Kasper Group LLC

(a)        *Classification*:  Class 5I consists of all General Unsecured Claims against Kasper Group LLC.

(b)        *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 5I agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim in Class 5I, each such holder of an Allowed General Unsecured Claim in Class 5I shall receive either:

(c)(b)    its Pro Rata share of 0.110% of the New Common Stock from the GUC Subsidiary Equity Pool, subject to dilution by the Management Incentive Plan and the New Warrants; or.

(i)        the GUC Cash Out Option to the extent such holder of an Allowed General Unsecured Claim timely elects to receive the GUC Cash Out Option.

(d)(c)    *Voting*:  Class 5I is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5I are entitled to vote to accept or reject the Plan.

KE 58496119

14.    Class 5J - General Unsecured Claims against Non-Operating Debtors

    (a)    *Classification*:  Class 5J consists of all General Unsecured Claims against Jasper Parent LLC, Nine West Jeanswear Holding LLC, Kasper U.S. Blocker LLC, Nine West Apparel Holdings LLC, and US KIC Top Hat LLC, if any.

    (b)    *Treatment*:  Allowed General Unsecured Claims in Class 5J, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of General Unsecured Claims in Class 5J will not receive any distribution on account of such Allowed General Unsecured Claims.

    (c)    *Voting*:  Class 5J is Impaired under the Plan.  Holders of General Unsecured Claims in Class 5J are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

15.    Class 6 - Intercompany Claims

    (a)    *Classification*:  Class 6 consists of all Intercompany Claims.

    (b)    *Treatment*:  On the Effective Date, all Intercompany Claims shall be, as determined by the Debtors with the reasonable consent of the Requisite Unsecured Lenders, either: (i) Reinstated, (ii) converted to equity, or (iii) cancelled and shall receive no distribution on account of such Claims and may be compromised, extinguished, or settled after the Effective Date.

    (c)    *Voting*:  Class 6 is either Impaired or Unimpaired under the Plan.  Holders of Intercompany Claims are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

16.    Class 7 - Interests in Holdings

    (a)    *Classification*:  Class 7 consists of all Interests in Holdings.

    (b)    *Treatment*:  On the Effective Date, all Interests in Holdings will be discharged, cancelled, released, and extinguished, and will be of no further force or effect, and holders of Interests in Holdings will not receive any distribution on account of such Interests in Holdings.

    (c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of Interests in Holdings are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

17.  Class 8 - Intercompany Interests

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, Intercompany Interests shall be, as determined by the Debtors with the reasonable consent of the Requisite Unsecured Lenders, either: (i) Reinstated, or (ii) discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

    (c)    *Voting*: Class 8 is Impaired or Unimpaired under the Plan. Holders of Intercompany Interests are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

18.    <u>Class 9 - Section 510(b) Claims</u>

    (a)    *Classification*: Class 9 consists of all Section 510(b) Claims.

    (b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

    (c)    *Treatment*: Allowed Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

    (d)    *Voting*: Class 9 is Impaired under the Plan. Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, such holders (if any) are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules; *provided* that this Article III.D shall not limit the respective rights of each party to the Restructuring Support Agreement, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, or the Committee.

KE 58496119

E.     *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

F.     *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.     *Intercompany Interests*.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims. For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**ARTICLE IV.
MEANS FOR IMPLEMENTATION OF THE PLAN**

A.     *Sources of Consideration for Plan Distributions*

The Reorganized Debtors will fund distributions and other sources and uses contemplated by the Plan with (1) Cash on hand, (2) the issuance and distribution of New Common Stock, New Warrants, and Non-Released Party Trust Interests, (3) proceeds from the New Debt, (4) the Equity Holders Settlement Proceeds, ~~and~~ (5) the ~~proceeds of Cash-Out Option Funding, (6) the~~ ~~NWHH~~ Administrative Expense ~~Settlement~~ Savings, and (7) the Professional Fee Savings.

1.     <u>New Common Stock</u>

On the Effective Date, Reorganized Holdings shall issue the New Common Stock to the Entities entitled to receive the New Common Stock pursuant to the Plan. The issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests. All of the shares of New Common Stock issued (including any New Common Stock to be issued upon the exercise of the New Warrants) pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set

forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

For the avoidance of doubt, any claimant's acceptance of New Common Stock, shall be deemed as its agreement to the Reorganized Holdings Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

2.      New Debt

On the Effective Date, contemporaneously with the satisfaction of the DIP Claims in accordance with Article II.A hereof, Reorganized Holdings and one or more Reorganized Debtors shall enter into the New Debt on the terms and conditions set forth in the New Debt Documents.  On and after the Effective Date, the New Debt Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New Debt, including the New Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Debt.

On the Effective Date, immediately upon receipt of the payments required in Article II.A hereof, all of the liens and security interests to be granted in accordance with the terms of the New Debt Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Debt Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the New Debt Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

3.      New Warrants; New Warrant Agreement

As described herein, the holders of Allowed Claims in Classes 5B, 5C, and 5D (but subject to, in the case of holders of Claims in Class 5D, the right of such holder to elect the GUC Cash Out Option), shall receive their Pro Rata share of New Warrants under the Plan. -The New Warrants shall only be exercisable as follows: (a) during the 5-year term of the warrantsNew Warrants, upon a change of control event consummated through a sale or a merger at a strike price based on a $625 million total enterprise value on a net (cashless exercise) basis; and (b) during the first 42 months of the5-year term of the New Warrants, for Cash only at the option of the holder of the New Warrants at a strike price based on a $625- million total enterprise value-, but only if such Cash election is made before a change of control event consummated through a sale or a merger. No adjustments will be made to the New Warrants' strike price, except solely in the event of dividends to shareholders, share repurchases, stock splits, above-market self-tenders, and other customary anti-dilution protections, to be set forth in the New Warrant Agreement. -In addition, the New Warrant Agreement shall provide that the New Warrants shall not (x) have any Black-Scholes or similar "cash out" protections in the event of a change of control transaction for less than the strike price, (y) have any covenants, or (z)- entitle the New Warrant holders to any corporate governance rights.

On the Effective Date, Reorganized Holdings shall issue the New Warrants to the Entities entitled to receive the New Warrants pursuant to the Plan.  The issuance of the New Warrants shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests other than as set forth herein.  Each distribution and issuance of the New Warrants under the Plan shall be governed by the New Warrant Agreement.

KE 58496119

For the avoidance of doubt, any claimant's acceptance of the New Warrants (including any New Common Stock to be issued upon the exercise of the New Warrants) shall be deemed as its agreement to the New Warrant Agreement and the Reorganized Holdings Organizational Documents (including the Shareholders Agreement), as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

B.    *Equity Holders Settlement*

Effective as of October 17, 2018, Nine West Topco (i) shall, to the extent it has not yet previously done so, amend its previously filed 2017 U.S. partnership tax return to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its equity investment in Holdings; (ii) shall not take any action that results in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code (including by treating the Interests in Holdings as becoming worthless within the meaning of Section 382(g)(4)(D) of the Internal Revenue Code and thereby resulting in an ownership change of Holdings within the meaning of Section 382(g) of the Internal Revenue Code or by subsequently amending Topco's 2017 U.S. partnership tax return to claim a worthless stock deduction on account of its equity investment in Holdings) until after the Effective Date (it being expressly acknowledged and agreed that Nine West Topco LLC shall be permitted to claim a worthless stock deduction on account of its Interest in Holdings in the taxable year in which the Effective Date occurs); (iii) shall not knowingly permit any Person (other than Nine West Topco LLC) to own or take any action that would result in any person owning directly, indirectly, or constructively (by operation of Section 318 as modified by Section 382(l)(3)(A) of the Internal Revenue Code) 50% or more of the Interests in Holdings until on or after the Effective Date; (iv) shall not change its taxable year to be other than the calendar year until after the Effective Date; and (v) take or refrain from taking any other action requested by the Company in its reasonable discretion in order to reverse the worthless stock deduction claimed by Nine West Topco LLC on account of its direct or indirect equity investment in Holdings; *provided*, *however*, that the Debtors understand, acknowledge, and agree that none of the Sponsor, the Minority Equity Holders, or any of their respective Affiliates make any representations or warranties with respect to the existence, realization, or value of any tax attributes of any of the Debtors.

On the Effective Date and subject to the satisfaction (but not waiver) of the condition set forth in Article IX.A.7, hereof, ~~Nine West Topco LLC~~the Sponsor shall contribute, or cause to be contributed, to the Estates the full amount of the Equity Holders Settlement Proceeds.  The Equity Holders Settlement Proceeds will be used as follows:  (1) Cash in the amount of $55,000,000 of the Equity Holders Settlement Proceeds shall vest in the Debtors (which the Debtors and/or Reorganized Debtors, as applicable, may use to fund the sources and uses under the Plan) and (2) Cash in the amount of $65,000,000 of the Equity Holders Settlement Proceeds shall be distributed to the holders of Claims in Classes 5A, 5B, 5C, and 5D in accordance with Article III.B hereof.

Effective as of October 17, 2018, an Affiliate of the Sponsor has caused its Affiliate, Belk, Inc., to enter into a covenant agreement whereby Belk, Inc. has agreed to make certain required minimum purchases of product from NWHI for the periods specified therein.

C.    *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan, including the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Equity Holders Settlement, the Estate Action STL Settlement, and the Estate Action UTL Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors; *provided*, *however*, notwithstanding anything to the contrary in the ~~foregoing sentence~~Plan, the Non-Released Party Trust Causes of Action shall be transferred to and vest in the Non-Released Party Trust on the Effective Date.

~~D.        NWHI Administrative Expense Settlement~~

~~As soon as reasonably practicable following the Confirmation Date and prior to the Effective Date, the Debtors, with the consent of the Requisite Unsecured Lenders and the Committee (such consent not to be unreasonably withheld, conditioned, or delayed), shall determine in good faith the Professional Administrative Expense Estimate, which amount shall be Filed with the Bankruptcy Court at least 3 business days prior to the Effective Date. An amount equal to 35% of the Professional Administrative Expense Estimate shall be charged against the Equity Holders Settlement Proceeds, and remain with and be held by the Reorganized Debtors, thereby reducing the amount of Cash distributions from the Equity Holders Settlement Proceeds that would otherwise be distributed to holders of Claims in Classes 5A, 5B, 5C, and 5D, in each case as set forth in Article III.B of the Plan, on a dollar for dollar basis. If, following the payment of all Allowed Professional Administrative Expenses, the Professional Administrative Expense Estimate exceeds the actual Professional Administrative Expenses that were paid, the difference between the Professional Administrative Expense Estimate and the actual Allowed Professional Administrative Expenses shall be redistributed, to holders of Allowed Claims in Classes 5A, 5B, 5C, and 5D in the same proportion as with respect to the distribution of Distributable Equity Holders Settlement Proceeds as set forth in Article III of the Plan.~~

~~For the avoidance of doubt (i) any reduction in distributions to holders of Claims in Classes 5A, 5B, 5C, and 5D as a result of the NWHI Administrative Expense Settlement shall in no way reduce the Equity Holders Settlement Proceeds or any obligation of any party to pay such Equity Holders Settlement Proceeds and (ii) Cash in an amount equal to 35% of the Allowed Professional Administrative Expenses shall vest in the Reorganized Debtors in accordance with the NWHI Administrative Expense Settlement.~~

~~E.~~D.        *The Non-Released Party Trust*

1.        <u>Creation of Non-Released Party Trust</u>

On the Effective Date, the Reorganized Debtors (solely in their capacity as successors to the Debtors) and the Non-Released Party Trustee shall execute the Non-Released Party Trust Agreement and the Non-Released Party Trust Transfer Agreement and shall take all steps necessary to establish the Non-Released Party Trust in accordance with the Plan, which shall be for the benefit of the Non-Released Party Trust Beneficiaries. Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Non-Released Party Trust all of their rights, title and interest in and to all of the Non-Released Party Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Non-Released Party Trust Assets shall automatically vest in the Non-Released Party Trust free and clear of all Claims and Liens, subject only to (a) Non-Released Party Trust Interests and (b) the expenses of the Non-Released Party Trust as provided for in the Non-Released Party Trust Agreement. Also on the Effective Date, <u>subject to, in all respects, the terms of the Non-Released Party Trust Transfer Agreement,</u> all Privileges held by the Debtors<u>, the Reorganized Debtors (solely in their capacity as successors to the Debtors), and the Committee</u> shall transfer to and vest exclusively in the Non-Released Party Trust.

The Non-Released Party Trust shall be governed by the Non-Released Party Trust Agreement and administered by the Non-Released Party Trustee. The powers, rights, and responsibilities of the Non-Released Party Trustee shall be specified in the Non-Released Party Trust Agreement. The Non-Released Party Trustee shall hold and distribute the Non-Released Party Trust Assets in accordance with the Plan and the Non-Released Party Trust Agreement. Other rights and duties of the Non-Released Party Trustee and the Non-Released Party Trust Beneficiaries shall be as set forth in the Non-Released Party Trust Agreement<u> and the Non-Released Party Trust Transfer Agreement.</u>

After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the Non-Released Party Trust Assets except to the extent set forth in the Non-Released Party Trust Agreement ~~and the Non-Released Party Trust Loan.~~. To the extent that any Non-Released Party Trust Assets cannot be transferred to the Non-Released

Party Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Non-Released Party Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Non-Released Party Trust shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Non-Released Party Trust Assets on behalf of the Reorganized Debtors for the benefit of the Non-Released Party Trust Beneficiaries. Notwithstanding the foregoing, all net proceeds of such Non-Released Party Trust Assets shall be transferred to the Non-Released Party Trust to be distributed in accordance with this Plan.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall have no obligation to provide any funds or financing to the Non-Released Party Trust, other than the obligation to contribute the Non-Released Party Trust Assets, and under no circumstances will the expenses of the Non-Released Party Trust be paid or reimbursed by the Debtors or the Reorganized Debtors, as applicable.

2.    Transfer of Assets and Causes of Action to Non-Released Party Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Non-Released Party Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301-7701-4(d), and the Non-Released Party Trustee will take this position on the Non-Released Party Trust's tax return accordingly. The Non-Released Party Trust Beneficiaries shall be treated as the grantors of the Non-Released Party Trust and as the deemed owners of the Non-Released Party Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Non-Released Party Trust will be deemed to occur as (a) a first-step transfer of the Non-Released Party Trust Assets to the holders of Class 5B, ~~Class~~ 5C, and ~~Class~~ 5D Claims (or to the ~~Reorganized Company~~Funding Entities for holders of Class 5B, 5C, and 5D Claims that elect the ~~GUC~~ Cash-Out Option, to the extent available) and, to the extent the Non-Released Party Trust Assets are allocable to disputed Claims, to the disputed claims reserve described in the subsequent paragraph and (b) a second-step transfer by such ~~H~~holders and, to the extent relevant with respect to the disputed claims reserve, to the Non-Released Party Trust. As a result, the transfer of the Non-Released Party Trust Assets to the Non-Released Party Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets. As soon as possible after the transfer of the Non-Released Party Trust Assets to the Non-Released Party Trust, the Non-Released Party Trustee shall make a good faith valuation of the Non-Released Party Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, Non-Released Party Trustee, and the holders of Claims receiving Non-Released Party Trust Interests shall take consistent positions with respect to the valuation of the Non-Released Party Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Non-Released Party Trust shall in no event be dissolved later than 5 years from the creation of such Non-Released Party Trust unless the Bankruptcy Court, upon motion within the 6-month period prior to the 5th anniversary (or within the 6-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Non-Released Party Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Non-Released Party Trust Assets.

With respect to amounts, if any, in a reserve for disputed claims, the Debtors expect that such account will be treated as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for such disputed claims reserve and will be subject to tax annually on a separate entity basis. Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the disputed claims reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

43

3.        The Administration of the Non-Released Party Trust and Powers of the Non-Released Party Trustee

The Non-Released Party Trust shall be administered by the Non-Released Party Trustee pursuant to the Non-Released Party Trust Agreement.  In the event of any inconsistency solely between the this Article IV.D of the Plan and the Non-Released Party Trust Agreement and such conflict relates to anything other than the establishment of the Non-Released Party Trust, the Non-Released Party Trust Agreement shall control, with the Plan controlling in all other cases.  In the event of any inconsistency solely between this Article IV.D of the Plan and the Non-Released Party Trust Transfer Agreement, the Non-Released Party Trust Transfer Agreement shall control, with the Plan controlling in all other cases.  All compensation for the Non-Released Party Trustee and other costs of administration for the Non-Released Party Trust shall be paid by the Non-Released Party Trust in accordance with this Plan and the Non-Released Party Trust Agreement.

The Non-Released Party Trust Agreement generally will provide for, among other things:  (a) the payment of the Non-Released Party Trust Expenses; (b) the payment of other reasonable expenses of the Non-Released Party Trust, including the cost of pursuing the Non-Released Party Trust Causes of Action; (c) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (d) the investment of Cash by the Non-Released Party Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the Non-Released Party Trust Assets; and (f) litigation of any Non-Released Party Trust Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Non-Released Party Trust Causes of Action.

Except as otherwise ordered by the Bankruptcy Court, the Non-Released Party Trust Expenses shall be paid from the Non-Released Party Trust Assets in accordance with the Plan and Non-Released Party Trust Agreement.

The Non-Released Party Trustee, on behalf of the Non-Released Party Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of theose professionals without further order of the Bankruptcy Court from the Non-Released Party Trust Assets in accordance with the Plan and the Non-Released Party Trust Agreement.

The Non-Released Party Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Non-Released Party Trust.  Any such indemnification shall be the sole responsibility of the Non-Released Party Trust and payable solely from the Non-Released Party Trust Assets, and the Debtors or the Reorganized Debtors shall have no obligations related to such indemnification.

In furtherance of and consistent with the purpose of the Non-Released Party Trust and the Plan, the Non-Released Party Trustee, for the benefit of the Non-Released Party Trust, shall (a) hold the Non-Released Party Trust Assets for the benefit of the Non-Released Party Trust Beneficiaries, (b) make distributions of Non-Released Party Trust Distributable Proceeds as provided herein and in the Non-Released Party Trust Agreement, and (c) have the power and authority to prosecute and resolve any Non-Released Party Trust Causes of Action.  The Non-Released Party Trustee shall be responsible for all decisions and duties with respect to the Non-Released Party Trust and the Non-Released Party Trust Assets, except as otherwise provided in the Non-Released Party Trust Agreement.  In all circumstances, the Non-Released Party Trustee shall act in the best interests of the Non-Released Party Trust Beneficiaries.

4.        Cooperation and Privilege

To effectively investigate, prosecute, compromise, and/or settle the Non-Released Party Trust Causes of Action on behalf of the Non-Released Party Trust, the Non-Released Party Trustee and its counsel and representatives may require reasonable access to documents and information relating to the Non-Released Party Trust Causes of Action in the possession of the Debtors and/or, the Reorganized Debtors, and/or the Committee, and in such event, must be able to obtain such information from the Reorganized Debtors and the Committee on a confidential basis and in common interest, without being restricted by any applicable work product, attorney-client, or other privilege.  Accordingly, the Non-Released Party Trust Transfer Agreement shall provide for the Non-Released Party Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtors) and the Committee's records and information, relating to the 2014 Transaction and Carve-Out Transactions, including electronic records or documents, as further detailed in, and subject in all respects to, the Non-Released Party

44

Trust Transfer Agreement.  The Non-Released Party Trust Transfer Agreement shall also provide that as of the Effective Date, and subject in all respects to the terms of the Non-Released Party Trust Transfer Agreement, all Privileges held by the Debtors, the Reorganized Debtors (solely in their capacity as successors to the Debtors, and the Committee shall transfer to and vest exclusively in the Non-Released Party Trust, and that the Reorganized Debtors shall preserve all of the Debtors' records and documents (including all electronic records or documents) related to the 2014 Transaction and the Carve-Out Transactions for the later of a period of 5 years after the Effective Date or until such later time as the Non-Released Party Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved.

F.E.    GUC Cash-Out Option

Each holder of an Allowed General Unsecured Claim shall have the opportunity to irrevocably elect to receive that portion of its distribution that would have been paid in the form of the Non-Cash Distribution on account of its Allowed Class 5D, 5E, 5F, 5G, 5H, or 5I Claim in the form of Cash, and shall be entitled to receive such Cash in lieu of the Non-Cash Distributions to which it would otherwise be entitled.  Holders of Allowed General Unsecured Claims in Classes 5D, 5E, 5F, 5G, 5H, or 5I shall have the opportunity to make such election pursuant to the GUC Cash-Out Election Form to be received by the Debtors no later than February 15, 2019.  Subject to the Maximum GUC Cash-Out Amount, the equivalent Cash distribution to such holders will be calculated based on the following values of the Non-Cash Distributions: (1) shares of New Common Stock shall be calculated at Plan Equity Value, (2) Non-Released Party Trust Interests shall be calculated at an aggregate net value of $70 million, and (3) New Warrants shall be calculated at an aggregate value of $24.7 million.  The distributions that, absent the GUC Cash-Out Option, would have otherwise been distributed to holders of General Unsecured Claims, shall be purchased by the Debtors and shall vest in the Reorganized Debtors.

In the event that the amount of holders of Allowed General Unsecured Claims in Classes 5D, 5E, 5F, 5G, 5H, and 5I electing to participate in the GUC Cash-Out Option would result in an aggregate Cash distribution to such holders in excess of the Maximum GUC Cash-Out Amount, such holders of Allowed General Unsecured Claims shall receive (1) their pro rata share of the Maximum GUC Cash-Out Amount and (2) their Non-Cash Distribution as reduced by Cash received in the foregoing clause (1), with each form of Non-Cash Distribution such holder is entitled to receive reduced on a pro rata basis.  The Debtors shall provide the Requisite Unsecured Lenders and the Committee with a register of holders of Allowed General Unsecured Claims who have elected to participate in the GUC Cash-Out Option.

As set forth in Article III.B herein, each holder of a Claim in Classes 5B, 5C, and 5D (other than members of the Ad Hoc Group of Unsecured Noteholders) shall have the opportunity to irrevocably elect to receive either (1) its Pro Rata portion of Non-Released Party Trust Interests or (2) its Pro Rata portion of Cash equal to 1.78% of its Allowed Claim.  All Cash-Out Elections shall be made pursuant to and subject to the terms of the Supplemental Cash-Out Election Form and this Article IV.E.  To make a valid Cash-Out Election, an eligible holder must submit a Supplemental Cash-Out Election Form so that it is received by the Debtors or Reorganized Debtors, as applicable, no later than March 22, 2019.  Any dispute with regard to the timeliness or validity of a Cash-Out Election or the eligibility of a holder to make a Cash-Out Election shall be resolved by the Debtors or the Reorganized Debtors, as applicable, in consultation with the advisors to the Committee.  To the extent any holder of a Claim made an election pursuant to the First Cash-Out Election Form, such election shall have no force or effect.

On the Effective Date, the Funding Entities shall transfer the Cash-Out Funding to the Debtors to be held in an interest-bearing escrow account in accordance with the Commitment Letter.  The Cash-Out Funding amounts shall only be used to fund the Cash-Out Option to eligible holders of Allowed Class 5B, 5C, and 5D Claims that make a valid Cash-Out Election.  To the extent holders of an Allowed Class 5B, 5C, or 5D Claim (other than members of the Ad Hoc Group of Unsecured Noteholders) make a valid Cash-Out Election, the Non-Released Party Trust Interests distributions that would have otherwise been distributed if such holder had not exercised the Cash-Out Option shall be distributed to the Funding Entities in accordance with their Pro Rata contribution to the Cash-Out Option Funding.

As soon as is reasonably practicable following expiration of the deadline to submit the Supplemental Cash-Out Election Form, the Reorganized Debtors shall provide the Funding Entities, the advisors to the Committee, and the Non-Released Party Trustee with a register of all holders of Class 5B, 5C, and 5D Claims who have elected the Cash-Out Option.

KE 58496119

Any Cash-Out Funding amounts not distributed to eligible electing holders pursuant to the Cash-Out Option shall be returned to the Funding Entities according to their Pro Rata contribution to the Cash-Out Option Funding as soon as practicable after the deadline for eligible holders to submit the Supplemental Cash-Out Election Form. The Debtors, in consultation with advisors to the Committee, shall use commercially reasonable efforts to resolve any disputes with respect to the Allowance of a Claim whose holder made a Cash-Out Election as soon as reasonably practicable after the deadline to submit the Supplemental Cash-Out Election Form.

G.F.    *Shareholders Agreement*

On the Effective Date, Reorganized Holdings shall enter into and deliver the Shareholders Agreement, in substantially the form included in the Plan Supplement, to each holder of New Common Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Holdings.

H.G.    *Management Incentive Plan*

On the Effective Date, all grants under the Management Incentive Plan shall be reserved for directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized Holdings Board and in accordance with the Management Incentive Plan to be included in the Plan Supplement. For the avoidance of doubt, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall approve, or deem to approve, any terms of the Management Incentive Plan, other than the reservation of grants as set forth in the immediately preceding sentence.

I.H.    *Reorganized Holdings Board*

The Reorganized Holdings Board shall initially consist of seven members, and shall include the Chief Executive Officer and one independent director, each of which shall be selected by the Requisite Unsecured Lenders and shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.

Notwithstanding the foregoing, each holder of Unsecured Term Loan Claims that is a Consenting Unsecured Lender prior to the Petition Date and who holds as of the Petition Date and continues to hold as of the Effective Date: (1) at least 10% but less than 30% of the aggregate principal amount of Unsecured Term Loan Claims, shall have the right to appoint one director to the Reorganized Holdings Board; and (2) more than 30% of the aggregate principal amount of Unsecured Term Loan Claims, shall have the right to appoint two directors to the Reorganized Holdings Board, *provided* that notwithstanding the rights of the Consenting Unsecured Lenders set forth in the foregoing clauses (1) and (2), nothing herein shall limit in any way the Consenting Unsecured Lenders' rights to select directors based on their respective holdings of New Common Stock as provided in the Reorganized Holdings Organizational Documents.

J.I.    *Restructuring Transactions*

On and after the Confirmation Date, the Debtors or Reorganized Debtors, may take all actions, subject to the Restructuring Support Agreement, as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Holdings, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (5) the execution and delivery of the New Debt Documents, and any filings related thereto; (6) this issuance of the New Common Stock; (7) all transactions necessary to establish the Non-Released Party Trust; and (8) all transactions necessary to effectuate the Cash-Out Option; and (9) all other actions that the

applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### ~~K.~~J.    Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtors Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### ~~L.~~K.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Non-Released Party Trust Agreement), on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### ~~M.~~L.    Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, and in the case of the DIP Claims, subject to satisfaction of such Claims in accordance with Article II.A hereof: (1) all notes, instruments, certificates, shares, bonds, indentures, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and other documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors giving rise to any rights or obligations relating to Claims or Interests, including the Secured Term Loan Claims, the Unsecured Term Loan Claims, the 2019 Notes Claims, the 2034 Notes Claims, the DIP Claims, and Interests in Holdings, shall be deemed cancelled and surrendered without any need for a holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, and any non-Debtor parties, thereunder or in any way related thereto shall be deemed satisfied in full and released and discharged, *provided* that notwithstanding Confirmation~~,~~ or Consummation~~, or~~ and notwithstanding the releases contained in Article VIII of the Plan (except with respect to clause (f) below), any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions as specified under the Plan, (b) allowing the Indenture Trustees, the DIP Agents, the Unsecured Term Loan Agent, and the Secured Term Loan Agent to make distributions pursuant to the Plan, (c) preserving the Secured Term Loan Agent's, the Unsecured Term Loan Agent's and the Indenture Trustees' rights to compensation and indemnification as against any money or property distributable to holders of Secured Term Loan Claims, Unsecured Term Loan Claims, 2034 Notes Claims, or 2019 Notes Claims, as applicable, including permitting the Secured Term Loan Agent, Unsecured Term Loan Agent, and each of the Indenture Trustees to maintain, enforce, and exercise their respective Secured Term Loan Agent Charging Lien, Unsecured Term Loan Agent Charging Lien, or Indenture Trustee Charging Liens, as applicable, against such distributions, (d) preserving all rights, including rights of enforcement, of the Indenture Trustees, the DIP Agents, the Unsecured Term Loan Agent, and the Secured Term Loan Agent against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the holders of the 2034 Notes Claims, 2019 Notes Claims, DIP Claims, the

47

Unsecured Term Loan Claims, or Secured Term Loan Claims, as applicable, pursuant and subject to the terms of the applicable Indenture as in effect on the Effective Date, (e) preserving all rights of the Indenture Trustees, Unsecured Term Loan Agent, and Secured Term Loan Agent, and the holders of the 2019 Notes Claims, the 2034 Notes Claims, the Unsecured Term Loan Claims, and Secured Term Loan Claims to the extent necessary for the Non-Released Party Litigation Trust to pursue all of the Non-Released Party Trust Causes of Action on behalf of the Non-Released Party Trust Beneficiaries, (f Trust to pursue all of the Non-Released Party Trust Causes of Action on behalf of the Non-Released Party Trust Beneficiaries, (f) subject in all respects to the releases contained in Article VIII of the Plan, authorizing and allowing each of the Indenture Trustees, solely upon instruction and direction, or any other person who may act, pursuant to the terms of the applicable Indenture (which provisions shall be preserved for the purposes of this subsection (f); *provided* that only those holders of 2034 Notes Claims and 2019 Notes Claims who did not exercise the Cash-Out Election shall be considered holders of outstanding securities for purposes of such instruction and direction), the Confirmation Order, and the terms of the Non-Released Party Trust (which may only be given in accordance with the terms of the Confirmation Order), to pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law, solely to the extent necessary to pursue such claims against any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees (for the avoidance of doubt, directly or indirectly holding equity interests in Holdings and/or any of the Carve-Out Businesses shall not be a reason to be deemed to be or constitute an assignee, participant, or mediate, immediate, or subsequent transferee of a shareholder of The Jones Group Inc.), and in connection therewith, providing further that the Indenture Trustee's rights, protections, immunities, and exculpations, including rights to compensation, indemnification, and charging liens and the right to maintain, enforce, and exercise such rights are preserved, *provided, however,* that the foregoing shall not include claims and Causes of Action against any Released Parties, solely in their capacities as such, or claims and Causes of Action settled or released by the Equity Holders Settlement, the Estate Action STL Settlement, the Estate Action UTL Settlement, or paragraphs F(xii) and 26 of the DIP Order, (g) permitting the Indenture Trustees, the DIP Agents, and the Secured Term Loan Agent to enforce any obligation (if any) owed to such Indenture Trustee, DIP Agent, the Unsecured Term Loan Agent, or the Secured Term Loan Agent under the Plan, (g h) permitting the Indenture Trustee, DIP Agent, the Unsecured Term Loan Agent, or Secured Term Loan Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other Court, and (h i) permitting the DIP Agents, the DIP Lenders, the Secured Term Loan Agent, and the Secured Term Loan Lenders to assert any right with respect to the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, or the Contingent Secured Term Loan Obligations, as applicable; *provided, however,* that (i) the preceding proviso first proviso in this Article IV.L shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (ii) except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. Each of the Indenture Trustees shall be discharged and shall have no further obligation or liability except as provided in the Plan and the Confirmation Order, and after the performance by the Indenture Trustees and their respective representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, each of the Indenture Trustees shall be relieved of and released from any obligations and duties arising under the Plan, Confirmation Order, and the applicable indentures, (i) unless specifically set forth in or provided for under the Plan or the Confirmation Order and (ii) except with respect to such other rights of the Indenture Trustees, that pursuant to the applicable indentures, survive the termination of such indentures. For the avoidance of doubt, nothing in this provision shall effectuate a cancellation of any New Common Stock or New Warrants.

Except as provided in this Plan, on the Effective Date, the DIP Agents, the Secured Term Loan Agent, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Documents and the Secured Term Loan Documents, as applicable. The commitments and obligations (if any) of the Secured Term Loan Lenders and/or the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents or the Secured Term Loan Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Documents or DIP Order are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Claims.

KE 58496119

If the record holder of either of the 2019 Notes or the 2034 Notes is DTC or its nominee or another securities depository or custodian thereof, and such 2019 Notes or 2034 Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of such 2019 Notes or 2034 Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

*N.M.*    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the issuance of the New Common Stock and the New Warrants; (2) the selection of the directors, officers, managers, and members for Reorganized Holdings and the other Reorganized Debtors; (3) implementation of the Restructuring Transactions; and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Holdings and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Holdings, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, or members of the Debtors, Reorganized Holdings, or the other Reorganized Debtors. On or before the Effective Date, as applicable, the appropriate officers or other authorized persons of the Debtors, Reorganized Holdings, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Holdings and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.NM shall be effective notwithstanding any requirements under non-bankruptcy law.

*O.N.*    *Reorganized Debtors Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtors will file such Reorganized Debtors Organizational Documents as are required to be filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective Reorganized Debtors Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized Debtors Organizational Documents.

*P.O.*    *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

*Q.P.*    *Exemption from Securities Act Registration*

Pursuant to section 1145 of the Bankruptcy Code, except as noted below, the offering, issuance, and distribution of the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) in respect of Claims as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued

under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) are not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) have not been such an "affiliate" within 90 days of such transfer, and (iii) are not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock, the New Warrants, or the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock, the New Warrants, and the Non-Released Party Trust Interests (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

The Debtors do not intend for the Non-Released Party Trust Interests to be "securities" under applicable laws. Notwithstanding this intention, to the extent such units are deemed to be "securities," the issuance of such units under the Plan is exempt, pursuant to (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder (including with respect to an entity that is an "underwriter").

R.Q.    *Retention of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII hereof, the Reorganized Debtors or the Non-Released Party Trustee, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action and Non-Released Party Trust Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Retained Causes of Action Schedule, if applicable, and the Reorganized Debtors' or the Non-Released Party Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue and/or settle the Causes of Action (other than the Non-Released Party Trust Causes of Action), as appropriate, in their discretion and in accordance with the best interests of the Reorganized Debtors, and the Non-Released Party Trustee may pursue and/or settle the Non-Released Party Trust Causes of Action, as appropriate, in its discretion and in accordance with the Non-Released Party Trust Agreement and the best interests of the Non-Released Party Beneficiaries.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors or the Non-Released Party Trustee, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, or the Non-Released Party Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court Final Order, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Unless any Non-Released Party Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court Final Order, the Non-Released Party Trustee expressly reserves all Non-Released Party Trust Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or

otherwise) or laches, shall apply to such Non-Released Party Trust Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Non-Released Party Trustee, as applicable, reserve and shall retain the Causes of Action and the Non-Released Party Trust Causes of Action, as applicable, notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors and any Non-Released Party Trust Causes of Action shall ~~b~~vest in the Non-Released Party Trust, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors or the Non-Released Party Trustee, as the case may be, in each case through their or its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action or Non-Released Party Trust Causes of Action, as applicable.

The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Non-Released Party Trustee, subject to and in accordance with the Non-Released Party Trust Agreement, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Non-Released Party Trust Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to its own terms; (3) those that have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (4) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; (5) the Sponsor Advisory Agreement, which shall be rejected, and any and all claims arising therefrom shall be waived and any Proof of Claim arising therefrom shall be deemed withdrawn upon the Effective Date; or (6) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such

Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease Schedule at any time up to forty-five days after the Effective Date.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the effective date of such rejection, or (2) the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.**

Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims in Class 5D, Class 5E, Class 5F, Class 5G, Class 5H, Class 5I, or Class 5J (depending on which Debtor such Claim is asserted against) and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VI of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.  The Debtors, prior to the Effective Date with the reasonable consent of the Requisite Unsecured Lenders and the Committee, or the Reorganized Debtors after the Effective Date, as applicable, may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Dispute Resolution*

In the event of a timely filed objection regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code, the Cure Claim shall only be paid following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption (and, if applicable, assignment).  The timing for the resolution of any such objection shall be governed by the contract assumption procedures approved as part of the Disclosure Statement Order or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

E.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

F.    *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary (except as provided in this Article V.F), each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such (excluding any Person(s) or Entities that may be defendants in or otherwise liable in connection with a Non-Released Party Trust Cause of Action, *provided, however, that nothing in this sentence shall have any effect on any applicable director and officer liability insurance policy*).  Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any Reorganized Holdings Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.  Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to indemnify any Person or Entity for any contribution made by such Person or Entity, or on such Person's or Entity's behalf, to the Debtors or to any holder of any Claim or Interests as consideration for any release provided pursuant to this Plan, or any costs or expenses related thereto.

G.    *Director and Officer Liability Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all director and officer liability insurance policies and any agreements, documents, and instruments related thereto.  The Reorganized Debtors shall maintain all of its unexpired D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, and managers, which coverage shall be through the Effective Date of the Plan, and all such directors, members, trustees, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations (other than with respect to any Person(s) or Entities that may be defendants in a Non-Released Party Trust Cause of Action as set forth in ~~Article V.F~~Article V.F) related to the foregoing D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

The Debtors and/or the Reorganized Debtors, as applicable, are authorized to purchase D&O Liability Insurance Policies (including a "tail" policy), subject to the reasonable consent of the Requisite Unsecured Lenders and the Committee, for the benefit of the Debtors' directors, members, trustees, officers, and managers (excluding any Person(s) or Entities that may be defendants in a Non-Released Party Trust Cause of Action under the Plan), which D&O Liability Insurance Policies shall be effective as of the Effective Date.  On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

H.    *Insurance Policies and Surety Bonds*

Each of the Debtors' insurance policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.G of the Plan) and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan or the Plan Supplement, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.  Except as set forth in  Article V.G of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to the any Claims Bar Date or similar deadline governing cure amounts or Claims.

On the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors, (2) surety bonds and related indemnification and collateral agreements entered into  by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order, and (3) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business.  The applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing Surety Bonds as they become due prior to the execution and issuance of new Surety Bonds.  Surety bond providers shall have the discretion to replace (or issue name-change riders with respect to) any existing surety bonds or related general agreements of indemnity with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity.

I.    *Collective Bargaining Agreement*

The Collective Bargaining Agreement and any agreements, documents, or instruments relating thereto, is treated as and deemed to be an Executory Contract under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed the Collective Bargaining Agreement and any agreements, documents, and instruments related thereto.  All Proofs of Claim Filed for amounts due under the Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein.  On the Effective Date, any Proofs of Claim Filed with respect to the Collective Bargaining Agreement shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

J.    *Workers Compensation Program*

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate, and (2) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation, and (c) workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

K.    *Benefit Programs*

Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Confirmation Date, and except for (1) Executory Contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 or 1129(a)(13) of the Bankruptcy Code) and (2) Executory

54

Contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts: all employee compensation and benefit programs of the Debtors, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under this Article V, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Confirmation Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Confirmation Date shall survive Confirmation of the Plan; *provided*, *however*, that the Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue; *provided*, *further*, *however*, that nothing herein shall extend or otherwise modify the duration of such period or prohibit the Debtors or the Reorganized Debtors from modifying the terms and conditions of such employee benefits and retiree benefits as otherwise permitted by such plans and applicable non-bankruptcy law.

L.      *Pension Plan*

As of the Effective Date, the Reorganized Debtors shall continue (and shall continue their obligations with respect to) the Pension Plan in accordance with, and subject to, its terms, ERISA, the Internal Revenue Code, and applicable law, and shall preserve all of their rights thereunder. All Proofs of Claim filed on account of Claims in connection with the termination of the Pension Plan shall be deemed withdrawn as of the Effective Date without any further action of the Debtors or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, no provision in the Plan or the Confirmation Order, or proceeding within the Chapter 11 Cases, shall in any way be construed as discharging, releasing, or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Pension Plan under any law, governmental policy, or regulatory provision, including for breach of fiduciary duty.

M.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

N.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

O.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter (which in no event shall be later than the later of (a) 30 days after the Effective Date or (b) 30 days following the deadline to elect the Cash-Out Option), each holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class; *provided*, *however*, to the extent the distributions to holders of Allowed General Unsecured Claims, Allowed 2019 Notes Claims, and Allowed 2034 Notes Claims on the Initial Distribution Date are only partial distributions due to the existence of Disputed Claims pursuant to Article VI.E hereof, such partial distribution shall be no less than 50% of the amount of such holder's total expected distribution, as determined by the Debtors or Reorganized Debtors, as applicable, in their reasonable discretion.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

The New Common Stock shall be deemed to be issued as of the Effective Date to the holders of Claims entitled to receive New Common Stock pursuant to Article III hereof.

B.    *Distributions Generally*

Except as otherwise provided in the Plan and/or (with respect to Non-Released Party Trust Interests) the Non-Released Party Trust Agreement, distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.  Distributions to holders of Secured Term Loan Claims and Unsecured Term Loan Claims shall be subject in all respects to the right of the Secured Term Loan Agent and the Unsecured Term Loan Agent, as applicable, to assert its Secured Term Loan Agent Charging Lien and Unsecured Term Loan Agent Charging Lien, as applicable, against such distributions.  Notwithstanding anything herein to the contrary, distributions to the Non-Released Party Trust Beneficiaries shall be made by the Non-Released Party Trustee as and when provided for in the Non-Released Party Trust Agreement.

Notwithstanding any provision of the Plan to the contrary, distributions to holders of 2034 Notes Claims and 2019 Notes Claims shall be made to or at the direction of each of the applicable Indenture Trustees, each of which shall act as Disbursing Agent for distributions to the respective holders of 2034 Notes Claims or 2019 Notes Claims under the 2034 Notes Indenture or the 2019 Notes Indentures, as applicable.  The Indenture Trustees shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.  The Indenture Trustees may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of 2034 Notes Claims and 2019 Notes Claims to the extent consistent with the customary practices of DTC.  Such distributions shall be subject in all respects to the right of each Indenture Trustee to assert its Indenture Trustee Charging Lien against such distributions.  All distributions to be made to holders of 2034 Notes Claims and 2019 Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the 2034 Notes Indenture or the 2019 Notes Indentures, as applicable.

KE 58496119

C.    *Rights and Powers of Disbursing Agent*

1.    <u>Powers of Disbursing Agent</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as reasonably deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

2.    <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions; Undeliverable or Unclaimed Distributions*

1.    <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, with respect to holders of Secured Term Loan Claims, distributions shall be made to such holders that are listed on the register or related document maintained by the Secured Term Loan Agent.  The Distribution Record Date shall not apply to the Indenture Trustees with respect to holders of 2034 Notes Claims or the 2019 Notes Claims.

2.    <u>Delivery of Distributions</u>

(a)    Initial Distribution Date

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Agents, the Secured Term Loan Agent, the Unsecured Term Loan Agent, or the Indenture Trustees as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided, further,* that the address for each holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a holder holds more than one Claim in any one Class, all Claims of the holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

(b)    Quarterly Distribution Date

Except as otherwise determined by the Reorganized Debtors in their sole discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Interests under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.H of the Plan.

3.      Minimum Distributions

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claims against the Debtors or their property.

4.      No Fractional Shares

No fractional shares of New Common Stock or the New Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of shares of New Common Stock or New Warrants that are not a whole number, such New Common Stock or New Warrants shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock and New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding; *provided*, *however*, the total number of authorized shares of New Common Stock and New Warrants pursuant to the Reorganized Holdings Organizational Documents and the New Warrant Agreement shall be in an amount sufficient such that all creditors entitled to receive shares of New Common Stock and New Warrants under the Plan will each receive at least one share of New Common Stock and one New Warrant.

5.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

E.      *Distributions on Account of Claims or Interests Allowed After the Effective Date.*

1.      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Reorganized Debtors and the applicable holder of such Claim or Interest agree otherwise.  The Reorganized Debtors and the Non-Released Party Trustee shall work together in good faith with respect to Disputed Claims and the Disputed Claims Reserve (as such term is defined in the Non-Released Party Trust Agreement), including distributions on Disputed Claims Allowed after the Effective Date.

2.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final

Order; *provided* that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated holders of Allowed Claims pursuant to the Plan.

F.      *Compliance with Tax Requirements*

        In connection with the Plan, to the extent applicable, the Debtors or the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.   The Debtors and Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.      *Allocations Between Principal and Accrued Interest*

        Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *No Postpetition Interest on Claims.*

        Unless otherwise specifically provided for in the Plan, the DIP Order, or the Confirmation Order, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

I.      *Foreign Currency Exchange Rate.*

        Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

J.      *Setoffs and Recoupment*

        Except as otherwise provided herein and subject to applicable law or order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim or Interest, set off against any Allowed Claim or Interest (which setoff shall be made against the Allowed Claim or Interest, not against any distributions to be made under the Plan with respect to such Allowed Claim or Interest), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a holder is entitled under the Plan shall be made on account of the Claim or Interest, as reduced after application of the setoff described above.  In no event shall any holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors, as applicable, unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim or Interest; *provided* that, where there is no written agreement between the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced, as applicable, the Debtors' or Reorganized Debtors'

rights to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, all rights of counterparties to unexpired leases of nonresidential real property (whether assumed or rejected) for setoff, recoupment, and subrogation are preserved and shall continue unaffected by Confirmation or the occurrence of the Effective Date.

K.    *Claims Paid or Payable by Third Parties*

    1.    <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Reorganized Debtors on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Reorganized Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor or the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

    2.    <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.    *Single Satisfaction of Claims; Distributions on Account of Obligations of Multiple Debtors*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the Allowed Claim plus applicable interest, if any.

Notwithstanding the foregoing and in accordance with the Plan distributions in Article III.B.4 and Article III.B.5, for all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each

applicable Debtor.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims*

On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall be responsible for and shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, and shall have the exclusive authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any disputed Claim or Interest.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Additionally, any Claim that is duplicative or redundant with another Claim against the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the

KE 58496119

Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (for the avoidance of doubt, the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, and the Contingent Secured Term Loan Obligations, in each case, are not discharged hereunder) or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. For the avoidance of doubt, nothing in this paragraph shall provide a release or discharge of any Retained Causes of Action or any Non-Released Party Trust Causes of Action.

B.    *Debtor Release*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of any of the foregoing entities, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Debt Documents, the Prepetition Credit Facilities, the 2014 Transaction, the Carve-Out Businesses, the ownership and/or operation of the Debtors and/or the Carve-Out Businesses by the Sponsor and the Minority Equity Holders, the Restructuring Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in**

63

connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the 363 Sale, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  For the avoidance of doubt and without limiting the scope of the foregoing Debtor Release, this Debtor Release releases any and all claims and Causes of Action against the Secured Term Loan Agent, the Unsecured Term Loan Agent, the Prepetition ABL/FILO Agent, the Minority Equity Holders, ~~and~~ Sycamore ~~and the Sycamore Affiliates (each~~ (as defined in the UCC Standing Motions)~~)~~, the Sycamore Affiliates (as defined in the UCC Standing Motions), and the Lender Defendants (as defined in the UCC Standing Motions), set forth in the Proposed Complaint (as defined in the UCC Standing Motions).

Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release (a) any post-Effective Date obligations of any Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Retained Causes of Action, or (c) any Non-Released Party Trust Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Debtor Release.

C.      *Third-Party Release*

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition Debt Documents, the Prepetition Credit Facilities, the 2014 Transaction, the Carve-Out Businesses, the ownership and/or operation of the Debtors and/or the Carve-Out Businesses by the Sponsor and the Minority Equity Holders, the Restructuring Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facilities, the DIP Documents, the 363 Sale, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the 363 Sale, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement,

event, or other occurrence taking place on or before the Effective Date. For the avoidance of doubt and without limiting the scope of the foregoing Third-Party Release, this Third-Party Release releases any and all claims and Causes of Action against the Secured Term Loan Agent, the Unsecured Term Loan Agent, the Prepetition ABL/FILO Agent, the Minority Equity Holders, and Sycamore and the Sycamore Affiliates (each (as defined in the UCC Standing Motions)), the Sycamore Affiliates (as defined in the UCC Standing Motions), and the Lender Defendants (as defined in the UCC Standing Motions), set forth in the Proposed Complaint (as defined in the UCC Standing Motions).

Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release or impair (a) any post-Effective Date obligations of any Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Retained Causes of Action, or (c) any Non- , Released Party Trust Causes of Action, or (d) the ability of any Releasing Party to object to any request for payment on account of Professional Fee Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of claims released by the Third-Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the Third-Party Release. Upon entry of the Confirmation Order, the Debtors will send an opt-out form to holders of Claims in clauses (l), (m o), (p), (q), and (n r) of the definition of Releasing Parties to provide such holders with an opportunity to opt out of the Third-Party Release for any Released Party added to the Plan after the First Amended Plan, which opt-out form shall be approved by the Confirmation Order.

D.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for (a) any prepetition action taken or omitted to be taken in connection with, or related to, formulating, negotiating, or preparing the Plan or the Restructuring Support Agreement, or (b) any postpetition action taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan (including the Restructuring Support Agreement), the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the 363 Sale transactions and documents, the New Debt Documents, the DIP Facilities, the DIP Documents, and/or the Restructuring Transactions, the Cash-Out Option, or selling or issuing the New Debt, the Non-Released Party Trust Interests, the New Common Stock, the New Warrants, and/or any other Security or instrument to be offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; *provided*, *however*, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Restructuring Support Agreement and the Plan. Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the

KE 58496119

negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.  For the avoidance of doubt, no Person or Entity that may be a defendant in a Non-Released Party Trust Cause of Action shall receive any exculpation under this Article VIII.D, solely in its capacity as such.

E.      *Release of Liens*

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim or Secured Tax Claim, satisfaction in full of the portion of the Other Secured Claim or Secured Tax Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  The ABL/FILO DIP Liens and Term DIP Liens (in each case, as defined in the DIP Order) shall not be released until the payment in full in Cash of the DIP ABL/FILO Claims or DIP Term Loan Claims, as applicable, in accordance with Article II.A of the Plan.

F.      *Injunction*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims, claims, or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, claims, or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, claim, or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, claims, or Interests released or settled pursuant to the Plan.

**Upon entry of the Confirmation Order, all holders of Claims, claims, and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan; *provided, however,* that the foregoing shall not enjoin any Consenting Term Loan Lender from exercising any of its rights or remedies under the Restructuring Support Agreement in accordance with the terms thereof. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.**

G.    *Certain Government Matters*

As to any Governmental Unit, nothing in the Plan or Confirmation Order shall limit or expand the scope of discharge, release, or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action.

Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Confirmation Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors or Reorganized Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases after the Effective Date. Nor shall anything in the Confirmation Order or the Plan: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan, or the Bankruptcy Code.

Moreover, nothing in the Confirmation Order or the Plan shall release or exculpate any non-Debtor, including any non-Debtor Released Parties, from any liability to any Governmental Unit, including any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the non-Debtor Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-Debtor Released Parties for any liability whatsoever; *provided*, *however*, that the foregoing sentence shall not (a) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code or (b) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

Nothing contained in the Plan or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including the Debtors and the Reorganized Debtors, nor shall the Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under section 505 of the Bankruptcy Code.

H.    *Challenge Period; No Disgorgement; Release of Escrowed Sale Proceeds Payment*

Notwithstanding anything to the contrary in the DIP Order (including paragraphs 17 and 26 thereof) or any other order of the Bankruptcy Court, upon the Effective Date ) the Challenge Period (as defined in the DIP Order) shall have expired and all provisions of the DIP Order that are contingent or become effective upon the expiration of the Challenge Period shall be in full force and effect, including clauses (a) through (e) of paragraph 26(b), (2) the Non-Stipulated Claims (as defined in the DIP Order) shall be stipulated to and released by the Debtors, which stipulation and release shall be binding upon all parties in interests, including the Committee, (3) any Adequate Protection Payment, Adequate Protection Fees and Expenses, Sale Proceeds Payment (as each term is defined in the DIP Order), payments received by the Prepetition ABL/FILO Secured Parties (as defined in the DIP Order) in connection with the ABL/FILO Refinanced Loans (as defined in the DIP Order), or any payment realized by the Prepetition Secured

Parties (as defined in the DIP Order), including upon the exercise of remedies pursuant to paragraph 10 of the DIP Order shall be deemed to be indefeasible and shall not be subject to disgorgement, recharacterization, or reallocation pursuant to section 506(b) of the Bankruptcy Code or any other remedy, and (4) the Prepetition Secured Term Loan Agent is authorized to disburse any portion of the Sale Proceeds Payment held by the Prepetition Secured Term Loan Agent pursuant to the Escrow Agreement (as defined in the DIP Order) to any Prepetition Term Loan Lender in accordance with the DIP Order, regardless of whether such Prepetition Term Loan Lender submitted a Certification (as defined in the DIP Order).  Notwithstanding the foregoing, if Confirmation of the Plan is reversed upon appeal, the provisions of the DIP Order (including paragraphs 17 and 26 thereof and any provisions governing the Challenge Period) shall be in full force and effect and subject to any subsequently confirmed chapter 11 plan or plans in the Chapter 11 Cases.

I.        Protections Against Discriminatory Treatment

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.        Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors; provided, however, that the Reorganized Debtors shall not dispose of any documents that relate to the Non-Released Party Trust Causes of Action without the prior consent of the Non-Released Party Trustee.

K.        Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

L.        Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect following the Effective Date in accordance with their terms.

M.        Subordination Rights

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, the Reorganized Debtors, their respective property, and holders of Claims and Interests and is fair, equitable, and reasonable.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been stayed, modified, or vacated on appeal;

2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.    the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

4.    the New ABL Facility Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements, and the Debtors shall have issued the indebtedness contemplated thereby;

5.    the New Secured Facility Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements, and the Debtors shall have issued the indebtedness contemplated thereby;

6.    the Reorganized Holdings Organizational Documents and the Reorganized Debtors Organizational Documents shall have been executed and delivered by each Entity party thereto and shall be in full force and effect, and the New Common Stock and the New Warrants shall have been issued;

7.    the Equity Holders Settlement shall have been approved by the Bankruptcy Court and the payments contemplated thereby shall have been made, and the Belk Commitment Agreement (as defined in the Restructuring Support Agreement) shall be in full force and effect;

8.    the Non-Released Party Trust shall have been established pursuant to the Non-Released Party Trust Agreement, all Non-Released Party Trust Causes of Action shall have been contributed to, and shall have vested in, the Non-Released Party Trust, the Non-Released Party Trust Transfer Agreement shall have been executed, and~~, if applicable,~~ the proceeds of the Non-_Released Party ~~Trust~~ Loan shall have been loaned to the Non-Released Party Trust~~; and~~

9.    all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all attorneys, advisors, and other professionals payable under the Restructuring Support Agreement~~and,~~ the DIP Order_, or the Plan_ shall have been paid in Cash~~.~~_; and_

10. the Commitment Letter shall be in full force and effect and the Cash-Out Option Funding shall have been placed into escrow pursuant to the terms of the Commitment Letter.

B.       *Waiver of Conditions*

Subject to and without limiting the rights to each party to the Restructuring Support Agreement, the conditions to Consummation set forth in Article IX may be waived by the Debtors, with the reasonable consent of (x) the Requisite Unsecured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee, (y) the Requisite Secured Lenders (solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.5, and Article IX.A.9) and (z) the Sponsor and the Minority Equity Holders (solely with respect to the condition set forth in Article IX.A.7), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.       *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or claims by any holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.       *Modification and Amendments*

Except as otherwise specifically provided in the Plan and subject to and not limiting the respective rights of each party to the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, subject to any applicable consent rights as set forth in the Restructuring Support Agreement and the reasonable consent of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders with respect to any other modifications, whether such modification is material or immaterial prior to Confirmation, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan; *provided, however*, that the consent of the Committee (without limitation or qualification), the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders shall be required with respect to any modifications that adversely impact (i) the distributions, recoveries, or rights of the holders of Claims (w) solely with respect to the Committee, in Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I, (x) solely with respect to the 2034 Notes Indenture Trustee, in Class 5B, (y) solely with the respect to the 2019 Notes Indenture Trustee, in Class 5C, and (z) solely with respect to the Ad Hoc Group of Unsecured Noteholders, in Classes 5B and 5C, or (ii) the Committee's*respective* consent rights of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders provided hereunder. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan) and any consent rights as set forth in the Restructuring Support Agreement and the reasonable consent of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan after Confirmation, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided* that (i) any modifications or amendments that impact the treatment of the DIP Claims shall require the consent of the applicable DIP Agent and (ii) any modifications or amendments that adversely impact (x) the distributions, recoveries, or rights of the holders of Claims in Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I or (y) the Committee's consent rights(1) solely with respect to the Committee, in Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I, (2) solely with respect to the 2034 Notes Indenture Trustee, in Class 5B, (2) solely with respect to the 2019 Notes Indenture Trustee, in Class 5C, and (3) solely with respect to the Ad Hoc Group of Unsecured Noteholders, in Classes 5B and 5C, or (y) the respective consent rights of the Committee, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group or Unsecured Noteholders

provided hereunder, shall require the consent of the Committee (without qualification or limitation). ), the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, and the Ad Hoc Group of Unsecured Noteholders.

**B.**     *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.**     *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans of reorganization, in each case subject to any applicable consent rights as set forth in the Restructuring Support Agreement and the reasonable consent of the Committee; *provided*, *however*, that the 2019 Notes Indenture Trustee's, the 2034 Notes Indenture Trustee's, the Ad Hoc Group of Unsecured Noteholders', and the Committee's rights with respect to any plan of reorganization Filed after the withdrawal or revocation of the Plan are preserved.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption (or assumption and assignment) or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, claims, or Interests; (b) prejudice in any manner the rights of such Debtor, any holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any holder, or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction (except where otherwise specifically noted below) over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Accrued Professional Compensation Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.     ensure that distributions to holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

8.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.        resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.        resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

13.        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.        determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clauses, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.        enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.        consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.        determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

21.     adjudicate, decide, and resolve any cases, controversies, suits, or disputes related to (and/or arising under, as applicable) the Non-Released Party Trust, the Non-Released Party Trust Agreement, the Non-Released Party Trust Transfer Agreement, the Non-Released Party Trustee, and/or the Non-Released Party Trust Causes of Action; *provided*, *however*, that the Bankruptcy Court's jurisdiction shall not be exclusive with respect to the adjudication and resolution of the Non-Released Party Trust Causes of Action;

22.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

24.     enforce all orders previously entered by the Bankruptcy Court;

25.     resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Non-Released Party Trust Agreement, the Non-Released Party Trust Transfer Agreement, or any contract, instrument, release, or other agreement or document that is entered into or delivered pursuant thereto or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

26.     hear any other matter not inconsistent with the Bankruptcy Code; and

27.     enforce the injunction, release, and exculpation provisions set forth in Article VIII.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

Each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors) shall pay all U.S. Trustee quarterly fees pursuant to section 1930(a)(6) of the Judicial Code, together with any interest thereon pursuant to 31 U.S.C. § 3717, on or before the Effective Date in Cash, based on disbursements in and outside the ordinary course of the Debtors' business and Plan payments. Thereafter, U.S. Trustee quarterly fees and any applicable interest shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) until the earlier of entry of a final decree closing such Chapter 11 Case or an order of dismissal or conversion, whichever occurs first.

D.    *Payment of Certain Fees*

~~All Restructuring Expenses, incurred up to (and including) the Effective Date shall be treated as Allowed Administrative Claims and shall be paid in full in Cash on the Effective Date; provided that each party and its counsel shall provide the Debtors or Reorganized Debtors with summary invoices (redacted for any potentially privileged material) for which it seeks payment.~~

Prior to the hearing on Confirmation of the Plan, the Brigade Advisors and the Ad Hoc Crossover TL Lender Group Advisors (each as defined in the Restructuring Support Agreement), in each case only for amounts that are not otherwise paid pursuant to the DIP Order, and the Ad Hoc Group of Unsecured Noteholders' (or its advisors, either individually or jointly) will file motions seeking payment on account of Restructuring Expenses as a substantial contribution under sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.  Unless otherwise agreed to by the Debtors, the Committee, the Requisite Unsecured Lenders, and the Ad Hoc Group of Unsecured Noteholders, the form of order approving such substantial contribution motion for the Brigade Advisors and the Ad Hoc Crossover TL Lender Group Advisors shall require a 20% holdback of all fees and expenses payable pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code pending the final allowance of all Professional Fee Claims, subject to agreement by the Debtors, the Committee, the Requisite Unsecured Lenders, and the Ad Hoc Group of Unsecured Noteholders to release such funds earlier.  Such parties will seek approval of such motions prior to Confirmation of the Plan.  If such motions are not approved, pursuant to the Plan and sections 1123(a)(6) and 363(b) of the Bankruptcy Code, the Debtors will seek to pay in full in Cash on the Effective Date all Restructuring Expenses, incurred up to (and including) the Effective Date and the U.S. Trustee reserves its rights to object to such payment; *provided* that each party and its counsel shall provide the Debtors, the Reorganized Debtors, and the Committee with summary invoices (redacted for any potentially privileged material) for which it seeks payment.  Notwithstanding the foregoing sentence, if the substantial contribution motions are approved by the Bankruptcy Court, the foregoing sentence shall be moot and of no further force or effect with respect to the Plan other than that the Debtors will pay in full in Cash on the Effective Date all Allowed Administrative Claims in accordance with the terms of the orders approving such motions.  For the avoidance of doubt, any amounts due under the DIP Order that are Restructuring Expenses or otherwise due under the DIP Order shall be paid in full in Cash on the Effective Date.

The Debtors and after the Effective Date the Reorganized Debtors shall continue to pay, reimburse, and honor the Contingent DIP Term Loan Obligations, the Contingent DIP ABL Obligations, and the Contingent Secured Term Loan Obligations. Counsel to each of the DIP Agents, the DIP Term Loan Lenders, the Secured Term Loan Agent, and the Secured Term Loan Lenders shall be authorized to disburse any and all retainer monies in its possession to reimburse the reasonable fees and expenses of such counsel.

E.    *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except that the Committee will stay in existence solely for the following limited ~~purpose of (i) Filing~~purposes and ~~prosecuting~~shall be paid as set forth as follows:  (i) for purposes pursuant to which it will receive payment for its fees and expenses from the Reorganized Debtors, it may (a) File and prosecute final fee applications, ~~(ii) participating~~b) participate in any adversary proceeding commenced on or before the Effective Date in which the Committee (or any member thereof solely in their capacity as such) is named as a defendant, including any appeals thereof, ~~(iii) complying with its obligations pursuant to an agreement to be entered into on the Effective Date between the Committee and the Non-Released Party Trust governing the transfer of certain documents, information, and privileges from the Committee to the Non-Released Party Trust (which document must include a set time by which such transfer must be complete and which shall be subject to the reasonable acceptance by the Debtors), *provided, however,* that such fees shall not include any time spent investigating the Non-Released Party Trust Causes of Action, and (iv~~and (c) on and after the Effective Date, the Committee (with the assistance of its attorneys) will monitor the distributions to Classes 5B, 5C, 5D, 5E, 5F, 5G, 5H, and 5I for a period of one year, *provided* that such monitoring will be limited to (1) assurance that the Cash-Out Option is effectuated pursuant to the Plan and (2) the receipt of a schedule of distributions 14 days in advance of each Quarterly Distribution Date identifying which distributions will be made on such Quarterly Distribution Date and resolving, in good faith, any questions the Committee may have with respect to such schedule and distribution.~~ (with all such monitoring described in sections (1) and (2) of subsection

(c) subject to a maximum amount of $30,000 in documented fees and expenses), and (ii) for purposes pursuant to which it will receive payment for its fees and expenses from the Non-Released Party Trust, it may comply with its obligations pursuant to the Non-Released Party Trust Transfer Agreement, *provided*, *however*, that such fees shall not include any time spent investigating the Non-Released Party Trust Causes of Action. Except as set forth in the prior sentence, the Debtors, the Estates, ~~and~~ the Reorganized Debtors, and the Non-Released Party Trust shall not be responsible for paying any fees or expenses incurred by any statutory committees, including counsel and advisors thereto, after the Effective Date.

## F.    Rights of Purchaser Under 363 Sale Order

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the rights of the Purchaser (as defined in the 363 Sale Order) under the 363 Sale Order.

## G.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. Neither the Plan, the Filing of the Plan, any statement or provision contained in the Plan, nor the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests unless and until the Effective Date has occurred.

## H.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## I.    Notices

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by courier or registered or certified mail (return receipt requested), or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

1.    <u>If to the Debtors, to:</u>

Nine West Holdings, Inc.
1411 Broadway
New York, New York 10018
Attn:    Patricia Anne Lind (plind@ninewestholdings.com)

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Christopher J. Marcus (christopher.marcus@kirkland.com)

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:    James A. Stempel (james.stempel@kirkland.com)

KE 58496119

      Joseph M. Graham (joe.graham@kirkland.com)
      Angela M. Snell (angela.snell@kirkland.com)
      Jaimie R. Fedell (jaimie.fedell@kirkland.com)

2.    <u>Counsel to the Consenting Secured Lenders, the Secured Term Loan Agent, and DIP Term Loan Agent</u>

      Davis Polk & Wardwell LLP
      450 Lexington Avenue
      New York, New York 10017
      Attn:   Marshall Huebner (marshall.huebner@davispolk.com)
             Darren S. Klein (darren.klein@davispolk.com)
             Adam L. Shpeen (adam.shpeen@davispolk.com)

3.    <u>Counsel to the Consenting Unsecured Lenders</u>

      King & Spalding LLP
      1185 Avenue of the Americas
      New York, New York 10036
      Attn:   Jeffrey D. Pawlitz (jpawlitz@kslaw.com)
              Michael R. Handler (mhandler@kslaw.com)
              David S. Zubricki (dzubricki@kslaw.com)

      and

      Kramer Levin Naftalis & Frankel LLP
      1177 Avenue of the Americas
      New York, New York 10036
      Attn:   Douglas Mannal (dmannal@kramerlevin.com)
             Rachael Ringer (rringer@kramerlevin.com)

4.    <u>Counsel to the DIP ABL/FILO Agent</u>

      Morgan Lewis & Bockius LLP
      One Federal Street
      Boston, Massachusetts 02110
      Attn:   Julia Frost-Davies (julia.frost-davies@morganlewis.com)
             Amelia C. Joiner (amelia.joiner@morganlewis.com)

      and

      Greenberg Traurig, LLP
      One International Place
      Boston, Massachusetts 02110
      Attn:   Jeffrey M. Wolf (wolfje@gtlaw.com)

5.    <u>Counsel to the Ad Hoc Group of Unsecured Noteholders</u>

      Sidley Austin LLP
      One South Dearborn
      Chicago, Illinois 60603
      Attn:   Matthew A. Clemente (mclemente@sidley.com)
             Dennis M. Twomey (dtwomey@sidley.com)

KE 58496119

5.6. Counsel to the Committee

        Akin Gump Strauss Hauer & Feld LLP
        One Bryant Park
        New York, New York 10036
        Attn:    Daniel H. Golden (dgolden@akingump.com)
                Arik Preis (apreis@akingump.com)
                Jason Rubin (jrubin@akingump.com)

6.7. Counsel to the Sponsor and Belk, Inc.

        Proskauer Rose LLP
        11 Times Square
        New York, New York 10036-8299
        Attn: Michael T. Mervis (mmervis@proskauer.com)

        and

        Proskauer Rose LLP
        70 West Madison Street
        Suite 3800
        Chicago, Illinois 60602
        Attn: Mark K. Thomas (mthomas@proskauer.com)

        and

        Proskauer Rose LLP
        2029 Century Park East
        Suite 2400
        Los Angeles, California 90067-3010
        Attn: Peter J. Young (pyoung@proskauer.com)

7.8. Counsel to the Minority Equity Holders

        Milbank, Tweed, Hadley & McCloy LLP
        1850 K Street NW, Suite 1100
        Washington, DC 20006
        Attn: Andrew M. Leblanc (aleblanc@milbank.com)—

9.    The 2019 Notes Indenture Trustee

        U.S. Bank National Association
        Global Corporate Trust Services
        60 Livingston Avenue, EP-MN-WS1D
        St. Paul, Minnesota 55107
        Attn: Julie Becker (julie.becker@usbank.com)

        with copies (which shall not constitute notice) to:

        White & Case LLP
        1221 Avenue of the Americas
        New York, New York 10020-1095
        Attn:    J. Christopher Shore (cshore@whitecase.com)
                Philip Abelson (philip.abelson@whitecase.com)

        and

KE 58496119

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Attn:     John R. Ashmead (ashmead@sewkis.com)
              Arlene Alves (alves@sewkis.com)

10.  The 2034 Notes Indenture Trustee

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, Delaware 19801
Attn: Patrick J. Healy (phealy@wsfsbank.com)

with copies (which shall not constitute notice) to:

Friedman Kaplan Seiler & Adelman LLP
7 Times Square
New York, New York 10036-6516
Attn:  Robert J. Lack (rlack@fklaw.com)

and

Kilpatrick Townsend & Stockton LLP
1114 Avenue of the Americas
New York, New York 10036
Attn:  David M. Posner (dposner@kilpatricktownsend.com)

After the Effective Date, the Reorganized Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

J.     Entire Agreement

Except as otherwise indicated, on the Effective Date, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which have become merged and integrated into the Plan on the Effective Date.  To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

K.     Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents

KE 58496119

shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Balloting Agent at https://cases.primeclerk.com/ninewest/ or (for a fee) the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

L.      *Non-Severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, with the reasonable consent of each of the Debtors, the Requisite Unsecured Lenders, the Requisite Secured Lenders, the 2019 Notes Indenture Trustee, the 2034 Notes Indenture Trustee, the Ad Hoc Group of Unsecured Noteholders, and the Committee, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  Notwithstanding the foregoing, the release, injunction, exculpation, and compromise provisions of the Plan are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Consenting Term Lenders, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

M.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

N.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

O.      *Closing of Chapter 11 Cases*

Each of the Debtors shall, promptly after the full administration of its Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close its Chapter 11 Case.

*[Remainder of Page Intentionally Left Blank]*

KE 58496119

Respectfully submitted, as of ~~January 20~~February 15, 2019.

Nine West Holdings, Inc. (for itself and all Debtors)

By:      */s/ Ralph Schipani*
Name:   Ralph Schipani
Title:    Interim Chief Executive Officer

**Exhibit A**

**GUC Cash-Out Election Procedures and Form**

KE 58496119

**Exhibit B**

**Advisors and Professionals Covered By Professional Administrative Expenses Definition**

Kirkland & Ellis LLP
Munger, Tolles & Olson LLP
Alvarez & Marsal North America LLC
Berkeley Research Group LLC
Lazard Freres & Co.
BDO USA, LLP
Deloitte Tax LLP
Deloitte Financial Advisory Services LLP
Consensus Advisory Services LLC
Prime & Clerk LLC (solely for fees incurred under section 327(a) of the Bankruptcy Code)
Akin Gump Strauss Hauer & Feld LLP
Kasowitz Benson Torres LLP
Houlihan Lokey Capital, Inc.
Protiviti Inc.
Province Inc.
Davis Polk & Wardwell LLP
Ducera Partners LLC
Morgan, Lewis & Bockius LLP
Greenberg Traurig, LLP
Kramer Levin Naftalis & Frankel LLC
Moelis & Co.
Morris Tbeile
King & Spalding LLP
Guggenheim Securities, LLC
Quinn Emanuel Urquhart & Sullivan LLP
Sullivan & Worcester LLP
Ropes & Gray LLP (as counsel to Morgan Stanley Senior Funding Inc.)